UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In the Matter of One Infant Child,

ABDOLLAH NAGHASH SOURATGAR,

                         Petitioner,

        -against-

LEE JEN FAIR,

                    Respondent.

------------------------------------------------------------x



12 Civ. 7797 (PKC)

MEMORANDUM
AND ORDER

P. KEVIN CASTEL, District Judge:

        Petitioner Abdollah Naghash Souratgar, an Iranian citizen, petitions this Court for the return of his son, Shayan, to Singapore. Shayan, who will soon be four years old, was born in Singapore and has Malaysian citizenship. Shayan's mother, respondent Lee Jen Fair, a Malaysian citizen, left Singapore with Shayan on May 20, 2012 without petitioner's knowledge or consent and in violation of a Singapore court order prohibiting either parent from taking the child out of Singapore. She traveled to the United States where neither petitioner, respondent, nor the child has any meaningful ties or connections. The petition is brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 ("Hague Convention"), and its domestic implementing legislation, the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 et seq. ("ICARA").

        On October 18, 2012, shortly after the father learned that the child and respondent were living in Dutchess County, New York, he filed a petition with this Court. (Docket No. 1.) The Court held ex parte proceedings on October 18, 2012, October 22, 2012, and November 1,

2012. On November 1,[1] after hearing the testimony from the petitioner and his investigators, the Court granted the application for an order directing the U.S. Marshal to take "all necessary and lawful steps" to "remove Shayan" from his mother's custody and deliver him "into the custody of [p]etitioner." (Docket No. 5.)  Petitioner was ordered to surrender his passport and post a $10,000 bond.  (Id.)  On November 7, 2012, both parties appeared with counsel, and the Court scheduled an evidentiary hearing.  The Court appointed Professor Jennifer Baum as a guardian ad litem for Shayan.  (Docket No. 9.)

During the nine-day evidentiary hearing held between December 3, 2012 and December 14, 2012, the Court heard testimony from fact witnesses including: (1) petitioner; (2) respondent; (3) petitioner's counsel in the Singapore civil proceedings, Ms. Winnifred Gomez, Esq.; (4) petitioner's private investigator, Ms. Tamatha Stitt; (5) respondent's mother, Ms. Mei Yoke Chew; and (6) respondent's sister, Ms. Jen Pink Lee.[2]  Mr. Abed Awad provided expert testimony for the petitioner regarding Islamic family law and the Singapore legal system.  Ms. Yasmeen Hassan testified as an expert for the respondent regarding the secular Singapore legal system and Sharia Law in Singapore, Malaysia, and Iran.  Also, Dr. B.J. Cling, a forensic and clinical psychologist, testified on behalf of respondent on the subject of domestic violence.

Based upon the record as a whole and the Court's assessment of the credibility of

---

[1] The Court expresses appreciation to the U.S. Marshal Service, District Executive and staff, Clerk's Office staff, court reporter, and maintenance crew who enabled the Court to conduct a hearing during the Hurricane Sandy closure.

[2] On the first day of the proceeding, respondent's counsel applied, pursuant to Rule 43(a), Fed. R. Civ. P., for leave to have several fact witnesses testify by live video feed.  The Court denied respondent's application.  (12/03/12 Tr. 98-103.)  Respondent asked the Court to reconsider its decision by written application.  Ruling from the bench, the Court again denied the application finding that "good cause in compelling circumstances" had not been demonstrated.  (12/05/12 Tr. 194-205 (citing Rule 43(a), Fed. R. Civ. P.; Matovski v. Matovski, No. 06 Civ. 4259 (PKC), 2007 WL 1575253 (S.D.N.Y. May 31, 2007)).)

the witnesses, this Court finds by a preponderance of the evidence that petitioner has established each required element under the Hague Convention: (1) the child was a habitual resident of Singapore; (2) the child's removal was in breach of petitioner's custody rights; and (3) petitioner was exercising those rights at the time of the child's removal.  The Court further finds that respondent has failed to prove by clear and convincing evidence either of her affirmative defenses (1) that the child will be subjected to a grave risk of harm if he returns to Singapore, Hague Convention, art. 13(b), or (2) that fundamental principles of the United States relating to the protection of human rights and fundamental freedoms do not permit repatriation of the child, id., art. 20.

BACKGROUND

Since 2000, petitioner has been an employment-pass holder in Singapore, where he has worked.  (12/03/12 Tr. 72-73.)  He first traveled to Singapore in 1985 and set up his company there in 1989.  (12/03/12 Tr. 72; 12/05/12 Tr. 132.)[3]  The head office of the business he owns is located in Singapore and has twelve employees.  He also owns a business in Iran.  (12/05/12 Tr. 128-29, 132.)

Respondent has permanent resident status in Singapore.  (12/10/12 Tr. 537.)  In June 2008, respondent stopped working outside of the home.  She previously held the position of brand manager of a jewelry company dealing in precious stones, which had a "few branches of retail stores around Singapore."  (12/11/12 Tr. 601-604.)  Before this, respondent worked for over four years as an assistant marketing manager at Diageo, a high-end alcoholic beverage distributor, and for approximately two years as retail manager for a cosmetic company's five or

---

[3] The Court cites to the hearing transcript and exhibits in the course of this Memorandum and Order.  These citations are not intended in every case to reflect the Court's sole source of support for the proposition.  In many instances, they are merely examples.

six stores. (Id.) Respondent's sister, with whom she resided in the months immediately prior to her departure to the U.S., is a U.K.-trained lawyer who serves as Vice President Regional Counsel of Citibank in Singapore. (12/12/12 Tr. 806.) Both petitioner and respondent are intelligent, sophisticated individuals. Neither is trained in law but both have displayed an ability to navigate legal systems in Singapore, Malaysia, and the United States.

Petitioner and respondent met in 1995 and maintained contact for over a decade. (12/03/12 Tr. 76.) In or around 2006, they began dating in Singapore. Respondent had practiced Christianity since childhood but, during the course of her relationship with the petitioner, converted to Islam. (12/06/12 Tr. 397-400.) In 2007, the couple married, and on January 16, 2008, they registered their marriage in Singapore. (12/06/12 Tr. 403.) Shayan was born on January 29, 2009. (Petr. Ex. C, Annex 1.) As noted, the child has Malaysian citizenship and had resided in Singapore from birth until the respondent removed the child to the United States. (12/04/12 Tr. 39-41.)

There was considerable strife in the marriage, and on April 29, 2011, while the couple still resided together, (12/10/12 Tr. 555-56), respondent filed an application for sole custody, care, and control of the child in the High Court of the Republic of Singapore. (Petr. Ex. C, Tab A.) On May 16, 2011, she obtained an ex parte order from the Subordinate Courts of the Republic of Singapore prohibiting petitioner from removing the child from the jurisdiction of Singapore without respondent's consent or the court's approval. (Petr. Ex. C, Tab B.) Respondent left the marital home with the child on May 25, 2011 and moved into her sister's Singapore apartment. Shortly thereafter, petitioner was served with a copy of the May 16, 2011 order. (12/03/12 Tr. 83-84; 12/10/12 Tr. 554-55.) Petitioner filed a cross-application for sole custody on June 28, 2011. (Petr. Ex. C, Tab C.)

