1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In the Matter of one infant child
    ABDOLLAH NAGHASH SOURATGAR,
4
                    Petitioner,
5
            v.                          12 Civ. 7797 PKC
6
    LEE JEN FAIR,
7
                    Respondent.
8
    ------------------------------x
9
                                        December 5, 2012
10                                      10:31 a.m.

11

12  Before:

13                      HON. P. KEVIN CASTEL,

14                                      District Judge

15

16                          APPEARANCES

17  ROBERT D. ARENSTEIN,
    SANDRA NUNEZ,
18      Attorneys for plaintiff

19  PATTON BOGGS LLP
        Attorneys for defendant
20  BY:  ANDREW J. McNALLY, Esq.
                    Of counsel
21
    Also Present:
22      JENNIFER BAUM,
        JENNA DiCOSTANZO,
23      Gardians ad Litem
         – and –
24      JANE KIM, Esq.

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
 1              (In open court)

 2              (Hearing resumes)

 3              THE COURT:  Please be seated.  Good morning, everyone.

 4         All right, Mr. Souratgar can resume the witness stand.

 5    Mr. McNally, you may proceed with your cross-examination.

 6              MR. McNALLY:  Thank you, your Honor.

 7              THE COURT:  Plea be seated.  The court reminds you,

 8    Mr. Souratgar, that you are still under oath.  Do you

 9    understand?

10              THE WITNESS:  Yes, I understand.

11              THE COURT:  Please continue.  Actually, before you

12    continue, I have a few questions of my own that I want to

13    present to the witness.

14              MR. McNALLY:  Sure.

15              THE COURT:  Please describe for me the business that

16    you have in Singapore.

17              THE WITNESS:  The business I have, I believe the

18    securities systems, the camera, and I am a distributor for a

19    few companies concentrating.

20              THE COURT:  All right.  Do you rent space in Singapore

21    or do you own a building in Singapore?

22              THE WITNESS:  No, this is a lease.  We are there for

23    20 years.

24              THE COURT:  When did the 20-year period begin,

25    approximately?
```

 1          THE WITNESS:  My next lease going to be expire next

 2    three or four years and then we every five years and five years

 3    we renew.  The rent will change a little bit more.

 4          THE COURT:  All right.  How many employees do you have

 5    in this business?

 6          THE WITNESS:  About twelve.

 7          THE COURT:  Do you own any home in Singapore?

 8          THE WITNESS:  No.

 9          THE COURT:  Do you rent in Singapore?

10          THE WITNESS:  Previously the house we had is rented.

11    Now my brother give his house because he owned the house.

12          THE COURT:  Now, do you own any business in Iran?

13          THE WITNESS:  Yes, I have an office in Iran.

14          THE COURT:  How many employees do you have in Iran?

15          THE WITNESS:  Seven.

16          THE COURT:  Do you own any real estate in Iran?

17          THE WITNESS:  I have a house.

18          THE COURT:  How many times a year do you travel to and

19    from Iran?

20          THE WITNESS:  Like, for example, for the last two

21    years I have been only twice.

22          THE COURT:  Let's go beyond that two-year period.

23    Let's go back the last 8 years.  How often, prior to that

24    two-year period, how often did you go?

25          THE WITNESS:  Before I marry, I just go like at least

1    once a month for three or four days.  After I marry, I go like,

2    for example, three to four times a year for four days or five

3    days.

4              THE COURT:  You have a brother in Singapore.  Is that

5    correct?

6              THE WITNESS:  Yes, my younger brother.

7              THE COURT:  Do you have any other family members in

8    Singapore?

9              THE WITNESS:  My sister work in Singapore.  My sister

10   husband pass away, but got two children, both of them in

11   Singapore.  Her son just married in Singapore and work in

12   Singapore.  And then my parents staying under my visa staying

13   with me.

14             THE COURT:  Where?

15             THE WITNESS:  In Singapore and the sisters in Iran.  I

16   have only one brother left --

17             THE COURT:  No.  They stay some in Iran, some in

18   Singapore.  Describe for me what you mean by that.

19             THE WITNESS:  Like, for example, my parents, the last

20   time stay one year in Singapore and then go back to Iran for

21   three or four months and then they supposed to come to

22   Singapore because my father never see my son.  We supposed to

23   go on June 2011 to my father to see my son for the first time

24   and we supposed to come back which this thing happened, my

25   family is all --

```
 1              THE COURT:  Your parents live for one year in
 2    Singapore?
 3              THE WITNESS:  No.  My parents live in Singapore for
 4    the last 10 years for about six years, six years in Singapore
 5    if you look at it total.
 6              THE COURT:  What do you mean by -- tell me what you
 7    mean if you look at it in total?  I am not understanding you.
 8              Over a 10-year period, they spent about approximately
 9    six years if you add up all the months.  Is that what you mean?
10              THE WITNESS:  Yes, about six years.
11              THE COURT:  They spent about 60 percent of their time
12    in Singapore and about 40 percent of their time in Iran?
13              THE WITNESS:  Yes.  My mother spends a little more.
14              THE COURT:  A little more where?
15              THE WITNESS:  In Singapore.
16              THE COURT:  All right.  When they're in Singapore,
17    they stay in your house?
18              THE WITNESS:  My father sometimes stay in my house.
19    When they stay long, like two years, the last time they two
20    years, we rent a place for them.  They have their own house,
21    but in the same condominium, the same place.  We are Block 150
22    and they're Block 151.
23              THE COURT:  When they're in Iran, do they own a home
24    there?
25              THE WITNESS:  No.  I stay in my house.
```

     1                THE COURT:  In Iran?

     2                THE WITNESS:  Yes.  I have a house and I give it to

     3     them.

     4                THE COURT:  You told me the business in Singapore has

     5     twelve employees and the one Iran, is it Teheran --

     6                THE WITNESS:  Teheran.

     7                THE COURT:  -- was seven employees.  In terms of

     8     dollar sales, which business is larger?

     9                THE WITNESS:  Singapore is the head office.

    10                THE COURT:  How long has that business been in

    11     existence?

    12                THE WITNESS:  Singapore, since 1989, for 20 years.

    13                THE COURT:  Have you owned the business since 1989?

    14                THE WITNESS:  I own everything.

    15                THE COURT:  Mr. McNally, thank you.

    16     ABDOLLAH NAGHASH SOURATGAR, resumes

    17     CROSS-EXAMINATION continued

    18     BY MR. McNALLY:

    19     Q.  Mr. Souratgar, I believe in front of you is some of the

    20     exhibits that we were looking at yesterday on the railing

    21     there.

    22     A.  R3

    23     Q.  Yes.  Turn your attention back to that document.

    24                MR. ARENSTEIN:  Which document?

    25                MR. McNALLY:  R3.

1    BY MR. McNALLY:

2    Q.   In the second paragraph of this document you say I also

3    wish to inform you this is my third maid and previously one of

4    the maid was bitten by my wife and the police report was made.

5         Do you see that?

6    A.   Yes.

7    Q.   When did this alleged biting incident occur?

8    A.   The police report happened in 2010.

9    Q.   Who made that police report?

10   A.   I think yesterday you asked me the question.

11        THE WITNESS:  Can I say, your Honor?

12        THE COURT:  Yes.

13        THE WITNESS:  A neighbor called the police to come to

14   our house.  I was not there.  When I came, I came back home,

15   Ms. Lee told me do you know what happened?  Because I saw my

16   maid eye is broken from here to here, near her eyebrow from

17   here to here is 1.5 cm is cut.

18        Then Ms. Lee told me what, do you know what happened

19   today?  I said no.  She say police came to our house.  I said

20   for what?  She said the neighbor called and said I'm biting the

21   maid, Ms. Tin Tin.  I said do you really bite?  She said no.  I

22   said are you sure?  She said no, I did not bite her.  I said

23   then what the police came?  She said our neighbor called the

24   police came to our house.

25        Then I said what happened.  She told me talk to Ms.

1    Lee, and the maid and after that say okay, the maid did not

2    complain and the police left.

3          Then at night I go and talk to the maid because she

4    was crying in her room.  Her room is in the kitchen about one

5    big room for the maid.  She was crying.  I asked her what

6    happened today.  Ms. Lee Fair was not there when I was talking

7    to her.  She told me mom bit me.  I said with what?  He say she

8    beat me with a GPS in the car.  I say how?  She said she took

9    the GPS and banged to my eyes.

10          Then I look at the eyes from, as I mentioned the

11   eyebrow here with broken about this size, and I said after that

12   what happened?  He say we went back home.

13          Because the reason one of Ms. Jen was not happy with

14   her because when she was -- one of the events she was ironing

15   Shayan clothes.  I don't know what happened, the clothes a

16   little bit burned or something like that, and she was scolding

17   her I am going to cut from your salary, you know, so life is so

18   difficult and then you are so careless.

19          All of the scolding, all this is what she was doing

20   because I was not involved in the maid and Ms. Jen Lee Fair and

21   only thing I involved with the payment of the maid.  She

22   choose, she arranged, she fire.

23          When I told made what did you tell the police?  She

24   said I told the police I banged my own eyes when I went to

25   stand up to the carpet in the kitchen.  I say that is true?

1    She said true.  Then why you say like that?  Say if I say mom

2    tomorrow said you are leaving, she is going to beat me again.

3              THE COURT:  Now, you referred to mom or mum?

4              THE WITNESS:  Mom, Ms. Lee.  She call me, sir, she

5    call her mom.

6              THE COURT:  Thank you.

7              THE WITNESS:  Mom going to beat me tomorrow when you

8    are leaving.  Then Ms. Lee Jen Fair come and call with me, why

9    are you listening to the maid?  Why you don't go and sleep with

10   her?  Then I came up from the room and that's it.

11   BY MR. McNALLY:

12   Q.  Was there any biting?  I think you were -- were you saying

13   beating or biting?  Biting with the teeth?

14   A.  No.  Beat.  She took out and she said, she took out the GPS

15   and banged her eyes near up here.

16   Q.  My confusion, sir, relates to the fact you're saying this

17   police report that the maid was bitten.  Like biting with one's

18   teeth?

19   A.  No.  That is a mistake.  Beat, not bite, beat.

20   Q.  Let's turn to the next paragraph.

21             So the police report that was made, did you see the

22   police report?

23   A.  No.  The police would not show it to us.

24   Q.  What was the size of the maid's injury that you saw?

25             THE COURT:  I want to make sure I understand what the

1   police report is.  Let me show you what's been received into

2   evidence as Respondent's Exhibit 3.  Is that the police report

3   you were referring to or are you referring to some other

4   document?

5           THE WITNESS:  This is my police report I did.  That

6   police report, a neighbor did the police report.

7           THE COURT:  That is your signature on R3?

8           THE WITNESS:  Yes.

9           THE COURT:  Thank you very much.  Have you ever seen

10  the neighbor's police report?

11          THE WITNESS:  No, sir.

12          THE COURT:  Thank you.

13  BY MR. McNALLY:

14  Q.  Did the neighbor bear witness to this alleged beating?

15  A.  I was not there.  Ms. Lee Jen Fair told me all this stuff.

16  I never been there.

17  Q.  When you saw the condition of the maid, you mentioned that

18  she had an injury on her eye?

19  A.  And the glass was broken.  The glass was broken, which my

20  brother bought glasses for her.

21  Q.  Did you talk with the neighbor about this incident?

22  A.  No, because I didn't know which neighbor called.  But we

23  suspect, according to Ms. Jen, the back neighbor.

24  Q.  What was the name of this maid?

25  A.  Sorry?

1  Q.  What was the maid's name?

2  A.  We call her Tin Tin from Burma.

3  Q.  Let's turn to the next paragraph of this police report.

4        In the last sentence of the third paragraph it says,

5  "I also wish to inform that my wife pulled my son's arm and

6  nearly dislocated my son's arm."

7        When did that incident occur?

8  A.  The time when she run through the streets with Shayan.

9  Q.  When was that?

10  A.  She was holding the Shayan and run through the street.

11  Q.  When was that?

12  A.  I think in 2010, 2010.

13  Q.  How do you know that your son's arm was nearly dislocated?

14  A.  Because she was holding Shayan like that and one of the --

15        THE COURT:  Indicating cradled in arms.  Go ahead.

16  A.  -- okay.  And the one of the Shayan arms was outside like

17  this and going up, and she's pressing him so hard that why, we

18  tried to open her hand.

19        THE COURT:  Pressing hard on his arm?

20        THE WITNESS:  This side.

21        THE COURT:  Underneath his arm, got it, on the torso

22  of the body immediately below the armpit the witness is

23  indicating.  Go ahead.

24        THE WITNESS:  Then we take the Shayan and bring back

25  home and she starts crying.

1    BY MR. McNALLY:

2    Q.  Did you take Shayan for any medical treatment?

3    A.  For?

4    Q.  You didn't take Shayan for any medical treatment after this

5    incident, did you?

6    A.  For this incident or before?  Every time I bring him to the

7    doctor, to hospital, is because I am a hospital every time

8    bring him because Ms. Lee Jen Fair just refer to the internet

9    for the medication.

10   Q.  We are talking about this alleged dislocation or near

11   dislocation.  Did you take the child to the doctor for

12   treatment for that?

13   A.  When I saw his hand okay and no pain, okay, everything look

14   at it, okay, no problem and he was not uncomfortable.  He was

15   okay.  No, I didn't bring him to any doctor.

16   Q.  At the time of this incident you didn't report it to the

17   police, did you?

18   A.  I did not.

19   Q.  When you say nearly dislocated, that is your diagnosis?

20   A.  Because I am a Volleyball player.  That is why I know how

21   the arm going to be dislocated because I saw so many times,

22   then it was like that.  This is what I saw.  Maybe I am wrong,

23   I don't know, but this is what I thought.

24   Q.  Just for context, in the timing of this report, this was

25   made after Ms. Lee vacated the marital home?

1   A.   Yes, after I could not find any of them, she left.

2   Q.   Shortly after Ms. Lee left you, she brought a custody

3   proceeding in Singapore, correct?

4   A.   Sorry?

5   Q.   Shortly after Ms. Lee left you, she brought a proceeding in

6   Singapore seeking custody of Shayan, correct?

7   A.   No, that is not correct.

8   Q.   How did a custody proceeding initiate?

9   A.   I, as I told before, on the 27th May 2011, when Mr. Mark,

10  my first lawyer, received a documentation from her lawyer, then

11  we find out she has already started in 2011.

12  Q.   She started a custody proceeding first.  Is that correct?

13  A.   Yes, in 2011, April, according to the document.

14  Q.   In response thereto, what did you do?

15  A.   I talked to my lawyer because they didn't -- when I look at

16  the document and my lawyer, it is the order by the court was 16

17  May 2011, but I didn't know, I did not serve and until they

18  left the house and they indicated to that court order which I

19  have to respond by the 30th, which was one Saturday and Sunday

20  in-between which they give me only one day to do it.

21        I did not have time to respond, but actually already

22  has made on the 16th of May and from the 16 May to the 25th of

23  May I have a video of my family, I brought in to send, and one

24  day before even she leave we decided where to go to eat.

25        My son playing with the water and washing her car in

1   in my phone right now.  Of course, my phone is downstairs.

2   When I come across the note, I had only one day to reply to the

3   court, which my lawyer, Mr. Mark, put the application, said we

4   need some time to reply, and the court gave us some time

5   because we told them we just received it on the 27th and today

6   is a Friday and tomorrow is Saturday, Sunday is closed, court

7   doesn't work.  Then after that Mr. Mark referred me to

8   Ms. Gomez, because Mr. Mark is not a family lawyer.

9        Ms. Gomez is a family lawyer, then I talked to Ms.

10  Gomez and from there Ms. Gomez proceeded for all of my

11  paperwork whatever you have right here now.

12  Q.  Do you recall submitting an affidavit in the context of the

13  custody proceeding?

14  A.  Sorry?

15  Q.  Do you recall signing an affidavit in the context of the

16  custody proceeding?

17  A.  I?

18  Q.  Yes.

19  A.  I signed an affidavit?

20  Q.  Yes.  Do you recall the allegations you made in that

21  affidavit?

22  A.  Actually, in my affidavit I can say most of them I give the

23  document to answer, to Ms. Lee Jen Fair allegations.

24  Q.  You're saying you're responding to her allegations?

25  A.  Yes.

1    Q.  Do you recall stating in the affidavit that --

2              MR. ARENSTEIN:  Your Honor, could he describe which

3    affidavit he is talking about?

4              MR. McNALLY:  Yes.

5              THE COURT:  Could who describe, the question?

6              MR. ARENSTEIN:  Mr. McNally.

7              THE COURT:  Yes.

8              MR. McNALLY:  I am referring to a June 28, 2011

9    affidavit.

10   BY MR. McNALLY:

11   Q.  Are we talking about the same affidavit?

12   A.  Yes, this is my affidavit in Singapore.

13   Q.  Do you recall alleging in that affidavit that Ms. Lee

14   hurled knives and various objects at you?

15   A.  Sorry?

16   Q.  She hurled knives and various objects at you?

17   A.  I don't know the meaning of, "hurled."

18   Q.  Let me show you the document.

19             THE COURT:  Okay.  It has been marked as?

20             MR. McNALLY:  It hasn't come in yet.

21             THE COURT:  You're going to show it to him and you're

22   going to mark it before you show it to him.  Even if you're not

23   offering it into evidence, it will be marked for

24   identification.

25             MR. McNALLY:  Certainly, your Honor.  One moment, your

Honor. I apologize.

THE COURT: Sure.

(Off-the-record discussion)

THE COURT: Mr. McNally, if it is convenient, perhaps you can move on to another matter and have your colleagues locate the document for you.

MR. McNALLY: I have it right here, your Honor.

THE COURT: All right. Thank you.

MR. McNALLY: My apologies.

BY MR. McNALLY:

Q. Mr. Souratgar, I am showing you what I have marked as R4. Do you recognize this document?

A. This is my affidavit.

Q. You've signed this affidavit on the last page?

A. Yes, sir.

MR. McNALLY: Your Honor, I would like to move this document into evidence as R4.

THE COURT: Any objection?

MR. ARENSTEIN: No objection.

THE COURT: Received.

MR. ARENSTEIN: Except one thing. I just ask my colleague if there were any attachments?

THE WITNESS: This is not complete, sir.

MR. ARENSTEIN: Your Honor, I have an objection as a result of my counsel here from Singapore tells me with the

1    affidavit were attached exhibits, and the exhibits are not

2    attached to the affidavit that was given to me.

3          THE COURT:  All right.  Are you offering the exhibits

4    with it?

5          MR. McNALLY:  No, I am not, your Honor.

6          THE COURT:  Then it is an incomplete document.  If you

7    want to offer it with the exhibits subject to supplying those

8    exhibits, then that's a different situation, but right now it

9    is incomplete.

10         MR. McNALLY:  Your Honor, my line of questioning has

11   nothing to do with any of the exhibits and I thought it would

12   be unnecessarily burdensome in order to put upon the court a

13   big stack of documents.  I don't need to offer this document

14   even in evidence, your Honor.

15         THE COURT:  So you're withdrawing your offer?

16         MR. McNALLY:  Yes.

17         THE COURT:  All right.  Go ahead.  The document is

18   stricken from evidence.  I had received it previously.

19         MR. McNALLY:  Thank your Honor.

20   BY MR. McNALLY:

21   Q.  Mr. Souratgar, do you recall alleging within R4, the

22   document that I've shown you that is not in evidence --

23         MR. ARENSTEIN:  Objection.

24         THE COURT:  Say again.

25   BY MR. McNALLY:

1   Q.  Do you recall alleging in the June 28th, 2011 affidavit

2   that Ms. Lee hurled knives at you?

3           THE COURT:  No.  First of all, do you recall whether

4   or not that's in your affidavit?  Don't look at the affidavit

5   yet.

6           THE WITNESS::  I did in my police report and I believe

7   it should be there because this --

8           THE COURT:  All right.

9   BY MR. McNALLY:

10  Q.  You recall making that?

11          THE WITNESS:  Can I look at it?

12          THE COURT:  Not yet.  The question is whether you

13  recall whether you made that allegation in your affidavit.

14          THE WITNESS:  I believe, because I making my police

15  report, it must be in my affidavit, too.

16  BY MR. McNALLY:

17  Q.  What did you mean by Ms. Lee hurling knives at you?

18  A.  She took a knife, it is very simple, took a knife and

19  attacked.  How do people take a knife?  Just hold the knife and

20  come.

21  Q.  The only thing I'm trying to establish here, did she throw

22  knives at you?

23  A.  She throw knife?  She throw knife?  She throw, I believe, I

24  believe, she throw things.  She threw from, as I mentioned from

25  the fruits to the --

 1          THE COURT:  From the fruits to the --

 2          THE WITNESS:  Pillow.

 3          THE COURT:  To the plate?

 4          THE WITNESS:  The plate, anything come close to her

 5   hand she can throw.  As I say, even I just mention the GPS on

 6   the hand came back.  Anything come close to her hand, she can

 7   throw.

 8   BY MR. McNALLY:

 9   Q.  You have no recollection of her throwing knives at you?

10          MR. ARENSTEIN:  Objection.

11          THE COURT:  Overruled.

12   A.  Throwing I think it was a fruit knife if I am not mistaken.

13   I think it was a fruit knife or not she did, she think, I

14   think, she did a fruit knife, the smaller to cut fruits if I am

15   not mistaken.

16   BY MR. McNALLY:

17   Q.  When did that occur?

18   A.  Sorry?

19   Q.  When did that occur?  When did she throw the knife at you?

20   A.  Where?

21   Q.  When, when, what point in time?

22   A.  This is a very difficult.  You are asking me because it is

23   a few years back and so many events like this happened, but

24   this is, of course, between 2009, 2010, something like that.

25   This is quite a normal part of my life.

1          THE COURT:  The question, sir, is do you recall when

2    your wife threw a fruit knife, and if you recall, give the

3    answer.  If you don't recall, simply say, "I don't recall."

4          THE WITNESS:  I don't recall.

5          THE COURT:  Thank you.  Next question.

6          THE WITNESS:  Thank you.

7    BY MR. McNALLY:

8    Q.  Do you recall if she hit you with a knife?  Did the knife

9    strike you?

10   A.  She never hit me with a knife, not sharpened, not knife,

11   nothing.

12   Q.  You were never injured by any of this?

13   A.  Never.

14   Q.  You never complained to the police as a result of any of

15   these incidences?

16   A.  Never, never.

17   Q.  You never sought any medical treatment as a result of these

18   knife throwing incidences?

19   A.  I never injured, then why I go to the doctor?

20         THE COURT:  It is a question.  Listen to the question.

21   Make sure you understand the question.  Just answer.

22         THE WITNESS:  Yes, sir.  No, I did not go to the

23   doctor.

24   BY MR. McNALLY:

25   Q.  Do you recall an allegation that you made on direct that

1    Ms. Lee bit you at one point in time?

2    A.   A few times, not one time.

3    Q.   Do you recall testifying about a photograph where she bit

4    you?

5    A.   One of the photographs is she bite like this arm.  If I

6    take off my shirt, you can see it is here.

7    Q.   Do you recall testifying on direct that you suffered some

8    internal bleeding as a result of that biting?

9    A.   Oh, yes, up to here to my hand, I could not wear a short

10   sleeve because in Singapore I have short sleeve, I could not

11   wear a shortened sleeve.

12   Q.   Did you go to the doctor?

13   A.   No, I did not go to the doctor, but the bite mark, it stays

14   on my arm right here I can show.

15   Q.   Do you recall testifying on direct certain allegations

16   regarding Ms. Lee's sister and your son?

17   A.   Yes, she, she touched my son.

18   Q.   Do you recall making those same allegations within what I

19   showed you is R4, this affidavit?

20   A.   Sorry?

21   Q.   Do you recall making those allegations in the affidavit I

22   showed you a few moments ago?

23   A.   Yes, sir; yes, sir.

24   Q.   Do you recall the circumstances in which this touching

25   occurred?

1  A.  The exactly started with a photograph which accidentally

2  came to my hand, and after that, as I mentioned, as a culture

3  different, but to be honest with you, I was very pay attention

4  to what was going on from there because that is a sign.

5          Then dining table asking for sugar and that at 12:00

6  midnight which my son pressed the -- was playing with my

7  sister-in-law breasts because even now my son got a habit, if

8  you put, use these two fingers, play with something.  Even my

9  nose there, he start playing, he starts.  Even now he is doing

10 the same, playing with the ear like that.

11         And he was, he was playing with my sister-in-law

12 breast.  Sister in-law's breasts.

13 Q.  Let's go back to the incident at the dining table.  Where

14 were you when this was happening?

15 A.  I was watching the TV.  My back to the dining table.  My

16 sister-in-law, sister-in-law was sitting there.  I turned back

17 to see Shayan, what he is doing, and Shayan was on top of the

18 table, she was sitting here, and she has the legs was open like

19 that and wearing the diaper, wearing the diaper, and she was

20 touching that private part.

21 Q.  Was she changing the diaper?

22 A.  No.

23 Q.  How far away was Ms. Lee's sister from you when this was

24 happening?

25 A.  From here to here.

 1            THE COURT:  Indicating about three and a half, four

 2    feet.

 3            THE WITNESS:  One meter, 1.2 meter.  Our room is not

 4    so big.

 5    BY MR. McNALLY:

 6    Q.  It is your claim that she was touching Shayan

 7    inappropriately?

 8    A.  I saw she is touching, he was wearing a diaper.  She is

 9    touching the private part of my son.

10    Q.  Within two meters of your location?

11    A.  No.  Like this, like to my back because the TV was here,

12    the sofa was sitting here.

13            THE COURT:  Again indicating three and a half, four

14    feet.

15    BY MR. McNALLY:

16    Q.  Literally behind your back she is touching your son

17    inappropriately?

18            THE COURT:  I don't think that was the witness's

19    testimony.

20            MR. McNALLY:  Withdrawn.

21            THE COURT:  The witness was indicating that this, in

22    response to the question.

23    BY MR. McNALLY:

24    Q.  Did she take off Shayan's diaper in order to accomplish

25    this?

1    A.  No, no.  The diaper, Shayan was wearing the diaper, her

2    hand was here near the diaper and playing with the private part

3    of my son, but I saw and observed it.  When I called my son

4    quickly bring him, watching TV and bring the toys in front of

5    me and change the scenario of the whole thing.

6    Q.  Do you remember what point in time this occurred?

7    A.  Sorry?

8    Q.  When did this occur?  When?

9    A.  This was in 2011.

10   Q.  In response to seeing this, what did you do?

11   A.  Sorry?

12   Q.  In response to seeing this, what did you do?

13           MR. ARENSTEIN:  Objection; asked and answered.

14           THE WITNESS:  I just mentioned.

15           THE COURT:  Overruled.  Go ahead.

16   A.  I just mentioned --

17           THE COURT:  Go ahead, next question.

18   BY MR. McNALLY:

19   Q.  Did you report this incident to the police?

20   A.  No, but I informed Ms. Lee Jen Fair.  She told me don't

21   talk nonsense.

22   Q.  Let me turn your attention back to R3.  Can I turn your

23   attention back to R3.

24   A.  Can I look at it?

25   Q.  Yes.

1   A.   Okay.

2   Q.   This police report was filed by you after the alleged

3   inappropriate touching occurred, correct?

4   A.   Sorry?

5   Q.   This police report was filed by you after the alleged

6   inappropriate touching occurred, correct?

7   A.   No, no.

8   Q.   Let's back up.

9   A.   I did not, I did not report after that incident.

10  Q.   I know you didn't report it.  That is what I am

11  establishing?

12  A.   This report is only when they left the house and I don't

13  know where are they.

14  Q.   This report was filed after the alleged inappropriate

15  touching occurred, correct?

16  A.   Excuse me, sir.  I answered your question.

17          This report just come when I went to the house and my

18  house was empty.  That is why I made the report to the police,

19  because I don't know where are they and nobody answered the

20  phone.

21  Q.   Sir, I am just trying to get the timeline straight.  You

22  say that Ms. Lee's sister inappropriately touched your son,

23  correct?

24  A.   Yes.

25  Q.   When did that happen?

1   A.  In 2011.

2   Q.  When, what month?

3   A.  Before March.

4   Q.  When is this police report dated?

5   A.  I did it on the 25th of May, 2011.

6   Q.  Do you allege in this police report any inappropriate

7   touching of your son?

8   A.  No.

9           MR. ARENSTEIN:  Objection, your Honor.

10  A.  I did not.

11          THE COURT:  Overruled.  Overruled.

12  BY MR. McNALLY:

13  Q.  It is a yes or no question, did you or did you not?

14  A.  I did not.

15          THE COURT:  You have answered the question.  Next

16  question.

17  BY MR. McNALLY:

18  Q.  I believe you testified on direct about an incident where

19  you and Ms. Lee got into an argument in a parking lot.  Is that

20  correct?

21  A.  Sorry?

22  Q.  You and Ms. Lee got into an argument over the service of

23  certain papers.  Do you recall testifying to that?

24  A.  We did not agree to anything.  I just told Ms. Lee Jen Fair

25  I have a court document to serve you.  It was raining.  She was

 1  on another side of the court, I was in another side of the

 2  court.  I hold the paper inside the room because I don't want

 3  to get it wet.  She run away to the security guard.

 4  Q.  We are talking about the same incident?

 5  A.  Okay.

 6  Q.  What were those court documents that you were serving on

 7  her?

 8  A.  Malaysia court documents.

 9  Q.  Malaysia court documents for what?

10  A.  To order for her to --

11  Q.  The order for her to?

12  A.  -- attend to the court.

13  Q.  Attend to the court for what purpose?

14  A.  For the child custody we have.

15  Q.  You brought a child custody action in Malaysia, correct?

16  A.  Anyplace she go, I bring the child custody.  I have to go,

17  follow her to find my child.  She went to Malaysia, and I find

18  her in Malaysia and made a police report.  She came to the

19  United States, and I did the same thing, came to the

20  authorities.

21       THE COURT:  Mr. Souratgar, you have to understand,

22  this is cross-examination.  Your lawyer asked you a question.

23  This is the respondent's opportunity to ask you questions.

24       After this your lawyer gets an opportunity to ask you

25  questions as well to bring out any matters that are necessary.

1   So listen to the words of the question, answer the question and

2   nothing else.  It is not your opportunity to make speeches,

3   okay?  Next question.

4              MR. McNALLY:  Thank you.

5   BY MR. McNALLY:

6   Q.  In what court in Malaysia, if you know, was your action

7   brought?

8   A.  Shairiah court.

9   Q.  What is the status of that action currently?

10  A.  I got joint custody, it was joint custody.

11  Q.  You have a joint custody from --

12  A.  Malaysia Shairiah court three days mother, three days

13  father.

14  Q.  Was the action in Malaysia dismissed?

15  A.  She fight for the jurisdiction and sent the jurisdiction to

16  Singapore.

17  Q.  What was the outcome of that fight, as you say?

18  A.  The jurisdiction in Singapore, go back to Singapore.

19  Q.  The action in Malaysia was dismissed, correct?

20  A.  By the judge.

21  Q.  Is that currently up on appeal?

22  A.  Sorry?

23  Q.  Have you appealed that decision?

24  A.  Yes, I did.

25  Q.  Is that appeal pending?

1    A.  No.  I have to stop a few months ago because we cannot

2    locate Ms. Jen, and that's it because I don't have any more

3    money to pay for the lawyer.

4           THE COURT:  No.  The question for these purposes --

5    your lawyer will have the opportunity to bring out other

6    things -- the question is, is that case still pending?

7           THE WITNESS:  Yes, I order my lawyer to stop it.

8           THE COURT:  We are going to be at this on and on and

9    on for weeks to come unless you don't follow this instruction.

10   So I just cautioned you on that and I am cautioning you again.

11          THE WITNESS:  Sorry.

12          THE COURT:  Next question.

13          MR. McNALLY:  Thank your Honor.

14   BY MR. McNALLY:

15   Q.  We were talking a moment ago about your attempted service

16   of Ms. Lee of certain papers related to the Malaysian court

17   proceedings.  Do you remember when that happened?

18   A.  (No answer)

19   Q.  Do you remember when that happened?

20   A.  Explain?

21   Q.  Give me a date and time.  Was it August 15th, 2011?

22   A.  Yes.

23   Q.  Thank you.  Are you aware Ms. Lee filed a police report

24   against you?

25   A.  Yes.

 1   Q.  How did you become aware of that?

 2   A.  Guy came from the court and give me the letter.

 3   Q.  They came from the court and gave you the letter?

 4   A.  In Singapore, the service is by letter.  I have to go to

 5   the court.

 6   Q.  They served upon you the police report?

 7   A.  No.  The court order, I have to attend to the court.

 8   Q.  In relation to her application for personal protection?

 9   A.  Yes, right.

10   Q.  Have you seen any police report at any point in time that

11   Ms. Lee filed following this incident on August 15, 2011?

12   A.  After we go to the court, she prepared the affidavit and

13   then I signed it.

14   Q.  So you're aware that Ms. Lee alleged within that report

15   that you physically harmed her, correct?

16   A.  Yes.

17   Q.  You're aware within that report she alleged that she

18   suffered certain injuries, shall we say?

19   A.  A cut on the chest, hand, according to the police medical

20   report.  She got four cuts on the chest, four cuts on the hand

21   if I remember and some on her palm.

22   Q.  You deny that you caused her to sustain those injuries?

23   A.  Of course, no, I did not do anything.

24   Q.  So in your opinion, Ms. Lee lied to the police?

25            MR. ARENSTEIN:  Objection to the form of the question.

