```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  In the Matter of one infant child
    ABDOLLAH NAGHASH SOURATGAR,
 4
                   Petitioner,
 5
              v.                        12 Civ. 7797 PKC
 6
    LEE JEN FAIR,
 7
                   Respondent.
 8
    ------------------------------x
 9
                                        December 6, 2012
10                                      10:35 a.m.

11

12  Before:

13                     HON. P. KEVIN CASTEL,

14                                      District Judge

15

16                        APPEARANCES

17  ROBERT D. ARENSTEIN,
    SANDRA NUNEZ,
18       Attorneys for plaintiff

19  PATTON BOGGS LLP
         Attorneys for defendant
20  BY:  ANDREW J. McNALLY, Esq.
                    Of counsel
21
    Also Present:
22       JENNIFER BAUM,
         JENNA DiCOSTANZO,
23       Guardians ad Litem
          – and –
24       JANE KIM, Esq.

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              (Trial resumed)
 2    ABED AWAD, resumed.
 3              THE COURT:  Good morning.  Mr. Awad, the Court reminds
 4    you you are still under oath.
 5              MR. ARENSTEIN:  Your Honor, I was just handed a
 6    document this morning.  I haven't had a chance to read it.  It
 7    was just given me to me a second ago by Ms. Baum.
 8              THE COURT:  That's great.
 9              Please proceed with the cross-examination of Mr. Awad.
10              MS. LEIDHOLDT:  Thank you, your Honor.
11              THE COURT:  By the way, it's a letter, correct?
12              MR. ARENSTEIN:  I don't know what it is, your Honor.
13              THE COURT:  Take a look at it.  Look at the front
14    here, Mr. Arenstein.  It appears to be a letter addressed to
15    the Court, is that right?
16              MR. ARENSTEIN:  Yes, it is a letter addressed to you,
17    your Honor.
18              THE COURT:  Thank you.  Go ahead.
19    CROSS-EXAMINATION (continued)
20    BY MS. LEIDHOLDT:
21    Q.  Mr. Awad, you have testified that the Singapore courts
22    protect the rights of victims of domestic violence, isn't that
23    true?
24    A.  That is correct.
25    Q.  Mr. Awad, I assume you have a general familiarity with the
```

 1   facts of this case.

 2   A.  Generally.

 3   Q.  Mr. Awad, are you aware that in the Singapore family court,

 4   and I'm talking about the civil court now, in a trial for a

 5   protective order, a personal protection order, the respondent

 6   in this case, Ms. Lee, was precluded from providing evidence

 7   about her history of domestic violence because at the of a

 8   court counselor she had previously withdrawn a petition for a

 9   protective order?

10           MR. ARENSTEIN:  Objection.

11           THE COURT:  Overruled.  It's a question.

12   A.  I don't know.

13   Q.  Mr. Awad, would you consider a court's decision in a

14   proceeding involving the issuance of a personal protection

15   order, a court's decision to preclude the alleged victim's

16   history of domestic violence, would you consider that to be

17   protective of that victim's rights?

18           MR. ARENSTEIN:  Objection, your Honor.  It's a vague

19   question.

20           THE COURT:  Sustained.

21   Q.  Isn't it a fact, Mr. Awad, that a court's decision in an

22   order of protection trial to preclude evidence of the

23   petitioner's history of domestic violence would fail to protect

24   that petitioner's right to be protected from domestic violence?

25           MR. ARENSTEIN:  Objection.

```
 1              THE COURT:  Sustained.
 2   Q.  Would it surprise you, Mr. Awad, to learn that a family
 3   court in Singapore refused to permit a petitioner in an order
 4   of protection case to provide evidence about the history, her
 5   history, of domestic violence at the hands of the respondent?
 6              MR. ARENSTEIN:  Objection.
 7              THE COURT:  Overruled.
 8   A.  Can you say the question again?
 9   Q.  Would it surprise you, Mr. Awad, to learn that a court
10   presiding over an order of protection case in Singapore family
11   court refused to permit a petitioner seeking an order of
12   protection to provide evidence about a history of domestic
13   violence at the hands of the respondent?
14              MR. ARENSTEIN:  Objection, your Honor.  The question
15   does not import the facts that happened in this case, the fact
16   that --
17              THE COURT:  It's only a question.  It's only a
18   question.  Would it surprise you?
19              MR. ARENSTEIN:  It's an ambiguous question.
20   A.  It's going to depend if it's in a criminal setting or
21   quasi-criminal, like we view domestic violence.  Even from a
22   domestic violence perspective under, say, New Jersey law, you
23   can't go into the history of the domestic violence until there
24   is a predicate act.
25              Once there is a finding there is a predicate act, the
```

1    courts are looking at the history of domestic violence.  But

2    here, if it is maybe in a criminal setting, maybe the court is

3    not going to look at the past history, because that would be

4    prejudicial that there is propensity for somebody to commit a

5    crime.

6            So, you're asking a question that is kind of loaded,

7    that involves criminal evidence, quasi-evidence.  Telling me it

8    surprises me, it's going to depend on the actual setting of the

9    case.  If it's a criminal matter --

10           THE COURT:  You have answered the question.

11           THE WITNESS:  OK.

12           THE COURT:  The question was would it surprise you.

13   If I understood your answer correctly, you said it depends on

14   the circumstances.

15           THE WITNESS:  Yes, your Honor.

16           THE COURT:  That's all you needed to say.  OK?

17           THE WITNESS:  Thank you.

18           THE COURT:  Next question.

19   Q.  Mr. Awad, are you aware that each of the five times that

20   the respondent in this case made a police report about domestic

21   violence in Singapore and even though that on three of the

22   occasions there was documented evidence of physical injury, the

23   police took no action?

24           MR. ARENSTEIN:  Objection to the question.

25           THE COURT:  Sustained.  He is not being tendered as an

1    expert on what happened in this case.

2    Q.  Would it surprise you, Mr. Awad, that in Singapore a victim

3    of domestic violence repeatedly reported domestic violence to

4    the police and on three of those occasions was examined by a

5    doctor who documented evidence of physical injury, and on none

6    of those occasions did the police take any action?

7              MR. ARENSTEIN:  Objection, your Honor.

8              THE COURT:  Overruled.

9    A.  Can you repeat the question?

10   Q.  Would it surprise you --

11             THE COURT:  No.  I'll let Tom read it back.

12             (Question read)

13             MR. ARENSTEIN:  Objection, your Honor.  There is

14   nothing in evidence to say that at this point.  As far as the

15   question is concerned, there is no proof that anybody committed

16   any domestic violence on anybody.  Overruled.

17   A.  My answer would be the same:  Depending on the

18   circumstances.  You're saying that there is evidence of harm.

19   The statute, the penal code, is very clear on grievous hurt, on

20   assault, on battery.  So I don't know what the circumstances

21   are.  Assuming the circumstances, if you would give me exactly

22   the circumstances, maybe I can opine on it.  But it would

23   depend on the circumstances.

24             So yes, I would be surprised under some circumstances,

25   just like sometimes in our country maybe police don't do what

1    they are supposed to do.  That happens.  Is that the norm or is

2    that the exception?  I would not be able to opine and tell you

3    that what happened was an exception or the norm.  I don't

4    believe it's the norm.

5    Q.  Isn't it true, Mr. Awad, that one of the reasons that you

6    find it difficult to provide an expert opinion about the

7    Singapore criminal justice system is that you have no direct

8    experience with the Singapore criminal justice system?

9             MR. ARENSTEIN:  Objection.

10            THE COURT:  Basis?

11            MR. ARENSTEIN:  I'll withdraw it.

12   A.  I'm opining specifically on the Shariah courts in Singapore

13   and the role of Shariah in family law and its relationship with

14   the civil law.  That's primarily my expert opinion in this

15   proceeding.  As it pertains to the issue of domestic violence,

16   domestic violence, the jurisdiction for domestic violence is in

17   the civil court, not in the Shariah court.  So I'm opining on

18   additional information based on the status.

19            Is there a cause of action for a woman that is

20   assaulted to be protected under Singapore law?  Yes, there is.

21   There are statutes on the book that protect a woman from being

22   assaulted, protect a woman from being hurt by her husband.  Do

23   I have the statistics on how often they are prosecuted or not

24   prosecuted or how often a woman actually files her complaint?

25   I don't those statistics.

 1          The Shariah court has no jurisdiction over domestic

 2   violence and orders of protection.  That lies in the penal

 3   code, which is a secular law modeled on the common law and the

 4   British law.

 5   Q.  Mr. Awad, in the course of testifying here in this

 6   courtroom, you have given opinions not only about the Shariah

 7   court system in Singapore but also about the justice system in

 8   Singapore in general and specifically as to how it pertains to

 9   the protection of victims of domestic violence.

10          MR. ARENSTEIN:  Objection.  That is not a question.

11          THE COURT:  Stop.

12   Q.  Isn't that true?

13          THE COURT:  OK.  Is that true?

14   A.  I said that the domestic violence -- there are protections

15   for domestic violence in Singapore that are in some ways

16   similar to ours in the sense that there is a criminal statute

17   that says if a husband, if anyone, assaults another person,

18   they will be subject to criminal prosecution.  That's what I

19   opined on.  I'm not opining that the domestic violence statute

20   in the United States is identical like in Singapore.

21          Is there a remedy for a woman that is assaulted by her

22   husband?  Yes, there is.  Is the remedy identical to the U.S.?

23   Obviously, there are very few countries that have identical

24   remedies similar to what we have in the U.S.  The remedy for

25   her in Singapore is criminal in nature.  Her remedy in the U.S.

is quasi-criminal and criminal in nature.  That's my general

opinion.

Q.  Mr. Awad, would you agree that in order to assess the

extent to which the justice system in Singapore protects

victims of domestic violence, one has to look not only at the

statutory law but also at the way those laws are applied in

that system?  Isn't that true?

A.  First and foremost, you need to look at the statute,

because if there is a mechanism for protection and the law is

on the books, the extent of its application or whether

prosecutors pursue it is relevant.  But in the whole scheme of

things, is there a remedy for her to pursue and get protected?

The answer is yes.  There are laws on our books; some are

applied in an unfair manner, some are applied or not applied.

So there is a mechanism.

     She has protections under the criminal code, the penal

code, similar to protections in all other countries.  How often

and how practical it is applied, I don't have the statistics

and I can't opine.  But does she have a remedy for protection.

Do women actually go to the police and report their husbands

and their husbands get prosecuted?  Yes.  How often?  Is it a

hundred percent?  I can't say.

Q.  Isn't it true that in Singapore, in order for women who

report domestic violence to the police to get protection,

meaning for the police to begin to investigate that case and

1   take action, it requires an extraordinarily high threshold of

2   physical injury, such as broken bones or lethal violence?

3   Isn't that the case, Mr. Awad?

4   A.  As it pertains to the statute, no.  The statute, the penal

5   code, article 319 simply says if you cause bodily injury or

6   pain, that's a violation of the penal code.  Then the penal

7   code goes into a different type, a grievous hurt, and then it

8   gives you a more egregious standard that you need to meet.  So

9   on its face the statute provides for these protections.

10  Q.  But isn't it true, Mr. Awad, that you have no basis to talk

11  about how that statute is applied in Singapore, because you

12  simply don't know, you have no direct experience with the

13  criminal justice system in Singapore?

14           MR. ARENSTEIN:  Objection.

15           THE COURT:  What is the basis?

16           MR. ARENSTEIN:  The basis is whether he has experience

17  with the criminal justice system.  Experts can opine on the

18  system by what they know and what they have researched and what

19  they have learned about the case.  So the question is an unfair

20  question, your Honor.

21           THE COURT:  I don't understand your objection.  It's a

22  question to the witness.  What is the objection to the question

23  to the witness?  I'm not getting it.

24           MR. ARENSTEIN:  I'll withdraw the objection.

25           THE COURT:  All right.  Go ahead.

1    A.   From my research of the penal code and from researching

2    other issues relating to the Singapore legal system, what I'm

3    saying, and I'm going to repeat my testimony, is there are

4    mechanisms of protection for a woman being abused by her spouse

5    to seek the prosecutor's intervention and the police's

6    intervention.  The statute is clear.

7            I've seen cases where people are prosecuted for

8    assaults and grievous harm.  How often, I don't have the

9    statistics.  My simple answer is:  For me to tell you how often

10   a prosecutor is contacted by a victim of domestic violence and

11   that the prosecutor does not proceed, I don't have the

12   statistics.

13           THE COURT:  Let me cut to the chase here.  You claim

14   expertise in the statutes and reported case law in the courts

15   of the Republic of Singapore insofar as it relates to family

16   and custody matters, correct?

17           THE WITNESS:  As it pertains to family and custody

18   matters and the role of Shariah, yes.

19           THE COURT:  My next question is, you claim the same

20   expertise as to the family and custody law as set forth in the

21   statutes and reported case law in the Shariah courts of

22   Singapore, is that correct?

23           THE WITNESS:  That is correct, your Honor.

24           THE COURT:  Am I correct, you have no expertise on

25   police practices in Singapore?

1          THE WITNESS:  No, I do not.

2          THE COURT:  You have no expertise in how prosecutorial

3     discretion is exercised in Singapore?

4          THE WITNESS:  That is correct, your Honor.

5          THE COURT:  You have no expertise in the number of

6     cases that are brought in the courts of Singapore, the Shariah

7     courts, is that correct?

8          THE WITNESS:  As it pertains to domestic violence?

9          THE COURT:  As it pertains to domestic violence.

10          THE WITNESS:  Yes.  The Shariah courts don't have

11     jurisdiction in domestic violence.

12          THE COURT:  So you do have expertise in knowing that

13     the Shariah courts do not have jurisdiction.

14          THE WITNESS:  Yes.

15          THE COURT:  Other than that, you have no expertise in

16     the number or manner of domestic violence prosecutions in

17     Singapore?

18          THE WITNESS:  That is correct, your Honor.

19          THE COURT:  I think we can short circuit much of what

20     we are doing here, counsel.

21          MS. LEIDHOLDT:  I understand.

22     BY MS. LEIDHOLDT:

23     Q.  Isn't it true that you have no expertise, Mr. Awad, in how

24     family courts in Singapore apply laws related to personal

25     protection orders?  Isn't that true?

1   A.  I just explained that my expertise is related to the

2   Shariah courts and that the Shariah courts do not have

3   jurisdiction to issue orders of protection.  That's an

4   authoritative, hundred percent answer.  The Shariah courts do

5   not have authority to issue orders of protection.

6   Q.  I understand that.  But you also have no expertise in how

7   family courts in Singapore apply laws related to personal

8   protection orders, isn't that true?

9          THE COURT:  Other than as set forth in reported

10  decisions.

11         MS. LEIDHOLDT:  OK.

12  A.  And the statute.

13  Q.  Thank you.

14         THE COURT:  Is that your answer?

15         THE WITNESS:  That is my answer, your Honor.

16         THE COURT:  OK.

17  Q.  Isn't it true, Mr. Awad, that in custody proceedings in the

18  Shariah court the testimony of non-Muslims is afforded less

19  weight than the testimony of Muslims?

20         MR. ARENSTEIN:  Objection.  What is the relevance to

21  this case when we have two Muslims, your Honor?

22         THE COURT:  Because maybe a non-Muslim would be called

23  as a witness.  Overruled.

24  A.  Depending on the types of cases, the evidence from Muslims

25  and non-Muslims in the premodern, in the classical tradition

1     did have certain exceptions.  However, if you look at the

2     Administration of Muslim Law Act, if you look at article --

3                THE COURT:  This is when you referred to yesterday as

4     AMLA?

5                THE WITNESS:  Yes, your Honor.

6                THE COURT:  Thank you.

7                THE WITNESS:  If you will give me just a moment, your

8     Honor.

9                MR. ARENSTEIN:  Your Honor, I can provide copies for

10    everybody of AMLA, if you wish.

11               THE COURT:  Mr. Arenstein, it would be your

12    prerogative to tender that or not tender that.  I'm not an

13    inquiring magistrate here.  This is an adversary system.  If

14    you propose to tender it, I would turn to learned counsel for

15    the respondent and I would ask if there is any objection, and

16    we would proceed in that fashion.

17               MR. ARENSTEIN:  Fine.

18    A.  Article --

19               MR. ARENSTEIN:  One second.  Are you going to ask

20    counsel?

21               THE COURT:  No, I'm not asking counsel.  Did you

22    listen to what I just said, Mr. Arenstein?

23               MR. ARENSTEIN:  I heard you, your Honor.  I'm sorry.

24               THE COURT:  I said if you want to offer it, then offer

25    it, and then I would turn to learned counsel and determine

1    whether there was an objection.  That's all.

2              MR. ARENSTEIN:  Thank you, your Honor.

3    A.  I testified yesterday that Singapore Shariah courts are so

4    progressive, so cutting-edge, that they are taking general

5    principles from premodern Islamic law and are dealing with them

6    within the context of modernity and the changes in society,

7    especially with the rise of the nation state and concepts of

8    citizenship, which did not exist in pre-modern society.  If you

9    look at article 42 of AMLA, and I quote -- and this is talking

10   about evidence that is take place in the Muslim court, the

11   Shariah court.

12             THE COURT:  Let me stop you right there.  AMLA is a

13   statute enacted and in force in Singapore, is that correct?

14             THE WITNESS:  Yes.

15             THE COURT:  Go ahead.

16   A.  "The courts shall have regard to the law of evidence for

17   the time being in force in Singapore and shall be guided by the

18   principles thereof but shall not be obliged to apply the same

19   strictly."  So, while the general principles of evidence law

20   govern, it gives a little bit of leeway for the Shariah court

21   in some areas.

22             However, when you read article 42(3), it gives you

23   another insight on the progressive and liberal nature of the

24   Shariah court as it pertains to applying the procedural laws

25   and evidence laws of the civil court.  It says, "Evidence shall

1   ordinarily be given on oath in a form binding upon Muslims."

2   Here is the emphasis that the oath, just as I took an oath

3   here, the oath has to be administered as an oath that Muslims

4   would take.

5        However, article 43(3) continues, "But the courts may

6   on special grounds dispense with an oath and take evidence on

7   affirmation," indicating that non-Muslims tonight have to take

8   the oath as Muslims and they can affirm.

9        If you also look at article 39 of AMLA, when it talks

10  about representation, "Every party to any proceeding shall

11  appear in person or by advocate and solicitor or by an agent

12  generally or specially authorized to do so by the court."  It's

13  been found that non-Muslim lawyers have appeared before the

14  Shariah court.  There is an article that I have read numerous

15  times that non-Muslims actually appear, non-Muslim lawyers.

16       So, if we are going to look at strictly 13th century

17  Islamic law, that won't be accurate, because the Shariah as

18  modified or the modern Singapore manifestation of Shariah is a

19  little bit different or much different, allowing a non-Muslim

20  lawyer to represent a Muslim in a court setting, which would

21  not be the case in 13th century Islamic empire.

22       Therefore, the Singapore evidence law, the Singapore

23  family law as it applies to the Shariah, is much more in tune

24  with the times.

25  Q.  Mr. Awad, are you familiar with scholarly writings of the

1   practicing attorney in Singapore Ahmad Nizam bin Abbas?

2   A.  Yes, I believe I am.

3   Q.  Isn't it true that he is the author of a widely circulated

4   article from the Washington Law Review entitled "The Islamic

5   Legal System in Singapore"?

6   A.  I probably read it.

7   Q.  Would you be surprised to learn that Mr. Abbas has reported

8   that in his actual practice in the Shariah courts of Singapore,

9   testimony from non-Muslims is awarded less weight than

10  testimony of Muslims?

11  A.  Will you show me his article?

12          MR. ARENSTEIN:  Objection, your Honor, to what Mr.

13  Ahmad put in the paper that he said in an isolated incident.

14          THE COURT:  Rephrase your question, please.

15  Q.  Would you be surprised to learn that Mr. Abbas, the author

16  of this article and a practitioner in the Shariah courts in

17  Singapore, has stated that in the Shariah courts of

18  Singapore --

19          THE COURT:  Where is this being stated?

20          MS. LEIDHOLDT:  It's stated in an expert affidavit

21  that he has prepared.

22  Q.  -- the testimony from non-Muslims is afforded less weight

23  than testimony of Muslims?

24          MR. ARENSTEIN:  Objection, your Honor.

25          THE COURT:  Are you surprised that he said this, is

 1   that the question you're asking, counselor?  Ms. Leidholdt, is

 2   that the question you're asking?

 3          MS. LEIDHOLDT:  Yes, that is the question, are you

 4   surprised.

 5          THE COURT:  That's the question.

 6   A.  Depending on the circumstance.  I think if a non-Muslim is

 7   opining on some intricate premodern legal concept issue, if

 8   it's a fact as an issue -- I don't know the circumstances.

 9   Maybe one judge takes less weight for testimony of a non-Muslim

10   as it relates to some technicalities.  But I wouldn't be

11   surprised until I know what the circumstances are.

12          THE COURT:  We are going to take a recess to take up a

13   criminal matter that I have.  We'll take a ten-minute recess.

14          (Recess)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated.  Ms. Leidholdt, you may

2    inquire.

