CCAJSOU1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -------------------------------x

 3   In the Matter of one infant child
     ABDOLLAH NAGHASH SOURATGAR,
 4
                    Petitioner,
 5
                v.                        12 Civ. 7797 PKC
 6
     LEE JEN FAIR,
 7
                    Respondent.
 8
     -------------------------------x
 9
                                          December 10, 2012
10                                        11:50 a.m.

11

12   Before:

13                    HON. P. KEVIN CASTEL,

14                                        District Judge

15

16                        APPEARANCES

17   ROBERT D. ARENSTEIN,
     SANDRA NUNEZ,
18        Attorneys for plaintiff

19   PATTON BOGGS LLP
          Attorneys for defendant
20   BY:  ANDREW J. McNALLY, Esq.
          DORCHEN A. LEIDHOLDT, Esq.
21                Of counsel

22   Also Present:
          JENNIFER BAUM,
23        JENNA DiCOSTANZO,
          Gardians ad Litem
24         - and -
          JANE KIM, Esq.

25
```

CCAJSOU1

```
1              (Trial resumes)

2              (In open court)

3              THE COURT:  The witness may resume the stand.  Please

4    be seated.

5              MR. ARENSTEIN:  Your Honor, if I might address the

6    court?

7              THE COURT:  One second, please.  Please be seated.

8              The court reminds you that you are still under oath.

9    Thank you.  Mr. Arenstein.

10             MR. ARENSTEIN:  On Thursday, your Honor, you directed

11   respondent's counsel to give us a copy of the passport and the

12   visas of the grandmother, and we asked for it this morning.

13   Counsel told us that they were going to give it to the court

14   and they weren't going to give it to us.  We have not received

15   it yet.

16             THE COURT:  Why don't you let them speak for

17   themselves.

18             MS. LEIDHOLDT:  Unfortunately, we just have one copy

19   of the passport of our client's mother's passport.  We are

20   happy to let opposing counsel take a look at it.  We did not

21   have a copy to give them.

22             THE COURT:  Okay.  That is easily.  Show it to Mr.

23   Arenstein, and my Deputy can arrange for a photocopy on the

24   break.

25             MS. LEIDHOLDT:  Thank you.
```

CCAJSOU1

```
1              THE COURT:  Mr. Arenstein.

2              MS. LEIDHOLDT:  Your Honor --

3              THE COURT:  These are the kinds of things that irk a

4    Judge for the following reason:

5              A simple conversation in which both people are

6    communicating would resolve an issue such as that.  I don't

7    understand why, and I don't want to hear why, but it is

8    apparent to anyone reading this record that grown-ups could

9    have resolved that without having to raise it at this hearing

10   this morning.  Yes, ma'am.  Was there something else you wanted

11   to address?

12             MS. LEIDHOLDT:  Only one other matter.  Your Honor

13   asked about information about New York State's mandatory arrest

14   law.  I have it here.  I would like to give Mr. Arenstein and

15   Ms. Nunez an opportunity to review the documents before I

16   submit them to the court.

17             THE COURT:  I am curious.  I am curious.  Why wouldn't

18   you have done that before the Judge took the Bench?

19             MS. LEIDHOLDT:  Your Honor is so right.  Apologies.

20             THE COURT:  This has happened before.

21             MS. LEIDHOLDT:  I understand.

22             THE COURT:  All right.  So what grown-ups do is they

23   show it to their adversary and then they hand it up to the

24   court saying they've already done this, all right?  They don't

25   with a big flourish say, "I have something I am going to hand
```

CCAJSOU1

1    up and now I'll give it to my adversary," et cetera.

2            MS. LEIDHOLDT:  I understand, your Honor.

3            THE COURT:  Really!

4            Folks ought to think first.  You may resume your

5    examination.  I mean I have to tell you, I much prefer just

6    hearing testimony of witnesses and proceeding to conclusion

7    with this hearing.  I didn't really become a judge to referee

8    issues of whether a photocopy was provided or not provided or

9    whether offers can be made before the judge before you talk to

10   your adversary.  That is not the fun part of judging.  I don't

11   enjoy having to have these conversations with both sets of

12   counsel.

13           I do appreciate getting to testimony and to the issues

14   in the case, which is why I came to work today.  So let's go

15           MS. LEIDHOLDT:  I would like to re-ask again, again

16   ask the last question that I asked when the trial concluded.

17           THE COURT:  Ask it.

18    LEE JEN FAIR,

19        resumes as a witness by the Respondent,

20        having been previously duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MS. LEIDHOLDT:

23   Q.  Ms. Lee, did there come a time that you found out that you

24   were pregnant?

25   A.  Yes.

CCAJSOU1                          Fair - direct

1    Q.   When, approximately, was this?

2    A.   The end of May.

3    Q.   Of what year?

4    A.   2008.

5    Q.   How did you feel about learning you were pregnant?

6              MR. ARENSTEIN:   Objection.

7              THE COURT:   Overruled.

8    A.   I was very happy.   I was thrilled because I always wanted

9    to have a baby.

10   BY MS. LEIDHOLDT:

11   Q.   Did you tell Mr. Souratgar that you had found out that you

12   were pregnant?

13   A.   Yes, I did.

14   Q.   When was that, approximately?

15   A.   As soon as I found out.

16   Q.   What was Mr. Souratgar's reaction?

17   A.   He was not happy at all.   He said that I was lying and he

18   told me that he does not want anything to do with the baby.

19             MR. ARENSTEIN:   Objection.

20             THE COURT:   Let me ask you a question.   I overruled

21   Mr. Arenstein's objection to the question, "How did you feel

22   when you learned you were pregnant?"   And I allowed that answer

23   to stand.

24             But I call upon you to tell me how that is relevant to

25   any issue before me?

CCAJSOU1                      Fair - direct

1                MS. LEIDHOLDT:  Your Honor, it is part of an incident,

2     a specific incident that I will then question my client about,

3     questions about an incident of serious domestic violence

4     directed at her immediately on the heels of this conversation

5     while she was pregnant, your Honor.

6                THE COURT:  I didn't ask you about the conversation.

7                MS. LEIDHOLDT:  Yes.

8                THE COURT:  I didn't ask you about the conversation.

9                MS. LEIDHOLDT:  Then perhaps I don't understand your

10    Honor's question.

11               THE COURT:  Let me go back.  The second question you

12    asked this morning was how the witness felt when she learned

13    that she was pregnant.  Do you recall asking that question.

14               MS. LEIDHOLDT:  Oh, yes, I do.

15               THE COURT:  Do you recall there was an objection.

16               MS. LEIDHOLDT:  I do.

17               THE COURT:  Do you recall that I overruled it?

18               MS. LEIDHOLDT:  Yes, I do, your Honor.

19               THE COURT:  The question that I asked you is having

20    overruled the objection, I am now asking you of what relevance

21    was that question and answer?

22               MS. LEIDHOLDT:  Your Honor, I think that the different

23    reactions of the parties to the news of Ms. Lee's pregnancy was

24    part and parcel of conflict and then an incident of domestic

25    violence that immediately followed on the heels of her learning

CCAJSOU1                          Fair - direct

 1    that she was pregnant.

 2             THE COURT:  Well, it may be that there are chains of

 3    causation.  I am giving you latitude to get into incidents

 4    which predate the separation of the parties in May of 2011.  I

 5    have given you latitude now to get into an incident that

 6    predated the birth of the child.

 7             Instead of getting into the incident, you're getting

 8    into causation.  You could very easily have asked the question

 9    about how did you feel before you met Mr. Souratgar about the

10    prospects of one day having a child.  It seems to me that the

11    answer to the question would be no more relevant than the

12    answer to the question that you've asked.

13             MS. LEIDHOLDT:  Your Honor, I will move immediately

14    into the incident.

15             THE COURT:  No.  There is a message to this.  Either I

16    am going to start sustaining objections or you're going to

17    confine yourself to relevant matter.  Then you can have an

18    argument with me about my sustaining objections.

19             I have given you a lot of latitude and I expect that

20    you not abuse it, okay?

21             MS. LEIDHOLDT:  Yes.  Thank you.

22    BY MS. LEIDHOLDT:

23    Q.  What, if anything, Ms. Lee, transpired on May 31st of 2008?

24    A.  I told Mr. Souratgar I wanted to leave him.

25             MR. ARENSTEIN:  I can't hear the witness, your Honor.

1              THE COURT:  Please keep your voice up.

2              THE WITNESS:  I told Mr. Souratgar that I wanted to

3    leave him because he wasn't happy about having a child.  Then

4    he got angry and then he took a newspaper and threw it on me.

5              MR. ARENSTEIN:  Objection, your Honor.

6              THE COURT:  Overruled.  Why?  What is the basis for

7    the objection?

8              MR. ARENSTEIN:  I don't see the relevance of this

9    testimony that basically occurred prior to the birth of the

10   child again and we are going into history that I am not sure is

11   relevant to even grave risk of danger.

12             THE COURT:  I think you may be right, but at this

13   stage of the game let's conclude this hearing.  The court can

14   sort this out based on the briefs that the parties have already

15   submitted.  Let's go.

16   BY MS. LEIDHOLDT:

17   Q.  Ms. Lee, when you testified he threw a newspaper at you,

18   was it an open or closed newspaper?

19   A.  It was a folded newspaper.

20   Q.  What happened then?

21   A.  And then I told him to stop it and then he started to slap

22   me.  Then he told me that he wanted to call my mother to tell

23   my mother that I'm crazy, and I tried to stop him because I

24   didn't want to upset my mom.

25   Q.  What was happening physically with Mr. Souratgar at that

CCAJSOU1                        Fair - direct

1   point?

2   A.   He was slipping and hitting me on my head, my body, and

3   then he started kicking me all over my body, on my thigh, on my

4   back.   Then he took a phone and started to call my mom, which I

5   tried to get away from him.   Then I got angry, so I slipped him

6   back once.

7              MR. ARENSTEIN:   Objection, your Honor.   Again I will

8   make a continuing objection to this line of questioning and the

9   testimony itself which I would ask to strike.

10             THE COURT:   The motion to strike I'm reserving on.

11             Go ahead.

12  BY MS. LEIDHOLDT:

13  Q.   What happened then?

14  A.   Then he called my mom and he told my mom that I'm crazy and

15  he asked her to come and take me home from Singapore back to

16  her home.   Then after that I tried to take the phone away from

17  him and I told my mom that Majid was beating me.   Then after a

18  while, I don't know what was the conversation and I just hear

19  him saying, "I will kill you."

20             So I got very scared.   Then he continued hitting me,

21  though I just grabbed my handbag and then I left the house and

22  I took my three dogs along with me.

23             THE COURT:   You took your three dogs along with you?

24             THE WITNESS:   Yes.

25             THE COURT:   Thank you.

CCAJSOU1                          Fair - direct

1   BY MS. LEIDHOLDT:

2   Q.   What happened then?

3   A.   And then I went to my friends' house.  She was staying --

4            THE COURT:  She stayed?

5            THE WITNESS:  She stayed nearby, and then I ran over,

6   I was so frightened and I told her what happened.  Then she and

7   her husband, they calmed me down and then they took, told me to

8   go and see a doctor because she knew I was in my first stage of

9   pregnancy.

10            MR. ARENSTEIN:  Again I object to the testimony what

11   her friend said and seeing a doctor.

12            THE COURT:  Overruled.  Go ahead.  Subject to a motion

13   to strike.  Go ahead.

14            THE WITNESS:  And my friend, her name is Alexandra,

15   she and her husband then said we should lodge a police report

16   first.  So I say okay.  Then the three of us we went down to

17   the police station.

18   BY MS. LEIDHOLDT:

19   Q.   What, if anything, happened when you were at the police

20   station?

21   A.   We lodged a police report.  The officer asked for my --

22            MR. ARENSTEIN:  Objection for what the officer did.

23            THE COURT:  What?

24            MR. ARENSTEIN:  She is saying the officer did

25   something.  That is hearsay.

1              THE COURT:  Why is it hearsay?

2              MR. ARENSTEIN:  That person is not here for me to

3    cross-examine.

4              THE COURT:  So, in other words, if the officer picked

5    up his baton and hit her or the officer went to the phone or

6    the officer wrote something down in a book, that would be

7    hearsay?  Is that what you are saying?

8              MR. ARENSTEIN:  No.

9              THE COURT:  That was the question that was asked, Mr.

10   Arenstein.  Please follow the questions.  Go ahead, you may

11   answer.

12             THE WITNESS:  Then I gave him my ID.  Then he took

13   down the particulars and then he asked me how can he help me.

14   I told him that my husband beat me and then I just want to

15   lodge a police report.  So he took down my statement and then

16   he printed out a copy and have me sign.  Then I signed it and

17   then he put a stamp on it.

18             After that, I asked the police officer are you going

19   to take action?  He say they cannot take action.

20             MR. ARENSTEIN:  Objection to what they said.

21             THE COURT:  Overruled.  Is it being offered for the

22   truth of itscontent or the fact it was said?

23             MS. LEIDHOLDT:  The fact it was said, your Honor.

24             THE COURT:  Go ahead.  Then it is not hearsay.

25             THE WITNESS:  The police officer told me this is

CCAJSOU1                         Fair – direct

1    categorized under domestic violence and unless I obtain a

2    personal protection order from the Family Court, they will not

3    take action.

4              MR. ARENSTEIN:  I object to that statement, your

5    Honor.

6              THE COURT:  Again it is not for the truth of its

7    content.  That is not evidence that that is the position of the

8    Singapore Police, correct?

9              MS. LEIDHOLDT:  True.

10             THE COURT:  That is not evidence of it.  It is simply

11   for the fact it was said by this man.

12             MS. LEIDHOLDT:  Yes.

13             THE COURT:  Not that it is, in fact, true, but it was

14   said.

15             MS. LEIDHOLDT:  Yes.

16             THE COURT:  Because that may influence what the

17   witness does next.

18             If what the witness does next, and its relevance to

19   the story is not there, then for the fact it was said becomes

20   irrelevant and it is subject to a motion to strike which in

21   this nonjury proceeding can be done.  You don't have a jury

22   here.  Let's go.

23   BY MS. LEIDHOLDT:

24   Q.  What happened then, Ms. Lee?

25   A.  By the time we were done, it was pretty late and then most

CCAJSOU1                          Fair - direct

1  of the medical centers are already closed.  So me and my

2  friends, we decided to see the doctor the next day, which the

3  next morning I went to the doctor and I told the doctor that I

4  would like to check.  I told him about the incident and I

5  wanted some medical treatment.

6          I also told him that I am five weeks' pregnant and I

7  just wanted to assure that the baby is okay.

8  Q.  At the time after this incident, at the time you were

9  getting help from the police and going to see the doctor, did

10 you have any injuries?

11 A.  Yes, there were big, multiple bruises, blue and black

12 bruises on my thigh.

13          THE COURT:  I didn't hear what you just said.

14          THE WITNESS:  Multiple blue and black bruises on my

15 thigh.

16          THE COURT:  Thigh?

17          THE WITNESS:  Yes.  My face was swollen because --

18          THE COURT:  Where was it swollen?

19          THE WITNESS:  Both sides of my cheeks.

20          THE COURT:  Both sides of your checks were swollen?

21          THE WITNESS:  Yes.

22          THE COURT:  That was from the slap?

23          THE WITNESS:  Yes.

24          THE COURT:  What was the thigh black and blue from?

25          THE WITNESS:  From the kick.  He kicked me and he beat

CCAJSOU1                         Fair - direct