Because petitioner had not seen Shayan in over fifty days, petitioner's counsel in the Singapore civil proceedings advised petitioner that a mediation judge could help facilitate access to the child. The parties' solicitors attended a pretrial conference and requested mediation. (12/03/12 Tr. 17.)  At a mediation session held on July 14, 2011, the Subordinate Court issued an order prohibiting both parties from removing the child from Singapore.  (Petr. Ex. C, Tab D.) The Order also granted petitioner supervised visitation every Saturday between 3 p.m. to 5 p.m. at the Centre for Family Harmony, the costs of which were to be borne equally.  (Id.)

Persons of the Muslim faith are a small minority in Singapore.  By statute, divorce actions between individuals of the Muslim faith must be brought in the Singapore Sharia Courts. Administration of Muslim Law Act, Part III, § 35(2) ("AMLA").  Sometime around the end of 2011, respondent brought an action for divorce in the Singapore Sharia Courts.  (12/04/12 Tr. 24, 58-59; 12/11/12 Tr. 652, 655-56; Petr. Ex. J.)  Respondent attended a mandatory counseling session within the Sharia Court.  (12/11/12 Tr. 670.)  Petitioner testified that he did not participate in the action.  (12/04/12 Tr. 24-25.)  Although no documentary evidence indicates the current status of the Singapore divorce action, petitioner's Singapore counsel testified that the divorce action did not proceed.  (12/03/12 Tr. 43.)

The Singapore Subordinate Court continued to function on issues relating to temporary custody of the child and visitation and on February 16, 2012, after a mediation session presided over by a judge of the Singapore Subordinate Court, the court ordered that "[t]he child shall continue to be in the care of the mother pending the determination of custody, care, and control of the child by the Syariah Courts" and that "[t]he father shall have access to the child two times a week at the Centre for Family Harmony pending the outcome of the hearing of the

Syariah Courts."[4]  (Petr. Ex. C, Tab H.)  The order states in boldfaced capital letters, which are underscored, that it was entered "**BY CONSENT**."  (Id.)  Respondent did not make an application to vacate or appeal this order.  (12/11/12 Tr. 666-67.)

Petitioner last saw respondent and Shayan in Singapore on May 17, 2012.  (12/03/12 Tr. 89.)  On May 20, 2012, the respondent left Singapore in breach of the July 14, 2011 order.  Respondent then failed to produce the child at petitioner's scheduled visit on May 24, 2012 and did not appear at a scheduled court mediation session on May 28, 2012.  (12/04/12 Tr. 26-28.)

Suspecting that respondent had fled, petitioner filed a police report, and the police determined that respondent left Singapore with the child.  (12/04/12 Tr. 27-29.)  Petitioner obtained a court order requiring the respondent to deliver the child to the Duty Judge of the Subordinate Courts Family and Juvenile Division within seven days and surrender the child's personal documents.  This order specified that "[t]he child be placed in the interim sole care and control of" the petitioner "pending the determination of the action or until further Orders."  (Petr. Ex. C, Tab J.)  The same order further directed that respondent be restrained from removing the child from the jurisdiction without the consent of petitioner or the court.  (Id.)  Respondent, who was no longer in the country and likely did not receive notice of the June 5, 2012 order, did not comply and was held in contempt on June 25, 2012.  (Petr. Ex. C, Tab L.)

DISCUSSION

First, the Court will outline the elements of petitioner's prima facie case under the Hague Convention and set forth its finding of facts relating thereto.  Next, it will set forth the

---

[4] Singapore court documents refer to the Sharia Courts as the "Syariah Courts."  For ease, the Court will use "Sharia" for all references to such laws or courts.

6

elements of respondent's affirmative defenses under Articles 13(b) and 20 of the Convention followed by its findings relevant to the affirmative defenses.

1. Petitioner's Case under the Hague Convention

The Hague Convention seeks to "secure the prompt return of children wrongfully removed to or retained in" signatory states. Hague Convention, art. 1; Blondin v. Dubois, 189 F.3d 240, 241 (2d Cir. 1999) ("Blondin II").  The United States has ratified the treaty and implemented its terms through ICARA.  Singapore acceded to the treaty in May 2012.

Under the Hague Convention, a child's removal from a signatory state is wrongful when "[(a)] it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and [(b)] at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  Hague Convention, art. 3.  The treaty applies to children under the age of 16.  Id., art. 4.

A person may exercise his rights under the Convention by filing a petition in a court "authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."  42 U.S.C. § 11603(b).  In order to prevail, petitioner must establish by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention . . . ."  42 U.S.C. § 11603(e).  This requires showing that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention."  Gitter v. Gitter, 396 F.3d 124, 130-31 (2d Cir. 2005).  The Supreme

7

Court held in <u>Abbott v. Abbott</u>, 130 S. Ct. 1983, 1992-93 (2010), that a statutory <u>ne exeat</u> right—the right not to have the child removed from the jurisdiction without consent—is a right of custody for purposes of the Hague Convention. A "person cannot fail to 'exercise' [his] custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." <u>Friedrich v. Friedrich</u>, 78 F.3d 1060, 1066 (6th Cir. 1996).

The Court finds that petitioner has established each and every element of a prima facie case under the Hague Convention. Both the United States and Singapore are signatories to the Convention. The child is under 16 years of age, was born in Singapore and resided there until respondent removed the child to the United States. The child was a habitual resident of Singapore. Petitioner was exercising custody rights at the time of the removal, specifically his parental rights under an express order precluding either parent from removing the child from the jurisdiction of Singapore without the other's consent. (Petr. Ex. C, Tab D.) He also regularly and faithfully exercised his court-ordered visitation rights in Singapore.

2.  Respondent's Affirmative Defenses

"[O]nce [petitioner] establishes that removal was wrongful, the child *must be returned* unless the [respondent] can establish one of four" narrow exceptions apply. <u>Blondin II</u>, 189 F.3d at 245-46 (quoting <u>Friedrich</u>, 78 F.3d at 1067 (emphasis added)). In this case, respondent urges that the Court should deny the petition because two such exceptions apply, Hague Convention Articles 13(b) and 20. The respondent bears the burden of proving these exceptions by clear and convincing evidence. 42 U.S.C. § 11603(e).

a. Article 13(b): The Grave Risk of Harm Defense

Article 13(b) of the Hague Convention provides that the signatory state "is not bound to order the return of the child" if "there is a grave risk that his or her return would expose

the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Although the respondent bears the burden of establishing by clear and convincing evidence that the exception applies, 42 U.S.C. § 11603(e)(2)(A), subsidiary facts may be proven by a preponderance of the evidence. Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002); see also In re Lozano, 809 F. Supp. 2d 197, 224 (S.D.N.Y. 2011).

The Second Circuit considered the "grave risk" exception at length in Blondin II and Blondin v. Dubois, 238 F.3d 153 (2d Cir. 2001) ("Blondin IV"). The court explained that mere showings of "inconvenience or hardship" do not amount to a "grave risk" of harm. Blondin IV, 238 F.3d at 162. Rather a "grave risk" of harm exists where "the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation." Id. The court cited with approval the Sixth Circuit's observation that a "grave risk" to the child presents itself in two situations:

> (1) where returning the child means sending him to 'a zone of war, famine or disease'; or (2) 'in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, *for whatever reason*, may be incapable or unwilling to give the child adequate protection.'

Id. (quoting Friedrich, 78 F.3d at 1069 (emphasis added)).