```
 1              THE COURT:  Sustained.

 2   BY MR. McNALLY:

 3   Q.  Do you know the timing of when Ms. Lee filed that police

 4   report in relation to the incident?

 5   A.  The incident was 12-something, 12:00 noon, and I think she

 6   did it about six or eight hours later.

 7   Q.  Do you recall another police report that Ms. Lee filed

 8   against you related to an incident on November 22, 2011?

 9   A.  After I received her affidavit, yes.

10   Q.  So again you did not receive any information with regards

11   to that police report when it was filed?

12              MR. ARENSTEIN:  Objection, asked and answered, your

13   Honor, by Mr. McNally earlier yesterday.

14              MR. McNALLY:  This is a November 22, 2011 police

15   report.

16              THE COURT:  I'll allow the question.

17              THE WITNESS:  Again a person come from the court and

18   give me the letter.  I have to go to the court for personal

19   protection.

20   BY MR. McNALLY:

21   Q.  Did the police ever contact you after the November 22, 2011

22   police report?

23   A.  Never.

24   Q.  Now, are you familiar with allegations that Ms. Lee said

25   that you chased her in a car?
```

1   A.  Yes, I saw the affidavit.

2   Q.  Was your son in the car at the time?

3   A.  Yes.

4   Q.  Are you aware of any police report -- who else was in the

5   car at the time?

6   A.  Ms. Lee Jen Fair, Shayan and Ms. Ram is a maid.

7   Q.  Is the maid the same maid you were talking about before

8   with regards to the alleged biting incident?

9   A.  No.  It is different.

10  Q.  Are you aware this maid filed a police report against you?

11  A.  No, sir.

12  Q.  You received no contact from the police following that

13  police report, either?

14  A.  Never.

15          MR. McNALLY:  One moment, your Honor.

16          (Off-the-record discussion)

17  BY MR. McNALLY:

18  Q.  Mr. Souratgar, let's return to the August 15th, 2011

19  incident -- I am sorry -- the November 22nd, 2011 incident

20  where Ms. Lee alleges that you chased her in a car.

21          Are you familiar with allegations that you've made

22  that Ms. Lee put the child in danger?

23  A.  Yes.

24  Q.  Did you file a police report after that?

25  A.  No, sir.

```
 1              MR. McNALLY:  May I approach, your Honor?

 2              THE COURT:  You may.

 3              (Pause)

 4    BY MR. McNALLY:

 5    Q.  Mr. Souratgar, I'm showing you what I've marked as R5.  Do

 6    you see that document?

 7    A.  Yes, sir.

 8    Q.  You recognize this document?

 9    A.  It is a passport.

10    Q.  Whose passport?

11    A.  Ms. Lee Jen Fair.

12    Q.  Now, Mr. Souratgar, are you aware that this document was

13    provided --

14              THE COURT:  Are you offering it into evidence?

15              MR. McNALLY:  I am just laying a foundation, sir.

16    Your Honor, I would be happy to do so.

17              THE COURT:  Will you be offering it into evidence?

18              MR. McNALLY:  Yes.

19              THE COURT:  Is there any objection?

20              MR. ARENSTEIN:  One, second, your Honor.  We don't

21    know what it is at this point.  I have an objection at this

22    point.

23              THE COURT:  What is the basis for the objection?

24              MR. ARENSTEIN:  I don't know what this document is.

25              THE COURT:  There is testimony as to what it is
```

1   already.  Did you hear the testimony?

2              MR. ARENSTEIN:  I thought he said it was a passport,

3   but it doesn't look like a passport to me.

4              THE COURT:  Any other objection?

5              MR. ARENSTEIN:  No.

6              THE COURT:  Is this a copy of your wife's passport?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Have you seen the original?

9              THE WITNESS:  I have never seen the original.

10             THE COURT:  How do you know it is a copy of her

11  passport?

12             THE WITNESS:  This one when I went to Iran embassy

13  because I don't know where they are, I asked them my wife is

14  already missing.  The embassy gave me a copy.  As a husband, I

15  show my ID, they gave me a copy of this.

16             THE COURT:  The copy marked as R5 is a true and

17  accurate copy of what you were provided by the Iranian embassy

18  in Singapore?

19             THE WITNESS:  No, sir.  In Malaysia.

20             THE COURT:  Do you still press your objection?

21             MR. ARENSTEIN:  No.

22             THE COURT:  Received.

23             (Respondent's Exhibit R5 received in evidence)

24  BY MR. McNALLY:

25  Q.  By your examination of this document, can you tell when

1    this passport was issued?

2    A.  03-06-2011.

3    Q.  What is that date?  What does that refer to?

4    A.  The date of issue.

5    Q.  Right.  You said it was 03-06-2011, correct?

6    A.  Yes, sir.

7    Q.  What date is that in words?  Is that March 6, 2011 or is

8    that June 3rd, 2011?

9    A.  No.  It is June 2011, not March.

10              MR. McNALLY:  May I approach again, your Honor?

11              THE COURT:  You may.

12              (Off-the-record discussion)

13   BY MR. McNALLY:

14   Q.  Mr. Souratgar, I show you a document that has been marked

15   as R6.  Have you ever seen this document before?

16   A.  Yes.

17   Q.  Can you describe what it is.

18   A.  This is a letter from the Iranian embassy to the Minister

19   of Home Affairs in Malaysia.

20   Q.  When was the first time you saw this document?

21   A.  When they called me to go to this place, and then for the

22   verification because I gave my contact number to Malaysia

23   embassy if they need to call me, they can call me any time and

24   I go there any time they want.

25   Q.  Is it your testimony that the embassy provided you with

1   this document?

2   A.  No.

3   Q.  Did you ever come to possess this document?

4   A.  I just got a copy from the Minister for Home Affairs

5   because they called me.

6   Q.  You were provided with this document by -- withdrawn.

7            Who provided you with this document?

8   A.  The Minister of the Home Affairs, they called me for the

9   verification, and I went to the Minister of Home Affairs for

10  verification.  This was what they did, and I asked them for the

11  copy, and they gave me a copy.

12  Q.  This is the document they gave you?

13  A.  This?

14  Q.  Yes.

15            MR. McNALLY:  I would like to offer this document.

16            MR. ARENSTEIN:  No objection?

17            THE COURT:  Received.

18            (Respondent's Exhibit R6 received in evidence)

19  BY MR. McNALLY:

20  Q.  If I can direct you to the third line up from the bottom of

21  this document.  Do you see it says she applied for Iranian

22  national card on 21-6-2011.  Do you see that?

23  A.  Yes.

24  Q.  What date is that, 21-6-2011?

25  A.  21-6, 2011.

```
 1   Q.  Is that June 21st, 2011?

 2   A.  Yes.  In that part, it goes day, month, yeah.

 3   Q.  Mr. Souratgar, before Ms. Lee came to the United States,

 4   who was caring for the child at that point?

 5           MR. ARENSTEIN:  Your Honor, time-frame because we

 6   didn't know exactly when she came.  We know she left on that

 7   date.

 8           THE COURT:  Fix a time.

 9           MR. McNALLY:  Sure.

10   BY MR. McNALLY:

11   Q.  Mr. Souratgar, there came a time when you learned that

12   Ms. Lee came to the United States, correct?

13   A.  Sorry?

14   Q.  There came a time when you learned Ms. Lee came to the

15   United States with Shayan, right?

16   A.  Yes, yes, right.

17   Q.  And there came a time where you sought assistance in order

18   to try to locate her, speaking with officials in Singapore.  Is

19   that correct?

20   A.  Yes.

21   Q.  There came a time where you applied for custody in

22   Singapore.  Is that right?

23   A.  That was my first affidavit, 2011.

24   Q.  After you submitted your first affidavit in 2011, was there

25   a determination made by the authorities as to who was going to
```

1  care for the child and visitation?

2  A.  No.  She just took the child with her and that's it.

3  Q.  Let's go back to 2011.  Was there a determination made by

4  any court as to who would have custody of the child?

5  A.  No, as far as I know, no.

6  Q.  Were you granted visitation rights at any point?

7         MR. ARENSTEIN:  Objection to the term, "visitation

8  rights."  There was access and there was family --

9         THE COURT:  Overruled.

10  BY MR. McNALLY:

11  Q.  Were you granted visitation?

12  A.  Yes.

13  Q.  By a court in Singapore?

14  A.  For the mediation court.

15  Q.  When were you given that visitation?

16  A.  I think August.

17  Q.  Of what year?

18  A.  2011.

19  Q.  So it was after you submitted your June 2011 affidavit,

20  correct?

21  A.  I saw her with affidavit, but we go for mediation, too.

22  Q.  In August of 2011 you get visitation?

23  A.  Yes.

24  Q.  Did there come a time where the custody arrangement changed

25  after that pursuant to an order of the Singapore court?

1    A.   Custody?  I didn't hear your question.  Sorry.

2    Q.   What sort of custody rights do you understand have been

3    given to you by the Singapore court?

4    A.   They just gave me the visitation to go visit my son two

5    hours a week supervised access.

6    Q.   Okay.

7    A.   And there is no custody pending.  We have to go to the

8    court for the custody.

9    Q.   So while you were enjoying visitation rights, who had care

10   and control of the child?

11   A.   Nobody.  She just took my son.  There is no court order for

12   care and control.

13           (Pause)

14           MR. ARENSTEIN:  Would this be a good time for me to

15   take a restroom break?

16           THE COURT:  Yes.  Why don't we take a 10-minute recess

17   and we'll tend to all matters.

18           (Recess)

19           (Continued on next page)

20

21

22

23

24

25

 1          THE COURT:  Before we resume, the Court wants to place
 2     the parties on notice that it proposes to take judicial notice
 3     of certain publicly available documents.  It proposes to take
 4     judicial notice of a document entitled Protecting Children in
 5     Singapore, a publication by the Rehabilitation and Protection
 6     Division, Ministry of Community Development, Youth and Sports,
 7     October 2005.

 8          It also proposes to take judicial notice of a document
 9     issued 26 July 2010 by the United Nations Convention on the
10     Rights of the Child, Committee on the Rights of the Child,
11     Second and Third Periodic Reports of State's Parties for
12     Singapore.  This document is available on the Internet, as is
13     the other document.

14          You may continue your questions.

15          MR. McNALLY:  Thank you, your Honor.

16     BY MR. McNALLY:

17     Q.  Mr. Souratgar, your wife left you May 25, 2011, is that

18     correct?

19     A.  Yes.

20          THE COURT:  That's correct been asked and answered,

21     counsel.

22          MR. McNALLY:  Sorry.

23     Q.  If I can return you to R5 and R6, the passport copy.

24     A.  Yes.

25     Q.  The letter that I had shown you.  OK.  The date of the

1  passport issuance, that was after your wife left you, correct?

2  A.  Yes.

3  Q.  The date that the letter recites that she applied for the

4  national identity card, that was after your wife left you,

5  correct?

6  A.  Yes.

7          MR. McNALLY:  May I approach, your Honor?

8          THE COURT:  You may.

9          MR. McNALLY:  Your Honor, I'm showing the witness what

10  was previously marked as Petitioner's Exhibit C.

11          THE COURT:  But not received into evidence?

12          MR. ARENSTEIN:  It was, your Honor.

13          MR. McNALLY:  Yes, it was received.

14          THE COURT:  It's received as petitioner C.  Go ahead.

15          MR. McNALLY:  Correct.  Just because it has a number

16  of pages, I placed a flag on the, with the permission of

17  opposing counsel.

18          THE COURT:  On a particular page?

19          MR. McNALLY:  That's correct.

20          MR. ARENSTEIN:  I have no objection's.

21          MR. McNALLY:  For the Court's advisement, it is tab H.

22          THE COURT:  Fine.  The document is in evidence.  Go

23  ahead, ask your question.

24          MR. McNALLY:  Thank you, your Honor.

25  Q.  Mr. Souratgar, could you turn to the flagged page of the

1  document I just handed you.

2          THE WITNESS:  Can I open the document?

3          THE COURT:  Yes.  I'll let you know if you should not

4  follow the direction.  Go ahead, open the document.

5  Q.  That says tab H, correct?

6  A.  Yes, sir.

7  Q.  Following that, there is a page that says "Order of the

8  Court obtained in Chambers"?

9  A.  Yes.

10  Q.  On the next page after that, there are three numbered

11  paragraphs.  Do you see that?

12  A.  One, two, three, yes.

13  Q.  That is correct.  What does number 2 say?

14          MR. ARENSTEIN:  Your Honor, I think the document

15  speaks for itself.

16          THE COURT:  It does.  It's in evidence.

17          MR. McNALLY:  I just wanted to clear up some

18  testimony.

19          THE COURT:  You're welcome to clear up some testimony.

20          MR. McNALLY:  Thank you.

21          THE COURT:  But having the witness read aloud a

22  document which is in evidence is not the way to go.

23          MR. McNALLY:  Understood, your Honor.

24  Q.  Mr. Souratgar, the numbered paragraph 2, does that

25  accurately state the conditions as far as custody, care, and

1    control of the child as of the date of this document?

2              MR. ARENSTEIN:  Objection.  He is not a lawyer to

3    describe.

4              THE COURT:  As far as you know.

5    A.  I can read here they put just care.

6              THE COURT:  This is a little bit on the margins, your

7    question.  You're asking this witness whether the order of

8    February 16, 2012, accurately states the ruling of the court?

9    Is that your question?

10             MR. McNALLY:  Your Honor, I just wanted to clear up

11   for purposes of the record who had visitation and who had care

12   of the child.

13             THE COURT:  Why don't you ask him that question.

14             MR. McNALLY:  Yes, your Honor.

15   Q.  You testified previously that you had visitation for the

16   child, is that correct?

17   A.  Yes, sir.

18   Q.  Who was caring for the child while you were enjoying

19   visitation rights?

20   A.  The child was with her mother.

21   Q.  The child was sleeping at the same house where the mother

22   lived?

23   A.  I don't have any information.

24   Q.  Understood.

25             THE COURT:  Do you have much more, Mr. McNally?

 1          MR. McNALLY:  I don't, actually.

 2          THE COURT:  OK.

 3  Q.  Mr. Souratgar, you don't need that document anymore.  Mr.

 4  Souratgar, the child is currently staying with you here in the

 5  United States?

 6  A.  Yes, sir.

 7  Q.  Are you caring for the child yourself?

 8  A.  Yes, sir.

 9  Q.  Is anybody helping you?

10  A.  No.  I'm doing by myself.

11  Q.  Is anybody caring for the child while you're in court, for

12  example?

13  A.  Yes.

14  Q.  Who is that?

15  A.  Dr. Ahmad Ehffarian.

16          THE COURT:  Who is that person?

17          THE WITNESS:  His person is like uncle to Shayan.

18          THE COURT:  Is he a blood relative?

19          THE WITNESS:  No.  He is about 30 years family friend.

20          THE COURT:  What does that man do for a living?

21          THE WITNESS:  He is an electromagnetic doctor and he

22  is an international director of the TCI in the United States.

23          THE COURT:  What is the TCI?

24          THE WITNESS:  TCI, they do direction finder for the

25  government.