3          MS. LEIDHOLDT:  Thank you, your Honor.

4          THE COURT:  I should just say this if I didn't say it

5    already:  The court reminds you you're still under oath.

6          THE WITNESS:  Yes, I understand, your Honor.

7          THE COURT:  All right.  Thank you.

8    BY MS. LEIDHOLDT:

9    Q.  Now, Mr. Awad, there are two separate issues here about the

10   Shairiah court and due process.  Isn't that correct?

11         One --

12         THE COURT:  No, no, no.  That is not a proper

13   question.

14         MS. LEIDHOLDT:  I understand, your Honor.  Let me try

15   to rephrase.

16   BY MS. LEIDHOLDT:

17   Q.  Isn't one important issue --

18         THE COURT:  No, that is not appropriate, either.

19         This man is not here to tell me what is important in

20   this case, what the issues are in the case.  That is not his

21   job and I am not going to allow him to do that.  He is not here

22   to tell me what is important in my decision, what issues I need

23   to focus on.

24         MS. LEIDHOLDT:  I do understand.

25         THE COURT:  You may do that from the podium as an

1    advocate, but an expert witness I will not allow.

2    BY MS. LEIDHOLDT:

3    Q.  You contend, isn't it true, Mr. Awad, that the Shairiah

4    court in Singapore provides the same due process protections to

5    Muslim and non-Muslim parties?

6            MR. ARENSTEIN:  Objection to the form of the question.

7            MS. LEIDHOLDT:  Let me reformulate, your Honor.

8            THE COURT:  Sure.

9    BY MS. LEIDHOLDT:

10   Q.  You cited a provision of AMLA earlier in your testimony,

11   and that provision states, in reference, in regards to the

12   civil procedural and evidentiary rules of Singapore, that the

13   Shairiah court shall not be obliged to apply these same rules

14   strictly.  Isn't that correct?

15           MR. ARENSTEIN:  Objection to the form of the question

16   again.

17           THE COURT:  Overruled.

18   A.  Article 42 says that the Shairiah court shall have regard

19   to the law of evidence that is in force in Singapore and shall

20   be guided by those principles, but then it says but they don't

21   have to follow it strictly.

22           In the sense that in family litigation in some

23   trial-level courts in New Jersey, they would make the rules of

24   evidence a little bit more flexible, so that's what they're

25   saying.  They're basically saying they don't have to follow

1    them strictly.

2    BY MS. LEIDHOLDT:

3    Q.  So isn't it true that that provision that the Shairiah

4    courts in Singapore do not have to follow the civil evidentiary

5    rules strictly gives Shairiah courts the latitude to give the

6    testimony of non-Muslims less weight than the testimony of

7    Muslims?

8    A.  I would say yes and no because it gives the court latitude

9    to allow both parties to probably get stuff into evidence and

10   to be considered more so than in a very strict evidentiary

11   commercial setting.  So, in other words, it cuts both ways.  It

12   could be helpful to one party and detrimental to another, and

13   it goes both ways.

14   Q.  So if Ahmad Nizam bin Abbas, a leading legal scholar of the

15   Shairiah courts and a practicing attorney in those courts in

16   Singapore, states that the Shairiah courts routinely give the

17   testimony of non-Muslims less weight than the testimony of

18   Muslims, isn't it likely that the reason that that is happening

19   is because of that provision of Article 42 that states that the

20   Shairiah courts shall not be obliged to apply the evidentiary

21   rules, the civil evidentiary rules of Singapore strictly in

22   their proceedings?

23            MR. ARENSTEIN:  Objection; compounded question.  A

24   statement of Ahmad, I am not sure how relevant that is to this

25   proceeding, and I object to the question totally.

1            THE COURT:  Overruled.

2    A.  Can you show me the article or the affidavit that you are

3    referring to so I can see the context of what he is saying.  I

4    would like to see his article, too.  You referenced his article

5    that he published in the Asian Law Review.  I would like to see

6    that, too.

7    BY MS. LEIDHOLDT:

8    Q.  I'll read you the relevant portion.

9            MR. ARENSTEIN:  Objection.

10           THE COURT:  The witness is allowed to see it.

11           MR. ARENSTEIN:  Your Honor, he also asked for both the

12   article and the affidavit.  I see only an affidavit.

13           THE WITNESS:  May I see the article?

14           MS. LEIDHOLDT:  I am referencing the affidavit and not

15   the article.

16           MR. ARENSTEIN:  The article was questioned earlier,

17   and I think if the witness --

18           THE COURT:  The pending question -- there was no

19   request for the article when the article was being

20   questioned -- the pending question relates to the affidavit, I

21   suppose.

22           THE WITNESS:  You can show me the article, too,

23   because I read something different from him in his article.

24           MS. LEIDHOLDT:  Your Honor, if I may, the article does

25   not address this issue.  The affidavit does.

```
 1              THE COURT:  Show him the article.  What is the
 2    question, so I understand the question that is pending with
 3    regard to this affidavit and perhaps the article.
 4              Go ahead, what is the question?
 5              MS. LEIDHOLDT:  Your Honor, the question that I just
 6    formulated?
 7              THE COURT:  Let me hear it again.
 8              MS. LEIDHOLDT:  I'll do my best.
 9    BY MS. LEIDHOLDT:
10    Q.  If Mr. Abbas, if it is his experience, as he attests to in
11    the affidavit, that a woman witness' testimony is worth --
12    withdrawn -- a non-Muslin's testimony is given less weight than
13    that of a Muslim in a Shairiah court system, is it likely that
14    this provision of Article 42 of AMLA, which states that the
15    Shairiah courts shall not be obliged to apply the same
16    evidentiary rules strictly, this is the basis of the fact that
17    a non-Muslin's testimony is accorded less weight?
18              THE COURT:  Do you understand the question?
19              THE WITNESS:  Yes, roughly I understand it.
20              At Page 8 of the affidavit that you've showed me, that
21    you've highlighted Paragraph 50, Paragraph 49, and I quote, "As
22    Ms. Lee's witnesses to domestic violence are nearly all women
23    and as her sister is her primary witness, she will be at a
24    severe disadvantage before the Shairiah court because the court
25    insists only on hearing testimony from male witnesses.
```

1   Testimony from non-Muslims is afforded less weight, if at all,

2   than that of Muslims before the Shairiah court."

3           As I testified earlier, the Shairiah court doesn't

4   have jurisdiction to hear domestic violence orders of

5   protection.  For starters, this would not be an issue for the

6   Shairiah court.

7   BY MS. LEIDHOLDT:

8   Q.  Mr. Awad, issues of domestic violence often surface in

9   custody cases.  Isn't that correct?

10  A.  Issues of the relationship of the parties to each other,

11  whether they've abused each other or called each other names,

12  if they're a co-parent, if they have a history of abduction or

13  refusal of access to kids, all of that are part of the rubric

14  of the best interests of the child.  Yes, that is correct, they

15  would be considered.

16          THE COURT:  Ms. Leidholdt, I have a responsibility to

17  control this hearing which is now in its fourth day.  I think I

18  alerted you previously, and I have alerted counsel in this case

19  on multiple occasions that this Court does not have before it

20  as an issue whether or not the courts of the Republic of

21  Singapore, the Shairiah courts or any other court gives one

22  side or the other a fair shake in a divorce proceeding.  That

23  is not part of what is before me.

24          Were I to find it is simply not part of what is before

25  me, we are now jeopardizing the ability to bring this hearing

1   to a prompt conclusion by the repeated detour into this area.

2   So I am directing you to confine your cross-examination to

3   relevant areas.  I have given you an awful lot of leeway.

4           Let's bring this to a close.

5           MS. LEIDHOLDT:  Yes, your Honor.  Thank you.  I am

6   attempting to focus on whether the Shairiah system in Singapore

7   comports with fundamental due process principles in its custody

8   cases.

9           THE COURT:  That's what you should do.

10          MS. LEIDHOLDT:  Yes.

11          THE COURT:  It appeared to this Court that the last

12  round of questions and your support for those questions had

13  fallen off that mark

14          MS. LEIDHOLDT:  Your Honor, if a non-Muslim witness'

15  testimony is given less weight than that of a Muslim's in a

16  custody proceeding in the Shairiah court in Singapore, wouldn't

17  that go directly to the issue of whether Mr. the Shairiah

18  system in Singapore comports with fundamental due process in

19  its custody?

20          THE COURT:  I don't respond to questions like that,

21  but I would suggest you ask that question, if you're interested

22  in the answer to that question, and see what happens.  But

23  confine yourself to questions that arise in this case or this

24  hearing will never be concluded.

25          MS. LEIDHOLDT:  Yes, I will move --

1                THE COURT:  We are not here to have an editorial.  We

2       are not here to have an expose.  We are here to adjudicate a

3       petition and that is the only thing we're doing here.

4                Let's go.

5                MS. LEIDHOLDT:  Thank you, your Honor.

6       BY MS. LEIDHOLDT:

7       Q.  Mr. Awad, you testified that under Article 42 of AMLA,

8       non-Muslims can testify before a Shairiah court by affirmation

9       when there are special grounds.  Isn't that correct?

10               MR. ARENSTEIN:  Asked and answered.

11      A.  Yes.

12               MR. ARENSTEIN:  Objection.

13               THE COURT:  Overruled.

14      A.  Yes.

15      BY MS. LEIDHOLDT:

16      Q.  Isn't it a fact, Mr. Awad, when there are no special

17      grounds, a non-Muslim is not permitted to testify in the

18      Shairiah court?

19      A.  No, that is not true, and that contradicts the article that

20      you showed me, the Islamic legal system in Singapore.  Abbas,

21      he said in his article you do not need to be Muslim to appear

22      by the Shairiah court.  So how could there be an ability for me

23      as a non-Muslim to appear in front of the Shairiah court and at

24      the same time say that a non-Muslim is not permitted to

25      testify?  So there seems to be a contradiction.

1  Q.  Isn't it true non-Muslims are only permitted to testify

2  when there has been a determination by the Shairiah court judge

3  that there are special grounds that permit that non-Muslim to

4  testify?

5  A.  No.  The special grounds could be that he or she is a fact

6  witness.  That doesn't mean some unique circumstance.  If it is

7  about best interest, as the standard is, the same standard in

8  the Shairiah court which is in the civil court which also from

9  my testimony yesterday, from my understanding, there is

10  negotiations of an undertaking to say this matter can just go

11  to the civil court anyways.

12         Be that as it may, if the best interests that is being

13  evaluated, and you have a forensic psychologist that is

14  appointed who has interviewed anyone who has evidence about the

15  best interests of the child, to determine what is in the best

16  interests of the child, they're going to meet with everyone.

17         Singapore is not a majority Muslim country.  Singapore

18  has 15 percent Muslims, 85 percent non-Muslims.  Just by

19  implication, that explains to you why the Shairiah court is

20  very liberal and open and flexible about premodern legal

21  principles.  It is a modern court, a modern state, a modern

22  country and a modern best interests law.

23  Q.  So you're contending, Mr. Awad, that Shairiah courts in

24  Singapore have never denied parties the ability to call

25  witnesses on the grounds that those witnesses are non-Muslim?

1          MR. ARENSTEIN:  Objection.

2    Q.  Is that your contention?

3          THE COURT:  The witness is to limit his answer to what

4    he has read in the academic literature or in the reported cases

5    or by statute because that is the only thing he is expert on.

6    A.  And based on the scope of my expertise that the court just

7    explained, no.

8    BY MS. LEIDHOLDT:

9    Q.  Mr. Awad, what is the standard that Shairiah courts employ

10   to determine custody, care and control of a child?

11   A.  As I told you -- how about we do it this way -- explain

12   premodern custody law gives a presumption in favor of the

13   mother to have physical custody.

14          In Singapore, in the 21st Century you're applying the

15   best interest standard, the same standard that we apply.  Of

16   course, the best interest standard in Alabama may be different

17   than in New Jersey, and the best interest standard in Singapore

18   is going to have also some of its indigenous cultural context.

19          Best interest is a very encompassing standard.  It has

20   been the standard for the common law from the 18th Century,

21   actually from the 19th Century.  Prior, in fact, the common law

22   gave custody to the father, and only later that it became the

23   tender years doctrine that gave the custody to the mother.

24   Then after that in the 1970's in our country, we decided to go

25   for the best interest standard.  We are talking in America

1    prior to the 1970's it was the tender year doctrine that made

2    the final cut.

3             In Singapore, they're applying the best interest

4    standard whether it is in the civil court, whether it is in the

5    state court.  In fact, there is a publish case and I will cite

6    it to you, it is CX versus CY, 2005 3SLR 690, and in that case

7    it says, "Joint custody is the norm in the Shairiah court."

8             So joint custody is the norm, which is consistent with

9    the civil law court adjudications of custody as well.  So we

10   are not putting Shairiah in the 13th Century on trial today.

11   We are talking about Singapore and the modern manifestations of

12   a source of law that is comporting with majorinity.

13   Q.  Isn't it true, Mr. Awad, the terminology that Shairiah

14   courts use that is child's welfare, that that's the preeminent

15   issue in child custody cases?

16   A.  Yes.

17   Q.  Mr. Awad, isn't it true that under the child's welfare

18   standard as applied in the Shairiah court, the religion of the

19   parties is an overriding factor in custody determinations?

20   A.  Based on American New Jersey law, the religiosity of the

21   parties is a factor that is considered in best interests.  If

22   you look at Feldman v. Feldman in New Jersey and many other

23   cases around our country, the religion of the parties is

24   clearly a component.

25             The parent of primary residence under New Jersey law

1    has the final say on religious upbringing and rearing of his

2    child.  Does that mean that the best interests of the child in

3    New Jersey is overridden by the religiosity?  Of course,

4    religion is a very relevant factor to a country and to parties

5    that are of the same religion and religion is important to

6    them.

7    Q.  Let me ask a follow-up question.

8            Isn't it true that the Shairiah court in Singapore

9    will not award custody or care and control of a child to a

10   party who is no longer Muslim?

11   A.  No.  In fact, the premodern times, even the most backward

12   schools of law that we consider that are in Saudi Arabia, the

13   Hanabli School of Law, they have provisions that say the fact

14   that the mother is non-Muslim is not sufficient to make her

15   ineligible to take custody.

16   Q.  What is not true, Mr. Awad, in the Shairiah courts in

17   Singapore or the Shairiah courts in Malaysia, which are closely

18   connected to the Shairiah courts in Singapore, that if a Muslim

19   renounces his or her Muslim faith, he or she losses all rights

20   to custody of that child?

21           MR. ARENSTEIN:  Objection to the question, your Honor,

22   in the form and compoundness of it, and Malaysia is not part of

23   this case.

24           THE COURT:  Overruled.

25           THE WITNESS:  Which country?

1    BY MS. LEIDHOLDT:

2    Q.  Let's talk about Singapore.  You're familiar with the

3    Malaysian --

4              THE COURT:  Do you understand the question?

5              THE WITNESS:  No, I don't.  Repeat the question.

6              THE COURT:  Let me try it for you.

7              If a person, one of the two parents renounces the

8    Muslim faith in a Shairiah court in Singapore where one has

9    renounced and the other has not renounced, does that render the

10   renouncing party ineligible to obtain custody?

11             Is that your question?

12             MS. LEIDHOLDT:  Yes, that is, your Honor.

13             THE WITNESS:  I would say no.  It would be part of a

14   post-judgment application to seek the modification of the

15   custodial arrangement.

16             THE COURT:  No.  The question is not -- it is prior to

17   judgment.  It is at the time of the trial, at the time of the

18   proceedings before the Shairiah court.

19             THE WITNESS:  What I would say, your Honor, is that it

20   would be a factor that would be considered, but it is not a

21   bright-line rule that would happen because --

22             THE COURT:  Okay.  That is your testimony?

23             THE WITNESS:  Yes.

24             MS. LEIDHOLDT:  No further questions.

25             THE COURT:  Any redirect?

 1          MR. ARENSTEIN:  Oh, yes, your Honor.

 2   REDIRECT EXAMINATION

 3   BY MR. ARENSTEIN:

 4   Q.  Mr. Awad, regarding the article that was handed to you by

 5   Ms. Leidholdt, would you look at Page 176 of that article.

 6   A.  She took it back.  If you can show me the article?  Have

 7   you premarked it into evidence?  If you can premark it so this

 8   way it would be easier for me to identify --

 9          THE COURT:  Learned treatises and the like need not be

10   marked.  Go ahead.

11   BY MR. ARENSTEIN:

12   Q.  This article is entitled, "The Islamic legal system in

13   Singapore," by Ahmad Nizam bin Abbas, who apparently is the

14   lawyer for Ms. Lee in Singapore?

15   A.  Yes, I have read this article in the past and I am familiar

16   with it.

17   Q.  Could you opine on what he has said on Page 176 of that

18   article.

19   A.  Well, he is discussing the issue about the concurrent

20   jurisdiction between the Shairiah court and the civil court,

21   and he explains, and I quote, "Singapore does not allow for

22   consolidation" --

23   Q.  It says does allow?

24   A.  -- "Singapore does allow for consolidation of related cases

25   being litigated simultaneously in both the Family Court and the

1    Shairiah court.  At any time during the course of the divorce

2    proceeding in a Shairiah court, parties may agree to have

3    questions of custody and access to or division of matrimonial

4    assets on divorce moved from the Shairiah court to the civil

5    courts," and this conclusion by Mr. Abbas is consistent with

6    AMLA's Article 35, the Supreme Court Judicature Act, Article

7    17, and Article 52 of AMLA.

8           So this is consistent with the statutory mechanism

9    that I've testified to yesterday and today about the ability of

10   the parties to consent that they will have their custody

11   determination taken place at the civil court, not the Shairiah

12   court.

13          MR. ARENSTEIN:  I ask the court to take judicial

14   notice of this article, "The Islamic Legal System in

15   Singapore."

16          THE COURT:  You can cite to me as an authority.

17          MR. ARENSTEIN:  Pardon me?  As an authority?

18          THE COURT:  Take a look at the Federal Rules of Civil

19   Procedure and the rules of evidence on foreign law.  They will

20   give you guidance, okay?

21   BY MR. ARENSTEIN:

22   Q.  Now, Mr. Awad, are you familiar with the Women's Charter in

23   Singapore?

24   A.  Yes, I am.

25   Q.  I show you a copy which has been marked for identification

1    as Petitioner's Exhibit A which is already before the court.

2    A.  Yes, I have reviewed this in the past.

3    Q.  This is called the Women's Charter?

4    A.  Yes.

5    Q.  Could you tell the court what this is and how it operates

6    in Singapore.

7    A.  Yes.  This is a section of the Women's Charter that is

8    titled, "Protection order."  It addresses issues related to

9    domestic violence.

10           Article 65 through 66 discuss the punishment, the

11   sentencing, the crimes related to spousal and domestic violence

12   violence cases.

13           Article 65 provides, "The court may, upon satisfaction

14   on a balance of probabilities that family violence has been

15   committed, or is likely to be committed against a family

16   member, in that it is necessary for the protection of the

17   family member, make a protection order restraining the person

18   against whom the order is made from using family violence

19   against the family member."

20           Then Section 65, Subsection 8, provides, "Any person

21   who willfully contravenes a protection order or an expedited

22   order or an order made by virtue of Subdivision 15, except an

23   order made by virtue of Subsection 5, shall be guilty of an

24   offense and shall be liable on conviction to a fine not

25   exceeding 2,000 or to imprisonment for a term not exceeding six

1      months, or to both, and in the case of a second or subsequent

2      conviction, to a fine not exceeding 5,000 or imprisonment of a

3      term not exceeding twelve months, or both."

4              THE COURT:  The court is very good at reading.  I

5      don't have that much of an eyesight problem and I am fully

6      fluent in English so I can read documents.

7              MR. ARENSTEIN:  I would ask under Article 14 of the

8      Hague Convention, your Honor, that you take judicial notice of

9      this statute.  Article 14 provides of the Hague Convention, the

10     court may take judicial notice of statutes of foreign

11     countries, and this is one.  I ask under the article that the

12     court take judicial notice of this statute.

13             THE COURT:  Thank you.

14             MR. ARENSTEIN:  May I proceed?

15             THE COURT:  You are welcome to proceed.

16     BY MR. ARENSTEIN:

17     Q.  Let me take you through this Women's Charter.

18             Do you agree that this these particular sections, that

19     the pre-existence of the personal protection order, of a

20     personal protection order or expedited order is necessary?

21     A.  Necessary for what?

22     Q.  To proceed under this, does one have to go and apply for

23     a --

24             THE COURT:  Apply for what?

25             MR. ARENSTEIN:  I withdraw the question.

1   BY MR. ARENSTEIN:

2   Q.  Are you aware of any legal recourse available to an abused

3   person in the absence of a personal protection or expedited

4   order?

5   A.  Yeah, of course.  It is explained.  The protection order

6   procedure, the penal code of Singapore and the Women's Charter

7   of Singapore provides that if a spouse, female, girlfriend, is

8   subject to domestic violence, that she can petition the court

9   and obtain an order of protection.

10          Once she obtains that order of protection, if there is

11  a violation of that order of protection, there is additional

12  penalties and punishments, including a specific reference in

13  the statute that there's a first offense.  If there is a second

14  offense, the punishment and the penalties go up, including up

15  to twelve months of imprisonment.