```
 1   me.
 2             THE COURT:  Anything else?
 3             THE WITNESS:  No.
 4             THE COURT:  Thank you.  Next question.
 5   BY MS. LEIDHOLDT:
 6   Q.  Other than your cheeks being swollen, were there any other
 7   marks on your face?
 8   A.  Fingernail marks.
 9             MR. ARENSTEIN:  Objection.
10             THE COURT:  I thought I just asked the question
11   anything else, and the answer was no.
12             MR. ARENSTEIN:  Right.  Objection.
13             MS. LEIDHOLDT:  Excuse me.
14             THE COURT:  Excuse me, Mr. Arenstein.  I am not
15   talking to you at the moment.  Go ahead, counselor.  I don't
16   understand what just happened.  I asked the witness was there
17   anything else.  She said no.
18             MS. LEIDHOLDT:  I don't think she fully understood the
19   question, your Honor.  I think she may have thought is there
20   anything else that you want to say because if I may make an
21   offer of proof, I am aware --
22             THE COURT:  I will let the witness's testimony stand
23   as it is.  Overruled.  Next question.
24             MS. LEIDHOLDT:  Okay.  Just one second, your Honor,
25   please.
```

CCAJSOU1                          Fair - direct

1    BY MS. LEIDHOLDT:

2    Q.  What then happened at the end, if anything, at the end of

3    your visit to the medical clinic?

4    A.  The doctor wrote a medical report for me because I also

5    told him that the police officer told me in order to obtain a

6    personal protection order, I needed a medical report from him,

7    which he did.

8            MR. ARENSTEIN:  I object to what the police officer

9    told her.  If it is not for the truth of the statement, I

10   understand that, but I think it seems to me it was for the

11   truth of the statement.

12           THE COURT:  Is it offered for the truth of its

13   content?

14           MS. LEIDHOLDT:  No, it is not, your Honor.

15           THE COURT:  Okay.

16           (Off-the-record discussion)

17           MS. LEIDHOLDT:  May I approach the witness, your

18   Honor?

19           THE COURT:  You may.  You may.  I would ask that you

20   do so.

21           MS. LEIDHOLDT:  Yes.  Thank you.

22   BY MS. LEIDHOLDT:

23   Q.  Ms. Lee, I am showing you a document that has been marked

24   for identification as Respondent's 7 for identification.

25   Ms. Lee --

CCAJSOU1                      Fair - direct

1   A.   Yes.

2   Q.   -- do you recognize the document in front of you that's

3   been marked Respondent's 7 for identification?

4   A.   Yes.

5   Q.   Ms. Lee, what do you recognize that document to be?

6   A.   The police report.

7   Q.   Why do you recognize this document to be the police report,

8   a police report?

9   A.   Because I went down to the police station to make one.

10  Q.   Is this the police report you made at the police station on

11  May 31st of 2008?

12  A.   Yes.

13          MR. ARENSTEIN:  Your Honor, I have an exhibit list

14  that was given to me by counsel, and Exhibit 7 is the May 16th,

15  2011 order of the court.  I believe Exhibit 1 is --

16          THE COURT:  Show it to counsel.

17          (Off-the-record discussion)

18          MS. LEIDHOLDT:  What has happened, your Honor, the

19  numbering has changed, but we have submitted all of these

20  documents to Mr. Arenstein.

21          THE COURT:  If you premarked your exhibits, I don't

22  see how they would change.

23          MS. LEIDHOLDT:  At the time that we submitted this,

24  our list of documents, we received no comparable list,

25  submission of exhibits from Mr. Arenstein, but --

CCAJSOU1                         Fair - direct

1           THE COURT:  That would explain why you have changed

2    between your premarked exhibits and your own exhibit list

3    because you didn't receive a comparable list from Mr.

4    Arenstein, I suppose.  Is that why they don't correspond?

5           MS. LEIDHOLDT:  That is part of the problem, your

6    Honor.

7           THE COURT:  How did that influence them not

8    corresponding?

9           MS. LEIDHOLDT:  Well, I wasn't sure what -- some of

10   the documents are documents Mr. Arenstein has submitted into

11   evidence and some are not, and we did not -- we sent Mr.

12   Arenstein the list of our exhibits before this trial commenced,

13   your Honor, and we had numbered them at that time, and then the

14   trial commenced and we were not sure precisely how the

15   numbering would change.

16          THE COURT:  I don't understand that because this is

17   something in common with every trial.  It is the concept of

18   premarking.  Trial evidence is dynamic.

19          MS. LEIDHOLDT:  Yes.

20          THE COURT:  It may be that you premark something as

21   Exhibit 19, but it may be the first exhibit that you offer.

22          MS. LEIDHOLDT:  Yes.

23          THE COURT:  That is the concept of premarking.

24          MS. LEIDHOLDT:  Yes.

25          THE COURT:  I am still not understanding how Mr.

CCAJSOU1                        Fair - direct

1    Arenstein's conduct influenced the variance between your

2    premarking of your own exhibit and the exhibit number which is

3    now being used.

4           MS. LEIDHOLDT:  Yes, it is not only Mr. Arenstein's

5    conduct.  We did not get a list of exhibits, as I mentioned

6    your Honor.  Also in the pendency of the trial, there were

7    documents we planned to introduce into evidence in a certain

8    order, and that is when we submitted our exhibit list to Mr.

9    Arenstein, we indicated what those numbers were.

10          Then after certain documents were introduced into

11   evidence, the numbering has changed.

12          THE COURT:  That would imply in the ordinary trial,

13   any trial held in this courthouse, that if your order of proof

14   varies, that would, therefore, affect the premarking of

15   exhibits, and that's contrary to what the concept of premarking

16   of exhibits is.

17          They are premarked before the trial, before you even

18   know whether you're going to offer it at the trial or in what

19   order you're going to offer.  The numbers are inherently

20   arbitrary in that sense.

21          MS. LEIDHOLDT:  Yes.

22          THE COURT:  The fact that you find no need to offer

23   the first exhibit, first five exhibits premarked as 1 through 5

24   would not make your premarked Exhibit 6 now Exhibit 1.  It

25   would remain premarked as Exhibit 6, and that would be your

CCAJSOU1                    Fair - direct

1    first exhibit.  That is the concept of premarking, and I am

2    still not understanding how Mr. Arenstein's conduct influenced

3    this.

4              MS. LEIDHOLDT:  I am not blaming this on Mr.

5    Arenstein.  I take full responsibility for any problems we are

6    having with numbering of any exhibits, your Honor.

7              THE COURT:  The problem I have is when I started this

8    dialogue with you, that is exactly what you said.  There is a

9    transcript here.  You are welcome to reread the transcript.

10             You said, and this is a close paraphrase, part of the

11   problem here, Judge, is that I didn't receive a comparable list

12   from the other side.

13             MS. LEIDHOLDT:  Yes.

14             THE COURT:  I think that is approximately what you

15   told me when I raised this with you.

16             Am I misremembering that?

17             MS. LEIDHOLDT:  Yes, your Honor.  What I was trying to

18   say was that I thought your Honor might be under the impression

19   we had not submitted our documents and our exhibit list to Mr.

20   Arenstein, and we had.

21             Your Honor, we did not receive a list of exhibits from

22   Mr. Arenstein.  We did not.  That is perhaps immaterial, your

23   Honor, and I apologize.  We should have done a better job of

24   dealing with the marking of our own exhibits.

25             THE COURT:  You have now reviewed what is newly marked

CCAJSOU1                        Fair - direct

1   as Respondent's Exhibit 7, Mr. Arenstein.

2              MR. ARENSTEIN:  Yes.  I haven't reviewed it but, yes,

3   I have it marked as the Exhibit 1.

4              THE COURT:  You established that already.  I am trying

5   to move off the dime on this.

6              MR. ARENSTEIN:  Yes.

7              THE COURT:  Have you now reviewed what has been shown

8   to the witness as Respondent's Exhibit 7?

9              MR. ARENSTEIN:  I have not been given a copy of it by

10  counsel, but now I have.

11             THE COURT:  You never received it?

12             MR. ARENSTEIN:  I have copies of it, but I never got

13  it from counsel.  I might have, I did give an exhibit list, but

14  I am not going to go that right now.  It was an exhibit list I

15  gave to your Deputy and I also gave it to both sides here by

16  e-mail.  They all received it.

17             THE COURT:  Do you have an objection to Respondent's

18  Exhibit 7?

19             MR. ARENSTEIN:  I do.

20             THE COURT:  Basis?

21             MR. ARENSTEIN:  Hearsay.

22             THE COURT:  Overruled.  It is received.

23             (Respondent's Exhibit 7 received in evidence)

24             MR. ARENSTEIN:  Are we calling this 1 or 7?

25             THE COURT:  It was offered as Respondent's 7.  I don't

CCAJSOU1                          Fair - direct

 1    know whether you heard the colloquy.

 2              MR. ARENSTEIN:  I did.  I am trying to, for my own

 3    exhibit list -- I will change it to 7.

 4              MS. LEIDHOLDT:  Respondent's 7 is now introduced into

 5    evidence as Respondent's 7 in evidence.

 6              THE COURT:  I didn't understand that comment.

 7              MS. LEIDHOLDT:  I am sorry.  May I again approach the

 8    witness, Judge?

 9              THE COURT:  Yes.

10    BY MS. LEIDHOLDT:

11    Q.  Ms. Lee, I am handing you Respondent's 8 for

12    identification.

13    A.  Okay.

14    Q.  Ms. Lee, do you recognize the document in front of you

15    identified as Respondent's 8 for identification?

16    A.  Yes.

17    Q.  What do you recognize that document to be?

18    A.  This is a medical report by the doctor.

19    Q.  When did you obtain this medical report?

20    A.  On the 1st of June.

21    Q.  What were the circumstances under which you obtained the

22    medical report?

23    A.  I am sorry?

24    Q.  Where did you obtain the medical report?

25    A.  At the clinic, the doctor's practice.

CCAJSOU1                          Fair - direct

1   Q.  Do you recognize the name Dr. Eugene Loke?

2   A.  Yes.

3   Q.  Who is Dr. Eugene Loke?

4   A.  He was one of the doctors who works at the practice.

5   Q.  Was this the doctor who treated you?

6   A.  Yes.

7   Q.  On June 1st of 2008 after you made, day after you made the

8   police report?

9   A.  Yes.

10          MS. LEIDHOLDT:  I respectfully offer Respondent's 8

11   for identification into evidence as Respondent's 8 in evidence.

12          THE COURT:  Objection?

13          MR. ARENSTEIN:  Objection, your Honor.  This is

14   hearsay.  There are statements made in this letter which I have

15   no right to cross-examine, talking about an episode of domestic

16   violence, et cetera.

17          THE COURT:  Why aren't they admissible as statements

18   made to a treating physician in the course of treatment?

19          When you say the treating physician -- I was hit by a

20   cab on 42nd Street -- wouldn't that be admissible as a

21   statement made to treating physician?  Obviously, it is no more

22   probative than the testimony of the witness, but why doesn't it

23   come in?

24          MR. ARENSTEIN:  He makes conclusions here I don't have

25   a right to cross-examine.

CCAJSOU1                        Fair - direct

 1              THE COURT:  What are the conclusions?

 2              MR. ARENSTEIN:  The injuries are consistent with her

 3      side of what happened, already been reported.  He said this is

 4      from an episode of domestic violence yesterday.  He has made a

 5      conclusion here that I don't believe he has the right to make

 6      without me having a chance to cross-examine.

 7              THE COURT:  I will receive it subject to a motion to

 8      strike.

 9              (Respondent's Exhibit 8 received in evidence)

10              THE COURT:  Please continue.

11              MS. LEIDHOLDT:  Your Honor, if I may just very, very

12      briefly, all of these exhibits were part of Mr. Arenstein's

13      reply papers, his motion to this Court in the instant matter

14      that, in fact, have been submitted.

15              THE COURT:  Mr. Arenstein did not raise an

16      authenticity objection.

17              MS. LEIDHOLDT:  Thank you.

18              THE COURT:  That wasn't the basis for his rise.

19              MS. LEIDHOLDT:  Thank your Honor.

20      BY MS. LEIDHOLDT:

21      Q.  Now, Ms. Lee, after you made the police report on May 31st

22      of 2008 and after you visited the medical clinic on June 1st of

23      2008, did you go to Family Court in Singapore in order to

24      obtain a protective order?

25      A.  No.

1    Q.  Why not?

2              MR. ARENSTEIN:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  Because we were just newlyweds and --

5              MR. ARENSTEIN:  I didn't hear the answer.

6              THE WITNESS:  We were newly Wednesdays.  We just got

7    married.  Then I was pregnant and then I just wanted to give

8    the marriage a chance.  I also was so afraid that if I get a

9    personal protection order, and Majid knows about it, then he

10   will beat me further.

11             MR. ARENSTEIN:  I didn't hear the answer, your Honor.

12             THE COURT:  "And if I get an order of protection,

13   Majid will beat me further," is that what you said?

14             THE WITNESS:  Yes.

15             MR. ARENSTEIN:  Objection.

16             THE COURT:  Basis?

17             MR. ARENSTEIN:  It is speculation, your Honor, by the

18   witness.

19             THE COURT:  The question was why she didn't do

20   something, and this is the witness's answer.

21             Go ahead, next question.

22   BY MS. LEIDHOLDT:

23   Q.  Ms. Lee, very briefly, did there come a time that you

24   returned back into the home that you shared with Mr. Souratgar?

25   A.  Yes.

CCAJSOU1                          Fair - direct