In the years since the Second Circuit's consideration of the Blondin case, several federal courts have found "a child's observation of spousal abuse is relevant to the grave-risk inquiry." E.g., Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 408 (E.D.N.Y. 2005). Indeed, "children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser." Id. (citing Tsarbopoulos v. Tsarbopoulos, 176 F. Supp. 2d 1045, 1058 (E.D. Wash. 2001) (citations omitted)). Accordingly, evidence of "[p]rior spousal abuse,

9

though not directed at the child, can support the grave risk of harm defense." Rial v. Rijo, 10

Civ. 1578 (RJH), 2010 WL 1643995, at *2 (S.D.N.Y. Apr. 23, 2010) (citing Walsh v. Walsh,

221 F.3d 204 (1st Cir. 2000)).  Still, the court need not "refuse to send a child back to [his] home

country in *any* case involving allegations of abuse, on the theory that a return to the home

country poses a grave risk of psychological harm." Blondin IV, 238 F.3d at 163 n.12.  Rather,

that determination must be based on the "specific facts presented in [the] case." Id.

> When making a grave risk determination, the court must also consider whether
the child can be protected from the risk of harm "while still honoring the important treaty
commitment to allow custodial determinations to be made—if at all possible—by the court of the
child's home country." Blondin II, 189 F.3d at 248.  Accordingly, in its deliberation of whether
there is a grave risk of harm, the Court takes into account "any ameliorative measures (by the
parents and by the authorities of the state having jurisdiction over the question of custody) that
can reduce whatever risk might otherwise be associated with a child's repatriation." Id.  "In
cases of serious abuse, before a [district] court may deny repatriation on the ground that a grave
risk of harm exists under Article 13(b), it must examine the full range of options that might make
possible the safe return of a child to the home country." Blondin IV, 238 F.3d at 163 n.11.

> For instance, in Blondin v. Dubois, 19 F. Supp. 2d 123, 129 (S.D.N.Y. 1998)
("Blondin I"), the district court concluded that there would be a grave risk of harm should the
children in that case be returned to France, the country of their habitual residence.  The Second
Circuit, in Blondin II, remanded the case to the district court for "further consideration of the
range of remedies that might allow *both* the return of the children to their home country *and* their
protection from harm, pending a custody award in due course . . . ." 189 F.3d at 249.  On
remand, the district court engaged in further analysis but reached the same conclusion, in part

because "any return" of the children would "'almost certainly' trigger a recurrence of their traumatic stress disorder." Blondin v. Dubois, 78 F. Supp. 2d 283, 295 (S.D.N.Y. 2000) ("Blondin III"). On appeal, the Second Circuit affirmed the district court's determination that there was a grave risk of harm to the children because repatriation to the country of habitual residence created a real risk of triggering further psychological trauma, regardless of any potential mitigating arrangements. Blondin IV, 238 F.3d at 161.

In applying the standard set out in the Blondin cases, district courts in this Circuit have denied petitions to return the child where there has been evidence supporting a finding of a real risk of psychological or physical harm to the child. See, e.g., Elyashiv, 353 F. Supp. 2d at 408-09 (evidence petitioner physically abused respondent and the children and expert testimony that the children would suffer PTSD symptoms upon their return to Israel, regardless of contact with petitioner); Reyes Olguin v. Cruz Santana, No. 03 Civ. 6299, 2005 WL 67094, at *2-*4, *11-*12 (E.D.N.Y. Jan. 13, 2005) (evidence petitioner frequently beat respondent in front of the children, children told psychiatrist that petitioner hit them, and expert testimony that return of the children would exacerbate the PTSD of one child). This Court held in M.M. v. F.R., No. 11 Civ. 2355 (PKC) (S.D.N.Y. June 30, 2011), that respondent had established that repatriating the child would expose him to a grave risk of physical or psychological harm, because, among other things, the petitioner had sexually abused the child's half-sister. But, credible evidence of some level of abuse by the petitioner does not necessarily equate to establishment of the grave risk to the child in repatriation. See, e.g., Rial, 2010 WL 1643995, at *2-*3 (evidence of verbal and physical abuse toward respondent, at times in front of child); Laguna v. Avila, No. 07 Civ. 5136, 2008 WL 1986253, at *8-*9 (E.D.N.Y. May 7, 2008) (evidence of violence toward respondent, but no evidence that petitioner physically abused the child).

11

The focus of the inquiry is not on the relationship between the two parents or the desirability of one parent having custody. Rather, the focus should be on whether returning the child to the country from which he was removed will present a real risk of harm to the child, because, for example, it will trigger trauma to the child or the country of habitual residence lacks the means to afford reasonable protection to the child from physical or psychological harm at the hands of a parent or third-party.

i. Domestic Violence

The Court finds that both parties have deep love for Shayan and care greatly about his wellbeing. Likewise, the guardian ad litem noted in her December 3, 2012 letter to the Court that petitioner "clearly adores his child" and respondent "is devoted to [the child]."[5] (Docket No. 33.) Respondent testified that she never saw petitioner physically abuse the child. Moreover, she never reported to the police any incident where petitioner abused the child. She never claimed in the Singapore courts that petitioner abused the child. (12/11/12 Tr. 699-700.)

Petitioner and respondent both allege instances of domestic abuse and inappropriate conduct aimed at one another. For instance, petitioner testified that respondent (1) often wielded knives in the home to threaten petitioner (12/04/12 Tr. 102-06); (2) cleared out the marital home when she left on May 25, 2011 (Resp. Ex. 3); and (3) inflicted injuries on herself and threatened suicide. (12/04/12 Tr. 79-80, 98-101.) The respondent denies each of these allegations. (12/10/12 Tr. 500 (knives); 12/10/12 Tr. 556 (furniture); 12/10/12 Tr. 500 (self-inflicted harm).) Respondent alleges that petitioner repeatedly hit, beat, kicked, and sexually

---

[5] The Court expresses its gratitude to the fine service of the guardian ad litem. While the guardian ad litem's views regarding visits and access are most appreciated, the guardian's views on ultimate issues, such as the risk that petitioner would take the child to Iran, which are principally based on the credibility of the parties, are not entitled to significant weight.

abused her, offering several police reports and medical examinations. The petitioner, in turn, denies these allegations.

Based upon an assessment of credibility and available corroboration or lack thereof, the Court finds that both parties have exaggerated their claims. The Court recognizes that victims of spousal abuse often do not come forward to report instances of domestic violence for many reasons and, therefore, a lack of near-contemporaneous documentation does not necessarily render a victim's claims unbelievable. In this particular case, however, the respondent did report instances of domestic abuse to the police or to the court. But these police and medical reports do not identify the most severe acts of violence claimed before this Court.

Respondent asserts, for example, that petitioner hit and kicked her on her head and body while calling her mother on the telephone on May 31, 2008, after respondent found out she was pregnant. (12/10/12 Tr. 441-46.) The respondent filed a police report, (12/10/12 Tr. 447), which detailed that petitioner slapped her several times on her face and kicked her on her legs. (Resp. Ex. 7.) The next morning, a medical doctor examined respondent and reported that she "presented with nail marks on her right & left cheeks & bruises on the outer aspect of her right thigh." (Resp. Ex. 8.) The Court credits respondent's testimony on this point, which is generally consistent with the description in the police report. But, respondent's mother testified that during the May 31, 2008 phone call her daughter stated that petitioner was kicking her in the stomach. (12/6/12 Tr. 346.) The Court does not find this testimony credible for several reasons. When petitioner's counsel asked respondent whether she told her mother that petitioner kicked her in the stomach, respondent testified that she did not remember. (12/11/12 Tr. 706.) Respondent's May 31, 2008 police report makes no mention of kicks to the stomach. (Resp. Ex. 7.) Furthermore, the mother's testimony is not credible in other respects. She affirmed that there

was no "shadow of a doubt" in her mind that on November 12, 2012 she saw petitioner, without the child, at John F. Kennedy Airport at a Turkish Airways gate, which is beyond the security clearance checkpoint, during the pendency of this case and after the U.S. Marshal had returned the child to petitioner. (12/06/12 Tr. 381-83.) Having heard petitioner's testimony that he was with his son on November 12, 2012, the Court concludes that Ms. Chew's testimony was a fabrication. On November 1, 2012, this Court ordered that petitioner surrender his passport to the U.S. Marshal and "never leave the boundaries of the Southern and Eastern Districts of New York" during this proceeding. The Court also ordered that the U.S. Marshal "notify the US Customs that Petitioner and [the child] should not be allowed to leave the United States until further order of this Court." (Docket No. 5.) Thus, the Court finds that the May 31, 2008 incident, pre-dating the birth of Shayan, was physical abuse of respondent but did not involve kicking a pregnant woman in the stomach.