```
 1              THE COURT:  Where does he live?
 2              THE WITNESS:  In California.
 3              THE COURT:  He has come to New York to assist you?
 4              THE WITNESS:  Yes, sir.
 5    BY MR. McNALLY:
 6    Q.  Has Mr. Ehffarian cared for the child previously?  Before
 7    these proceedings, has he ever cared for the child?
 8    A.  Yes.  He has come to Singapore to stay with us, and my son
 9    knows him as Uncle Ahmad.
10              THE COURT:  How do you spell that?
11              THE WITNESS:  Ahmad, his first name, A-H-A-M-D.
12              THE COURT:  Thank you.
13    Q.  Has anyone else babysat for the child?
14    A.  Sometimes I ask the help from Ms. Tamme.
15    Q.  Who is Ms. Tamme?
16    A.  Ms. Tamme was a PI for Shayan.
17    Q.  How many times has Ms. Tamme cared for the child?
18    A.  Maybe three, four times, three times, especially when Ms.
19    Jennifer asked me to come to New York for the interview.
20    Q.  With regards to Ms. Tamme, what is the longest period of
21    time that she has cared for the child?
22    A.  Sorry?
23    Q.  With regards to Ms. Tamme, what was the longest period of
24    time that she has cared for the child?
25              MR. ARENSTEIN:  I'm going to object to the line of
```

1   questioning.  I don't know what the relevance is to the Hague

2   Convention.

3           THE COURT:  What is the relevance?

4           MR. McNALLY:  Your Honor, we are trying to establish

5   who is taking care of the child.

6           THE COURT:  What is the relevance?

7           MR. McNALLY:  We think it is relevant to determine is

8   the father taking care of this child, is somebody else?

9           THE COURT:  What is the relevance?

10          MR. McNALLY:  We think this is relevant for -- bear

11  with me one moment, your Honor.

12          Withdrawn, your Honor.

13          THE COURT:  OK.

14  Q.  Mr. Souratgar, you mentioned Ms. Tamme a moment ago.  Are

15  there other people who you have employed since obtaining

16  custody of the child to assist with dropping off the child and

17  picking her up?

18          MR. ARENSTEIN:  Objection.

19          THE COURT:  I'll allow it.

20          THE WITNESS:  Answer?

21          THE COURT:  Yes, please.

22  A.  Mr. McNally, could you repeat the question, please?

23  Q.  Since obtaining custody of the child here in the United

24  States, other than Ms. Stitt, have there been people that you

25  have employed to assist with dropping off and picking up the

1  child from visitation?

2  A.  I just go by taxi which Ms. Jennifer told me to engage a

3  taxi driver to observer when I hand over to Ms. Lee, and she

4  give an instruction to ask the taxi driver to come up from the

5  cab, when I hand over to Ms. Fair, he observe.  When I take

6  back Shayan, he observe.  And I have to take the name and

7  inform Ms. Jennifer.

8  Q.  Is it your testimony that no one else has assisted with the

9  picking up and dropping off of the child?

10 A.  Ms. Christine did.  My son called her Auntie Christine.

11 Q.  What is Christine's last name?

12 A.  I can't remember.  Ms. Christine.

13 Q.  Who is Ms. Christine?

14 A.  Ms. Christine?

15 Q.  Yes.

16 A.  Is one of the persons who was helping to find my son.

17 Q.  She is a private investigator?

18 A.  I have a contract with Ms. Tamme, which is the Blue Moon

19 company.  The rest, Ms. Tamme, all the people work for Ms.

20 Tamme, not me.  I just engage Ms. Tamme.

21 Q.  So it is your understanding that Christine works for Tamme,

22 is that correct?

23      MR. ARENSTEIN:  Again objection, your Honor.  I'm not

24 sure how relevant this is.

25      THE COURT:  I'll allow it.  Go ahead.

1    A.   Sorry?

2    Q.   Christine works for Tamme, that is your understanding?

3    A.   That's my understanding.  There is people working for her.

4    But I engaged Blue Moon Company, which is Ms. Tamme.

5    Q.   You're paying Blue Moon for those services?

6    A.   For what services?  For finding my son?

7    Q.   Yes.

8    A.   Yes.

9    Q.   You're paying Blue Moon for the services in connection with

10   visitation?

11   A.   No.

12          MR. ARENSTEIN:  Objection to the form of the question.

13          THE COURT:  Overruled.

14   A.   No, I'm not paying.

15          THE COURT:  Overruled.  Next question.

16   Q.   Other than Ms. Christine and Ms. Tamme, has anyone else

17   assisted you in the context of picking up and dropping off the

18   child from visitation?

19   A.   I just mentioned, taxi driver.

20   Q.   That's it?

21   A.   That's it.

22   Q.   Thank you.

23          MR. McNALLY:  One moment, your Honor.

24   Q.   Mr. Souratgar, how much have you paid Blue Moon agency to

25   date for their services?

1   A.  They give me the invoice and I pay.

2   Q.  How much is that?  How much was the last invoice you saw?

3   A.  I can't remember exactly for this one, but I know I pay

4   about close to 80 to $90,000 for the three PI.  I had three PI.

5   Q.  Who are those three PI?

6   A.  One, the first one, I can't remember.  But the second one

7   is Mr. Augostino.  And then Blue Moon, Ms. Tamme.  The first

8   one, I can't remember the name.

9   Q.  And then Christine?

10  A.  I explained I engaged Blue Moon.  The rest of the people

11  working for Ms. Tamme, I don't know who is working.

12  Q.  You said you are three investigators.  I'm just trying to

13  find out who those three are.

14  A.  The first one, I can't remember the name.  They call it

15  International Investigators --

16  Q.  InterPro, does that sound right?

17  A.  No, InterPro I think is Mr. Augostino.

18  Q.  OK.

19  A.  Mr. Augostino was second PI, and the third one is Blue

20  Moon, Ms. Tamme.

21  Q.  Mr. Souratgar, do you recall a visitation session from

22  Wednesday of last week?

23          MR. ARENSTEIN:  Objection.

24          THE COURT:  Overruled.

25  A.  Wednesday last week?

1   Q.   Correct.  There was a visitation session?

2              THE COURT:  Do you have a date to offer the witness?

3   Q.   November 28, 2012.

4   A.   You're talking about the church?

5   Q.   Yes.

6   A.   Yes, I remember.

7   Q.   Were you present for that visitation session when you

8   dropped off the child?

9   A.   Yes, I brought my son.

10  Q.   Did you go by yourself?

11  A.   Yes, of course.  I took bus.

12  Q.   It was you and the child?

13  A.   Yes.

14  Q.   There was nobody else with you?

15  A.   Nobody else was with me.

16  Q.   Isn't it true, Mr. Souratgar, that you also had two

17  additional people with you?

18             MR. ARENSTEIN:  Objection.  That's not what he said.

19             THE COURT:  Overruled.  This is cross-examination.

20  A.   Sorry?  I took bus with my son.  On the way Ms. Jennifer

21  sent me four SMSs and changed me four different places I

22  supposed to go.  All SMSs on my phone.  She asked me to go to

23  Olivia Restaurant or something like that.  Then she changed it,

24  she told don't take off from the cab.  Then she told me to come

25  to the church.  I supposed to go to the church.  Then I go to

1  74 Trinity something.

2  Q.  There were no additional persons within your employ who

3  were there at the time?

4  A.  When I reached there, it was two PI was waiting there for

5  us.

6  Q.  Who were they?  What are their names?

7  A.  These two persons, one of the names is Mr. Fred, the second

8  one I can't remember, which this has already managed and is

9  working for Ms. Tamme.

10  Q.  I asked you before if there was anybody with you when you

11  dropped off the child?

12  A.  Nobody with me.  I'm saying nobody with me.

13  Q.  Let's try and get the order of events here.  You go to drop

14  off the child and you take the bus, correct?

15  A.  Yes.

16  Q.  Then, when you arrive at the ultimate location where the

17  visitation is supposed to proceed --

18  A.  I took the taxi from the terminal to that place, and we

19  changed four times according to Ms. Jennifer, and reached the

20  destination.  When I reached there --

21          THE COURT:  Excuse me.  A second.  You asked the

22  question.  Let the witness answer.

23          MR. McNALLY:  I'm sorry.

24  A.  I saw Ms. Jennifer, but I can't remember that lady's name

25  besides Ms. Jennifer.  I'm sorry.  I saw these two persons.  We

1    go up to the building, and there was two gentlemen there.

2    Q.  Are you paying those two gentlemen?

3    A.  I am dealing with Blue Moon, Ms. Tamme.  They will invoice

4    me, and I will pay Ms. Tamme.

5    Q.  Did you ask for these two people to be there?

6    A.  I asked Ms. Tamme all my visitation because I want to watch

7    my son because my wife flew three times with my son.

8    Q.  What are your instructions as far as what these additional

9    people are supposed to do during these visitation sessions?

10          MR. ARENSTEIN:  I'm going to object to this line of

11   questioning.

12          THE COURT:  I'll allow it.  Go ahead.

13   A.  I do not give any instruction.  My instruction, talking to

14   Ms. Tamme, I want my son to be secure which Ms. Lee cannot take

15   him to another country as she mentioned before again.

16   Q.  I don't want to put words in your mouth, Mr. Souratgar.

17   Does Ms. Tamme have free rein to do whatever is necessary in

18   order do what you just said?

19          MR. ARENSTEIN:  Objection to the form.

20          THE COURT:  Do you understand the question?

21          THE WITNESS:  No.

22          THE COURT:  OK.

23   Q.  You mentioned that you have Ms. Tamme assisting you in the

24   context of visitation and dropping off and picking up the

25   child, is that right?

```
 1              MR. ARENSTEIN:  Objection.  That's not what was

 2   testified to.

 3              THE COURT:  Overruled.

 4   A.  Ms. Tamme and Ms. Christine did twice.  The first time Ms.

 5   Christine originally was because I have to be here in New York.

 6   The second time when Ms. Tamme pick up Shayan, Ms. Jennifer

 7   call me, I want you as the father send your son there and pick

 8   up your son by yourself.  Then I follow Ms. Jennifer

 9   instruction and I did the same.

10   Q.  What instructions have you provided to Ms. Tamme or the

11   people within her employ with regards to visitation?

12              MR. ARENSTEIN:  Objection, your Honor.

13              THE COURT:  Basis?

14              MR. ARENSTEIN:  I don't see the relevance.

15              THE COURT:  Overruled.

16   A.  I did not give instruction what Ms. Tamme do.  I just

17   asking Ms. Tamme please make the place secure which Ms. Lee do

18   not take my son and run away to another country.

19   Q.  No further specifics beyond that?

20   A.  I don't understand.

21              MR. ARENSTEIN:  Objection.

22              THE COURT:  Sustained.  Are you suggesting that

23   something inappropriate took place, Mr. McNally, or something

24   relevant to this proceeding?  If so, tell me what it is.

25              MR. McNALLY:  Yes.
```

```
 1              THE COURT:  What is inappropriate or relevant here?

 2              MR. McNALLY:  Your Honor, there is a visitation order

 3    that you signed dated November 19th in this case.

 4              THE COURT:  Sit down, Mr. Arenstein.  Do you want to

 5    stop Mr. McNally from answering my question?

 6              MR. ARENSTEIN:  No, no hat all.

 7              THE COURT:  Then why were you standing up?

 8              MR. ARENSTEIN:  I apologize.

 9              THE COURT:  Why were you standing up?

10              MR. ARENSTEIN:  I was going to wait for him to finish.

11              THE COURT:  He just started.  I just started

12    questioning him.

13              MR. ARENSTEIN:  OK.

14              THE COURT:  Go ahead.

15              MR. McNALLY:  Thank you.  On November 28th last week,

16    there was a visitation session.  Two individuals purporting to

17    be police officers of some kind or off-duty police officers,

18    were present.  They insisted upon being present during the

19    visitation session.