16  Q.  In the case of alleged marital rape, are the offenses

17  punishable under the penal code of Singapore?

18  A.  Yes, there is at least three sections in the penal code

19  that are very basic that are in almost every penal code in the

20  world.  Anyone who causes bodily harm will be subject to

21  prosecution.  The way they articulate it under Singapore,

22  Article 319 of the penal code, Article 319 of the penal code

23  titled "Hurt," says, "Whoever causes bodily pain, disease or

24  infirmity to any person is said to cause hurt."

25          Article III 20 discusses grievous hurt.  The following

1     kinds of hurt only are designated as grievous hurt, and they go

2     through a list of the injuries.  These are all punished under

3     the penal code.

4     Q.  Are you aware that the Family Court of --

5     A.  They're punished under the penal code up to two years in

6     some circumstances of imprisonment.

7     Q.  -- are you aware the Family Court of Singapore falls within

8     the arm of the subordinate courts of Singapore?

9     A.  Yes.

10    Q.  I show you Petitioner's Exhibit C in evidence and I ask you

11    if you had reviewed this document?

12    A.  All of these exhibits?

13    Q.  Basically -- no, no.  The orders of the court, have you

14    reviewed the orders of the court?

15    A.  Yes, those I have.

16    Q.  From a perusal of these documents, have these custody

17    proceedings been transferred to the Shairiah court of

18    Singapore?

19    A.  No.  Everything had initiated and commenced in the civil

20    court, continued in the civil court as we speak today.  The

21    three referenced orders are from the civil Family Court, not

22    from the Shairiah court.  So there is no action pending in the

23    Shairiah court as we speak today in Singapore.

24    Q.  Could you refer to the three referenced orders that you're

25    talking about and explain to us what you mean.

1    A.   In the Petitioner's Exhibit C, there is a Tab H.   In Tab H,

2    this is an order from the subordinate courts of the Republic of

3    Singapore which reflects a consent agreement between the

4    parties that was incorporated in the form of this particular

5    order.

6              THE COURT:   Let me pause on this.   The order itself

7    makes no express reference to consent, correct?

8              THE WITNESS:   That is true.   On the type it just says,

9    "By consent, it is ordered."

10             THE COURT:   I see.   I overlooked those words.   It

11   says, "By consent, it is ordered" is correct.   Let me ask you

12   to suppose the following, and if you don't know the answer to

13   the question, I instruct you not to speculate.

14             THE WITNESS:   Okay.

15             THE COURT:   Let us suppose that the court in Singapore

16   entered this order by consent, and it was not, in fact, the

17   case that the parties had consented to proceed with the custody

18   issue in the Shairiah courts; in other words, as those of us in

19   the judicial line of work appreciate, the judge was wrong.

20   This happens.   The mother had not consented, but the order says

21   "By consent, it is ordered that."

22             What would the mother's remedy have been upon receipt

23   of the order of the 16th day of February, 2012, at Tab H?

24             THE WITNESS:   I would simply say she would make an

25   application to vacate.   She would reach out to the court and

1    say I did not consent.  Tell the lawyers I did not consent, I

2    want this changed.  She had a remedy simply to go to the court,

3    "I did not consent, I want to vacate it."

4            THE COURT:  Would she have any right to appeal?

5            THE WITNESS:  I would go the route of vacating first

6    and then at that point, yes, she would have an appeal as of

7    right because she's going to say, "I never consented."

8            If there isn't any colloquy in the proceeding where

9    she was present physically or may have been questioned that she

10   entered into this agreement voluntarily without threat or

11   coercion or duress, I would think she would have a very strong

12   appellate case and clearly on motion to vacate.

13           So, in other words, I would like to know more about

14   these circumstances because maybe she was present in open court

15   when this took place and maybe she wasn't.

16           THE COURT:  As you understand the law as applied in

17   the subordinate courts in the Republic of Singapore, the Family

18   Court, the civil Family Court, the court could not lawfully

19   order the parties to resolve the custody dispute in the

20   Shairiah courts unless they consented?

21           THE WITNESS:  Yes.  They don't have the authority to

22   direct you because if you sought the civil court to resolve

23   your custody matter, and it is by consent, you're stuck with

24   the civil court.  If there is a divorce action because as we

25   speak here at the time this was taking place, or as we speak

1    today, there is no divorce action pending in the Shairiah

2    court.

3            THE COURT:  Confine yourself to at the time this order

4    was entered, which was February 2012.

5            THE WITNESS:  Yes.

6            THE COURT:  Was there a divorce action pending in the

7    Shairiah court of Singapore, as far as you know?

8            THE WITNESS:  As far as I know, your Honor, if my

9    recollection is correct, there may have been an application

10   made by the wife to be in the Shairiah, saying Singapore has

11   jurisdiction to the divorce as opposed to some dispute they may

12   have had in Malaysia.

13           But from my recollection, I would say I don't believe

14   there was anything strictly pending.

15           THE COURT:  Let me give you a hypothetical.  The

16   hypothetical is I want you to assume for the sake of argument

17   there is a divorce proceeding pending in a Shairiah court.  Can

18   the civil court -- by that, I mean the subordinate court --

19   direct that custody be litigated in the Shairiah court where

20   the divorce action is pending without having secured the

21   consent of the parties?

22           THE WITNESS:  There need to be a proactive step taken

23   by one of the parties to bring the custody case in.  So, in

24   other words, if there isn't a request for affirmative relief,

25   in the circumstance we have both of them are in the civil

1    court, one of them has to take a proactive step to say I have

2    my Shairiah divorce pending in the Shairiah court.  I will ask

3    the Shairiah court in my application, I want them to determine

4    the issue of custody.

5         If they take a proactive step requesting affirmative

6    relief, then the civil court would have to transfer the issue

7    regarding custody to the Shairiah court because both parties

8    are Muslim, but there needs to be a formal application from one

9    of the parties to say that the Shairiah court should govern

10   because we are Muslim.

11        THE COURT:  That is an application that would be made

12   to the Shairiah court?

13        THE WITNESS:  Yes, and to the civil court as well.

14        You would make the application listen, civil court, I

15   don't want you hearing my custody matter, I want this to be

16   heard with my divorce that is pending in the Shairiah court.

17        THE COURT:  Next question.

18        MR. ARENSTEIN:  Is your Honor finished questioning the

19   witness?

20        THE COURT:  Maybe not, but I have invited you to ask

21   your next question.  That was an invitation to you.

22        MR. ARENSTEIN:  I am sorry.

23   BY MR. ARENSTEIN:

24   Q.  Can I draw your attention to Provision 52 of AMLA,

25   Subsection 3.  Can you tell us how that fits in to the judge's

1    question to you.

2    A.  Article 52 of the Administration of Muslim Law Act provides

3    the provisions related to ancillary issues in the matrimonial

4    proceeding.

5          For example, the Shairiah court does not have

6    jurisdiction as it pertains to maintenance and even in

7    circumstances of property ownership.  If you look at other

8    provisions in AMLA, they have very similar factors of

9    distribution of marital assets similar to what we have in the

10   states.  Here it says, "The court may at any stage of the

11   proceeding for divorce or annulity of marriage, or after making

12   a decree or order for divorce or annulity of marriage, or after

13   any divorce has been registered, on the application of any

14   party" -- so you see that is what I just explained to the court

15   earlier, on the application of any party, make such orders as

16   it thinks fit with respect to the custody, maintenance and

17   education of the minor children of the parties.

18          THE COURT:  All right.  Pause.

19          Ms. Leidholdt, I have a question for you.  I'll see

20   whether or not opposing counsel disagrees, but this is a

21   foundational question.  I just want to understand the facts.

22   You always can argue the consequences or significance, but I am

23   just trying to understand the facts.

24          I have a series of orders that have been presented in

25   this case from the subordinate courts of the Republic of

Singapore, and you've seen them, they're annexed to the

petition and they came in as Petitioner's Exhibit C, all right?

A number of these orders are entered in a matter which

either one of them, the originating summons I guess which is

Tab A, was filed in the High Court of the Republic of Singapore

and it is in the matter of Shayan Naghash Souratgar between Lee

Jen Fair and Mr. Souratgar.

Am I correct that the proceedings reflected in this

summons were instituted by Lee Jen Fair?  Is that correct?

MS. LEIDHOLDT:  That's correct, your Honor.

THE COURT:  Again not being familiar with the practice

and procedure, I see that that bears the caption of the High

Court of the Republic of Singapore, but subsequent documents --

that's the originating summons -- bear the caption of the

subordinate courts and have a docket number throughout of what

appears to be OSF 181/2001/K.  Do you see where that is found

on the documents, the subsequent documents?

MS. LEIDHOLDT:  Yes, I do, your Honor.

THE COURT:  All right.  Are those orders issued by the

subordinate courts, part of the proceeding, the one and the

same proceeding reflected by Tab A which originated in the High

Court?

MS. LEIDHOLDT:  I believe it is to be the case, your

Honor.

THE COURT:  That kind of procedure is not unknown to

1    us here, where it might be commenced in Supreme Court, but for

2    some reason transferred to a different court within the unified

3    court system of New York?

4             MS. LEIDHOLDT:  Yes.

5             THE COURT:  All right.  Were there any other

6    proceedings commenced by your client or by Mr. Souratgar in

7    either the High Court or the Subordinate Court of Singapore

8    from any time from the point of marriage on through today that

9    you're aware of?

10            MS. LEIDHOLDT:  Yes, your Honor.  Mr. Souratgar

11   cross-filed for custody after Ms. Lee filed for custody, and

12   then in -- Excuse me.

13            (Off-the-record discussion)

14            MS. LEIDHOLDT:  Yes, so that is the other proceeding,

15   Mr. Souratgar filing for, cross-filing for custody.

16            THE COURT:  The cross-petition, I assume, is filed in

17   the context of the one single action.  Is that correct?

18            MS. LEIDHOLDT:  Yes, we understand that that is the

19   case that it was, in fact, consolidated.

20            THE COURT:  Now, Mr. Arenstein, do you disagree with

21   with the answers to any of the questions?  We are not talking

22   about the significance of any of this.  The question is, do you

23   disagree with counsel's responses to the court's questions?

24            MR. ARENSTEIN:  I do not, your Honor.

25            THE COURT:  Okay.  Thank you.  That was helpful.  You

 1    can ask your next question.

 2            MR. ARENSTEIN:  Thank you.  One second.

 3            (Off-the-record discussion)

 4    BY MR. ARENSTEIN:

 5    Q.  You reviewed all the orders of the court, the subordinate

 6    courts of the Republic of Singapore in Exhibit C.  Is that

 7    correct?

 8    A.  Yes, I have.

 9    Q.  I draw your attention to the order that is dated June 5th,

10    2012, Tab J, and ask you to look at Paragraph C of that order.

11    A.  Yes.

12    Q.  Could you tell us what that means in the context of the

13    case being in the subordinate court or in the Shairiah court.

14    A.  There is one very important point I think we need to

15    highlight.  If you look at the face of the caption of this

16    order, on the top you'll see on the originating summons on the

17    left, and you look to the right you see in the matter of

18    Section 3-5 of 11 of 13 of Guardianship of Infant Act, this is

19    the best interest standard in the civil action, civil family

20    law cases.

21            In other words, this is not the AMLA, the

22    Administration of Muslim Law Act which governs the Shairiah

23    court.  This is governing the civil court.  That is important

24    that this subordinate court has taken into account its

25    authority under the secular law as it pertains to the issue of

 1    custody.

 2              So Paragraph C, it states, "The child be placed in the

 3    interim sole care and control of the plaintiff pending the

 4    determination of the action or until further orders," so here

 5    the determination of the action which is the pending action in

 6    the Family Court.

 7    Q.  Under Singapore law, there are many options available to

 8    a --

 9              MR. ARENSTEIN:  Excuse me one second.

10              (Off-the-record discussion)

11    BY MR. ARENSTEIN:

12    Q.  So under Singapore law, are there many options available to

13    a domestic violence victim besides going to the Family Court?

14    A.  Yes, it is in the criminal court.

15    Q.  Under the laws of Singapore, do you believe that the

16    respondent will have special options to seek help and recourse

17    if she believes -- several options to seek help and recourse if

18    she believes she has been a victim of domestic violence?

19              MS. LEIDHOLDT:  Objection; leading.

20    A.  I didn't hear the question.

21    BY MR. ARENSTEIN:

22    Q.  I'll repeat it.

23    A.  I thought we were going the orders.  Now I am getting

24    confused.

25    Q.  Under the laws of Singapore, do you believe the respondent

1    will have several actions to seek help and recourse if she

2    believes she has been a victim of domestic violence?

3    A.  Yes.

4    Q.  Is there any danger that a woman's legal and human rights

5    will be violated in the courts of Singapore?

6    A.  Based on the Singapore constitution --

7            MS. LEIDHOLDT:  Objection.

8            THE COURT:  Overruled.

9    A.  -- based on the Singapore Constitution, based on the

10   Women's Charter, based on all of the laws that we've referenced

11   here today and the case law, her human rights will not be

12   violated.

13           THE COURT:  Anything further?

14           MR. ARENSTEIN:  One second.

15           (Off-the-record discussion)

16   BY MR. ARENSTEIN:

17   Q.  In relation to the orders in Exhibit B, do you have

18   anything else to add with regard to the effect of the court in

19   Singapore on this case?

20   A.  No.

21           MS. LEIDHOLDT:  Objection.

22           THE COURT:  Sustained.

23           MR. ARENSTEIN:  I have no further questions.

24           THE COURT:  You may step down.

25           (Witness excused)

```
 1            THE COURT:  Let me ask a question of counsel.  I will

 2    begin again with respondent's counsel, respondent in this

 3    proceeding.

 4            There is at Tab E, a document which is labeled

 5    "Summons to a respondent," and it bears a docket number NRIC

 6    No. E 1964128 and the seal of the court, 16 August 2011, and it

 7    appears also that there is a subsequent order found at Tab F.

 8            Am I correct that the summons the court ordered

 9    directing the respondent, directing Mr. Souratgar to appear and

10    the subsequent order granting leave to withdraw were entered in

11    a proceeding different from and separate from the proceeding

12    which was initiated by the original summons at Tab A?

13            MS. LEIDHOLDT:  You mean the proceeding for custody,

14    your Honor?

15            THE COURT:  Yes.  It is different and separate from

16    the custody proceeding?

17            MS. LEIDHOLDT:  Yes, my understanding is that is

18    completely the case.  Ms. Lee was represented in the custody

19    proceeding but was not represented in the separate proceeding

20    for personal protection order.

21            THE COURT:  Thank you.  Do you disagree with that, Mr.

22    Arenstein?

23            MR. ARENSTEIN:  No.

24            THE COURT:  Mr. Arenstein, you may call your next

25    witness.
```

```
 1                MR. ARENSTEIN:  We have no further witnesses.

 2                THE COURT:  Do you have any other evidence you are

 3   presenting?

 4                MR. ARENSTEIN:  No further evidence.

 5                THE COURT:  The petitioner rests?

 6                MR. ARENSTEIN:  The petitioner rests.

 7                THE COURT:  Respondent may call its first witness.

 8                MS. LEIDHOLDT:  Thank you, your Honor.  Your Honor,

 9   the first witness will be Mei Chew, Ms. Lee's mother.

10                THE COURT:  All right.

11    MEI YOKE CHEW,

12        called as a witness by the Respondent,

13        having been duly sworn, testified as follows:

14                THE COURT:  Ms. Chew, why don't you pull your chair

15   up.  You might be more comfortable and then you can sit back

16   and relax.  Maybe just scoot it a little bit forward so we can

17   hear you through the microphone.  That's good.  Terrific.

18                THE WITNESS:  Thank you.

19                THE COURT:  You may inquire.

20   DIRECT EXAMINATION

21   BY MS. LEIDHOLDT:

22   Q.  Good afternoon, Ms. Chew.

23   A.  Yes.

24   Q.  Ms. Chew, what is your relationship to the respondent in

25   this case, Jen Fair Lee?
```

```
 1   A.  I am her mom.

 2   Q.  What is your relationship to the petitioner in this case,

 3   Mr. Majid Souratgar?

 4   A.  He is my son-in-law.

 5   Q.  Would you please describe your relationship to the child in

 6   this case, Shayan Souratgar?

 7   A.  He is my grandson.

 8   Q.  Are you employed?

 9   A.  Yes.

10   Q.  Where do you live?

11   A.  I live in Malaysia.

12   Q.  Where in Malaysia?

13   A.  Kuala Lumpur.

14   Q.  You stated you're employed, and just briefly what is your

15   employment?

16   A.  I manage a toy shop in Times Square with my two sons.

17   Q.  That Times Square is in Kuala Lumpur?

18   A.  Yes, the shopping complex.

19           THE COURT:  What type of objects are sold there?

20           THE WITNESS:  Toys, collectible toys for adults,

21   Batman and things like that.

22   BY MS. LEIDHOLDT:

23   Q.  Ms. Chew --

24   A.  Yes.

25   Q.  -- when did you first meet Mr. Souratgar?
```

 1   A.  It was around maybe June or July in Year 2007.

 2   Q.  Just briefly, what was your impression?

 3           MR. ARENSTEIN:  Objection.

 4           THE COURT:  Sustained.

 5           MS. LEIDHOLDT:  Your Honor, if I may, it goes to

 6   issues of bias and credibility.

 7           MR. ARENSTEIN:  Objection.

 8           THE COURT:  Sustained.  Next question.

 9   BY MS. LEIDHOLDT:

10   Q.  After meeting Mr. Souratgar and seeing him with your

11   daughter, what was your impression of the relationship?

12           MR. ARENSTEIN:  Objection.

13           THE COURT:  Overruled.

14   A.  They seem to be very happy together.

15   BY MS. LEIDHOLDT:

16   Q.  Did you have the opportunity to see your daughter and

17   Mr. Souratgar again around the time of their wedding?

18   A.  No.  The next time I saw them is they say they're going to

19   get married.

20   Q.  When did they get married?

21   A.  In July 2007.

22   Q.  Where was the --

23   A.  The wedding receptionist in Malaysia, Kuala Lumpur.

24   Q.  Who was at that reception?

25   A.  Majid and his family, my family and he bring along a friend

 1   named Emas Kahwin.

 2   Q.  After the reception was over, what happened?

 3   A.  My daughter and Majid went back to Singapore.

 4   Q.  After Ms. Lee and Mr. Souratgar returned to Singapore, did

 5   you communicate with your daughter?

 6   A.  Very seldom, only once in a while we talked on the phone.

 7        THE COURT:  When you say "once in a while," how often?

 8        THE WITNESS:  Maybe like one week or two week once

 9   because she is busy, she is working, and then we communicate on

10   the phone.

11   BY MS. LEIDHOLDT:

12   Q.  How many times a month, approximately, were you

13   communicating with your daughter on the telephone after she

14   returned to Singapore?

15   A.  Two weeks or maybe a month.

16   Q.  Every two weeks, is that what you're testifying?

17   A.  Yes, yes, yes.

18   Q.  Until May of 2008, in those conversations that you were

19   having with your daughter approximately every two weeks, did

20   anything transpire in those conversations that caused you to

21   concern?

22        MR. ARENSTEIN:  Objection.

23        THE COURT:  Overruled.

24   A.  No, no.  I mean I know they're happy, but she didn't say

25   anything.

1   BY MS. LEIDHOLDT:

2   Q.  So I'd like to direct your attention to a conversation that

3   you had with your daughter in May of 2008.

4          Did anything of moment transpire in that conversation

5   in May of 2008?

6   A.  Oh, she called me and she told me she's pregnant.  Then I

7   was very happy and then she told me she did a urine test, but

8   it is not confirmed by a doctor yet.  I was very happy for her,

9   and I congratulated her and I told her she's going to be a mom.

10  She is a grown up person now, she is going to be a mother.

11  Q.  How did your daughter sound during that conversation?

12  A.  Well, she is very happy.

13         MR. ARENSTEIN:  Objection.

14         THE COURT:  Overruled.

15  A.  She is very happy and she was like giggling, "I am going to

16  be a mom soon."  I said yes, you know.

17  BY MS. LEIDHOLDT:

18  Q.  Now Ms. Chew, I would like to direct your attention to May

19  31 of 2008, to the evening of May 31st of 2008, approximately

20  9:00 o'clock pm.

21         What, if anything, happened at that time?

22  A.  Oh, there was a phone call from Majid, and he --

23  Q.  Just one second.  Who is Majid?

24  A.  My son-in-law.

25  Q.  Mr. Souratgar?

1   A.  Yes.  He called me on the phone.  He was very angry.  He

2   was shouting on the phone and he tell me you come to Singapore

3   and take your daughter back.  She is crazy.  She is mad.  I was

4   so shocked, you know, I asked him what is the matter?  What is

5   it all about?  And he just kept on telling me my daughter is

6   crazy and she is mad and asking me to go to Singapore to take

7   her back.

8   Q.  Could you please describe the tone of Mr. Souratgar's

9   voice.