```
 1   Q.  Could you very briefly describe the interaction, if any,
 2   you had with Mr. Souratgar after you returned home?
 3   A.  We did not have any interaction for a couple of months.
 4   Q.  Then what, if anything, occurred in September of 2008?
 5   A.  He came back from a trip from Iran, and then I just wanted
 6   to know where the relationship was heading because he has not
 7   been talking or calling me from Iran for the past few months
 8   when he went back.
 9            So I asked him, and then he said that everything that
10   happened was my fault.  And I told him what about the marriage?
11   He said if you want it to go on, then apologize, which I did.
12            MR. ARENSTEIN:  Objection, your Honor.  This whole
13   line of testimony seems to me is something that should be in a
14   court in Singapore if there is going to be anything.  To have
15   this testimony in this Court, in the federal court which
16   doesn't even hear domestic relations issues, to me is improper.
17            This is not --
18            THE COURT:  You stated your objection.  Your response?
19            MS. LEIDHOLDT:  Yes.  Your Honor, Mr. Arenstein has
20   submitted numerous documents that are in evidence that are an
21   effort to show that they're statements from Ms. Lee that
22   contain apologies, and I believe they're intended to show if
23   Ms. Lee was apologizing, then the violence did not occur or
24   perhaps she was the perpetrator of said violence.
25            Because Mr. Arenstein has submitted these documents, I
```

CCAJSOU1                          Fair - direct

1    think it is important that Ms. Lee have the opportunity to

2    address statements that --

3          THE COURT:   The objection is overruled.   I think this

4    whole line, however, is of marginal relevance, but on the basis

5    on which you have offered it, I will let it stand in testimony.

6          Go ahead, next question.

7    BY MS. LEIDHOLDT:

8    Q.   Why did you apologize to Mr. Souratgar, Ms. Lee?

9    A.   Because the baby is on the way and I just wanted a complete

10   family for him.

11   Q.   Did there come a time that you resigned your employment?

12   A.   Yes.

13   Q.   When was that?

14   A.   June 28.

15   Q.   Why did you resign your employment?

16   A.   Because Majid has -- since we got married, he has been

17   asking me to quit my job, and he said that a wife should stay

18   at home and look after the house.   So I eventually quit the job

19   as something like a peace offering so that our marriage could

20   go on for the sake of the baby.

21   Q.   At that point in time did you have savings of your own?

22   A.   Yes.

23   Q.   Approximately how much money did you have?

24         MR. ARENSTEIN:   Your Honor, I will ask the relevance.

25   I object to the relevance of savings of her own.

1          THE COURT:  Yes.

2          MS. LEIDHOLDT:  Yes, your Honor.

3          Your Honor, there have been numerous statements,

4    actually there has been testimony by Mr. Souratgar on the stand

5    about my client's savings, that money and resources that she

6    had.  For that reason, I think it is important for credibility

7    issues to address them.

8          THE COURT:  What was the testimony that was elicited

9    on the petitioner's case?  I am not remembering the testimony

10   relating to this individual's, the respondent's assets.

11         MS. LEIDHOLDT:  Excuse me.

12         (Off-the-record discussion)

13         MS. LEIDHOLDT:  To the best of my recollection, there

14   was testimony that -- and I believe this may also have appeared

15   in petitioner's papers -- that Ms. Lee had an -- actually,

16   there was testimony, our first appearance in court, that

17   Ms. Lee has access to large sums of money and there was

18   testimony about -- withdrawn, your Honor -- that she had large

19   sums of money.  Part of this is relevant to issues of

20   credibility.

21         THE COURT:  Let me ask you this:  Was that testimony

22   relevant that petitioner elicited?

23         MS. LEIDHOLDT:  It may not have been relevant, your

24   Honor, but it is part of the record.

25         THE COURT:  That is very easy because if it wasn't

 1  relevant, I'll strike it.  Would you like me to strike it?

 2          MS. LEIDHOLDT:  If I may, your Honor, what is I think

 3  very relevant here is, your Honor, our expert witness will

 4  testify that Mr. Souratgar was subjecting Ms. Lee to a

 5  particularly acute form of family violence that impacted

 6  profoundly on the child, and it is designated by the experts as

 7  variously intimate terrorism and coercive control.

 8          A key tactic of abuse by perpetrators of this form of

 9  domestic violence is economic control over their victims, and

10  there will be testimony, your Honor, not only did Mr. Souratgar

11  pressure -- one might even use the word force Ms. Lee to

12  terminate her job, but over the next year she was required to

13  deplete her entire life savings of $40,000.

14          THE COURT:  How is that relevant to this case?

15          MS. LEIDHOLDT:  Your Honor, I am trying to explain

16  that it is a means --

17          THE COURT:  That is what I am asking you.

18          MS. LEIDHOLDT:  -- it is a means of economic control.

19          THE COURT:  Right.  Let's see assume that.  How is

20  that relevant to this case?

21          MS. LEIDHOLDT:  Because at the core of this case and

22  the core of our defense of grave risk of harm to the child, is

23  that Mr. Souratgar was subjecting our client to a particularly

24  acute form of family violence that started very early on in the

25  relationship.

CCAJSOU1                        Fair - direct

1              THE COURT:  Let's take that as a given.  How is that

2      relevant to this case?

3              MS. LEIDHOLDT:  And that this form of violence that

4      has been designated coercive control or intimate terrorism --

5              THE COURT:  You are repeating yourself.  I am asking

6      you how is it relevant to this case?

7              MS. LEIDHOLDT:  I am trying to get there, your Honor.

8              THE COURT:  Okay.

9              MS. LEIDHOLDT:  It, in fact, escalates once the

10     parties are separated, once the parties are separated and it

11     takes on new forms.

12             THE COURT:  Okay.  The parties have been separated now

13     since May of 2011.  They will never cohabitate under any set of

14     facts that I can observe in the same household ever again.

15             How is this testimony relevant to this proceeding?

16             MS. LEIDHOLDT:  Because this form of violence, once

17     the parties are separated, it intensifies, but takes new forms.

18     Once the perpetrator no longer has physical access to the

19     victim in the same way, it takes the forms of --

20             THE COURT:  How does granting or denying the petition

21     change anything then?

22             MS. LEIDHOLDT:  Because, so the question, of course,

23     is what is going to happen should the child be repatriated to

24     Singapore?  That is correct, your Honor, and what would be the

25     grave risk of harm to the subject child in Singapore?

1            THE COURT:  Correct.

2            MS. LEIDHOLDT:  Should she be repatriated?

3            Your Honor, we submit that this abuse will continue to

4    take place.

5            Now, should the mother go there or not go there, the

6    father will continue in his efforts to control and dominate

7    Ms. Lee and to exclude her from the child's life, and he

8    will -- and this is family violence, your Honor, that is not

9    only directed towards intimate partners, it is --

10           THE COURT:  Let's not talk about plurals and intimate

11   partners.  Let's talk about this case.

12           MS. LEIDHOLDT:  It is equally directed towards

13   children.

14           THE COURT:  Why don't you confine yourself to what has

15   transpired since May 2011 when the parties ceased to

16   cohabitate.  Maybe you can explain to me how it would be

17   different if I denied your petition?  What would be different

18   if I denied your petition?

19           MS. LEIDHOLDT:  Your Honor, is the question what we

20   submit what has transpired after the parties separated in May

21   of 2011 that is relevant to the grave risk of harm analysis?

22           So this is what transpired.

23           THE COURT:  No.  I said why don't you confine yourself

24   to what has transpired since May.  I sat through this hearing

25   and I know what transpired after May 2011, to the extent either

CCAJSOU1                        Fair - direct

1    side has developed it in the record so far.  My question is why

2    don't you confine yourself to what transpired, which would be

3    perhaps an indicator of future events?

4              MS. LEIDHOLDT:  Because, your Honor, it is impossible

5    for your Honor to make a credibility determination because of

6    what we are describing is a course of conduct that escalated

7    over time.

8              THE COURT:  You say credibility determination?

9              Assume I find your client credible.  The question is,

10   is not the grave risk of harm to her a matter of concern to me

11   as a fellow human being, but perhaps not within my purview as a

12   judge?  I am concerned of grave risk of harm of all persons in

13   this courtroom, but my job here is to consider the grave risk

14   of harm to the child.

15             MS. LEIDHOLDT:  Yes.

16             THE COURT:  Why don't you confine yourself to what

17   evidence you have from May 2011 to the filing of this petition

18   which may be a good predictor of what will happen in the

19   future.  That is number one.

20             No. 2, why would that be alleviated?  If your theory

21   is correct, how would that be alleviated if I denied your

22   petition?

23             (Continued on next page)

24

25

Ccarsou2                        Lee - direct

1          MS. LEIDHOLDT:  Your Honor, if I may.  In order to

2     show the escalation --

3          THE COURT:  Deny the petitioner's petition, rather.

4     Go ahead.

5          MS. LEIDHOLDT:  I'm sorry, your Honor.  If you could

6     give me one minute, please.

7          Your Honor, in order to show the escalation of Mr.

8     Souratgar's violence and its new forms after the parties

9     separated and the harm to Shayan that awaits Shayan should he

10    be returned to Singapore, it is of critical importance to show

11    what took place in this respect before the parties separated.

12         Your Honor, in Blondin v. Dubois the harm that the

13    father subjected the two children in that case to in France,

14    really the reign of terror that he exerted over his wife and

15    two children in France was of paramount importance to Judge

16    Chen's ultimate determination that there was a great risk of

17    harm to those children should he be repatriated to France.

18         Similarly, your Honor, in Elyashiv v. Elyashiv there

19    was extensive testimony about the father's pattern of control

20    and growing abuse principally to the mother in the presence of

21    the children and also to the children.  The decision of Judge

22    Block in that particular case rested on his consideration of

23    the pattern of family violence that was directed against the

24    mother and in that case the three children.  I am intimately

25    familiar with that case, your Honor, because Ms. Elyashiv was

Ccarsou2                         Lee - direct

1    our client.  We were very deeply involved in that case.

2            In both of those cases, one of which is controlling

3    precedent, your Honor, there was a history of family violence

4    directed toward the mother and the children.  There was some

5    recognition in both cases that the interests of the mother and

6    the children were deeply interconnected because much of the

7    violence took place in the presence of the children and the

8    children operated in an environment of threat and abuse, but

9    also that the perpetrator would certainly continue those very

10   tactics of intimate terrorism, in France in one case, a country

11   that most would consider well equipped to protect domestic

12   violence victims, and the other case in Israel, your Honor.

13           I am attempting to show precisely that, that the

14   violence that was directed towards this child in his home,

15   towards our client in the home of the child and frequently in

16   the presence of the child, started immediately after marriage

17   of the parties and before the pregnancy and escalated and

18   became habitual and was profoundly injurious to Ms. Lee.

19           There will be testimony that she suffers from

20   post-traumatic stress disorder from violence inflicted on her

21   in the presence of the child, and it is highly likely to have

22   already been injurious to the child, although we are talking

23   about a little boy who is not yet 4 years old and it is

24   difficult to make that determination.

25           We submit, your Honor, that the violence, even if the

Ccarsou2                          Lee - direct

1     parties are separated, even if Ms. Lee stays here, your Honor,

2     we are submitting that Mr. Souratgar is a perpetrator of an

3     acute form of family violence that is profoundly injurious to

4     children and that these tactics that have been directed against

5     him and his mother will continue in Singapore even if this

6     child is permanently separated from his mother.

7             Your Honor, Mr. Souratgar has made repeated statements

8     about both to Ms. Lee and to her sister, who has flown here

9     from Singapore to testify about said statements.

10            THE COURT:  I appreciate your endeavoring to answer

11    the first part.  What about the second part of the question?

12            MS. LEIDHOLDT:  The second part, your Honor -- and

13    please forgive me, this is stressful -- one second, please.

14            THE COURT:  Sure.  Would you like a recess?

15            MS. LEIDHOLDT:  No.  My apologies to the Court.

16            Were your Honor to deny the petition, first of all,

17    the legal system here, we submit, is infinitely better equipped

18    to protect Ms. Lee, and, of paramount importance in this case,

19    Shayan.  The police response will be entirely different here.

20    In Singapore six police reports, three medical examinations

21    that documented physical injury, two futile efforts to obtain

22    orders of protection from the family court --

23            THE COURT:  Let me pause right there.  Did Ms. Lee

24    ever get an order of protection out of the family court?

25            MS. LEIDHOLDT:  Never.

Ccarsou2                          Lee - direct

1          THE COURT:  She applied for one?

2          MS. LEIDHOLDT:  Twice.

3          THE COURT:  One was never issued?

4          MS. LEIDHOLDT:  Yes.

5          THE COURT:  OK.

6          MS. LEIDHOLDT:  In addition, your Honor, Ms. Gomez,

7    who is here in court, submitted an affidavit to the family

8    court in Singapore detailing in great specificity all of our

9    allegations about the failings of that court.  I had a

10   conversation last night with Ms. Lee's attorney who had

11   represented her in not the protective order cases, because she

12   did not have the funds to hire him to do so, but in the custody

13   case.  I asked him how prejudicial would the receipt of said

14   affidavit be by the family court in Singapore, and he said that

15   it would be prejudicial.

16         MR. ARENSTEIN:  Your Honor --

17         MS. LEIDHOLDT:  Your Honor, I believe that that

18   affidavit will make it exceptionally difficult now.  Those

19   statements were completely gratuitous, and the only conclusion

20   one can draw from reading that affidavit that was sent to the

21   court by Ms. Gomez actually after or shortly before this case

22   commenced, is going to make it very, very difficult for Ms. Lee

23   to obtain a fair trial in Singapore.

24         THE COURT:  When was the affidavit submitted?

25         MS. LEIDHOLDT:  I actually complained to both Mr.

Ccarsou2                     Lee - direct

1    Arenstein and to Professor Baum --

2              THE COURT:  I'm asking, approximately when was it

3    submitted?  September, July, November, December?

4              MS. LEIDHOLDT:  It would have been submitted in late

5    November of this year or early December of this year, very

6    likely late November, your Honor.

7              THE COURT:  I haven't seen any such affidavit.

8              MR. ARENSTEIN:  Your Honor, might I respond to that?

9              THE COURT:  You may.

10             MR. ARENSTEIN:  We sent you a copy of all the letters

11   that were sent to the harmony area, the family harmony, when we

12   requested the documents.

13             THE COURT:  If they are not in evidence, I don't know

14   anything about them.

15             MR. ARENSTEIN:  We sent you a letter.

16             THE COURT:  You may have sent me a letter, but if it

17   is not in evidence, I don't know what you are referring to.

18   I'm not accustomed to reading --

19             MR. ARENSTEIN:  There is no affidavit.  She is

20   misstating to the Court that there is an affidavit.  I have Ms.

21   Gomez here.  She can tell you there was no affidavit.  She

22   wrote a letter that was very, very derogatory to me and the

23   guardian knows quite what she is talking about.

24             I transmitted documents that were sent to me, that

25   were transmitted to the court of family harmony and also to

Ccarsou2                    Lee - direct

1     your Honor, asking that you request the documents from the

2     courts in Singapore.  That's what happened.  I got a nasty

3     letter from Ms. Leidholdt criticizing me.  The guardian told me

4     not to write back to her, which I didn't do.  But it was very

5     nasty, very derogatory, and it deserved an apology, which I

6     didn't get.

7               There was no affidavit.  It was a letter.

8               THE COURT:  Please sit down.

9               MR. ARENSTEIN:  Mrs. Gomez is here.  She is accusing

10    Mrs. Gomez of doing something.  Mrs. Gomez is here to tell the

11    Court that she didn't do it.

12              THE COURT:  Please sit down.

13              Ms. Leidholdt, I call upon you to produce to me the

14    affidavit which Gomez submitted to the Court in Singapore in

15    the month of November 2012.

16              MS. LEIDHOLDT:  I will, your Honor.  I think perhaps

17    technically it has numbered paragraphs, so I called it an

18    affidavit.  Perhaps "affirmation" or "letter" are other terms

19    that might be used.  But I will absolutely bring the letter to

20    your Honor.

21              THE COURT:  If it's not an affidavit but a

22    declaration, they are the functional equivalents.  If, however,

23    it's neither of those, I think you have some explaining to do,

24    because you have just made this assertion and it's been

25    challenged in this court.  You immediately, upon being

Ccarsou2                        Lee - direct

1    challenged, are now leaving open the possibility that it is not

2    an affidavit, not an affirmation, not a declaration, none of

3    those things.

4              MS. LEIDHOLDT:  Your Honor, I believe it to be an

5    affidavit.  I will bring it to the Court.  Thank you, your

6    Honor.

7              THE COURT:  All right.

8              MS. LEIDHOLDT:  Your Honor, if I may --

9              THE COURT:  When are you going to have that for me?

10             MS. LEIDHOLDT:  After lunch.

11             THE COURT:  Thank you.  And show it to the other side

12   before you hand it up.

13             MS. LEIDHOLDT:  I will.

14             THE COURT:  Go ahead.

15             MS. LEIDHOLDT:  Your Honor, additional problems if

16   your Honor dismisses the petition of the petitioner.  She will

17   not have to return to a forum in Singapore, where her

18   citizenship is completely uncertain.

19             Your Honor, you will hear evidence through Ms. Lee

20   that Mr. Souratgar surreptitiously made her and the subject

21   child Iranian citizens and subsequently told the Malaysian

22   authorities that they were Iranian citizens, and the Malaysian

23   authorities commenced a proceeding against Ms. Lee to strip her

24   of her Malaysian citizenship.  Your Honor, we have documents

25   that attest to the fact that there have been accusations

Ccarsou2                          Lee - direct

1   against Ms. Lee of holding dual citizenship in Malaysia and

2   proceedings have commenced to strip her of her Malaysian

3   citizenship.

4        Her Malaysian citizenship is the predicate of her

5   permanent citizenship status in Singapore.  In effect, were Mr.

6   Souratgar to succeed, she would have no option, and I have made

7   this representation before previously, your Honor, the only

8   country that she would be able to go to would be Iran.

9        THE COURT:  What happens if I deny the petition here?

10       MS. LEIDHOLDT:  If you deny the petition, she would

11  stay here.  She would stay in the United States.

12       THE COURT:  She is eligible to stay in the United

13  States?

14       MS. LEIDHOLDT:  Yes, your Honor.  Our organization has

15  been evaluating her eligibility for asylum, and we believe that

16  we will be able to establish that she has a well-founded fear

17  of persecution should she be forced to return to either

18  Singapore or Malaysia, and that the governments of both

19  countries are both unwilling or are unwilling or unable to

20  protect her from Mr. Souratgar's violence.

21       THE COURT:  Before she entered the United States, my

22  understanding is that the Singapore court had given her

23  temporary custody.  Is that correct?

24       MS. LEIDHOLDT:  Yes.  They had given her temporary

25  custody --

Ccarsou2                          Lee - direct

1          THE COURT:  And they had given the father supervised

2     visitation, is that correct?

3          MS. LEIDHOLDT:  Yes, that's correct, your Honor.

4          THE COURT:  Why should I be skeptical that the

5     Singapore court wouldn't have given her permanent custody, in

6     which event, if she wanted to, under the circumstances you have

7     laid out, she could have moved to the United States?

8          MS. LEIDHOLDT:  Your Honor, there has been a

9     significant change in circumstances since she was granted,

10    albeit temporary, custody.  First, the case was then

11    transferred to the Shariah court.  I understand that it likely

12    has been transferred back, but it was transferred to the

13    Shariah court.  There has been a highly prejudicial letter that

14    has been sent to the court in Singapore, the family court.

15         THE COURT:  What is the highly prejudicial letter?

16         MS. LEIDHOLDT:  Letter or affidavit, a highly

17    prejudicial document signed by Ms. Gomez.

18         THE COURT:  More prejudicial than the finding of

19    contempt?

20         MS. LEIDHOLDT:  In some ways I think perhaps it is

21    more prejudicial, your Honor, which I believe your Honor may

22    agree with when you read this document.  It's highly, highly

23    prejudicial, I believe.

24         THE COURT:  Is it inaccurate?

25         MS. LEIDHOLDT:  Pardon?

Ccarsou2                      Lee - direct

1          THE COURT:  It may be highly prejudicial.  Is it

2     inaccurate?

3          MS. LEIDHOLDT:  It simply quotes liberally statements

4     that we made in our papers about that court's persistent

5     failure to protect the rights of Ms. Lee and to protect her

6     from Mr. Souratgar's violence.  We believe the statements are

7     completely accurate but will likely be deeply offensive to the

8     court there and will prejudice her ability to proceed there.

9          Then, your Honor, there is one other matter.  After he

10    filed his cross-petition for custody of the subject child in

11    Singapore, Mr. Souratgar filed a parallel action for custody of

12    the subject child in the Shariah court in Malaysia, requiring

13    Ms. Lee to hire an attorney to represent her.  He made

14    misrepresentations in his papers to the court there.  He

15    claimed that he was living in Malaysia and intended to stay in

16    Malaysia.  That action is continuing.

17         Ultimately, Ms. Lee's attorney in Malaysia was able to

18    persuade the court that there was not jurisdiction.  He has

19    appealed that denial, and there is a custody proceeding for the

20    subject child, a parallel custody proceeding happening in

21    Malaysia as well.  Your Honor, not in any court in Malaysia, in

22    the Shariah court in Malaysia, the Shariah court.  That's where

23    he brought his action in Malaysia.

24         Mr. Souratgar has considerable resources, as has been

25    very, very clear.  I think bottom line we do not believe that

Ccarsou2                    Lee - direct

<table>
<tr><td>1</td><td>Mr. Souratgar will be able to carry out the same campaign or</td></tr>
<tr><td>2</td><td>will not be able to carry it out as successfully in the United</td></tr>
<tr><td>3</td><td>States as he has been in Singapore and in Malaysia.</td></tr>
<tr><td>4</td><td>THE COURT:  Next question.</td></tr>
<tr><td>5</td><td>MR. ARENSTEIN:  Your Honor, I would like to move to</td></tr>
<tr><td>6</td><td>strike that entire argument.  I haven't had a chance to</td></tr>
<tr><td>7</td><td>respond.  I don't think it is relevant.  I think all the</td></tr>
<tr><td>8</td><td>statements are prejudicial to my client.  Most of them are Mrs.</td></tr>
<tr><td>9</td><td>Leidholdt testifying to the Court about something.</td></tr>
<tr><td>10</td><td>THE COURT:  If you would like to respond, go ahead.</td></tr>
<tr><td>11</td><td>MR. ARENSTEIN:  There's quite a bit to respond to.</td></tr>
<tr><td>12</td><td>THE COURT:  You don't have to respond.  I'm just</td></tr>
<tr><td>13</td><td>inviting you.  If you want to respond, you can respond.  It's</td></tr>
<tr><td>14</td><td>up to you.</td></tr>
<tr><td>15</td><td>MR. ARENSTEIN:  All I can tell you is, number one,</td></tr>
<tr><td>16</td><td>there is no action pending in Singapore anymore.  It's been</td></tr>
<tr><td>17</td><td>dismissed.  It was dismissed by the court in Malaysia.</td></tr>
<tr><td>18</td><td>THE COURT:  No, no.  The reference was to Malaysia,</td></tr>
<tr><td>19</td><td>not Singapore.</td></tr>
<tr><td>20</td><td>MR. ARENSTEIN:  In Malaysia.  My client brought an</td></tr>
<tr><td>21</td><td>action because the children were there and she was refusing to</td></tr>
<tr><td>22</td><td>let him see the kids.  Apparently the court ruled there was no</td></tr>
<tr><td>23</td><td>jurisdiction.  There was an appeal.  The appeal is dismissed.</td></tr>
<tr><td>24</td><td>There is no action pending in Malaysia.  For her to make that</td></tr>
<tr><td>25</td><td>statement is again deceiving the Court.</td></tr>
</table>

Ccarsou2                    Lee - direct

 1            Secondly, it seems to me what I hear here from Ms.

 2   Leidholdt is her whole organization is making a big thing about

 3   domestic violence being grave risk of danger.  I think most of

 4   the cases are not so.  They are attacking the government of

 5   Singapore.  The issue of Singapore is such that there are very

 6   few, if none, article 20 cases.  We have here her spending a

 7   huge amount of time on an article 20 argument which I think is

 8   specious, and it is not to the level of almost article 11

 9   sanctions.

10            In addition, the other day we had this thing, and

11   we're getting a letter from Turkish Airways.  My client as

12   never at the airport.  That statement that was made here by Ms.

13   Lee's mother and all that is just outrageous.  It really shocks

14   the conscience to me what was done in this court, because it

15   was not true.

16            He was not there.  There were two visitations, one

17   back to back from the 12th and the 13th.  There was no way he

18   could get from the airport all the way up to Kingston back and

19   forth.

20            THE COURT:  Mr. Arenstein, you have gone beyond the

21   comments made from the podium this afternoon.  Let me continue

22   with the questioning.  Go ahead.

23   BY MS. LEIDHOLDT:

24   Q.  Ms. Lee, did there come a time that you asked your husband

25   for an allowance?

Ccarsou2                          Lee - direct

1   A.  Yes.

2   Q.  Why?

3   A.  Because --

4        MR. ARENSTEIN:  I'm sorry.  I didn't hear the

5   question.

6        THE COURT:  Did there come a time that you asked your

7   husband for an allowance.  Answer yes.

8        MR. ARENSTEIN:  Objection to the relevance of the

9   question.

10       THE COURT:  Overruled.  Go ahead.

11  A.  Because I have bills to pay and I wasn't working, and also

12  I have to buy the basic necessities for the baby.  So I asked

13  Majid for an allowance.

14  Q.  At the time that you asked him for an allowance, did you

15  have any savings of your own?

16  A.  I finished using it.

17  Q.  Were you ever employed by Mr. Souratgar?  Did you ever work

18  for Mr. Souratgar's company?

19  A.  No.

20  Q.  Did you ever sign any documents --

21  A.  Yes.

22  Q.  -- that stated that you were an employee of Mr. Souratgar's

23  company?

24  A.  Yes.

25  Q.  Why did you do that?

Ccarsou2                        Lee - direct

1          MR. ARENSTEIN:  Objection.

2          THE COURT:  Overruled.

3  A.  He came home one day and he told me that he need me to

4  pretend to be an employee of his company, but he say that I do

5  not have to go to the office or do any work, I'm supposed to

6  stay home and look after the house and Shayan.  So he drew up a

7  contract, an employment contract, and also asked me to fill out

8  his company application form, which I did.  I asked him why am

9  I required to do this, and he say it's for accounts purposes.

10  Q.  Ms. Lee, could you describe the situation that transpired

11  involving your identity documents and the baby's identity

12  documents in relation to Mr. Souratgar.

13  A.  He wants to keep all our documents.  It is kept in a safe

14  in his office, which I have no access to.

15  Q.  Which documents did he keep in the safe in his office?

16  A.  He kept my birth certificate, Shayan's Malaysia and

17  Singapore birth certificate, Shayan's Malaysian passport, our

18  marriage certs.

19  Q.  Thank you.  When was Shayan born?

20  A.  29 January 2009.

21  Q.  Where was Shayan born?

22          THE COURT:  Say the date again.

23          THE WITNESS:  29 January.

24          THE COURT:  29 January?

25          THE WITNESS:  Yes.

Ccarsou2                         Lee - direct

1                THE COURT:  Thank you.

2     Q.  Of what year?

3     A.  2009.

4     Q.  Where was Shayan born?

5     A.  In Singapore.

6     Q.  Did that make Shayan a citizen of Singapore?

7     A.  No.

8     Q.  What, if anything, did you and Mr. Souratgar do in

9     reference to Shayan's citizenship?

10    A.  We decided that Shayan be a Malaysian citizen.  Then we

11    went to the Malaysia high commissioner in Singapore to register

12    his birth and to get the Malaysian citizenship.

13    Q.  After Shayan was born, did you return with the baby to your

14    home?

15    A.  Yes.

16    Q.  What was it like after you brought him back from the

17    hospital in relation to Mr. Souratgar?

18    A.  He was basically criticizing everything I do.  He didn't

19    like the way I took care of Shayan.

20    Q.  Was your mother there for a period of time?

21    A.  Yes.

22    Q.  What was his reaction to your mother's presence?

23    A.  He was also complaining about her.

24    Q.  You testified that Mr. Souratgar was criticizing you about

25    how you were taking care of the baby, is that right?

Ccarsou2                          Lee - direct

1              MR. ARENSTEIN:  Objection to the form of the question.

2              THE COURT:  Sustained.

3    Q.  Mr. Souratgar, other than criticizing you about how you

4    were taking care of the baby, were there other criticisms that

5    he was directing against you at that time?

6    A.  Yes.  He was also criticizing the housekeeping.

7    Q.  How would he behave when he was criticizing you for the

8    housekeeping?

9              MR. ARENSTEIN:  Objection to the form of the question.

10             THE COURT:  Overruled.

11   A.  He was usually angry, and he would pick on multiple things.

12   For example, the floor mat is not placed properly, the kitchen

13   stove is dirty, things like that.

14   Q.  Would you describe his demeanor.

15             THE COURT:  Asked and answered.

16   Q.  Would you describe the tone of his voice when he was

17   criticizing you.

18             MR. ARENSTEIN:  Objection.

19             THE COURT:  Overruled.

20   A.  He was angry.

21             MR. ARENSTEIN:  Objection.

22             THE COURT:  Overruled.

23   Q.  What, if anything, would he do when he was angry around

24   this time?

25   A.  He would shout at me, and if I answer him back, he would

Ccarsou2                          Lee - direct

```
 1   start hitting me.
 2   Q.  What would he shout at you?  What would he say to you when
 3   he was shouting at you?
 4   A.  He sometimes called me "stupid," sometimes he called me
 5   "bitch," he even called me a prostitute.
 6   Q.  How often was he calling you "bitch" and "stupid" and
 7   "prostitute"?
 8   A.  Almost every time when we get into an argument.
 9   Q.  How often was that?
10   A.  Two, three times a month.
11   Q.  How did Mr. Souratgar treat you physically --
12            THE COURT:  During what period of time?  Was this
13   throughout the marriage?
14            THE WITNESS:  Yes, after Shayan was born.
15            MS. LEIDHOLDT:  Your Honor --
16            THE COURT:  Excuse me a second.
17            I didn't hear what you said.
18            THE WITNESS:  This was before and after Shayan was
19   born.
20            THE COURT:  Thank you very much.
21   Q.  How did he treat you physically after the baby was born?
22   A.  When we get to argue, he would start kicking me, punch me,
23   slap me, hit me on my head.
24   Q.  Where was the baby when Mr. Souratgar was abusing you
25   physically?
```

Ccarsou2                          Lee - direct

1              MR. ARENSTEIN:  Objection.

2              THE COURT:  Let's have an approximate date, time, and

3    place.

4    Q.  After the birth of Shayan, while he was still an infant,

5    where was Shayan when Mr. Souratgar was physically abusing you?

6              MR. ARENSTEIN:  Objection.  Leading.

7              THE COURT:  No.  Let's get to an incident.  When was

8    the first time after the birth of Shayan that your husband

9    kicked or punched you?

10             THE WITNESS:  In front of Shayan?

11             THE COURT:  Yes.

12             THE WITNESS:  It was probably to two to three months

13   old.

14             THE COURT:  Two to three months old.  Where did this

15   take place?

16             THE WITNESS:  At our home.

17             THE COURT:  In what room in the house?

18             THE WITNESS:  Living room.

19             THE COURT:  What time of year was that?

20             THE WITNESS:  2009.

21             THE COURT:  I'm sorry?

22             THE WITNESS:  2009.

23             THE COURT:  What time of year was it?  Was it winter,

24   fall, spring, November, January, August?

25             THE WITNESS:  I would say it's probably around March,

Ccarsou2                         Lee - direct