Respondent also testified regarding two acts of violence occurring in the presence of the child in 2009, but she did not report either incident. (12/10/12 Tr. 494.) She stated that in March 2009, petitioner struck her multiple times on her right shoulder while the child was breastfeeding in her arms. (12/10/12 Tr. 486-89.) She also testified that around the end of 2009 or beginning of 2010, petitioner insisted during an argument that respondent leave the marital home. When she refused, the petitioner took the child out of her arms and started to beat her on the head and back. (12/10/12 Tr. 492-93.) The Court credits respondent's testimony insofar as it establishes some form of inappropriate physical contact but concludes that the child was never in physical danger.

Respondent testified that on January 5, 2010, after petitioner threatened her, she left the house with the child in her arms and ran to a neighbor's house. She testified that

14

petitioner pulled her into the marital home, in which he "continued to beat [her]." (12/10/12 Tr. 528-29.)  Respondent lodged a police report the next day stating that the petitioner "ransacked the whole wardrobe to find [the child's] passport and birth certificate," and "out of fear" she carried the child out of the house.  Respondent further reported that "[petitioner] managed to stop [her] along the street and there was a scuffle" during which she "sustained scratches and redness on [her] arms where he had grabbed [her]."  (Resp. Ex. 9.)  She noted, "[t]his was not the first time her husband had hit [her]."  (Id.)  Respondent's medical report of January 6, 2010 indicates a bruise in the shape of finger marks on her right upper-arm.  (Resp. Ex. 10.)  The Court finds it credible that petitioner did engage in the abuse described in the January 6 police report but that respondent's testimony at the hearing concerning beating was exaggerated and not credible.

When the respondent and child left the marital home on May 25, 2011, petitioner filed a police report, stating that his family, maid, clothes, and furniture were gone.  Petitioner's report asserted that respondent attempted suicide twice and had tried to attack him with a knife and chopper a few times.  (Resp. Ex. 3.)  The report also stated that the respondent had nearly dislocated the child's arm.  (Id.)  The police called respondent and insisted that she bring the child to the station.  There, an officer examined the child, (12/10/12 Tr. 558-60), and respondent made a police report stating that she voluntarily left the marital home on May 25, 2011 "in fear that [her] husband [would] turn violent against [her]" when the order she obtained was served on him.  (Resp. Ex. 11.)  The Court finds petitioner's account to be exaggerated and not credible.

In 2011, respondent also filed two applications to obtain Personal Protection Orders ("PPO") protecting her against abuse by petitioner.  Petitioner's Singapore counsel explained that in order to obtain a PPO, a victim must make a police report and get a medical report.  Then, the victim will "appear before a magistrate to swear to the complaint."  If the

15

victim "convinces the judge" that she is "in imminent danger of violence being committed . . . the court will issue an expedited order on an ex-parte basis." (12/03/12 Tr. 21-22.) "Thereafter, a return date will be given for summons to be served" on the alleged aggressor. If the complaint is disputed, a counseling session is usually held and if the parties still do not agree, the matter proceeds to trial. (12/03/12 Tr. 22.) During this proceeding, the Singapore court may not consider evidence of accusations made in prior applications, which have been withdrawn. (12/03/12 Tr. 55-57.)

The respondent filed her first PPO application on August 16, 2011. The parties dispute the events leading up to the application. The police report respondent filed on August 15, 2011 explains that she met her husband at his office in order to pick up several packages belonging to her. After he placed the parcels in her car, "[petitioner] sat in the front passenger" seat while petitioner's brother "started to record [their] actions and conversations with his camera phone." (Resp. Ex. 16.) The report also stated that:

> My husband had requested for me to accept a number of Malaysia
> Court documents which I refused. My husband then grabbed my
> handphone and car keys to refrain me from leaving. As such I
> tried to retrieve back my handphone and car keys from him. A
> struggle then ensued. During the struggle my husband pulled my
> hands and also pushed me. I suffered some bruises and scratches
> on my chest and my hands.

(Id.) Respondent was issued an expedited order of protection on an ex parte basis. (Petr. Ex. M-1.) Petitioner received a summons, (Petr. Ex. C, Tab E), and both parties appeared in court on August 25, 2011. Ms. Gomez represented petitioner; respondent represented herself.[6] (12/11/12

---

[6] In both of the proceedings to obtain a PPO, respondent was not represented by counsel, which she testified was because of the expense. However, Mr. Ahmad Nizam Abbas of the Straits Law Practice, LLC, represented the respondent in the Singapore custody and divorce proceedings. (12/11/12 Tr. 652-53.) The respondent also retained counsel for the proceedings petitioner brought in a Malaysian Sharia Court. (12/11/12 Tr. 653.)

Tr. 620-21.)  While petitioner indicated that he wished to proceed to trial, respondent obtained leave to withdraw her application.  (12/05/12 Tr. 192-193; Petr. Ex. C, Tab F.)

In December 2011, respondent applied for a second PPO based on the events of November 22, 2011.  In her November 22, 2011 police report, respondent explained that after a visitation session at the Centre for Family Harmony, her husband left the Centre before her because he insisted that he had an urgent meeting (usually respondent left first, and her husband left approximately ten minutes later).  Respondent reported that while driving with her son and maid, petitioner "tried to stop [her] by overtaking [her] vehicle" several times "in a reckless and dangerous manner."  (Resp. Ex. 18.)   Respondent obtained a second expedited order on December 1, 2011.  (Petr. Ex. M-2.)  Petitioner again disputed respondent's allegations and this time the matter proceeded to trial.   Ms. Gomez represented the petitioner and respondent represented herself at the two-day proceeding.   Respondent called no witnesses other than herself.  (12/11/12 Tr. 644, 646-50.)  On March 12, 2012, the judge dismissed respondent's application for lack of evidence and awarded costs to petitioner.  (12/11/12 Tr. 651; Petr. Ex. C, Tab G.)  The expedited protective order lost effect once the case was dismissed.  (12/03/12 Tr. 26.)

Respondent urges that the foregoing events punctuated an otherwise sustained pattern of coercion and control by petitioner. Respondent testified that after the marriage was registered, petitioner became more controlling, for instance, making respondent ask permission to go out and discouraging her friendships.  (12/06/12 Tr. 422, 428-29.)  Respondent testified that petitioner frequently criticized respondent and called her derogatory names. (12/10/12 Tr. 485, 501.)  Respondent asserted that at times petitioner shouted at Shayan as well.