20              There is an order from your Honor dated November 19th

21    that says in paragraph 9 that the petitioner nor any person

22    acting on the petitioner's behalf are supposed to be present

23    for those visitation sessions.  That's what I'm trying to get

24    at here, whether those instructions came from the petitioner or

25    these people are acting on their own.
```

```
1              THE COURT:  Thank you.  Does that order apply to the
2    respondent's use of an expert to interview the child during a
3    visitation?
4              MR. McNALLY:  Your Honor, I think that the order
5    doesn't specifically address that, number one.  And I think
6    that there is some clarification that is going to be coming out
7    as to when the examination actually occurred.
8              THE COURT:  How long was it for?
9              MR. McNALLY:  The examination, your Honor?
10             THE COURT:  Yes, sir.
11             MR. McNALLY:  I don't think it was an examination, but
12   I personally wasn't there.  My co-counsel could address it.
13             MS. LEIDHOLDT:  I would be happy to, your Honor.
14             THE COURT:  How long?
15             MS. LEIDHOLDT:  Your Honor, what happened was, and we
16   have discussed it with Professor Baum, that the person that we
17   will be calling as an expert witness, Dr. Cling, never examined
18   the child.
19             THE COURT:  Never interviewed the child?
20             MS. LEIDHOLDT:  She didn't interview the child, no.
21             THE COURT:  Thank you.  That's good.
22             MR. ARENSTEIN:  Your Honor, if I might respond?
23             THE COURT:  Sure, you can respond.
24             MR. ARENSTEIN:  Apparently, Ms. Baum wrote a letter
25   last night.  She says, "No evaluation occurred, but she
```

1   confirmed my understanding that the child was not in fact

2   evaluated by speaking with Dr. Cling this evening, who told me

3   she was not there to evaluate the child and in fact didn't

4   evaluate the child.  She was there to observe the mother's

5   interaction with the child in connection with her evaluation of

6   Mrs. Lee.  She spoke briefly with the child in passing, words

7   to the effect of hello, how are you playing with" --

8           THE COURT:  Slow down when you are reading.  There is

9   a court reporter who needs to take down the words, Mr.

10  Arenstein.

11          MR. ARENSTEIN:  I'll start again and go slow.

12          THE COURT:  No, don't start again.

13          MR. ARENSTEIN:  "I confirm my understanding that the

14  child was not in fact evaluated by speaking with Dr. Cling this

15  evening, who told me that she was not there to evaluate the

16  child and in fact did not evaluate the child.  She was there to

17  observe the mother's interaction with the child in connection

18  with her evaluation of Mrs. Lee.  She spoke briefly with the

19  child in passing, words to the effect of hello, how are you

20  playing, what are you playing with, as it would be awkward and

21  strange to be in the room with the child and not say anything

22  to him.  But Dr. Cling assured me that her communications with

23  the child were de minimis and the child was not evaluated."

24          My problem is that nobody ever told me that Dr. Cling

25  was going to be at this visitation.  We have never had the

1   child evaluated or played with by our psychologist or anybody

2   doing this.  This is not a custody case.  Under the APA rules

3   we should have been given notice of what was going on.

4          Ms. Baum says that Ms. Leidholdt has never in fact

5   asked me --

6          THE COURT:  Excuse me a second, Mr. Arenstein.  What

7   are the APA rules?

8          MR. ARENSTEIN:  The American Psychological Association

9   says that when you interview children, you basically are

10  supposed to give notice to the parties if you're in the middle

11  of an action, to the parties that are involved or at least to

12  the counsel.

13         THE COURT:  Are they binding in this court?

14         MR. ARENSTEIN:  I don't know whether they are binding

15  in the federal court, but they are binding in the state courts

16  when you have custody evaluations.

17         Further, she says, "Ms. Leidholdt has never in fact

18  even asked me for permission to have the child evaluated."

19  Yesterday or the day before I think I heard that she had asked

20  us whether or not we'd have an evaluation.  She told Ms.

21  Dorchen that you do this at your own peril because it's not in

22  the order.  Apparently, Ms. Dorchen did ask to have Cling in.

23         I didn't know Dr. Cling was there.  I have a problem

24  with Dr. Cling testifying to anything she did with the child

25  and evaluating the child, playing with the mother or whatever.

1    My client hasn't seen his kid for months until he found his

2    child here.  We have never brought any psychological people at

3    any time at all to the child with my client and his son.

4         What's happened here is I think we've gotten into,

5    even with the guardian, a custody case where they are

6    evaluating the child.  They bring in Dr. Cling, who can ask

7    questions of the mother, show the mother playing with the

8    child.  She was in the room the whole time.

9         I would ask for permission after this is all over to

10   have my investigator, Tamme Stitt, testify as to what happened.

11   They were there to protect that the child was not taken away.

12   Originally, I was told the child was being brought to a church.

13   It turned out to be to an office building at 74 Trinity Place,

14   which was not a church.  It was a place where they went into a

15   room and my people were not going into the room.  They were

16   just making sure that the child was not taken anywhere else

17   other than where the child was supposed to be and returned.

18        It was my understanding, but I guess the letter says

19   different, that there was going to be a handoff back to my

20   client with Ms. Baum there.  But Ms. Baum couldn't stay four

21   hours for the visit, so she left, and my client was left

22   waiting there to figure out who was going to return his child

23   to him at the time.

24        We have had three times where he has been abducted,

25   and we are very concerned, very concerned, about security.  I

1   was asking Ms. Baum, who is going to be responsible for taking

2   care of this child?  What she told me was, she says, it's your

3   client's responsibility.  She said, I'm not responsible, I'm

4   not going to be responsible for the security of the child.

5           There is nobody that is responsible for the security

6   of the child but my client.  The only thing he can do is pay

7   for and expend money for private investigators.  At some point

8   in time there has to be a semblance where there is security

9   that this child is not spirited away, because there have been

10  incidents where children have been spirited away and

11  disappeared.  I've seen it in many of my cases.  One went to

12  Hungary and never came back because he was spirited a away.

13          The problem I have with the line of questioning and

14  the so forth -- I would ask for the opportunity because on my

15  witness list was Ms. Stitt, who is outside or will be outside

16  today, to testify to exactly what happened.  Her people asked

17  for permission to stay there.  It was public property.

18  Somebody told her that it was not public report property.  She

19  is giving you the facts.  I wasn't there, so I'm not going to

20  testify as to what happened.  But the people that were there

21  can tell you better what happened.

22          The thing is that without security, this child is

23  going to disappear.  As I said to you yesterday, the Supreme

24  Court is deciding right now, it is probably over now, but they

25  are deciding the issue of mootness if a child is taken out of

1   the jurisdiction of the court.  My concern is that we want this

2   trial to finish, we want you to make a decision, and we want

3   the child to be within the jurisdiction of the Court.

4         We have obeyed every order.  My client is not taking

5   anybody away.  We have obeyed every visitation.  He's brought

6   the children there.  He's gone himself and dropped him off.  I

7   know we have three visitations for the weekend, and I spoke to

8   the guardian earlier this morning about the Friday one.

9         I submitted to the Court earlier this morning a copy

10  of an affidavit that we are taking to the Singapore embassy,

11  which is sitting on your desk.  I gave it to the clerk this

12  morning and I gave it to all the parties here.  He is prepared

13  to go Friday morning to sign it, swear to it, and have the

14  consulate take care of it.

15        My concern is that that morning he would drop the

16  child off or would have the child dropped off by Dr. Allen and

17  then he would come back after he signed it, and then he will be

18  back there after 1 o'clock to be with his son, which he needs

19  to spend time with also.  The other two days your Honor has

20  ordered, and we'll obey that.

21        This line of questioning about the investigators and

22  the problem that occurred was because I had discussions with

23  Ms. Baum.  I think she sent you a letter this morning asking

24  for her responsibilities as guardian.

25        This is not a custody case.  This is a case under the

1    Hague Convention.  They are trying to bring in domestic

2    violence and grave risk of danger.  That is their opportunity,

3    but we need to secure the child.

4            When your Honor issued the original order that set up

5    the visitation, I was being interviewed, my client was, with

6    his son by the guardian, so we did not have time to respond to

7    the letters that were sent by Ms. Dorchen.  We didn't have time

8    to respond at all.  We did respond the next day, and we sent

9    you our letter.

10           But your order was already made.  We were responding

11   as you were issuing the order.  Ms. Nunez was writing the

12   response as the order came off the presses.  So we didn't have

13   a chance to respond to what Ms. Dorchen had said in her letter

14   until afterwards.  Your order was made prior to our concerns in

15   our letter.

16           We ask your Honor, number one, I don't think that this

17   testimony is relevant.  But if you think it is, I have no

18   problem with putting my investigator on and having you hear the

19   whole story.  I certainly have a problem with Ms. Cling, Dr.

20   Cling, being in there, evaluating the client, playing with the

21   child without consent from us.

22           The guardian never informed us until yesterday.

23   That's when I first found out that Dr. Cling was in the room

24   with the client outside at 74 Trinity Place.  Nobody told us.

25   This was all done surreptitiously, and we were entitled to

1    notice.

2           When I asked the guardian yesterday, that's when she

3    first told me that Dr. Cling was in the room.  I have a very

4    big objection to that.  Your Honor made a ruling yesterday, and

5    I'm going to ask that that ruling stick, that Dr. Cling not be

6    allowed to testify to any evaluation that she has done with or

7    without the child there at the time.  Thank you, your Honor.

8           THE COURT:  Mr. McNally.

9           MR. McNALLY:  Your Honor, in response --

10          THE COURT:  No, no.  We are in the middle of cross-

11   examination.

12          MR. McNALLY:  I wasn't aware of that, your Honor.

13          THE COURT:  Are you done with cross-examination?

14          MR. McNALLY:  I have no further questions of this

15   witness.

16          THE COURT:  Redirect.

17   REDIRECT EXAMINATION

18   BY MR. ARENSTEIN:

19   Q.  Mr. Souratgar, in January of 2010, the arm incident that

20   you described in your testimony, was that before she left the

21   house?

22   A.  Yes, sir.

23   Q.  Regarding Ms. Fair's police record, did you or your

24   attorney receive any notice of a personal protection

25   application being filed after the series of police reports were

1    made?

2    A.   Sorry, I didn't understand.

3    Q.   I'll repeat it again.  Regarding Ms. Fair's police reports,

4    did you or your attorney receive any notice of a PPO, or

5    personal protection application, being filed after the various

6    police reports were made?

7    A.   No.

8    Q.   Did you take the matter of your wife's touching the

9    child -- the wife's sister touching the child -- did you think

10   that the manner of your wife's sister touching the child was

11   inappropriate?

12   A.   Yes.

13   Q.   Were you concerned about the whereabouts of your son when

14   you filed the police report, an RJ3?

15   A.   Yes, sir.

16   Q.   RJ3.  When you filed the police report, were you concerned

17   about the whereabouts of your son?

18   A.   Yes.

19   Q.   Why did you not report the inappropriate touching in that

20   police report?

21   A.   I was shocked.  Because when I was home, when I went back

22   home, everything's gone.  In the first place, I thought they

23   kidnapped my family, because everything gone.  Until Mr. Mark

24   came and told me, no, kidnapper would not take the furniture,

25   they wouldn't take anything, even the rice and oil.  They left.

1    Then I realized, yes, they left, because they clean up

2    everything.

3           Then I asked him what, should I do?  He asked me to go

4    to police station.  When I went to police station, in police

5    station my first concern, wherever I was, is my son's safety.

6    That's why I quickly make the police report.  And the police

7    told me, have you contacted your wife.  I say yes, I keep

8    calling, but the phone is off.

9           Then I made the police report.  And I don't know where

10   they went.  I say the first thing I want, safety of my son, put

11   in some nursery, find my son, keep son far from her, because

12   I'm afraid she going to do something to hurt him.

13   Q.  Who is the "they" you're referring to?

14   A.  Sorry?

15   Q.  Who is the "they" that you just referred to in your

16   testimony?

17   A.  On the 25th May 2011.

18   Q.  Who is the "they"?  Who are the people that you are talking

19   about?  Who was it that was taking the report?

20   A.  Police.  I was in a police station.

21   Q.  Who were the people that went to the house and took

22   everything?

23   A.  One more time.  Sorry.

24   Q.  Who were the people that went to the house and took

25   everything?

1  A.  Ms. Lee Jen Fair, my maid, and she took my son.  And

2  everything has removed.

3  Q.  Where did they take him?

4  A.  I learned after that she went to her sister place, which I

5  don't know where is she, where was the place.

6  Q.  What did they take out of the house with them when they

7  left?

8  A.  Everything.  Even I had shoes, one side left.  They take

9  $13,200 U.S. cash.  They took a 50-gram gold bar, my computer.

10  I just left with one shoe which got one half with them, one

11  half with me, and there's nothing left.  Even from the rice and

12  the oil, everything, everything they took.

13  Q.  Why did you bring the action in the Shariah court in

14  Malaysia?

15  A.  Because I call her, I saw she the tone ring is a Malaysian

16  tone ring.  Then I went to Malaysia to find my son.  That's why

17  I went to my mother-in-law house to find them.  When I find

18  them in Malaysia, I asked my mother-in-law, I want to see my

19  son, is he OK or not?  She said I'm not allowed to see my son.

20  I think Ms. Jennifer saw the video.  I'm not allowed to touch

21  my son, I'm not allowed to see my son, and I'm not allowed to

22  hold my son.

23       Only am allowed to see from afar.  This never

24  happened.  I told them I am going to make a police report, and

25  I have did a police report.  And two police officers came.

 1   Q.  Have you spoken to your attorney in Malaysia regarding the

 2   discontinuance of this action?

 3   A.  Yes, three months ago, a bit more.

 4   Q.  You have asked him to discontinue?

 5   A.  Yes, because I don't want any more money to spend there.

 6   Q.  On the date of August 15th, when Ms. Fair alleged that you

 7   had scratched her, what did she do besides making police

 8   reports?

 9   A.  Sorry.  Again.

10   Q.  Did she make a PPO?  Did she make a personal order?

11   A.  On the 16th August, yes.  I learned later on, received a

12   letter, she asked for personal protection.

13   Q.  What did she do after that?

14   A.  I went to the court and then Ms. Gomez was with me.  We

15   went to the court to see the judge.  Then they asked us go for

16   the counseling, both of us.  And then Ms. Gomez left.  I went

17   for the counseling.  The counselor asked me what happened.  I

18   explain.  Then she went to talk.  And then the counselor call

19   me again and say, your wife agree to withdraw her application

20   if I give undertaking.

21        I told exactly, I want to go for hearing and continue.

22   If I am wrong, I have to be punished.  Then I show him, show

23   them, a booklet which I already made for my court which showed

24   Ms. Jennifer phone and her picture is there, and nothing

25   happened to her.  When they saw this one, they call Ms. Lee Jen

 1   Fair back into the room, asked me to wait outside.  Then Ms.

 2   Lee Jen Fair came back into the room.

 3          Then they called me again and say your wife, Ms. Lee

 4   Jen Fair, wants to proceed with the court.  I said OK.  Then

 5   they called us again to go downstairs to wait.  Ms. Lee Jen

 6   Fair came from this door, I came from another door.  When we

 7   enter the court, the judge call our name and say Ms. Lee Jen

 8   Fair withdraw the application dismiss the charges against me

 9   and we can go pack home.

10          When we came back out from the door, Ms. Lee Jen Fair

11   said, I had a very good --

12          THE COURT:  Stop.  I didn't hear you.  Ms. Lee Jen

13   Fair say?

14          THE WITNESS:  Withdraw.  She doesn't want to continue.

15          THE COURT:  Withdraw?

16          THE WITNESS:  Yes, withdraw.

17          THE COURT:  Go ahead.

18   A.  Then the judge asked us to leave the court and case closed.

19   Maybe I don't use the proper wording, but they say we have to

20   go home.  Then, when we came home from the court, Ms. Lee Jen

21   Fair look at me and started smiling, I had good fun with you.

22   I quickly back to the courtroom.  I informed a secretary there,

23   I want to ask the judge to continue the case, she said she had

24   fun with us.

25          The judge informed to go and see counselor again.  I

1    went to see the counselor again.  I inform.  She said, she told

2    me, this is her application; if you want, you make a police

3    report and then again, sir, which I did.

4            MR. ARENSTEIN:  I have no further questions at this

5    point.

6            THE COURT:  You may step down, sir.

7            (Witness excused)

8            THE COURT:  At this time I will take up the

9    respondent's letter application with regard to the testimony of

10   witnesses from a remote location.  Mr. McNally, is there

11   anything further you wish to say beyond your letter of December

12   4th?

13           MR. McNALLY:  I think I can rest on my papers there.

14   The only exception to that is, your Honor, one of the

15   witnesses, in light of your ruling on Monday, we are urgently

16   trying to get a visa for her so she may actually be present in

17   the courtroom.

18           THE COURT:  Anything else?

19           MR. McNALLY:  I rest on my papers, your Honor.

20           THE COURT:  All right.

21           Mr. Arenstein.

22           MR. ARENSTEIN:  Yes, your Honor.  First of all, I got

23   this late last night, so I did not have a chance to respond

24   this morning.  I apologize to the Court for not having a

25   written response.  I only received this at 7:30 in the morning,

1    when I looked at my email.

2           Respondent is not ready, because she never thought she

3    would be at trial.  The reason for calling witnesses at this

4    late hour is a lack of planning.  The way I understand the

5    Hague Convention, it is supposed to be an expedited trial.  We

6    are supposed to have a trial done within six weeks from the

7    filing of the petition for this case.  We did have problems

8    locating the respondent, but once we did, I think the time

9    under the Hague Convention begins to run.

10          One month was all we had to plan the trial after the

11   first hearing date.  Before that, we focused on finding the

12   respondent and the child.  We knew we needed our client's

13   Singapore counsel to clear any issues regarding the family

14   court proceedings and rules, and we asked her to come.  After

15   December 1st she had a conflict.  She had to change her whole

16   schedule once your Honor set a date of December 3rd for the

17   beginning of the trial.  She had to reorganize her schedule,

18   yet she came here.

19          I believe this application is prejudicial.  It's

20   surprise in a way to come in after we start the trial and then

21   give us a list of witnesses who were available before.  They

22   had information at the start.  They had a month to prepare.

23   They have done all the things they enunciated in their letter.

24   All of a sudden now they are asking for this at the midnight

25   hour.

1          I think it is prejudicial.  I don't think it is

2   proper.  They argue that you gave time in another case and they

3   argue that there is time under the federal rules.  Well, the

4   federal rules are relaxed under Hague Convention cases,

5   especially expedited cases, which are supposed to get done in a

6   quick way.

7          My client is here spending a fortune on time and money

8   to live here, on security guards to make sure that his child

9   isn't spirited away again, three times already, and it is

10  costing him a fortune to be here.  For us to prolong this trial

11  and go on with additional witnesses, and so forth, I think is

12  unfair and I think it is improper.

13         I think their application, which you already ruled on,

14  was correct.  I think the statements you made on the record

15  were right, and I disagree with their application and their

16  cites to go forward and do that.

17         This is a trial to determine jurisdiction, not

18  custody.  I think if you look at the witnesses that they intend

19  to put on, they are trying a custody trial.  They are trying a

20  domestic violence trial.  I'm going to be objecting to a large

21  part of their witnesses because domestic violence is not

22  necessarily grave risk of danger.

23         If anything, abduction of a child is child abuse.

24  That's the abuse that has occurred here.  They have abused this

25  child by abducting the child and keeping the child away from

1    his father for all the time they did and all the effort he had

2    to make to try to find his son.

3         This entire charade of witnesses to come in to testify

4    to alleged domestic violence or whatever else they are going to

5    testify to should be done in Singapore, which is the proper

6    jurisdiction for everything in this case.  Everybody lived in

7    Singapore.  The child lives in Singapore.  The works was in

8    Singapore.

9         And I don't believe there is any danger to anything.

10   We have given an undertaking this morning and we are going to

11   give it on Friday just like we agreed to with the Court.

12        THE COURT:  I would ask you to confine your comments,

13   Mr. Arenstein, to the application that is presently being

14   heard.

15        MR. ARENSTEIN:  I believe that the witnesses they have

16   asked for and the surprise and the timing isn't a proper

17   application at this time.  It's too late, it's surprise, and it

18   is not in the interests of justice for this case.  If anything,

19   it is more of a delay to keep this case going.

20        I would oppose the application, ask your Honor not to

21   grant it, and let us go on and finish this trial.  If I put on

22   Ms. Stitt, I only have a few more witnesses, we will be done.

23   I'd like to get this trial finished.  I don't want to spend

24   weeks on a trial that should be done in a short period of time.

25   Many of these Hague trials are summary proceedings.  This

1   should be expedited.  It shouldn't be stretched into a full-

2   scale trial with all these witnesses that they have submitted

3   here, your Honor.

4          Thank you.

5          THE COURT:  Mr. McNally.

6          MR. McNALLY:  To respond to a couple of things as far

7   as that is concerned.

8          THE COURT:  Mr. Arenstein, one question.  You said

9   list of the witnesses that they have submitted here.  What are

10  you referring to?

11         MR. ARENSTEIN:  After your Honor made a ruling, they

12  sent me a list of witnesses the next day with a list of

13  exhibits.  That's what I was referring to.

14         THE COURT:  Thank you.

15         Mr. McNally.

16         MR. McNALLY:  It was the same day, your Honor.  The

17  fact of the matter is we received Mr. Arenstein's witness list

18  on Wednesday night, less than a week ago.  We came in Monday,

19  we were ready to go.  We saw that petitioner's Singapore

20  counsel was testifying.  We said OK, we play ball and we adhere

21  to the judge's schedule no matter what.

22         We only asked for an opportunity to call our own

23  witnesses.  If you compare the relative time frames to when our

24  witnesses will go on versus when his witnesses were presented,

25  he actually is going to have more time than we ever did to

 1    present our case.

 2              If this was an normal case, of course we would have

 3    been exchanging these things.  For example, seeking to call

 4    respondent's Singapore counsel, that's possibly, quite frankly,

 5    not something that we would have done.  But we needed to rebut

 6    Ms. Gomez's testimony, which we only found out about last

 7    Wednesday.

 8              With regards to the point about six weeks under the

 9    Hague Convention, it is true that the Hague Convention does say

10    that.  The consequences if it doesn't happen, the petitioner

11    can seek or the central authority can ask the question, why

12    hasn't this happened, and the Court would have to respond to

13    that.  We would be happy to submit whatever would be needed to

14    support the Court as far as the procedural history is

15    concerned.

16              If you look at the cases that are out there on the

17    Hague Convention, unless it is an uncontested case, I would say

18    it is extremely rare that they do get resolved within six

19    weeks.

20              Thank you, your Honor.

21              MR. ARENSTEIN:  May I respond to that, your Honor?

22              THE COURT:  Usually when there is a motion, the movant

23    makes their motion, the person opposing the motion responds,

24    and it is customary to give the movant a reply.  That's the way

25    I proceed on these things.  Do you have some reason why I

 1    should vary from that, Mr. Arenstein?

 2          MR. ARENSTEIN:  Yes.  I just wanted to make one point.

 3          THE COURT:  Can you explain to me why I should vary

 4    from that here?

 5          MR. ARENSTEIN:  The only reason I think you would vary

 6    is because one thing that was said needs to be addressed to the

 7    Court.

 8          THE COURT:  What is that, sir?

 9          MR. ARENSTEIN:  That the witnesses were available to

10    them well before -- during the time that we first started, in

11    November, when we were in court.  They had the time to get

12    their witnesses together.

13          I only responded to the witnesses when your Honor

14    issued an order for us to respond, to put that in.  I put in

15    rebuttal witnesses.  The only fact witnesses I have were my

16    investigators and my client and Ms. Gomez.  That's it.  We

17    don't have a whole slew of witnesses here to testify.  We are

18    not stretching this out.

19          The point is that they could have told us that they

20    were going to have witnesses.  We could have rescheduled.  We

21    could have done a lot of different things.  This is surprise to

22    me.  This whole thing with the notice and everything else is

23    putting us while we are starting our trial, a list of people

24    that they are going to bring from all over, I think it is

25    improper, your Honor.

1          The only thing we had to do, which is why we couldn't

2     get our list quicker than possible, was we had to have Ms.

3     Gomez change her schedule.

4          THE COURT:  Mr. McNally, anything further?

5          MR. McNALLY:  I think we have laid it all out in our

6     letter, spoken on it.  We can't go back and forth.

7          THE COURT:  Thank you.  I am prepared to rule on this

8     issue.

9          First of all, the respondent has moved to reconsider

10    the Court's ruling of December 3 denying the respondent's

11    application to call witnesses to testify by live video

12    transmission.  It is perfectly appropriate for the respondent

13    to make such a motion and to do so on a written submission,

14    which they have now done.  That written submission is the

15    letter of December 4th, which is 3 pages in length.  I have

16    considered that and the argument of counsel.

17         Let me begin by reviewing Rule 43(a).  Rule 43(a) of

18    the Federal Rules of Civil Procedure provides, and I don't need

19    to read the entire rule in the record, that witnesses'

20    testimony must be taken in open court unless some exception

21    applies.  It further goes on to say, "For good cause, in

22    compelling circumstances and with appropriate safeguards, the

23    court may permit testimony in open court by contemporaneous

24    transmission from a different location."

25         The advisory committee notes report that

1    contemporaneous transmission from a different location is

2    permitted only on showing good cause and compelling

3    circumstances, and goes on to say that the importance of

4    presenting live testimony in court cannot be forgotten.  "The

5    very ceremony of trial," says the advisory committee notes, "in

6    the presence of the fact-finder may exert a powerful force on

7    truth-telling.  The opportunity to judge the demeanor of a

8    witness face to face is accorded great value in our tradition.

9    Transmission cannot be justified," says the advisory committee

10   notes, "merely by showing that it is inconvenient for the

11   witness to attend the trial."

12           It then goes on to give an example of compelling

13   circumstances which would be "unexpected reasons, such as

14   accident or illness."  It then says, "Other possible

15   justifications for remote transmission must be approached

16   cautiously."

17           This circumstance calls to mind this Court's decision

18   in Matovski, v. Matovski, 06 Civ. 4259, a decision of May 31,

19   2007, which I understand is available on Westlaw, cited in Mr.

20   McNally's submission, a 6-page decision.  The reasoning I

21   incorporate by reference.

22           There the petitioner sought to permit eight witnesses

23   to testify telephonically at a child abduction trial or,

24   alternatively, by video link.  The court denied the application

25   as to all witnesses other than the petitioner himself.  The

court found compelling circumstances to exist because it was

going to be adjudicating the rights of the father in relation

to the child without the benefit of any questioning of the

petitioner, without the benefit of any examination.

        The court concluded that that was a compelling

circumstance justifying the provisions of Rule 43(a) or

justifying the simultaneous contemporaneous transmission.  I

will note for the record that that was not the first time or

not the only time I have allowed a contemporaneous video

transmission this a vague convention case.

        I did that subsequently in another case where the

petitioner could not, like the petitioner in Matovski, enter

the United States because of an insurmountable visa problem.  I

allowed the petitioner's father to testify in that case as well

by contemporaneous transmission.

        But I do not find that that circumstance justifies the

other fact witnesses.  As I said in Matovski, there was ample

opportunity for the petitioner to at least attempt to conduct

de bene esse depositions of the witnesses.  And there is no

evidence that there were any specific visa problems faced by

the other witnesses; there is nothing unexpected or compelling.

        With regard to what do I have before me which

demonstrates the compelling circumstances, I have the letter of

Mr. McNally, and I fully credit what he says, that these

witnesses are outside the United States, and indeed in

1    Singapore.  I don't dispute that for one moment.

2           But there has been no attempt by the respondent to

3    demonstrate to the Court regarding the testimony of these

4    particular witnesses, why there is any compelling need or why

5    they could not last week, this week, have testified by

6    deposition with the right to cross-examine live or some other

7    means taken.

8           Rather, on the first day of the hearing, at the end of

9    the hearing, the end of the first day's hearing, respondent

10   raised this for the first time on an oral application and at

11   that point in time hadn't even given petitioner's counsel the

12   identity of the witnesses so that he could intelligently

13   respond to the application.

14          In this regard I want to be abundantly clear that the

15   Court did not require the parties to disclose the identity of

16   fact witnesses.  There was no violation of that rule by the

17   respondent.  That's not the point.  But when the respondent

18   moves the Court under 43(a) to show good cause and compelling

19   circumstances, that changes the playing field.  At that point

20   the rule puts the affirmative burden on the party who is

21   seeking to have the testimony in open court by contemporaneous

22   transmission to show good cause and compelling circumstances.

23          The respondent did not do on its application on

24   December 3, nor have they done it at this point.  Therefore,

25   upon reconsideration, this Court fully adheres to its prior

1    ruling and supplements that ruling with the oral statements

2    here today from the bench, this bench ruling, as well as the

3    full text of the Court's decision in Matovski.

4             We will pick up at 2 p.m.  Thank you all.

5             (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                AFTERNOON SESSION

2                2:25 pm

3                (Hearing resumes)

4                (In open court)

5                THE COURT:  Please be seated.  Good afternoon,

6     everyone.  Mr. Aaron, you can call your next witness.

7                MR. ARENSTEIN:  I call Tammy Stitt to the stand, your

8     Honor.

9                THE COURT:  All right.

10     TAMATHA STITT,

11          called as a witness by the Petitioner,

12          having been duly sworn, testified as follows:

13     DIRECT EXAMINATION

14     BY MR. ARENSTEIN:

15     Q.  Ms. Stitt, what is your occupation?

16     A.  I am a private investigator.  I own a private investigation

17     agency.

18     Q.  What experience do you have leading up to making you a

19     private investigator?

20     A.  I started originally at the Department of Social Services

21     in the Child Support Investigation Unit where I looked for

22     missing fathers that failed to pay child support.  I then was

23     an investigator for Tier W, which at that time was a credit

24     bureau agency.  Then I went to the police academy, where I

25     became a police officer and stayed there for 10 years.

1   Q.  What did you do after you became a police officer?

2   A.  Immediately after the academy I was recruited into the drug

3   task for where if stayed for 8 years, and then I went on the

4   road for two years.  During that time I had extensive training

5   in narcotics, some training in domestic violence and juvenile

6   law.

7   Q.  After that, what did you do after that?

8   A.  I opened up my agency around that time and I made the

9   decision I would like doing this better, so I left the

10  department.

11  Q.  Where is your agency located?

12  A.  40 Greenkill Road, Bloomington, New York.

13  Q.  Are you acquainted with the petitioner, Abdullah Naghash

14  Souratgar?

15  A.  Yes, I am.

16  Q.  How did you become acquainted with him?

17  A.  He called me one day to talk about his missing child.

18  Q.  When was that?

19  A.  It was around the beginning of September, approximately

20  September 10th.

21  Q.  At that time did you have -- what was the conversation you

22  had with him?

23  A.  He advised me he was trying to find his child Shayan and he

24  believed he was in the Dutchess County area.

25  Q.  Tell us what steps you took after you met him and did he

1    engage you to represent him?

2    A.  Yes, we have a contract.

3    Q.  As a result of that contract, what did you do?

4    A.  First I asked for all the court documents showing that he

5    had custody of Shayan and that he sent me everything.  I have a

6    lot of paperwork.  I also spent some time, probably 4 or 5 days

7    checking out, to make sure the documents were legitimate which

8    I was able to find that easily online.

9    Q.  What due diligence did you do to ascertain whatever you had

10   needed to know to proceed, do the investigation in this case?

11   A.  The paperwork he gave me coincided with the paperwork I

12   found online filed in Singapore court.  The only thing that

13   concerned me was the Iran watch list that I found, that I was

14   able to confirm that, looked like a very weak web site.

15          So I made phone calls and did a visit to check out the

16   possibility that I should not be working for him.  I was able

17   to confirm he was totally fine to work for.

18   Q.  After you did that, what did you do next?

19   A.  We started the surveillance.  We started with our

20   initiative to try to find Shayan.

21   Q.  Can you describe for the court the steps you took on your

22   surveillance, what you did?

23   A.  Yes.  He had two addresses.  He was not sure -- he was sure

24   he was at one of two of the addresses.  We ended up following

25   her for almost 500 hours surveillance total.

1   Q.  Where did you do?

2   A.  We followed her.  Her schedule was pretty much the same

3   every day.  She left her house at Turkey Hill, went to Dunkin

4   Donuts before she went to work until Monday, when she went to

5   7:00 o'clock and went back to Turkey Hill.

6   Q.  Turkey Hill is in Dutchess County.  What other places did

7   you go?

8   A.  14 Sharon Drive which is her uncle's house.

9   Q.  Is that Tivoli?

10  A.  Yes.  She went there every evening for about 20 to 30

11  minutes.

12  Q.  What did you observe?

13  A.  Not much.  We never saw anything other than her going into

14  the house and leaving the house except for one time that Marc

15  called me very late in the evening that he thought he may have

16  seen Shayan through the window.  By the time I got there, he

17  was gone.

18  Q.  Tell the court who Marc is.

19  A.  Marc is one of my investigators, Marc Vandewater.

20  Q.  How does Marc fit into this picture?

21  A.  He works for me.  He is a sergeant with the Police

22  Department and he is one of my employees.

23  Q.  What is the name of your agency?

24  A.  Blue Moon Detective Agency.

25  Q.  Marc works for you.  Did you have Marc do anything in this

case?

A.  We could not find Shayan.  I was starting to think he

didn't exist or he wasn't here.  I thought maybe he was in New

York City with a relative because we never saw him.  I sent

Marc in to become her friend at the shop.

Q.  Then what happened?

A.  He became friends with her.  He had a conversation with

her.  He went in and said his nails needed to be fixed because

he was in a courtroom and his boss didn't like the way his

hands looked, so she asked her what he did.  He said he was a

lawyer, and they started talking about family law and child

custody matters.

Q.  Were you able to locate Shayan at the time?