10  A.  He is very angry --

11          MR. ARENSTEIN:  Objection.

12          THE COURT:  Basis?

13  A.  -- and shouting on the phone.

14          MR. ARENSTEIN:  She is on a telephone conversation and

15  she is asking her to describe the tone.  I am not sure that you

16  can adequately describe the situation by a telephone

17  conversation.

18          THE WITNESS:  Excuse me.  I can.

19          THE COURT:  The witness will say I can't describe it.

20          THE WITNESS:  I can.  He was shouting.  He was yelling

21  and then he was yelling to take my daughter back.  She insists

22  my daughter is crazy and mad, you know?

23          How can you say such a thing about my daughter?  And I

24  tell Mr. Majid that calm down, please.  And then before I know

25  it, my daughter was on the phone.  She was crying and she said

1    mommy, mommy, Majid is kicking me in my stomach.

2           Then she was crying and she said he is holding her

3    wrist and it is very painful.

4           THE COURT:  He is holding?

5           THE WITNESS:  Holding onto her wrist and she said it

6    is very painful.

7           THE COURT:  Wrist?

8           THE WITNESS:  The wrist.  Then she told me he is

9    kicking her stomach.  Majid was on the phone again, and I said

10   Majid, my daughter is pregnant with your child.  And he

11   shouted, he said you take your daughter back.  I don't want a

12   baby and I don't care.  I said it is your child.  I don't care.

13   I don't want to --

14          THE COURT:  Slow down, ma'am.  The Court Reporter has

15   to take down --

16          THE WITNESS:  I am sorry.  I am sorry.  He said he

17   doesn't want the child.  He said he doesn't want the baby and

18   he said he don't care.

19          MR. ARENSTEIN:  Objection.  I didn't hear exactly what

20   she said.

21          THE COURT:  Excuse me.  Stop.

22          MR. ARENSTEIN:  I didn't hear the response, but it

23   didn't sound like it was responsive.  Could I hear the response

24   again?

25          THE COURT:  All right.  Mr. Reporter, if you can take

1    the last phrase or so.

2              (Record read)

3    BY MS. LEIDHOLDT:

4    Q.  Ms. Chew --

5    A.  Yes.

6    Q.  -- what happened then?

7              What happened after that conversation that you had

8    with your daughter on the telephone and Mr. Souratgar?

9    A.  The phone was dead.  It was dead, you know.  Then I sit

10   down and I think and I was worried what is happening there in

11   Singapore.  Then after a while I got on the phone and called my

12   daughter and I told her to go to the police.

13   Q.  It is your testimony that you called your daughter, and

14   what happened in the conversation with your daughter?

15             What, if anything, did you say to your daughter?

16   A.  I told my daughter, asked my daughter what happened, and

17   she said Majid is beating me, so I told her to go report to the

18   police.

19             THE COURT:  I am at a loss here.  Is this being

20   offered for the truth of its content or the fact it was said,

21   or for what purpose?

22             MS. LEIDHOLDT:  I believe this is an excited

23   utterance, and I think it would constitute an exception to the

24   hearsay rule.  I am offering it for the truth of the matter

25   asserted.

1          MR. ARENSTEIN:  I would object.

2          THE COURT:  Yes, the objection is sustained as to this

3   conversation for the truth of its content.

4          Now, if you have some basis on which it's relevant for

5   the fact it was said, that might be a different story.

6          MS. LEIDHOLDT:  Yes, your Honor, we're also offering

7   this conversation into evidence for its effect on the listener.

8          MR. ARENSTEIN:  Objection.

9          THE COURT:  The effect on the listener is not relevant

10  to this proceeding.  The effect on the listener can be relevant

11  in some proceeding, but not in this proceeding.

12         MS. LEIDHOLDT:  I understand.

13         THE COURT:  Go ahead.

14         MS. LEIDHOLDT:  Just one second, please.

15         (Off-the-record discussion)

16  BY MS. LEIDHOLDT:

17  Q.  Ms. Chew --

18  A.  Yes.

19  Q.  -- could you describe how your daughter sounded when she

20  was saying to you over the telephone, "Mommy, he's beating me"?

21         THE COURT:  Which conversation are you talking about?

22         MS. LEIDHOLDT:  I am talking about the telephone

23  conversation that Ms. Chew detailed in which she was speaking

24  with her daughter and her daughter was telling her, "Mommy,

25  he's beating me."

1              THE COURT:  Well, as to that conversation, there was

2   no hearsay objection asserted by Mr. Arenstein.

3              MS. LEIDHOLDT:  Yes.

4              THE COURT:  Why are you doing this?

5              MS. LEIDHOLDT:  Thank you.  Thank you, your Honor.

6   BY MS. LEIDHOLDT:

7   Q.  Ms. Chew, what happened after you had this conversation

8   that you've just described with your daughter?  What, if

9   anything, happened later in the evening?

10  A.  Well, I talked to my son about the matter.  I talked to my

11  family about what happened in the evening.

12  Q.  What, if anything, did you say to your family?

13  A.  I told them my daughter and Majid is fighting, Majid is

14  beating her, and my son told me --

15             MR. ARENSTEIN:  Objection to what the son said.

16             THE COURT:  Sit down, Mr. Arenstein.  Sustained.

17             THE WITNESS:  Then my son say --

18             THE COURT:  No, no, we are not getting into what the

19  son said.

20             THE WITNESS:  Sorry.

21  BY MS. LEIDHOLDT:

22  Q.  Did there come a time that evening when you were in a car

23  and there was a telephone conversation between you and

24  Mr. Souratgar?

25  A.  Yes.

 1            MR. ARENSTEIN:  Objection.  Now we are leading the

 2   witness, your Honor.

 3            THE COURT:  Overruled.

 4            MR. ARENSTEIN:  This is a leading question.

 5            THE COURT:  Overruled.

 6            THE WITNESS:  My son talked to Majid and asked Majid

 7   why he beat his sister.

 8            MR. ARENSTEIN:  Objection to what the son said to

 9   Majid.

10            THE COURT:  Sustained as to the comments of the son.

11   BY MS. LEIDHOLDT:

12   Q.  Were you present when this conversation --

13   A.  Yes, I was.

14   Q.  Just, please.  Were you present when this conversation

15   between your son and Mr. Souratgar transpired?

16            MR. ARENSTEIN:  Objection.

17   A.  Yes.

18            THE COURT:  What is your objection to the question?

19            MR. ARENSTEIN:  Not to that question.  If she is going

20   to say what the son said --

21            THE COURT:  That was the only question that was asked,

22   Mr. Arenstein.

23            MR. ARENSTEIN:  Okay.

24            THE COURT:  This trial is going to go on forever if

25   objections are made and then withdrawn when the court asks the

1    basis.

2    BY MS. LEIDHOLDT:

3    Q.  Ms. Chew, where did this conversation take place?

4    A.  It is in a car.  I called Majid, I passed the phone to my

5    son.

6    Q.  Where was your son sitting in the car?

7    A.  Just beside me.

8    Q.  Who was driving the car?

9    A.  My other son.

10   Q.  So which seat of the car were you seated in?

11   A.  In the front seat.

12   Q.  Where was your son who was having the conversation with

13   Mr. Souratgar?

14   A.  In the back seat.

15   Q.  As your son was having this conversation with

16   Mr. Souratgar, were you able to hear --

17   A.  Yes.

18   Q.  -- the conversation between the parties?

19            MR. ARENSTEIN:  Objection.

20   A.  It was --

21            THE COURT:  Excuse me.  What is the basis for the

22   objection, Mr. Arenstein?

23            MR. ARENSTEIN:  Whether she was able to hear a

24   conversation between two people is hearsay.

25            THE WITNESS:  It is --

1          THE COURT:  Excuse me a second.  How is that hearsay?

2          MR. ARENSTEIN:  The contents of the conversation would

3    be hearsay.

4          THE COURT:  She didn't ask about the contents of the

5    conversation, Mr. Arenstein.  This is the same problem we had

6    the last time.  Go ahead.

7    BY MS. LEIDHOLDT:

8    Q.  Were you able to hear the tone of Mr. Souratgar's voice as

9    he was speaking to your son?

10   A.  Yes, he was on the speakerphone.

11         MR. ARENSTEIN:  Objection.

12         THE COURT:  The answer is, "Yes, he was on

13   speakerphone." Next question.  What is the basis for your

14   objection, Mr. Arenstein?

15         MR. ARENSTEIN:  Your Honor, it seems to me that what

16   we're going into is a conversation that is being testified to

17   on a speakerphone where we don't -- describing something that I

18   don't think is proper and that is why I have objected to the

19   question.

20         THE COURT:  No.  The question was could you hear the

21   conversation.  That was the question, wasn't it?

22         MR. ARENSTEIN:  I think she was going into the

23   substance of the conversation.

24         THE COURT:  She said yes, it was on the speakerphone.

25   Please tell me, explain this to me.

 1          MR. ARENSTEIN:  What I am hearing is she is going into

 2   the substance of the conversation.

 3          THE COURT:  Where are you hearing that?

 4          MR. ARENSTEIN:  I am hearing it from the witness.

 5          THE COURT:  There is a transcript here.  The witness

 6   said yes, it is on the speakerphone.  Is that the substance of

 7   the conversation?

 8          MR. ARENSTEIN:  Not at this point, your Honor.  We are

 9   leading to it.  And she heard the tone, and is like hearsay on

10   the tone.  She wasn't talking to the party and she is

11   describing what she claims she heard on a conversation.

12          THE COURT:  She was asked whether she heard the tone.

13   That is where we are.

14          MR. ARENSTEIN:  Okay.

15          THE COURT:  Next question.

16   BY MS. LEIDHOLDT:

17   Q.  Ms. Chew, would you please describe to the best of your

18   ability the tone of Mr. Souratgar's voice in that conversation.

19   How did he sound?

20   A.  He sounded --

21          MR. ARENSTEIN:  Objection.

22          THE COURT:  Overruled.  Go ahead.

23   A.  -- he still sounded like earlier when she was scolding my

24   daughter on the phone, he was shouting, he was very angry and

25   yelling.

1    Q.  You have answered the question.

2           Were you able to hear any of Mr. Souratgar's

3    statements during that conversation?

4    A.  Yes.

5    Q.  What, if anything, did Mr. Souratgar -- were you able to

6    hear Mr. Souratgar stating?

7           MR. ARENSTEIN:  Objection.

8           THE COURT:  Overruled.

9    A.  Majid was telling my son that your sister is crazy.  Call

10   your mom to her back and before I know it, he was saying you

11   come to Singapore and I going to kill you.  That is what he

12   said to my son.  My son said oh, my God.

13          THE COURT:  We are not --

14          MR. ARENSTEIN:  Objection.

15          THE COURT:  -- not interested what the son said.

16          THE WITNESS:  My son said Majid.

17          MR. ARENSTEIN:  To what his son said.

18          MS. LEIDHOLDT:  Yes.

19          THE COURT:  Sustained.

20   BY MS. LEIDHOLDT:

21   Q.  After --

22          THE COURT:  This is not a jury trial, Mr. Arenstein.

23   Do you understand that?

24          MR. ARENSTEIN:  I understand that.

25          THE COURT:  So I'll sustain your objection, but I

1   would urge you to comport yourself as a member of the Bar of

2   this Court.

3          If testimony is admitted, and I conclude after hearing

4   it that it is inadmissible, on application, the court can

5   strike the testimony or disregard it.  It may be immaterial to

6   anything I have to decide in this case or it may be properly

7   received.  So I suggest that you would be well advised probably

8   for your own personal well-being to comport yourself in a less

9   agitated manner.

10          MR. ARENSTEIN:  Thank you.

11          THE COURT:  Next question.

12  BY MS. LEIDHOLDT:

13  Q.  Ms. Chew --

14  A.  Yes.

15  Q.  -- after you heard Mr. Souratgar make that statement, what,

16  if anything, happened?

17  A.  My son was a bit shocked.

18          MR. ARENSTEIN:  Objection to what the son was.

19          THE COURT:  Sustained.

20          MS. LEIDHOLDT:  I am not asking about anything that

21  anyone said.

22  BY MS. LEIDHOLDT:

23  Q.  What, if anything, happened after you heard Mr. Souratgar

24  make that statement?

25  A.  My son said --

 1              MR. ARENSTEIN:  Objection.

 2              THE COURT:  I am not interested.  Sustained.

 3    BY MS. LEIDHOLDT:

 4    Q.  Did the conversation continue?

 5    A.  Yes.

 6    Q.  Did there come a time that the conversation was

 7    discontinued?

 8    A.  No.  Can I please tell what my son says?

 9              MR. ARENSTEIN:  Objection.

10              THE COURT:  No, no.

11              MS. LEIDHOLDT:  No.

12              THE COURT:  Ma'am, listen to me.

13              THE WITNESS:  Yes?

14              THE COURT:  No.

15              THE WITNESS:  Okay.

16              THE COURT:  All right?

17              THE WITNESS:  All right.

18              THE COURT:  Did there come a time that conversation

19    ended?

20              THE WITNESS:  Yes.

21              THE COURT:  At some point the conversation ended?

22              THE WITNESS:  Sorry.  I don't understand the question.

23              THE COURT:  You're doing just fine.

24              THE WITNESS:  I am sorry, so sorry.

25              THE COURT:  No, no, you are doing fine.  There came a

```
 1    time when the conversation ended, correct?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Next question.

 4    BY MS. LEIDHOLDT:

 5    Q.  Ms. Chew, when was the next time after this conversation

 6    that you came into contact with Mr. Souratgar?

 7    A.  There was the phone call from my daughter that --

 8    Q.  No.  Ms. Chew, did there come a time when your grandson

 9    Shayan was --

10              MR. ARENSTEIN:  Objection; leading.

11              THE COURT:  Overruled.

12    BY MS. LEIDHOLDT:

13    Q.  Did there come a time Shayan was born?

14    A.  Yes, there that is the time I received phone call from my

15    daughter saying she is going to the hospital and the baby is

16    going to be due.

17              MR. ARENSTEIN:  Baby what?

18    A.  The next time I see her.

19    BY MS. LEIDHOLDT:

20    Q.  What, if anything, did you do after you learned that your

21    daughter was about to give birth to Shayan?

22    A.  I went to Singapore.

23    Q.  Where did you stay while you were in Singapore?

24    A.  In Majid's house.

25    Q.  Was anybody else staying in the house besides Majid
```

1    himself?

2    A.  I can't recall.  I can't recall.

3    Q.  Was he living there alone or was he living with --

4    A.  With Jenny.

5    Q.  When you say "Jenny," do you mean your daughter?

6    A.  Yes.

7    Q.  What observations, if any, did you make about Mr. Souratgar

8    while you were staying in his home after the birth of your

9    grandson Shayan?

10              MR. ARENSTEIN:  Objection to the form of the question.

11              THE COURT:  Overruled.

12   A.  Well, he not at home.  He go to work early in the morning

13   and come back late at night, and then we see him, he started to

14   complain that -- I can't find food for my daughter.  Then he

15   complained about I don't know how to take care of the baby,

16   don't now how to bathe the baby.  Jenny said I know how to do

17   the job.

18              Then he was not happy that I am staying there till

19   after his son, he just doesn't like it.  He was complaining.

20              THE COURT:  All right.  Stricken as to statements

21   made.  We are going to break for lunch.

22              (Luncheon recess)

23              (Continued on next page)

24

25

1                          <u>AFTERNOON SESSION</u>

2                               2:30 p.m.

3    MEI YOKE CHEW, resumed.

4              MS. LEIDHOLDT:  May I, your Honor?

5              THE COURT:  You may continue.

6    DIRECT EXAMINATION (continued)

7    BY MS. LEIDHOLDT:

8    Q.  Ms. Chew, when we broke, you were testifying about a visit

9    you had at your daughter and son-in-law's home after the birth

10   of Shayan.

11   A.  Yes.

12   Q.  Before you went to stay with your daughter to help take

13   care of the baby, how long did you expect to stay there?

14   A.  One whole month.

15             MR. ARENSTEIN:  Objection to "expect to stay there,"

16   your Honor.

17             THE COURT:  Overruled.

18   A.  One whole month.

19   Q.  How long did you in fact stay there?

20   A.  Only around two weeks.

21   Q.  Why did you cut your visit short?

22   A.  Because there is a lot of complaint that I'm not doing my

23   job well.  Majid complained that I shouldn't cook the food for

24   my daughter to eat.  Those aren't the food that -- it's no good

25   for her and I don't have to look after the child.

1          THE COURT:  I'm very happy to have the respondent's

2    mother in this courtroom and I'm fully prepared to accept that

3    she has relevant testify to offer here, and she has offered

4    some here, but this line of inquiry appears not to be

5    appropriate for this proceeding.  It may be appropriate for

6    other proceedings between the parties, but not this one in this

7    court.  Please move on to something relevant.

8          MS. LEIDHOLDT:  Your Honor, if I may make a few

9    comments about why I believe that this is relevant, would your

10   Honor accept that?

11         THE COURT:  Are you moving to reargue or do you want

12   to make a record?  If they are just comments, then I would say

13   write me a letter.  But if you want to move to reargue, you

14   want to make an appellate record, please be my guest.

15         MS. LEIDHOLDT:  Your Honor, I believe the relevance is

16   that this demonstrates a pattern of controlling behavior and

17   ongoing criticism of both our client and members of her family

18   that is part of a pattern of psychological abuse.

19         THE COURT:  Thank you.  I stand by my ruling.  Go

20   ahead.

21   BY MS. LEIDHOLDT:

22   Q.  During the course of your visit, who was providing the

23   care, the daily care for Shayan?

24   A.  For our Chinese custom, the first whole month, the

25   confinement month, had to be taken --

 1              THE COURT:  Stop.

 2              MR. ARENSTEIN:  Objection to the relevance of who was

 3    providing the care.

 4              THE COURT:  Overruled.  It is a foundational question,

 5    Mr. Arenstein.

 6              MR. ARENSTEIN:  OK.

 7              THE COURT:  You don't want leading, right?  Correct?

 8    If you're not going to have leading, then you have to ask a

 9    foundational question to get where you want to be.

10              MR. ARENSTEIN:  I understand.

11              THE COURT:  I'm happy to hear well-placed objections.

12    Q.  I'll rephrase my question or repeat my question, your

13    Honor.  During the time you were staying with your daughter,

14    son- in-law, and the baby, who was actually taking care of the

15    baby on a day-to-day basis?

16    A.  It was me, because for our custom the first month --

17              THE COURT:  I think the question was who was taking

18    care of the baby, and I think you have answered it.

19    A.  Me.

20    Q.  Was anyone other than you taking care of the baby?

21    A.  Well, Jenny helped a bit, because she's weak.

22    Q.  After you returned home to Kuala Lumpur, did you continue

23    to have conversations with your daughter about how things were

24    going?

25    A.  Yes.

1   Q.  Telephone conversations?

2   A.  Yes.  She called me.

3           THE COURT:  No.  You have answered it.

4           Excuse me.  When I'm talking, Ms. Leidholdt, please

5   refrain.

6           The question was whether you had conversations, and

7   you have answered that.  The answer is yes, you have.  Now let

8   the lawyer do the job of asking you the next question.  Then

9   you can answer the next question.  We do it this way so we can

10  understand what the question is, we give the other side an

11  opportunity to object, and then you answer.

12          THE WITNESS:  OK.  I'm sorry.

13          THE COURT:  That's quite all right.  You're doing just

14  fine.  This is an unfamiliar procedure for most people.

15          THE WITNESS:  Yes.

16          THE COURT:  I perfectly understand that.

17          THE WITNESS:  Thank you.

18          THE COURT:  Next question.

19  BY MS. LEIDHOLDT:

20  Q.  Did there come a time, Ms. Chew, that Jenny began to talk

21  with you about her relationship with Mr. Souratgar?

22  A.  After the --

23  Q.  Yes or no, please.

24  A.  Yes.

25  Q.  What, if anything, was communicated to you about the

1   relationship?

2   A.   She says there was a complaint from her husband Majid, and

3   he was always calling her stupid and lazy and calling her fat,

4   that she's not doing anything at home, and he was always

5   shouting at her and yelling at her.  And she's not able to look

6   after Shayan, he said she's not good enough to look after

7   Shayan.

8               THE COURT:  I didn't hear the last part.

9               THE WITNESS:  He said she's not good enough to look

10   after Shayan.

11               THE COURT:  Not good enough to?

12               THE WITNESS:  Look after Shayan.

13               THE COURT:  Thank you.

14               Ms. Leidholdt, I am going to ask you again to limit

15   your questions to that which is relevant in this case.

16               MS. LEIDHOLDT:  Thank you, your Honor.

17               THE COURT:  This is not a custody case.  It is not a

18   custody case.  It is not a marital case.  I think there is a

19   perception here that while it may not be a marital case, it is

20   a custody case.  It's not that, either.  Do you understand

21   that?

22               MS. LEIDHOLDT:  Your Honor, I do understand the

23   difference between evidence that would be proof of what is in

24   the best interests of the child and evidence that goes to one

25   of the key issues of the case, and that is whether there would

 1    be a grave risk of harm to the subject child should he be

 2    repatriated to Singapore.

 3              THE COURT:  The article 13 and the article 20 issues,

 4    correct me if I'm wrong, are the only two issues in this case.