```
 1    April.
 2               THE COURT:  March or April.  Go ahead.
 3               MS. LEIDHOLDT:  I'll direct the witness's attention to
 4    a particular time.
 5               THE COURT:  Thank you.
 6    BY MS. LEIDHOLDT:
 7    Q.  Ms. Lee, I'd like to direct your attention to the end of
 8    2009, to a time when you were breastfeeding Shayan in the
 9    living room of the home that you shared with Mr. Souratgar.  Do
10    you remember an incident that occurred with Mr. Souratgar while
11    you were breastfeeding the baby?
12    A.  Yes.
13    Q.  Could you please describe what happened.
14    A.  It was after dinner.  I was feeding Shayan, breastfeeding
15    Shayan in the living room.  Majid came out from the kitchen and
16    he started scolding me for the dirty stove.  He said that only
17    crazy people cook until the whole stove is dirty.  Then I told
18    him that can we ask the helper to clean it up.  He say no.
19               THE COURT:  Ask who to clean it up?
20               THE WITNESS:  Our helper.
21               THE COURT:  Is that your maid?
22               THE WITNESS:  Yes, our maid.
23               THE COURT:  You asked Mr. Souratgar whether the maid
24    could clean this up?
25               THE WITNESS:  Yes.
```

Ccarsou2                          Lee - direct

1              THE COURT:  Go ahead.

2    A.   Then he say no.  He say, you are the one who dirtied it, so

3    you go and clean it up.  So I told him, OK.

4    Q.   Ms. Lee, where was Shayan at the time that you were having

5    this conversation with Mr. Souratgar?

6    A.   He was breastfeeding.  He was drinking from my breast.

7    Q.   Continue, please.

8    A.   I told Majid, OK, when Shayan finish, then I will go and

9    clean it up.  After which he told me, don't answer me back.

10   And then I just stare at him.  I don't know why he got so

11   angry.  And then he started hitting me on my shoulder.  He

12   struck me a few times on my shoulder, my right shoulder.

13   Q.   Where was Shayan as Mr. Souratgar was striking you on your

14   shoulder?

15   A.   He was in my arms, drinking.

16   Q.   Approximately how much force did Mr. Souratgar use?

17              MR. ARENSTEIN:  Objection.  Leading.

18              THE COURT:  Overruled.

19   Q.   How much force did Mr. Souratgar use when he was striking

20   you in the shoulder as you were holding Shayan?

21              MR. ARENSTEIN:  Objection to the question, your Honor.

22              THE COURT:  Overruled.

23   A.   He struck me multiple times on my shoulder, and when he

24   struck, I was like moving back and forth.

25   Q.   As you were moving back and forth, approximately how many

Ccarsou2                        Lee - direct

1    times, if you recall, did Mr. Souratgar strike you?

2    A.  I can't remember exactly how many times, but I know

3    multiple times.

4    Q.  Did there come a time that he stopped striking you?

5    A.  Yes.  I told him to stop.  Because of Shayan, I say, you

6    might hit Shayan, so I asked him to stop.  But he continue.

7    And then after that I just -- my focus was just to protect

8    Shayan because I didn't want him to get hurt.

9    Q.  How old, approximately, was Shayan at this time?

10   A.  11 months.

11   Q.  How, if at all, did Shayan react if you were able to

12   notice?

13            MR. ARENSTEIN:  Objection.

14            THE COURT:  Overruled.

15   A.  Shayan was drinking.  But when he saw this, he stopped, he

16   stopped drinking, he stopped breastfeeding.  He just looked, I

17   mean he just stare at what is happening.  I could tell that he

18   was afraid.

19            MR. ARENSTEIN:  Objection.

20            THE COURT:  Overruled.

21   Q.  Was this the only time that Mr. Souratgar physically abused

22   you while you were holding the baby?

23            MR. ARENSTEIN:  Objection.

24            THE COURT:  We are going to take a lunch break and

25   we'll pick up at 2 o'clock.  Thank you all.  Have a pleasant

Ccarsou2                          Lee - direct

1    lunch.

2                  (Luncheon recess)

3

4                          AFTERNOON SESSION

5                           2:20 p.m.

6    LEE JEN FAIR, resumed.

7    CROSS-EXAMINATION (continued)

8    Q.   Ms. Lee, you testified about an incident in which Mr.

9    Souratgar --

10                 THE COURT:  We moved on from that.  You are on to

11   testimony about other incidents.

12                 MS. LEIDHOLDT:  Yes.

13                 THE COURT:  Is this to remind me of where we were?

14                 MS. LEIDHOLDT:  It was to remind our client of where

15   we are, your Honor.

16                 THE COURT:  Just put your questions to the witness.

17   Q.   Was this the only time that Mr. Souratgar physically abused

18   you while you were actually holding Shayan?

19                 MR. ARENSTEIN:  Objection.

20                 THE COURT:  Overruled.

21   A.   No.

22   Q.   I'd like to direct you to an incident that transpired after

23   this incident in the beginning of 2010, when Mr. Souratgar

24   requested that you leave the home.  Could you describe what

25   happened.

Ccarsou2                    Lee - direct

1   A.   He wanted to have Shayan documents --

2   Q.   No.  I'd like to --

3           THE COURT:  "No"?  What does that mean, counselor?

4   What does "no" mean?

5           MS. LEIDHOLDT:  I think Ms. Lee is describing an

6   incident much --

7           THE COURT:  Let me see you at the side bar.

8           (At the side bar)

9           THE COURT:  What are you doing?

10           MS. LEIDHOLDT:  I'm sorry.  She is describing an

11   incident that transpired in 2011.  She didn't understand --

12           MR. ARENSTEIN:  Let's put this on the record.  I can't

13   hear it.

14           MS. LEIDHOLDT:  I asked for 2010.  I don't think she

15   understood that I said 2010.  She is describing an incident

16   that happened much, much later than the incident I'm trying to

17   direct her to.

18           THE COURT:  I gather that.  This is inappropriate

19   conduct of a member of the bar.  You are a member of the bar of

20   this court?

21           MS. LEIDHOLDT:  I am, your Honor.

22           THE COURT:  It is inappropriate for you to respond to

23   an answer of the witness "no."  That's inappropriate.

24           MS. LEIDHOLDT:  I'm sorry.

25           (In open court)

Ccarsou2                    Lee - direct

1              THE COURT:  Next question.

2    BY MS. LEIDHOLDT:

3    Q.  Did there come a time, is Lee, when Mr. Souratgar told you

4    that you were a bad wife?

5    A.  He tells me that all the time.

6    Q.  Did there come a time in the end of 2009 and the beginning

7    of 2010 when Mr. Souratgar became angry at you after telling

8    you that you were a bad wife and instructed you to leave the

9    home?

10             MR. ARENSTEIN:  Objection to the question, your Honor.

11   Leading.

12             THE COURT:  Sustained.

13   Q.  Ms. Lee, you described an incident where Mr. Souratgar

14   struck you as you were holding Shayan.  Were there incidents in

15   which Mr. Souratgar pulled Shayan from your arms?

16             MR. ARENSTEIN:  Objection.

17             THE COURT:  Overruled.

18   A.  Yes.

19   Q.  Could you describe any incident that you recall in around

20   the end of 2009-beginning of 2010 when Mr. Souratgar pulled

21   Shayan from your arms.

22   A.  Yes.  We were arguing over some petty household issues.

23   Then it elevated to he asking me to leave the home, because he

24   say that I was a bad wife and I'm a bad mother, too.  And he

25   told me that he doesn't need me around anymore, and he asked me

Ccarsou2                         Lee - direct

 1   to leave the home.

 2          At the time I was carrying Shayan, and I told him no,

 3   I'm not going to leave the home.  I say, Shayan stay here, I

 4   stay here.  But he insisted that I leave.  So after that, he

 5   just snatched Shayan away from my arms.  I told him, I still

 6   refuse to leave.  Then he started beating me, he started

 7   hitting me on my head.  Then he started hitting my back.

 8          MR. ARENSTEIN:  Move to strike.  Not responsive to the

 9   question, your Honor.

10          THE COURT:  Overruled.

11   Q.  What, if anything, happened after he began to beat you on

12   your head and began to beat you on your back during this

13   particular incident that you're detailing?

14   A.  Because I didn't want to leave the home, so I just sat

15   down.  To protect myself, I just curled --

16          MR. ARENSTEIN:  Could we have a time frame on this?

17          THE COURT:  Yes.

18   Q.  When, approximately, to the best of your recollection, did

19   this particular incident that you are describing now occur?

20   A.  End of the year of 2009.

21   Q.  Where was Shayan when you curled up on the floor, as you

22   testified?

23          MR. ARENSTEIN:  Objection to the characterization.

24          THE COURT:  Overruled.

25   A.  Majid was carrying him.

Ccarsou2                    Lee - direct

1  Q.  What, if anything, did Mr. Souratgar do as you were seated

2  on the floor as you just described?

3  A.  He continued hitting and kicking me on my back.

4  Q.  What, if anything, did you do at that time?

5  A.  I just told him to stop, but he wouldn't.

6  Q.  How much force did he use as he was kicking you?

7           MR. ARENSTEIN:  Objection, your Honor.

8           THE COURT:  Overruled.

9  A.  He was kicking me hard and hitting me hard.  Because after

10 that, when I went up to take a shower, I saw that my back and

11 parts of my body were red, and next few days it developed into

12 bruises.

13          MR. ARENSTEIN:  I didn't hear that, your Honor.

14          THE COURT:  Read back the answer.

15          (Record read)

16          THE COURT:  Thank you.

17 Q.  How often was Mr. Souratgar home during the period that you

18 are describing now, the end of 2009 and the beginning of 2010?

19 A.  During that period he was in Singapore.

20 Q.  Did you make a police report after either of these

21 incidents that you just described, abuse while you were

22 carrying Shayan?

23 A.  No.

24 Q.  Why didn't you do that?

25 A.  Mainly because I didn't want to bring Shayan to the police

Ccarsou2                    Lee - direct

1    station and then thereafter to the doctor's practice.  And I

2    was also afraid that if Majid finds out, then I be in big

3    trouble.

4              MR. ARENSTEIN:  Objection.

5              THE COURT:  Overruled.

6    Q.  What do you mean when you say in big trouble?

7    A.  Because he has threatened to kill me before if he finds out

8    that I ever lodge a police report.

9              MR. ARENSTEIN:  Objection.

10             THE COURT:  Overruled.

11   Q.  Do you recall a specific incident when Mr. Souratgar

12   threatened to kill you?

13   A.  Yes.

14   Q.  Could you describe that incident, please.

15             MR. ARENSTEIN:  Can we have a time and a place and a

16   date, your Honor?

17             THE COURT:  Yes.

18   Q.  When was that incident, approximately, if you can recall?

19   A.  This was back in May 2008.  No, sorry.  March 2008.  It was

20   after the first few times he beat me.

21             MR. ARENSTEIN:  I object, your Honor.

22             THE COURT:  Overruled.

23   A.  I actually told his nephew's girlfriend, Angie, she works

24   in a law firm, and I told her about the domestic violence.  She

25   told me that I should lodge a police report and seek --

Ccarsou2                        Lee – direct

1              MR. ARENSTEIN:  Objection to what she told her.

2              THE COURT:  Overruled.

3    A.   She told me that I should lodge a police report and seek

4    medical attention, after which she told his nephew and his

5    nephew told Majid.  Then Majid, if he caught me --

6              MR. ARENSTEIN:  Objection to who told what to who for

7    what was said.  Somebody told somebody, somebody told somebody

8    else, that's hearsay.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CCAJSOU3                    Fair - direct

1          THE COURT:  I'm not understanding which conversation

2     you're objecting to, as to who said what.

3          MR. ARENSTEIN:  She is testifying that somebody told

4     her something and said it to somebody else.  That is hearsay.

5          THE COURT:  That's sustained as to what the third

6     person told somebody else.

7     BY MS. LEIDHOLDT:

8     Q.  What ultimately happened during this incident?

9     A.  Majid then called me and he told me -- he asked me why did

10    I tell Angie, and then he said that I had caused him

11    embarrassment and then he said that if you ever lodge a police

12    report, I'll kill you.

13    Q.  After that first instance in which Mr. Souratgar talked

14    with you about possibly killing you, were there any other

15    incidents in which he threatened to kill you?

16    A.  There were multiple incidents.  We had a lot of arguments

17    throughout, so there were times when he would just say I'll

18    kill you, go ahead die.

19         MR. ARENSTEIN:  Objection.  I don't think the answer

20    was responsive to the question, your Honor.

21         THE COURT:  Sustained.

22    BY MS. LEIDHOLDT:

23    Q.  Were there any other times after this, after the birth of

24    Shayan when Mr. Souratgar threatened to kill you?

25         MR. ARENSTEIN:  Asked and answered, your Honor.

CCAJSOU3                        Fair - direct

1          THE COURT:  I think it was.

2          MS. LEIDHOLDT:  Your Honor, I'll move on.

3   BY MS. LEIDHOLDT:

4   Q.  Ms. Lee, how often after the birth of Shayan did

5   Mr. Souratgar subject you to incidents of physical violence?

6          MR. ARENSTEIN:  Objection.  That is asked and

7   answered, too, your Honor.

8          THE COURT:  No.  I'll allow it.  Go ahead.

9   A.  There were multiple times, many times.

10  BY MS. LEIDHOLDT:

11  Q.  How often during those incidents was the subject child

12  present?

13  A.  I would say most of the times.

14  Q.  How, if at all, as Shayan began to get older, let's say in

15  his second year of life, according to your observations, did he

16  react to his father's abuse of you?

17         MR. ARENSTEIN:  Objection.

18         THE COURT:  Well, I am not going to preclude you from

19  asking a question as you asked before as to what he observed in

20  a particular instance, but in the form you've asked it, the

21  objection is sustained.

22         MR. ARENSTEIN:  Thank you.

23  BY MS. LEIDHOLDT:

24  Q.  You described an incident in which Mr. Souratgar ordered

25  you to leave the home?

CCAJSOU3                          Fair - direct

1   A.  Yes.

2   Q.  And you testified pulled the baby out of your arms?

3   A.  Yes.

4            MR. ARENSTEIN:  Objection --

5            THE COURT:  Overruled.

6            MR. ARENSTEIN:  -- to the form.

7   BY MS. LEIDHOLDT:

8   Q.  Were you able to observe -- how old was Shayan at that

9   period of time, approximately?

10  A.  Coming to one year old.

11  Q.  How, if at all, did Shayan react during or immediately

12  after that incident to what was transpiring?

13           THE COURT:  First of all, do you recall when the

14  incident was?

15           THE WITNESS:  It was the end of 2009.

16           THE COURT:  Didn't your witness testify to this

17  already?

18           MR. ARENSTEIN:  Yes, she did.

19           MS. LEIDHOLDT:  There were two incidents she testified

20  about, one when she was breastfeeding the child.

21           THE COURT:  Yes.

22           MS. LEIDHOLDT:  Another when Mr. Souratgar allegedly

23  pulled the child out of her arms and ordered her to leave the

24  home, and I do not believe that she testified to the child's

25  reaction during or after the second incident.

CCAJSOU3                         Fair - direct

1              THE COURT:  All right.  Go ahead.

2              THE WITNESS:  Shayan was frightened.  He looked really

3      scared and his face was just blank.  He doesn't have any --

4      just stare, just stare and --

5              MR. ARENSTEIN:  Objection.

6              THE COURT:  Overruled.  Thank you.  Next question.

7      BY MS. LEIDHOLDT:

8      Q.  Now, you heard Mr. Souratgar's testimony in this courtroom

9      that you were repeatedly chasing him with knives and something

10     that he called choppers and that you threw knives at him.

11             Did that occur at any point during the time that you

12     were living with him or even before, during the time you were

13     in a relationship with him?

14     A.  No, never.

15     Q.  You're aware also, aren't you, of Mr. Souratgar's claims

16     that you would hit and punch yourself and actually physically

17     injure yourself during the course of the relationship?  Did you

18     hear that testimony?

19     A.  Yes.

20     Q.  Did you ever in the course of your relationship with

21     Mr. Souratgar deliberately injure yourself?

22     A.  No.

23     Q.  When was the first time you learned that Mr. Souratgar was

24     making these kinds of claims that you were throwing knives at

25     him and physically injuring yourself?  When did you first learn

1   about it?

2   A.   When I received his affidavit.

3   Q.   When was that?

4   A.   Somewhere in June 2011.

5   Q.   When Mr. Souratgar cursed at you, you testified that he

6   called you bitch?

7   A.   Yes.

8   Q.   And prostitute?

9   A.   Yes.

10   Q.   And stupid?

11   A.   Yes.

12   Q.   Were there any other derogatory words that he used against

13   you while you were living with him after Shayan was born?

14   A.   He would call me animal names like pig.

15   Q.   Did you ever curse back at him?

16   A.   No.

17   Q.   Why didn't you curse back at him?

18   A.   I wouldn't dare.

19   Q.   Ms. Lee, how did Mr. Souratgar treat Shayan, and I'd like

20   to direct your attention to the period after Shayan's early

21   infancy, say from the time he was perhaps 9 months' old and

22   going forward, for the year after, let's say for the year after

23   he was 9 months' old?

24           How did he treat his son?

25           MR. ARENSTEIN:   Objection to the relevance of how he

CCAJSOU3                    Fair - direct

1  treated his son at that time.  Your Honor, I would just like to

2  object to the line of questioning.  Ms. Lee hold has been using

3  two cases, and these two cases are really not relevant to this

4  case.  They're totally different cases.

5           THE COURT:  This is an opportunity to state your

6  objection.  State your objection.  This is not an opportunity

7  for oral argument.  State the basis for your objection.

8           MR. ARENSTEIN:  The basis for my objection is this is

9  going far afield from grave risk of danger from Blondin,

10 Elyashiv, or any other case.

11          THE COURT:  Overruled.  Next question.

12 BY MS. LEIDHOLDT:

13 Q.  Would you please answer that question.

14 A.  He is basically very dominating with the child.  He would

15 scold Shayan when Shayan cries because he says that boys don't

16 cry and that they should shed blood rather than shed tears.

17          He will be very selective of Shayan's toys and he

18 wouldn't allow Shayan to play with any toys that is played by

19 girls, for example, like dolls or cooking or even cooking

20 kitchen set because he said those are for girls to play.

21 Q.  It's your testimony that Mr. Souratgar would scold Shayan?

22 A.  Yes.

23 Q.  What tone of voice did he use when he would scold Shayan?

24 A.  In a harsh tone.

25          MR. ARENSTEIN:  Your Honor, again I object.  This goes

CCAJSOU3                          Fair - direct

 1   to the issue of maybe a custody proceeding, but it is certainly

 2   not proper in this Court.

 3               THE COURT:  I am taking the testimony subject to a

 4   motion to strike.  If it is ultimately concluded it is

 5   irrelevant, it will not factor into my consideration.

 6   BY MS. LEIDHOLDT:

 7   Q.  When you said he spoke with Shayan, he would scold Shayan

 8   at times and spoke in a harsh tone, how loud was his voice when

 9   he was scolding Shayan or speaking with Shayan in a harsh tone?

10   A.  In a shouting manner.

11   Q.  Did Mr. Souratgar say anything about the kind of school he

12   wanted Shayan to go to when he got older?

13   A.  Yes.

14               MR. ARENSTEIN:  Objection to the relevance.

15               THE COURT:  Sustained.

16               MS. LEIDHOLDT:  Your Honor, this goes to the issue of

17   whether or not Mr. Souratgar intended to take Shayan to Iran.

18               THE COURT:  Why don't you ask that question instead.

19               MS. LEIDHOLDT:  I am trying not to make it a leading

20   question.

21               THE COURT:  I think I could imagine a form of the

22   question which would not be leading just as your response to

23   the objection was suggestive, but go ahead.

24   BY MS. LEIDHOLDT:

25   Q.  Didn't Mr. Souratgar make a statement to you about the

CCAJSOU3                          Fair - direct

1    school that he wanted Shayan to attend when he got older that

2    caused you to concern?

3            THE COURT:  I think I sustained an objection to that

4    question.

5            MS. LEIDHOLDT:  I didn't --

6            (Off-the-record discussion)

7    BY MS. LEIDHOLDT:

8    Q.  Did Mr. Souratgar make statements about sending Shayan to a

9    school in a future date that caused you concern that he would

10   take Shayan to Iran?

11           MR. ARENSTEIN:  Objection.

12           THE COURT:  Yes.

13           MR. ARENSTEIN:  That is leading.

14           THE COURT:  That is really leading.

15           MS. LEIDHOLDT:  I am trying --

16           THE COURT:  I know what you're trying to do.  It is

17   easily accomplished, but you haven't done it so far.  If that

18   is not a leading question -- withdrawn.

19           Go ahead, ask a question.

20   BY MS. LEIDHOLDT:

21   Q.  What, if at all, did Mr. Souratgar say to you about sending

22   Shayan to a particular kind of school when Shayan was older?

23           MR. ARENSTEIN:  Objection.

24           THE COURT:  Sustained.

25   BY MS. LEIDHOLDT:

CCAJSOU3                      Fair - direct