Respondent also testified that petitioner forced her to engage in certain sexual

17

acts, including anal and oral intercourse, which often occurred in the marital bedroom where the child slept. (12/10/12 Tr. 511-15.)  The Court does not credit respondent's testimony because respondent's SMS text messages to petitioner contradict her account and indicate that she was a willing participant. (Petr. Ex. I 1-4.)

Dr. B.J. Cling, retained by respondent, testified as an expert on domestic violence matters.  She is a clinical and forensic psychologist as well as an attorney.  Over the course of her career, Dr. Cling has completed two judicial clerkships, worked as an associate at three large corporate law firms in New York City, performed private forensic work, and written numerous publications in the area of forensic psychology. (12/13/12 Tr. 952-53; see also Resp. Ex. 34.) While Dr. Kling is principally a forensic psychologist, she spends a portion of her time in clinical practice, and about 20 percent of that practice involves treating patients who have suffered domestic violence.  (12/13/12 Tr. 955.)  Dr. Cling opined that respondent suffered from symptoms of post-traumatic stress disorder ("PTSD") and depression. (12/13/12 Tr. 1019.)  Dr. Cling testified about a specific type of domestic violence termed "coercive control" or "intimate terrorism," (12/13/12 Tr. 974-75), which "has as its main focus the domination and control of the victim." (12/13/12 Tr. 981.)  This type of violence is severe, frequent, and very harmful to children.  (Id.)  Moreover, when the victim and perpetrator separate, the characteristics of "coercive control" often escalate. (12/13/12 Tr. 989.)  Here, however, the evidence does not support any conclusion that petitioner is an obsessed or jilted lover who seeks to be reunited with respondent or prevent others from being with her.

During her evaluation of respondent, Dr. Cling employed a "danger assessment tool" and determined that petitioner posed an "extreme danger" to respondent. (12/13/12 Tr. 994-95, 999.)  The tool requires an assessor to ask the victim yes-or-no questions, accept the

18

victim's answers as true, and score the questions based on the specific point values the tool assigns. (12/13/12 Tr. 997, 1005.) The factors Dr. Cling checked during her evaluation of respondent included, for example, that petitioner (1) owned a gun (which was assigned four times the weight of other factors); (2) engaged in violence toward the victim during pregnancy; (3) followed or spied on the victim; (4) threatened to kill the victim; (5) engaged in forced sex with the victim; (6) attempted to choke the victim; and that (7) the victim believed that the perpetrator had the potential to kill her. (12/13/12 Tr. 1003-07.) The Court finds that this "danger assessment tool" is a crude but useful checklist for those who may come in contact with victims of domestic violence; its predictive power in this case, however, is of minimal value. Dr. Cling did not conduct an examination of petitioner or of the child. There was no credible evidence in the proceeding that petitioner owned a gun, although respondent's sister asserted that he knew how to use a gun. (12/12/12 Tr. 816.) All other factors were based upon self-reporting by respondent or her family members.

With regard to the claim that petitioner restricted respondent's access to others, the Court finds the claim not to be credible. While the parties cohabited, respondent travelled at least twice to Malaysia to visit her mother with Shayan and petitioner. (12/06/12 Tr. 367-68.) Also, in the last four months of cohabitation, respondent's sister lived with respondent and Shayan while she found housing in Singapore. (12/12/12 Tr. 808.) Further, the couple had a maid in their home throughout the period of cohabitation.

Despite the wide latitude afforded the parties at the nine-day hearing, there is no credible evidence that petitioner physically abused the child. Indeed, respondent never saw petitioner physically harm the child. (12/11/12 Tr. 699-700.) None of the police reports filed by respondent on May 31, 2008 (Resp. Ex. 7), January 6, 2010 (Resp. Ex. 9), May 25, 2011 (Resp.

19

Ex. 11), August 15, 2011 (Resp. Ex. 16), and November 22, 2011 (Resp. Ex. 18), includes allegations of physical violence toward the child. The guardian ad litem's letter of December 3, 2012 states that the child "reported never being physically disciplined . . . ." (Docket No. 33.)

Respondent urges that the return of the child poses a grave risk of harm because he will bear witness to petitioner's abuse of respondent. The Court finds that petitioner engaged in abusive conduct toward the respondent. This included shouting and offensive name-calling. It also included several incidents of physical abuse where the petitioner kicked, slapped, grabbed, and hit the respondent, which were near-contemporaneously reported by her to the police. The Court finds that the child was in respondent's arms when petitioner grabbed her during the January 5, 2010 incident, (Resp. Ex. 9), and that the child was in respondent's vehicle on November 22, 2011. (Resp. Ex. 18.) However, there is no credible evidence that petitioner and respondent will ever cohabit again. And, unlike in the Blondin case, there is no credible evidence that the return of this soon-to-be four-year-old child to Singapore would itself trigger a grave risk of psychological harm. There is no credible evidence, as in Blondin III, that the child himself suffers from PTSD or will have a negative reaction to being repatriated to Singapore.

Furthermore, the Court finds that Singapore is well-equipped to mitigate any risk of harm to the child pending a final custody determination. During the pendency of the Singapore custody proceedings, the Singapore Subordinate Courts acted with sensitivity to the case and needs of the parties. Indeed, when respondent alleged petitioner was violent and planned to leave the country with the child, the Singapore civil courts granted temporary physical custody, care and control to respondent and weekly supervised visitation to petitioner.

The visits took place on over thirty occasions at the Centre for Family Harmony. The Centre for Family Harmony provides a location for child visitation for "couples who are

20

having custody issues . . . while awaiting the outcome of the trial." Respondent usually observed "at least three or four" employees of the Centre for Family Harmony present during supervised visits. (12/10/12 Tr. 573-74.) Petitioner's access to the child was confined to a room where counselors observed the visits or they were video recorded. (12/03/12 Tr. 30.) "[The counselors] would speak to the parties and they would submit a report to the Family Court." (Id.) The Centre for Family Harmony kept detailed records summarizing petitioner's scheduled visits with the child. (Petr. Ex. HH.) The Centre also facilitated the parents' drop-offs and pick-ups of the child. (Id.)

Additionally, each time respondent applied for a PPO, she obtained an ex parte expedited order of protection. (Petr. Ex. M-1, M-2.) Respondent chose to dismiss her first application and not call witnesses at the trial regarding the second application. While respondent asserts she could not afford representation for the PPO proceedings, she had retained counsel for the Singapore custody, Singapore divorce and Malaysian custody proceedings.

Finally, when the petitioner made allegations of harm to the child in his May 25, 2011 police report, the police station called respondent and asked her to come to the station. At the station, the child was physically examined. Based on the credible evidence before the Court, Singapore has adequate protections in place to prevent harm to the child pending a final custody determination if respondent avails herself of them.

ii. Citizenship and Immigration Status

As noted, petitioner has an employment-pass, which allows him to reside in Singapore. He has significant ties to Singapore but also has significant ties to Iran. Petitioner's parents reside in Iran in a home owned by petitioner. Petitioner's business in Iran has seven employees. (12/05/12 Tr. 129-132.)

Respondent testified that petitioner took steps to move the child to Iran and have respondent's Malaysian citizenship revoked, which, she contends, poses a grave risk of harm to the child because the permanent resident statuses of mother and child in Singapore are contingent upon Malaysian citizenship. Malaysia prohibits citizens from holding dual-citizenship and "will revoke" the Malaysian citizenship "if the citizen is found out to have two" citizenships. (12/10/12 Tr. 522; see also 12/11/12 Tr. 681; Resp. Ex. 22.) Documentary evidence shows that actions were taken in order for respondent to obtain Iranian citizenship and travel documents. However, respondent and petitioner dispute whether respondent knew of or consented to these actions. (12/04/12 Tr. 21-23; 12/10/12 Tr. 540.)