A.  No, not at the time we didn't.  We still did not at that

point know where he was.

Q.  What steps did you take to find out where Shayan was?

A.  Marc took her out for dinner one night just to talk about

her situation, and she still did not tell him anything about

Shayan.  Eventually he was able to bring her out on a lunch

date with the mother and another child, and that is when she

brought Shayan out.

Q.  What happened after that?

A.  She spent some time in the mall.  He showed up with

sunglasses on and a hat.  He was very introverted.  I had

another investigator in the restaurant taking pictures so I

1     could show Mr. Souratgar, in fact, was actually here in Upstate

2     New York.

3     Q.  Where was Shayan found?

4     A.  He was at 14 Sharon -- I don't know where he was found that

5     day.  He was brought out to the mall, but eventually with we

6     found out through conversation that he had been at 14 Sharon

7     Drive.

8     Q.  That is where they kept Shayan?

9     A.  That is where they kept Shayan, but we never saw him leave

10    the house ever.

11    Q.  He was always in the house?

12    A.  Always in the house.  We were on that house all the time.

13    We even at one point were able to get to the back of the house

14    and do surveillance from the back of the house and never saw

15    him leave.

16    Q.  They never took him out of the house for a trip or some

17    place --

18              THE COURT:  Sustained.

19              MS. LEIDHOLDT:  Objection.

20    BY MR. ARENSTEIN:

21    Q.  Tell us what they did with Shayan.

22    A.  Sometimes she has off on Monday, and there were times we

23    were behind the house when she came home and Shayan was not

24    with her that evening, either.  There was twice we followed her

25    home that she came into the back of the house and we could see

1    clearly into the vehicle, and Shayan was not in the vehicle.

2    Q.  Did Lee Jen Fair travel at all?

3    A.  Yes, she took off a couple of times.  She went to the

4    Palisades Mall one weekend.  She went to a casino another

5    weekend.

6            THE COURT:  What issue does this go to, Mr. Aaron?

7            MR. ARENSTEIN:  The attempts that were made to try to

8    find the child and where the child was kept.  We are going to

9    hear testimony, your Honor, that the child was locked up in a

10   house and never came out, which we've heard.

11           THE COURT:  What does that go to?

12           MR. ARENSTEIN:  It goes to the issue of where the

13   child was placed and kept in the United States.

14           THE COURT:  We have the testimony from this witness.

15   She has now established that.  What else do you need from this

16   witness?

17           MR. ARENSTEIN:  Give me a minute.

18           (Off-the-record discussion)

19   BY MR. ARENSTEIN:

20   Q.  Have you established a system of -- withdrawn.  How many

21   employees do you have in your agency?

22   A.  I have a pool of employees that I can grab from.  It

23   depends on what is going on.  Sometimes I have two, sometimes I

24   have 10.

25   Q.  Could you describe for the court the incident that occurred

1   at Trinity Church in December of this year regarding a

2   visitation of Shayan with his father.

3   A.  Yes.  I had done some research on the Sanctuary for

4   Families.  I found a single article stating that they were

5   located in possible churches throughout New York City, and that

6   concerned me.  So we went two private investigators just to

7   make sure that nobody left with Shayan.

8   Q.  What happened?

9   A.  As far as I know, nothing happened.  There was a little

10  miscommunication between my investigators.  They thought they

11  had to be in the same room.  I cleared that up and everything

12  was fine.

13  Q.  Were they able to stay on the scene and surveil the place?

14  A.  They were.  They didn't have any problems staying.  They

15  were told by the security guard they could stay.

16  Q.  What credentials do you require of your employees?

17  A.  Everybody that works for me is active or retired law

18  enforcement.

19  Q.  The people that you hired on that day?

20  A.  They are active law enforcement.

21  Q.  What was their purpose of being there?

22  A.  Just to make sure that nobody left with Shayan.

23          THE COURT:  Anything further, Mr. Arenstein?

24          MR. ARENSTEIN:  No, no other questions.

25          THE COURT:  Any cross-examination?

1    CROSS EXAMINATION

2    BY MR. McNALLY:

3    Q.  Good afternoon, Ms. Stitt.

4    A.  Hello.

5    Q.  You mentioned on direct that you have a contract with

6    Mr. Souratgar.  Is that correct?

7    A.  That is correct.

8    Q.  You're being paid under that contract, correct?

9    A.  Yes, I am.

10   Q.  Have you received any funds so far from Mr. Souratgar?

11   A.  Yes, I have.

12   Q.  How much have you received?

13   A.  Approximately 45 to $50,000.

14   Q.  Are you still owed money from Mr. Souratgar based on

15   services rendered since your last invoice?

16   A.  No, I do not.

17   Q.  What did you do to prepare for your testimony today?

18   A.  I don't understand the question.

19   Q.  What did do, if anything, to prepare for your testimony

20   today?

21   A.  I didn't do anything.  I just walked in the door.

22   Q.  Are you billing for your time spent on the stand today?

23   A.  No, I am not.

24   Q.  Are you billing for your travel time?

25   A.  No, I am not.

1  Q.  Do you recall submitting an affidavit in this matter during

2  the ex-parte matters portions?

3  A.  What was the question?

4  Q.  Do you recall submitting an affidavit to the court in this

5  matter?

6  A.  I've submitted quite a few affidavits, yes.

7  Q.  Do you recall that your affidavit refers to a male

8  investigator and female investigator?

9  A.  Yes.

10          MR. ARENSTEIN:  Objection unless he produces the

11  affidavit.

12          THE COURT:  What is the basis for the objection?

13          MR. ARENSTEIN:  He is questioning about a document.

14  He should be presenting the document.

15          THE COURT:  Not necessarily unless the witness

16  indicates a failure of recollection, in which event it can be

17  shown to the witness to refresh the witness' recollection.

18          MR. ARENSTEIN:  Withdrawn.

19          THE COURT:  Thank you.

20          MR. ARENSTEIN:  I withdraw the objection.

21          THE COURT:  Thank you.

22  BY MR. McNALLY:

23  Q.  Who was the male investigator you referred to?

24  A.  Marc Vandewater.

25  Q.  Who was the female investigator?

 1  A.  Which incident?

 2  Q.  Do you recall that your affidavit references occasions

 3  where people within your employ went into the nail salon where

 4  Ms. Lee was?

 5  A.  Yes, that would be Leslie Tothe.

 6  Q.  Can you spell the last name for the record.

 7  A.  T O T H E.

 8  Q.  What was the purpose of those contacts with Ms. Lee --

 9  withdrawn.

10        Did Ms. Tothe or Mr. Vandewater make any personal

11  contacts with Ms. Lee?  Did they speak to Ms. Lee at all?

12  A.  Yes.

13  Q.  Do you know what they said?

14  A.  They just had general conversation.  I believe Leslie tried

15  to get her to go out one evening.

16  Q.  And she declined?

17  A.  That's correct.

18  Q.  Did Mr. Vandewater talk to Ms. Lee?

19  A.  Yes.

20  Q.  What did Mr. Vandewater say to Ms. Lee?

21  A.  He had a conversation with her and he asked her to go out

22  to dinner to talk about her case.

23  Q.  Who did Mr. Vandewater say that he was?

24  A.  He said he was a lawyer.

25  Q.  Do you know what kind of lawyer?

1    A.  He did not specific.  I don't believe he specified, but I

2    am not sure.

3    Q.  Do you know how Mr. Vandewater decided to say he was going

4    to be a lawyer?

5    A.  I asked him to do that.

6    Q.  What was the purpose of that?

7    A.  My client had told me that she would not become friends

8    with anybody unless that person would be able to help her, and

9    so after Leslie was not able to become friends with her, that

10   was the decision I made, hoping she would have a conversation

11   with him.

12   Q.  The point of him holding himself out as a lawyer was to

13   gain her confidence.  Is that correct?

14   A.  It was to discuss -- our end result was to try to find

15   Shayan.

16   Q.  Why did you deem it appropriate for him to hold himself out

17   as lawyer?

18   A.  Because I knew she would probably need help and a lawyer

19   could help her.

20   Q.  What, to your knowledge, did Mr. Vandewater say in order to

21   maintain his cover as a lawyer?

22   A.  As far as --

23          MR. ARENSTEIN:  Objection to the form of the question,

24   "cover as a lawyer."

25          THE COURT:  Overruled.

1          THE COURT:  If you know the answer, you can give it.

2          THE WITNESS:  Can you repeat it.

3          MR. McNALLY:  Let me withdraw that question and ask it

4    a different way.

5          THE COURT:  Right.

6    BY MR. McNALLY:

7    Q.  What preparations were made so that Mr. Vandewater would

8    successfully hold himself out as a lawyer to Ms. Lee?

9    A.  He studied the Hague Convention and he studied some family

10   law, but he is a very smart individual and been on the job 18

11   years and been in a courtroom quite a lot.  I don't think he

12   needed to do too much.

13   Q.  Did he consult with any counsel ahead of time?

14   A.  Not that I know of.

15   Q.  Was his consultation of the Hague Convention and other

16   family law matters, was that pursuant to your instructions?

17         THE COURT:  Let me pause.  What is the relevance of

18   this line of questioning?

19         MR. McNALLY:  The relevance of this line of

20   questioning, your Honor, we believe it goes to a continuing

21   pattern of intimidation and abuse that my client has suffered.

22         What we have here is an individual holding himself out

23   as a lawyer, and we are going to get to this, dispensing some

24   form of legal advice he is not qualified to give.

25         THE COURT:  Let's assume that is the case.  Let's say

1   he committed a crime under New York State Law and is subject to

2   prosecution for the crime.  What relevance does that have to

3   the case before me?

4           MR. McNALLY:  Your Honor, they put up this witness and

5   I thought that --

6           THE COURT:  I am not seeing where this is relevant to

7   the case before me.  No statement made to this individual is

8   being offered in evidence, and if you raised an objection to

9   the content of such a statement, I might very well sustain the

10  objection, but that's not before me.  So move on.

11          MR. McNALLY:  Yes, your Honor.

12  BY MR. McNALLY:

13  Q.  Are you aware of the fact the U.S. Marshals retrieved the

14  child at some point from Ms. Lee pursuant to an order of this

15  Court?

16  A.  Yes.

17  Q.  What work have you or your agency performed for the

18  petitioner since that time, if any?

19  A.  Just some surveillance during visitation which they agreed

20  to.

21  Q.  Did the petitioner provide you with any instructions as far

22  as how you should conduct that surveillance during visitation?

23  A.  No.

24  Q.  How did you proceed with that surveillance?

25  A.  Which surveillance?

1      THE COURT:  Mr. McNally, I am not seeing the relevance

2   of this.

3      MR. McNALLY:  Your Honor, this goes to discussion we

4   were having when the petitioner was on the stand, where it

5   appears that the instruction that was given was for these

6   investigators to be present for the visitation.

7      THE COURT:  Okay, I will let you ask that question.

8   Was there any instruction they were supposed to be -- I thought

9   you already testified to this.

10      THE WITNESS:  I did.

11      THE COURT:  We already covered this.  Go ahead, you

12   want to cover it again, be my guest.

13   BY MR. McNALLY:

14   Q.  Did you provide any instructions for any of your

15   investigators to be present?

16   A.  Yes.  As I stated earlier, we had a little

17   miscommunication.  They thought they needed to be in the room

18   with the child.  I advised him the other side knew we would be

19   having surveillance during visitation and it was okay if they

20   knew we were there.

21      Once I told them they did not need to be in the room,

22   they had to make sure Shayan didn't leave the building, then

23   the visit went off without a hitch.

24   Q.  You're aware there is a court order regarding visitation in

25   this case, correct?

1    A.  Yes.

2            MR. McNALLY:  One moment, your Honor.

3            (Off-the-record discussion)

4    BY MR. McNALLY:

5    Q.  Ms. Stitt, I would like to address a visitation session on

6    November 28th of this year.  Were any of your employees present

7    for this visitation session?

8    A.  Was that the Trinity Church visit?

9    Q.  Yes.

10   A.  Yes.

11           THE COURT:  Didn't the witness already testify to

12   that?

13   BY MR. McNALLY:

14   Q.  Could you tell me the names of the people?

15   A.  Travis, Angelo and Fred Eberhard.

16           THE COURT:  Tell me the relevance of that question.

17           MR. McNALLY:  Your Honor, again I think that this goes

18   to potential violation of your court's order.

19           THE COURT:  It may, but that is not what we are here

20   for.  Maybe you can make a motion for contempt or some such

21   thing.  That is not the purpose of this hearing.

22           MR. McNALLY:  Okay, your Honor.  In that case, I have

23   no further questions.

24           THE COURT:  Any redirect?

25           MR. ARENSTEIN:  I do not.

1          THE COURT:  You may step down.

2          (Witness excused)

3          THE COURT:  Call your next witness.

4          MR. ARENSTEIN:  I call Marc Vandewater.

5          MR. McNALLY:  Especially in light of the court's

6   position of the relevancy of these witnesses, I would ask that

7   Mr. Arenstein make some kind of offer of proof.

8          THE COURT:  Who is Marc Vandewater and what is he

9   going to testify to?

10         MR. ARENSTEIN:  Marc Vandewater had interaction with

11  the respondent in this case.  He was present when the child was

12  picked up, and received certain messages from the respondent in

13  this case which are relevant to the issue of -- she stated,

14  apparently she stated her intentions of what he was going to do

15  to take the child away and outside of the United States from

16  this Court both prior to your orders and after your orders.

17         THE COURT:  Mr. Vandewater is going to take the stand

18  and testify he posed as a lawyer to gain her confidence and

19  that she made these statements?

20         MR. ARENSTEIN:  I believe so.

21         THE COURT:  All right.  Mr. McNally, your objection?

22         MR. McNALLY:  My objection is to relevancy of this.

23         Since the child was brought here, I don't see how this

24  is relevant.

25         THE COURT:  Any other objection to the testimony?

1          MR. McNALLY:  Only relevance, your Honor, and

2     cumulative.

3          (Pause)

4          THE COURT:  I am going to sustain the objection and

5     I'm going to add that I believe that it would also, in

6     addition, violate the public policy of the State of New York,

7     as I understand it, to allow communications that appear to have

8     been intended as confidential communications for the purpose of

9     securing legal advice to be testified to by a person posing,

10    who posed as a lawyer.  I sustain it on the grounds of

11    relevance, cumulativeness and also on the additional grounds

12    stated.

13          Call your next witness.

14          MR. ARENSTEIN:  My next expert is Abed Awad.

15     ABED AWAD,

16         called as a witness by the Petitioner,

17         having been duly sworn, testified as follows:

18    DIRECT EXAMINATION

19          MR. ARENSTEIN:  One moment, your Honor.

20          (Off-the-record discussion)

21          MR. McNALLY:  If I may?

22          THE COURT:  You may.

23          MR. McNALLY:  I believe the would-be witness from the

24    petitioner is still in the courtroom, Mr. Vandewater.  I don't

25    have any problem with that provided that Mr. Arenstein has no

1   designs on seeking reconsideration of your order or anything

2   like that.

3          THE COURT:  I've ruled.  At this point I sustained

4   your objection.  That would make him not a witness.  Now, I

5   can't predict the future.

6          MR. ARENSTEIN:  I don't intend to use him now that

7   your Honor has ruled I can't use him.

8          MR. McNALLY:  Okay.

9          MR. ARENSTEIN:  I just need one more minute, your

10  Honor.  I apologize to the court.

11         (Off-the-record discussion)

12  BY MR. ARENSTEIN:

13  Q.  Mr. Awad, can you tell us your educational experience.

14  A.  I am --

15         THE COURT:  Are you offering the resume?

16         MR. ARENSTEIN:  Pardon me?

17         THE COURT:  Read it back, Mr. Reporter.

18         (Record read)

19         MR. ARENSTEIN:  Yes, I am.

20         THE COURT:  Any objection to the resume?

21         MS. LEIDHOLDT:  No.

22         THE COURT:  Received.

23         MR. ARENSTEIN:  Exhibit K.

24         (Petitioner Exhibit K received in evidence)

25  BY MR. ARENSTEIN:

1   Q.  Mr. Awad, would you tell us what areas of law you practice

2   in.

3   A.  Yes.  I am looking at my Exhibit K which is my resume which

4   includes all my educational background.  To summarize --

5           THE COURT:  You weren't ask that question.

6           THE WITNESS:  Can you repeat the question.

7           MR. ARENSTEIN:  Withdrawn.

8   BY MR. ARENSTEIN:

9   Q.  Can you tell us what areas of law you have expertise in?

10  A.  Yes, I have expertise in -- admitted to practice law in the

11  State of New York and New Jersey.  A substantial part of my

12  practice is devoted to matrimonial litigation, divorce, custody

13  and the like, and I also have developed a certain expertise in

14  international family law, specifically Islamic family law and

15  the laws, familiar laws of Muslim countries.

16          I have testified in the past in those areas of

17  expertise.

18  Q.  Now, are you familiar with -- are you an expert in --

19  besides Shairiah law, Islamic law, are you familiar with the

20  law in Singapore?

21  A.  Yes, as part of my work on international family law,

22  specifically on Shairiah family law and the family laws of

23  Muslim countries.  I keep up to date with the different legal

24  systems around the Muslim world involving family law for the

25  purposes of my academic teaching or preparation to testify or

1   other consultations for potential clients.  So I am familiar

2   with the family law of Singapore from my experience and

3   education.

4   Q.  Have you testified as an expert before?

5   A.  Yes, I have.

6           THE COURT:  Is there any objection to this witness as

7   an expert in Shairiah law and the law of Singapore?

8           (Off-the-record discussion)

9           MS. LEIDHOLDT:  No objection, your Honor.

10          THE COURT:  All right, he is qualified.  Ask your next

11  question.

12  BY MR. ARENSTEIN:

13  Q.  Have you testified about Singapore before?

14  A.  No, I have not.

15  Q.  Are you getting paid for your services?

16  A.  Yes, I am.

17  Q.  How much are you getting paid?

18  A.  I bill at the rate of $550.00 an hour.

19  Q.  Now, please describe the Singapore Shairiah court system.

20  A.  The Singapore legal system is a very unique system in which

21  it is a pluralistic legal system in the sense there is multiple

22  dual legal systems that coexist and function in tandem.

23          There is the secular civil law system and there is a

24  large minority of Muslims in the country of Singapore.  From

25  the legacy of the colonialists history of the British Empire,

1    whether it was in Asia or in Africa or in the Middle East, the

2    British always allowed this dual system to function where they

3    created a legal system that would address a lot of the

4    nonfamily-related type of matters, the commercial law, the

5    penal law and so forth which are western-based models.

6              As it pertained to the cultural unique specifics of

7    the different cultures and the the colonialist empire, they

8    allowed the populations to govern themselves by their

9    indigenous family law, Islamic law in Muslim countries, Hindu

10   law in Hindu countries and so forth.  Those legacies were

11   created after the 1880's, 1900s, leading up to 1960, the

12   adoption of a specific law that addressed Islamic family law.

13             This body of law would govern when Muslims are

14   involved in divorce litigation.  So you have a Shairiah court

15   that has, it is a statutory construction.  The jurisdiction of

16   the Shairiah court is statutory, so it is specific to the

17   statute vesting jurisdiction in the Muslim Shairiah court in

18   Singapore for the purposes of divorce and dissolution of

19   marriage.  That is the primary subject matter jurisdiction for

20   that Singapore Family Court.

21             However, the statute also provides that while the

22   court will have primary jurisdiction as it pertains to

23   dissolving a marriage between two Muslims, they also would be

24   vested with powers as opposed to jurisdiction, powers to

25   address ancillary subjects such as the custody and care of a

1    child.  The court only has jurisdiction if the parties, both

2    the husband and the wife, are Muslim.  If they are not Muslim,

3    the jurisdiction vests in the civil court not in the religious

4    court.

5           Given it is a statutory construction type of

6    jurisdiction, there are the ability of the litigants to waive

7    out from the Shairiah court as it pertains to the ancillary

8    issues; but if you're a Muslim and you need a divorce, the only

9    divorce you can obtain is a religious divorce.

10          THE COURT:  Thank you.  Next question.

11   BY MR. ARENSTEIN:

12   Q.  How are family law matters governed?

13          THE COURT:  I don't understand the question.  How is

14   that different than the question and the answer that was just

15   given?  Make your question more precise so I understand where

16   we're headed.

17   BY MR. ARENSTEIN:

18   Q.  Can you explain how the family courts are governed, both

19   the Shairiah and civil, explain the differences within the

20   statute.

21   A.  Yes.  As it pertains to the Shairiah Singapore court, it is

22   governed by the statute that's called AMLA, A M L A.  That

23   vests the court with all of its jurisdictions as it pertains to

24   dissolving the marriage.

25          In the secular system, you have the Supreme Judicator

1   Act, and you have the Women's Charter and you have the

2   Guardianship, Infant & Guardianship Law.  So in the event of a

3   Muslim divorce, that is the statute that governs the issues of

4   divorce and the ancillary issues.

5         If the parties are non-Muslim, they would be governed

6   by the civil law.  But again there is the ability of the Muslim

7   couple to say that we consent and we do not ask the Muslim

8   court to render its decision as it pertains to the financials

9   arising out of the marital relationship, nor the issues

10  relating to the custody and care of the child and leave those

11  to be addressed by the civil court.

12  Q.  Can the parties elect who would hear the dispute?  Can you

13  explain that.

14        THE COURT:  I think the witness has just testified to

15  that.  Didn't you just testify to that?

16        THE WITNESS:  Yes, I did.

17        THE COURT:  Thank you.  Next question, Mr. Arenstein.

18        Mr. Arenstein, a new question, do you understand?

19  BY MR. ARENSTEIN:

20  Q.  Can you describe custody under Singapore law.

21  A.  Yes.  Under Singapore law, custody, similar to New York

22  State, follows the best interest standard.  In the event of a

23  dispute regarding custody, the custody is divided into two

24  parts like under New York law where we look at custody as a

25  component called legal custody and the other component which is

1     physical custody.  As it pertains to legal custody, there in

2     Singapore like in New York, it describes two types:  A joint

3     custodial relationship and a sole legal custodial relationship,

4     meaning that the parties need to confer on all major issues

5     relating to the care and welfare of their child.

6          The sole would mean that the sole custodian would have

7     the primary decision-making arrangement when it pertains to the

8     important issues regarding to the care and education and

9     welfare of the child.

10         THE COURT:  You're now talking about the subordinate

11     courts of the Republic of Singapore as distinguished from the

12     Shairiah courts, correct?

13         THE WITNESS:  Yes.

14         THE COURT:  Next question.

15         THE WITNESS:  One thing I didn't finish, your Honor,

16     if I may, that the same applies also in the civil court and the

17     Shairiah court with these two distinctions.

18     BY MR. ARENSTEIN:

19     Q.  Who has jurisdiction for domestic violence cases?

20     A.  Only the civil courts.

21     Q.  The Shairiah court doesn't hear domestic violence cases?

22     A.  It does not have the power or jurisdiction to hear anything

23     related to orders of protection.  That is vested under the

24     Women's Charter and all penal law and civil law applies to all

25     Singaporean population without difference.

1   Q.  Did you review the pleadings in this case?

2   A.  Yes, I did.

3   Q.  What do you understand are the respondent's arguments

4   against the return of the child to Singapore?

5   A.  From my review, I saw two basic arguments:

6          The first argument is that if the child is returned,

7   he would be subject to the jurisdiction of the Shairiah court

8   to make the custody determination on the merits;

9          The second argument I gleaned from the pleadings is

10  that if we return the child back to Singapore, the mother would

11  be subject to domestic violence and abuse, which is not

12  protected under Singapore law because Shairiah permits the

13  abuse of women, according to the respondent.

14  Q.  Do you have an opinion regarding these two issues?

15  A.  Yes, I do.

16          MR. McNALLY:  Objection.  The witness is being asked

17  to opine on the ultimate issues.

18          THE COURT:  Rephrase your question.

19          There is probably a question in there that you can

20  have answered, but then not the one you asked.

21  BY MR. ARENSTEIN:

22  Q.  After you've reviewed the documents and knowing the laws in

23  Singapore, have you come to an expert opinion based on all of

24  the factors regarding the issues that you just stated?

25  A.  Yes, I have.

1            MR. McNALLY:  Objection.

2            THE COURT:  Mr. Arenstein, did you understand the

3    objection?

4            MR. ARENSTEIN:  No, I did not, your Honor.

5            THE COURT:  Okay.  The objection was that you're

6    asking the expert to opine on the ultimate issues in this case.

7    If this expert is going to opine on what Shairiah law provides

8    or doesn't provide, Singapore law provides or doesn't provide,

9    that objection wouldn't lie.

10           But when you incorporate by reference the pleadings in

11   this case and ask him to opine on who's right and who's wrong,

12   that's my job.  That is not the witness's job, and that is what

13   Mr. McNally was saying in shorthand under the Federal Rules of

14   Evidence as to why the question was objectionable, and that's

15   why I sustained it the first time and sustain it again now.

16           Do you understand?

17           MR. ARENSTEIN:  Yes, I do, your Honor.

18           THE COURT:  Now put a fresh question.

19   BY MR. ARENSTEIN:

20   Q.  Could you tell us what your opinion is regarding how

21   Singapore law would apply to a situation regarding custody

22   involving domestic violence and custody issues?

23   A.  If the child is returned to Singapore, the parties can

24   elect to have the custody matter heard on the merits in the

25   civil court, and my opinion is that the mother would have a

1  better -- the Shairiah courts actually would be more

2  deferential to her than the courts because the Shairiah courts

3  have a tender year doctrine and presumption in favor of mothers

4  when children are of a certain age.

5         THE COURT:  "Tender year doctrine," is that what you

6  said?

7         THE WITNESS:  Yes.

8         THE COURT:  Thank you.

9         THE WITNESS:  Or similar to a tender year doctrine,

10 your Honor.  So the Shairiah court and the civil court would

11 apply the best interests, and that is provided by statute.

12        If you would go to the Singapore Shairiah web site and

13 you click on the section about custody, it would say that the

14 standard that applies is the best interest.  There are numerous

15 cases, published cases as well, if I may reference them to the

16 court relating to the best interest standard that applies even

17 in Shairiah courts.

18 BY MR. ARENSTEIN:

19 Q.  What is the situation regarding orders of protection or

20 domestic violence cases?

21 A.  Like I said earlier, the only court with jurisdiction to

22 issue an order of protection is the civil courts, not the

23 Shairiah courts.  The Shairiah courts are a court of limited

24 jurisdiction, statutorily provided strictly for dissolution of

25 marriages between Muslims, and if a dissolution is commenced,

1    the court will have powers to render decisions relating to some

2    ancillary issues such as custody and control, but requires an

3    affirmative step from the litigants to request from the court

4    to render a decision on the custody.  It is not by implication.

5    Q.  How would you describe the relationship between the

6    domestic violence laws in Singapore to those of New York?

7    A.  Very similar.  If you look at the Women's Charter, the

8    penal code, the orders of protection are very similar to the

9    United States.

10   Q.  Do you know if there is any bias against women in the

11   Singapore courts?

12   A.  From my research and from my preparation, I have not seen

13   any systematic type of discrimination against women.  Some

14   would say there is discrimination against women in our own

15   country.  There is an issue, is there systematic discrimination

16   from the Constitution of Singapore, from the review of the

17   documents?  I would say no.

18           THE COURT:  You're referring to the subordinate courts

19   of the Republic of Singapore?

20           THE WITNESS:  I am generally, because it is a dual

21   legal system, the Constitution applies to everyone equally and

22   it provides for equal protection of gender and race as it

23   pertains to Shairiah court in its limited jurisdiction.

24           Clearly when it comes to the issue of dissolution of

25   marriage, while the Shairiah court in Singapore is very

progressive and considered a model for many other Muslim

countries to emulate, there are still easier ways for a husband

to dissolve his marital relationship than it is for a wife to

seek the dissolution of her marital relationship.  That being

said, that is only in the limited circumstance to dissolve the

marital relationship.

THE COURT:  That is in the Shairiah court?

THE WITNESS:  That is in the Shairiah court.

THE COURT:  Next question.

BY MR. ARENSTEIN:

Q.  If there isn't an action for divorce in the Shairiah court

in Singapore, but there is a pending custody matter, does the

Family Court of Singapore have the right or power to transfer a

pending custody matter in the Family Court to the Shairiah

court of Singapore?

A.  Only with the consent of the parties.  Only if the parties

seek to invoke the Shairiah court's jurisdiction as it pertains

to custody, then the Shairiah court would have that authority.

Otherwise, if the parties select to litigate their

custody matter in the civil system, that would be the system

that would govern, and we need to keep in mind as it stands

today from what I know about this case, there is no pending

divorce action filed in Singapore.  Therefore, the only court

with original subject matter jurisdiction to hear the custody

dispute between these parties is the civil court, not the

1    Shairiah court.  Unless the wife or the husband commences a

2    divorce action in Shairiah court, the Shairiah court is

3    divested of any authority or jurisdiction in this matter.

4    Q.  Is there any validity to a claim that the Singapore laws

5    and courts will not protect a woman and a child?

6    A.  Absolutely not.  Again I'm going to say that Singapore is a

7    paradise for the women of the world to go to, to move to.  Of

8    course, no one can make these generalizations and extreme

9    positions.  Some feel that in certain states in our great union

10   have problems in gender and equity as it pertains to divorce.

11          So overall if we look at Singapore in Asia or look at

12   Singapore around the world in Muslim countries, it has one of

13   the most open, liberal societies and cultures in the world.  It

14   is multiethnic, multiculture, it is pluralistic and in many

15   circumstances you have -- for example, in the Shairiah court in

16   the administration you have a woman who is running it.

17          In the Court of Appeals that is the final word in the

18   Shairiah court, we have three women members of that tribunal.

19   You see many women that are in very important positions in

20   Singapore, whether it is in government or in Muslim community,

21   and it is a progressive system as it pertains to interpretation

22   of Islamic law that focuses on many cases I can cite to you

23   with citations, where the Shairiah court amended its

24   interpretation of premodern Islamic law to be consistent with a

25   high court decision on inheritance issues.

1          So you see there is this coexistence and accommodation

2     between both of these court systems or legal systems to be

3     consistent with the overriding constitutional structure of that

4     country.

5          THE COURT:  Thank you.  Next question.

6     BY MR. ARENSTEIN:

7     Q.  What will the effect of an undertaking be by a party

8     undertaking not to bring a custody action in the Shairiah

9     courts in Singapore?

10    A.  The undertaking would need to make sure that it looks at

11    Section 35 (a) of AMLA and look at 35 (a)(5) I think (B) or

12    (C), which specifically tells you that you could enter by

13    consent an undertaking not to proceed with your custody action

14    in the Shairiah court.  So an undertaking is enforceable, and

15    there are several cases that confirmed that fact.

16         There was a case where there were disputes where

17    after-the-fact the parties had said we -- one wanted to go to

18    the Shairiah court and another party said I want to stay in the

19    custody of the civil court.  They had initiated the case in the

20    Shairiah court.

21         The court held that if both parties would agree that

22    the matter of custody will be determined in the civil court,

23    then we can transfer that court.  The AMLA provides a

24    mechanism, a procedural mechanism in multiple circumstances to

25    transfer a custody case from the Shairiah court to the civil

1    court.

2          For example, it says if the matter has already vested

3    and the court, and the Shairiah court is considering a custody

4    matter, the parties can still petition the court by consent to

5    stay the proceeding in the Shairiah court and transfer it to

6    civil court.

7          In another circumstance it says if nothing was

8    commenced, if there was no divorce commenced in the Shairiah

9    court, then the court cannot hear the custody matter.  An

10   undertaking that is consistent with Section 35 (a) would be

11   valid and enforceable, and the case law confirms this opinion.

12         THE COURT:  Thank you.  Next question.

13   BY MR. ARENSTEIN:

14   Q.  Do you believe both parties will receive unbiased treatment

15   from the Singapore Family Court?

16   A.  Yes, because it is the best interest standard that governs

17   and, in fact, they have forensic psychologists that are

18   appointed by the court to do evaluations to make sure that what

19   is in the best interest.

20         In fact, I feel there is going to be deference more to

21   her than to the male.  Again because of the age of the child,

22   the tender year doctrine which we dill not follow in the U.S.,

23   seems to push more favorable to a joint custodial arrangement

24   under Singapore law.

25         THE COURT:  All right.  Next question.

 1          MR. ARENSTEIN:  No further questions.

 2          THE COURT:  Cross-examination.

 3   CROSS EXAMINATION

 4   BY MS. LEIDHOLDT:

 5   Q.  Good afternoon, Mr. Awad.

 6   A.  Good afternoon.

 7   Q.  Mr. Awad, you made a statement that the domestic violence

 8   laws in Singapore are very similar to the domestic violence

 9   laws in the United States.  Let me just start with some -- have

10   you ever lived in Singapore?

11   A.  No, I have not.

12   Q.  Have you ever visited Singapore?

13   A.  No, I have not.

14   Q.  Have you ever been into a police precinct -- then you have

15   not been in a police precinct in Singapore, correct?

16   A.  No, I have not.

17   Q.  Who have you talked with on the ground in Singapore,

18   perhaps excluding Ms. Gomez and her husband, about the way

19   domestic violence laws have been codified or the way they're

20   practiced in Singapore?

21   A.  Just from academic literature that I have reviewed in the

22   past.

23   Q.  Just let's stop there.

24          THE COURT:  Let the witness finish his answer.

25   A.  Just from academic literature I have looked at in the past

1   and looking at their penal code, they have a penal code that

2   applies to everyone, whether you're Muslim or not, about

3   assault, about battery.  In fact, the cause of action for

4   divorce under the Shairiah court does include --

5           MS. LEIDHOLDT:  Your Honor --

6           MR. ARENSTEIN:  Objection.

7           MS. LEIDHOLDT:  -- he is not responding to my

8   question.

9           THE COURT:  Please sit down, Mr. Arenstein.  Are you

10  finished with your answer?

11          THE WITNESS:  Yes.

12          THE COURT:  Next question.

13          MS. LEIDHOLDT:  Thank you.

14  BY MS. LEIDHOLDT:

15  Q.  You referred to academic literature on domestic violence

16  law as it exists in Singapore.  What specifically?

17          Give me an example of the literature you have referred

18  to specifically on domestic violence law or that goes into

19  domestic violence law in Singapore to any significant extent?

20  A.  In general, from my past experience and reading in the

21  area, is that domestic violence --

22  Q.  No, that is not what I am asking you.

23          I am asking you to please give one example of a

24  publication that addresses domestic violence law in Singapore

25  that you are basing your conclusion, your conclusion on,

1   specifically your opinion that the domestic violance laws in

2   Singapore are similar to those in the United States?

3   A.   There are several articles that I read, and they are not

4   attached in this binder.  So I would request just permission

5   that I would e-mail you the citations.  I don't have anything

6   here.

7          THE COURT:  That wasn't even the question.  Can you

8   identify it?  If you can, you can; if you can't, you can't.

9          That is the question.  Can you identify any specific

10  piece of literature that you have read on the subject contained

11  in the question?  The answer is I can, I can't, I remember, I

12  don't remember --

13         THE WITNESS:  I don't --

14         THE COURT:  Please don't talk while I am talking.

15         THE WITNESS:  I apologize.

16         THE COURT:  Do you understand the question now?

17         THE WITNESS:  Yes, I do.

18         THE COURT:  You can answer, go ahead.

19         THE WITNESS:  I am trying to remember the site that I

20  read last night.  I can't recall the exact citation.

21  BY MS. LEIDHOLDT:

22  Q.   The first time you read anything in relation to the

23  domestic violence law in Singapore was last night.  Is that

24  correct?

25  A.   No.