 5    Is that correct?

 6              MS. LEIDHOLDT:  That is correct, your Honor.

 7              THE COURT:  So it is not best interests or article 13.

 8    It's article 13 or article 20.

 9              MS. LEIDHOLDT:  I'm attempting to say, not very well,

10    your Honor, that I understand that this case is not about the

11    best interests of the child.

12              THE COURT:  That's what I'm trying to say.  It's not a

13    custody case that considers issues other than the best

14    interests of the child.  One of the issues that I will not be

15    asked to decide in this case is whether the petitioner gets

16    custody of this boy.  That's not before this Court.  Do you

17    understand that?

18              MS. LEIDHOLDT:  Your Honor, I understand that.

19              THE COURT:  Whether it is best interests or any other

20    standard.  So it is not a question of whether something goes to

21    best interests.  It's a question of whether it goes to article

22    13.

23              MS. LEIDHOLDT:  Yes, I understand.

24              THE COURT:  Please confine your inquiry.  You have

25    gone on now at quite some length with this and other witnesses,

1    including Mr. Souratgar, on issues that go to fitness of a

2    parent and treatment of spouses.  Fitness of a parent insofar

3    as it relates to the article 13 issue may have some relevance.

4    It may have bearing on the relief.  But at the end of this

5    proceeding, I will not say, and so Shayan will remain in the

6    custody of his mother, nor will I say, and so Shayan will

7    remain in the custody of the father.  Do you understand that?

8            Mr. Arenstein, are you asking me to do that?

9            MR. ARENSTEIN:  No.

10           THE COURT:  Are you asking me to do that?

11           MS. LEIDHOLDT:  Absolutely not.

12           THE COURT:  No one is asking me to decide that.  The

13   question is whether Shayan will be returned to Singapore or

14   whether Shayan will not be returned to Singapore.  Who returns

15   him to Singapore and how he goes to Singapore and where he

16   lives in Singapore are entirely separate and different from the

17   issues of how a court may decide a custody issue.  Do you

18   understand that?

19           MS. LEIDHOLDT:  Yes, I do understand, your Honor.

20           THE COURT:  So please confine yourself to the article

21   13 and the article 20 issues.

22           MS. LEIDHOLDT:  Your Honor, emotional and psycho-

23   logical abuse directed towards one parent in the presence of

24   the subject child would be relevant, is that correct, to the

25   article 13 issue?

1           THE COURT:  I don't do that, counsel.  This is not an

2      opportunity for you to ask questions of the Court.  I will

3      note, however, that the question before the Court is not

4      whether there is a grave risk of harm from the child being with

5      the father.  That's not the question.  That's not the article

6      13 question.

7           The article 13 question is whether there is a grave

8      risk from the return to the country where they habitually

9      lived.  Is that not correct?  It's not a question of grave risk

10     of harm being with the father.  It's a grave risk of harm to

11     return to the country, correct?

12          MS. LEIDHOLDT:  Yes.  Your Honor, as I understand it,

13     what goes to the core of the article 13(b) argument is whether

14     the child was subjected to abuse, physical or emotional abuse,

15     that harmed that child, perhaps even traumatized that child,

16     and whether or not there is a grave risk that should that child

17     be repatriated to Singapore, the child would continue to be

18     abused.

19          Referring to Blondin v. DuBois, where the two children

20     were subjected to abuse themselves and to the abusive parent in

21     France, the court was deeply concerned that were the children

22     to be repatriated to France, the children would be

23     retraumatized by being back in the environment that they were

24     abused in and that the harmful effects of the abuse could

25     continue.

1          THE COURT:  On the facts presented, that could be the

2    case.  But it is not inherently the case that the return of the

3    child to Singapore necessarily means that the child will be

4    living with either parent, correct?

5          MS. LEIDHOLDT:  I do understand that.

6          THE COURT:  The question is whether there is a grave

7    risk of harm from returning the child to the country, not

8    returning the child to the custody of the mother or returning

9    the child to the custody of the father.  Do you agree?

10          MS. LEIDHOLDT:  I think, yes, the grave risk of harm

11    would be the circumstances in Singapore that that child would

12    likely be in that would be injurious to that child.

13          THE COURT:  Thank you.  Ask your next question.

14    BY MS. LEIDHOLDT:

15    Q.  Ms. Chew, after Shayan's birth, did your daughter and your

16    son-in-law, Ms. Lee and Mr. Souratgar, make any visits to your

17    home in Malaysia with their son?

18    A.  Yes.

19    Q.  When did those visits occur?

20    A.  It was during Chinese New Year 2010, around January, they

21    came back to Malaysia for a visit to celebrate our Chinese New

22    Year.

23    Q.  Was there another visit that transpired after the visit

24    during Chinese New Year in 2010?  Was there a visit the

25    following Chinese New Year, in 2011?

1  A.  Yes.

2  Q.  Directing your attention to the first of those visits, the

3  visit that took place in February -- in Chinese New Year, 2010,

4  what month was that, if you recall?

5  A.  Well, Chinese New Year always falls between January and

6  February.

7  Q.  Was there anything that transpired during that visit

8  involving the father and the subject child that caused you

9  concern?

10  A.  The first Chinese New Year after Shayan born, they came

11  back.  Shayan was around 1 year old.  One morning after

12  breakfast, Majid was carrying Shayan, sitting at the sofa.  The

13  TV was on, and I was at the kitchen.  There's a window that go

14  across to the living room.  I saw him carrying Shayan on his

15  lap and holding his hand up.  And he was loudly happily telling

16  Shayan, you are King Shayan, you must kill the dragon.  He lift

17  his hand up, he say, with this sword you kill the dragon, and

18  you when you grow up, you going to kill other Americans.

19  That's what he say.  I was so stunned, I stare at him and then

20  confront him.  And I told my daughter about it.

21  Q.  Was this the only time that you were present when Mr.

22  Souratgar made statements of this nature?

23  A.  Yes.

24  Q.  During that same visit was there another visit that

25  happened in your bedroom --

1          MR. ARENSTEIN:  Objection.

2     Q.  -- that involved the subject child?

3          MR. ARENSTEIN:  I think that's leading, your Honor.

4          THE COURT:  Really?  How would you suggest getting at

5     the second incident?

6          MR. ARENSTEIN:  If she could just ask the second

7     incident.  She is pointing to a place, giving her --

8          THE COURT:  I'm sorry?  Pointing to a place, giving

9     her?

10         MR. ARENSTEIN:  Specifics.

11         THE COURT:  Overruled.

12    Q.  Ms. Chew, would you please describe an incident that

13    happened during that visit in your bedroom that involved Shayan

14    and his father.

15    A.  That was like one or two days later, it was around evening,

16    Jenny said she want to go to the shower.  She asked me to look

17    after Shayan while Shayan was crying.  Then Majid just picked

18    Shayan up, and he shouted at Shayan, he say, you're a big boy

19    now, you be quiet.  Then Shayan was crying very loudly, asked

20    for me.  He did no, no grandma, no Shayan, stop it, you're a

21    big boy now, and he took him downstairs and let him cry until

22    Jenny came out from the bathroom.

23    Q.  You testified that your daughter, Mr. Souratgar, and Shayan

24    visited your home during Chinese New Year 2011.

25    A.  Yes.

1   Q.  How long were they there, if you recall?

2   A.  Usually spend three to five days.

3   Q.  Do you remember if that's how long they spent at your home

4   during Chinese New Year of 2011?

5   A.  Yes.

6   Q.  What observations, if any, did you make of Mr. Souratgar's

7   treatment of your daughter in the presence of Shayan?

8          MR. ARENSTEIN:  Objection.

9          THE COURT:  Overruled.

10  A.  On 2011, when he came to my house during Chinese New Year,

11  I find that he is always very angry.

12  Q.  Who is he?

13  A.  Majid was always very angry, and he was always on the

14  phone.  And when Shayan crying, he was shouting at Shayan to

15  keep quiet, you're a big boy.  And he will pick up Shayan when

16  he was on the phone and was talking on the phone for a long

17  time, and then --

18  Q.  When Mr. Souratgar was speaking on the telephone and then

19  made statements to Shayan, could you describe the tone of voice

20  that he used to the child.

21  A.  He was shouting at Shayan.

22  Q.  How often did that occur during that visit?

23  A.  Many times.

24  Q.  How did Shayan react when his father shouted at him?

25         MR. ARENSTEIN:  Objection.

1           THE COURT:  Basis?

2           MR. ARENSTEIN:  The relevance of this testimony is not

3    going to grave risk of danger, as far as I'm concerned, for our

4    hearing.  It doesn't meet any level of a test for grave risk.

5    It might be family disputes, family harmony or inharmony, but

6    it has nothing to do with grave risk of danger.

7           THE COURT:  I'll have to hear what the answer is to

8    know that.  I don't know how the child reacted.  If he came

9    over and bit his father on the arm, it might be a different

10   situation.  Go ahead, you may answer.

11   A.  When he shouted, Shayan call out, crying louder.  But

12   sometimes Shayan just stare at his father, very stony, like

13   that.

14          THE COURT:  I didn't hear that. Sometimes Shayan --

15   A.  Very stony.  He just stared.  I think maybe Shayan don't

16   understand what is this all about.

17          MR. ARENSTEIN:  Objection to what Shayan understood.

18   How would she know what the child understood?

19          THE WITNESS:  When the child stared --

20          THE COURT:  You object to questions, move to strike

21   questions.

22          MR. ARENSTEIN:  Move to strike the answer.

23          THE COURT:  Next question.  Overruled.

24   Q.  What, if anything, happened on May 24th of 2011?  I'll be

25   more specific.  Withdrawn.  Directing your attention to May 24,

 1    2011, on that date did you fly to Singapore?

 2    A.  24th May?

 3    Q.  May 24, 2011.  Did you fly to Singapore on May 24, 2011?

 4    A.  Yes.  I received --

 5    Q.  Why did you go there.

 6    A.  I received a call from my daughter.  She told me she's

 7    moving out of Majid's house.

 8    Q.  Where you surprised to learn that your daughter was moving

 9    out of Majid's house?

10    A.  No.

11    Q.  Why not?

12    A.  Because she had been telling me that Majid is not happy

13    with her and always scolding her and calling her fat and stupid

14    and lazy.

15    Q.  What happened, what, if anything, happened while you were

16    there in Singapore in reference to your older daughter?

17          MR. ARENSTEIN:  Objection.  I don't know how the older

18    daughter fits into the picture here, your Honor.

19          MS. LEIDHOLDT:  Subject to connection, your Honor.

20          THE COURT:  Overruled.

21    A.  When I reached Singapore, I talked to my eldest daughter,

22    because we moved to her house.  She told me that --

23          MR. ARENSTEIN:  Objection to what the older daughter

24    told her.

25          THE COURT:  Basis?

1              MS. LEIDHOLDT:  It's not coming in for the truth of

2     the matter asserted, your Honor.

3              THE COURT:  What's it coming in for?

4              MS. LEIDHOLDT:  It's coming in to show the declarant's

5     state of mind.

6              THE COURT:  The declarant being the older daughter's

7     state of mind?

8              MS. LEIDHOLDT:  Yes, and for the impact on the

9     witness.

10             THE COURT:  How is the older daughter's state of mind

11    relevant to the proceeding before me?  Sustained.

12             MS. LEIDHOLDT:  Thank you.

13             MR. ARENSTEIN:  Thank you, your Honor.

14    Q.  After you arrived, a few days after you arrived, what, if

15    anything, happened?

16    A.  It's a call from the police station.

17             MR. ARENSTEIN:  I'm sorry.  I didn't hear that answer.

18             THE COURT:  There's a call from the police station.

19    Q.  Did you have the opportunity to pay a visit to the police

20    station?

21    A.  Yes, because the policeman call my daughter Jenny to go and

22    testify that Majid accused her of stealing this money.

23             MR. ARENSTEIN:  Objection to what the policeman said.

24             THE COURT:  We already had a discussion about this.

25    You can object to the question, you can move to strike the

1   answer.  The witness is in the middle of answering.  Let the

2   witness answer, and you can move to strike.

3            MR. ARENSTEIN:  Fine.

4            THE COURT:  Go ahead.

5   A.  The policeman asked my daughter to go to the police station

6   to testify that Majid had accused her of stealing $13,000 U.S.

7   from him, two watches, a gold bar, and a laptop.  So --

8            THE COURT:  Stop.  You have answered the question.

9   Next question.

10            MR. ARENSTEIN:  I move to strike the answer.

11            THE COURT:  Overruled.  Go ahead.

12  Q.  Did you accompany your daughter to the police station?

13  A.  Yes.

14            THE COURT:  Which daughter is this now?

15  Q.  Did you accompany Ms. Lee to the police station?

16  A.  Yes.

17  Q.  What, if anything, occurred while you were in the police

18  station?

19  A.  I was at the police station reception.  I saw Majid and his

20  brother walking into the police station.

21  Q.  What, if anything, transpired in the police station

22  involving Mr. Souratgar?

23  A.  To tell the truth, I was very scared.  I run behind the

24  police counter, and I hear Majid shouting and screaming at the

25  policeman.  Then the policeman asked him to calm down.  He was

```
 1   banging on the table.  And then Shayan was very scared with me.

 2              MR. ARENSTEIN:  Objection to what Shayan --

 3              THE COURT:  Overruled.

 4   Q.  Where was Shayan at that time?

 5   A.  I was holding Shayan's hand.

 6   Q.  Why were you holding Shayan's hand?

 7   A.  Because Jenny went to the room to have her statement

 8   written down.  I was outside the reception.

 9   Q.  Do you know if there had been a request to bring Shayan to

10   the police station that day?  Do you know if there had been a

11   request by the police to bring Shayan to the police station

12   that day?

13   A.  I don't know.

14              MR. ARENSTEIN:  Objection.

15              THE COURT:  Overruled.

16              When was this, ma'am?  Give me an approximate date on

17   this.

18              THE WITNESS:  It was one day after removal of Majid

19   house.

20              THE COURT:  Next question.

21              MS. LEIDHOLDT:  One second, please, your Honor.

22              THE COURT:  That was what month?

23              THE WITNESS:  May 2011.

24              THE COURT:  Thank you.

25   Q.  Ms. Chew, I'd like to direct your attention to June 28th of
```

1   2011.  Do you remember that day?

2   A.  June 28th, '11?

3   Q.  June 28th of 2011 in Malaysia.

4   A.  Oh, yes.  I went back to Malaysia.  There was a doorbell.

5   Somebody pressed my doorbell, and when I looked out, he say

6   "wrong number."  One minute later Majid ring my doorbell.

7   Q.  What, if anything, then transpired involving Mr. Souratgar

8   outside of -- where was that?  Outside of your home in

9   Malaysia?

10  A.  It was outside of my house.

11  Q.  What occurred?

12  A.  Majid was shouting on top of his voice asking me to let him

13  in.  He say he want to see Jenny and Shayan.

14  Q.  What happened then?

15  A.  I refused to let him in.  He say if I don't let him in, he

16  will call the police.

17  Q.  What happened then?

18  A.  I told him, you can call the police, this is my house, it's

19  not your house, go ahead.

20  Q.  Did Mr. Souratgar say anything else other than that he was

21  going to call the police?

22  A.  Then he called the police.

23  Q.  Prior to Mr. Souratgar calling the police, did he make any

24  other statement?

25  A.  Yes.  While he was waiting for the police, he shouted at me

1   and said I stole all his money.  And then my husband asked him,

2   why it takes you four years to complain?

3            MR. ARENSTEIN:  Objection to what the husband asked.

4   A.  Yes, my husband was beside me.

5            MR. ARENSTEIN:  Move to strike, your Honor.

6            THE COURT:  I'll grant that.

7   Q.  Did there come a time that the police arrived?

8   A.  Yes.

9   Q.  How long were the police there, approximately?

10  A.  Around 20 minutes.

11  Q.  The police then left, is that correct?

12  A.  Well, the police questioned me why do I let him come in.

13           MR. ARENSTEIN:  Objection, your Honor.  Move to strike

14  the answer.

15           THE COURT:  Sustained.  I don't see where this is

16  relevant.

17           MS. LEIDHOLDT:  Yes.

18           THE COURT:  Excuse me a second.  I'm talking.  Why are

19  you talking when I'm talking?

20           MS. LEIDHOLDT:  I'm sorry, your Honor.

21           THE COURT:  We have had this conversation.  Next

22  question.

23  Q.  I'm directing your attention, Ms. Chew, to after the police

24  left.

25  A.  Yes.

1    Q.  What, if anything, transpired involving Mr. Souratgar after

2    the police left?

3    A.  He took his camera and he start to video my house, and he

4    went to my neighbor and talk bad about us.

5    Q.  How many neighbors did he go to?

6    A.  Well, there's one whole row of terrace houses in front of

7    me, opposite and beside me.

8              THE COURT:  One whole row of what kind of house?

9              THE WITNESS:  We have a house that is different in

10   color.  The total amount of house inside is 64 houses.

11             THE COURT:  You said something like there was one

12   whole row of terraced houses?

13             THE WITNESS:  Yes, a terrace house.

14             THE COURT:  I was just trying to find out the word you

15   said, that's all.  We have to take down the words.  You see the

16   gentleman over there?  He takes down the words.  We have to

17   hear the words so we can write it down.

18             THE WITNESS:  Sorry.

19             THE COURT:  No, you didn't do anything wrong.  I just

20   didn't hear you.

21   Q.  Ms. Chew, did you have the opportunity to observe what Mr.

22   Souratgar was doing after the police left?

23   A.  I looked from inside my house and I totally -- he

24   totally -- I find him talking to my neighbor.

25             MR. ARENSTEIN:  I didn't hear the answer, your Honor.

 1              THE COURT:  I find him talking to my neighbor.

 2    Q.  Could you describe the tone of voice that he used when he

 3    was talking to your neighbors.

 4              MR. ARENSTEIN:  Objection.

 5              THE COURT:  Overruled.

 6    A.  I didn't hear it.

 7    Q.  I'm asking you if you could describe it.  Could you hear

 8    his voice at all?

 9    A.  I saw his actions.  He was like moving his head and body a

10    lot.

11              MR. ARENSTEIN:  Objection to it.

12              THE COURT:  Overruled.

13              MS. LEIDHOLDT:  Your Honor, we have learned a

14    concerning piece of information from this witness as we

15    prepared her for this trial.  I discussed this information with

16    Professor Baum and my colleagues.  I wasn't really sure how to

17    proceed with this information.  I'm asking your Honor for

18    permission to ask some questions about some events that

19    happened very recently, specifically, on November 13th at 12:05

20    a.m. at the airport as she was leaving New York to fly back

21    home to Malaysia.

22              THE COURT:  I don't know what my granting permission

23    or denying permission would mean in this context.  I don't know

24    what that would mean.  The custom typically is a lawyer decides

25    whether or not they are getting into an appropriate area or a

1   not appropriate area.  They are a member of the bar.  They are

2   subject to Rule 11.  They are subject to the rules of

3   professional responsibility.  They are expected to know what

4   relevant evidence is.

5           How could I say, yes, that's OK?  What would that mean

6   if I said yes, that's OK, or no, that's not OK?  What would

7   that really mean?  And how would I go about knowing whether I

8   should say yes, it's OK, or no, it's not?

9           MS. LEIDHOLDT:  Before I enter a line of questioning

10  with this witness --

11          THE COURT:  You wanted to find out whether it was OK,

12  right?

13          MS. LEIDHOLDT:  I did.  I believe that it is relevant.

14  I'm not entering this line of inquiry in order to make an

15  accusation, but I do believe that it is highly relevant to the

16  instant matter.  I'm understanding your Honor.  I will then ask

17  the witness these questions.  If your Honor find it not to be

18  relevant, I will be stopped from this line of questioning.

19  BY MS. LEIDHOLDT:

20  Q.  Ms. Chew, what, if anything, happened on Monday, June 12th,

21  around 10:30 in the evening?

22          MR. ARENSTEIN:  I'd like a proffer of what the arenas

23  is in this.

24          THE COURT:  We are about to find out.  A proffer makes

25  sense when you have a jury.  You go to the side bar and you

1    have a proffer out of the hearing of the jury.  Then we bring

2    over the witness and we have the witness tell us what they are

3    going to say in front of the jury.  Then I rule whether or not

4    the jury can hear it.  How is this proffer thing going to work,

5    Mr. Arenstein?

6             MR. ARENSTEIN:  I don't know, your Honor, and I don't

7    know what she is going to ask, but I'm prepared to object to

8    the question after it's asked.

9             THE COURT:  The question was asked.  It was asked.  Do

10   you have an objection?

11            MR. ARENSTEIN:  I'll wait for the answer.

12   Q.  Where were you on Monday, November 12th, at around 2:30 in

13   the evening?

14            THE COURT:  Your question was about June.  Tom, could

15   you read back the last question.

16            MS. LEIDHOLDT:  Your Honor, I apologize.  I misspoke.

17   I'm talking about Monday, November 12th of this year.  I did

18   misspeak.  I just want to make it clear.  Monday, November 12,

19   2012.

20   A.  I was at J.F. Kennedy Airport going back to Malaysia, and

21   at the security checkpoint, there I saw Majid at the airport.