```
 1    Q.  Did Mr. Souratgar ever make any statements about taking
 2    Shayan to Iran?
 3              MR. ARENSTEIN:  Objection.
 4              THE COURT:  Overruled.  That is not a leading
 5    question.
 6    A.  Yes.
 7    Q.  What did he say at this time?
 8    A.  He say he.
 9              MR. ARENSTEIN:  At which time, your Honor?
10              THE COURT:  At the time of this conversation.  Let's
11    fix a time and place.  When was the conversation, ma'am?
12              THE WITNESS:  Sometime in the year 2010.
13              THE COURT:  Thank you.  You don't recall when in 2010,
14    to the best -- can you approximate the month or the season of
15    the year?
16              THE WITNESS:  I would say probably mid, midyear.
17              THE COURT:  Okay.
18    BY MS. LEIDHOLDT:
19    Q.  What, if anything, did he say in the middle part of 2010
20    about taking Shayan to Iran?
21    A.  He said that he wanted to relocate back to Iran and he
22    wanted me and Shayan to follow him, and I told him that, you
23    know, I think the education over there is not as good as the
24    one in other countries, and he said that no, he said I want to
25    put Shayan in a military school in Iran.
```

CCAJSOU3                          Fair - direct

1            THE COURT:  In a what school?

2            THE WITNESS:  Military.  Then I wasn't agreeable with

3     him at all.

4     BY MS. LEIDHOLDT:

5     Q.  Did Mr. Souratgar make statements to Shayan about Americans

6     and Israelis?

7            MR. ARENSTEIN:  Objection; leading question and not

8     only -- I don't see the relevance.  Inflammatory as well.

9            THE COURT:  Yes.  I think it probably is, but I'm

10    going to allow it.  Go ahead, subject to a motion to strike.

11    A.  Yes, there are many times when he was watching the news and

12    Shayan sometimes is sitting on his lap.  He will -- and there

13    is news about the Iranians and the Syrian war, and he will tell

14    Shayan, you see, the Americans are bad.  When you grow up, you

15    have to kill them.  Then he said the Syrian people, they're

16    fighting with Israelis who are trying to take over their land

17    and things like that.  He told him, when you grow up, you have

18    to kill them or bomb them.

19            MR. ARENSTEIN:  Objection.

20            THE COURT:  Ms. Leidholdt, what is the relevance of

21    this?

22            MS. LEIDHOLDT:  Your Honor, the relevance is, it

23    appears Mr. Souratgar --

24            THE COURT:  Sit down, sir.

25            MS. LEIDHOLDT:  -- was engaged in a campaign to

1   indoctrinate Shayan and instill in him bigoted and hostile and
2   even racist attitudes towards Americans and Jewish people, and
3   there were many statements, upon information and belief, that
4   were made to the children.
5          THE COURT:  No.  I am talking about the testimony that
6   was just elicited.  I am not talking about some other
7   testimony.  I am talking about the testimony that just came out
8   of the mouth of the witness.  Confine your comments to that.
9          MS. LEIDHOLDT:  So, your Honor, this is an indication
10  of that.
11         THE COURT:  Of racism?  What was the racist statement?
12         MS. LEIDHOLDT:  Instilling hatred towards Americans
13  and hatred towards Israelis.
14         THE COURT:  And?
15         MS. LEIDHOLDT:  And stating violent, you have to kill
16  them when you grow up, you need to kill them.  That would be
17  indoctrinating the child.
18         Your Honor, we believe this is a form of psychological
19  abuse of the child that Mr. Souratgar was subjecting him to in
20  his home from the time he was a baby.
21         THE COURT:  No.  Does it make any difference whether
22  it is an Iranian saying this about Americans or an American
23  father saying it about Iranians?
24         Would it make any difference?
25         MS. LEIDHOLDT:  To tell the child when you go up, you

CCAJSOU3                        Fair - direct

1   need to kill these people, I think it would be equally harmful

2   to a child to be told that whether the focus is Americans or

3   Iranians or any group of people.

4           THE COURT:  Then would be what, detrimental?  This is

5   not a custody case, ma'am.

6           MS. LEIDHOLDT:  I do, your Honor, understand, but it

7   is seriously detrimental to a child to be told when you grow

8   up, you need to kill these people; when you grow up, you need

9   to kill these people.  I think it is a form of psychological

10  abuse of a child.

11          THE COURT:  Okay.  How about, "When you grow up,

12  you'll likely have to go to war with these people?"

13          MS. LEIDHOLDT:  That is perhaps more borderline.

14          THE COURT:  How about sending a child to military

15  school?

16          MS. LEIDHOLDT:  I wouldn't call that the same thing --

17  the point of that -- I wouldn't call that the same thing,

18  sending a child to military school is the same thing, but

19  telling a small child you need to kill people, I think that it

20  is -- and we'll have a clinical psychologist who would be able

21  to testify about the significance of that and whether, in fact,

22  that is a form of psychological abuse.

23          THE COURT:  As distinguished from bad parenting or

24  evil-mindedness?

25          MS. LEIDHOLDT:  Yes, your Honor, as distinguished from

CCAJSOU3                          Fair - direct

1   bad parenting.

2              THE COURT:  What is the difference between bad

3   parenting and abuse?

4              MS. LEIDHOLDT:  All forms, negligent parenting, not

5   spending time, there are many different forms of parenting that

6   can be bad.  Abusive parenting is, I believe, your Honor, a

7   different phenomenon, and it would include verbal abuse, but

8   saying to a child -- and this is one instance -- but over and

9   over again from the time the child is quite small that you need

10  to kill people, and there will be more testimony about

11  statements that Mr. Souratgar made.

12             THE COURT:  Now, correct me, I may be misremembering

13  the facts, but the facts as I understand it as of the date of

14  the mother's taking of the child out of Singapore, the

15  Singapore court had given the mother temporary custody and had

16  supervised visitation by the father.

17             Do I have that right or wrong?

18             MS. LEIDHOLDT:  That's correct, your Honor.

19             THE COURT:  Next question, please.

20             MR. ARENSTEIN:  Your Honor, I would move to strike

21  that part of the testimony.

22             THE COURT:  Overruled.

23  BY MS. LEIDHOLDT:

24  Q.  Did Mr. Souratgar make statements directly to Shayan about

25  Jewish people that caused you concern?

CCAJSOU3                        Fair - direct

1          MR. ARENSTEIN:  Objection; asked and answered.

2          THE COURT:  Overruled.

3    A.  He constantly poked fun at the Jewish people.

4    Q.  What did he say specifically, if you recall?

5    A.  He said that they were greedy, and why they have big

6    nostrils is to suck up all the air.

7          MR. ARENSTEIN:  Objection to relevance again, your

8    Honor.

9          THE COURT:  Well, that remains to be seen.  I will

10   allow the testimony to stand for now.

11   BY MS. LEIDHOLDT:

12   Q.  Ms. Lee, would you please describe your sexual relationship

13   with Mr. Souratgar.

14   A.  From the start?

15   Q.  After the birth of Shayan?

16   A.  I --

17          MR. ARENSTEIN:  Objection to the relevance.

18          THE COURT:  You are a little late in objecting this

19   time, but I think it is of marginal relevance, but with the

20   time-frame narrowed and the fact it was covered on direct, I'll

21   let the testimony come in subject to a motion to strike.

22          MR. ARENSTEIN:  Thank you.

23          THE COURT:  I think both sides have gotten into

24   enormous amounts of irrelevancies in the course of this

25   proceeding, treating it as if this Court is going to decide

CCAJSOU3                        Fair - direct

1   custody of this child, visitation or who is the better parent

2   or what country the child should be raised in, none of which

3   are before me.

4            If this Court denies the petition, the question of

5   custody, if it were decided by a New York court, could include

6   that the child go back to Singapore.  If I grant the petition,

7   the determination of a court in Singapore could be a direction

8   that the child come to the United States.  This is at the

9   moment really a question that is focused on which court will

10  hear this.  I have overruled it.

11           Go ahead, next question.

12  BY MS. LEIDHOLDT:

13  Q.  Will you describe your sexual relationship with

14  Mr. Souratgar as it took place in the presence of the subject

15  child Shayan.

16           MR. ARENSTEIN:  I would like a time-frame, your Honor.

17           THE COURT:  Please.

18  BY MS. LEIDHOLDT:

19  Q.  During the first two and a half years of Shayan's life?

20  A.  He was very rough.

21  Q.  When you say "he," who do you mean?

22  A.  Majid.

23  Q.  Yes.

24  A.  And there were many times that I totally -- actually, I

25  don't enjoy having sex with him at all because he's rough, he

1    would make me do things that I don't want to, and he will

2    physically hit and slap me and beat me, pull my hair during

3    sexual intercourse.

4          He knows that I suffer from hemorrhoids and it became

5    worse after I gave birth to Shayan, and there were times after

6    he withdraw from my anal, he would force me to perform oral

7    sex.

8    Q.   Where was Shayan while this was happening?

9    A.   Shayan is at the side, in his crib at the side of the bed.

10   Q.   How, if at all, did you resist when Mr. Souratgar was doing

11   these things to you?

12   A.   I told him many times no, I say that Shayan might witness

13   these things and I say stop.

14          MR. ARENSTEIN:  I didn't hear the answer to that.

15          THE COURT:  Keep your voice up.  Mr. Reporter.

16          (Record read).

17          THE COURT:  Thank you.

18          MR. ARENSTEIN:  Thank you.

19   BY MS. LEIDHOLDT:

20   Q.   You testified you had a physical condition that made anal

21   intercourse painful?

22   A.   Yes.

23          MR. ARENSTEIN:  Objection.

24          THE COURT:  Oh, you know, I am going to take it

25   subject to a motion to strike.  Ms. Leidholdt is of the view

1    this is relevant to this proceeding.  I am going to let her

2    offer this evidence subject to a motion to strike.

3              MR. ARENSTEIN:  Thank you, your Honor.

4    BY MS. LEIDHOLDT:

5    Q.  Did this deter Mr. Souratgar from insisting on this kind of

6    sexual --

7              MR. ARENSTEIN:  Objection.  It is a leading question,

8    your Honor.

9              THE COURT:  Sustained.  Watch your demeanor, Mr.

10   Arenstein, okay?

11             MR. ARENSTEIN:  I am frustrated.

12             THE COURT:  I don't need the commentary, Mr.

13   Arenstein.

14   BY MS. LEIDHOLDT:

15   Q.  Did Mr. Souratgar make you say things that you felt

16   uncomfortable saying during your sexual activity?

17             MR. ARENSTEIN:  Objection.

18             THE COURT:  Overruled.

19   A.  Yes.

20   Q.  What kinds of things?

21   A.  Things like fuck me, suck me, I'm coming.

22   Q.  Did Mr. Souratgar want you to say things like this to him

23   when he was traveling?

24             MR. ARENSTEIN:  Objection.

25             THE COURT:  Yes, you are so way, way untethered from

CCAJSOU3                          Fair – direct

1   the mark, Ms. Leidholdt, that that objection is sustained.

2          I caution you once again to confine yourself to

3   matters that are relevant to this proceeding.

4   BY MS. LEIDHOLDT:

5   Q.  Ms. Lee, why did Shayan sleep next to the marital bed?

6   A.  Because he doesn't have his own room and also to facilitate

7   breastfeeding.

8          MR. ARENSTEIN:  I didn't hear that.

9          THE COURT:  "Because he doesn't have his own room and

10  also to facilitate breastfeeding."

11         Mr. Arenstein, if you would like to move your chair

12  forward, you're free to do that.

13         MR. ARENSTEIN:  Thank you.  I will.

14  BY MS. LEIDHOLDT:

15  Q.  Did Shayan ever move into his own room while you and Shayan

16  were living with Mr. Souratgar?

17  A.  No.

18  Q.  Did you take any steps to try to prevent the sexual abuse

19  that Shayan was being exposed to in the marital bed?

20         MR. ARENSTEIN:  Objection to the form.

21         THE COURT:  Sustained as to form.

22  BY MS. LEIDHOLDT:

23  Q.  What steps, if any, did you take to stop Shayan from

24  witnessing what was happening in the marital bedroom?

25         MR. ARENSTEIN:  Objection.

CCAJSOU3                          Fair - direct

1           THE COURT:  Overruled.

2   A.   Sometimes I will just remain, breastfeed Shayan and then I

3   put him -- I would put him in the crib and I would come back

4   downstairs -- I stayed in the living room and probably watch

5   Korean drama.

6           THE COURT:  What kind of drama?

7           THE WITNESS:  Korean.

8           THE COURT:  Ms. Leidholdt, what is the relevance of

9   this testimony, of your question and the answer that followed?

10          MS. LEIDHOLDT:  The relevance is whether or not

11  Ms. Lee took any steps to prevent her child from being exposed

12  to the specter of sexual abuse with her.

13          THE COURT:  I understand that is why you're eliciting.

14  Why is that relevant?

15          MS. LEIDHOLDT:  Your Honor, I agree it is of marginal

16  relevance and I will withdraw that question.

17          THE COURT:  All right.  The last question and answer

18  is stricken.  Next question.

19  BY MS. LEIDHOLDT:

20  Q.   After you --

21          THE COURT:  I had just cautioned you, so please keep

22  the caution in mind.

23          MS. LEIDHOLDT:  Yes.

24  BY MS. LEIDHOLDT:

25  Q.   -- after you married Mr. Souratgar, were you free to travel

CCAJSOU3                          Fair - direct

1    or to socialize with friends outside of the marital home --

2              MR. ARENSTEIN:  Objection.

3    Q.  -- or inside the marital home, for that matter?

4              MR. ARENSTEIN:  Objection.

5              THE COURT:  Overruled.

6    A.  He doesn't like me to go out or even make calls to my

7    friends, so each time if I need to go out, I went to visit my

8    family, I have to ask him for permission.

9              THE COURT:  This ended when you moved out in May 2011?

10             THE WITNESS:  Yes.

11             THE COURT:  Thank you.  Next question.

12   BY MS. LEIDHOLDT:

13   Q.  What, if anything, did Mr. Souratgar instruct you about

14   obedience and wives and obedience in particular?

15             MR. ARENSTEIN:  A time and framework, your Honor.

16             THE COURT:  Yes.

17   BY MS. LEIDHOLDT:

18   Q.  Did Mr. Souratgar make any statements to you about wives

19   and obedience.

20             MR. ARENSTEIN:  Objection, your Honor.  I asked for

21   time and frame.

22             MS. LEIDHOLDT:  I am going to try to focus a time and

23   frame once he establishes --

24             THE COURT:  I am not sure where we're going with this.

25             In this country, there are many Americans who have

1   been married with a vow of obedience, is that not correct?

2              Those are lawful vows in this country even in 2012,

3   correct?

4              MS. LEIDHOLDT:  Yes, that's correct, your Honor.

5              THE COURT:  Where are we going with this?

6              MS. LEIDHOLDT:  Your Honor, I believe it goes to a

7   pattern of psychological abuse.

8              THE COURT:  Okay.  So a spouse who in 2008 or 9 takes

9   a vow of obedience would be, that would be a step in the path

10   towards psychological abuse?

11              MS. LEIDHOLDT:  I think it would be what a spouse did

12   with the spouse's vow of obedience.

13              THE COURT:  Okay.  Go ahead, I'll allow the question.

14   BY MS. LEIDHOLDT:

15   Q.  What, if anything, did Mr. Souratgar tell you?

16   A.  He said that a wife should listen to her husband and not

17   answer him back and be submissive to him.

18   Q.  Did there come a time Mr. Souratgar wanted to take you and

19   Shayan to Malaysia?

20   A.  Yes.

21   Q.  When was this?

22   A.  This was in March 2009.

23   Q.  Why did Mr. Souratgar want to go to Malaysia?

24   A.  He said that he wanted to apply for multiple entry visas to

25   Malaysia and to register our marriage with the Iranian

CCAJSOU3                          Fair – direct

1   consulate as well as Shayan both.

2   Q.  Did you go to the Iranian consulate in Malaysia with

3   Mr. Souratgar and with your son?

4   A.  Yes.

5   Q.  Is there an Iranian embassy or Iranian consulate in

6   Singapore?

7   A.  No.

8   Q.  What, if anything, did you do to prepare for the visit to

9   the Iranian consulate in Malaysia?

10  A.  He asked me to take a passport size photo for myself and

11  Shayan and he told me that I have to wear a head scarf because

12  this is the dress code of Iran for a woman.

13  Q.  Did he explain why he wanted you to take a passport size

14  photo of yourself and Shayan?

15            MR. ARENSTEIN:  Objection.

16            THE COURT:  Overruled.

17  A.  He said it was to submit together with the forms he needs

18  to fill out.

19  Q.  For what purpose?

20  A.  For the marriage registration.

21  Q.  Did there come a time you and Mr. Souratgar and Shayan

22  actually went to -- withdrawn -- come a time you and

23  Mr. Souratgar subsequently went to the Iranian consulate in

24  Malaysia?

25  A.  Yes.

CCAJSOU3                     Fair - direct

1   Q.  What, if anything, transpired once you were there?

2   A.  When we go in, he was greeted at the reception and then a

3   lady came out to escort us into a guest room and over there.

4       We were given special treatments, we were served tea

5   and snacks.  Then later a gentleman, I believe he is a

6   diplomat, he came out and he was beginning -- they shook hands

7   and then he started speaking, after which the lady returned

8   with some forms to fill out, and then Mr. Souratgar filled out

9   the forms.

10  Q.  What, if anything, happened after Mr. Souratgar filled out

11  the form?

12  A.  He asked me to sign and put a thumbprint and then he

13  returned the forms to the gentleman together with the

14  photograph.

15  Q.  What, if anything, transpired -- withdrawn -- what did you

16  believe was happening at the Iranian consulate, to the best of

17  your understanding?

18       MR. ARENSTEIN:  Objection.  We have two questions

19  before the witness.  What, if anything, transpired and a second

20  question.  I am not sure which one she is asking the witness.

21       THE COURT:  The first one is withdrawn and the second

22  one was pending.

23  BY MS. LEIDHOLDT:

24  Q.  What was your understanding, Ms. Lee, of what was happening

25  during that visit with Mr. Souratgar at the Iranian consulate

CCAJSOU3                        Fair – direct

1   in Malaysia?

2   A.  He told me it was to register our marriage and to register

3   Shayan both.

4   Q.  Did you return to the Iranian consulate in Malaysia

5   approximately two weeks later?

6   A.  Yes.

7   Q.  What, if anything, happened then?

8   A.  We reached there and the same thing, he came out and

9   greeted us, took us to the room and he told -- the same

10  gentleman came out with a file, and then he passed some

11  documents to Majid and at the same time there was a passport,

12  and then Majid flipped it open so I saw the photograph of

13  Shayan.

14          MR. ARENSTEIN:  Objection to the answer not being

15  responsive to the question.

16          THE COURT:  I'll let it stand.

17  BY MS. LEIDHOLDT:

18  Q.  What was your reaction to seeing a photograph of Shayan on

19  the passport?

20  A.  I was shocked and I was so very worried because this was

21  not what Majid told me we were going to do.  He told me he was

22  going to register them both in our marriage.

23          THE COURT:  At that point you knew he had obtained a

24  passport?

25          THE WITNESS:  Yes.

CCAJSOU3                          Fair - direct

1                  THE COURT:  Now, correct me or help me out here.  You

2       met Mr. Souratgar in Malaysia or in Singapore?

3                  THE WITNESS:  Singapore.

4                  THE COURT:  You met him in 1995, right?

5                  THE WITNESS:  Yes.

6                  THE COURT:  Did you know he was Iranian?

7                  THE WITNESS:  Yes.

8                  THE COURT:  Thank you.  Next question.

9       BY MS. LEIDHOLDT:

10      Q.  It is your testimony that you were shocked when you saw a

11      passport with Shayan's picture on it in the Iranian consulate?

12      A.  Yes.

13                 THE COURT:  Stricken.  Asked and answered.  What are

14      you doing, reiterating the testimony?

15                 MS. LEIDHOLDT:  No.  I am trying to move on to another

16      question.

17                 THE COURT:  That is not how you move on to another

18      question, by reiterating the testimony.

19      BY MS. LEIDHOLDT:

20      Q.  Could there be a legal problem in Malaysia that could be

21      created by Shayan having an Iranian passport?

22                 MR. ARENSTEIN:  Objection, your Honor.  She is not a

23      lawyer, and I don't think she can testify to that.  Frankly, we

24      have already researched that issue and I think what you heard

25      from counsel is not the law, and we have the law here.

CCAJSOU3                          Fair - direct

 1              THE COURT:  I'll allow the witness to testify to what

 2      her understanding is.

 3              THE WITNESS:  Yes.  In Malaysia, the citizens are not

 4      allowed to have dual citizenship.  If the citizen is found out

 5      to have two, hold two citizenships, they will revoke the

 6      Malaysia one.

 7      BY MS. LEIDHOLDT:

 8      Q.  Did you have a conversation with Mr. Souratgar after you

 9      saw the passport with Shayan's photograph on it?