Respondent testified that in 2009 petitioner said he "was always wanting to bring Shayan to Iran." (12/10/12 Tr. 522.) Likewise, around the middle of 2010, petitioner told her that he wanted to "relocate back to Iran" with the respondent and child and enroll the child in an Iranian military school. (12/10/12 Tr. 505.)

In March 2009, petitioner told respondent that he "wanted to apply for multiple entry visas to Malaysia" and register their marriage as well as Shayan's birth with the Iranian Consulate in Malaysia.[7] (12/10/12 Tr. 517-18.) To prepare for the visit to the Consulate, respondent obtained passport-size photos of herself as well as of the child. Respondent claims petitioner told her the photos would be submitted with the marriage registration forms. (12/10/12 Tr. 518.) At the Iranian Consulate in Malaysia, respondent signed a form and provided her thumbprint. She testified that it was her understanding that she was taking steps to "register [the] marriage and to register [the child's birth]." (12/10/12 Tr. 519-20.) The couple returned to the Iranian Consulate two weeks after their first visit. Respondent testified that on

---

[7] There is no Iranian Consulate in Singapore. (12/10/12 Tr. 518.)

this occasion she saw a passport with a photograph of the child inside and became "worried because this was not what [petitioner] told [her]" they were doing.  (12/10/12 Tr. 520.)

During the course of the marriage petitioner kept the personal documents of the respondent and child in his office safe.  (12/10/12 Tr. 482.)  At the end of 2009, respondent asked petitioner for the child's birth certificate and Malaysian passport in order to register him for a nursery play group.  (12/10/12 Tr. 525-26.)  She instead gave these documents to a friend for safekeeping, until petitioner asked for the child's documents back in January 2010.  (12/10/12 Tr. 526-27.)  Respondent testified that in early January 2010 petitioner said "if he can't get hold of the documents tonight, he will kill me."  (12/10/12 Tr. 527.)  Petitioner managed to leave the home and run toward a neighbor for help, but petitioner caught up to her and told the neighbor not to interfere.[8]  (12/10/12 Tr. 528.)  The next day respondent collected the documents and provided them to petitioner.  (12/10/12 Tr. 536.)

Respondent testified that petitioner indicated "he want[ed] to go back to Iran to manage the Iran business."  (12/10/12 Tr. 539.)  The respondent's sister, Ms. Jen Pink Lee, who lived with the parties in their home between January and May 2011, testified that around March or April 2011 petitioner told her he "wanted to get divorced" and "take Shayan away to Iran because he doesn't want my sister to bring Shayan up."  (12/12/12 Tr. 820-22.)  Ms. Jen Pink Lee then began to look for her own apartment so that the respondent could move in with her.  (12/12/12 Tr. 823-24.)

After respondent left the marital home in May 2011, respondent did not allow petitioner to visit with Shayan because she was "afraid" that petitioner would "take Shayan to

---

[8] This incident corresponds to the events described in the January 6, 2010 police and medical reports.  (Resp. Ex. 9; Resp. Ex. 10.)

Iran, because he was threatening to do that." (12/10/12 Tr. 564.)  Respondent alleges that in mid-June 2011, petitioner called respondent and told her that he had obtained an Iranian passport for her and that "he was going to the Malaysian [Embassy] in Singapore" to report respondent.[9] (12/10/12 Tr. 563.) She went to the Malaysian Embassy in Singapore to explain what had happened because she feared her Malaysian citizenship would be revoked.  (12/10/12 Tr. 565.) On July 1, 2011, Mr. Ahmad Nizam Abbas, respondent's attorney, wrote to the Malaysian National Registration Department Headquarters asking the Department to confirm whether there was information received regarding the respondent and Shayan's passports.  Respondent's lawyer's letter stated that petitioner "had taken out Iranian passport for her and their child" and that petitioner had "made a complaint to the authorities of Malaysia High Commission in Singapore for action to be taken against her from this . . . ." (Resp. Ex. 15.)  The parties' attorneys in the Singapore custody proceedings exchanged several communications regarding the issuance of Iranian passports for respondent and the child. (E.g., Resp. Ex. 12; Petr. Ex. X.)

In March 2012, a letter regarding respondent's Malaysian citizenship, addressed to respondent at her mother's address in Kuala Lumpur, required respondent to "attend to this matter in the time limit of **20 days**" and warned that "failure to attend in the required time limit is an **offence** . . . and **your identification card will be blacklisted**." (Resp. Ex. 21 (emphases in original).)  Respondent testified that she responded by giving a statement and submitting the required documents.  (12/11/12 Tr. 674-77.)  In a letter dated June 18, 2012, the Malaysian National Registration Department informed respondent that it had received a complaint that she held a passport released by the Iranian Embassy in Kuala Lumpur on June 3, 2011.  The

---

[9] A letter from the Iranian Consulate in Malaysia to the Malaysian Ministry of Home Affairs National Registration Department, dated September 28, 2011, indicates that respondent applied for an Iranian national card on June 21, 2011 and an Iranian passport on February 6, 2011.  (Resp. Ex. 6.)  The passport issued on June 3, 2011. (Id.)

Department, therefore, requested that respondent contact the Department "so that immediate investigation [could] take place before any action of revocation of citizenship takes place." (Resp. Ex. 22.)

Respondent urges that the child will face a grave risk of harm if the petition is granted because petitioner intends to take the child to Iran. Respondent argues that petitioner obtained Iranian passports for her and the child without her knowledge or consent, as part of petitioner's scheme to strip respondent of her Malaysian citizenship, jeopardize her permanent residency status in Singapore, and force the family to reside in Iran. In Iran, respondent would be unable to protect the child from a grave risk of harm, and might even be deprived of seeing the child again, which, she urges, would itself qualify as a grave risk of harm.

The Singapore civil courts have already afforded respondent ample opportunity during the course of the custody proceedings to prove these allegations of a plot to strip her of Malaysian citizenship and force her to live in Iran. In this proceeding, respondent has not proven that such a plot exists or, if it does, that it will likely come to fruition.[10] First, respondent's

---

[10] Respondent also argues that the laws of a third foreign jurisdiction, Malaysia, pose a grave risk of harm to the child. In June 2011 petitioner traveled to Malaysia to look for his wife and child. A letter written by respondent's Singapore counsel in July 2011 indicates respondent made a trip to Malaysia to attend to requests of the Malaysian High Commission regarding her citizenship. (Resp. Ex. 12.) When petitioner discovered the respondent and child were staying in Malaysia at the home of respondent's mother, he filed a custody application with a Malaysian Sharia Court on an ex parte basis. (Resp. Ex. 37; Resp. Ex. 38.) A Malaysian court order divided custody between the parents. Respondent then challenged the Malaysian court's jurisdiction over the matter and the court agreed. The action was dismissed. The parties and the child returned to Singapore. (12/03/12 Tr. 83-90; 12/05/12 Tr. 153-55.) Petitioner appealed the Malaysian Sharia Court's decision, but testified in this Court that he later ordered his Malaysian counsel to terminate the appeal. (12/05/12 Tr. 153-155, 192.)