```
 1            MR. ARENSTEIN:  Objection.

 2  A.  That is when I was preparing for today.

 3            THE COURT:  What is the basis for objection?

 4            MR. ARENSTEIN:  The question was a conclusion.

 5            THE COURT:  Overruled.  Go ahead, next question.

 6  BY MS. LEIDHOLDT:

 7  Q.  I just would like to ask -- and I don't believe I got an

 8  answer to this question, Mr. Awad -- who did you speak with, if

 9  anyone, who's actually had experience in other than Ms. Gomez

10  and her husband, has had experience in addressing domestic

11  violence?

12  A.  I spoke to Ms. Gomez and her husband.  I spoke to a

13  professor colleague of mine that spends a month or so almost

14  every year in Singapore.

15  Q.  What is the name of that professor?

16  A.  Professor Halaq, H A L A Q, and I reviewed the --

17  Q.  I just --

18            THE COURT:  Let the witness finish.

19  A.  -- I reviewed the Women's Charter and the sections relating

20  to assault, battery and what have you.  If you're asking me if

21  I contacted a domestic violence shelter, no, I did not.

22            THE COURT:  Next question.

23  BY MS. LEIDHOLDT:

24  Q.  You made this very sweeping statement domestic violence

25  laws in Singapore are very similar to those in the United
```

1   States.

2            MR. ARENSTEIN:  Objection to form of the question,

3   sweeping statement.

4            THE COURT:  Okay.  Look, you may not have noticed, but

5   there is no jury here.  I am going to sustain your objection,

6   Mr. Arenstein, okay?  It is objectionable as to form.  Please

7   rephrase the question without the characterization sweeping,

8   all right?

9            MS. LEIDHOLDT:  I will.

10  BY MS. LEIDHOLDT:

11  Q.  You made the statement the domestic violence laws in

12  Singapore are very similar to those in the United States, isn't

13  that correct, Mr. Awad?

14  A.  Yes, I did.

15  Q.  That would mean you would have some considerable knowledge

16  about domestic violence laws in the United States.  Isn't that

17  true?

18  A.  Yes.

19  Q.  Would you please tell me what are the key provisions as

20  they relate specifically to domestic violence, of the Federal

21  Violence Against Women Act that was passed in 1994?

22           MR. ARENSTEIN:  Objection to the relevance of the

23  question.

24           THE COURT:  Overruled.

25  A.  Under the Federal Domestic Violence Act, it created a

1   specific crime that is called domestic violence, that if any

2   one of certain categories of crime such as assault and battery,

3   harassment would constitute an act of domestic violence, a

4   restraining order would enter.

5   BY MS. LEIDHOLDT:

6   Q.  You're complaining the Federal Violence Against Women Act

7   created new, generic crimes of domestic violence that required

8   the issuance of restraining orders?

9           MR. ARENSTEIN:  Objection.

10  A.  I didn't say that.

11          THE COURT:  Overruled.  Next question.

12  BY MS. LEIDHOLDT:

13  Q.  Isn't it true, Mr. Awad, that almost all states in the

14  United States have mandatory arrest laws?  Isn't that a fact?

15  A.  Mandatory arrest laws?

16  Q.  Mandatory arrest laws?

17          MR. ARENSTEIN:  Objection to the form of the question,

18  your Honor, whether mandatory arrest laws have to do with

19  anything.

20          THE COURT:  I am going to allow the question.  Does

21  New York have such a law?

22          MS. LEIDHOLDT:  Yes, it does.

23          THE COURT:  What is the citation to it?

24          MS. LEIDHOLDT:  I am afraid I couldn't tell you the

25  citation.

```
1              THE COURT:  Provide it to me.

2              MS. LEIDHOLDT:  The name of the statute is the Family

3    Protection Domestic Violence Intervention Act of 1994.  It was

4    passed by the New York State Legislature in 1994.  It was went

5    into effect in 1995.

6              THE COURT:  Thank you.  You have answered my question.

7    I can find it now.  Thank you.

8    BY MS. LEIDHOLDT:

9    Q.  Isn't it a fact, Mr. Awad, that the vast majority of states

10   in the United States have mandatory arrest laws that require

11   police officers to make arrests where there is probable cause

12   that a crime of domestic violence has been committed.  Isn't

13   that true?

14   A.  If somebody comes into the house -- you get a police call

15   to a domestic disturbance, and he comes to the house and sees

16   probable cause that somebody is being abused, of course they're

17   going to arrest them.  It is the same thing in most any other

18   country.