22   Q.  Where were you in the airport when you saw Mr. Souratgar

23   there?

24   A.  I was also at the security checkpoint.

25   Q.  Where you behind Mr. Souratgar or where you in front of him

1   or were you in some other location?

2   A.  I was behind him, in a different line, different row of

3   line, queuing up.

4   Q.  What, if anything, did you observe while you were at the

5   airport?

6   A.  I saw him putting back on his shoe after the security

7   check.  I was still at the security check.  When I walked in, I

8   didn't see him anymore.  So my boarding gate is on gate 8.  I

9   walked towards gate 8.  And then I sitting on one of those

10  chairs, I saw Majid again going to get boarding to gate 7 on

11  the Turkish airline.  I was very scared.

12  Q.  What time was that, approximately?

13  A.  That was around 12:00, almost.  My flight is at 12:05, so

14  it's like half an hour before, before going, flying, he was

15  already queuing up going to gate 7.

16  Q.  Ms. Chew, were you absolutely certain that it was Mr.

17  Souratgar whom you observed clearing security and then waiting

18  at the gate to board the Turkish airlines?

19  A.  Yes.

20  Q.  Did you actually see him get in line?

21  A.  Yes, he go inside.

22          THE COURT:  What time was this?

23          THE WITNESS:  It was around 11 something.

24          THE COURT:  In the morning or in the evening?

25          THE WITNESS:  It was the evening.

```
 1              THE COURT:  11 p.m.?

 2              THE WITNESS:  Yes.

 3              THE COURT:  What airline were you getting on?

 4              THE WITNESS:  EVA Airline.

 5              THE COURT:  Say the name again.

 6              THE WITNESS:  EVA.

 7              THE COURT:  E-V-A?

 8              THE WITNESS:  Yes.

 9              THE COURT:  Did you mention the gate you were getting

10    on?

11              THE WITNESS:  Gate 8.

12              THE COURT:  Go ahead.  Next question.

13              What time did your flight depart?

14              THE WITNESS:  12:05 a.m. on the 13th.

15              THE COURT:  Go ahead, next question.

16    Q.  From the time you observed Mr. Souratgar, the person you

17    believed to be Mr. Souratgar, clearing security until you

18    actually boarded the plane that you were boarding that evening,

19    about how many times did you have the opportunity to observe

20    him?

21    A.  Three times.

22    Q.  Was there any shadow of a doubt in your mind that it was

23    Mr. Souratgar?

24    A.  No.

25    Q.  The person that you believed to be Mr. Souratgar, did he
```

1  turn around and look at you at any time?

2  A.  I was a distance away from him because I don't want him to

3  see me.  He was queuing up and he was talking with some people,

4  a family, a man and a woman, two kind of like adult children

5  and one younger child.

6          MS. LEIDHOLDT:  Your Honor, I have no further

7  questions.

8          MR. ARENSTEIN:  Your Honor, I would object to the line

9  of questioning.  In fact, I think it is almost elevated, unless

10  they can prove this, to a Rule 11 sanction, from what I'm

11  hearing here.  My clients passbook was with this Court.  My

12  client didn't travel anywhere.  I can put my client on the

13  stand.  And I don't believe that this witness is necessarily

14  telling the truth.  Unless they have proof to show that, I

15  think we almost should have a Rule 11 sanction here.

16          THE COURT:  We have testimony.  You have a right to

17  cross-examine.

18          MR. ARENSTEIN:  I will.

19          THE COURT:  OK.  Thank you.

20          MS. LEIDHOLDT:  Thank you, your Honor.

21  CROSS-EXAMINATION

22  BY MR. ARENSTEIN:

23  Q.  Do you have a passport, ma'am?

24  A.  Yes.

25  Q.  Can I see it, please.  Can I see your passport, please.

 1   A.  Yes.

 2              MS. LEIDHOLDT:  Your Honor, I object.

 3              THE COURT:  Overruled.

 4              Do you have your passport with you, ma'am?

 5              THE WITNESS:  Yes.

 6              THE COURT:  Do you have any problem with producing it?

 7              THE WITNESS:  No.

 8              THE COURT:  Then you can show it to the questioner.

 9              THE WITNESS:  Do you want to see it now?

10              THE COURT:  Yes, if you have it.

11              (Witness procures passport)

12              MR. ARENSTEIN:  May I have a moment, your Honor?

13   Q.  You can sit down.

14              THE COURT:  Mr. McNally can see it after you.  We'll

15   take a five-minute recess.

16              MR. ARENSTEIN:  Thank you.

17              (Pause)

18              THE COURT:  Bring in respondent's counsel.

19              Mr. McNally, there is a sequestration directive.  Once

20   cross-examination begins, you and your co-counsel, anybody on

21   your legal team, cannot discuss the substance of the testimony

22   with your witness until cross-examination has ended.  Please

23   communicate that to your co-counsel.

24              MR. McNALLY:  She understands that.  As a matter of

25   fact, that is exactly what she said to me.

1          THE COURT:  OK.  And that goes for everybody.  Thanks

2   very much, Mr. McNally.

3          MR. McNALLY:  Thank you.

4          (Recess)

5          THE COURT:  Ma'am, come on up and take the stand.

6          Mr. Arenstein, you may cross-examine.

7   BY MR. ARENSTEIN:

8   Q.  I had asked you for a passport.  The one you gave me was a

9   recent passport from April of 2012.  Can I see the passport

10  that you had prior to that one, which has the entries back and

11  forth that you had, that you have.

12          MS. LEIDHOLDT:  Objection, your Honor.

13  A.  I don't understand what you say.

14          THE COURT:  The question you're request asked, ma'am,

15  is do you hold any other passports other than the passport that

16  you just gave Mr. Arenstein?

17          THE WITNESS:  No.  I only got one passport.

18  Q.  The previous passport that you had, where is that?

19  A.  It was back in Malaysia.

20  Q.  Back in Malaysia?

21  A.  Yes.

22  Q.  You don't have it with you today?

23  A.  This passport will last for five years.

24  Q.  You just applied for a passport in April of 2012, is that

25  correct?

1   A.  No.

2          MR. ARENSTEIN:  Can I have that passport again that

3   was given to me.  Some somebody took it back.

4          May I approach the witness, your Honor?

5          THE COURT:  You may.

6   Q.  I'm mistaken.  What is the date that you applied for this

7   passport?

8   A.  September 2011.

9   Q.  What was the date that you applied for this visa?

10  A.  This one?

11  Q.  Yes.

12  A.  17 April 2012.

13  Q.  Right.  April 17, 2012?

14         THE COURT:  The record will never reveal what you mean

15  by "this visa," but that's your prerogative, sir.

16         MR. ARENSTEIN:  The visa from the United States of

17  America to come to the United States.

18         THE COURT:  Let me see the passport.

19         Ma'am, were you referring to the page in your passport

20  indicating "Visa, United States of America"?  Is that what you

21  were referring to?

22         THE WITNESS:  Yes.

23         THE COURT:  One moment.  I'm going to direct counsel

24  for respondent to have a photocopy made of the entirety of the

25  passport and to bring it to court along with the original, and

1    provide it to Mr. Arenstein.  Monday will be fine.  Monday will

2    be soon enough for that.  All right?

3         MS. LEIDHOLDT:  I will, your Honor.  Would your Honor

4    also like me to bring a copy of the boarding pass?

5         THE COURT:  I didn't ask for any boarding pass.  I

6    just asked for the visa.

7         MS. LEIDHOLDT:  OK.

8         THE COURT:  For, rather, the passport.  I'm not an

9    investigating magistrate here.  I'm simply concerned with a

10   record in which a lawyer has asked a witness in a proceeding

11   before me about a passport.  Anyone reviewing this record would

12   not know what our discussion was about, because the document as

13   to which the question was asked is not in the record.  That's

14   why I have asked for it.

15   BY MR. ARENSTEIN:

16   Q.  Ms. Chew, can you tell us when you first came to the United

17   States.

18   A.  May 20th.

19   Q.  May what?

20   A.  May 20, 2011.  2012, sorry.

21   Q.  May 10, 2012?

22   A.  May 10, yes, 2012.

23   Q.  I'm sorry.  I didn't hear the answer.

24   A.  May 20th.

25   Q.  20th.

1  Q.  And when did you attempt or when did you leave to go back

2  to Kuala Lumpur?

3  A.  The date of November 2012.

4  Q.  When did you come back here again?

5  A.  November 28th, 2012.

6  Q.  What airlines did you take to come back and forth?

7  A.  Pardon?

8  Q.  What airlines did you travel on to come back and forth?

9  A.  To come back, American Airlines.

10 Q.  Let me rephrase the question.

11       On May 20th, 2012, what airline did you take to come

12 to the United States?

13 A.  May 20th, May 20th, 2012?

14 Q.  Yes.

15 A.  China Airline.

16 Q.  China Air, you took that from where to where?

17 A.  Malaysia to Taiwan to Los Angeles to New York.

18 Q.  On November 15th when you went back to Malaysia, what

19 airlines did you take?

20 A.  Eva Airline.

21 Q.  And on November the 28th, 2012, what airline did you take

22 to come back to the United States?

23       MS. LEIDHOLDT:  Objection, your Honor.

24       THE COURT:  Overruled.

25 A.  It was American Airlines -- it was American Airlines

1   managed by Japan Airlines.

2   Q.  Thank you.

3       Ma'am, I'd like to have a copy, if you can produce it

4   the next time we're in court, of your previous passport that

5   you had when you exchanged it for this one.  Could you do that

6   the next time we come back to court?

7   A.  I'll try my best because it is back in Malaysia.

8   Q.  Can you have somebody send you --

9       MS. LEIDHOLDT:  I object to this and to the relevance

10  of the witness producing a passport.

11      THE COURT:  I am not familiar with the rule of

12  practice or procedure which includes an attorney inquiring of a

13  non-party witness and making document requests to a non-party

14  witness called by an adversary on the adversary's direct case.

15  This is a new concept to me.

16      MR. ARENSTEIN:  Your Honor, the reason I am asking for

17  the passport --

18      THE COURT:  I understand why you want it.

19      The practice or procedure of an attorney in my

20  courtroom making a document request of a non-party witness

21  called during a trial by an adverse party is not familiar to

22  me.  Do you have some support for this in the Federal Rules of

23  Civil Procedure or any case law that supports such an approach

24  to things?

25      MR. ARENSTEIN:  I do not have at this moment any

1   documentation to do that.  I suppose I could serve on counsel a

2   request for a document.  I don't know about it at this late

3   date.

4           THE COURT:  Even if you did, it is not necessarily in

5   the respondent's possession or control.  It it may be in the

6   possession or control, one would assume, of this non-party

7   witness.  So the document request -- let me make inquiry.

8           Is this witness' former passport in the possession or

9   control of the respondent?

10          MS. LEIDHOLDT:  No, it is not, your Honor.

11          THE COURT:  That is the end of that.  You did note the

12  stamp in the passport which indicated that the prior passport

13  was presented in 2007 is what I read and canceled.  Did you

14  read that?

15          MR. ARENSTEIN:  I didn't see that specifically.

16          THE COURT:  Take a look.  Maybe I read it wrong, but

17  that's what I read.  Mr. Arenstein, why don't you hand up the

18  passport.  Maybe I can expedite this for you.  I don't claim

19  any expertise in reading Malaysian passports.

20          MR. ARENSTEIN:  Neither do I, your Honor.

21          THE COURT:  It says bearer has previously traveled on

22  passport number, and then the passport number appears.  It says

23  issued at Kuala Lumpur on February 3rd, 2007, which has been

24  canceled and returned.  It does not say that it was canceled on

25  February or maybe it probably more likely it is March 2nd,

1    2007, but it was issued on March 7, 2007 and it has been

2    canceled and returned.

3              (Off-the-record discussion)

4              MR. ARENSTEIN:  Your Honor, what I was trying to

5    accomplish --

6              (Off-the-record discussion)

7              MR. ARENSTEIN:  The passport would not have any

8    entries of 2009's visit, that passport.  You say 2007 it was

9    turned in?

10             THE COURT:  No, no.  2007 it was issued.  It does not

11   bear the date that it was canceled.  I thought it did.  It

12   didn't.  It indicates the date it was issued which was 2007.

13             MR. ARENSTEIN:  I understand that.

14             THE COURT:  And it indicates that it was canceled, but

15   it doesn't have the date of that, as best as I can see.

16             MR. ARENSTEIN:  I see.  My purpose of asking for the

17   passport was to show the time that she spent in Singapore.  She

18   testified to one thing, and the passport would show her

19   in-and-out movements into the country.

20             THE COURT:  I bet it would.  My problem is not with

21   your purpose; it is with the procedure for accomplishing your

22   purpose.  Your purpose sounds fine to me.  That is not your

23   problem.

24             MR. ARENSTEIN:  I understand.  Okay.

25   BY MR. ARENSTEIN:

1  Q.  Ms. Chew, what other evidence do you have that

2  Mr. Souratgar boarded a Turkish Airline plane on November 13th,

3  2012?

4  A.  I saw him personally.

5  Q.  Pardon me?

6  A.  I saw him personally at the airport.

7  Q.  Did you see him board the plane?

8  A.  I saw him go inside Gate 7.

9  Q.  Did you see him board the plane, ma'am?

10  A.  I am not allowed to go inside Gate 7.

11  Q.  Did you see him board the plane, yes or no?

12  A.  I am not allowed to --

13          MR. ARENSTEIN:  Would you direct the witness to answer

14  the question?

15          THE COURT:  Do you understand the question?

16          THE WITNESS:  Yes.  He said, "board the plane."  How

17  am I allowed to go inside Gate 7?

18          THE COURT:  The question is did you see him board the

19  plane?

20          THE WITNESS:  No.

21          THE COURT:  Next question.  Thank you.

22  BY MR. ARENSTEIN:

23  Q.  Did you attempt to get a list of passengers that were on

24  that plane?

25  A.  No.

1  Q.  How long were you in Singapore after Shayan was born?

2  A.  Around two weeks.

3  Q.  Wasn't it three days, ma'am?

4          Wasn't it three days, ma'am?

5  A.  I don't recall.

6          THE COURT:  You ask the question once, Mr. Arenstein.

7          MR. ARENSTEIN:  Okay.

8          THE COURT:  Sorry, ma'am, your answer is?

9          THE WITNESS:  I don't recall.

10  BY MR. ARENSTEIN:

11  Q.  You don't recall?  You just testified --

12          Were you present during the events on May 31st in

13  Singapore?

14  A.  Pardon?

15  Q.  Were you present during the events you testified to on May

16  31st in Singapore?

17          MS. LEIDHOLDT:  Objection.

18          THE COURT:  Overruled.  What is the basis?

19          MS. LEIDHOLDT:  He is not giving a date.

20          MR. ARENSTEIN:  I did.

21          THE COURT:  What year, sir?

22          MR. ARENSTEIN:  May 31st, 2009.

23          THE COURT:  Restate the question, sir.

24  BY MR. ARENSTEIN:

25  Q.  Were you present during the events on May 31st, 2008 in

1    Singapore that you described in your testimony?

2              THE COURT:  Do you understand the question?

3              THE WITNESS:  No.

4              THE COURT:  Try it again.

5    BY MR. ARENSTEIN:

6    Q.  You testified to events that occurred that you heard on a

7    phone on May 31st, 2008.  Were you present during the events on

8    May 31st, 2008 in Singapore?

9    A.  No.  I was on the phone with him.

10             MR. ARENSTEIN:  Move to strike the rest of the answer.

11             THE COURT:  Overruled.

12   BY MR. ARENSTEIN:

13   Q.  So your knowledge of the alleged incidents are based

14   entirely on what Ms. Lee Jen Fair told you.  Is that correct?

15   A.  Yes.

16             MR. McNALLY:  That's mischaracterized.

17   A.  She was crying.

18             MR. ARENSTEIN:  Objection to the last statement she

19   was crying.

20             THE COURT:  Overruled.

21             MR. ARENSTEIN:  No further questions.

22             THE COURT:  All right.  Any redirect?

23             MS. LEIDHOLDT:  No, your Honor.

24             THE COURT:  You may step down.

25             (Witness excused)

```
 1              THE COURT:  Call your next witness.

 2              MS. LEIDHOLDT:  Thank you, your Honor.

 3              MR. McNALLY:  Your Honor, may I approach to retrieve

 4   the passport?

 5              THE COURT:  Yes, you may.

 6              (Pause)

 7              MS. LEIDHOLDT:  Your Honor, may we just have a brief

 8   break.  I have a throat condition and I am going to need to

 9   refill my bottle of water?

10              THE COURT:  All right.  Go right ahead.

11              (Recess)

12              MS. LEIDHOLDT:  Your Honor, I would like to call my

13   client, Jen Fair Lee, to the witness stand, if I may.

14              THE COURT:  Fine.

15    LEE JEN FAIR,

16        called as a witness by the Respondent,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MS. LEIDHOLDT:

20   Q.  Ms. Lee, good afternoon.

21   A.  Good afternoon.

22   Q.  Now, Lee is your last name.  Is that right?

23   A.  Family name.

24   Q.  Yes?

25   A.  Yes.
```

1  Q.  And Jen Fair, that's your first name and middle name.  Is

2  that right?

3  A.  Yes.

4  Q.  So even though "Fair" appears last in the court papers,

5  your actual family name is Lee.  Is that right?

6  A.  Correct.

7  Q.  Thank you.

8          Ms. Lee, where were you born?

9  A.  Malaysia.

10  Q.  What citizenship do you hold?

11  A.  Malaysian.

12  Q.  What is your ethnicity?

13  A.  I'm Chinese.

14  Q.  Just very, very briefly, could you describe just a little

15  about your family background.

16  A.  I have an elder sister and two younger brothers, a father

17  and a mother.  Me and my sisters stay in Singapore and the rest

18  of my family in Kuala Lumpur.

19  Q.  How old are you now?

20  A.  Now?

21  Q.  Yes.

22  A.  37.

23  Q.  What is your religious background?

24  A.  I am Christian, but converted to Muslim.

25  Q.  Briefly, briefly your educational background?

1   A.  After I graduated from high school at 16, I did a two year

2   pre-university course, which after I joined Singapore Airlines

3   after that.  Then when I quit from Singapore Airlines, I did a

4   degree at the University of Bradford in Singapore and graduated

5   with a business management degree.

6   Q.  Again very, very briefly, just your professional

7   background?

8   A.  After I graduated, I worked with an ophthalmologist for a

9   few years as a personal assistant and I then joined a cosmetic

10   company in which I was a retail manager.  Then I joined Diageo,

11   D I A G E 0, which distributes alcoholic beverages to duty free

12   airports.

13   Q.  What did you do at Diageo?

14   A.  I was the retail manager there as well.  Then after that, I

15   joined a jewelry company as a brand manager.

16   Q.  What was the name of that company?

17   A.  Coulisse, C 0 U L I S S E.

18   Q.  When did you leave that job?

19   A.  I left when?

20   Q.  Yes.

21   A.  June 20, '08.

22   Q.  What is your relationship to Mr. Souratgar?

23   A.  He is my husband.

24   Q.  What is your relationship to Shayan?

25   A.  He is my son.

1    Q.  Again very, very briefly, how did you meet Mr. Souratgar?

2    A.  We met back in 1995 at a disco.

3    Q.  How long did you date him?

4    A.  Probably about a year.

5            THE COURT:  That was in 1995?

6            THE WITNESS:  No.  That was in 2006.

7            THE COURT:  Thank you.  I am sorry, yes.

8    BY MS. LEIDHOLDT:

9    Q.  When did you start dating Mr. Souratgar?

10   A.  In 2006.

11   Q.  Could you briefly describe, very briefly your courtship

12   with Mr. Souratgar.  How was it when you began to date him?

13   A.  He was a very nice person.  He was like a perfect

14   gentleman.  He would open car doors, buy me flowers, take me

15   out for dinner.  Overall, he was nice.

16   Q.  Were there any problems during the courtship?

17   A.  As a couple, we had some disagreements which usually -- we

18   would challenge each other on some subject matters about -- he

19   likes to win, so sometimes I would just give in to whatever he

20   says.

21   Q.  Did the subject of religion come up in your courtship?

22   A.  Religion?

23   Q.  Did the subject of religion come up in your courtship?

24   A.  Yes.  He knew that I was Christian when we were dating, and

25   then he told me that if we were to get married, I have to

1   convert to Muslim because it is a requirement by the Muslim

2   law.

3   Q.  Did you ultimately agree to convert to Islam?

4   A.  Yes, I did.

5   Q.  How did you, just very briefly, how did you feel about

6   doing that?

7   A.  I was reluctant.  However, Majid told me you're just to

8   convert to a paper Muslim.  He said I don't have to practice or

9   believe in it, it is just for the sake of the marriage

10  documentation.

11  Q.  I'd like to direct your attention to the time that you got

12  married.  Did you and Mr. Souratgar have a wedding reception?

13  A.  Yes, we did.

14  Q.  Where was that held?

15  A.  In Kuala Lumpur.

16  Q.  When?

17  A.  July 20, '07.

18  Q.  How was the wedding reception briefly?

19  A.  Everyone was happy.  I was happy.  He was happy.  We had a

20  lot of fun during the wedding reception.