10      A.  Yes, I asked him why did he get a passport for Shayan

11      because I say if the Malaysia government finds out, then they

12      might revoke his Malaysian citizenship.  He just told me to

13      keep quiet and don't ask so many questions.

14      Q.  What were your concerns, if any, at this time about the

15      potentiality of Mr. Souratgar taking Shayan to Iran?

16              MR. ARENSTEIN:  Objection.

17              THE COURT:  Sustained.

18      BY MS. LEIDHOLDT:

19      Q.  Were there any other incidents in 2009 that caused you

20      concern that Mr. Souratgar was intending to take Shayan to

21      Iran?

22      A.  He had said that he wanted to -- he was always wanting to

23      bring Shayan to Iran.

24              MR. ARENSTEIN:  Objection.

25              THE COURT:  Overruled.

CCAJSOU3                         Fair - direct

1   BY MS. LEIDHOLDT:

2   Q.  Was there anything about Mr. Souratgar's treatment of you

3   at this time that contributed to your concern that he was

4   planning to take Shayan to Iran?

5   A.  He started asking me the kind of -- to take over some

6   duties.  He started taking over these.  He asked for the food

7   that Shayan eats and he asked me to stop breastfeeding.

8               THE COURT:  Pause.  Ma'am, Ms. Lee, you are going to

9   have speak slowly and distinctly so our Court Reporter can take

10  down the words you're speaking.  Do you understand?

11              THE WITNESS:  Yes.

12              THE COURT:  Next question.

13  BY MS. LEIDHOLDT:

14  Q.  Did Mr. Souratgar make statements about your mothering of

15  Shayan that caused you concern about this issue about a desire

16  to take Shayan to Iran?

17              MR. ARENSTEIN:  Objection, your Honor, to the form of

18  the question.

19              THE COURT:  Sustained.

20  BY MS. LEIDHOLDT:

21  Q.  What kinds of statements was Mr. Souratgar making about

22  your mothering at this time that caused you concern?

23              MR. ARENSTEIN:  Objection.  This was asked and

24  answered.

25              THE COURT:  Overruled.

CCAJSOU3                        Fair - direct

1   A.  He constantly said I'm a bad mother.  That Shayan doesn't

2   need a mother like me and that his sister would be a better

3   mother to Shayan.

4   Q.  Where was Mr. Souratgar's sister at this time?

5   A.  In Iran.

6   Q.  You described an incident earlier where Mr. Souratgar told

7   you to leave the house.  Was that the only time that

8   Mr. Souratgar ordered you out of the home?

9   A.  No.  There were other occasions.

10  Q.  How often did he tell you you had to leave the home?

11          MR. ARENSTEIN:  Objection.  Time and place and when.

12          THE COURT:  Yes, fix a time.

13  BY MS. LEIDHOLDT:

14  Q.  Do you remember approximately when those other occasions

15  were when he ordered you to leave the home?

16  A.  There were many.  There are a few occasions.  I really

17  can't put a date because every time we argued, then he asked me

18  to leave the house.

19          THE COURT:  So this, when you said that you argued two

20  to three times a month, in each of those instances he would ask

21  you to leave the house.  Is that correct?

22          THE WITNESS:  Not every single one.

23          THE COURT:  Well, is it most of them?

24          THE WITNESS:  I would say 50 percent.

25          THE COURT:  50 percent of those he asked you to leave

CCAJSOU3                          Fair – direct

1   the house?

2              THE WITNESS:  Yes.

3              THE COURT:  In how many instances did you leave the

4   house?

5              THE WITNESS:  I never left the house after Shayan was

6   born.

7              THE COURT:  Thank you.  Next question.

8   BY MS. LEIDHOLDT:

9   Q.  Why didn't you leave the house after Shayan was born?

10             MR. ARENSTEIN:  Objection.

11             THE COURT:  Overruled.

12  A.  Because there was no one to take care of Shayan then.

13  Q.  Did you take any steps at the end of 2009 to try to prevent

14  Mr. Souratgar from taking Shayan to Iran?

15             MR. ARENSTEIN:  Objection.

16             THE COURT:  Overruled.

17  A.  Yes.  After one trip, I managed to get hold of Shayan's

18  passport and birth certificate.

19  Q.  How did you get that?

20  A.  I told Majid I wanted to register him in a play group for a

21  nursery.

22             THE COURT:  A what?

23             THE WITNESS:  Nursery.

24             THE COURT:  In a what?

25             THE WITNESS:  Nursery.

CCAJSOU3                           Fair - direct

1            THE COURT:  Nursery?

2            THE WITNESS:  Yes.

3            THE COURT:  Thank you.

4            THE WITNESS:  And after that when I got a hold of the

5    documents, I actually kept them at a friend's house.

6    BY MS. LEIDHOLDT:

7    Q.  What was Mr. Souratgar's response to holding onto Shayan's

8    documents?

9    A.  He kept asking me have I registered Shayan, and he wanted

10   them back.

11           THE COURT:  Shayan held only an Iranian passport and

12   no other; is that your testimony?

13           THE WITNESS:  No.  Malaysia.  I don't have Shayan's

14   Iranian passport with me.  It is only Malaysia passport.

15           THE COURT:  At the time you're describing with the

16   nursery, which passport did you obtain from your husband?

17           THE WITNESS:  The Malaysian.

18           THE COURT:  Pardon me?

19           THE WITNESS:  The Malaysian.

20           THE COURT:  There was, in addition to that, the

21   Iranian passport, correct?

22           THE WITNESS:  Yes.

23           THE COURT:  Next question.

24   BY MS. LEIDHOLDT:

25   Q.  At the beginning of the Year 2010, did Mr. Souratgar make

1    any statements about Shayan that alarmed you?

2    A.   Sorry.  Could you repeat it.

3    Q.   At the beginning of the Year 2010, specifically on January

4    1st of 2010, did Mr. Souratgar make a statement about Shayan

5    that alarmed you?

6    A.   He wanted Shayan's documents back.

7    Q.   Did he explain why he wanted Shayan's documents back?

8    A.   He said he wants to keep it in his office.

9    Q.   What, if anything, happened four days later, on January 5th

10   of 2010, at approximately 9:00 pm?

11   A.   He --

12   Q.   Who is "he"?

13   A.   Mr. Majid asked me for Shayan's documents, and then I

14   refused to give it to him because it was at my friends' place.

15   So he ransacked my whole wardrobe and he took out, threw out

16   all my clothes onto the floor.

17          He overturned all the drawers in my wardrobe and then

18   he couldn't find the documents, so he insists that I sit on the

19   bed in the bedroom, and he didn't let me go out from the room

20   till he finds the document.

21   Q.   Did Mr. Souratgar make any statements to you at that time?

22   A.   He said that if he can't get hold of the documents tonight,

23   he will kill me.

24   Q.   How, if at all -- what, if anything, did you do after he

25   made that statement to you he would kill you if he didn't get

CCAJSOU3                          Fair - direct

1   the documents that night?

2   A.   I knew he couldn't get the documents because it was at my

3   friend's place, so I was very, very frightened.  So I just told

4   him that I needed go downstairs to get some water from the

5   kitchen for Shayan.

6   Q.   Did he let you do that?

7   A.   At first, no, but then I told him Shayan needs to drink

8   water, so he said okay.  So I carried Shayan down to the

9   kitchen and then I took my car keys and my handbag and Iran out

10  of the house.

11  Q.   What, if anything, did you do after you, immediately after

12  you left your house with your handbag and your car keys?

13  A.   I was running towards my car, but he managed to catch up

14  with me, Majid managed to catch up with me, so I ran towards a

15  neighbor who lives opposite and asked him for help.

16       But then Majid came over and told the neighbor that

17  this is a husband and wife issue and asked him not to

18  interfere.

19  Q.   Why did you ask the neighbor for help?

20  A.   He was the only one standing on the street.  I was so

21  frightened.

22  Q.   What, if anything, happened then?

23  A.   Then Majid took, grabbed my hand and he pulled me back into

24  the house.

25  Q.   What, if anything, occurred as Majid was pulling you back

CCAJSOU3                              Fair - direct

1    into the house?

2    A.  I tried to resist.

3    Q.  How did he respond to your efforts to resist?

4    A.  He kept, continued dragging me in and he started to hit me.

5    Q.  Where was Shayan at that time?

6    A.  I was carrying Shayan.

7    Q.  What, if anything, happened then?

8    A.  Then he managed to pull me back into the house, in which he

9    continued to beat me.

10   Q.  Did there come a time that he dragged you into the living

11   room of the house?

12   A.  Yes.

13   Q.  What, if anything, happened there?

14   A.  He demanded for the documents and then he wanted to beat me

15   again, but his brother who came downstairs stopped him.

16   Q.  Did you then have a conversation with his brother?

17   A.  No.  He spoke to his brother in Iranian, I don't know what

18   they were saying, but after that his brother told me that --

19          MR. ARENSTEIN:  Objection to what his brother told

20   him.

21          THE COURT:  Overruled.

22   A.  His brother said that just return the documents to Majid

23   and then everything will be okay.

24   Q.  What happened then?

25   A.  And then I just said okay and I said I would return it to

CCAJSOU3                         Fair - direct

 1    him tomorrow.

 2              Then Majid say that if he doesn't see them on the

 3    dinner table when he gets back from work the next day, I will

 4    be in big trouble.

 5    Q.  Did there come a time shortly thereafter you returned to

 6    your bedroom in your home?

 7    A.  Yes.

 8    Q.  Could you describe what happened there.

 9    A.  I --

10    Q.  What did the bedroom look like?

11    A.  All my clothes, you know, my belongings were all over the

12    floor, so I went downstairs and asked maid to help me put back

13    everything.

14    Q.  What happened then?

15    A.  And then while she was helping me to put back all my

16    belongings into my wardrobe, she started crying and said she

17    was so frightened.

18              THE COURT:  Who started crying?

19              THE WITNESS:  The maid.

20              MR. ARENSTEIN:  Objection to strike.

21              THE COURT:  Overruled.

22    BY MS. LEIDHOLDT:

23    Q.  Did you have the opportunity to look at your body that

24    night?

25    A.  Yes, later that night when I used the bathroom, I saw some

CCAJSOU3                          Fair - direct

1   red marks on my arms.

2   Q.  How did you feel after -- how did your body feel after that

3   incident earlier?

4            MR. ARENSTEIN:  Objection.

5            THE COURT:  Basis?

6            MR. ARENSTEIN:  The relevance of how her body felt,

7   the whole scenario of the maid, it is not relevant to --

8            THE COURT:  It is not a scenario of the maid.  The

9   question is how did her body feel in connection with the

10  interaction with Mr. Souratgar.  You may answer the question.

11           THE WITNESS:  My body was aching and painful.

12  BY MS. LEIDHOLDT:

13  Q.  What, if anything, did you do the next morning?

14  A.  The next morning I went out to lodge a police report as

15  well as to see a doctor.

16  Q.  Did you take anyone with you when you lodged the police

17  report?

18  A.  Yes, I had no choice but to bring Shayan and the maid

19  along.

20           MR. ARENSTEIN:  I didn't hear that answer.

21           THE COURT:  I had no choice but to bring Shayan and?

22           THE WITNESS:  The maid along.

23           THE COURT:  The maid?  Thank you.

24           MR. ARENSTEIN:  Thank you.

25  BY MS. LEIDHOLDT:

CCAJSOU3                           Fair - direct

1   Q.  Why did you go to the police station?

2   A.  To lodge a police report and I was also so scared.

3   Q.  What were you afraid of?

4   A.  That Majid will kill me.

5         MS. LEIDHOLDT:  May I approach the witness?

6         THE COURT:  You may.

7         (Off-the-record discussion)

8   BY MS. LEIDHOLDT:

9   Q.  Ms. Lee, I am showing a document marked Respondent's 9 for

10  identification.  Ms. Lee, do you recognize the document in

11  front of you marked Respondent's 9 for identification?

12  A.  Yes.

13  Q.  What do you recognize that document to be?

14  A.  A police report.

15  Q.  Which police report, if any, do you recognize it to be?

16  A.  Which?

17  Q.  Is it a specific police report?

18  A.  I am sorry.  I don't understand the question.

19        MR. ARENSTEIN:  I didn't hear the answer to that.

20        MS. LEIDHOLDT:  One question.

21        MR. ARENSTEIN:  Would you ask the witness to speak up

22  because she is whispering.

23        THE COURT:  Ms. Lee, you have to keep your voice up.

24        THE WITNESS:  Okay.

25  BY MS. LEIDHOLDT:

CCAJSOU3                          Fair - direct

1   Q.  You recognize this to be a police report?

2   A.  Yes.

3   Q.  What police report do you recognize it to be?

4   A.  Of the incident.

5   Q.  Did you make this police report?

6   A.  Yes.

7   Q.  When did you make it?

8   A.  On the 6th of January, 2010.

9   Q.  Is that your signature on the police report?

10  A.  Yes.

11          MS. LEIDHOLDT:  Your Honor, I would respectfully ask

12  that Respondent's 9 for identification be entered into evidence

13  as Respondent's 9 in evidence.

14          THE COURT:  Any objection?

15          MR. ARENSTEIN:  The same objection as to hearsay, your

16  Honor.

17          THE COURT:  Received.

18          (Respondent's Exhibit 9 received in evidence)

19          (off-the-record discussion)

20  BY MS. LEIDHOLDT:

21  Q.  Ms. Lee, I am showing you a document marked Respondent's 10

22  for identification.

23  A.  Okay.

24  Q.  Ms. Lee, do you recognize the document marked Respondent's

25  10 for identification?

CCAJSOU3                          Fair – direct

1    A.   Yes.

2    Q.   What do you recognize this document to be?

3    A.   This is a document given to me by the police when I lodged

4    the police report, to be filled out by a doctor.

5    Q.   As part of this document, is there a medical report?

6    A.   This is the medical report.

7    Q.   So it is your testimony that the entire document is the

8    medical report.  Is that correct?

9    A.   Yes.

10   Q.   Was this the medical report that was prepared after you

11   lodged the police report?

12   A.   Yes.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Ccarsou4                    Lee - direct

1              MS. LEIDHOLDT:  Your Honor, I would respectfully ask

2    that this document be entered into evidence as Respondent's 10

3    in evidence.

4              THE COURT:  Any objection?

5              MR. ARENSTEIN:  Same objection I made before as to

6    hearsay.

7              THE COURT:  Received.

8              (Respondent's Exhibit 10 received in evidence)

9              THE COURT:  Ms. Lee, did the police tell you which

10   doctor you were supposed to see, or were you invited to select

11   the doctor?

12             THE WITNESS:  They don't have a specific doctor.

13             THE COURT:  What doctor did you go to?

14             THE WITNESS:  I just went to the one nearest to the

15   police station.

16             THE COURT:  Thank you.  Had you ever been to that

17   doctor before.

18             THE WITNESS:  This one, no.

19             THE COURT:  Have you ever been to this doctor since

20   then?

21             THE WITNESS:  No.

22             THE COURT:  What did you do with this document after

23   you went to the doctor?

24             THE WITNESS:  I took it back to the police officer.

25   Then he told me to just keep it.  He say, if you want to get a

Ccarsou4                      Lee - direct

1    personal protection order, then you have to bring this to the

2    family court.

3            THE COURT:  Thank you.  Next question.

4    BY MS. LEIDHOLDT:

5    Q.  What, if anything, did you do, Ms. Lee, after you went to

6    the doctor and had the medical examination and received this

7    report.

8    A.  I went to my friend's place to collect the documents, and

9    then right home.

10   Q.  Which documents are you talking about?

11   A.  Shayan passport and birth certificate.

12   Q.  Once you arrived home with Shayan's -- was that his birth

13   certificate and passport from Malaysia?

14   A.  Malaysian passport and the Singapore birth certificate.

15   Q.  What, if anything, did you do once you arrived home with

16   those documents?

17   A.  I left it on the dinner table.

18   Q.  Did there come a time that Mr. Souratgar arrived home?

19   A.  Yes.

20   Q.  What happened once Mr. Souratgar arrived home?

21   A.  He saw it, and then he just kept it, and the next morning

22   he took it with him.

23   Q.  Ms. Lee, Mr. Souratgar testified that his parents reside in

24   Singapore.  Were they living in Singapore throughout the

25   pendency of your relationship with Mr. Souratgar?

Ccarsou4                     Lee - direct

1    A.  No.

2    Q.  Where were they living throughout the pendency of your

3    relationship with Mr. Souratgar?

4    A.  In Iran.

5         MR. ARENSTEIN:  Objection to the relevance of this

6    question, your Honor.

7         THE COURT:  Overruled.

8    Q.  What, if anything, were you aware of in relation to Mr.

9    Souratgar's immigration status?

10        MR. ARENSTEIN:  Can I hear that question again?

11   Q.  To the best of your understanding, what was Mr. Souratgar's

12   immigration status in Singapore?

13   A.  He's an employment pass holder.

14   Q.  What is your immigration status in Singapore again?

15   A.  Permanent resident.

16   Q.  If you know, what is Mr. Souratgar's brother's immigration

17   status in Singapore?

18        MR. ARENSTEIN:  Objection to his brother's.

19        THE COURT:  Overruled.

20   A.  Employment pass.

21        THE COURT:  How did you become a permanent resident of

22   Singapore?

23        THE WITNESS:  I got it back in 1998 when I was working

24   in Singapore.

25        THE COURT:  On what basis were you granted permanent

Ccarsou4                          Lee - direct

1   resident status?

2            THE WITNESS:  Because I was working in Singapore, and

3   then they say that if you want to apply, you can go and apply,

4   after which I send in all my documents, the relevant documents,

5   I sent them to the Singapore immigration.  Then I went for an

6   interview, and after that, they grant me.

7            THE COURT:  How long did the process take?

8            THE WITNESS:  Probably six months.

9            THE COURT:  How long had you been in Singapore at the

10  time you applied for permanent resident status?

11           THE WITNESS:  To the day I left to the United States.

12           THE COURT:  No, no.  How long before you 1998 had you

13  been in Singapore?

14           THE WITNESS:  Four years.

15           THE COURT:  Next question.

16  BY MS. LEIDHOLDT:

17  Q.  To the best of your knowledge, had Mr. Souratgar applied

18  for permanent resident status in Singapore?

19  A.  He told me he did.

20           MR. ARENSTEIN:  Objection to the answer, your Honor.

21  That's not responsive to the question.

22           THE COURT:  Overruled.

23  Q.  Did he detail any problems that he encountered trying to

24  obtain permanent resident status in Singapore?

25  A.  He didn't manage to get one.

Ccarsou4                          Lee - direct

1    Q.  How long, to the best of your knowledge, has Mr. Souratgar

2    resided in Singapore?

3    A.  20 or more years.

4         THE COURT:  20 you say?

5         THE WITNESS:  No, more than years.

6         THE COURT:  20 or more years.

7    Q.  To your knowledge, has Mr. Souratgar had difficulty having

8    his employment pass in Singapore renewed?

9    A.  Yes.  There were once back in the year 2008 he had some

10   troubles getting his employment pass renewed.

11        THE COURT:  Let me see whether I understand this.  You

12   moved to Singapore in 1994?

13        THE WITNESS:  Yes.

14        THE COURT:  You continuously resided in Singapore from

15   1994 until May of 2012, is that correct?

16        THE WITNESS:  Correct.

17        THE COURT:  Correct?

18        THE WITNESS:  Correct.

19        THE COURT:  Thank you.  Next question.

20   Q.  Did there come a time that Mr. Souratgar began to talk

21   about moving his business in Singapore to Iran?

22   A.  He said that his brother will manage the Singapore business

23   and he wants to go back to Iran to manage the Iran business.

24   Q.  When did he make that statement to you?

25   A.  It was back in 2010.

Ccarsou4                    Lee - direct

1    Q.  What, if anything, did you say to Mr. Souratgar when he

2    said he wanted to move back to Iran and run the Iranian

3    business?

4    A.  He said that me and Shayan are supposed to follow him.  But

5    I didn't want to go.

6    Q.  Ms. Lee, have you ever wanted to become an Iranian citizen?

7              MR. ARENSTEIN:  Objection.

8              THE COURT:  Overruled.

9    A.  No, never.

10   Q.  Did you ever take any steps to become an Iranian citizen?

11   A.  No.

12   Q.  Why don't you want to become an Iranian citizen?

13             MR. ARENSTEIN:  Objection.

14             THE COURT:  I'm going to allow it.

15   A.  Because Majid, with an Iranian passport and as a citizen,

16   there's a lot of problems when he travels.  He needs to get

17   visas for most of the countries that he travels to.  And I on

18   the other hand am holding a Malaysian citizenship, and we do

19   not have as much problem traveling at all.  Also, globally

20   there was some discrimination against Iranians.  So I just

21   thought that why would you want to put yourself in that

22   position?

23   Q.  Ms. Lee, would you like to live in Iran?  How would you

24   feel about living in Iran?

25             MR. ARENSTEIN:  Objection.

Ccarsou4                          Lee - direct