Certain filings with the Malaysian Sharia Court in this action detailed that respondent, a Muslim, was practicing Christianity. (Resp. Ex. 37; Resp. Ex. 38.) Ms. Hassan testified that under most schools of Islamic thought, a Muslim does not have the right to renounce Islam and that in Malaysia apostasy is a crime punishable by death. (12/13/12 Tr. 910.) Losing a parent would invariably qualify as a grave risk of harm. However, respondent has not proven that such risk of harm exists in this case.

credibility regarding these accusations was undermined at trial.  Respondent claimed that she could not confirm her suspicions that an Iranian passport had been issued to her until this proceeding, when she first saw a photocopy of an Iranian passport.  But, the letter of her Singapore attorney, who is her agent, insisted back on July 20, 2011 that respondent "ha[d] seen the Iranian passport of herself and her son . . . ."  (Resp. Ex. 12.)  In a December 2011 letter regarding Shayan's Iranian passport, respondent's attorney again maintained that "[respondent] had obtained her own Iranian passport through [petitioner's] efforts and [was] thus speaking from experience."  (Petr. Ex. AA.)  Second, respondent did not establish that it is more likely than not her Malaysian citizenship would be revoked.  In fact, a letter dated June 18, 2012 from the Malaysian authorities still asked respondent to "contact" the Malaysian authorities "so that immediate investigation can take place before any action of revocation of citizenship takes place."  (Resp. Ex. 22.)  There is no evidence that Malaysian authorities would be unsympathetic to or unable to act on a claim, if true, that she had involuntarily become an Iranian citizen.  Third, respondent did not offer credible evidence establishing that, if her Malaysian citizenship were revoked, she and the child could no longer reside in Singapore.  Petitioner's counsel elicited on cross-examination that respondent had not looked at the Singapore government's website regarding permanent residency status requirements in "many years." (12/11/12 Tr. 701-02.)  When the Court then asked respondent if she had "done any investigation or checking or inquiry or looking at websites to determine the grounds on which [she] would be able to reapply" for permanent residency status, the respondent replied that she had not.  (12/11/12 Tr. 703.)

Although the Court credits that, at some point in time, petitioner would like to take the child to Iran where his mother lives, the Court finds that respondent has failed to demonstrate that petitioner is likely to do so in violation of a Singapore court order.  The Court

in Singapore could place tight conditions on out-of-country travel and ensure the mother's rights

of access to the child. It also could deny petitioner's request outright. The July 14, 2011 court

order prohibiting both parties from taking the child out of the jurisdiction of Singapore remains

in effect. (12/03/12 Tr. 20-21.) There is no credible evidence that petitioner has violated any

Singapore court order in any significant respect.[11] Petitioner has lived in Singapore since 2000

and has had a business there since 1989. Respondent has failed to prove that petitioner would

likely abandon his business in Singapore and risk being found in contempt of a Singapore court

with the associated sanctions that could be imposed upon him.[12]

b. Article 20: The Human Rights and Fundamental Freedoms Exception

Article 20 permits the requested State to refuse the return of the child when it

"would not be permitted by the fundamental principles of the requested State relating to the

protection of human rights and fundamental freedoms." Hague Convention, art. 20.[13] The

Article 20 defense must be "restrictively interpreted and applied" "on the rare occasion that

return of a child would utterly shock the conscience of the court or offend all notions of due

process." Department of State, Hague International Child Abduction Convention: Text and

Legal Analysis, Pub. Notice 957, 51 Fed. Reg. 10,494, 10,510 (1986). The exception is "not to

be used, for example, as a vehicle for litigating custody on the merits or for passing judgment on

---

[11] A December 2011 letter from respondent's Singapore counsel to Ms. Gomez says that petitioner was delinquent in returning Shayan's birth certificate to respondent, pursuant to the Singapore court's May 16, 2011 order. (Petr. Ex. AA.)

[12] See, e.g., Petr. Ex. C, Tab L (finding respondent guilty of contempt of court and imposing fines and, upon default, one week imprisonment).

[13] The Court invited the U.S. Attorney's Office for the Southern District of New York or a representative from the U.S. Department of State to comment on this issue. (Docket No. 22.) In a letter dated December 14, 2011, the U.S. Attorney's Office declined to make a substantive comment at this time "in light of the number of facts and disputes that remain unsettled" in the case. (Docket No. 31.)

the political system of the country from which the child was removed." Id.  The parties do not cite and the Court cannot find any published federal case law in which the Article 20 exception was found to have been established. See Uzoh v. Uzoh, No. 11 Civ. 9124, 2012 WL 1565345, at *7 (N.D. Ill. May 2, 2012) (noting the same).

Mr. Abed Awad, retained by petitioner, and Ms. Yasmeen Hassan, retained by respondent, testified regarding the legal system in Singapore.  Neither has practiced law in Singapore.  Petitioner's Singapore counsel, Ms. Gomez, who testified as a fact witness, regularly practices in the family court of Singapore and testified before this Court.

Respondent argues that returning the child is not permitted by the fundamental principles of the United States because the custody determination in Singapore will be made in a Sharia Court.   AMLA grants the Sharia Courts in Singapore considerable discretion in considering evidence from non-Muslims.  See AMLA § 42(3).  Ms. Hassan testified that a woman's testimony is worth less than a man's in the Sharia Courts. (12/13/12 Tr. 907-08.) Moreover, she testified that Sharia Law applies presumptions favoring fathers and disfavoring non-Muslim parents in custody determinations.  (12/13/12 Tr. 900.)  These rules, respondent urges, ought shock the conscience and offend notions of due process.  The Court concludes, however, that it need not reach the issue of whether the procedural and substantive rules in Sharia Courts "shock the conscience" or "offend all notions of due process" because the Court finds that respondent has failed to prove that it is more likely than not that the Sharia Court will make a final custody determination in this case.

As noted, Singapore is a predominantly non-Muslim country with about 15 percent of the population as Muslim.  Singapore has a dual legal system in which civil and Sharia Courts function concurrently. AMLA sets out guidelines for the Sharia Courts in Singapore and

28

vests them with limited jurisdiction.  For instance, a Sharia Court does not have jurisdiction to consider domestic violence matters, including applications for protective orders.  (12/05/12 Tr. 230, 233.)  The Sharia Courts have exclusive jurisdiction in divorce actions where both spouses are Muslim or where the parties were married under the provisions of the Muslim Law.  AMLA § 35(2).  Unless a spouse commences a divorce action in the Sharia Court, the Sharia Court is "divested of any authority or jurisdiction in [a custody] matter."  (12/05/12 Tr. 236.)  However, when a divorce action is pending in Sharia Court, the Sharia Court also has jurisdiction to decide ancillary matters of custody and division of property.

Still, AMLA provides procedural mechanisms for a litigant in Sharia Court to commence or continue custody proceedings in the Singapore civil courts.  A civil court would be able to decide the issue of custody if both parties "consent to the commencement of the civil proceedings" or "consent to the continuation of the civil proceedings," and obtain a certificate of attendance, which is issued after a counseling session.  AMLA §§ 35A(5), 35A(7).  If the parties do not consent, the Sharia Court may still, in its discretion, grant an application for leave to commence or continue civil custody proceedings, AMLA §§ 35A(1), 35A(2), if "every party who will be affected by such leave has been notified of the application at least 7 days before the grant of such leave," AMLA § 35A(3), and the parties "attend counseling provided by such person as the Court may appoint."  AMLA § 35A(6).  The frequency with which these provisions are invoked in practice is unknown, in part because there is no system of recorded judgments. (12/13/12 Tr. 931.)