19   Q.  You're not answering my question.

20   A.  You are not letting me finish.

21             THE COURT:  You are not allowed to interrupt.

22             MS. LEIDHOLDT:  Yes.

23             THE COURT:  I am telling you that for the last time.

24   A.  Clearly that if a police officer in New York City is

25   responding to a domestic disturbance, and he believes when he
```

1    comes in, knocks on that door or he sees a husband, a boyfriend

2    is committing an assault, harassment, intimidation of his

3    spouse or his girlfriend, of course they're going to arrest

4    him, but that applies in most countries.

5            If a police officer in Singapore on the books, it

6    would say if a police officer comes in and he sees an act, a

7    criminal act taking place, he has an obligation to issue a

8    complaint and sign it himself, so there could be an arrest.

9            What I think you're trying to say is the restraining

10   order, violation of a restraining order is a criminal act.  The

11   initial aspects of what may be unique about the U.S. as opposed

12   to any other countries, after a restraining order is issued,

13   which is a quasi-criminal matter, the violation of that is a

14   criminal matter and there is an automatic arrest.

15           There are very few countries around the world that

16   follow that particular model.  That being said, that doesn't

17   mean that if a police officer sees a woman an being abused by

18   her spouse, they're not going to arrest him.

19   Q.  Mr. Awad, I am afraid you didn't answer my question.

20           MR. ARENSTEIN:  Objection to the response.  It is not

21   a question.

22           MS. LEIDHOLDT:  I would like to --

23           MR. ARENSTEIN:  Your Honor --

24           THE COURT:  Sustained.  The same question.  Ask

25   questions.

1   BY MS. LEIDHOLDT:

2   Q.  I asked this particular question and I am referring to the

3   laws on the books of states in the United States.

4           Isn't it a fact, Mr. Awad, that the majority of

5   states, the vast majority of states, more than two-thirds of

6   the states in the United States have laws on the books that

7   require police officers to make arrests when there is probably

8   cause that a crime of domestic violence has been committed?

9   This question calls for a simple yes or no answer.

10          MR. ARENSTEIN:  Objection.

11          THE COURT:  Overruled.  If you know?

12  A.  When there is a domestic violence allegation, two things

13  have to happen.  I handle domestic violence cases in my

14  practice.  Either I'm seeing something different than what

15  you're seeing, because you're seeing something maybe

16  theoretical, and I am just trying to rethink when I have a

17  client and I am trying a domestic violence case, how did it all

18  come about.

19          If my wife calls the police and says my spouse is

20  abusing me, the police are going to show up to my house.  If

21  they see there is probable cause, they ask her do you want to

22  proceed with the domestic violence complaint against your

23  husband?  If my spouse says yes, she fills it out.  If there is

24  probable cause, I am going to get arrested.

25          But if my wife says she is not going to proceed and

1   the police officer does not have enough information from the

2   surveillance of the surrounding circumstances to be able to say

3   there is enough here for me as the police officer to issue the

4   complaint, there won't be any complaint.

5          MS. LEIDHOLDT:  Your Honor, if I may?

6          And I certainly don't want to interrupt the witness in

7   his testimony.  I would submit he is not responding to a very

8   very simple question as to whether or not --

9          THE COURT:  Do you understand the question?

10         THE WITNESS::  I am not understanding.  If she is

11  saying --

12         THE COURT:  Counsel is positing, and it may not be

13  true.  In fact, I am going to require counsel to come up with a

14  citation to the New York State statute because I on a quick

15  review wasn't able to find it with the reference that was given

16  to me.

17         Counsel is positing that, really asking you the

18  question do you know whether a majority of states in the United

19  States have statutes --

20         MS. LEIDHOLDT:  Statutes, your Honor.

21         THE COURT:  -- that require the police to make an

22  arrest for a domestic violence incident if they have probable

23  cause to believe that the incident occurred?  Is that what

24  you're positing?

25         MS. LEIDHOLDT:  Precisely, your Honor.

  1              THE COURT:  Do you know?  Do you know the answer to

  2    that question?

  3              THE WITNESS:  Yes, with an explanation.

  4              THE COURT:  What is the answer?

  5              THE WITNESS:  The answer is if the --

  6              THE COURT:  No, no.  The answer, and then I'll let

  7    you --

  8              THE WITNESS:  Yes.

  9              THE COURT:  You know a majority of states have such a

 10    statute?

 11              THE WITNESS:  Yes.

 12              MS. LEIDHOLDT:  That is all I am asking.

 13              THE COURT:  All you're asking?

 14              THE WITNESS:  The way it is articulated, there is a

 15    mandatory arrest, I have to have an explanation.  It is a

 16    mandatory arrest if a temporary restraining order is issued.

 17              THE COURT:  Then that answer would be enough?

 18              THE WITNESS:  Yes.

 19              THE COURT:  So you are not aware that a majority of

 20    states, and maybe the majority of states don't, I don't know

 21    the answer to that question, according to your testimony, the

 22    majority of states do not have a statute that would require an

 23    arrest upon a police officer's belief that an act of domestic

 24    violence occurred.  The question does not include as part of

 25    its premise there is a prior order of protection.

 1              THE WITNESS:  Yes, I understand.

 2              What I would say is that if there is a domestic

 3    disturbance, and the police believe with probable cause he

 4    committed an act of domestic violence, he will be arrested,

 5    yes.

 6              THE COURT:  The question that you're being asked, and

 7    I don't know the answer to this question, I don't, do you know

 8    whether a majority of the states statutorily require that

 9    police officer to make the arrest?  That is what you're

10    positing?

11              THE WITNESS:  I would say no.

12              THE COURT:  Excuse me?  That is what you're positing?

13              THE WITNESS:  I don't know.

14              THE COURT:  Thank you.  Next question.

15              MS. LEIDHOLDT:  Was that answer --

16              THE WITNESS:  I don't know.

17    BY MS. LEIDHOLDT:

18    Q.  You don't know?  Okay.

19              THE COURT:  And you're going to provide me with a copy

20    of the New York Penal Code on this provision?

21              MS. LEIDHOLDT:  I will, your Honor.

22              THE COURT:  Promptly?

23              MS. LEIDHOLDT:  I will, your Honor.

24              THE COURT:  What is the penalty for the violation?

25              MS. LEIDHOLDT:  You mean for violations as opposed to

1      crimes or what is the penalty?

2              THE COURT:  No.  If a police officer violates the

3      statute, what is the penalty with it?

4              MS. LEIDHOLDT:  If a police officer violates the

5      statute?

6              THE COURT:  Yes.

7              MS. LEIDHOLDT:  If a police officer does not make an

8      arrest when there is probable cause --

9              THE COURT:  Yes.

10             MS. LEIDHOLDT:  -- is there a penalty for that police

11     officer who fails to make the arrest.  I am not aware of any

12     such penalty, your Honor.  There is a mandatory arrest law, but

13     would the police officer be charged with an offense for failing

14     to make an arrest?

15             THE COURT:  What is the consequence of violating the

16     statute?

17             MS. LEIDHOLDT:  If a police officer?

18             THE COURT:  What is the consequence to a police

19     officer of violating the statute, I guess I am asking you?

20             MS. LEIDHOLDT:  Honestly, your Honor, I am not aware

21     of what -- I know that the Family Protection Domestic Violence

22     Prevention Act is for police officers a mandatory arrest law.

23             THE COURT:  That is a federal statute?

24             MS. LEIDHOLDT:  No, no.  That is the Violence Against

25     Women Act, referring to New York State statute, Family

1   Protection Domestic Violence Intervention Act, and it is a

2   pretty standard mandatory arrest law that obligates a police

3   officer to make an arrest.  We have seen many, many instances

4   where the police officers have not necessarily followed that.

5   I haven't seen a police officer charged with a violation of

6   that statute.

7            (Continued on next page)

 1          THE COURT:  Does the statute provide for a --

 2          MS. LEIDHOLDT:  I'm not aware that it does.

 3          THE COURT:  Thank you.  Next question.

 4    BY MS. LEIDHOLDT:

 5    Q.  Does Singapore have a mandatory arrest law?

 6    A.  I don't know.

 7    Q.  Isn't it a fact, Mr. Awad, that New York State law requires

 8    courts to take domestic violence, proof of domestic violence,

 9    into consideration when they render decisions on custody or an

10    visitation?  Isn't that a fact?

11          MR. ARENSTEIN:  Objection to the relevance of the

12    question.  This is not a custody proceeding, and it's not

13    relevant even to grave risk.

14          THE COURT:  You put the witness on.  I'm going to

15    allow it.

16    A.  Only if there's a final restraining order, if there's a

17    final restraining order.  If I am the father and I'm involved

18    in a domestic violence, there is a restraining order against me

19    for abusing my wife, in a custody evaluation and in a custody

20    determination, the fact that I am found to be an abuser would

21    create a presumption in favor of physical custody being with

22    the victim.

23    Q.  It is your contention, Mr. Awad, that the New York State

24    Domestic Relations Act requires the existence of a final

25    restraining order before it requires courts to take domestic

1   violence into consideration in custody and visitation matters?

2   Is that correct?

3            MR. ARENSTEIN:  Objection.  That's not what he said.

4            THE COURT:  Overruled.

5            Let me say for the record the only reason I'm allowing

6    this testimony at all, and I'll give you a little bit of

7    latitude but I'm going to shut it down, is for one reason and

8    one reason only.  It is not relevant to this proceeding.

9    However, Mr. Arenstein elicited from this witness the statement

10   comparing Singapore law to New York law.  That is the only

11   reason that I have allowed any question in this area.

12           What New York law is is not relevant.  But the witness

13   opened the door by venturing in that direction.  What New York

14   provides or doesn't provide is not at all relevant to this

15   proceeding or has no immediate relevance to the questions that

16   arise under the treaty that I can see or anyone has

17   demonstrated thus far.  But since the witness has ventured into

18   this arena, I'm giving counsel a little bit of latitude, and

19   then move on.  OK?

20           MS. LEIDHOLDT:  Yes.  Thank you, your Honor.

21           THE COURT:  Do you disagree that the issue is not

22   relevant, it just goes to the credibility of the witness?

23           MS. LEIDHOLDT:  I totally agree, your Honor.

24           THE COURT:  OK.

25   BY MS. LEIDHOLDT:

1  Q.  Let's look at the issue of marital rape in United States

2  versus marital rape law in Singapore.  Do you know, Mr. Awad,

3  whether New York State has a marital rape exemption?

4  A.  Don't know.

5       MR. ARENSTEIN:  Objection to the question whether New

6  York State has a -- he didn't testify to anything about New

7  York State marital rape, your Honor.

8       THE COURT:  What was his testimony?

9       MR. ARENSTEIN:  His testimony was about domestic

10  violence laws.

11       THE COURT:  Wouldn't that include marital rape?

12       MR. ARENSTEIN:  I guess it might.

13       THE COURT:  OK.  So you are withdrawing the objection?

14       MR. ARENSTEIN:  I'll withdraw the objection for now.

15  But if it goes further, I might object again.

16       THE COURT:  Go ahead.

17  BY MS. LEIDHOLDT:

18  Q.  Would you be surprised, Mr. Awad, to learn that the New

19  York State Court of Appeals struck down as unconstitutional in

20  the 1980's, I believe the mid '80s, in the case of People v.

21  Liberta, New York State's marital rape exemption?  Were you

22  aware of that?

23       MR. ARENSTEIN:  Objection, your Honor.  That's going

24  far afield now, what the Court of Appeals in 1980 did in a

25  marital rape case, to the testimony of this witness, and it is

1    not relevant to the Hague Convention.

2              THE COURT:  Your witness is the person who opened this

3    door.  I'll allow the question.

4    A.  I don't recall.

5    Q.  You don't know?

6    A.  No.

7    Q.  Whether or not that is the case?

8    A.  I don't know.

9    Q.  Isn't it a fact, Mr. Awad, that currently, as we stand here

10   in this courtroom, the country of Singapore does have a marital

11   rape exemption?  Isn't that a fact?

12   A.  I would have to research it.  I can't a hundred percent

13   give you an answer.

14   Q.  Mr. Awad, you don't know whether or not Singapore has a

15   marital rape exemption?

16   A.  No, I do not.

17   Q.  Isn't it a fact, Mr. Awad, that the police in Singapore

18   will not take action or even investigate a report of domestic

19   violence unless the person making that claim of domestic

20   violence, that allegation of domestic violence, already has a

21   personal protection order?  Isn't that true?

22   A.  Repeat your question.

23             MS. LEIDHOLDT:  Would the reporter mind repeating that

24   question?

25             THE COURT:  No, no.  That question goes to me.  The

1    reporter may not mind it, but the question is still asked of

2    me, and the answer is no.

3            MS. LEIDHOLDT:  Then I will do my best, your Honor.

4    Q.  Isn't it a fact, Mr. Awad, that in Singapore the police

5    will not investigate or take action in a report of domestic

6    violence unless the person making that report first has a

7    personal protection order?

8    A.  That would make no sense.  It is a contradiction in terms,

9    your question.  How did he eventually get an order of

10   protection?  It had to start somewhere.  That means that there

11   was a report, calls the police, they show up, she wants to

12   proceed with her domestic violence complaint, she gets an order

13   of protection.  Then we can get to your question.

14   Q.  So there is no precondition in Singapore in order for the

15   police to take action that a person making a report of domestic

16   violence must first have a personal protection order, is that

17   your testimony here?

18           MR. ARENSTEIN:  Objection, your Honor.  Asked and

19   answered.

20           THE COURT:  Overruled.

21   A.  How could you get an order of protection?  It's got to

22   start somewhere.  What you're saying is not making logical

23   sentence.  I'm not following the logic.  In other words --

24           THE COURT:  You have answered the question already.

25   You are repeating yourself now.  Next question.

1   Q.  Mr. Awad, in order to take an action following a report of

2   domestic violence, do the police in New York State or New

3   Jersey, your state, require the victim to first get a medical

4   examination?

5           THE COURT:  That I'll sustain the objection to.

6           MR. ARENSTEIN:  Objection.

7           THE COURT:  Next question.

8   Q.  Isn't it a fact, Mr. Awad, that in Singapore, before they

9   will take action or commence an investigation, the police

10  require people alleging that they have been victims of a crime

11  of domestic violence to obtain a medical examination?  Isn't

12  that true?

13          MR. ARENSTEIN:  Objection.

14          THE COURT:  Overruled.  If you know.

15  A.  I don't know.

16  Q.  Now I'd like to focus on the Shariah court in Singapore, if

17  I may.  You testified that you have testified in the past in

18  areas of expertise related to Shariah law, correct?

19  A.  That's correct, yes.

20  Q.  Has any of this testimony involved cases in the Shariah

21  court in Singapore?

22  A.  No.

23  Q.  You referenced the administration of Muslim Law Act in

24  Singapore, isn't that right?

25  A.  That is correct.

1    Q.  Isn't it true that under the Administration of Muslim Law

2    Act, or AMLA, the Shariah court in Singapore has jurisdiction

3    over family-related actions or proceedings in which all the

4    parties are Muslim or where the parties were married under the

5    provisions of the Muslim law?  Isn't that true?

6    A.  That's correct.

7    Q.  Isn't it true that when there is a divorce proceeding

8    before the Shariah court in Singapore, the court holds

9    jurisdiction over child custody as an ancillary matter?

10   A.  It depends.  I can make it easy.  Why don't we read the

11   statute.  Let's look at article 35 of AMLA.  We can make this

12   very simple.  Article 35 provides in relevant part, "The court

13   shall have jurisdiction throughout Singapore.  The court shall

14   have jurisdiction to hear and determine all actions and

15   proceedings in which all the parties are Muslims or where the

16   parties were married under the provisions of Muslim law and

17   which involved disputes relating to marriage, divorce known in

18   the Muslim law as fasakh, betrothal, nullity of marriage, or

19   judicial separation, the disposition or division of property on

20   divorce or nullification of marriage, or the payment of emas

21   kahwin, marriage expenses, and conciliatory gifts."  Those are

22   the areas where the court has jurisdiction.

23          Then, if you look at 35(a), so, in other words

24   expressly provided, there is no express provision that says

25   that custody is within the jurisdiction of the Shariah court.

1    So the subject matter original jurisdiction is just these areas

2    which I just mentioned.

3           But then if you would look at 35(a), it says, and this

4    explains where the jurisdiction shifts to the civil court,

5    35(a), "Any person who, on or after the commencement of

6    proceedings for divorce in the court or after making a decree

7    or order for divorce by the court or on or after the

8    registration of the divorce under section 102, intends to

9    commence civil proceedings in any court involving any matter

10   relating to the disposition or division of property on divorce

11   or custody of any child where the parties are Muslim or were

12   married under the provisions of Muslim law, shall apply to the

13   court for leave to commence the civil proceeding."

14          So 35(a)(1) specifically says only if an action has

15   already been commenced in the Shariah court, then, if you

16   wanted to proceed on your custody matter in the civil court,

17   you needed to get permission from the Shariah court.

18          THE COURT:  With that we are going to take a recess

19   and we'll resume after the break.

20          (Recess)

21          THE COURT:  You may continue.

22   BY MS. LEIDHOLDT:

23   Q.  Mr. Awad, you testified a little bit earlier that the

24   Shariah court does not have the authority, cannot transfer a

25   case to the family court, a custody case --

 1              MR. ARENSTEIN:  Objection.  That was not the question,

 2     your Honor.  It was the other way around.

 3              THE COURT:  Overruled.  The witness can take care of

 4     it.  Please continue.

 5     Q.  -- cannot transfer a custody case to the family court on

 6     its own volition, isn't a fact?

 7     A.  Let me try to understand your question.  Are you saying

 8     that if we have husband and wife --

 9              THE COURT:  I think it is pretty simple.  Your

10     question is, can the Shariah court on its own?

11              MS. LEIDHOLDT:  Your Honor, I am clarifying that I

12     correctly understood his testimony.  I heard Mr. Awad testify,

13     I may be mistaken, I heard him state that the Shariah court is

14     unable to transfer a custody case to the civil family court on

15     its own volition.

16              THE COURT:  That's what I understood to be your

17     question.

18     A.  No, I did not say that.

19     Q.  You did not state that?

20     A.  No.

21              THE COURT:  OK.

22     Q.  Isn't it a fact that the Shariah court can, in theory,

23     transfer cases from the Shariah court to the family court if

24     both parties consent?

25     A.  That is correct.

1    Q.  Or if the Shariah court orders the transfer?

2    A.  That is correct.

3    Q.  Do you know, Mr. Awad, when this provision was made part of

4    AMLA?

5    A.  I'm looking at the most recent, 2012, but there have been

6    amendments in '08, in '09.  So it is most likely in '08 or '09.

7    Q.  Isn't it a fact, Mr. Awad, that within the Shariah court

8    system or by the Shariah court in Singapore the transfers of

9    custody cases from the Shariah court to the civil family court

10   are exceedingly rare?  Isn't that true?

11           MR. ARENSTEIN:  Objection.

12           THE COURT:  Overruled.  Go ahead, if you know.

13   A.  I don't know the statistics, but I have in a 1996 case

14   Hafioni Abdul Karim v. Mazlan bin Redzuan, 1 S.L.R. page 378.

15   I quote, and this is from 1996 that specifically talks about

16   the authority to make these transfers.  It says, "If one party

17   wanted a change of forum and regime and the other party agreed

18   or acquiesced to it, the change may be made.  But if one or

19   both parties wanted to have the matter decided under the same

20   regime, no change should be imposed by the courts."

21           So, even as of 1996, and this is within the context

22   that a party had already initiated and is already within the

23   jurisdiction of the Shariah court, but even at that point, if

24   the parties wanted to shift it to the civil court, they are

25   able to do that.

1    Q.  That is not in dispute, Mr. Awad.

2              MR. ARENSTEIN:  Objection.  That is not a question.

3    Q.  It's very clear, isn't it --

4              MR. ARENSTEIN:  Objection.

5              THE COURT:  Sustained.  Congratulations.  Stricken.

6    Present the question.

7              MS. LEIDHOLDT:  Thank you, your Honor.

8    Q.  If both parties consent, there is no problem, isn't that

9    right?

10   A.  That is correct.

11   Q.  Then the Shariah court can order transfer, in theory, can't

12   it, according to article 35 of AMLA, isn't that correct?

13   A.  Again, we are assuming that the divorce action was already

14   established.  If a divorce action hasn't, the Shariah court has

15   no jurisdiction to entertain a custody application.

16   Q.  Yes.  I'm not addressing that circumstance, Mr. Awad.

17   A.  You have to explain to me.  You're assuming in your

18   discussion, the line of questioning, assuming that one of the

19   parties had already initiated a divorce action in the Shariah

20   court.  We have to get the assumptions clear so that I'm able

21   to give you an answer.

22   Q.  Mr. Awad, do you know of a single case, can you point me to

23   a single case in which a custody case in Singapore was

24   transferred from the Shariah court to the family court?  I'm

25   not asking whether or not the court has the authority to do

1    that.  I'm asking of a single case in which that transfer in

2    fact occurred.

3              MR. ARENSTEIN:  Objection, your Honor.

4              THE COURT:  Basis?

5              MR. ARENSTEIN:  The basis, it's not part of this

6    proceeding.  There is no divorce pending right now.  To ask the

7    question of whether a case that is already in the Shariah court

8    is transferred to the family court can't be, because that's not

9    the facts of this case.

10             THE COURT:  Maybe it goes to the credibility of the

11   witness.

12             MR. ARENSTEIN:  Then the question should be posed as

13   if it's a hypothetical and not as part of this case.

14             THE COURT:  Overruled.  You may answer.

15   A.  Tell me the question again, please.

16   Q.  Do you know of a single case in the Shariah court in

17   Singapore in which the Shariah court transferred a custody case

18   to the civil family court?  That's what I'm asking.

19   A.  There is a published decision in 1990, Munir v. Noor Hidah,

20   1990 S.G.H.C. 78.  It is also reported under 2 S.L.R. page 348.

21   In this particular case it does discuss several issues

22   regarding transfer from one court to another.  I believe one of

23   them was an actual transfer.

24   Q.  I'm not asking about a discussion of the issues.  I'm

25   asking about the actual transfer of a particular case that you

 1  are familiar with.

 2  A.  That I'm personally familiar with, no.

 3          THE COURT:  I don't understand what we mean by

 4  "familiar with."  That you read in the literature, that counts

 5  as familiar with.  Do you understand?

 6          THE WITNESS:  Yes, your Honor.

 7          THE COURT:  You don't have to have represented

 8  somebody to be familiar with the case.

 9          THE WITNESS:  I understand, your Honor.

10  Q.  You're saying that you have read a single case in the

11  literature in which such a transfer occurred, is that your

12  testimony, Mr. Awad?

13  A.  From the literature that I have reviewed, there is one

14  reported case.  But like in all legal systems, most of the

15  time, given that it is by consent, it is never going to be

16  reported.  So if the parties have the legal authority to decide

17  they want the custody to be determined by the civil court, no

18  one's ever going to hear about it because they went there by

19  consent.  So we are only going to see reported cases where

20  there are disputes.

21          Where there are disputes, I have given you several of

22  these cases where it says based on article 35(a) and 52 of the

23  administrative Muslim law, there is that authority, and by

24  consent you could divest the Shariah court from determining the

25  issue of custody.

 1  Q.  Mr. Awad, you don't have any idea how often custody cases

 2  in Singapore are transferred from the Shariah court into the

 3  civil family court, do you?

 4          THE COURT:  Let me ask you, is this going to

 5  credibility of the witness or does this have any relevance in

 6  this proceeding?

 7          MS. LEIDHOLDT:  I think it does to both, your Honor.

 8          THE COURT:  Let me hear you on relevance.

 9          MS. LEIDHOLDT:  If I may, just one second, please.

10          Your Honor, as to relevance, we have an order from the

11  court in Singapore that has transferred this custody case from

12  the civil family court to the Shariah court.  That's what we

13  have.

14          THE COURT:  Right.

15          MS. LEIDHOLDT:  To the best of our knowledge --

16          THE COURT:  That hasn't been modified.

17          MS. LEIDHOLDT:  That has not been modified.

18          THE COURT:  Correct.  Have you furnished a copy of

19  this affidavit?

20          MR. ARENSTEIN:  I have, your Honor.

21          THE COURT:  There is an affidavit that I'm told is

22  going to be filed shortly in the Singapore subordinate courts

23  in which the petitioner renounces any desire, intent, to pursue

24  the action in the Shariah court.  I understood from the

25  discussion the other day that your client doesn't oppose that.

1          MS. LEIDHOLDT:  No, that's correct, your Honor.

2          THE COURT:  On the basis that it is consented to by

3    both parties, it is a matter of time, and maybe I will wait to

4    see whether the order comes down.  But if the order comes down,

5    it is a moot issue, is that correct?

6          MS. LEIDHOLDT:  As to whether or not the case will

7    be -- this would be an order from the Shariah court in

8    Singapore stating that it is --

9          Help me.

10          THE COURT:  You correctly say, you're quite right,

11    there is an order from the civil court, the subordinate court

12    in the Republic of Singapore directing that the issue of

13    custody be litigated in the Shariah court.

14          MS. LEIDHOLDT:  That's right.

15          THE COURT:  The point that has been posited to me is

16    that upon the filing of the application of the petitioner in

17    this proceeding and the lack of opposition from your client,

18    and I understand your client does not oppose it, that the

19    Singapore court will modify that provision of its prior order,

20    thereby making it plain that it has jurisdiction over the issue

21    of custody.  That's what I understand.  Is that correct, Mr.

22    Arenstein?

23          MR. ARENSTEIN:  Yes, that is correct, your Honor.

24          THE COURT:  That issue will be dropping out of this

25    case or not.  If the Singapore court denies that application,

 1   it may be a very different story.  But it will either grant the

 2   application or it will deny the application, and we'll know the

 3   answer to that question, correct?

 4          MS. LEIDHOLDT:  Yes.  If I may consult with one of my

 5   colleagues for one second, your Honor?

 6          THE COURT:  Sure.

 7          MS. LEIDHOLDT:  Your Honor, I think this is the

 8   question and this is why this line of questioning is relevant.

 9   Assuming that the family court in Singapore does modify its

10   order, to the best of our understanding this case is now in the

11   Shariah court in Singapore.  It is a court of concurrent

12   jurisdiction.  Will the Shariah court surrender the

13   jurisdiction that it currently exercises over this custody

14   matter?

15          MR. ARENSTEIN:  If I might be heard, your Honor?

16          THE COURT:  If it is an order of the Singapore court,