21  Q.  Now, around this time in 2007 or at any time during your

22  relationship, did you tell Mr. Souratgar that you wanted to

23  commit suicide?

24  A.  No, never.

25  Q.  Did you make an attempt to commit suicide?

1    A.  No.

2    Q.  Did you ever jump into a river in order to commit suicide,

3    or a body of water?

4    A.  No.

5    Q.  Have you ever been in psychiatric treatment?

6    A.  No.

7    Q.  Did Mr. Souratgar ever ask you to see a psychiatrist?

8    A.  He said, he always said I'm crazy.

9    Q.  Did he ever say, "I'd like you to meet with a

10   psychiatrist"?

11   A.  Yes, he did.

12   Q.  Did he ever give you the name of a psychiatrist or take you

13   to a psychiatrist?

14   A.  No.

15   Q.  Now, do you have any idea how Mr. Souratgar might have

16   reached the conclusion or gotten the idea that you were

17   suicidal?

18        MR. ARENSTEIN:  Objection to the form of the question.

19        THE COURT:  Overruled.

20   A.  He had told me that his first wife committed suicide and he

21   said he was there when the body came back from Australia.  So I

22   think that is where he got the idea from.

23   Q.  What, if anything, did Mr. Souratgar say -- if you know,

24   how many times has Mr. Souratgar been married?

25   A.  Twice.

1    Q.  In addition to marrying you?

2    A.  I'm the third wife.

3    Q.  Did Mr. Souratgar say anything to you along these lines

4    about his second wife?

5    A.  He mentioned to me that his second wife, she's a young

6    girl, probably in the early 20's and she is Iranian, and he

7    told me that she's a psychologist and that she beats herself.

8    She is crazy.  She self-abused.  She would bang her head on the

9    wall.  She was subject to abuse himself, and he also told me

10   she beat him and hit him --

11          MR. ARENSTEIN:  Objection to what she told him.  I

12   move to strike.

13          THE COURT:  Overruled.  It was for the fact that it

14   was said.

15   BY MS. LEIDHOLDT:

16   Q.  When did Mr. Souratgar make these representations to you

17   about his first wife and his second wife?

18   A.  This was after the wedding ceremony.

19   Q.  What was your reaction to this information?

20   A.  I felt sorry for him.

21   Q.  Have you ever been married before?

22   A.  No.

23   Q.  Did you have any serious relationships before being

24   involved with Mr. Souratgar?

25   A.  Yes.

1    Q.  How many?

2    A.  Two.

3    Q.  Were there any problems in those relationships?

4             THE COURT:  Sustained.

5             MR. ARENSTEIN:  Thank you.

6    BY MS. LEIDHOLDT:

7    Q.  When did you and Mr. Souratgar actually began to live

8    together?

9    A.  Sometime in September 2007.

10   Q.  It is your testimony there was a wedding reception in July

11   of 2007.  Is that correct?

12            Had you registered your marriage in Singapore?

13   A.  No.

14   Q.  At that time?

15   A.  Not yet.  There was the wedding ceremony.  We only

16   registered the marriage on the 16th January 2008.

17   Q.  Thank you.

18            But you began to live together before you registered

19   your marriage.  Is that correct?

20   A.  I wouldn't say live together.  At the time I had my own

21   apartment and he has his own apartment, so I was shuffling

22   in-between and most of the time he was traveling.

23   Q.  Did you travel with Mr. Souratgar to Iran after the wedding

24   reception that you described?

25   A.  Yes, once.

1   Q.  How many times?

2   A.  Once in 2007 and another time in 2006.

3   Q.  Would you just briefly describe that experience.

4   A.  Well, the country is a beautiful country, the scenery.

5   However, I was shocked what a woman is required to wear, fully

6   cover up her body and wear a scarf and not show any hair at

7   all.

8          MR. ARENSTEIN:  Objection to the question and the

9   answer.

10          THE COURT:  It is too late for an objection to the

11   question.

12          MR. ARENSTEIN:  Move to strike the answer.

13          THE COURT:  You're moving to strike the answer, and

14   that is granted.

15          MS. LEIDHOLDT:  Your Honor --

16          THE COURT:  Yes.

17          MS. LEIDHOLDT:  -- is the objection based on

18   relevance?

19          THE COURT:  Yes.  I don't know whether the objection

20   is based on it.  I granted the motion to strike on the grounds

21   that it is not relevant.

22          MS. LEIDHOLDT:  Your Honor, I believe that this goes

23   to the credibility of the parties.  There has been an

24   allegation that Ms. Lee has surreptitiously obtained an Iranian

25   passport, an Iranian citizenship, and I wanted to ask one

1    brief --

2            THE COURT:  How is that relevant?

3            How is it relevant if she obtained an Iranian

4    passport, an Iranian citizenship?  How is the petitioner's

5    argument that you're trying to respond to relevant?  Is it

6    relevant?

7            MS. LEIDHOLDT:  I think it goes to credibility.

8            THE COURT:  No, no.  Is the petitioner's argument

9    relevant?

10           MS. LEIDHOLDT:  That Ms. Lee has obtained an

11   Iranian --

12           THE COURT:  Is that relevant?

13           MS. LEIDHOLDT:  I believe it is highly relevant.

14           THE COURT:  So the petitioner was right to offer

15   evidence on that?  What did that go to on the petitioner's

16   case?  I am a little bit at sea.

17           I am trying to figure out what you're responding to,

18   and I am not sustaining an objection to whether you can ask

19   your client if she has an Iranian passport.  I have no

20   objection to your asking that, but her recitation of her views

21   on the cultural practices in Iran are not relevant to this

22   proceeding.

23           MS. LEIDHOLDT:  I'll continue, your Honor.

24   BY MS. LEIDHOLDT:

25   Q.  Ms. Lee --

```
 1              THE COURT:  You can answer my question, though.  Why
 2     was that relevant that she did have an Iranian passport?  Why
 3     was the petitioner's assertion relevant?  Because I thought it
 4     was not relevant, but you're urging it is highly relevant and
 5     that --
 6              MS. LEIDHOLDT:  Because, your Honor, it is our
 7     contention that petitioner, in fact, rather than our client
 8     having surreptitiously obtained Iranian citizenship, an Iranian
 9     passport, the petitioner, without her knowledge, obtained
10     Iranian citizenship -- excuse me -- an Iranian passport for her
11     that put her and actually --
12              THE COURT:  In danger of losing her Malaysian
13     citizenship?
14              MS. LEIDHOLDT:  Not only her, but the subject child
15     Shayan because she did the same thing for the child, and
16     Malaysia strictly prohibits their citizens having dual
17     citizenship, which would result in neither Ms. Lee or Shayan of
18     having Malaysian citizenship, which would have meant Malaysian
19     citizenship, both Ms. Lee and Shayan have had permanent
20     resident status in Singapore contingent on their Malaysian
21     citizenship.  If the relationship is rescinded -- and we will
22     be able to prove it was in the process of being rescinded -- it
23     would render both Ms. Lee and the subject child Shayan
24     essentially stateless, with citizenship of one country and one
25     country alone, that country being Iran.
```

 1              THE COURT:  How would that be stateless?

 2              MS. LEIDHOLDT:  Your Honor, that's a very good point.

 3    They would have no option of going to any country but to the

 4    country of Iran.

 5              THE COURT:  Your position is that Shayan will not be

 6    allowed into Singapore; is that your position?

 7              MS. LEIDHOLDT:  If Shayan Malaysian citizenship is

 8    rescinded.

 9              THE COURT:  Well, have you established that Shayan has

10    Malaysian citizenship?

11              MS. LEIDHOLDT:  Yes.

12              THE COURT:  How did you establish that?

13              MS. LEIDHOLDT:  I haven't yet gotten to Shayan's

14    birth, and I will be able to establish it through the testimony

15    of my client.

16              THE COURT:  We haven't gotten there.  Feel free to ask

17    about citizenship, although I have to say I don't understand

18    you're arguing that Shayan is not allowed to go to Singapore?

19              MS. LEIDHOLDT:  Not currently, your Honor.

20              THE COURT:  Not currently allowed to go to Singapore?

21              MS. LEIDHOLDT:  No, I am not saying he is currently

22    not allowed to go to Singapore.  Since Shayan holds dual

23    citizenship at this moment, your Honor, dual Malaysian-Iranian

24    citizenship and the country of Malaysia has a strict

25    prohibition against any of its citizens holding dual

1  citizenship.

2        The remedy is to rescind the citizenship of the person

3  who holds the dual citizenship.  That is the remedy in

4  Malaysia.  So certainly Ms. Lee's Malaysian citizenship is

5  greatly at risk, as is Shayan's.

6        The basis of Shayan's and Ms. Lee's permanent

7  residency is Singapore is the Malaysian citizenship.  They're

8  citizens of Malaysia, and I will establish that and I actually

9  do not think that will be a point of issue.  They're citizens

10 of Malaysia, and their resident status in Singapore is

11 contingent upon being citizens of Malaysia.

12       THE COURT:  So your position is if Shayan is only a

13 citizen of Iran, he may not remain in Singapore?

14       MS. LEIDHOLDT:  That is correct, your Honor.

15       THE COURT:  Who is going to testify to that

16 proposition?

17       MS. LEIDHOLDT:  I believe we have documentation that

18 will satisfy your Honor's desire for proof of that proposition.

19       THE COURT:  Why don't you confine yourself to the

20 issue of citizenship.  If you want to ask about the citizenship

21 of this individual, I am going to allow you to do it because it

22 may have bearing on Shayan's.

23       MS. LEIDHOLDT:  Thank you.

24       THE COURT:  But you're proffering to this Court that

25 if Shayan is a citizen only of Iran and not also Malaysia, that

1   he will not be eligible to enter or remain in Singapore.

2   That is the proposition I understood you advance.  Is

3   that correct?

4   MS. LEIDHOLDT:  Your Honor, that is not it precisely.

5   He will lose his residency status in Singapore.  He will lose

6   his residency status in Singapore.

7   THE COURT:  And, therefore, not be eligible to remain?

8   MS. LEIDHOLDT:  That is very likely the case, yes.

9   THE COURT:  That is what you're offering to the court?

10   MS. LEIDHOLDT:  I am.

11   THE COURT:  He would not be eligible for residency in

12   Singapore as an Iranian citizen, is that what you're proffering

13   to this Court?

14   MS. LEIDHOLDT:  That is the case, your Honor, I

15   believe, yes, that is what I am proffering to this Court.

16   THE COURT:  You are going to come forward with support

17   for that proposition?

18   MS. LEIDHOLDT:  Yes, your Honor.

19   THE COURT:  Okay.  Go ahead.

20   BY MS. LEIDHOLDT:

21   Q.  Ms. Lee, after your marriage ceremony in Malaysia and

22   before you registered your marriage in Singapore on January

23   16th of 2009, am I -- no, 2008, correct, January 16th, 2008.

24   Apologies.

25   A.  Yes.

1   Q.  When your marriage became official, would you briefly,

2   briefly describe your relationship with Mr. Souratgar.

3   A.  We had our disagreements.  We did argue about things.

4   Q.  Yes.

5   A.  And --

6   Q.  Could you just briefly describe the nature of that conflict

7   that was happening at that time.

8              THE COURT:  How is this relevant?

9              MS. LEIDHOLDT:  Well, your Honor, opposing counsel has

10  introduced documents into evidence that make it clear that

11  there was conflict and has introduced into evidence documents

12  that were prepared by Ms. Lee.

13             I would like to give her an opportunity to describe

14  what was going on in the relationship that your Honor, I would

15  contend, is very much connected to Mr. Souratgar's abuse of Ms.

16  Lee.

17             THE COURT:  You mean the reasons for the abuse, is

18  that what --

19             MS. LEIDHOLDT:  No.  To describe the abuse, the

20  psychological abuse.

21             THE COURT:  Of whom?

22             MS. LEIDHOLDT:  The psychological abuse of Ms. Lee by

23  Mr. Souratgar and how that is reflected in documents that have

24  been submitted into evidence.

25             THE COURT:  Does this predate the birth of Shayan?

1        MS. LEIDHOLDT:  Yes, but very, very -- there was a

2   good bit of testimony on the part of Mr. Souratgar about what

3   he stated was erratic, very extreme, violent behavior by

4   Ms. Lee at this time.

5        THE COURT:  Is that relevant to this proceeding, that

6   testimony by Mr. Souratgar?

7        MS. LEIDHOLDT:  Your Honor, I think it is relevant.

8        THE COURT:  Why?

9        MS. LEIDHOLDT:  Because I think it is very much

10  connected to Mr. Souratgar's psychological abuse of Ms. Lee,

11  that was soon to be followed by physical abuse of Ms. Lee.

12       THE COURT:  So that is relevant, probative evidence in

13  this proceeding relating to Article XIII and Article XX?

14       MS. LEIDHOLDT:  Yes.

15       THE COURT:  That is your position?

16       MS. LEIDHOLDT:  My position is it is going to be hard

17  to assess the credibility of Ms. Lee or of Mr. Souratgar, for

18  that matter, unless there is some -- as to whether there was

19  domestic violence in the presence of the child that was

20  injurious to the child and it continued throughout the pendency

21  of the relationship without this evidence because this is when

22  the abuse began to surface in the relationship.

23       THE COURT:  Look, domestic violence, including

24  domestic violence of the child is probative evidence, but it

25  doesn't satisfy the Article XIII, correct?

 1              MS. LEIDHOLDT:  Your Honor, I absolutely understand

 2    that while --

 3              THE COURT:  Do you agree?

 4              MS. LEIDHOLDT:  It depends on how one understands the

 5    domestic violence and the impact of the domestic violence on

 6    the child, the subject child in this particular case.

 7              Your Honor, our expert will testify that the domestic

 8    violence typically -- and specifically in this case -- is a

 9    multifaceted pattern, a course of conduct, the goal of which is

10    one party, the perpetrator, obtaining power and control over

11    the victims, and that certainly can and often can include

12    children.  It takes a number of different forms and it often

13    affects children in grievously injurious ways.

14              THE COURT:  Let me take a hypothetical situation where

15    you have a petitioner father -- not this case -- petitioner

16    father who's extremely abusive, and the respondent's position

17    is that petitioner father, because of the extreme abuse, should

18    never see the child ever, the child should never speak to or

19    ever see the father again.

20              The father petitions for the return of the child to

21    the country where the child habitually lived, and the father

22    was abusive of the mother and abusive of the child.  Does that

23    make out an Article XIII defense to the return of the child?

24              MS. LEIDHOLDT:  Your Honor, I think it depends, and I

25    think those are essentially the facts of Blondin v. Dubois and

1  Elyashiv v. Elyashiv.

2         THE COURT:  I am sure it depends.  Do those facts,

3  without more, state out an Article XIII defense?

4         MS. LEIDHOLDT:  I think it depends on whether that

5  abusive conduct that was directed towards the mother and the

6  child, I think whether it had an impact on the child --

7         THE COURT:  Let's assume it did.

8         MS. LEIDHOLDT:  -- whether it was harmful to the

9  child.

10        THE COURT:  Let's assume it was.

11        MS. LEIDHOLDT:  And whether there was a great risk

12 that abusive conduct will continue should the child be

13 returned, repatriated to the country that the child was taken

14 from.

15        THE COURT:  Well, the question is whether there is a

16 grave risk presented by the return of the child.

17        For example, the Republic of Singapore could make

18 arrangements so that the child is kept in a secret location

19 unknown to the hypothetically abusive father, correct?

20        MS. LEIDHOLDT:  Yes, that's correct, your Honor, that

21 could happen.

22        THE COURT:  In that situation, where would be the

23 grave risk of harm to the child?

24        MS. LEIDHOLDT:  Well, your Honor, I believe that the

25 court must evaluate -- and this is the Blondin standard --

1    engage in an aggregate evaluation of the people and

2    circumstances awaiting the child in the country of habitual

3    residence.

4         So I know that in Blondin V Dubois, Judge Chen looked

5    at France and whether France would be able to protect that

6    child from a grave risk of harm.

7         I know in Elyashiv v. Elyashiv, the court looked at

8    Israel and evaluated whether Israel had the capacity and would,

9    in fact, protect the child from a grave risk of harm.

10        Yes, that --

11        THE COURT:  That does appear -- that sounds right,

12   that sounds right to me, but that is a different focus than the

13   focus that you have proceeded with in this proceeding.

14        MS. LEIDHOLDT:  Your Honor, in both of those cases, in

15   Elyashiv v. Elyashiv was our case, a case we litigated.  The

16   court looked at the pattern of psychological, physical and

17   other forms of abuse of the mother and the child, and there was

18   the two, as your Honor knows only too well, are often very

19   deeply interconnected.

20        THE COURT:  And you will be able to say that when this

21   case is concluded no matter who wins or losses because I have

22   sat through four days of this, and you will be able to say

23   Judge Castel sat through the testimony on the dating period and

24   when they met in 1995, and he sifted through all of this, and

25   that will be true.

1          MS. LEIDHOLDT:  Yes.

2          THE COURT:  That will be true.  It doesn't mean that

3    that particularly, is particularly germane to the Article XIII

4    defense, which I think you did a good job of summarizing what

5    the focus is, which is looking at the facts and circumstances,

6    the real facts and circumstances on the ground in the country

7    where the child is to be returned to.

8          MS. LEIDHOLDT:  Yes.

9          THE COURT:  Not, not exclusively determined, though

10   there could be some relevance to, you know, to past history.

11   Past history can be very, very relevant.  That is what we deal

12   with.  We don't deal with fortune telling at trials, I realize

13   that, but you have gone very far afield in this proceeding, in

14   my judgment, in getting into events that -- and I think both

15   sides are guilty of this -- that substantially predate the

16   birth of this child and in circumstances that are not likely to

17   arise again with the two individuals not cohabiting.

18          Is there any set of facts in which you envision the

19   petitioner and the respondent ever cohabiting again?

20          MS. LEIDHOLDT:  Your Honor, I would respectfully

21   submit that when these parties stopped cohabiting, in fact, the

22   abuse continued.  It took new forms and in many ways became

23   even more dangerous to my client and the child.

24          THE COURT:  That sounds to me like highly probative

25   evidence.  That is evidence, evidence of that sort is what you

1      should be developing in this hearing.

2              MS. LEIDHOLDT:  Yes.

3              THE COURT:  But answer my question.  Do you envision

4      any set of facts under which these two individuals, the

5      petitioner and respondent, would ever be could cohabiting

6      again?

7              MS. LEIDHOLDT:  I can't address that, your Honor.

8              If Mr. Souratgar succeeds, and I don't think this is

9      ludicrous, this may seem not like a stretch in credulity,

10     strained credulity, but if Mr. Souratgar, and they go back, and

11     Mr. Souratgar succeeds, and he has taken the steps to do this,

12     if he succeeds in having Ms. Lee's Malaysian citizenship

13     rescinded, which is gravely at risk now, and she has no option

14     but to return -- to go to Iran, which will be the only country

15     available to her, could that happen under those circumstances?

16             Perhaps.  I can't say there are no circumstances under

17     which these parties would no longer could cohabitate.  I know

18     my client does not want to cohabitate with Mr. Souratgar.

19             I believe it puts her at grave risk, as it puts the

20     subject child at grave risk because the child would continue to

21     be exposed of the victimization of the mother.  Given the facts

22     of this case, I cannot say there are no circumstances under

23     which my client could end up cohabiting with Mr. Souratgar.

24             THE COURT:  Interesting, but that would be a voluntary

25     decision on her part?

1          MS. LEIDHOLDT:  No.  She would have no option because

2    if she loses her Malaysia citizenship, she can't stay in --

3    actually she can't stay in Singapore.  She has no place to go

4    but Iran.

5          In fact, the evidence will show, your Honor, that this

6    is a scheme that Mr. Souratgar concocted.  He told my client

7    about it.  He told other individuals about it and he had, in

8    fact, implemented and we can document that.

9          THE COURT:  Is there some rule of law in any of the

10   countries discussed in this proceeding -- Singapore, Malaysia,

11   or Iraq -- that would require a person to cohabitate with an

12   estranged spouse?

13         MS. LEIDHOLDT:  Your Honor, we can look at --

14   actually, there is another case I can provide your Honor.  Your

15   Honor, there are not a lot of Article XX cases under the Hague

16   Convention because most of the signatories, most of the

17   countries that have ratified the Hague Convention protect human

18   rights and fundamental fairness.  The UCCJEA, Uniform Child

19   Custody, uniform child custody enforcement act has almost

20   identical provision to the Hague Convention, the Article XX

21   provision of the Hague Convention, and there have been cases.

22         I myself have appeared in cases under the UCCJEA where

23   the other jurisdiction was the Ivory Coast or Mali, and there

24   is a decision about Iran, a UCCJEA case, and where the court,

25   and we may have that decision in court, that held that Iran

1    does not protect fundamental human rights.

2            I think that Ms. Lee -- and we can look at country

3    reports by the State Department or by Human Rights Watch -- I

4    do not believe that Ms. Lee would be protected from Mr.

5    Souratgar's domestic violence should she be forced to return to

6    Iran.  I think it is pretty clear that she would be stripped of

7    many of her rights, that her human rights would not be

8    protected.