```
 1              THE COURT:  Overruled.
 2   A.   It will be a horrible place to live in.  Basically, number
 3   one is it's a Muslim country, and the Muslim laws there are
 4   really, really strict.  The women there basically have no
 5   rights.  I have read articles on people living there, which is
 6   not a very nice place to live.
 7              THE COURT:  Have you ever visited there?
 8              THE WITNESS:  Yes, twice.
 9              THE COURT:  With your husband?
10              THE WITNESS:  With Majid, yes.
11              THE COURT:  Thank you.
12              MR. ARENSTEIN:  Your Honor, I move to strike the
13   answer as not responsive.
14              THE COURT:  I'll take it under advisement.  Go ahead.
15   Q.   Did you have any other concerns about what would your
16   personal situation be like if you moved to Iran, what would it
17   be like for you and Shayan if you moved to Iran?
18              MR. ARENSTEIN:  Objection, your Honor.  Speculative.
19              THE COURT:  Overruled.
20   A.   The fact that even in Singapore the police is not taking
21   action for domestic violence and I have to file a personal
22   protection order.  Under the Shariah law, which applies to most
23   women in Muslim countries, the husband has the right to beat
24   their wife.  So if I am going to live in Iran, he can continue
25   abusing me and then nothing will happen, because they don't
```

Ccarsou4                    Lee - direct

1   protect the women at all.

2          MR. ARENSTEIN:  Objection.  Move to strike the answer

3   as not responsive and inflammatory and not a proper answer.

4          THE COURT:  I'll take it under advisement.  Next

5   question.

6   Q.  Briefly, could you describe your relationship with Mr.

7   Souratgar in 2010.

8          THE COURT:  I think we've covered this.

9   Q.  How old was Shayan on January 29th of 2011?

10  A.  2 years old.

11         THE COURT:  Isn't it just a matter of arithmetic?  His

12  birthday is January 29, 2009.

13         MS. LEIDHOLDT:  I'm going to move on, your Honor.

14         THE COURT:  Please.

15  Q.  Did there come a time, Ms. Lee, that your sister came to

16  live with you?

17  A.  Yes.

18  Q.  Came to live with you in a home you shared with Mr.

19  Souratgar?

20  A.  Yes.

21  Q.  When was that?

22  A.  Mid January 2011.

23  Q.  What is your sister's name?

24  A.  Lee Jen Pink.

25  Q.  Why did Jen Pink come to live with you?

Ccarsou4                    Lee - direct

1   A.  She got a promotion and she was relocated to the Singapore

2   branch office.

3   Q.  Of what company or organization?

4   A.  She is working with Citibank.

5   Q.  How long did she stay with you and Mr. Souratgar?

6   A.  Around four months.

7   Q.  How did Mr. Souratgar respond to your sister's presence in

8   the family's home?

9   A.  He was OK with her initially.  Then after that he started

10  complaining that the electric bills went up, the water bill

11  went up.

12  Q.  I'd like to direct your attention to March 15th of 2011.

13  What, if anything, transpired that day?

14  A.  When?  Sorry.

15  Q.  March 15th of 2011.

16  A.  He was supposed to go to Majid's brother's house for an

17  Iranian New Year dinner.  Then, when he got home, he claimed

18  that Shayan was jumping on a bean bag which he has earlier in

19  the morning told me to put it away because he had some bad

20  dream.  I did tell the maid to put it away, but I think she

21  forgot.  So when he came back, he kick a fuss and say why

22  didn't I listen to him.

23          THE COURT:  Who did you tell to put away the bean bag?

24          THE WITNESS:  The maid.

25          THE COURT:  Thank you.  How many days a week did the

Ccarsou4                         Lee - direct

1    maid come, or did she live there?

2                 THE WITNESS:  She's a stay-in.

3                 THE COURT:  She lives in the house?

4                 THE WITNESS:  Yes.

5                 THE COURT:  Thank you.

6    Q.  When you say Mr. Souratgar kicked up a fuss, what exactly

7    happened?  What did he do?

8                 MR. ARENSTEIN:  Objection to the form of the question.

9                 THE COURT:  What do you mean by kick up a fuss?

10   That's the question.

11   A.  He started scolding me for not putting the bean bag away.

12   He said that I doesn't listen to him.  Then he started

13   shouting.

14   Q.  What, if anything, did he shout?

15   A.  He told me that I was stupid, I was a bad mother to allow

16   Shayan to play on the bean bag.  After that, he went on to say

17   that me and my family are animals and that we should live in a

18   farm in the home.

19   Q.  What, if anything, happened then?

20   A.  Then he continued scolding, and he got his sister, and his

21   niece was waiting in the car, so he actually went out.  He

22   wanted to bring Shayan along, which he took to the car for less

23   than five minutes.  Then he came back in and told me that we're

24   not bringing Shayan to my brother's house, then he left.

25   Q.  As he was scolding you, what tone of voice was he using?

Ccarsou4                          Lee - direct

1   How loud was he speaking?

2              MR. ARENSTEIN:  Objection to the phrase "scolding" in

3   the question, your Honor.

4              THE COURT:  Overruled.

5   A.  He was yelling.

6   Q.  Where was Shayan while this was transpiring?

7   A.  Shayan was in the living room.  When my sister heard the

8   yelling, she actually came and carried Shayan away.

9              MR. ARENSTEIN:  Objection to what the sister did.

10             THE COURT:  Overruled.

11  Q.  Now I'd like to direct your attention to March 30th of

12  2011.

13             THE COURT:  Before we get to March 30th, did you go to

14  the New Year's celebration?

15             THE WITNESS:  No, I didn't.

16             THE COURT:  Did Mr. Souratgar go?

17             THE WITNESS:  Yes, he went.

18             THE COURT:  He went with his family members?

19             THE WITNESS:  Yes.

20             THE COURT:  Other than you and Shayan?

21             THE WITNESS:  Me, my sister, and Shayan.

22             THE COURT:  And you remained home?

23             THE WITNESS:  Yes.

24             THE COURT:  When was the maid hired?

25             THE WITNESS:  This maid in September 2010.

Ccarsou4                    Lee - direct

1            THE COURT:  September of 2010.

2            THE WITNESS:  Yes.

3            THE COURT:  When you left in May of 2011, what

4    happened to the maid?  Where did the maid go?

5            THE WITNESS:  I brought her long.

6            THE COURT:  Thank you.  Next question.

7    BY MS. LEIDHOLDT:

8    Q.  I'm directing your attention to March 30th of 2011, about

9    two weeks later, March 30, 2011.  Did there come a time that

10   you received a telephone call from your sister?

11   A.  Yes.

12   Q.  Not coming in for the truth, could you describe the

13   substance of that call that you received from your sister.

14           MR. ARENSTEIN:  Objection, your Honor.  That is coming

15   in for the truth if we are going to describe something on a

16   telephone call.  I don't know how it's not.

17           THE COURT:  Let me ask a question.  What is the

18   relevance?  Is it coming in for the truth?

19           MS. LEIDHOLDT:  No, it is not, your Honor.

20           THE COURT:  What is the relevance of the fact that it

21   was said?

22           MS. LEIDHOLDT:  The relevance is to demonstrate its

23   effect on Ms. Lee, who received the call and then took action

24   in response to that call.

25           THE COURT:  Let me hear it subject to a motion to

Ccarsou4                      Lee - direct

1  strike.

2  Q.  Would you please describe the substance of that call, the

3  call that your sister made to you on March 30th.

4  A.  She called me and she told me that this morning, while

5  Majid was giving her a ride to the subway, he told her that he

6  wants a divorce.  Then she asked him what will happen to

7  Shayan.  And then Majid say that Shayan doesn't need mother

8  like me because I'm a bad mother and that he will take Shayan

9  to Iran.

10           MR. ARENSTEIN:  Move to strike, your Honor.

11           THE COURT:  I'm still not understanding.  What is the

12  relevance of the fact that this was said?

13           MS. LEIDHOLDT:  It is not coming in for the truth of

14  the matter asserted.  It is to show the effect on Ms. Lee, who

15  then began to take action after having this conversation with

16  her sister.  The sister will be able to testify about the

17  conversation that she had with Mr. Souratgar that led her to

18  call her sister, Ms. Lee, your Honor.

19           THE COURT:  Let me hear what the reaction was.  Go

20  ahead.

21  Q.  What was your reaction to what your sister told you?

22  A.  I was very afraid because Majid wanted to take Shayan to

23  Iran.  I then went to get my lawyer, Mr. Ahmad Nizam, and then

24  we filed for custody, an ex parte custody, with the Singapore

25  family court.

Ccarsou4                    Lee - direct

1              THE COURT:  When was that, approximately?

2              THE WITNESS:  April 2011.

3              MR. ARENSTEIN:  Again I renew my motion to strike.

4    The conversation with the sister.

5              THE COURT:  So noted.

6    Q.  Around this time did Mr. Souratgar make statements to you

7    about renouncing Islam?

8    A.  Yes.

9    Q.  What were those statements that he made to you?

10   A.  He told me many times that I can renounce Muslim because,

11   he say, I'm just a paper Muslim.  He say that I do not believe

12   in Muslim, in Islam, and I can go back to become Christian.

13   Q.  What was your reaction to Mr. Souratgar making those

14   statements?

15   A.  I found it very strange, because he was the one who wanted

16   me to convert to Muslim.

17             THE COURT:  When was this conversation in which Mr.

18   Souratgar made these statements?

19             THE WITNESS:  This was sometime in the third quarter

20   of 2010.

21             THE COURT:  Thank you.

22   Q.  Would you have renounced Islam and gone back to

23   Christianity?  Was that a possibility for you?

24             MR. ARENSTEIN:  Objection.

25             THE COURT:  Overruled.

Ccarsou4                    Lee - direct

1    A.   In Malaysia, no.

2    Q.   What are the consequences of a Muslim renouncing Islam in

3    Malaysia, if you know?

4            MR. ARENSTEIN:   Objection.

5            THE COURT:   Overruled.

6    A.   We will be subjected to severe punishment.   There are also

7    imprisonment and killing.   That's what the punishment is.

8    Q.   What about the consequences of renouncing Islam in

9    Singapore, would there potentially be negative consequences in

10   relation to your relationship to Shayan?

11           MR. ARENSTEIN:   Objection.

12           THE COURT:   Overruled.

13   A.   Under the Shariah law, if either parent renounce the Islam

14   faith, custody will immediately be given to the parent who

15   still practices Islam.

16   Q.   Were you aware of that at the time that Mr. Souratgar made

17   those statements to you?

18   A.   Actually asked some of my Muslim friends.   They told me.

19   But I only got the confirmation from my lawyer, Mr. Ahmad.

20   Q.   What is the full name of your lawyer?

21   A.   Ahmad Abbas Nizam.

22   Q.   You testified that you contacted a lawyer.

23   A.   Yes.

24   Q.   April of 2011?

25   A.   Mm-hm.

Ccarsou4                    Lee - direct

1   Q.  Was that Mr. Ahmad Nizam Abbas?

2   A.  Yes.

3   Q.  Did you have a meeting with him in April of 2011?

4   A.  Yes.

5   Q.  What happened at that meeting?

6          MR. ARENSTEIN:  Objection.  There is a privilege

7   there.

8          THE COURT:  Ms. Lee is perfectly free to waive the

9   privilege.  If that is your objection, it's overruled.

10  A.  I told him what happened.  And then he told me --

11         MR. ARENSTEIN:  Objection to what he told her.

12         THE COURT:  Sustained.

13  Q.  What did you tell Mr. Abbas and what, if anything, did you

14  give Mr. Abbas in that meeting?

15  A.  I told him the history of domestic violence, and then I

16  told him about Shayan's Iranian passport.  I told him that I

17  fear that Majid is going to take Shayan back to Iran.  So Mr.

18  Ahmad collected the documents from me and he filed petition

19  with the Singapore family court.

20  Q.  As part of that application, did you prepare an affidavit

21  yourself or did he assist you in preparing an affidavit from

22  you?

23  A.  Yes, he did.

24  Q.  In that affidavit did you describe Mr. Souratgar's

25  violence?

Ccarsou4                          Lee - direct

1    A.  Yes.

2    Q.  I'd like to direct your attention to April 24th of 2011.

3    You testified previously that you had a domestic worker you

4    call a helper named Tintin?

5    A.  Yes.

6           THE COURT:  This the person you referred to as the

7    maid?

8           THE WITNESS:  We have two maids, two different maids.

9           THE COURT:  I'm sorry?

10          THE WITNESS:  Tintin left and the other one came.

11          THE COURT:  Just say that again.  I had trouble

12   understanding what you said.

13          THE WITNESS:  Tintin work from 2009, two-oh-oh-nine,

14   to September 2010.  Then the next one came from September 2010

15   to the day I left.

16          THE COURT:  The one who came September 2010 was named

17   what?

18          THE WITNESS:  Ram.

19          THE COURT:  Ram?

20          THE WITNESS:  Yes, R-A-M.

21          THE COURT:  So they did not overlap?

22          THE WITNESS:  No, did not.

23          THE COURT:  Did you have any other help or assistance

24   in the home, any other workers or helpers in the home?

25          THE WITNESS:  During the same time?

Ccarsou4                          Lee - direct

1              THE COURT:  During the time of your marriage.

2              THE WITNESS:  We have another Indonesian one.

3              THE COURT:  When was that?

4              THE WITNESS:  She came in January 2009.

5              THE COURT:  And left when?

6              THE WITNESS:  September 2009 then was Tintin from

7    September of 2009 to September 2010.

8              THE COURT:  And then?

9              THE WITNESS:  Was Ram from September 2010 to May 2012.

10             THE COURT:  Any other domestic workers, help, maids,

11   servants of any type?

12             THE WITNESS:  No.

13             THE COURT:  Thank you.  Next question.

14   BY MS. LEIDHOLDT:

15   Q.  You heard Mr. Souratgar's testimony that you had physically

16   assaulted domestic workers in the home that you shared with

17   him.

18   A.  Yes.

19   Q.  Ms. Lee, at any time did you physically assault any of the

20   domestic workers that were living in the home that you shared

21   with Mr. Souratgar?

22   A.  No.

23   Q.  At any time did any domestic worker working in the home

24   that you shared, to the best of your knowledge, ever file a

25   police report about you?

Ccarsou4                     Lee - direct

A.   No.

Q.   I'm directing your attention to April 24th of 2011.  Did

your domestic helper at the time, Ram, approach you about a

matter of concern?

A.   Yes.

Q.   What transpired?

A.   She was in the car with Shayan and Majid.  They were going

to some place, a shopping mall.  Then Majid called his mom, and

she overheard.  She said he was speaking in Persian.  But then

after that, Majid turned to Shayan and told Shayan, we are

going to mamani's.  Mamani means grandmother in Persian -- to

mamani's home in Iran, we are going to take an airplane there.

          MR. ARENSTEIN:  Objection to the testimony of the

witness if she wasn't there and-didn't hear it, number one.

Number two, what does this have to do with grave risk of

danger?  Again, we are getting far afield here with testimony

that probably, if it is anything, should be testified to in

Singapore, where everybody was and the courts have the

jurisdiction to hear, not in this court.

          THE COURT:  I'll take it subject to your motion to

strike.  Go ahead.

Q.   I'd like to direct your attention to May 3rd of 2011.  I'm

going to rephrase the question.  Did there come a time that Mr.

Abbas filed papers in Singapore family court requesting that

you be granted custody of Shayan?

Ccarsou4                          Lee - direct

1   A.  Yes.

2   Q.  Do you recall when that was?

3   A.  Sometime in May.

4          THE COURT:  May 2011?

5          THE WITNESS:  Yes, 2011.

6          THE COURT:  Thank you.

7   Q.  Did you at that time make any representations to you

8   expressing concern that you might have trouble receiving a fair

9   trial?

10          MR. ARENSTEIN:  Objection.

11          THE COURT:  Sustained.  The fact that it was said is

12   irrelevant.

13          MS. LEIDHOLDT:  I understand.

14          THE COURT:  The truth of the content is hearsay.

15   Q.  What, if anything, occurred on May 25th, 2011?

16   A.  I move out to my sister's apartment with Shayan and the

17   maid Ram.

18   Q.  What, if anything, did you take from the family's home when

19   you moved out and into your sister's home?

20   A.  I just took my, mine, Shayan, and Ram's belongings.

21          THE COURT:  When the sister move out of the home that

22   you and your husband were living in?

23          THE WITNESS:  Probably mid May.

24          THE COURT:  Mid May of 2011?

25          THE WITNESS:  Yes.

Ccarsou4                         Lee - direct

1          THE COURT:  When did you move in with her some.

2          THE WITNESS:  25th.

3          THE COURT:  Of May?

4          THE WITNESS:  Yes.

5          THE COURT:  While she was living with you, what is she

6     looking for a place?

7          THE WITNESS:  Yes, she was.

8          THE COURT:  So it was her plan all along to get a

9     place?

10          THE WITNESS:  Yes.

11          THE COURT:  Thank you.  When did you decide that you

12     were going to say move in with your sister?

13          THE WITNESS:  After I spoke to my Singapore attorney

14     and he say that, yeah, he is going to file an application in

15     the family court.  I decided that when the order is out, then I

16     will move.

17     BY MS. LEIDHOLDT:

18     Q.  Why did you feel you needed to move when the order was out?

19     A.  Because I was afraid that when they served the documents to

20     Majid, he probably kill me.

21          THE COURT:  Which documents?

22          THE WITNESS:  The ex parte order for custody.

23          THE COURT:  That was served in April?

24          THE WITNESS:  No.  That was served on 26 or 27 of May

25     to him.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ccarsou4                        Lee - direct

1           THE COURT:  All right.

2   Q.  When you left Mr. Souratgar's home and moved into the

3   apartment that your sister had just rented, did you take any of

4   Mr. Souratgar's furniture?

5   A.  No.

6   Q.  Did you take any of his money?

7   A.  No.

8   Q.  Did you take any of his personal possessions?

9   A.  No.

10          THE COURT:  What did you take out of the house?

11          THE WITNESS:  My belongings, which is my clothes and

12  the things that belongs to me; Shayan's belongings, toys; as

13  well as the maid's belongings.

14          THE COURT:  When you say things that belong to me, did

15  that include any furniture?

16          THE WITNESS:  We have two of everything in the house,

17  because when we move in together, he brought his set of

18  electrical appliances and I brought my set.

19          THE COURT:  Tell me what furniture you moved out of

20  the house, if any.

21          THE WITNESS:  I only took my mattress and the bed

22  which I brought to the house, a refrigerator and a washing

23  machine which was mine, because we had two refrigerators and

24  two washing machines in the house.

25          THE COURT:  When you said to me a minute ago in your

Ccarsou4                    Lee - direct

1  testimony, I just took my clothing, Shayan's clothing, his

2  toys, and things that belonged to me, you meant to tell me that

3  you moved out the washing machine, the refrigerator, and the

4  mattress?

5          THE WITNESS:  Yes, my belongings.

6          THE COURT:  OK.  Thank you.  Anything else?

7          THE WITNESS:  No, nothing.

8          THE COURT:  Did you take anything out of the cabinets

9  in the kitchen?

10          THE WITNESS:  No.

11          THE COURT:  You mentioned appliances.

12          THE WITNESS:  Appliances, yes, the washing machine and

13  the refrigerator, the electrical.

14          THE COURT:  Anything else?

15          THE WITNESS:  No.  Only three items which belongs to

16  me.

17          THE COURT:  Those three items and nothing else?

18          THE WITNESS:  Nothing.

19          THE COURT:  Next question.

20  BY MS. LEIDHOLDT:

21  Q.  Did you make a visit to the police precinct on May 23rd of

22  2011?

23  A.  May 23rd?

24  Q.  I'm so sorry.  May 25th of 2011.

25  A.  Yes.  I went to lodge a police report that I moved out from

Ccarsou4                         Lee - direct

1    the matrimony home voluntarily.

2    Q.  Why did you lodge a police report stating that you had

3    moved out of the matrimonial home?

4              MR. ARENSTEIN:  Objection.

5              THE COURT:  Overruled.

6    A.  Because my attorney Mr. Ahmad say that --

7              MR. ARENSTEIN:  Objection to what her attorney said.

8    Move to strike.

9              THE COURT:  Sustained as to what your attorney said.

10   You filed a police report because your attorney told you to?

11             THE WITNESS:  Because he told that.

12             THE COURT:  That's all I need to know.

13             THE WITNESS:  Yes.

14             THE COURT:  Was it because of the instructions of your

15   attorney?

16             THE WITNESS:  Yes.

17             THE COURT:  Next question.

18   Q.  Did you have any concerns about what might -- were there

19   any other reasons that you lodged a police report besides the

20   conversation that you had with Mr. Abbas?

21   A.  Because we don't want to be reported --

22             THE COURT:  Who is "we"?

23             THE WITNESS:  Me and Shayan and the maid.

24   A.  -- as missing person.

25   Q.  At the time you filed the police report, did you have any

Ccarsou4                    Lee - direct

1   knowledge as to whether your husband had filed a police report

2   about you?

3   A.  Yes.

4   Q.  Please explain.

5   A.  An officer from one of the police station called my

6   headphone, my cell phone.

7           MR. ARENSTEIN:  I'm sorry.  I didn't hear that answer.

8           THE COURT:  A police officer called her cell phone.

9   Go ahead.

10  Q.  What did the police officer say to you?

11          MR. ARENSTEIN:  Objection.

12          THE COURT:  Overruled.

13  A.  He told me to come down to the police station and to fix an

14  appointment with him to come down.  And he insisted that I

15  bring Shayan together to the police station.

16          MR. ARENSTEIN:  Objection, your Honor.

17          THE COURT:  Overruled.

18  Q.  Do you know why the police officer wanted you to bring

19  Shayan to the police station?

20          MR. ARENSTEIN:  Objection.

21          THE COURT:  Overruled.

22  A.  I didn't know until I got there.  And then the police

23  officer started doing a bodily check on Shayan.  He lifted up

24  Shayan's shirt and then he was pressing the parts of his limbs.

25  Then he look at his back.  He lift up Shayan's shirt, and then

Ccarsou4                      Lee - direct

1    he look at the front and the back and Shayan's legs as well.

2            After that, I ask the police officer, why are you

3    doing this?  Then he say, oh --

4            MR. ARENSTEIN:  Objection.

5            THE COURT:  Overruled.

6    A.  Then he say that your husband has claimed that you

7    physically abuse your son, so therefore I required to do a body

8    check to see if there's any bruises.

9            THE COURT:  Did he find any bruises?

10            THE WITNESS:  No, he did not.

11            MS. LEIDHOLDT:  May I approach the witness?

12            THE COURT:  You may.

13    Q.  Ms. Lee, I'm showing you a document marked Respondent's 11

14    for identification.

15    A.  Yes.

16    Q.  Do you recognize that document?

17    A.  Yes.

18    Q.  What do you recognize that document to be?

19    A.  A police report.

20    Q.  Was this police report filed by you?

21    A.  Yes.

22    Q.  When did you file this police report?

23    A.  On the 25th of May 2011.

24    Q.  Is that your signature on this police report?

25    A.  Yes.

Ccarsou4                    Lee - direct

1              MS. LEIDHOLDT:  Your Honor, I'm offering Respondent's

2    11 for identification into evidence as Respondent's 11 in

3    evidence.

4              THE COURT:  Any objection?

5              MR. ARENSTEIN:  The same objection, your Honor.

6              THE COURT:  Overruled.

7              (Respondent's Exhibit 11 received in evidence)

8    Q.  I'd like to direct your attention to the day after you

9    filed this police report, May 26th of 2011.  Without stating

10   the comments that were made in the conversation, I just want to

11   ask you, did you receive a call that day on May 25th, 2011, did

12   you receive a call from your sister, Jen Pink?

13   A.  On 26th?

14   Q.  On May 26, 2011, the day after you filed this police

15   report.

16   A.  Oh, yes.

17   Q.  Did she make certain comments to you -- please do not state

18   what those comments were -- in the course of that conversation?

19   A.  Yes.

20             MR. ARENSTEIN:  Objection to the question, your Honor.

21             THE COURT:  Overruled.

22   Q.  What was your reaction, just your reaction, to what your

23   sister told you?

24             MR. ARENSTEIN:  Objection.  It's in the abstract.  We

25   don't even know what she told her.  I don't think it should be

Ccarsou4                     Lee - direct

1  going in.

2          THE COURT:  It's all subject to connection.  I don't

3  understand your objection.

4          Is the sister going to testify?

5          MS. LEIDHOLDT:  She is going to testify, your Honor.

6          THE COURT:  So what is your objection?

7          MR. ARENSTEIN:  If it's subject to connection, your

8  Honor, then we'll wait and see.

9          THE COURT:  Thank you.

10          You may answer.