True, the order of February 16, 2012 of the Singapore family court contemplates that the issue of custody will be determined by the Sharia Courts.  But that order was entered into after a mediation session and was "**BY CONSENT**" of the parties, each of whom was

29

represented by counsel and neither of whom challenged the order. If respondent had objected to the Sharia Court acting on the custody matter, one would expect her counsel to have documented the client's desire or intent to have the Sharia Court stand down in favor of the Singapore Court. The Court rejects the respondent's after-the-fact claims that she never consented to the matter proceeding in the Sharia Court. The petitioner's expert set out plausible grounds why she may have rationally thought such a path was in her interest. (12/05/12 Tr. 231-33.) Thus, any unfairness in the process in Sharia Court is, in this case, a self-inflicted wound.

But in any event, circumstances have evolved which make it likely that the Singapore family court where respondent's original custody petition and petitioner's cross-petition remain pending will exercise jurisdiction over the custody dispute. First, the Court finds that there is no divorce action currently pending between the parties in the Sharia Courts in Singapore. (12/03/12 Tr. 43.) Second, in an affidavit dated December 7, 2012, petitioner affirmed that he "undertake[s] not to pursue any action in the Syariah Court of Singapore in relation to the custody, care and control of [his] son" and "commit[s] to the custody proceedings being continued and adjudicated upon in the Family Court of Singapore within the realm of civil proceedings." (Petr. Ex. II.) The affidavit was sworn to at the Singapore Consulate in Manhattan, and Ms. Gomez filed the document as an affidavit in the Subordinate Courts of Singapore on December 11, 2012. (Id.) Ms. Gomez testified before this Court that petitioner's undertaking, if given to the Family Court of Singapore, is binding and enforceable. (12/03/12 Tr. 62.) According to Gomez, it will require a judge to enter a court order for it to be punishable by contempt. (12/03/12 Tr. 62-63.) Petitioner has familial ties and significant business interests in Singapore. He has been substantially compliant with court orders during the pendency of the Singapore proceedings and these proceedings. Respondent has failed to prove that custody will

30

be determined by the Sharia Courts rather than the civil courts.

Respondent also urges that there are insufficient protections against domestic violence in Singapore, and thus, Article 20 bars the child's repatriation. But the Court finds that Singapore has reasonable procedures to ensure the safety of the child during the pendency of the custody proceedings including supervised visitation. Moreover, respondent was able to obtain two expedited orders, and had the opportunity to proceed to trial on each application in order to obtain permanent PPOs. It may be the case that respondent was barred in the second proceeding from bringing up evidence relating to the first application, which she voluntarily dismissed, due to the court's evidentiary rules. However, this does not rise to the level of shocking the conscience or offending all notions of due process.[14] Accordingly, fundamental principles of the United States regarding the rights and freedoms of domestic violence victims do not prohibit the return of the child under Article 20.

CONCLUSIONS

Based on the findings of fact, the Court concludes that petitioner has proven by a preponderance of the evidence that (1) the child was a habitual resident of Singapore; (2) the removal of the child from Singapore violated petitioner's custody rights under the law of Singapore; and (3) that petitioner was exercising these rights at the time of the child's removal. These are the only required elements he need prove under the Hague Convention.

---

[14] Article 20 is silent as to whether it applies only to the human rights and fundamental freedoms of the child, or to the parties in the case as well. See Uzoh v. Uzoh, No. 11 Civ. 9124, 2012 WL 1565345, at *7 (N.D. Ill. May 2, 2012) (respondent "presented nothing to suggest that Article 20 applies to the protection of a parent's human rights and fundamental freedoms, as opposed to those [of] the children"); Freier v. Freier, 969 F. Supp. 436 (E.D. Mich. 1996) ("The Court has focused primarily on Respondent's rights even though it is not clear that the Hague Convention's focus under Article 20 is on the parents' rights as opposed to the child's rights."). The Court concludes that Article 20 is broad enough to encompass the rights of the parties but only insofar as they relate to the exercise of custody rights of the child.

The Court concludes that respondent has not proven by clear and convincing evidence her defense under Article 13(b) of the Convention, i.e. that returning the child to Singapore will subject the child to a grave risk of harm.

The Court also concludes that respondent has not proven by clear and convincing evidence her defense under Article 20 of the Convention, that returning the child is prohibited by the fundamental principles of the United States relating to the protection of human rights and fundamental freedoms.

Because petitioner has established his case under the Hague Convention and respondent has failed to prove her Article 13(b) and Article 20 defenses, the Convention and the case law cited above require that the petition be granted. The petition is granted.

STAY OF ORDER PENDING APPEAL

The Court has considered whether to stay its Order pending the hearing and determination of an appeal. For reasons that will be explained, the Court concludes that it would be an improvident exercise of discretion to stay the Order pending appeal.

In leaving Singapore with the child in violation of the Singapore court's order, the mother traveled from Singapore to Taipai and then booked a separate trip from Taipai to Los Angeles, making it more difficult to uncover her ultimate destination. Once in Los Angeles, she travelled to the community of Red Hook, New York in Dutchess County. Petitioner located the mother and child through the use of private investigators and a bit of luck in matching a social network photo of a relative of the mother featuring a nail salon in the background with photos of nail salons available on the internet. The Court ultimately ordered the U.S. Marshal Service to take the child and turn him over to the father. This, thankfully, was executed peacefully and expertly on November 2, 2012 without significant incident. Based upon the foregoing, as well as

the mother's proven willingness to flaut the orders of the court in Singapore, which led to that court granting the father temporary custody of the child, this Court has ordered the child to remain in the father's temporary custody with liberal visitation by the mother in locations that are capable of being monitored.  The Court has disallowed overnight visits with the mother or visits in locations that cannot be monitored because there is a significant risk that she will flee with the child and avoid detection.

Neither the father nor the mother has significant ties to the United States.  The father entered the United States only after this proceeding was commenced.  He is living temporarily in Kingston, New York, which is located in Ulster County, and delivers the child for visitations in Dutchess County by taxi.  Unlike a parent with some roots in a community or the country, he has only improvised access to babysitters or other services.  He has a business in Singapore with twelve employees to which he has not returned since arriving for this proceeding.

Disputes have arisen over the length and locations of visits. A United States District Court, even with the assistance of a pro bono guardian ad litem, is unable to offer facilities or monitoring services that would regularize supervised visits.  For instance, to address concerns regarding Shayan's transition between parents at the end of scheduled visits, his father's taxi drivers had served as "objective witnesses" to the guardian ad litem.  (Docket No. 34.)  After the completion of the hearing, there was a dispute as to whether visitations at the maternal uncle's home permitted the child to play on the property surrounding the house and whether the guardian ad litem was authorized to alter or extend visitations hours.  (Docket No. 32.)  In contrast, the Centre for Family Harmony in Singapore has a proven track record in this case of successfully monitoring visits.  It has a facility with amply appointed rooms where visits may take place with the assistance of vigilant nearby staff.

The treaty between the United States and Singapore contemplates the "prompt" return of the child to the country of habitual residence.  See Hague Convention, art. 1.  This Court will grant a stay of return until January 16, 2013 at 5 p.m. to permit a stay application to be made to the United States Court of Appeals for the Second Circuit and otherwise denies a stay pending appeal.

SO ORDERED.

P. Kevin Castel
United States District Judge

New York, New York
December 26, 2012