17   the subordinate court of Singapore on which you rely and which

18   says that the Shariah court is the court in which this issue is

19   to be litigated, if that order is vacated or modified to delete

20   that provision, I'm not quite sure I understand your point.

21          MS. LEIDHOLDT:  Your Honor, this is the additional

22   wrinkle in the matter.  I believe that we can establish,

23   perhaps this witness has already conceded, and I believe that

24   he has, that the Shariah court has jurisdiction over all

25   divorce proceedings.

1              THE COURT:  Between Muslims, yes.

2              MS. LEIDHOLDT:  Yes.  Ms. Lee really would like to

3      exercise her right to obtain a divorce.

4              THE COURT:  Right.

5              MS. LEIDHOLDT:  From Mr. Souratgar.  As long as there

6      is a divorce proceeding, to the best of my understanding, in

7      the Shariah court, the custody matter is ancillary and will be

8      considered in the Shariah court.

9              THE COURT:  Why don't you put that as a question to

10     the witness.

11             MS. LEIDHOLDT:  If I may.

12             THE COURT:  Is it correct that as long as there is a

13     divorce proceeding pending in the Shariah court, the matter of

14     custody will be deemed to be ancillary regardless of the

15     positions of the parties on whether it should be heard by the

16     Shariah court?

17             THE WITNESS:  No.  They have to make affirmative

18     application requesting that the Shariah court entertain the

19     custody matter and rule on it.  Let's look at the statute,

20     because the statute has an answer.

21             THE COURT:  No, you have answered my question.  Next

22     question.

23             MS. LEIDHOLDT:  I think that is a point that will be

24     disputed, your Honor.  And if I may have just one second,

25     please.

 1   Q.  Mr. Awad, are you familiar with Ahmad Nizam Abbas?

 2   A.  Yes, probably.

 3   Q.  Then you know that he is currently the chairman of the

 4   Muslim Law Practice Committee of the Law Society of Singapore,

 5   is that right?

 6          MR. ARENSTEIN:  Objection to the question, your Honor.

 7   Relevance.

 8          THE COURT:  Overruled.

 9   A.  You can show me a document to refresh my recollection.

10   Maybe I'll know.

11          MS. LEIDHOLDT:  I'd like to show a document to refresh

12   Mr. Awad's recollection.

13          THE COURT:  Sure.

14          MR. ARENSTEIN:  Can I see the document?

15          THE COURT:  Show it to counsel, and then you can show

16   it to the witness.

17          MS. LEIDHOLDT:  I'm only going to use the first page

18   of the document.

19   Q.  I would like to direct your attention, Mr. Awad, to

20   paragraph number 5.

21          THE COURT:  What is the question?

22   Q.  The question is, does this refresh your recollection, Mr.

23   Awad, as to whether Mr. Abbas is the chairman of the Muslim Law

24   Society in Singapore.

25   A.  His affidavit is saying that.  Then I assume --

1          THE COURT:  No, no.  The question is whether it

2    refreshes your recollection.

3    A.  No, it does not.

4          THE COURT:  Next question.

5    Q.  Mr. Awad, would you be surprised to learn that Mr. Abbas

6    has stated in a sworn affidavit that when there is a divorce

7    proceeding before the Shariah court, the court holds

8    jurisdiction over child custody as an ancillary matter?

9          MR. ARENSTEIN:  Objection, your Honor.

10          THE COURT:  Overruled.

11   A.  What I said, to make this very clear, the statute says once

12   a divorce action is commenced, the court will have power on

13   these ancillary matters, including custody.  But if the parties

14   do not take a proactive step and say, judge in the Shariah

15   court, we want you to make the decision on custody, if they say

16   they want the civil court to make the decision, there's two

17   different circumstances.

18          So yes, it is true that once a divorce is vested, is

19   commenced, the court has power on the ancillary issues.  I have

20   testified to that from the beginning on direct and on cross.

21   But we have to look at the other variables.  If the parties say

22   we want to have our custody matter resolved in the civil court,

23   that's in their hand.

24   Q.  Mr. Awad, do you know of a single case in the Shariah in

25   Singapore where a divorce action has been initiated in the

1   Shariah court -- the only place a divorce action can be

2   initiated, correct?

3   A.   Correct.

4   Q.   -- and after that divorce action has been started the

5   custody provision which AMLA says is ancillary is then

6   transferred to the civil family court?  Do you know of a single

7   case in which that has happened?

8   A.   I just gave you a couple of the cites for those cases where

9   they say that there are these transfers that are taking place.

10  Q.   That's not --

11          MR. ARENSTEIN:  Objection, your Honor.  She is not

12  letting him answer.

13          THE COURT:  Sit down.

14  A.   From my research and from my review, there are in the

15  statute, the AMLA statute, painstakingly and in detail giving

16  us multiple scenarios of when a transfer can take place,

17  whether it is prejudgment, post-judgment, or pending, the

18  action is still pending.

19          In addition, I cited to you Hafioni v. Mazlan Redzuan,

20  1 S.L.R. page 378 1996.  In that decision the court

21  specifically says the legislator did not intend to confer

22  jurisdiction on the Shariah court to hear and determine issues

23  with respect to custody of children.

24          The other case, Munir v. Noor, 2 S.L.R. 1990, page

25  348, where the court went painstakingly giving us multiple

1   scenarios and variables:  When a divorce is commenced, when a

2   divorce is not commenced, when it's prejudgment, post-

3   judgment, when a custody case will be transferred from the

4   Shariah court to the civil court or from the civil court to the

5   Shariah courts.  Why would we have all of this in the statute

6   and this case law and you're asking me if I know of one case?

7        The statute provides that these parties, if they

8   consent and they want to divest the Shariah court of the

9   authority to make the decision on their custody, they are

10  entitled to do that.  And you have an undertaking that you are

11  waiting to see if the court is going to enter it.  If they are

12  entering it, then this becomes moot and irrelevant.

13  Q.  It is your testimony that you know of at least one specific

14  case where there was a divorce, and during the pendency of that

15  divorce -- and there was a divorce, can you establish, Mr.

16  Awad, that in that case there was a pending divorce --

17       MR. ARENSTEIN:  Objection, your Honor --

18  Q.  -- that you are referring to?

19       MR. ARENSTEIN:  -- to the form of the question.

20       THE COURT:  Overruled.

21  A.  Yes, there were pending divorces.

22  Q.  In those specific cases there were pending divorces?

23  A.  Yes.  Let's clarify, because you said about divorce.

24  Q.  I'm asking for you to give me, if you could read the

25  passage --

1          MR. ARENSTEIN:  Your Honor, could she --

2          THE COURT:  Stop, Mr. Arenstein.

3          Go ahead, put your question.

4    Q.  Please read the passage that indicates that there was a

5    pending divorce and during the pendency of that divorce a

6    custody case was transferred to the civil family court.

7          THE COURT:  If I understood the witness, he said that

8    the statute and the case lay out the circumstances where that

9    may occur.  That's what I understood him to say.

10          THE WITNESS:  Yes.

11          THE COURT:  Maybe I misunderstood the testimony.

12          THE WITNESS:  Your Honor, you are correct in

13    summarizing my testimony.

14          THE COURT:  Next question.

15    Q.  Isn't it true that AMLA is largely silent as to the

16    substantive interpretation of the Shariah law that the Shariah

17    court should follow?

18    A.  What do you mean?

19    Q.  Isn't it clear that --

20          THE COURT:  Do you understand the question?

21          THE WITNESS:  No, I do not understand the question.

22    Q.  The AMLA is not specific as to the substantive

23    interpretation of Shariah law that the Shariah court should

24    follow, isn't that a fact?

25    A.  What do you mean by substantive interpretation?

1   Q.  That AMLA does not provide any definition of Shariah law?

2   A.  No, that's not true.  If you look at article 33, it says

3   that one of the -- let's look at article 33 of AMLA.  It says,

4   "Authorities to be followed.  Subject to this section, the

5   majlis and the legal committee, in issuing any rulings, shall

6   ordinarily follow the tenets of the Shafi school of law."

7   Number 2.  "If the majlis or the legal committee considers that

8   the following of the tenets of the Shafi school of law will be

9   opposed to the public interest, the majlis may follow the

10  tenets of any of the other accepted schools of Muslim law as

11  may be considered appropriate."

12          In the section on inheritance in AMLA, they

13  specifically list a few treatises that they say are

14  authoritative for purposes of the interpretation.

15  Q.  Yes.  Shafi law is a school of Islamic thought, isn't that

16  correct?

17  A.  Yes.

18  Q.  Please correct me if I'm wrong.  There are four major

19  schools of Islamic thought, is that correct?

20  A.  Four surviving schools.

21  Q.  And the Shafi is one of them, is that right?

22  A.  That is correct.

23  Q.  Isn't it true that the Shafi school of thought is the

24  official school of thought in Malaysia?  Isn't that correct?

25  A.  That is correct.

1   Q.  The Malaysia, the Singaporean Shariah law is very closely

2   connected to the Malaysian Shariah law, isn't that true?

3   A.  Yes and no.  No:  When you see in a statute that

4   specifically says if Shafi law would oppose the public interest

5   and public policy, they are entitled to deviate.  And most of

6   the time, if you are going to go to any Muslim country, they

7   are going to say that the Shafi law or the Maliki law should be

8   the law of the land and should control.

9           So, in AMLA, because of the pluralistic legal system

10  in Singapore and how liberal and progressive they are, they are

11  creating a big picture that there are general principles of

12  Shariah that should be taken into account as long as they are

13  consistent with the other statutory corpus of Singapore,

14  including their constitution, including the women's charter,

15  including the infant and guardianship law, including that

16  specifically at the Shariah court website and all of the

17  Shariah cases specifically say best interest controls.  That

18  gives you the leeway and the flexibility of the legal system

19  and the forward thinking of the drafters of the statute.

20          THE COURT:  Mr. Awad, you are not in a debate.

21          THE WITNESS:  I apologize.

22          THE COURT:  You are not arguing anything.  You are

23  responding to questions.  Keep that in mind.

24          THE WITNESS:  I understand.  I apologize.

25          THE COURT:  Next question.

1  Q.  What are the principles of the Shafi school of thought

2  derived from?  Where do they come from?

3  A.  In the Quran and the traditions of the Prophet.

4  Q.  Other than saying the AMLA will be interpreted according to

5  the principles of the Shafi school of thought, other than

6  stating that, isn't it true that AMLA provides courts and

7  practitioners very little substantive authority or guidance?

8  Isn't that a fact, Mr. Awad?

9  A.  No.

10  Q.  Mr. Awad, in fact, there is a virtual dearth of

11  codification of the substantive law, the substantive Shariah

12  law that is practiced in Singapore, isn't that correct?

13  A.  I told you there's five or six treatises that are

14  specifically referenced in the law as it pertains to

15  inheritance.  And because custody is following the best

16  interest, they are following the principles of best interest

17  that are in the civil court as well.

18        There is codification of the concept that the best

19  interests of the child governs.  In other words, the lack of

20  detailed codification of all premodern Islamic legal concepts

21  is actually one of the reasons why this is such a powerful

22  model for other Muslim countries.  It's giving you flexibility

23  and admitting and acknowledging that the constitution, the

24  other laws of Singapore are another source of law that is

25  governing.

1   Q.  So you're acknowledging that there is very little law

2   codified as Shairiah law in Singapore.  Isn't that correct?

3          MR. ARENSTEIN:  Objection.

4   Q.  Isn't that correct, Mr. Awad?

5          MR. ARENSTEIN:  Objection.

6          THE COURT:  Overruled.

7   A.  When we talked about codification, Islamic law generally is

8   contrary to codification.  Under Islamic law, the perspective

9   of the diversity of multiple schools is that there is no

10  monopoly over divine will.  Therefore, multiple interpretations

11  will all have similar authority.

12          Therefore, a codification divests courts from

13  flexibility and you understand is that when they specifically

14  say you follow the Shafi School, when we talk about the Shafi

15  School, I can take you to my library and pull some of the major

16  treatises that are Shafi law, and we have encyclopedias of the

17  substantive law you're asking for we can go back and look at.

18          The point is that this statute says if Shafi law is

19  not really up to date, you could look at other schools of law,

20  and if the interpretation is not consistent with the public

21  order and the public interest, you're free to deviate.  So that

22  is a good thing, not a bad thing.

23  Q.  In your opinion, Mr. Awad?

24  A.  Yes, in my opinion.

25  Q.  Mr. Awad, isn't it a fact that Shairiah law is not taught

1    in law schools in Singapore?

2    A.  That is true, but they are offering certificates, and it is

3    an area that is becoming very important.

4    Q.  Isn't it also a fact, Mr. Awad, that if you're a lawyer

5    practicing in Singapore, you do not need a special license or

6    accreditation to practice in the Shairiah courts.  Isn't that

7    true?

8    A.  It is true and that is a good thing.

9            THE COURT:  Stop, stop.  You answered the question.

10           THE WITNESS:  Yes.  Sorry, your Honor.

11   BY MS. LEIDHOLDT:

12   Q.  Isn't it true, Mr. Awad, that Singapore's Shairiah court

13   has the authority to make determinations with respect to

14   procedure and the application of Shairiah law in accordance

15   with Islamic law?

16   A.  You answered the question itself, had the answer.

17           THE COURT:  Well, no.

18           THE WITNESS:  Yes.

19           THE COURT:  Could you please, next question.

20   BY MS. LEIDHOLDT:

21   Q.  Thus, Mr. Awad, within the Shairiah system in Singapore,

22   individual judges have immense discretion in applying their

23   interpretations of Shairiah law to the cases before them.

24   Isn't that true?

25   A.  Interpretation of Shairiah law is a body that governs from

1    custody to possessory interest to sale of goods.  I mean you're

2    asking me like I'm supposed to be a walking Shairiah

3    encyclopedia.  Maybe if you specifically tell me exactly what

4    area of Shairiah law you want me --

5          THE COURT:  Let me take a wild guess and say custody

6    law.  Go ahead.

7    BY MS. LEIDHOLDT:

8    Q.  Isn't it a fact, Mr. Awad, that as to custody and family

9    law in general, custody, divorce, family law in general,

10   individual judges in the Shairiah court have immense discretion

11   in applying their interpretations of Shairiah law to those

12   cases before them.  Isn't that a fact?

13   A.  The Shairiah judges are the finders of fact and they make

14   the conclusions of law.  Of course there is certain discretion.

15          In family cases in New Jersey, when you are at the

16   trial level there is so much discretion from a Family Court

17   judge and appellate courts defer to any credibility finding and

18   what have you.  Yes, it is true that there is a lot of

19   flexibility with the Shairiah judge in his application of the

20   law.

21   Q.  Now, Mr. Awad, it is clear that Singapore Shairiah courts

22   do not have the authority to issue personal protection orders.

23   Isn't that true?

24   A.  That is true.

25   Q.  Isn't it also true, Mr. Awad, that the Shairiah court in

1   Singapore has no obligation to take a personal protection order

2   into consideration?

3   A.  From a classical Islamic perspective, the question is they

4   have to take that into consideration.  If you're assaulting and

5   harming your wife, any judge, whether a Shairiah judge or

6   secular judge, is going to take that into account.

7   Q.  Do you know of a single case in the Shairiah court in

8   Singapore in which a judge has taken into consideration in any

9   family law matter a personal protection order?  Are you aware

10  of a single case in which this has happened?

11  A.  What I am aware of -- you're asking me about the Shairiah

12  law and Singapore law -- what I am saying is a Shairiah judge

13  has an obligation to take into account the circumstances.

14          On the web site of the Shairiah court, and I quote, it

15  says that:  "In deciding the matter, the court will look into

16  the whole circumstances of the case, but the paramount

17  consideration is the best interests of the children."

18          So what are the whole circumstances?  If I'm the

19  mother and the judge is going to hear that --

20          THE COURT:  Where did you just quote from?

21          THE WITNESS:  The Shairiah Singapore Court Site, and I

22  can get the URL for you.

23          THE COURT:  I am not asking for the URL.  What is the

24  web site of what court?

25          THE WITNESS:  The Singapore Shairiah Court.  A Google

1    search will take you right there.

2            THE COURT:  Thank you very much.

3    BY MS. LEIDHOLDT:

4    Q.  Do you know of a single case -- and this is my question --

5    in which a court, a judge in the Shairiah court, has taken a

6    party's personal protection order into consideration when

7    rendering a decision of custody or visitation?  Do you know of

8    a single case in which that has occurred?

9    A.  I don't know of a single case that that has occurred, but

10   the Islamic law principles come organically from the experience

11   of the law.  So if there is a principle that says if the father

12   is abusing the mother, that impacts the judge's determination

13   on custody, that is self-evident.  I don't know specifically of

14   a case that I can cite to you, but the law is the law.  That's

15   the general guideline and the ideal.

16           We have to acknowledge that the Shairiah court judge

17   is a human being just like everybody else.  If a mother is

18   being abused, the judge will take that into account, and more

19   importantly, and I said that earlier, the Shairiah custody

20   determination is favorable to the mother until the child

21   reaches a certain age.  So there is a presumption in her favor

22   already.

23   Q.  Would it surprise you, Mr. Awad, to know that attorneys

24   practicing in the Shairiah court in Singapore have stated that

25   it is not uncommon for the Shairiah court to state that a

1    personal protection order issued by the Family Court is not

2    valid --

3              MR. ARENSTEIN:  Objection.

4    Q.  -- in that court?

5              THE COURT:  Sustained.

6    Q.  Isn't it true, Mr. Awad, that a Muslim domestic violence

7    victim seeking divorce from her Muslim battering husband can

8    only obtain relief in the Shairiah court?

9              THE COURT:  I think that has already been established,

10   hasn't it?  Didn't you ask that question before as to divorces?

11             MS. LEIDHOLDT:  Yes.

12             THE COURT:  Okay.

13   BY MS. LEIDHOLDT:

14   Q.  The answer is yes?

15             MR. ARENSTEIN:  Objection to the statement, "The

16   answer is yes?"

17             MS. LEIDHOLDT:  I am following a different line of

18   questioning, your Honor.

19   Q.  So the answer is yes, correct?

20             MR. ARENSTEIN:  Objection.

21   A.  When you say "relief," what are you relief are you saying?

22   Q.  Seeking a divorce?

23   A.  Yes.  Relief can mean also financial compensation for her

24   injury.

25   Q.  What if I am seeking a divorce?

1   A.  Seeking a divorce, yes, that is the exclusive jurisdiction.

2   By the way, even --

3           THE COURT:  We are not doing by the ways.  If you want

4   to rescind your answer, you can or modify it.  We are not doing

5   by the ways, okay?

6           THE WITNESS:  I appreciate.  Sorry.

7           THE COURT:  Next question.

8   BY MS. LEIDHOLDT:

9   Q.  Isn't it true that even if the victim were to renounce

10  Islam during the course of the marriage, the Shairiah court

11  would continue to have jurisdiction over the divorce?

12          THE COURT:  Let me pause.  What is the relevance of

13  this?  Let's assume that is true or not true.  What is the

14  relevance?

15          MS. LEIDHOLDT:  Because this is the system our client

16  whom we contend is a Muslim domestic violence victim seeking

17  divorce can only obtain were she to renounce Islam, that she

18  would continue to be within the Shairiah court.  There is no

19  way that she --

20          THE COURT:  Right.

21          MS. LEIDHOLDT:  -- she could avail herself in any

22  other court in terms of pursuing divorce.

23          THE COURT:  Let's assume that is true.  How is that

24  relevant to this proceeding?  Let's assume every word you said

25  is a hundred percent true.  What of it as far as the matter

1   before this Court?

2       MS. LEIDHOLDT:  Because, your Honor, we're asserting

3   the Article XX defense in this case that the Shairiah system

4   will not protect the rights of our client or any domestic

5   violence victim.

6       THE COURT:  Article XX does not protect the rights of

7   a domestic violence victim in a divorce proceeding in another

8   jurisdiction.  Maybe it should.  Maybe there should be a

9   convention.  Maybe there will be a convention, but none has

10  been cited to me and I'm not aware of any.

11      MS. LEIDHOLDT:  Yes.  Your Honor, what --

12      THE COURT:  I am sorry.  That was yes, you agree?  Or

13  just yes?  If I am wrong, I invite you to tell me I'm wrong.

14      MS. LEIDHOLDT:  What we are contending, your Honor, is

15  that within the Shairiah system -- and ---could you give me one

16  second just to confer with my colleagues?

17      THE COURT:  Sure.

18      (Off-the-record discussion)

19      MS. LEIDHOLDT:  We're contending, your Honor, that the

20  Shairiah court in Singapore profoundly discriminates against

21  women and it profoundly discriminates against non-Muslims, and

22  that were our client's child be repatriated in Singapore, and

23  our client to return to Singapore because her child has been

24  repatriated to Singapore, that she will be in a legal system

25  where her rights, including her right to protection from

1    domestic violence, will be transgressed.

2            THE COURT:  That may be horrible.  That may be a

3    horrible circumstance, but what does that have to do with the

4    international child abduction provisions of the Hague

5    Convention, the only matter which is before me?

6            I don't relish or I don't, at this stage of the game I

7    am not expressing the view on whether it is or is not horrible,

8    but I am accepting for the sake of this discussion that it is

9    not to your client's liking and may be a very bad thing if your

10   client has to participate in a proceeding in a court where she

11   feels she is not being treated as an equal on a matter of

12   divorce and in a system where she is not being protected

13   against domestic violence.

14           But if I assume both of those things to be true, of

15   what moment is that in this proceeding?

16           MS. LEIDHOLDT:  Your Honor, Article XX provides that

17   the return of the child may be refused if this would not be

18   permitted by the fundamental principles of the requested state

19   relating to the protection of human rights and fundamental

20   freedoms.

21           THE COURT:  I am familiar with that, but that doesn't

22   relate to whether your client, as distinguished from the child,

23   may not get a fair shake in a divorce proceeding or may not get

24   a fair shake in a domestic violence proceeding.  I firmly hope

25   that all humans always get fair shakes in domestic violence and

1   divorce proceedings.  That is most desirable.

2        Whether or not that is the case here does not appear

3   to be the issue before this Court, which is in terms of Article

4   XX, the rights with regard to the child.

5        MS. LEIDHOLDT:  Your Honor, I don't think we are

6   talking simply about a fair shake.  I know your Honor --

7        THE COURT:  Let's call is a gross deprivation of all

8   possible norms of fairness and due process, but the treaty does

9   not relate to divorce actions and it does not relate to

10  domestic violence against a spouse.  It relates to Article XX.

11       Article XX relates to the rights relative to the

12  adjudication of custody.  Am I wrong?

13       MS. LEIDHOLDT:  No, you are not wrong at all, your

14  Honor.

15       THE COURT:  Okay.  So then it may be horrific if your

16  client must go someplace where she will not get minimal due

17  process, if that's the case, to get a divorce, but it is not

18  within the purview of this Court on an Article XX objection.

19       MS. LEIDHOLDT:  Your Honor, we would contend that if

20  our client is not protected from continued domestic violence --

21  in other words, if her human right to security is transgressed

22  in that forum, and if our client does not enjoy due process

23  because -- and I haven't been able to question the witness

24  about this because a woman witness' testimony is worth less

25  than a man's in that system, that it has a profound impact on

1   the rights of the child in this case, a profound impact.

2          THE COURT:  How?

3          MS. LEIDHOLDT:  Because the rights of --

4          THE COURT:  If the mother is denied a divorce unfairly

5   and inappropriately, it does not mean that the two individuals

6   will be cohabiting.  That may be a denial of a fundamental

7   human right, but it is not one that I see addressed in this

8   treaty.

9          MS. LEIDHOLDT:  It it more than simply a denial of a

10  right to a divorce because custody matters are ancillary to

11  divorce matters in the Shairiah court.

12         THE COURT:  But that's a fair subject, and I have

13  allowed you enormous latitude on that point.

14         MS. LEIDHOLDT:  Yes.

15         THE COURT:  Whether the issue of custody will be

16  adjudicated by the Shairiah court, that is a relevant issue in

17  this proceeding.  What is not, not a relevant issue in this

18  proceeding, it appears to me, unless it is tied into custody --

19         MS. LEIDHOLDT:  Yes.

20         THE COURT:  -- is whether the spouse's divorce action

21  will be properly adjudicated in a Shairiah court.  There may be

22  a miscarriage of justice.  I don't know.  I am not in a

23  position to opine on the Shairiah courts at this juncture in

24  this proceeding.  If you are right, it does not speak to the

25  Article XX objection as it relates to the custody.

1          MS. LEIDHOLDT:  Of course, your Honor.

2          It is our understanding once a divorce action is

3    commenced in the Shairiah court, the custody action will be

4    litigated as part of that divorce action.  We understand from

5    the many experts that we have consulted with in preparation for

6    this case that it is extraordinarily rare for custody to be

7    transferred from the Shairiah court to another court.

8          THE COURT:  That may be a valid point.  I have allowed

9    you -- and this record will reflect -- enormous latitude to go

10   with that point over and over and over again.  Maybe you want

11   to go over it over and over some more.  You have.  At some

12   point I am going to say it is cumulative.

13         The point that you raised in your question, isn't it a

14   fact that a battered spouse who is Muslim or has renounced the

15   Muslim faith, who is seeking a divorce in Singapore from a

16   spouse of the Muslim faith must pursue the case in a Shairiah

17   court, the answer to that question standing alone does not get

18   us any closer to a resolution of the issues in this case.  I

19   have allowed the testimony to be elicited and I have allowed

20   the testimony to stand.

21         So you have that in the record.

22         MS. LEIDHOLDT:  Thank you.

23         THE COURT:  I have invited you to tell me how this is

24   relevant, and you have stated your position.

25         MS. LEIDHOLDT:  Thank you.

1          THE COURT:  Now we are going to break for the evening

2     and we'll pick up tomorrow morning at 10:00 o'clock.

3          THE WITNESS:  Tomorrow?  What time tomorrow morning?

4     I do have a conflict.

5          THE COURT:  I just said what time we are beginning.

6          THE WITNESS:  Okay.

7          (Court adjourned until Thursday, December 6, 2012, at

8     10:00 o'clock am)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                    Page

        Cross By Mr. McNally  . . . . . . . . . 132
        Redirect By Mr. Arenstein . . . . . . . 188


TAMATHA STITT

        Direct By Mr. Arenstein . . . . . . . . 206
        Cross By Mr. McNally  . . . . . . . . . 214


ABED AWAD

        Direct Mr. Arenstein  . . . . . . . . . 223
        Cross By Ms. Leidholdt  . . . . . . . . 239




                    PETITIONER EXHIBITS

Exhibit No.                              Received

K   . . . . . . . . . . . . . . . . . . . 224


                    RESPONDENT EXHIBITS

Exhibit No.                              Received

R5   . . . . . . . . . . . . . . . . . . 160

 R6   . . . . . . . . . . . . . . . . . . 162