9            THE COURT:  So your answer is what?

10           MS. LEIDHOLDT:  Is that she could be forced to

11   cohabitate.

12           THE COURT:  By an Iranian court?

13           MS. LEIDHOLDT:  Probably not by an Iranian court, but

14   I think she might not -- it might be the only way that she

15   could physically survive if she is forced to live in Iran.

16           THE COURT:  I see.  I see.  Is there any reason to

17   believe -- I mean, as I understand it, before your client got

18   on a plane to come to New York, the courts, civil courts in

19   Singapore had given her physical custody, correct?

20           MS. LEIDHOLDT:  That's correct.

21           THE COURT:  Okay.  Is there any reason to believe that

22   the courts of Singapore would not be open to giving her

23   physical custody?

24           MS. LEIDHOLDT:  I don't think she would be able to.

25   She received a letter from Malaysia.  The problem, your Honor,

 1  is she could get physical custody perhaps and not have resident

 2  status in Iran and be -- withdrawn -- resident status in

 3  Singapore and be unable to stay there.

 4          THE COURT:  I see.

 5          MS. LEIDHOLDT:  How would she be able to stay in

 6  Singapore if she didn't have resident status?

 7          THE COURT:  I am not familiar with the law of

 8  Singapore, but I've had testimony in this proceeding.

 9          MS. LEIDHOLDT:  Yes.

10          THE COURT:  Excuse me a second.  I have had testimony

11  in this proceeding of an individual who does not have Malaysian

12  citizenship, who does not have Singapore citizenship.  This

13  individual happens to have only Iranian citizenship, and this

14  individual seems to have resident status in Singapore.  So at

15  least from the evidence before this Court, Singapore seems to

16  allow some Iranian citizens to have residence in Singapore.

17          MS. LEIDHOLDT:  Yes.

18          THE COURT:  Now, if you have some evidence that you're

19  going to present to me that that only applies to certain types

20  of individuals, of which your client is not one --

21          MS. LEIDHOLDT:  Yes.

22          THE COURT:  -- that might be something that goes in

23  that direction, but you have made what sounds to me to be a bit

24  of a leap in assuming that having Iranian citizenship means you

25  don't get resident status in Singapore.

1           MS. LEIDHOLDT:  Your Honor, Mr. Souratgar has an

2     employment pass in Iran, and it is based on not only his, the

3     fact he is working in Iran and making a certain level of --

4     working in Singapore, I am sorry -- and making a certain amount

5     of income in Singapore, that is what authorizes him to the

6     employment pass.  That is what Iranian citizens are able to

7     obtain in Singapore.

8           I understand, your Honor, it is not so easy for

9     Mr. Souratgar to renew his employment pass.  Ms. Lee could not

10    obtain an employment pass.  She would have to show that she had

11    been working there for a certain period of time and that she

12    was making income above a certain level.

13          THE COURT:  How do you show you've been working in

14    Singapore for a certain period of time if you're standing

15    outside the borders of Singapore seeking to come in?

16          MS. LEIDHOLDT:  Yes, how Mr. Souratgar first obtained

17    his employment pass?  He has been in Singapore, whether

18    Singapore's rules in this respect have changed since he first

19    obtained his employment pass quite a number of years ago, I

20    couldn't speak to that, your Honor, but I understand currently

21    that Iranian citizens are permitted employment passes in

22    Singapore, and it is not easy to obtain and they're contingent

23    upon having worked for a certain period of time and having a

24    certain level of income.

25          MR. ARENSTEIN:  I need to go to the bathroom, with all

1    respect.

2              THE COURT:  We'll take five minutes.

3              (Recess)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  You may continue.

2            MS. LEIDHOLDT:  Thank you.

3      BY MS. LEIDHOLDT:

4      Q.  Ms. Lee, I'd like to direct your attention to the period of

5      time in Singapore after your wedding reception on January 16th

6      of 2008.  Could you please explain what, if anything, caused

7      you concern about your interaction with Mr. Souratgar or Mr.

8      Souratgar's treatment of you.

9            MR. ARENSTEIN:  Objection to the form of the question,

10     your Honor.  It's an ambiguous question.  I couldn't answer it

11     myself if I wanted to.

12           MS. LEIDHOLDT:  I'll rephrase, your Honor.

13           THE COURT:  If you're going to rephrase it, go ahead.

14     Q.  What, if anything, caused you concern after the wedding

15     reception on January 16, 2008, involving Mr. Souratgar's

16     treatment of you?

17           MR. ARENSTEIN:  Objection.

18           THE COURT:  Overruled.

19     A.  He became more controlling.  He would make me ask him

20     permission to go out.  He wants me to cook breakfast for him

21     every day, lunch, dinner.  Then he wants me to upkeep the

22     house.  And he say that a woman place is at home and that I

23     should quit my job.

24           THE COURT:  What was your job?

25           THE WITNESS:  At that time I was a brand manager.

1          THE COURT:  A brand manager?

2          THE WITNESS:  Yes.

3          THE COURT:  For whom?

4          THE WITNESS:  A jewelry company, Coulisse.

5          THE COURT:  What's the name of the company?

6          THE WITNESS:  Coulisse.

7          THE COURT:  Spell it, please.

8          THE WITNESS:  C-O-U-L-I-S-S-E.

9          THE COURT:  How long had you been there?

10         THE WITNESS:  Probably around eight months.

11         THE COURT:  Where were they located?

12         THE WITNESS:  In Singapore.

13         THE COURT:  Please continue with your answer.

14  Q.  Ms. Lee, you heard Mr. Souratgar testify at some length

15  about your three dogs.

16  A.  Yes.

17  Q.  Was that an issue of contention?

18  A.  He didn't like my dogs at all.  When we move in together,

19  he insisted that the dogs stay in the garden and not enter the

20  house. so the dog were kept outside.  He never like the dog at

21  all.

22  Q.  How did he treat them?

23         MR. ARENSTEIN:  Objection to how he treated the dogs,

24  your Honor.

25         THE COURT:  I think we are so far afield.  I really

 1    feel like I have uttered words into the wind over the last four

 2    days.  Abuse of the dogs, beating and whipping the dogs may be

 3    a horrible thing, it may turn my stomach, if that's what you

 4    are going to get into, although there is a not a scintilla of

 5    evidence of that, but I don't see where that is relevant.

 6            But go ahead.  Go ahead.  It would be easier for me to

 7    have you ask the question than to continue and rule and have my

 8    rulings ignored by you and by Mr. Arenstein.

 9            Go ahead, answer the question.

10    Q.  How did he treat the dogs?

11    A.  He didn't like the dogs.  When they bark, he would roll up

12    a piece of newspaper and beat them till they --

13            MR. ARENSTEIN:  Objection.

14    A.  -- cry.  Then, when they see him, they usually run to a

15    corner of the garden and hide there.

16            MS. LEIDHOLDT:  Your Honor, the next question simply

17    goes to credibility.

18    Q.  Mr. Souratgar claimed on the stand that you demanded that

19    he purchase a condominium for the dogs.  Was that true.

20    A.  No.

21            MR. ARENSTEIN:  Objection.

22            THE COURT:  Overruled.  You brought it out, sir.  Mr.

23    Arenstein, I don't understand your objection.

24            MR. ARENSTEIN:  I don't see the relevance at this

25    point.

1    THE COURT:  You elicited the testimony.  Did I miss

2    something?  Mr. Arenstein, hello?

3    MR. ARENSTEIN:  You did not, your Honor.  I brought it

4    out.  I guess that gives her a license to spend the whole day

5    asking two, three, four, five, six hours worth of questions on

6    the topic.

7    THE COURT:  I doubt that very much.  I think you

8    elicited the million-dollar condo, second million-and-a-half-

9    dollar condo for the dogs.  She just asked whether the story

10   was true, and you raise an objection as relevance.  What are we

11   dealing with here, Mr. Arenstein?  I don't get it.  You elicit

12   the testimony, and then you object when Ms. Leidholdt asks the

13   question was that true.  Explain yourself.

14   MR. ARENSTEIN:  The dog situation was only like one

15   question on the situation with him.  Maybe I should not have

16   asked the question.  Maybe I made a miscalculation.  But what's

17   happened here is I've heard maybe an hour and a half to two

18   hours of oratory from Ms. Leidholdt.  I didn't respond one

19   iota.

20   But I do object to everything she has said because

21   most of it is not true, and I know it is not true.  I have seen

22   no proof of anything she said with regard to what she said

23   about Singapore, the permanent residency, and all these other

24   things.  We have a lot of oratory of different things of

25   domestic violence.

1            This trial has been a domestic violence trial

2     basically because Ms. Leidholdt is the head of a battered

3     children's center and domestic violence center.  What we have

4     heard here is domestic violence, and that's what's done in most

5     of the cases she has talked about.  She has brought in domestic

6     violence, and most of them have been denied by the judges who

7     have heard them, and they don't go into domestic violence

8     unless it shocks the conscience and there is a grave risk of

9     danger.  That's not the case in this case.  But what we are

10    hearing here all day, all night, is domestic violence, domestic

11    violence.

12           Maybe I made a mistake, and I apologize to the Court

13    for bringing up the dogs.  But we are going into things here

14    that don't go into a Hague case.

15           This is a very simple case, your Honor.  The case is

16    basically habitual residence, rights of custody, wrongful

17    retention, wrongful removal.  Then, if they wanted to bring in

18    article 13(b) or article 20, which there is almost nothing,

19    there is a dearth of cases on article 20 --

20           I suspect, because I just got a letter this morning

21    that I think was sent to the Court and to us from the U.S.

22    Attorney after you issued an order, that they have asked your

23    Honor to wait until December 14th for their response or

24    something like that.  Something came through in an email that I

25    saw.

1           I don't think you're going to find from anybody that

2     there is any article 20 situation in Singapore.  In fact, I

3     think Singapore has more protections than any other country

4     than albeit the United States.

5           This is a case where the kids were taken from

6     Singapore to here, abducted.  Abduction is basically not a

7     right thing.  It's child abuse to abduct a kid.  What we have

8     here is they are trying to do a forum shopping to argue that

9     because of domestic violence, the kid should stay in the United

10    States.  That's not what this case is about.

11          This case is to return the child back to where the

12    child has been living, let the courts there decide properly

13    what should happen.  They have jurisdiction.  They have custody

14    jurisdiction, they have every jurisdiction.  That was the place

15    where the child lived, where the parties lived, where everybody

16    lived.  That's the place with the courts that should be hearing

17    this.

18          Those courts were hearing this until she abducted the

19    child.  Now she has abducted the child here.  Does this give

20    her a right to come into this court and spend days and days and

21    days trying to try a domestic violence case in this court?  I

22    don't think so, your Honor.  That's why I objected.

23          THE COURT:  The question stands.  Go ahead.  Did you

24    get an answer?  Yes, I think you got an answer.  Next question.

25    BY MS. LEIDHOLDT:

1   Q.  Ms. Lee, how, if at all, did Mr. Souratgar treat you after

2   your marriage was registered in relation to your Christian

3   religion?

4           MR. ARENSTEIN:  Objection.

5           THE COURT:  Overruled.

6   A.  He demanded that I stop attending church.  He said that my

7   church is a clan and my pastor is just out to give some moneys

8   to cheat the donations of the public.

9           THE COURT:  Was this after you converted to Islam?

10          THE WITNESS:  Yes.

11          THE COURT:  Thank you.  Next question.

12  Q.  What was his attitude or how did he treat you in relation

13  to your social activities, your friendships, after your

14  marriage was registered?

15          MR. ARENSTEIN:  Objection to the relevance, your

16  Honor.

17          THE COURT:  Overruled.

18  A.  The friends that he knows of mine that he used to like, he

19  suddenly disliked them.  Then he told me to stop going out with

20  them.  For example, Vivian, who is a mutual friend of ours, we

21  used to go out; but after we went out, he didn't want me to mix

22  with her.  He told me that she's crazy and she just seek

23  attention.  Then there is a very good friend of mine,

24  Alexandra.  He didn't want me to mix with her anymore, because

25  he said that she was jealous of our marriage and she and her

1  husband are trying always to spoil it.

2  Q.  Did this affect you in terms of your social relationships?

3          THE COURT:  Ms. Leidholdt, have you listened to

4  anything I've said to you?

5          MS. LEIDHOLDT:  Yes.

6          THE COURT:  And my rulings?

7          MS. LEIDHOLDT:  I have, your Honor.  May I please

8  respond?

9          THE COURT:  You may.

10          MS. LEIDHOLDT:  Your Honor, the research shows and our

11  expert will testify that domestic violence typically involves

12  isolating the victim and the child -- I know we have not yet

13  reached the birth of Shayan, but we will very shortly -- from

14  social networks, from relationships.  It is a tactic of

15  psychological domination, and it is injurious to the victims.

16  I would submit that that is what this testimony demonstrates at

17  this point and that's why --

18          THE COURT:  It is utterly irrelevant.  It is utterly

19  irrelevant.  You may elicit the answer to the question.  Go

20  ahead, elicit the answer to the question.  It's irrelevant.

21  This is so far afield from the birth and raising of this child,

22  and the question here is not who should have custody of this

23  child.

24          MS. LEIDHOLDT:  Your Honor --

25          THE COURT:  You may answer the question, Ms. Lee.  Go

1    ahead.  Do you understand the question?

2              THE WITNESS:  Which question?

3              THE COURT:  Restate your question now if you would

4    like to.

5              MS. LEIDHOLDT:  Your Honor, I will move on.

6    BY MS. LEIDHOLDT:

7    Q.  I'd like to direct your attention, Ms. Lee, to February 7

8    of 2008.  Do you remember that date?

9    A.  Yes.

10   Q.  Why do you remember that date?

11   A.  It was sometime near Chinese New Year.

12   Q.  Would you please describe what, if anything, happened

13   involving Mr. Souratgar on that date in your home in Singapore.

14   A.  At the time I was watching the serial Chinese drama which

15   comes on every night at 9 p.m.  That particular day, after I

16   took a shower, I came down.  Mr. Souratgar was watching news.

17   So I wanted to switch the channel.  He knew that I was

18   following this drama serial.  So I told him, can I change to

19   the Chinese channel?  He say no.  I was shock, because I

20   thought that he knew I was following the show.

21             So I took the control, the remote control, and I

22   switched the channel.  In which he snatched it back and he

23   switched it back to the channel he wanted to watch.  After that

24   I just switch it back.  Then he got angry.  He stood up and

25   then he started slapping me.

 1          MR. ARENSTEIN:  Your Honor, rather than making

 2   objections each time, I'm going to have a continuing objection

 3   to the entire line of testimony.  I will keep my mouth shut

 4   while the testimony goes in, but I have a continuing objection

 5   to this line of questioning.

 6   Q.  When you say he started slapping you, please describe

 7   precisely what Mr. Souratgar did at that time.

 8   A.  He slapped me then.

 9   Q.  Where did he slap you?

10   A.  On both my cheeks.

11   Q.  How much force did he use when he slapped you?

12   A.  Enough to -- I mean my cheeks was swollen after that.  Then

13   he continue slapping.  Then he push me down on the couch and he

14   started hitting me and slapping to -- there's a cut on my lips.

15   Q.  How did you sustain the cut on your lip?

16   A.  From his multiple slaps.  Then, after that, I told him that

17   I wanted to leave the room, but he didn't allow me.  He grab

18   hold of my wrists and he pulled me back to be sitting on the

19   couch.  And he told me not to move.  So I just sat down there.

20   Q.  What, if anything, happened after Mr. Souratgar stopped

21   beating you?

22          MR. ARENSTEIN:  Objection to the characterization

23   "beating."

24          THE COURT:  Overruled.

25   A.  I told him I wanted to go upstairs, but he didn't allow.

1    Once again he held me down.

2    Q.  How did he hold you down?

3    A.  He just hold my wrist, and then he made me sit on the sofa

4    and told me not to move.  We sat there for some time.  After

5    that, he told me that, oh, I'm sorry, I won't be beat you

6    again.  He say he was sorry.  I thought this was a one-time

7    abuse.

8    Q.  What, if anything, happened after that?  Did you have the

9    occasion to look at yourself?

10   A.  Yes.  After that, I told him that I wanted to use the

11   restroom, which I went upstairs.  And then he followed me.

12   Then in the restroom I look at the mirror.  My cheeks were

13   swollen and there was a cut on my lips.  My T-shirt I remember

14   was a white one, has a black stain at the collar.

15   Q.  What happened then?

16   A.  After that, I went to the bedroom.  He went in, too, and he

17   started trying to get intimate.  But I told him that I'm not in

18   the mood because he has just beaten me.  Then he wanted to get

19   intimate, and I just felt -- I just wasn't in the mood to get

20   intimate with him.

21   Q.  What happened then?

22   A.  Then he totally ignored me.  Then he just pulled down my

23   pants and he forced himself onto me.

24   Q.  Did you call the police after this incident?

25   A.  No, I didn't.

1   Q.  Why not?

2           MR. ARENSTEIN:  Objection.

3           THE COURT:  Overruled.

4   Q.  Why not?

5   A.  Because he asked for forgiveness, he said he was sorry, and

6   I thought he meant it and this was a one-time occasion.

7           MR. ARENSTEIN:  Objection to what she thought, your

8   Honor.

9           THE COURT:  Overruled.

10  Q.  How were you affected by this incident?

11          MR. ARENSTEIN:  Objection.

12          THE COURT:  Sustained.

13  Q.  I'd like to direct your attention to the early part of May

14  2008.  Was there an incident involving Mr. Souratgar one Friday

15  evening?

16  A.  Yes.  I went out for dinner with a friend.  I wanted to

17  confide in her what happened about the abuse.  I was feeling so

18  sad.

19  Q.  What was the name of your friend?

20  A.  Vivian.  So we went out for dinner, and I told her what

21  happened.  After that, when I came home was almost midnight.

22  So when I got home Majid actually locked the door from the

23  inside, and then I couldn't get in.  So I started knocking on

24  the glass door.  And then he turned around, he look at me, and

25  then he just turn back and continue watching the television.  I

1    continue knocking.

2            Then he walk over and open the sliding door.  Then he

3    asked me, do you know what time it is and where have you been?

4    So I told him, oh, I just met up with Vivian for dinner.  Then

5    he say, if you want to come back so late, you get out from this

6    house, you leave this house.  I say OK.  So I just started

7    walking toward the staircase as if I was going to go up and

8    take a shower.  As I was walk towards the staircase, he pulled

9    my hair from the back and then he had another hand around my

10   neck.

11   Q.  When you say he had another hand around your neck, what do

12   you mean?

13           MR. ARENSTEIN:  Objection.

14           THE COURT:  Overruled.

15   A.  One of his hands was pulling my hair and the other one, his

16   arm, elbow, was around my neck and he was strangling me.  And

17   he was trying to pull me and drag me by my hair towards the

18   main door to ask me to leave the house.  I was in a choke hold

19   and I couldn't breathe.  I meant to defend myself, to make him

20   let go of the hold, I bite him.

21   Q.  Where did you bite him?

22   A.  On his arm.

23   Q.  What, if anything, happened one you bit Mr. Souratgar on

24   his arm?

25   A.  He let go of me, and then he look at the bite, and then he

1   was really, really angry.  Then he just charged forward towards

2   me and he started beating me again and hitting me on my head

3   and my body.  He keep asking me to get out from the house.  He

4   was also trying to push me out from the house.  So I resisted

5   and I started screaming, hoping that a neighbor would hear and

6   come to my help.  But then Mr. Souratgar, he continue beating

7   me and asked me to shut up, because he see the neighbor.  He

8   said, stop screaming, shut up.

9           MR. ARENSTEIN:  Objection to what the neighbor said.

10          THE COURT:  Overruled.

11  A.   Then, after that, I just sat down, I cover myself to

12  protect myself.  I just curled to a ball, and he just continue

13  kicking and hitting till he was satisfied.

14  Q.   Did there come a time that you found out that you were

15  pregnant?

16  A.   Yes.

17  Q.   When was that?

18  A.   Towards the end of May.

19          THE COURT:  Now that we are getting close to the birth

20  of the child who is the subject of this proceeding, we are

21  going to adjourn until 11 a.m. on Monday.  We'll pick up at

22  that point.  Thank you.

23          MR. ARENSTEIN:  Your Honor, can we leave some of our

24  stuff in the suitcase we have here over the weekend?

25          THE COURT:  I think your question is will it be safe

1   and secure for you to leave things.  I can give you no

2   assurance in that regard whatsoever.  I do ask that you keep

3   the surface of the counsel table free of anything.  That's all

4   I can tell you.

5           MR. ARENSTEIN:  Thank you, your Honor.

6           (Adjourned to 11:00 a.m., December 10, 2012)

INDEX OF EXAMINATION

Examinationof:                    Page

ABED AWAD

     Cross By Ms. Leidholdt  . . . . . . . . 293
     Redirect By Mr. Arenstein . . . . . . . . 323


MEI YOKE CHEW

     Direct By Ms. Leidholdt . . . . . . . . 340
     Cross By Mr. Arenstein  . . . . . . . . 384


LEE JEN FAIR

     Direct By Ms. Leidholdt . . . . . . . . 396