11  A.  I was shock.

12          THE COURT:  Next question.

13  Q.  Did there come a time that you learned that you were being

14  accused of stealing $13,200 in cash from Mr. Souratgar?

15  A.  Yes.

16  Q.  And his watches?

17  A.  Yes.

18  Q.  And his personal laptop?

19  A.  Yes.

20  Q.  How did you learn that you were being accused of stealing

21  these things from him?

22  A.  A police called me and he wanted me to go down to the

23  police station to give a statement.

24          THE COURT:  I really wonder what a divorce action

25  transcript would look like in this case and how it would be any

Ccarsou4                    Lee - direct

1   different from what I have listened to in this proceeding.  It

2   appears to me that not only are the parties trying to get me to

3   try a custody case, they also want me to try a divorce case.

4   Next question.

5   Q.  Ms. Lee, did there come a time in mid June when you

6   received a call from Mr. Souratgar?

7   A.  Yes.

8   Q.  Would you please describe that phonecall.

9   A.  He told me that he have obtain an Iranian passport for me

10  and that he was going to the Malaysian high com in Singapore.

11  Q.  What do you mean high com?

12  A.  The Malaysian embassy in Singapore to report that I have

13  two citizenship.

14         MR. ARENSTEIN:  Two what?

15  A.  I have two citizenship.  And he told me to watch out.

16  Q.  What did you understand him to mean when he told you to

17  watch out?

18         MR. ARENSTEIN:  Objection.

19         THE COURT:  Overruled.

20  A.  That he was trying to revoke my Malaysian citizenship so

21  that I have -- I got no choice but to stay in Iran.

22         THE COURT:  This was how long after you moved out?

23         THE WITNESS:  This was in June 2011.

24         THE COURT:  What arrangements had you made at the time

25  you moved out for Mr. Souratgar to see Shayan?

Ccarsou4                        Lee - direct

1          THE WITNESS:  We did not make any arrangement.  We

2     were waiting for the first mediation with the family court to

3     arrange something.

4          THE COURT:  Was there any reason why you could not

5     have let him see Shayan?

6          THE WITNESS:  Because he was holding on to Shayan's

7     Iranian passport and I didn't have in possession with me.

8          THE COURT:  Where were you living when you moved out?

9          THE WITNESS:  My sister's place in Singapore.

10         THE COURT:  In Singapore?

11         THE WITNESS:  Yes.

12         THE COURT:  Was there any reason why you could not

13    have let Shayan's father visit with Shayan?

14         THE WITNESS:  I was afraid that when he visit with

15    Shayan, that he take Shayan to Iran, because he was threatening

16    to do that.

17         THE COURT:  Any other reason?

18         THE WITNESS:  I was afraid to see him because I scared

19    that he might start scolding and beating me again.

20         THE COURT:  Next question.

21    Q.  What, if anything, did you do the next day, after you

22    received this threat from Mr. Souratgar?

23         MR. ARENSTEIN:  Objection to the characterization

24    "threat."

25         THE COURT:  Yes, that is really not necessary.

Ccarsou4                          Lee - direct

1    Q.  What, if anything, did you do the next day after you

2    received this call from Mr. Souratgar?

3    A.  I went to the Malaysian embassy in Singapore and I met with

4    consulate there and I explain what have happened.  Then I told

5    him that I am afraid that my Malaysian citizenship will be

6    revoke.  So I just wanted to let them know first.

7    Q.  What, if anything, did the consular officer do while you

8    were at the Singapore?

9    A.  They took my statement and then they said they will keep it

10   in file, and if anything arise, they will investigate.

11             THE COURT:  Let me ask you, did you consult with

12   counsel before you made that trip?

13             THE WITNESS:  My Singapore attorney?

14             THE COURT:  Yes.

15             THE WITNESS:  No.

16   Q.  Why didn't you consult with counsel before you made that

17   trip?

18   A.  I just decided -- I got the phonecall the day before.  The

19   next morning I just went down to the Malaysian embassy.

20   Q.  As you were leaving the Malaysian consulate, did you

21   encounter Mr. Souratgar in the reception area there?

22   A.  Yes.

23             MR. ARENSTEIN:  Objection.  Leading question.

24             THE COURT:  Overruled.

25   Q.  What, if anything, happened when you encountered Mr.

Ccarsou4                    Lee - direct

1  Souratgar there?

2  A.  As I was leaving the reception area, Majid actually walk

3  in.  And then he stop and smile at me and he told me, you are

4  dead meat.

5  Q.  Did there come a time that you informed your attorney about

6  Mr. Souratgar's plans to have your Malaysian citizenship

7  revoked?

8          MR. ARENSTEIN:  Objection.

9          THE COURT:  Overruled.

10  A.  Yes, I told him.

11  Q.  If you know, did he send a letter to Ms. Gomez explaining

12  your concerns that your Malaysian citizenship was going to be

13  revoked?

14          MR. ARENSTEIN:  Objection.

15          THE COURT:  I'll allow it.

16  A.  Yes.

17          MR. ARENSTEIN:  Can we have a time frame when this

18  alleged letter was made, your Honor?  We don't have any idea

19  where the letter is or what the letter is or if they are going

20  to produce the letter.  I don't even know when it was allegedly

21  sent or written or what.

22          THE COURT:  Give counsel a moment.  Counsel is engaged

23  in another activity right now.

24          MS. LEIDHOLDT:  May I approach the witness?

25          THE COURT:  Yes.  Can you comply with counsel's

Ccarsou4                    Lee - direct

1    request?

2              MS. LEIDHOLDT:  I'm sorry.  I didn't hear it.

3              MR. ARENSTEIN:  I'd like to see this letter, when it

4    was sent.

5              THE COURT:  I'll take care of it.  Ms. Lee,

6    approximately when was this letter sent by your lawyer to Ms.

7    Gomez regarding your concerns about losing your Malaysian

8    citizenship?

9              THE WITNESS:  Somewhere in June-July 2011.

10             THE COURT:  Next question.  You may approach.

11   Q.  Ms. Lee, I'm showing you what's been identified as

12   Respondent's 12 for identification.  Could you take a moment to

13   look at that letter.

14   A.  Yes.

15   Q.  Ms. Lee, do you recognize this document?

16   A.  Yes.

17   Q.  What do you recognize it to be?

18   A.  A letter from my Singapore attorney to Majid's attorney.

19             THE COURT:  Is this the letter to which you were

20   referring, Ms. Lee, in your prior testimony?

21             THE WITNESS:  Yes.

22             MR. ARENSTEIN:  Your Honor, she testified to a letter

23   that Ms. Gomez wrote, from what I heard on the testimony.  It

24   was a letter that Ms. Gomez had written.  That's a letter to

25   Mrs. Gomez.  I have a reply to that letter here, and I have a

Ccarsou4                    Lee - direct

1   problem that Ms. Gomez -- Ms. Gomez is going to be leaving

2   tonight to go back to Singapore.  I'm going to be objecting to

3   that letter going in.  If it does go in, I'm going to want Ms.

4   Gomez's letter to go in, the reply to that letter.

5           THE COURT:  Mr. Arenstein, did you receive a copy of

6   R12?

7           First of all, are you offering R12?

8           MS. LEIDHOLDT:  I am, your Honor.  And I have no

9   objection to Ms. Gomez's letter coming in as well.

10          MR. ARENSTEIN:  I have no objection to them both going

11  in.  That's fine.

12          THE COURT:  All right.  Why don't you mark that now as

13  the petitioner's next exhibit.  R12 is received in evidence

14  without objection.

15          (Respondent's R12 received in evidence)

16          MR. ARENSTEIN:  Petitioner's Exhibit L.

17          THE COURT:  Do you want to hand it up, sir.  Any

18  objection to petitioner's L?

19          MS. LEIDHOLDT:  None whatsoever.

20          THE COURT:  Received.  L is received in evidence.

21          (Petitioner's Exhibit L received in evidence)

22          MS. LEIDHOLDT:  Your Honor, would it be possible to

23  have a 5-minute break?

24          THE COURT:  It is, sure.

25          (Recess)

CCAJSOU5                        Fair - direct

 1              MR. ARENSTEIN:  If I might address the court on two
 2     issues?
 3              THE COURT:  Let's wait until the testimony is over
 4     today.  Please be seated.
 5              MR. ARENSTEIN:  I don't know if it will be over today,
 6     but --
 7              THE COURT:  Well, what needs to be addressed at this
 8     moment as opposed to when we get to the end of the day?
 9              MR. ARENSTEIN:  I'll wait till the end of the day,
10     your Honor.  I'll wait.
11              THE COURT:  Thank you.
12     BY MS. LEIDHOLDT:
13     Q.  Did there come a time, Ms. Lee, when you learned that
14     Mr. Souratgar filed for custody of Shayan in Singapore?
15              Did there come a time when you learned that
16     Mr. Souratgar had also filed for custody of Shayan in
17     Singapore?
18     A.  Yes.
19     Q.  Do you recall when that was?
20     A.  In June 2011.
21     Q.  Do you recall what Mr. Souratgar asked for in his petition?
22     A.  He asked for sole custody and care of Shayan and also the
23     documents of Shayan.
24     Q.  Did he ask for anything in reference to visitation of
25     Shayan?

CCAJSOU5                          Fair - direct

1   A.   No.

2             MR. ARENSTEIN:  Objection, your Honor.  The document

3   speaks for itself.

4             THE COURT:  Overruled.  Go ahead.

5             (Off-the-record discussion).

6             MS. LEIDHOLDT:  May I approach the witness?

7             THE COURT:  You may.

8             (Off-the-record discussion)

9   BY MS. LEIDHOLDT:

10  Q.  Ms. Lee, I am showing you a document marked Respondent's 13

11  for identification.  Will you please take a moment and look at

12  that document.

13            THE COURT:  Isn't this document in evidence already as

14  part of Petitioner's C?

15            MR. ARENSTEIN:  Yes, it is, your Honor.

16            MS. LEIDHOLDT:  Thank you.  I wasn't aware of that.

17            THE COURT:  It is a question I asked.  It is a

18  question.  Isn't this document already in evidence as

19  Petitioner's C?

20            MS. LEIDHOLDT:  Opposing counsel has just confirmed

21  that it is.  I wasn't aware that it was, your Honor, but I

22  certainly accept his representation that it is and it is

23  Petitioner's C in evidence.  Thank you so much.

24            THE COURT:  All right.

25  BY MS. LEIDHOLDT:

1   Q.  Ms. Lee, have you had an opportunity to refresh your

2   recollection?

3   A.  Yes.

4   Q.  Does this document refresh your recollection as to whether

5   Mr. Souratgar asked that you have a certain kind of visitation

6   with Shayan?

7   A.  Yes.

8   Q.  What kind of visitation did he ask that you have with

9   Shayan?

10  A.  Supervised access with his presence.

11  Q.  Did there come a time that you received reply papers from

12  Mr. Souratgar to your petition for custody?

13  A.  Yes.

14  Q.  Do you recall approximately when you received those papers?

15  A.  Either the end of June, July.

16  Q.  Was there anything that surprised you in Mr. Souratgar's

17  papers?

18  A.  Yes.

19  Q.  What in particular surprised you?

20  A.  Accusations against my sister for sexually abusing Shayan,

21  that I am self-abusive and that I chase him around the house

22  with knives and choppers and also I abused the meat.

23          THE COURT:  Thank you.

24  BY MS. LEIDHOLDT:

25  Q.  Was there a proceeding in Singapore Family Court on July

 1   14th of 2011?

 2   A.  Yes.

 3   Q.  Briefly what happened in that proceeding?

 4   A.  We brought up the issue of Shayan's Iranian passport and

 5   then the judge ordered that Majid had supervised access once a

 6   week at the Family Service Center.

 7             (Off-the-record discussion)

 8   BY MS. LEIDHOLDT:

 9   Q.  Ms. Lee, I am showing you a document marked Respondent's 14

10   for identification.  Do you recognize it?

11   A.  Yes.

12   Q.  What do you recognize it to be?

13   A.  Order of court.

14   Q.  Is this the order that you were just describing a few

15   moments ago?

16   A.  Yes.

17             MS. LEIDHOLDT:  Your Honor, I respectfully request

18   that Respondent's 14 for identification be entered into

19   evidence as Respondent's 14 in evidence.

20             THE COURT:  Is this part of Petitioner's C?

21             MR. ARENSTEIN:  It is in C, your Honor.

22             THE COURT:  Where do I find it in C?  What tab within

23   C?

24             MR. ARENSTEIN:  I am trying to find that out, your

25   Honor.

1           THE COURT:  It appears to be at Tab D.

2           MR. ARENSTEIN:  Do you have it, your Honor.

3           THE COURT:  Tab D.  I have it.

4           MR. ARENSTEIN:  Thank you.

5           THE COURT:  Ms. Leidholdt, I am going to have to ask

6    you to please be attentive to this.  It appears to already be

7    in evidence.

8           MS. LEIDHOLDT:  I apologize, your Honor.

9           THE COURT:  We just went through this a few minutes

10   ago.

11   BY MS. LEIDHOLDT:

12   Q.  Ms. Lee, did your attorney, Mr. Abass, take any action to

13   try to establish that Mr. Souratgar had obtained and was in

14   possession of an Iranian passport in your name?

15          MR. ARENSTEIN:  Objection.

16          THE COURT:  Overruled.  If you know?

17   A.  He wrote a letter to the Iranian consulate as well as the

18   Malaysian government.

19          THE COURT:  What do you understand, Ms. Lee, the

20   Center for Family Harmony to be?

21          THE WITNESS:  It is a place where couples who are

22   having custody issues to have visitations with the other parent

23   while awaiting the outcome of the trial.

24          THE COURT:  Who runs the Center for Family Harmony, if

25   you know?

CCAJSOU5                          Fair - direct

1            THE WITNESS:  If I am not mistaken, it is partially

2    run by the government.

3            THE COURT:  Partially run by the government?

4            And this is a physical location, a place within

5    Singapore?

6            THE WITNESS:  Yes.

7            THE COURT:  Where supervised visitation may take

8    place?

9            THE WITNESS::  Yes.  It is like a pretty big

10   apartment.  Inside they have multiple rooms with toys and then

11   they have a kitchen, bathroom and then living area, and during

12   visitations, the supervised one, there will be a counselor.

13           THE COURT:  Somebody who works for the Center for

14   Family Harmony?

15           THE WITNESS:  Yes.

16           THE COURT:  How many people are employed by the Center

17   for Family Harmony or how many do you see when you go there?

18           THE WITNESS:  I usually see at least three or four of

19   each type.

20           THE COURT:  Thank you very much.

21   BY MS. LEIDHOLDT:

22   Q.  Ms. Lee, I am showing you a document marked Respondent's 15

23   for identification.

24   A.  Okay.

25   Q.  Do you recognize it?

CCAJSOU5                            Fair - direct

 1   A.  Yes.

 2   Q.  What do you recognize it to be?

 3   A.  An inquiry of nationals, a letter to the Malaysian National

 4   Registration Department.

 5   Q.  What do you understand the purpose of this letter to be?

 6   A.  It is to inquire whether both me and Shayan have an Iranian

 7   passport.

 8            MS. LEIDHOLDT:  Your Honor, I'd like to offer this

 9   into evidence.

10            THE COURT:  Any objection?

11            MS. LEIDHOLDT:  As Respondent's 15 in evidence.

12            MR. ARENSTEIN:  One second, your Honor.

13            (Off-the-record discussion)

14            MR. ARENSTEIN:  Unless there is a reply to it, I would

15   have an objection.  I see it is a one-sided letter to the

16   director of the Malaysian National Registration Department.

17            THE COURT:  Is there a response?

18            MS. LEIDHOLDT:  I don't believe there was a response,

19   your Honor.

20            THE COURT:  Ms. Lee, was there a response to this

21   letter that you know of?

22            THE WITNESS:  No.

23            MR. ARENSTEIN:  Then I object to the letter.

24            THE COURT:  Overruled.  Received.

25            (Respondent's Exhibit 15 received in evidence)

1          MS. LEIDHOLDT:  Your Honor, I am about to commence on

2     a line of questioning that has to do with another incident of

3     domestic violence after the parties --

4          THE COURT:  How much more do you have of direct

5     examination of --

6          MS. LEIDHOLDT:  Not very much.

7          THE COURT:  When I am talking, I can't hear you when

8     you talk.  Only one of us can talk at a time.

9          Do you remember what the question I asked was?

10          MS. LEIDHOLDT:  Yes, how much more do you have on your

11     direct examination.

12          THE COURT:  Yes.

13          MS. LEIDHOLDT:  I am very much nearing the end, your

14     Honor, not much at all.  There was abuse after the parties

15     separated.  There were incidents of --

16          THE COURT:  This is a temporal question.

17          MS. LEIDHOLDT:  I couldn't tell you how precisely how

18     long it will take, your Honor, but I don't think it will take

19     very long at all.

20          THE COURT:  You'll have to forgive me if I just sit

21     here puzzled as to "not very long at all" because we are now in

22     the 5th day of this hearing.  Maybe you could try and translate

23     that into an approximate time period because I would have

24     predicted that this hearing would not take very much time at

25     all, and you both might be in agreement that it hasn't taken

CCAJSOU5                          Fair - direct

1    very much time at all because that's a term that is susceptible

2    to multiple meanings.

3              MS. LEIDHOLDT:  Your Honor, to the best of my ability,

4    I would estimate that perhaps, and much of it depends on

5    objections and things like that, but perhaps an hour and a

6    half.

7              THE COURT:  Okay.  We will pick up tomorrow at 10:00,

8    and I may have to break around 11:00 for a couple of criminal

9    matters.  Now I'll hear Mr. Arenstein.  The witness may step

10   down.  Yes, Mr. Arenstein.

11             MR. ARENSTEIN:  First of all, your Honor, I have, we

12   have submitted to the Singapore embassy the documents that we

13   had presented to the court.  We had them signed -- it is

14   notarized.  Excuse me.

15             THE COURT:  I don't know if this is the time and place

16   for it.  If you want to send me a letter, you can just send me

17   a letter with it and that is fine.

18             MR. ARENSTEIN:  I have given copies to counsel, other

19   counsel.

20             THE COURT:  I assumed you have.

21             MR. ARENSTEIN:  The other thing is, your Honor, the

22   statement made by Ms. Leidholdt earlier today, she has provided

23   us with a copy of a letter, and she accused my counsel here of

24   putting in false affidavits and various other things to the

25   court which is not the case.  If your Honor looks at what was

1   submitted here, this is a document which --

2           THE COURT:  What exhibit number is it?

3           MR. ARENSTEIN:  There is no exhibit number.

4           THE COURT:  I don't know what you mean by what was

5   submitted here.  That phrase doesn't mean very much to me.

6           MR. ARENSTEIN:  She brought up in her questioning, and

7   she mentioned to the court that there was some letter that was

8   sent, affidavit that was sent to the court in Singapore that

9   was going to jeopardize her client.

10          THE COURT:  You said it was submitted here.  That is

11  what I am wondering about.

12          MR. ARENSTEIN:  You asked before the break for her to

13  make a copy of it and bring it to the court, so the court did

14  see it.  We were given a copy of it.  I don't know whether it

15  was given to the court or not at this point, but this is not an

16  affidavit.  This is not a declaration.  This is merely a letter

17  that was --

18          THE COURT:  Nothing has been submitted to me at this

19  stage of the game.  I don't even know what you're talking

20  about.

21          MR. ARENSTEIN:  Your Honor, if I might approach?  This

22  is a letter that was sent to the courts in Singapore,

23  requesting --

24          MS. LEIDHOLDT:  May I respond, please?

25          MR. ARENSTEIN:  I am not finished yet.

1          THE COURT:  Do you have a stapler?  I have been handed

2     a letter dated 21 November 2012 to the Registrar of the Family

3     & Juvenile Court, which appears to be five pages in length.

4          Yes, sir.

5          MR. ARENSTEIN:  This is a letter that was requesting

6     the transcript and the various documents from the Family

7     Harmony for this Court.

8          I sent a copy of this letter to your Honor, to

9     Ms. Baum and to Ms. Leidholdt.  I received a nasty letter back

10    accusing me of being unethical and prejudicial and et cetera,

11    various things which were very, very attacking my credibility

12    and my license and everything else.

13         Ms. Baum told me not to respond to it.  She asked me

14    not to respond to it, so I didn't.  However, she was going to

15    talk to Ms. Leidholdt about it because it was way out of line.

16    I I had spoken to Mrs. Baum about this letter and we sent a

17    copy to your Honor with a letter requesting to the Singapore

18    courts to give us a copy of the Family Harmony reports for this

19    Court, and this was what our counsel in Singapore sent to

20    Family Harmony.

21         It was a letter.  It wasn't an affidavit.  Now, I sent

22    the letter to this Court with all the attachments so the court

23    could see it.  I sent a copy to Ms. Baum, and I sent a copy to

24    Ms. Leidholdt.  I got this nasty letter back from her.

25         THE COURT:  You're repeating yourself, sir.

1             MR. ARENSTEIN:  I won't repeat myself.

2             THE COURT:  You even made some of these comments

3    before the lunch break.  You are definitely repeating yourself

4    now.

5             MR. ARENSTEIN:  Basically this letter was to get from

6    Family Harmony a copy of the report, to explain why we needed

7    it.  Basically, your Honor, I think sent a letter off because I

8    got a copy that was sent to all of us, to the Family Harmony

9    people asking for a copy of that report in Singapore.  I don't

10   know whether they have sent you a copy or not or what they've

11   sent you, but they only wanted to exchange between judiciary,

12   not between parties.

13            So this is one of the documents that was submitted to

14   the court to get the documents we needed from Family Harmony.

15   Ms. Leidholdt represented to the court that this was going to

16   prejudice her client.  It was an affidavit, and it is not --

17            THE COURT:  Thank you.

18            MR. ARENSTEIN:  Therefore, I submit this to the court

19   and let the court deal with it any way they want to.

20            THE COURT:  Thank you.

21            MS. LEIDHOLDT:  Your Honor, I did send maybe a

22   two-sentence e-mail to Mr. Arenstein when I received this, this

23   document, which is a document that Ms. Gomez sent to the judge

24   presiding, to the kind attention of Your honor, Ms. Shoba Nair.

25   I understand she is the judge presiding over the custody matter

CCAJSOU5                        Fair - direct

1   in Singapore.  I think my words were this is a transparent

2   attempt to prejudice the court against our client, and I would

3   stand by those words, your Honor.

4          THE COURT:  This is the court in which your client has

5   been adjudicated to be in contempt for leaving the court in

6   violation of the court's orders?

7          MS. LEIDHOLDT:  That is true, your Honor.  If you look

8   at the statements that were made here, this is not an effort or

9   solely an effort to obtain documents from that court.

10         This is an effort to -- if you notice the statements

11  in bold face, these are efforts to prejudice the court against

12  my client, your Honor, and I think that this --

13         THE COURT:  What is pending before that court at this

14  stage?

15         MS. LEIDHOLDT:  To the best of my understanding, and I

16  am not precisely sure, I have had some conversations with my

17  client's former Singapore counsel, it may be the custody

18  proceeding.  If the custody proceeding is not pending in the

19  Shairiah court, it may be the custody proceeding.

20         What is represented, the statements that are made are

21  not about the needs for documents from the court for this

22  proceeding, but they're very inflammatory statements about this

23  proceeding, and the Singapore system that I believe would only

24  serve to prejudice the court against Ms. Lee.

25         THE COURT:  Thank you.  Anything further?

CCAJSOU5                         Fair – direct

1          MR. ARENSTEIN:  This is was to the mediation judge who

2     doesn't deal with the custody.  This is the mediation judge

3     dealing with Family Harmony.  This is not a custody judge

4     deciding a custody case, from what I am told by counsel.

5          Details were given to the court so they could

6     understand how important this was and what was going on.

7     Nothing in that letter is untrue, nothing.

8          THE COURT:  Thank you.  Anything further from anyone?

9     We're adjourned until tomorrow morning.

10          (Court adjourned until Tuesday, December 11, 2012, at

11     10:00 o'clock am)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

LEE JEN FAIR

Direct By Ms. Leidholdt  . . . . . . . . . . . 441

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

L  . . . . . . . . . . . . . . . . . . . . . 568

DEFENDANT EXHIBITS

Exhibit No.                                    Received

7  . . . . . . . . . . . . . . . . . . . . . 457

8  . . . . . . . . . . . . . . . . . . . . . 460

9  . . . . . . . . . . . . . . . . . . . . . 533

10  . . . . . . . . . . . . . . . . . . . . . 535

11  . . . . . . . . . . . . . . . . . . . . . 561

[Exhibit]*[received]  . . . . . . . . . . . 568

15  . . . . . . . . . . . . . . . . . . . . . 575