```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In the Matter of one infant child
     ABDOLLAH NAGHASH SOURATGAR,
 4
                      Petitioner,
 5
                  v.                        12 Civ. 7797 PKC
 6
     LEE JEN FAIR,
 7
                      Respondent.
 8
     ------------------------------x
 9
                                    December 11, 2012
10                                  10:00 a.m.

11

12   Before:

13                    HON. P. KEVIN CASTEL,

14                                    District Judge

15

16                         APPEARANCES

17   ROBERT D. ARENSTEIN,
     SANDRA NUNEZ,
18        Attorneys for plaintiff

19   PATTON BOGGS LLP
          Attorneys for defendant
20   BY:  ANDREW J. McNALLY, Esq.
          DORCHEN A. LEIDHOLDT, Esq.
21                  Of counsel

22   Also Present:

23        JENNIFER BAUM,
          JENNA DiCOSTANZO,
24        Guardians ad Litem
           – and –
25        JANE KIM, Esq.
```

 1                  (Hearing resumed)

 2        LEE JEN FAIR, resumed

 3                  THE COURT:  Ms. Lee, the Court reminds you that you

 4     are still under oath.

 5                  You may continue.

 6     DIRECT EXAMINATION (continued)

 7     BY MS. LEIDHOLDT:

 8     Q.  Ms. Lee, good morning.

 9     A.  Good morning.

10     Q.  I'd like to direct your attention to August 15, 2015.  Did

11     you receive a telephone call from Mr. Souratgar on that date?

12     A.  Yes.

13                  MR. ARENSTEIN:  Your Honor, 2015?

14                  THE COURT:  That's what she said.

15                  MS. LEIDHOLDT:  I apologize, your Honor.

16                  THE COURT:  You don't need to apologize.

17     Q.  August 15, 2011, did you receive a telephone call from Mr.

18     Souratgar that day?

19     A.  Yes.

20     Q.  Could you describe the substance of that call, please.

21     A.  Majid called me and told me that I have some parcels at his

22     office and he told me to go down to collect them.  He said that

23     he is doing renovations, and if I don't collect them by that

24     day, they will dispose it.

25                  THE COURT:  You had some?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

 1                    THE WITNESS:  Parcels.

 2                    THE COURT:  Parcels.  Thank you.

 3    Q.  What, if anything, did you know about the parcels?

 4    A.  I know that my brother ordered some parcels from eBay, and

 5    it was delivered to his office.

 6                    THE COURT:  Your brother ordered parcels from eBay.

 7                    THE WITNESS:  Yes.

 8                    THE COURT:  And they were delivered to your husband's

 9    office?

10                    THE WITNESS:  Yes.

11                    THE COURT:  Thank you.

12    Q.  Was there a discussion about where to meet?  Did you agree

13    to pick up the parcels?

14    A.  Because my brother required the items in the parcel for his

15    business, so I agreed to pick it up.  Majid wanted me to go up

16    to his office, but I told him no, we meet downstairs at the car

17    park.

18    Q.  Why didn't you want to go collect the parcels at Mr.

19    Souratgar's office?

20    A.  Because I wanted to be in a public area because I'm afraid

21    of him, that he might do something.

22    Q.  Did there come a time that you arrived at the car park?

23    A.  Yes.

24    Q.  Approximately what time was that, if you recall?

25    A.  Probably around 3 o'clock.

1   Q.  What, if anything, transpired at that time?

2   A.  When I arrive, I gave him a call and told him that I'm at

3   the car park, and he said he would come down shortly, after

4   which he did.  He came down with his brother, and they were

5   carrying I think three boxes, big boxes.  Then they approached

6   my car, and I opened the booth, and then they put one in the

7   booth, and the other two he put it at the back passenger seat.

8   Q.  What happened then?

9   A.  Then Majid walk over to the front passenger seat and he

10  went inside my car and he sat down there.  I went over --

11  Q.  What was your reaction to Mr. Souratgar actually entering

12  your car and sitting down in the front passenger seat?

13          MR. ARENSTEIN:  Again, your Honor, I'll make my

14  continuing objection and move to strike at the end of the

15  testimony.

16          THE COURT:  All right.  Overruled.

17  A.  Then I was very shock.  I was also very frightened, because

18  I know that Majid is capable of doing harm of things.

19          MR. ARENSTEIN:  Objection.

20          THE COURT:  Overruled.

21  Q.  What then happened after that?

22  A.  Then I went back to the driver's seat.  I didn't go in from

23  outside.  I asked him, I said, why are you sitting here.  I

24  said then, can you please get out from the car.  And then he

25  say no.  He say, unless you receive these documents, I'm not

1   going to get out from the car.

2   Q.  Did you know what documents he was talking about at that

3   time?

4   A.  I was unsure what the document was.  But later he showed

5   me.  He said these are the Malaysian Shariah court documents

6   requiring you to attend court.

7   Q.  At that time you didn't know what those documents were?

8   A.  Yes, at that time I didn't know.

9   Q.  What happened then?

10  A.  Then he showed me the front page, and I saw the Shariah

11  court that was in Malay.

12  Q.  Yes.

13  A.  Then I felt very -- I felt I was almost trick, because he

14  told me that I should go down to collect the parcels and not to

15  be served any documents.

16           MR. ARENSTEIN:  Objection, your Honor.  Move to

17  strike.

18           THE COURT:  Overruled.

19  Q.  What happened then?  Did Mr. Souratgar get out of the front

20  passenger seat at that time?

21  A.  No, he didn't want to get out.  He said unless I accept the

22  documents, he would not get out from the car.

23  Q.  Where was Mr. Souratgar's brother at that time?

24  A.  His brother was on the front, at the side, at the door of

25  the front passenger seat.  He took out a camera and he started

1 filming.

2 Q. What happened then?

3 A. Then I tried to take -- because I didn't want to enter the

4 car, so I tried to take my mobile phone and my car keys, which

5 Mr. Majid grabbed my cell phone, because I left it at the

6 gearbox.  And then he learned over to the steering --

7 Q. When you say the gearbox, what do you mean?

8 A. Where the handbrake is.

9 Q. Yes, inside the car?

10 A. Yes.  There was a compartment near the handbrake.  I left

11 my mobile phone there.  He took it.

12 Q. Where had the keys been?

13 A. The key was in the ignition.  He actually leaned over and

14 off the engine and he took out my car keys.

15 Q. After Mr. Souratgar had your mobile cell phone and your car

16 keys, what happened then?

17 A. I was very frightened at that time, so I tried -- and I

18 just wanted to get away from him.  I went to retrieve back my

19 belongings, the car keys and the mobile phone.  So I tried to

20 take it back from him, after which we got into a struggle.  And

21 then he started pushing me away, and he didn't want to hand

22 over my car keys and my mobile phone.  So he kept pushing me

23 and then he started hitting me.  And then I got scared, so I

24 ran out, I came out from the car.  Then I saw two men who was

25 standing near the building, so I ran towards them and asked

1     them to help me to call the police.

2   Q.   What happened then?

3   A.   And then, when I approached the two guys, I told them, I

4   say, please help me call the police, this guy is beating me.

5   Then Mr. Souratgar managed to catch up with me.  Then he told

6   the two men that this is personal issues and asked them not to

7   interfere.

8   Q.   What happened then?

9   A.   Then Majid forced me the accept the documents.

10            THE COURT:  I didn't hear what you said.

11            THE WITNESS:  Majid forced me to accept the documents.

12            THE COURT:  I don't understand what you mean.

13            THE WITNESS:  He catch up with me.  Then I was

14   standing beside the two men.  He came over, and then he push

15   the documents to ask me to take it.

16            THE COURT:  He pushed the documents to ask you to take

17   it, is that what you said?

18            THE WITNESS:  Yes.

19            THE COURT:  Next.  Continue.

20   Q.   Did you take the documents?

21   A.   I refused to accept it.  Therefore, he threw it.  Then he

22   threw it on the floor and he say that is considered accept.

23   Q.   What happened after that?

24   A.   After that, I told him to give me back my hand phone and my

25   car keys.  I said if not, then I would call the police.  Then,

1  I don't know, he spoke to his brother in Persian, and his

2  brother took the hand phone from Majid and pass it to me.  And

3  then they say that -- he pointed at the documents on the floor

4  and say, the documents are here, you better accept it.  And

5  then he returned me my car keys, and then he left, he went back

6  up to his office.

7  Q.  What did you do after that incident?

8  A.  I just took my car key and my mobile phone and walked back

9  to my car, and then I drove off.

10  Q.  Where did you drive off to?

11  A.  I went to lodge a police report at the police station.

12  Q.  You described an encounter, a physical encounter, with Mr.

13  Souratgar while you were in the car.

14  A.  Yes.

15       MR. ARENSTEIN:  Objection to the form of the question.

16       THE COURT:  Overruled.

17  Q.  Did you feel any physical effects from that encounter?

18  A.  Yes.  My arms were aching, and then I also noticed there

19  were bruises on my chest.

20  Q.  When you say bruises, what do you mean?

21  A.  It was yellowish bruise at the top of my chest.

22       MS. LEIDHOLDT:  Let the record reflect that the

23  witness is pointing to the right side of the lower part of her

24  chest.

25       THE WITNESS:  Yes.

1   Q.  When did you observe this yellowish bruise on the lower

2   right side portion of your chest?

3   A.  After I lodged the police report that day, I went to the

4   doctor.  When I was waiting for my turn to see the doctor, then

5   I notice.

6   Q.  It's your testimony that you lodged a police report after

7   this incident?

8   A.  Yes.

9   Q.  And it is your testimony that at some point you went to see

10  the doctor?

11          MR. ARENSTEIN:  Objection.

12  A.  After I lodged the police report.

13          MR. ARENSTEIN:  Repeating the questions.

14          THE COURT:  Yes.  Try to avoid that, please.

15          MS. LEIDHOLDT:  I will.

16          THE COURT:  This is not an opportunity to reiterate

17  and summarize the testimony for the Court.  Elicit the

18  testimony and it will stand.  OK?

19          MS. LEIDHOLDT:  Yes.  Thank you, your Honor.

20          THE COURT:  Thank you.

21  Q.  How much time transpired between lodging the report with

22  the police -- withdrawn.  What happened when you got to the

23  police station?

24  A.  I waited in the queue for my turn.  Then I was there

25  probably two hours, after which I went to the doctor, and then

1   I have to wait another one and a half, two hours again.

2   Q.  To the best of your knowledge, was any action taken on the

3   part of the police involving this incident?

4          MR. ARENSTEIN:  Objection.

5          THE COURT:  If you know.

6   A.  The police, again they told me that unless there is a

7   personal protection order, they will not take action, because

8   he is my husband.

9          MR. ARENSTEIN:  Objection.  Move to strike what the

10  police told her.

11         THE COURT:  Yes.  I don't understand why it would be

12  admissible for anything other than the truth of its content.

13  And if it is for the truth of its content, then it seems to be

14  hearsay.

15         MS. LEIDHOLDT:  I understand.

16         THE COURT:  If it is for some other reason, please

17  tell me what that other reason is.

18         MS. LEIDHOLDT:  Your Honor, I would like to reframe

19  the question.

20         THE COURT:  OK.  That answer will be stricken.  Ask a

21  new question then.

22         MS. LEIDHOLDT:  Yes.

23  Q.  My question is, did the police take any action, if you

24  know, after you made that report?

25  A.  No.

1        MR. ARENSTEIN:  Is it no, she doesn't know, or that

2   the police didn't take any action?

3        THE COURT:  You will have an opportunity to conduct

4   cross-examination, Mr. Arenstein.

5        MR. ARENSTEIN:  Thank you.

6        MS. LEIDHOLDT:  May I approach the witness?

7        THE COURT:  You may.

8   Q.  Ms. Lee, I'm handing you a document that's been marked

9   Respondent's 16 for identification.  Ms. Lee, do you recognize

10  that document?

11  A.  Yes.

12  Q.  What do you recognize that document to be?

13  A.  A police report.

14  Q.  Is this the police report that you made on August 15th of

15  2011?

16  A.  Yes.

17  Q.  After the incident that you just testified about?

18  A.  Yes.

19  Q.  Is that your signature on the police report?

20  A.  Yes.

21        MS. LEIDHOLDT:  Your Honor, I request that

22  petitioner's 16 for identification be entered into evidence as

23  Petitioner's 16 in evidence.

24        THE COURT:  Any objection?

25        MR. ARENSTEIN:  Same objection.

1          MS. LEIDHOLDT:  I'm sorry.  Respondent's 16 in

2    evidence.

3          THE COURT:  Respondent's 16 is received into evidence.

4          (Respondent's Exhibit 16 received in evidence)

5          MS. LEIDHOLDT:  May I approach the witness, your

6    Honor?

7          THE COURT:  You may.  You have standing permission to

8    approach the witness, revocable at any time by the Court.

9    Q.  Ms. Lee, I show you a document that's been marked

10   Respondent's 17 for identification.  Would you please review

11   that document.  Ms. Lee, do you recognize this document?

12   A.  Yes.

13   Q.  What do you recognize this document to be?

14   A.  This is a medical form that was given to me by the police

15   officer to be filled out by the doctor.

16   Q.  Which clinic did you have this --

17         THE COURT:  Are you offering this document?

18         MS. LEIDHOLDT:  Yes, your Honor.  I respectfully

19   request that this document be entered into evidence as

20   Respondent's 17 in evidence.

21         THE COURT:  Any objection?

22         MR. ARENSTEIN:  Can I look at it, your Honor?  I

23   haven't had a chance to look at it.

24         THE COURT:  Yes.

25         MR. ARENSTEIN:  Again my same objection.

 1                THE COURT:  Same ruling.  Received, Respondent's 17.

 2                (Respondent's Exhibit 17 received in evidence)

 3    Q.  Ms. Lee, how much time transpired between the time this

 4    incident took place at the car park and the time you went to

 5    the police?

 6    A.  Two hours.

 7    Q.  What happened during those two hours?

 8    A.  I was at the car park until around 4:00.  And then when I

 9    left, it was already around 4 o'clock, then I drove to the

10    police station.

11    Q.  How long did it take you to go from the car park to the

12    police station, if you recall?

13    A.  It would be around 30 to 40 minutes' drive because of the

14    traffic.

15    Q.  After your encounter with Mr. Souratgar and before you

16    arrived at the police station, did you take any action to

17    injure yourself?

18    A.  To?

19    Q.  Injure yourself.

20    A.  No.  I was in the car driving.

21    Q.  At any time how long did it take you to go from the police

22    station after you filed the report there to the medical clinic,

23    if you recall?

24                MR. ARENSTEIN:  Objection, your Honor.  We haven't had

25    a time when she'd gone to the medical clinic or when she went

1   to the medical clinic.

2          THE COURT:  Why don't you lay a little bit of a

3   foundation.

4          MS. LEIDHOLDT:  I will, your Honor.

5   Q.  What did your what time you made the police report?

6   A.  After I waited for my turn, it was probably around 6:00,

7   6:00-plus.

8   Q.  That's 6 o'clock in the evening, is that correct?

9   A.  Yes.

10  Q.  After you finished making the police report, how long did

11  it take from that point until you arrived at the medical

12  clinic?

13  A.  I was at the police station giving my statement, I was

14  there for almost an hour.  It was more than one hour.  One and

15  a half hours.  Then after that, I went to the doctor.  But they

16  were closed for dinner break from I think most likely 7:00 to

17  7:30, so I waited for the doctor to come back.  I was waiting

18  at the clinic and then the doctor came back.

19          MR. ARENSTEIN:  I can't hear that.

20          THE COURT:  Back up your last few words and say them

21  again.

22  A.  When I reached the clinic around 7 o'clock, the doctor was

23  out for his dinner break.  And then I returned in the clinic

24  reception until he came back around 7:30.  Then he was seeing

25  other patients.  By the time he got to my turn, it was around

1   one hour later.

2   Q.  At any time after you left the police precinct until you

3   actually saw the doctor, did you take any action to inflict

4   injury on yourself?

5   A.  No.

6   Q.  Did there come a time that you opened the parcels that Mr.

7   Souratgar and his brother had delivered to your car?

8           MR. ARENSTEIN:  Objection, your Honor.  I don't know

9   how the parcel is relevant to anything to do with this case.

10          MS. LEIDHOLDT:  Subject to connection, your Honor?

11          THE COURT:  Yes, I'll allow it.

12  A.  I opened the parcel after I got home from the doctor's

13  clinic.

14  Q.  What, if anything, did you discover when you opened the

15  parcels?

16  A.  I discovered that two boxes contain the items that my

17  brother ordered and the other box, essentially there's another

18  two small empty boxes inside the big box.

19  Q.  What conclusion did you reach after discovering that one of

20  the boxes was empty but contained two small empty boxes?

21          MR. ARENSTEIN:  Objection.

22          THE COURT:  I'll hear the answer subject to a motion

23  to strike.

24  A.  I had concluded that Majid actually have another fake box

25  in order for his brother, for an excuse for his brother to come

1    down with him to put the parcels in my car.

2              MR. ARENSTEIN:  Move to strike.

3              THE COURT:  I'm not going to rule on that at this

4    stage.  Much of what has been introduced at this hearing,

5    including by both sides, has struck me as either irrelevant or,

6    under rule 403, having slight probative value which is

7    substantially outweighed by the other factors in Rule 403.  I'm

8    going to let it stand for the moment subject to my ability to

9    disregard it in adjudicating this case.  Quite frankly, I don't

10   see the relevance to the issues, the only issues, that are

11   before me under article 30 and article 20.  Next question.

12   Q.  Did there come a time that you obtained the papers that Mr.

13   Souratgar had tried to serve you with?

14   A.  Yes.

15   Q.  Ms. Lee, at any time during the course of your marriage or

16   afterwards, to the best of your knowledge, has Mr. Souratgar

17   ever resided in Malaysia?

18             MR. ARENSTEIN:  Objection.

19             THE COURT:  Overruled.

20   A.  No.

21   Q.  Has Shayan ever resided in Malaysia?

22   A.  No.

23   Q.  Ms. Lee, why do you believe that Mr. Souratgar filed a

24   custody action for Shayan in Malaysia in the Shariah court?

25             MR. ARENSTEIN:  Objection, your Honor.

1          THE COURT:  Sustained.

2    Q.  Did there come a time that you were served with the

3    Malaysian Shariah court papers?

4    A.  Yes.

5    Q.  What, if anything, did you have to do once you were served

6    with those papers?

7    A.  I have to attend a hearing at the Malaysian Shariah court,

8    in which I have no choice but to hire a Malaysian attorney who

9    specialize in Shariah proceedings.

10   Q.  Did you have the resources to hire an attorney to represent

11   you in the Malaysian Shariah court proceedings?

12          MR. ARENSTEIN:  Objection.

13          THE COURT:  Overruled.

14   A.  No.  I have to borrow money from my brother to pay for the

15   legal costs.

16   Q.  What was your financial situation at this time?

17          MR. ARENSTEIN:  Objection, your Honor.

18          THE COURT:  Overruled.

19   A.  I was unemployed.  I was looking around for a job.  In the

20   meantime I have to pay for all the basic necessities for

21   Shayan, myself, and of the household expenses as well.

22          THE COURT:  This is at a point in time when you were

23   living in your sister's house, is that correct?

24          THE WITNESS:  Yes.

25          THE COURT:  You described for the Court in your prior

 1   testimony the position that you previously held.  I think you

 2   said you were a brand manager for a jewelry company, is that

 3   correct?

 4            THE WITNESS:  Yes.

 5            THE COURT:  Tell me about the jewelry company.

 6            THE WITNESS:  You mean what they do?

 7            THE COURT:  Yes.  What did you do for the jewelry

 8   company?  What kind of jewels are we talking about?  Are we

 9   talking about precious stones, semiprecious stones?

10            THE WITNESS:  Yes, precious stones.

11            THE COURT:  What kind of precious stones?

12            THE WITNESS:  They deal with diamonds, they have ruby,

13   emeralds, things like that.  They actually have a few branches

14   of retail stores around Singapore.  I'm doing the branding, the

15   promotions, as well as the marketing activities.

16            THE COURT:  Tell me what that entails.  When you say

17   branding, I have a general awareness of the concept, but tell

18   me what you did.

19            THE WITNESS:  Basically, the job is to ensure that all

20   promotions and marketing activities, we have to come up with

21   strategies on that.

22            THE COURT:  Never mind we.  I'm talking about you now.

23            THE WITNESS:  I have to come up with strategies.  Then

24   we have to implement these at the shop front.

25            THE COURT:  How long did you work for them?

1            THE WITNESS:  Worked for them probably eight months.

2            THE COURT:  You did you get that job?

3            MR. ARENSTEIN:  I was a headhunted.

4            THE COURT:  Meaning that a headhunter contacted you?

5            THE WITNESS:  Yes.

6            THE COURT:  What qualifications did you have at that

7     point in time for that job?  Why did a headhunter reach out to

8     you, if you know, for a brand manager position with a precious

9     jewelry distributor?

10           THE WITNESS:  Because before that I was doing high-end

11    alcoholic beverages.

12           THE COURT:  High-end?  I'm sorry?

13           THE WITNESS:  Alcoholic beverages.

14           THE COURT:  Yes.

15           THE WITNESS:  And that was a global company.

16           THE COURT:  Who were you doing the high-end alcoholic

17    beverages for?

18           THE WITNESS:  Diageo.

19           THE COURT:  What brands to they sell?

20           THE WITNESS:  Johnnie Walker, Tanqueray, Bailey's.

21           THE COURT:  You were a brand manage for them?

22           THE WITNESS:  No.  I was the marketing.

23           THE COURT:  What was your position in marketing?

24           THE WITNESS:  I was the assistant marketing manager.

25           THE COURT:  Is this a distributor just in Singapore,

1   or did they have other markets that they distributed in?

2            THE WITNESS:  My position covers Singapore and

3   Thailand.

4            THE COURT:  How long did you work with them?

5            THE WITNESS:  Four and a half years.

6            THE COURT:  What did you do before that?

7            THE WITNESS:  I was in the cosmetic.

8            THE COURT:  Who did you work for in the cosmetic

9   field?

10           THE WITNESS:  It was a local Singapore company.

11           THE COURT:  A local Singapore company.

12           THE WITNESS:  Yes.

13           THE COURT:  What did you do for them?

14           THE WITNESS:  I was the retail manager there.  I

15   manage their stores as well as orders.

16           THE COURT:  How many stores did they have?

17           THE WITNESS:  I believe they have five, around five to

18   six stores.

19           THE COURT:  You managed the five to six stores?

20           THE WITNESS:  Yes.

21           THE COURT:  Approximately what year were you doing

22   that?

23           THE WITNESS:  2001, around 2000, 2001.

24           THE COURT:  How long did you work for them?

25           THE WITNESS:  Two years.

```
 1              THE COURT:  Prior to that?

 2              THE WITNESS:  Prior to that I was working with an

 3    ophthalmologist.

 4              THE COURT:  Ophthalmologist.

 5              THE WITNESS:  Yes.

 6              THE COURT:  Doing what?

 7              THE WITNESS:  Personal assistant.

 8              THE COURT:  Personal assistant?

 9              THE WITNESS:  Yes.

10              THE COURT:  Thank you very much.  Next question.

11    BY MS. LEIDHOLDT:

12    Q.  How long had it been at the time you needed to hire a

13    lawyer in Malaysia since you had been working?  How much time

14    had transpired at this time, the middle part of 2011, since you

15    had been working?

16    A.  I don't understand.  I'm sorry.

17    Q.  When did you stop working?

18    A.  I stopped working in June 2008.

19    Q.  If you know, Ms. Lee, did your attorney who was

20    representing you in the custody case in Singapore at that time

21    communicate with Ms. Gomez about the custody case that Mr.

22    Souratgar had brought at the same time in Malaysia?

23              MR. ARENSTEIN:  Objection, your Honor.

24              THE COURT:  Sustained.

25    Q.  I'd like to direct your attention to August 16th of 2011.
```

1   What, if anything, transpired on August 16th of 2011, if you

2   recall?  I'll rephrase the question.  Ms. Lee, did there come a

3   time that you went to family court in Singapore?

4   A.  Yes.

5   Q.  Do you remember what month, approximately, you went to the

6   family court in Singapore?

7   A.  There were a few times I went there.

8   Q.  Did there come a time that you went to the family court in

9   Singapore to apply for a personal protection order?

10          THE COURT:  You're asking this witness about her

11  physical travel to the building where the court is located, is

12  that your question?

13          MS. LEIDHOLDT:  Yes, I am.

14          THE COURT:  OK.

15  A.  Yes.

16  Q.  When was the first time that you went to the family court

17  in Singapore to apply for a personal protection order, if you

18  recall?

19  A.  The day after this incident.

20          MR. ARENSTEIN:  I'm sorry.  I didn't hear the answer.

21          THE COURT:  The day after what, ma'am?

22          THE WITNESS:  This incident.

23          THE COURT:  What do you mean by "this incident"?

24          THE WITNESS:  The incident at the car park.

25          THE COURT:  I'm sorry?

 1              THE WITNESS:  The incident at the car park.

 2              THE COURT:  Thank you.

 3  Q.  Why did you decide at that point to apply for a personal

 4  protection order?

 5              MR. ARENSTEIN:  Objection.

 6              THE COURT:  Overruled.

 7  A.  Because I felt that even after I left Majid, he is still

 8  finding ways to harm me.

 9              MR. ARENSTEIN:  Objection, your Honor.  Move to

10  strike.

11              THE COURT:  Overruled.

12  A.  And I was frightened.  So then I wanted some protection

13  from the police.

14              MR. ARENSTEIN:  Objection, your Honor.  This is not a

15  response to the question.  She already answered the question.

16              THE COURT:  She did answer the question.  Next

17  question.

18              MR. ARENSTEIN:  Move to strike the response.

19              THE COURT:  Granted.

20  Q.  At that point in time did you think that the personal

21  protection order would influence the police response?

22  A.  Yes.

23              MR. ARENSTEIN:  Objection, your Honor, to the question

24  and the response.

25              THE COURT:  Overruled.

1  Q.  What happened once you went to the family court to apply

2  for a personal protection order?

3          MR. ARENSTEIN:  Could we have a time frame when this

4  occurred?

5          THE COURT:  Yes.

6          MR. ARENSTEIN:  There was already an order of

7  protection.

8          THE COURT:  Yes, please.

9          I didn't understand what you just said, Mr. Arenstein.

10          MR. ARENSTEIN:  I believe there was already a PPO

11  outstanding, and now we are talking about getting another one.

12          THE COURT:  No.  There was testimony in this case

13  yesterday that at no time, in fact a representation made by

14  counsel, at no time was there a personal protection order in

15  place.  That's what you told me yesterday, Ms. Leidholdt?

16          MS. LEIDHOLDT:  Yes.

17          THE COURT:  That's what I thought.

18          MR. ARENSTEIN:  Your Honor, there was an emergency

19  order issued prior.  Whether we call it a PPO or whatever she

20  had, a temporary order that was already issued by the court.

21          THE COURT:  I hear what you say.  Ms. Leidholdt takes

22  issue with that.  Correct?

23          MS. LEIDHOLDT:  That's correct, your Honor.

24          THE COURT:  So we have a difference of opinion as to

25  whether there was ever any order from the Singapore court that

1   provided any protection for the respondent.  You maintain that

2   there was such an order, and you maintain, Ms. Leidholdt, that

3   there was never such an order, correct?

4            MS. LEIDHOLDT:  Yes, your Honor.

5            THE COURT:  Have you all ever talked to each other

6   about this?

7            MR. ARENSTEIN:  No.

8            THE COURT:  No, that would be too much to ask, I

9   guess.  We're talking about a piece of paper, right?

10           MR. ARENSTEIN:  Yes.

11           THE COURT:  Do you know the piece of paper that Mr.

12   Arenstein is talking about?

13           MS. LEIDHOLDT:  I don't.

14           THE COURT:  You don't have any idea, right?

15           MS. LEIDHOLDT:  I don't know what he is referring to.

16   I wasn't aware that Mr. Arenstein had the belief that there was

17   a personal protection order.

18           THE COURT:  I heard it during the direct case, and

19   that's why I pressed you yesterday on it, because my

20   understanding was that there was such an order.  But that was

21   based on the petitioner's case.  You are free to dispute that,

22   and that's fine.  You may very well be factually correct.  I'm

23   not taking sides on this issue.  But I'm astounded that on what

24   is now the sixth day of this hearing there isn't even an

25   understanding as to the effect -- may I see the document, Mr.

 1   Arenstein.

 2           MR. ARENSTEIN:  I'm going to need some time to get it

 3   for your Honor.

 4           THE COURT:  You need some time?  I'll wait.

 5           MR. ARENSTEIN:  My understanding is, your Honor,

 6   whenever you go to the court initially, which is what she did

 7   first, they issue an order.  I don't know that we have a copy

 8   of the order.  Maybe we do.

 9           THE COURT:  Why don't you look to get me a copy of the

10   order.  You said there is an order.  You made that statement,

11   Mr. Arenstein.  Show me a copy of the order and show it to Ms.

12   Leidholdt.

13           MR. ARENSTEIN:  I do have a document, your Honor.

14           THE COURT:  I'm sure you have plenty of documents.

15   The question is whether you have a copy of the order.

16           MR. ARENSTEIN:  What I have, your Honor --

17           THE COURT:  No, no.  Do you have a copy of the order?

18           MR. ARENSTEIN:  We'll get the order.  But we do have

19   an order which was issued by the court which says, "Leave

20   granted to withdraw personal protection order application for

21   self.  Summons withdrawn."  This was issued by the court after

22   she had gotten the temporary order prior to getting --

23           THE COURT:  I've seen the order to which you're

24   referring.  You have asserted that there was an order from the

25   court in Singapore providing Ms. Lee with protection, some kind

1   of a protective order.  Whether it is called a PPO or it is

2   given some other name, it's some form of order of protection.

3   You have asserted that, is that correct?

4           MR. ARENSTEIN:  That's correct, your Honor.

5           THE COURT:  And you stand by that?

6           MR. ARENSTEIN:  I stand by that.

7           THE COURT:  I have asked you to provide me with a copy

8   of that order.  Take your time and look for it.

9           MR. ARENSTEIN:  Thank you.

10          THE COURT:  This has been unacceptable conduct in this

11  case.  I had a statement made that there was a submission by

12  the respondent to this Court that accused the petitioner of

13  engaging in acts of terrorism or being a terrorist.  I stopped

14  the proceeding and I asked for it, and then it turned out that

15  it there never was any such document.  Now I'm being told yet

16  again there is this order from the court in Singapore.  Ms.

17  Leidholdt says there is not such an order.

18          As a United States district judge, with lawyers

19  appearing before me who are subject to rule 11 as to their oral

20  statements, I'm entitled to expect that they be careful in

21  their assertions.  This is not some idle point.  The assertion

22  that Mr. Souratgar had been accused of being a terrorist in a

23  submission to me was not an idle point.  I'm entitled to see

24  the order on which you're relying and I am waiting.

25          MR. ARENSTEIN:  Your Honor, may I have my associate

1    speak?  She has something to say to the Court.

2              THE COURT:  No, no.  I'll wait for you.  Either you're

3    going to tell me I have no such order or you're going to hand

4    it up to me.

5              MR. ARENSTEIN:  She can tell you.

6              MS. NUNEZ:  May I speak, your Honor?

7              THE COURT:  Mr. Arenstein, you're not able to speak?

8              MR. ARENSTEIN:  She knows the issue better.

9              THE COURT:  Why don't you consult with her.  You're

10   the one who MADE the representation, Mr. Arenstein.  You're the

11   one with the Rule 11 obligation, and you're the one who is

12   subject to rule 11 sanctions if you're making statements to the

13   Court without a good-faith basis.

14             MR. ARENSTEIN:  What my associate informs me is that

15   when you go to the police and you make an application for a

16   police report, they provide you with an emergency order.  You

17   go to court, they provide you with an emergency order which

18   protects you until such time as you come back to court for the

19   case to be heard.  We need some time to get the order for you.

20   We'll find it and get it to you sometime today, your Honor.

21             THE COURT:  I'll wait for you.  Let's see this.  We'll

22   take a recess.

23             (Recess)

24             (Continued on next page)

25

```
 1                    (In open court)

 2              THE COURT:  Mr. Arenstein, do you have the order?

 3              MR. ARENSTEIN:  Yes, your Honor.

 4              THE COURT:  Have you given it to Ms. Leidholdt?

 5              MR. ARENSTEIN:  Yes, I have, your Honor.  I would like

 6      to address the court on it.

 7              MS. LEIDHOLDT:  Would your Honor like me at the

 8      podium?

 9              THE COURT:  No.  There is nothing --

10              MR. ARENSTEIN:  I want to address the court if I can,

11      your Honor.

12              THE COURT:  On what subject?

13              MR. ARENSTEIN:  On the two orders that you have, the

14      two documents that your Honor has up there.

15              THE COURT:  All right.  These are marked for

16      identification as Petitioner's Exhibit M and N, and neither one

17      of them is in evidence, correct?

18              MR. ARENSTEIN:  They are in evidence.  They're part of

19      Exhibit C -- I am sorry.  Withdrawn.

20              Can I just address the court first?

21              THE COURT:  No.  Can you answer to me whether they're

22      in evidence?  That is a simple question.

23              MR. ARENSTEIN:  I don't believe they're in evidence.

24              They were filed with the court as reply to defendant's

25      memorandum of law, and a copy was provided to Ms. Leidholdt and
```

1    to Ms. Baum under the reply to the petitioner's reply to the

2    memorandum of law.  They were documents applied to both sides

3    prior to being in this Court today and, your Honor, the first

4    is a copy of expedited protection order given to Ms. Fair by

5    the court immediately after she alleged she had been abused by

6    Mr. Souratgar.  This document was contained in the petitioner's

7    reply to memorandum of law which has been filed with this Court

8    and both parties have received.

9         She was protected under this order until she appeared

10   in the court with further proof in order for her to get an

11   extended PPO, and the Women's Charter under 65 and 66 are what

12   basically gives her that protection.

13        At this time she made an application to withdraw this

14   application for an extended PPO because she learned that the

15   photographs taken at the scene showed that she had sustained no

16   injuries.  She received the second expedited order which we

17   will show the court as well.

18        The second --

19        THE COURT:  Do you have that, sir?  Do you have that?

20   Have you given that to Ms. Leidholdt?

21        MR. ARENSTEIN:  That was also in the reply memorandum.

22   We'll get to that on cross.

23        THE COURT:  We have taken almost an hour break so that

24   I could take up two criminal matters.  You haven't been able to

25   find the second one?

```
 1                MR. ARENSTEIN:  It was not requested, your Honor.

 2           The second document that you have there is a letter

 3   written to a judge of the Singapore court alleging that

 4   Mr. Souratgar is a --

 5                THE COURT:  You're telling me there is a second order.

 6           The issue before the break was whether there was an

 7   order, any kind of protective order.  You asserted there was,

 8   and Ms. Leidholdt asserted there wasn't.

 9           Now the reason you're not producing the second order

10   is, if I understand the words you just said --

11                MR. ARENSTEIN:  We --

12                THE COURT:  Excuse me a second, sir.  If I understand

13   the words you said, is because it wasn't requested?  Is that

14   what you're saying, sir?

15                MR. ARENSTEIN:  No, your Honor.

16                THE COURT:  That is what I think you just said though.

17                MR. ARENSTEIN:  We believe I was addressing the court

18   on the first order, which is what we did.

19           There was an order.  She said there wasn't an order.

20   There is an order.  I was accused by Ms. Leidholdt that there

21   was no order.  Your Honor said to produce the order.  We have

22   now produced the order.  The further order I have here.  This

23   is the second order.

24                THE COURT:  Show it to Ms. Leidholdt.

25           Have you marked it for identification?
```

1          MR. ARENSTEIN:  Not yet, your Honor.

2          THE COURT:  All right.

3          MR. ARENSTEIN:  This was also in the reply,

4   petitioner's reply to the memorandum of law of the respondent.

5   Both documents were given to Ms. Baum by ECF and to Ms. Dorchen

6   Leidholdt by ECF.  This is the document, the second order.  I

7   can mark it Exhibit O, Petitioner's.  I have to make copies at

8   the break and I can provide them to the court if that is okay

9   with your Honor?

10          THE COURT:  That is fine.

11          MR. ARENSTEIN:  Further, the second thing is --

12          THE COURT:  Why don't you mark it and give it to my

13   Deputy, and my Deputy will make copies.

14          MR. ARENSTEIN:  Thank you.

15          The second thing is, the letter, the second document

16   was a letter written to a judge of the Singapore court alleging

17   Mr. Souratgar is a terrorist in order to influence the court

18   and deny Mr. Souratgar access and care, right of care and

19   control of his son.

20          I also am handing the court a copy of Mr. Souratgar's

21   certificate of good conduct issued by the Singapore police

22   since 1995 to 2012.

23          THE COURT:  It is not in evidence and I am not going

24   to take it.  It is not something I can take judicial notice of.

25          If one wants to, it may be the case I can take

1     judicial notice of the order of a Singapore court, and I will

2     consider that issue.  I don't see where correspondence or any

3     such thing I can take judicial notice of.

4          MR. ARENSTEIN:  This will be shown to counter any

5     allegations that were made in this letter.  I'll just go

6     forward.

7          If I may, your Honor, I request the court to consider

8     cautioning respondent's counsel from any further accusations

9     such as the observed fact that Mr. Souratgar boarded a Turkish

10    Airline flight on November 12th when he was actually in New

11    York with his son.  He was accompanied by his son on the 13th,

12    at 9:00 am, for visit at respondent's home in Upstate New York.

13    There is no way he could have gotten at 11:00 o'clock at night

14    from the airport to a visitation.

15         Second, Ms. Gomez had written an affidavit endangering

16    the respondent in Singapore, when we gave the court a copy of

17    the letter Ms. Leidholdt was calling endangering affidavit not

18    only in open court, but two weeks ago accompanying a request to

19    your Honor to request a letter for the documents to the

20    director from the Singapore court on Family Harmony.

21         We also requested a passenger list from the Turkish

22    Airlines to prove the fact that Mr. Souratgar was not at the

23    airport and not boarding a plane there.

24         THE COURT:  Your application to bar counsel from

25    making statements is denied.  It remains the case that you

1    stood up before this Court and told the court that in its

2    submission to this Court, your client was accused of being a

3    terrorist, and you have confirmed for me that that statement

4    was not correct, that your adversary had never submitted any

5    such statement to this Court.  I don't understand what you have

6    said now to in any way refute that.

7           Furthermore, at this stage of the proceeding there is

8    testimony from a witness that your client was at Kennedy

9    Airport boarding a plane, Turkish Airlines, and to quote the

10   witness, she is sure that, "beyond a shadow of a doubt."  That

11   is the testimony I have.

12          I am not going to bar respondent's counsel from

13   referring to that testimony.  You have avenues open to you, and

14   I suggest you utilize the avenues that are open to you, okay?

15          Next question.

16          MR. ARENSTEIN:  Your Honor, I had objected, when we

17   stopped the proceeding, I had objected to the answer by

18   Mrs. Lee Jen Fair based on the fact there was an additional

19   order outstanding, and now that there is an additional order

20   outstanding, I renew my objection.

21          THE COURT:  I'll take the motion to strike under

22   advisement.  Next question.

23   DIRECT EXAMINATION continued

24   BY MS. LEIDHOLDT:

25   Q.  Ms. Lee, what happened on August 16th, 2011 when you

1    arrived at the Family Court in Singapore?

2            MR. ARENSTEIN:  Objection; asked and answered, your

3    Honor.

4            THE COURT:  I think it was, wasn't it?

5            MS. LEIDHOLDT:  Your Honor, I don't believe she -- I

6    believe we broke at this point in time.

7            THE COURT:  I'll allow you to re-ask it.  Go ahead.

8    Ma'am, do you understand the question?

9            THE WITNESS:  Yes.

10           THE COURT:  Please give me your answer.

11           THE WITNESS:  When I arrived at the Family Court, I

12   went to the section for application for personal protection

13   order.  Over there I met an officer who took down the

14   information, and then she asked me whether I had any police

15   reports or medical reports, and I submitted it to her.  She

16   made a copy and then she attached it to the application form.

17           Then she told me to wait outside, to be called to

18   swear in front of a magistrate.  So I waited, and then later

19   they called me up, and then the magistrate reviewed the

20   documents and then he asked me to swear under oath.

21           MR. ARENSTEIN:  Objection to what the magistrate did,

22   your Honor.

23           THE COURT:  No.  Overruled.

24           THE WITNESS:  Asked me to swear under oath, and then

25   he told me to go out of the room and wait at the reception

1    area, after which another officer came and she told me that

2    these documents will be served to Majid, and then she gave me a

3    sheet of paper to inform me of the next hearing.

4    BY MS. LEIDHOLDT:

5    Q.  Did you hire an attorney to represent you in this

6    proceeding?

7    A.  No.

8    Q.  Why not?

9             MR. ARENSTEIN:  Objection.

10            THE COURT:  I'll allow it.

11   A.  I didn't have the funds to.

12   Q.  What, if anything, happened?

13            Did there come a time you arrived back at the Family

14   Court on the adjourned date?

15   A.  Yes.

16   Q.  Do you recall how many days after the date that you

17   initially applied for the protection order that was?

18   A.  It was a week later or more.

19   Q.  What, if anything, happened on the following court date?

20   A.  We went to the court and waited for our turn.

21            MR. ARENSTEIN:  We what?

22            THE WITNESS:  Waited for our turn.

23            THE COURT:  "For our turn."

24            MR. ARENSTEIN:  Okay.

25   BY MS. LEIDHOLDT:

1    Q.  What happened then?

2    A.  Then the judge there ordered that we go for counseling

3    session before proceeding further, so we were escorted out from

4    the courtroom.

5    Q.  When you say "we," who are you referring to?

6    A.  Me, Majid and Ms. Gomez.

7    Q.  So Ms. Gomez was in court along with Mr. Souratgar.  Is

8    that right?

9    A.  Yes.

10   Q.  What happened then?

11   A.  And then we waited for our turn for a counseling session.

12   I was called in first, and then I spoke to the counselor, and I

13   told him what happened, and the counselor told me that --

14              MR. ARENSTEIN:  Objection.

15              THE COURT:  I'll take it for the fact it was said.  Go

16   ahead.

17   A.  -- and the counselor told me to reconsider the application

18   because she said that it is better to settle things out of

19   court.  Then she asked me whether me and Majid are still

20   residing together, and I told her no.  So she said the chances

21   of physical abuse is very little.

22              MR. ARENSTEIN:  Objection, your Honor, and I move to

23   strike the testimony.

24              THE COURT:  I'll allow it to stand for whatever it's

25   worth.

1           THE WITNESS:  And then she also said that in the

2   future you just have to be more careful, and then she asked me

3   whether I am going to hire an attorney to represent me because

4   she said in order to obtain a permanent protection order, I

5   would be required to go for a trial.

6           And she said that -- then I told her what if I

7   represented myself -- and she said it is going to be very

8   difficult because you do not know the court procedures.  Then

9   she said you might want to reconsider that.

10           So her advice to me was just to be more careful in the

11   future, and she said the fact we are not staying together,

12   meaning the next event of physical event.

13           So after that --

14           THE COURT:  You have answered the question.  Next

15   question.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

 1   Q.  What happened after that?

 2          THE COURT:  No, no.  What happened in relation to

 3   what, ma'am?  What is your question?

 4   Q.  After you left the session with the counselor in family

 5   court, did something else happen in family court that day?

 6   A.  Yes.

 7   Q.  What happened?

 8   A.  After I did a counseling session, Majid went in for the

 9   counseling session.  Then both of us were required to wait

10   downstairs and to appear again in front of the same judge, in

11   which he asked whether I would like to proceed or I would like

12   to withdraw my application.  I choose to withdraw my

13   application, after much deliberation.

14          MR. ARENSTEIN:  Objection.  Move to strike.

15          THE COURT:  Overruled.  Tell me about the counseling

16   session.  Who was the counselor?  I don't need to know a name.

17   What kind of a person was it?

18          THE WITNESS:  They are court officers, but they are --

19   on their name tag is written "counselor."

20          THE COURT:  Say that again.

21          THE WITNESS:  They are court officers, but the name

22   tag that they wore are written they are counselors.

23          THE COURT:  Did they meet with you together or

24   separately or both?  How does it work?

25          THE WITNESS:  Separately.

1                    THE COURT:  The counsel met with you?

2                    THE WITNESS:  Yes.

3                    THE COURT:  And the counselor met with Mr. Souratgar?

4                    THE WITNESS:  Yes.

5                    THE COURT:  Did the counselor ever meet with the two

6        of you together?

7                    THE WITNESS:  No.

8                    THE COURT:  How many times that day did the counselor

9        meeting with you?

10                   THE WITNESS:  They met me twice.

11                   THE COURT:  They spoke to you, then they spoke to him,

12       then they spoke to you again?

13                   THE WITNESS:  Yes.

14                   THE COURT:  Is that what happened?

15                   THE WITNESS:  Yes.

16                   THE COURT:  Did the counselor go to the courtroom

17       also?

18                   THE WITNESS:  No.

19                   THE COURT:  What did you understand the purpose of

20       seeing the counselor was.

21                   THE WITNESS:  It's more for mediation.  They try to

22       settle things out of court.

23                   THE COURT:  Thank you very much.

24       BY MS. LEIDHOLDT:

25       Q.  Ms. Lee, at this time you testified, I believe, that there

1  were supervised visitations happening at the Center for Family

2  Harmony?

3  A.  Yes.

4  Q.  You would bring Shayan to the supervised visit and pick him

5  up?

6  A.  Yes.

7  Q.  Would you wait there?

8  A.  No, I'm not allowed to be around during the supervised

9  visit.

10 Q.  When you took Shayan to the Center for Family Harmony and

11 when you picked him up from the Center for Family Harmony, did

12 you encounter Mr. Souratgar?

13 A.  Yes.

14 Q.  How often did you encounter Mr. Souratgar?

15 A.  Every time I send Shayan to the center.

16 Q.  What, if anything, happened when you encountered Mr.

17 Souratgar at the Center for Family Harmony?

18          THE COURT:  Fix a time, Ms. Leidholdt.

19          MS. LEIDHOLDT:  I will, your Honor.

20 Q.  When was the first time, if you recall, that you took

21 Shayan to the Center for Family Harmony, approximately?

22 A.  July, end of July, August.  I really can't remember the

23 first visit.

24 Q.  Of 2011?

25 A.  Yes.

1   Q.  For what period of time did the supervised visitation at

2   the Center for Family Harmony go on?

3   A.  Until I left for the United States.

4   Q.  That would have been --

5          THE COURT:  20th May 2012.

6   Q.  So it is your testimony that it was almost a year, is that

7   right?

8   A.  Yes.

9   Q.  You testified that you encountered Mr. Souratgar at the

10  Center for Family Harmony repeatedly?

11  A.  Yes.

12          MR. ARENSTEIN:  Objection.

13          THE COURT:  Overruled.

14  Q.  Ms. Lee, how many visits per week, supervised visits, were

15  there at the Center for Family Harmony starting in July of

16  2011, July or August of 2011, when the visits commenced?

17  A.  It was once a week for two hours.

18  Q.  Did there come a time that the visits became two times a

19  week?

20  A.  Yes.

21  Q.  When was that, if you recall?

22  A.  November.  I think it's November.

23  Q.  That would be November of 2011?

24  A.  Yes, correct.

25          THE COURT:  From what period to what period was it

1    once a week supervised visitation through Family Harmony?

2              THE WITNESS:  From the start.  I can't really recall

3    the first date, but it went on for a couple of months, probably

4    to November.  Then it increased to twice a week.

5              THE COURT:  How long did it run twice a week?

6              THE WITNESS:  Two hours per session.

7              THE COURT:  The twice a week continued till when?

8              THE WITNESS:  Until day I left, 20th of May.

9              THE COURT:  2012?

10             THE WITNESS:  Yes.

11             THE COURT:  So from November 2011 to May of 2012?

12             THE WITNESS:  Yes.

13             THE COURT:  Thank you.  Next question.

14   Q.  I'd like to direct your attention to the period of time

15   while there was one visit a week.  That would be from

16   approximately August of 2011 until November of 2011.  During

17   that period did you have any encounters with Mr. Souratgar at

18   the Center for Family Harmony?

19             MR. ARENSTEIN:  Objection to the phrase "encounters,"

20   your Honor.

21             THE COURT:  Overruled.

22   A.  Every time when I send Shayan down and I pick him, he would

23   scold me for something at the center.

24   Q.  When you say scold, what do you mean?

25   A.  He would just pick on things.  He would just pick on petty

1   issues like why is Shayan not wearing socks, why is he having

2   the flu, all these petty issues.

3          MR. ARENSTEIN:  Objection.

4          THE COURT:  Overruled.

5   Q.  How loudly or softly was he speaking when he made these

6   statements to you?

7   A.  He was using a very harsh tone.  It's above a normal

8   conversation tone.

9   Q.  Did that continue after November of 2011?

10  A.  Yes.

11  Q.  There were officials, workers, at the Center for Family

12  Harmony --

13  A.  Yes.

14  Q.  -- that were assisting with the supervised visitation?

15  A.  Yes.

16  Q.  Did they ever have the occasion to respond to any of these

17  kinds of encounters that you have just described?

18  A.  Every single time.

19          MR. ARENSTEIN:  Objection.

20          THE COURT:  Overruled.  I don't understand what your

21  question means by "respond."  I'm going to sustain the

22  objection as to form.  Re-ask your question.

23          MS. LEIDHOLDT:  Yes.

24  Q.  Ms. Lee, when Mr. Souratgar was making these kinds of

25  statements to you at the Center for Family Harmony, did the

1  officials there or the people working there take any steps to

2  intervene?

3  A.  Yes.

4          MR. ARENSTEIN:  Objection to the form of the question.

5          THE COURT:  Overruled.

6  A.  Yes.

7  Q.  Would you please explain.

8  A.  Majid would be always scolding in a loud voice.  Then,

9  because there were other children around, the workers there,

10  the counselor, actually told him to lower his voice.

11          MR. ARENSTEIN:  Objection to what the workers told

12  him.

13          THE COURT:  Overruled.

14  A.  This goes on almost for every single visit to the extent

15  that the counselor told me, next time just drop Shayan off and

16  just go off immediately.

17          MR. ARENSTEIN:  Objection, your Honor.

18          THE COURT:  Overruled.

19  A.  And there were a few times that they even have to pull

20  Majid away because he was shouting and they didn't want to

21  affect the other children that were around in the center.

22          MR. ARENSTEIN:  Objection to the last statement.

23          THE COURT:  Sustained.  Stricken.

24  Q.  Were there any occasions where the workers there physically

25  intervened when Mr. Souratgar was interacting with you in these

1   ways?

2           MR. ARENSTEIN:  Objection.

3           THE COURT:  Overruled.

4   A.  Yes.  They pulled away a few times.

5   Q.  How close did Mr. Souratgar actually get to you during the

6   incidents that you are describing?

7   A.  It usually happens when I -- usually when I will be

8   carrying Shayan, and then they will walk towards me to take

9   Shayan from me.  So it's more like we are handing the child to

10  each other, that's how close.  And then he would start scolding

11  and shouting.

12  Q.  Ms. Lee, I'd like to direct your attention to November 22,

13  2011.

14  A.  OK.

15  Q.  Around 4 p.m. at the Center for Family Harmony.

16  A.  Yes.

17  Q.  What, if anything, was happening at that time?

18  A.  On that day, as normal, I was going to fetch Shayan after

19  the supervised visit.  The procedure is that Mr. Souratgar

20  would stay back ten minutes for clearance after I left with

21  Shayan and my maid.  On that day he told the counselor, Mr.

22  Colin, that he have an urgent meeting to attend to.

23          THE COURT:  Wait a minute.  Were you present?

24          THE WITNESS:  Yes.

25          THE COURT:  When Mr. Souratgar said this?

 1              THE WITNESS:  Yes.

 2              THE COURT:  Go ahead.

 3   Q.  This is when you were going to pick up Shayan at the

 4   conclusion of a supervised visit?

 5   A.  Yes.  So I was in the doorway waiting for Shayan to come

 6   out.  Then Shayan came out, and then Majid went over to the

 7   counselor and say that he has an urgent meeting to attend and

 8   he needs to go off first.

 9              MR. ARENSTEIN:  I didn't hear that answer, your Honor.

10              THE COURT:  Repeat what you said, ma'am.

11              THE WITNESS:  Majid said to the counselor that he have

12   an urgent meeting to attend, so he wants to go off first.

13   Q.  Would you please explain what was the usual procedure when

14   you went to pick up Shayan after the supervised visit with his

15   father, how did the officials there, what, if anything, did

16   they do?

17   A.  The procedure is when I finish Shayan, he will stay back at

18   the center.

19   Q.  Who is "he"?

20   A.  Mr. Souratgar.

21   Q.  Yes.

22   A.  Would stay back at the center with the counselor for

23   another ten minutes, and then he can leave after that.

24   Q.  Did you understand what the purpose of Mr. Souratgar's

25   staying with the counselor for ten minutes was?

1           MR. ARENSTEIN:  Objection.

2           THE COURT:  Sustained.

3  Q.  I'd like to go back to this particular supervise visit on

4  November 22, 2011.  Mr. Souratgar made a representation?

5  A.  Yes.

6           MR. ARENSTEIN:  Objection to the question that Mr.

7  Souratgar made a representation, your Honor.  I don't believe

8  there is any --

9           THE COURT:  Rephrase your question.

10 Q.  What, if anything, did Mr. Souratgar say to the counselor?

11 A.  He said that he have an urgent meeting and wants to go off

12 before me.

13 Q.  Mr. Colin, was that the name?

14 A.  Yes.

15 Q.  How, if at all, did Mr. Colin respond to Mr. Souratgar's

16 request to precede you in exiting from the supervised visit?

17          MR. ARENSTEIN:  Objection.

18          THE COURT:  Sustained.

19 Q.  How, if at all, did Mr. Colin respond?

20          MR. ARENSTEIN:  Objection.

21          THE COURT:  Tell me what happened.

22          THE WITNESS:  Majid say that he needs to go off first.

23 So the counselor -- the door was open, so he just say thank

24 you, Mr. Colin, and then he just went off.  Then Mr. Colin told

25 me, OK --

 1          MR. ARENSTEIN:  Objection to what Mr. Colin told her.

 2          THE COURT:  Why?  What's the basis?

 3          MR. ARENSTEIN:  It's hearsay and it's not --

 4          THE COURT:  What is the basis for the objection?

 5          MR. ARENSTEIN:  It's submitted for the truth of the

 6     statement.

 7          THE COURT:  Is it?

 8          MR. ARENSTEIN:  I believe so.

 9          THE COURT:  What did Mr. Colin say?

10          THE WITNESS:  He say, OK, so do you want to wait for

11     another ten minutes before you leave.

12          THE COURT:  How is that for the truth of its content?

13          MR. ARENSTEIN:  I'll withdraw it for now.  I think the

14     whole line of what Mr. Colin said is definitely submitted for

15     the truth of something that occurred, and I can't cross-examine

16     Mr. Colin.

17          THE COURT:  No, you can't.  The hearsay rule means

18     that you cannot offer the statement of a nondeclarant, a

19     nonwitness, for the truth of its content.  If Mr. Colin says

20     Mr. Arenstein hit his associate in the face with a pie, that

21     statement can come in.  If the fact that Mr. Colin said it has

22     some relevance, it comes in.  It's not hearsay if it's not

23     offered to prove that Mr. Arenstein hit his associate in the

24     face with a pie.  If it is offered to prove the hitting in the

25     face with a pie, then it becomes hearsay.  The fact that it is

1    said is not hearsay.

2              I don't intend, quite frankly, to conduct a seminar on

3    the Federal Rules of Evidence and the body of case law under

4    it.  I've been very patient, Mr. Arenstein, and this is not the

5    fifth conversation we're having on the hearsay rule.  It's been

6    more than five times in the course of this hearing we have had

7    to have a conversation.  I really urge you to read up on it.

8    BY MS. LEIDHOLDT:

9    Q.  What happened then, Ms. Lee?

10   A.  Then me, Shayan, and my maid stayed back at the center for

11   another ten minutes.  From the window of the center, we could

12   look into the car park, and we saw Majid driving off.

13             THE COURT:  Confine your comments to what you

14   personally saw, not what we saw.

15   A.  I saw that Majid drove off and exit the car park to the

16   main road.  I stayed back another five minutes, and then I left

17   with Shayan and the maid.  We went to the car, strapped Shayan

18   into the car seat, and then I drove off.

19   Q.  Where was the car seat in the car?

20   A.  At the back.

21   Q.  Where was the maid seated?

22   A.  She was seated beside him.

23   Q.  Beside Shayan in the backseat?

24   A.  Yes.

25   Q.  You were?

1   A.  In the driver's seat.

2   Q.  What, if anything, occurred as you were beginning to drive

3   off?

4          THE COURT:  Can you give me a date on this or a month

5   or an approximation?

6          THE WITNESS:  22nd November.

7          THE COURT:  Go ahead.

8          MS. LEIDHOLDT:  Of 2011.

9          THE COURT:  Go ahead.

10  A.  As I drove off, exited the car park, and I turned right,

11  then I saw Majid car parked at the next car park.  So I just

12  told my maid, oh, Souratgar is over there.  And she turned and

13  she look.  Anyway, I just continue driving.  Then he came out

14  from the car park, and he followed me.  I just continued

15  driving towards the highway which I want to take to go home,

16  but he catch up with me and he accelerate and then he tried to

17  intervene to the front of my car.

18  Q.  When you say he tried to intervene with the front of your

19  car, what specifically do you mean?

20  A.  Meaning he was cutting into my lane.  I was on the straight

21  road and he was cutting into the lane.

22  Q.  When he was cutting into your lane, was his car behind

23  yours or parallel to yours or in front of yours?

24  A.  He was in the back, then he went to the side, then he speed

25  up to cut into my lane, so it's like a parallel into my lane.

1    Q.  Approximately how fast were you driving at this time?

2    A.  In kilometers at that time it was around 40, 50 kilometers

3    per hour.

4    Q.  What happened then?

5    A.  Then I just continue driving.  He didn't manage to cut into

6    the lane; he tried.  Then we came to a traffic light stop, at

7    which he stopped right beside my car.  And then he started

8    making funny faces.  His hand gesture was like this

9    (indicating).

10            THE COURT:  Raising an upward palm, right?

11            THE WITNESS:  Yes.

12   A.  Then he was making funny faces and he was also laughing.

13   Q.  What, if anything, happened when the light changed?

14   A.  I just continued to drive towards the highway.

15   Q.  What, if anything, did Mr. Souratgar do at that time?

16   A.  Then he started overtaking again and tried to cut into my

17   lane.  This continue until we almost reach the highway where if

18   you go straight it's the highway and if you turn to your right

19   it's another circle.  During that time I thought that I would

20   go back to the family center for help.

21   Q.  How were you feeling as this was happening?

22            MR. ARENSTEIN:  Objection, your Honor.

23            THE COURT:  Overruled.

24   A.  I was very frightened.  I was also trying my best to make

25   sure that I do not get into the accident because of his chase.

1            THE COURT:  What did you do?

2            THE WITNESS:  In my mind I just focus on just to drive

3    back to the center.

4            THE COURT:  Is that what you did?

5            THE WITNESS:  Yes.

6            THE COURT:  Thank you.  Next question.

7    Q.  How long, approximately, did this car chase last?

8            MR. ARENSTEIN:  Objection.

9            THE COURT:  Sustained.  Rephrase your question.  There

10   is no evidence of a car chase.

11           MS. LEIDHOLDT:  I'm sorry, your Honor.

12   Q.  How long did this episode with Mr. Souratgar driving close

13   to you as you were driving last, if you recall?

14   A.  Ten minutes.

15   Q.  What, if anything, did you do at the end of that time?

16   A.  I drove back to the family center.  Before arriving at the

17   center, we stopped at another traffic light.

18   Q.  Where was Mr. Souratgar's car as you began to drive back to

19   the family center?

20   A.  Beside mine.

21   Q.  You testified that you stopped at a light.  What happened

22   then?

23   A.  I took out my cell phone.  At the break I just take it and

24   I want to take a photo of his car.

25   Q.  What, if anything, occurred once you did that?

1    A.   He saw me holding the phone, and when the light turned

2    green he just speed off.

3    Q.   What happened then?

4    A.   Then I drove back to the family center.

5    Q.   What did you do once you were at the family center?

6    A.   When we reach there, me, Shayan, and the maid, we got out

7    and went back to the family center.  Mr. Colin opened the door,

8    and then I told him what happened.

9    Q.   How, if at all, was the made responding to this incident?

10             MR. ARENSTEIN:  Objection.

11             THE COURT:  I'm sorry?

12   Q.   How, if at all, if you observed, was the maid responding to

13   this incident?

14             MR. ARENSTEIN:  Objection.

15             THE COURT:  Sustained.  I'm not terribly sure, Ms.

16   Leidholdt, that you have demonstrated why the respondent's

17   reaction is relevant in this proceeding.  If the respondent was

18   in dread fear or thought it to be trivial, how does that make

19   your case any stronger or weaker either way?

20             MS. LEIDHOLDT:  First of all, your Honor, the child

21   was in the car.

22             THE COURT:  Yes.

23             MS. LEIDHOLDT:  The child likely would have been aware

24   of the reactions of the adults in the car.  This incident would

25   have directly impacted the child.

1          THE COURT:  The incident may have directly impacted

2   the child, but how your client was feeling would not

3   necessarily impact the child.  What your client was doing,

4   saying, or how she reacted visibly could possibly have some

5   relevance; how she was feeling would not.  Next question,

6   ma'am.  We are not trying a divorce action, we are not trying a

7   personal protection or protective order action, and we are not

8   trying a custody case.  Go ahead, next question.

9   Q.  What, if anything, did you do after you went back to the

10  Family Harmony center?

11         MR. ARENSTEIN:  Objection.  Asked and answered, your

12  Honor.

13         THE COURT:  I think it has been answered.  You spoke

14  to Mr. Collins, didn't you?

15         THE WITNESS:  Yes.

16         THE COURT:  Next question.

17  Q.  What, if anything, did you do after that?

18         MR. ARENSTEIN:  Objection.

19         THE COURT:  Overruled.

20  A.  I was at the center.  I stayed there for around 15 minutes

21  to calm down.  Then I left the center and headed home.

22  Q.  Did there come a time that you lodged a police report about

23  this incident?

24  A.  Yes.  After I dropped Shayan and the maid home, I went to

25  the police station to lodge a police report.

1    Q.  Do you remember what date specifically you lodged the

2    police report?

3    A.  On the same day.

4    Q.  Ms. Lee, I'm showing you two documents for identification

5    marked Respondent's 18 and 19 for identification.  Could you

6    please look at them.

7    A.  OK.

8    Q.  Ms. Lee, do you recognize the document marked Respondent's

9    18 for identification?

10   A.  Yes.

11   Q.  What do you recognize this document to be?

12   A.  A police report.

13   Q.  Was this the police report that you made on November 22nd

14   of 2011?

15   A.  Yes.

16   Q.  After the incident that you just described?

17   A.  Yes.

18   Q.  Is that your signature on the police report?

19   A.  Yes.

20           MS. LEIDHOLDT:  Your Honor, I respectfully offer

21   Respondent's 18 for identification into evidence as

22   Respondent's 18 in evidence.

23           THE COURT:  Any objection?

24           MR. ARENSTEIN:  The same objection I had before.

25           THE COURT:  Received.

```
 1              (Respondent's Exhibit 18 received in evidence)

 2              THE COURT:  This was not previously received into

 3   evidence I take it?

 4              MR. ARENSTEIN:  I don't think so.

 5              THE COURT:  OK.

 6   Q.  Do you recognize the document marked Respondent's 19 in

 7   evidence?

 8   A.  Yes.

 9   Q.  What, if anything, do you recognize that document to be?

10   A.  A police report.

11   Q.  Who made this police report?

12   A.  My maid.

13              MR. ARENSTEIN:  Objection.

14              THE COURT:  Overruled.

15   Q.  What is the name of your maid?

16   A.  Ram Tani.

17              MS. LEIDHOLDT:  Your Honor, I respectfully offer

18   Respondent's 19 for identification into evidence as

19   Respondent's 19 in evidence.

20              MR. ARENSTEIN:  Objection, your Honor.  This is not

21   from the respondent.  This is from a third party, who is not

22   here, who I can't cross-examine.  This is a hearsay document.

23              THE COURT:  How did you obtain this document, Ms. Lee?

24              THE WITNESS:  My maid Ram, after this incident she was

25   very frightened and she told me that for two nights she
```

```
 1   couldn't sleep --

 2            THE COURT:  No.  How did you obtain this document?

 3            THE WITNESS:  I got a copy from her.

 4            THE COURT:  After she went to the police station?

 5            THE WITNESS:  Yes.

 6            THE COURT:  Did you go to the police station with her?

 7            THE WITNESS:  Yes.  She asked me to bring her there.

 8            THE COURT:  Did you go into the police station with

 9   her?

10            THE WITNESS:  Yes.

11            THE COURT:  Did you sit with her while she gave the

12   report?

13            THE WITNESS:  No.

14            THE COURT:  Do you know what she said to the police?

15            THE WITNESS:  No.

16            THE COURT:  Sustained.

17            MR. ARENSTEIN:  Thank you.

18   BY MS. LEIDHOLDT:

19   Q.  Ms. Lee, did there come a time that you filed for another

20   personal protection order in Singapore family court?

21   A.  Yes.

22   Q.  Do you recall when this was?

23   A.  A week after this incident.

24   Q.  What, if anything, happened when you went to family court

25   to file for a personal protection order?
```

1    A.   The same thing.  Go there, submit the documents to the

2    court officer.  And then, to get an application form, she sent

3    me to a magistrate.  I'm required to swear in front of a

4    magistrate, the same procedure.

5    Q.   When you arrived at court --

6              MR. ARENSTEIN:  Your Honor, what date was this?

7              THE COURT:  Date, please.  When was this, ma'am?

8    Q.   If you recall.

9              THE COURT:  Ms. Lee, do you recall when this was?

10             THE WITNESS:  The exact date I'm not sure, but it's a

11   week or more later, probably ten days later I went to the

12   family court.

13             THE COURT:  OK.

14   Q.   Did there come a time after you filed those papers,

15   submitted those reports, that you then returned to court, to

16   the Singapore family court?

17   A.   Yes.

18   Q.   Approximately how long after that first court date was the

19   second court date in Singapore family court, if you recall?

20             MR. ARENSTEIN:  Can I have the dates that we are

21   talking about, your Honor?  I'm a little confused.

22             THE COURT:  No.  I think that's what we are trying to

23   do now.

24             Do you recall how long after the first date the second

25   date was?

1          THE WITNESS:  The first date for we met at the hearing

2    or for the trial?

3          THE COURT:  Sustained.  Put a new question to the

4    witness.

5    Q.  After the first day that you went to family court --

6          THE COURT:  Could we place that date?  You have

7    testified there was an incident on November 22, 2011, correct?

8          THE WITNESS:  Yes.

9          THE COURT:  How long after that did you go to court to

10   get a personal order of protection?

11         THE WITNESS:  It's more than a week.  Probably ten

12   days later.

13         THE COURT:  About ten days later?

14         THE WITNESS:  Yes.

15         THE COURT:  Did you return to court after that first

16   session ten days later?

17         THE WITNESS:  Yes.

18         THE COURT:  When was that, approximately, in relation

19   to the first appearance in court?

20         THE WITNESS:  If I'm not wrong, it's a week later.

21         THE COURT:  Thank you.  Next question.

22   Q.  At that second court appearance, who, if anyone, did you

23   encounter?  Did you encounter Mr. Souratgar at that second

24   court appearance?

25   A.  Yes.

1   Q.  Was anyone with Mr. Souratgar?

2   A.  Ms. Gomez.

3   Q.  What, if anything, happened on that second court

4   appearance, if you recall?

5   A.  The same procedure.  We were supposed to meet with the

6   counselor.

7   Q.  Did you meet with the counselor?

8   A.  This time no.

9   Q.  What arguments, if any, were made?  Was there an appearance

10  before a judge on the second court date?

11  A.  Sorry.  Actually, we did meet with the counselor.

12          MR. ARENSTEIN:  I didn't hear the answer.

13  A.  We did meet with the counselor.

14  Q.  What, if anything, did you tell the counselor?

15  A.  I told her what happened.

16  Q.  Yes.  Did you go before a judge on that second court date?

17  A.  Yes.

18  Q.  What, if anything, transpired while you were in front of

19  the judge?

20  A.  After we met with the counselor, we met the judge.  Then he

21  asked whether we are going to proceed or do you want to

22  withdraw it.

23  Q.  What, if anything, did you say?

24  A.  This time I decided to proceed.

25  Q.  What happened then in court?

1   A.  Then they say OK, and they gave us a date for a trial.

2   Q.  When did the trial occur?

3   A.  Sometime in February.

4           MR. ARENSTEIN:  I'm sorry.  I didn't hear.

5   A.  Sometime in February.

6   Q.  Was there anyone in court?  Was Mr. Souratgar in court the

7   day of trial?

8   A.  Yes.

9   Q.  Was anyone else in court with Mr. Souratgar?

10  A.  Yes.  Ms. Gomez and another of her associates.

11  Q.  Did you bring any witnesses with you on the date of trial?

12          MR. ARENSTEIN:  Objection.

13          THE COURT:  Overruled.

14  A.  No, I didn't.

15  Q.  Why not?

16          MR. ARENSTEIN:  Objection.

17          THE COURT:  Overruled.

18  A.  During the first trial, Majid, he took the stand.  Then, at

19  the end of the session, I came out and --

20          THE COURT:  What first trial?

21          THE WITNESS:  The first trial.

22          THE COURT:  What first trial?

23          THE WITNESS:  There were two dates given.  The first

24  trial he was taking the stand.

25          THE COURT:  You mentioned that this was set for trial

1    for February 2012, is that correct?

2              THE WITNESS:  Yes.

3              THE COURT:  That's the trial.  Is there any trial that

4    took place prior to February 2012?

5              THE WITNESS:  No.  That's the first trial.

6              THE COURT:  What do you mean when you refer to the

7    first trial?  You're referring to the February 2012?

8              THE WITNESS:  Yes, correct.

9              THE COURT:  How many days did the trial go on for?

10             THE WITNESS:  Two days.

11             THE COURT:  So there was one trial that lasted two

12   days, is that correct?

13             THE WITNESS:  Yes.

14             THE COURT:  Then I don't understand what you mean when

15   you refer to the first trial.  Are you referring to the

16   February 2012 trial?

17             THE WITNESS:  OK, I think I mistake.  Maybe I used the

18   wrong word.  There were one trial, but we were called to come

19   back on another date, because it was only two hours and then

20   the judge say to come back another day.

21             THE COURT:  The trial started in February 2012.  Do

22   you recall when?

23             THE WITNESS:  I don't remember.

24             THE COURT:  The judge heard the case for two hours,

25   correct?

1              THE WITNESS:  Yes.

2              THE COURT:  Then the judge adjourned it to another

3    day?

4              THE WITNESS:  Yes.

5              THE COURT:  Thank you.

6              MR. ARENSTEIN:  Your Honor, the question to the

7    witness was did you bring any witnesses.

8              THE COURT:  I think she answered that question.  She

9    said no.  That question was answered.  There was a subsequent

10   question asked.  Go ahead, next question.

11   BY MS. LEIDHOLDT:

12   Q.  Why didn't you bring any witnesses?

13             MR. ARENSTEIN:  Objection.

14             THE COURT:  I'm going to sustain the objection.

15             MS. LEIDHOLDT:  Your Honor, I believe this is highly

16   relevant to the issue of due process and whether or not Ms. Lee

17   was provided with due process in this particular family court

18   proceeding for a personal protection order in Singapore.

19             THE COURT:  Maybe if you ask the right question, I'll

20   allow it.  But that question I'm not going to allow in the form

21   that you have asked it.

22             Let me ask you, Ms. Lee, are you permitted to call

23   witnesses at a proceeding?

24             THE WITNESS:  Yes.

25             THE COURT:  You decided not to call witnesses?

 1              THE WITNESS:  No.  I didn't know when to call.

 2              THE COURT:  You didn't know when to call them?

 3              THE WITNESS:  Yes.

 4              THE COURT:  Thank you.  Next question.  Let's go.

 5    BY MS. LEIDHOLDT:

 6    Q.  Could you please describe what happened at this two-day

 7    trial for a personal protection order.

 8    A.  The first day I took the stand, and then I say what

 9    happened.  Then, after that --

10    Q.  When you testified that you said what happened, what

11    specifically did you focus on in your testimony?

12              MR. ARENSTEIN:  Objection.

13              THE COURT:  Sustained.

14    Q.  What did you tell the court?

15              MR. ARENSTEIN:  Objection.

16              THE COURT:  Sustained.

17    Q.  What happened after you testified?

18              THE COURT:  I'm not trying that case again.  Do you

19    understand that?

20              MS. LEIDHOLDT:  I understand.

21              THE COURT:  Would you like me to hear the testimony in

22    that case and decide whether the judge did a good job?

23              MS. LEIDHOLDT:  No, your Honor, I don't.

24              THE COURT:  Did your client file a notice of appeal?

25    Ms. Lee, did you file a notice of appeal?

```
 1                THE WITNESS:  No.

 2                THE COURT:  Thank you.  Next question.

 3   Q.  Ms. Lee, were you permitted in court to testify about the

 4   history of domestic violence --

 5                MR. ARENSTEIN:  Objection.

 6   Q.  -- that you have sustained?

 7                MR. ARENSTEIN:  Objection.

 8                THE COURT:  You mean events preceding the November

 9   22nd event?

10                MS. LEIDHOLDT:  Yes, your Honor.

11                THE COURT:  The Court didn't allow you to do that,

12   correct?

13                THE WITNESS:  Yes, he didn't allow.

14                THE COURT:  Next question.

15   Q.  Were you able to call a witness about those incidents?

16                MR. ARENSTEIN:  Objection.

17                THE COURT:  I'll allow that.

18   Q.  Were you able to call a witness about those incidents?

19   A.  The earlier incidents or . . .

20   Q.  Were you able to call a witnesses to testify about the

21   incident in November of 2011?

22   A.  I wasn't able to.

23                THE COURT:  The court prohibited you from calling

24   witnesses?

25                THE WITNESS:  No, they didn't prohibit.  It's just
```

1   that I didn't know when to call.

2           THE COURT:  Thank you.  That's what you had said

3   before.  That's what I understood your testimony to be.  Next

4   question.

5   Q.  At any time in this second application for a personal

6   protection order in Singapore family court, were you ever

7   offered the representation of an attorney that you would not

8   have to pay for?  Were you ever offered representation at any

9   time?

10          MR. ARENSTEIN:  Objection, your Honor.

11          THE COURT:  Overruled.

12  A.  No.

13  Q.  What, if anything, Ms. Lee, did Mr. Souratgar testify to in

14  this particular case about the November 22nd incident?

15          MR. ARENSTEIN:  Objection.

16          THE COURT:  Sustained.

17  Q.  Did Mr. Souratgar deny that he had followed you in the car?

18          MR. ARENSTEIN:  Objection.

19          THE COURT:  Sustained.

20  Q.  Ms. Lee, what, if anything, happened at the conclusion of

21  the trial?

22          MR. ARENSTEIN:  Objection.

23          THE COURT:  I'll allow it.  Didn't you get into this

24  in your client's direct testimony, Mr. Arenstein?

25          MR. ARENSTEIN:  Yes.

 1          THE COURT:  So what is your basis for objection to

 2   opposing counsel getting into it in her client's testimony?

 3          MR. ARENSTEIN:  I was under the impression she was

 4   going to be talking to what occurred in the trial.  If it was

 5   what occurred in the trial itself, I was objecting.

 6          THE COURT:  Did your impression come from anything

 7   other than the question that was asked?

 8          MR. ARENSTEIN:  It was the question that was asked.

 9          THE COURT:  All right.  How does the question that was

10   asked vary from the question that you asked your client on the

11   stand when he testified in your direct case?

12          MR. ARENSTEIN:  I'll withdraw my objection, your

13   Honor.

14          THE COURT:  You may answer.

15   A.  At the end the judge dismiss the case.  She said that there

16   was just lack of evidence.

17          MR. ARENSTEIN:  I didn't hear that.

18          THE COURT:  "At the end the judge dismissed the case.

19   She say there was a lack of evidence."

20          MR. ARENSTEIN:  Thank you.

21   Q.  Did the judge say that she didn't believe you or didn't

22   find you credible?

23   A.  No.

24   Q.  Ms. Lee, did you initiate another legal action in Singapore

25   in January of 2011?

1    A.   Yes.  I filed for divorce.

2    Q.   Where did you file for divorce?

3    A.   The Singapore Shariah court.

4    Q.   Why did you file for divorce in the Singapore Shariah

5    court?

6            MR. ARENSTEIN:  Objection.

7            THE COURT:  Overruled.

8    A.   Because we are Muslim, we register our marriage with the

9    Muslim registration of marriage.  Therefore, the only place

10   that we, me and Majid, can file for divorce is at the Shariah

11   court.

12           THE COURT:  Let me ask you, Ms. Lee, when you filed in

13   Shariah court, did you have a lawyer who was admitted before

14   the Shariah court representing you?

15           THE WITNESS:  Yes.

16           THE COURT:  Who did you have?

17           THE WITNESS:  Mr. Ahmad.

18           THE COURT:  Mr. Abbas?

19           THE WITNESS:  Yes, Abbas.

20           THE COURT:  He is with the Straits law firm?

21           THE WITNESS:  Yes.

22           THE COURT:  Did Mr. Abbas also represent you in the

23   custody proceeding?

24           THE WITNESS:  Yes.

25           THE COURT:  Did he represent you with regard to Mr.

1    Souratgar's cross-claim in the custody proceeding, too?

2              THE WITNESS:  Yes.

3              THE COURT:  What about with regard to the Malaysian

4    high commissioner?  Did he write on your behalf to the

5    Malaysian high commissioner?

6              THE WITNESS:  Yes.

7              THE COURT:  Did he do anything else for you in the

8    course of the representation?  Did he represent you in any

9    other proceedings or before any other bodies?

10             THE WITNESS:  No.  Only thing he did was he

11   recommended a Malaysian lawyer to represent me for the

12   Malaysian Shariah case.

13             THE COURT:  Did you have a lawyer representing you in

14   the Malaysian Shariah court?

15             THE WITNESS:  Yes.

16             THE COURT:  The Straits law firm, how did you find Mr.

17   Abbas and the Straits law firm.

18             THE WITNESS:  He was recommended by one of my friends'

19   lawyer.

20             THE COURT:  Did you interview other lawyers or did you

21   just go directly to Mr. Abbas?

22             THE WITNESS:  I go direct to Mr. Abbas.

23             THE COURT:  How much does Mr. Abbas charge for his

24   services?

25             THE WITNESS:  For the custody I paid initial retainer

1   of 3,000.

2           THE COURT:  Right.

3           THE WITNESS:  Then later there were other fees.  In

4   total it's over 10,000.

5           THE COURT:  Does he charge on an hourly rate?

6           THE WITNESS:  I am not so sure.

7           THE COURT:  Did he charge you for writing to the

8   Malaysian high commissioner?

9           THE WITNESS:  I believe so, because it's written there

10  in a section in the bill.  There is letters, photocopies,

11  printing, yes.

12          THE COURT:  Was there a separate bill for that?

13          THE WITNESS:  For letters?

14          THE COURT:  For writing to the Malaysian high

15  commissioner.

16          THE WITNESS:  No.  It was all lump together.

17          THE COURT:  Where did you get the money to pay Mr.

18  Abbas?

19          THE WITNESS:  Part of it Majid got a loan from my

20  sister.

21          THE COURT:  Thank you very much.  We are going to

22  break for lunch and we'll pick up at 2 o'clock.  Thank you all.

23  Enjoy lunch.

24          (Luncheon recess)

25

1      AFTERNOON SESSION

2      2:00 pm

3      (Trial resumes)

4      (In open court)

5      THE COURT:  Please be seated.  You may continue.

6      MS. LEIDHOLDT:  Your Honor, I believe I inadvertently

7  introduced a factual mistake into the record when I asked

8  Ms. Lee --

9      THE COURT:  Well, if it is a question you need to add

10 or clarify with the witness, clarify it with the witness.  If

11 it is a statement you made to me as an advocate, then you may

12 clarify it.

13     MS. LEIDHOLDT:  It is a question I made to the

14 witness, your Honor.

15 BY MS. LEIDHOLDT:

16 Q.  Ms. Lee, I asked you when you filed for divorce in

17 Singapore.

18 A.  Yes.

19 Q.  I asked you if you initiated another action in Singapore,

20 and I think question I posed to you was did you initiate

21 another legal action in Singapore in January 2011?

22     After initiating the action for --

23     THE COURT:  Whoa, whoa, whoa!  Is there a question

24 somewhere?

25     MS. LEIDHOLDT:  Yes, I was trying to pose that

1   question.

2   BY MS. LEIDHOLDT:

3   Q.  When, when did you initiate the divorce action or what year

4   did you initiate the divorce action in Singapore, if you

5   recall?

6        MR. ARENSTEIN:  Objection; asked and answered, your

7   Honor.

8        THE COURT:  Overruled.

9   A.  It was back in October-November 2011.

10       THE COURT:  Thank you.

11  BY MS. LEIDHOLDT:

12  Q.  Where did you file for divorce?

13  A.  With the Shairiah Singapore.

14  Q.  Why did you file for divorce in the Shairiah court?

15       MR. ARENSTEIN:  Objection.

16       THE COURT:  Absolutely asked and answered.

17  BY MS. LEIDHOLDT:

18  Q.  When you filed for divorce in the Shairiah court in

19  Singapore, what, if anything, did you think would happen to the

20  custody case that was being litigated in the Family Court in

21  Singapore?

22       MR. ARENSTEIN:  Objection.

23       THE COURT:  Sustained.

24  BY MS. LEIDHOLDT:

25  Q.  Did there come a time that you learned that the custody

1    case was being pending in the Family Court in Singapore was

2    being transferred to the Shairiah court in Singapore?

3          MR. ARENSTEIN:  Objection.

4          THE COURT:  Overruled.

5    A.  Yes.

6    Q.  Do you recall approximately when that was?

7    A.  March 2012 or April.

8    Q.  Would anything refresh your recollection about when the

9    case was transferred?

10   A.  There are so many documents, I can't remember the exact

11   date, but I know there was a letter from the court.

12         THE COURT:  Let me see you at sidebar, counselor.

13   Ms. Lee, you can go back to your seat.

14         (At the sidebar)

15         THE COURT:  What is the factual basis for your

16   question?

17         MS. LEIDHOLDT:  I'm simply trying to direct my

18   client's attention to her experience in the Shairiah court.

19         THE COURT:  Please lower your voice.

20         MS. LEIDHOLDT:  I am trying to locate that date and

21   time because --

22         THE COURT:  What is the factual basis for your

23   question there was a transfer of custody from the courts of

24   Singapore to the Shairiah court?

25         MS. LEIDHOLDT:  Because there is an order that

1   transfers custody of the Family Court matter.

2           THE COURT:  Are you talking about the matter which

3   says, "The child shall continue to be in the care of the mother

4   pending the determination of custody, care and control of the

5   child by the Shairiah courts," or are you referring to some

6   other order because I have seen no order transferring anything.

7           MS. LEIDHOLDT:  I understand, your Honor.

8           Your Honor, the case was in the Family Court,

9   proceeding in the Family Court in Singapore, and then it was,

10  to the best of my understanding, based on conversations with

11  respondent's counsel, she had Singapore counsel, sent to the

12  Shairiah court, so that is the basis, the factual basis.

13          THE COURT:  You have asked and elicited questions from

14  this witness that the court in Singapore transferred it to the

15  Shairiah court, correct?

16          MS. LEIDHOLDT:  That's my understanding of what

17  happened, your Honor.

18          THE COURT:  I am asking for the basis.  Do you have

19  any order that reflects such a transfer?

20          MS. LEIDHOLDT:  I don't have an order.  I have

21  conversations with my client's counsel who is representing her

22  in those proceedings, and he indicated to me in our

23  conversations that the custody case was transferred.

24          THE COURT:  This witness is not competent to testify

25  on that subject and I'll clear this up on the record.

```
 1          (In open court)

 2          (Off-the-record discussion)

 3          MS. LEIDHOLDT:  Your Honor, may we approach again?

 4          THE COURT:  Sure.

 5          (At the sidebar)

 6          MS. LEIDHOLDT:  Your Honor, in addition to the --

 7          MR. ARENSTEIN:  I can't hear.

 8          MS. LEIDHOLDT:  -- in addition to the communications

 9   that I had with my client's Singaporean counsel, there is also

10   Paragraph 2 of the order.

11          THE COURT:  That is what I just read.  Didn't I just

12   read from that?

13          MS. LEIDHOLDT:  Yes, you did.

14          THE COURT:  Okay.

15          MS. LEIDHOLDT:  It says, "The child shall continue to

16   be in the care of the mother pending the determination of the

17   custody, care and control of the child by the Shairiah courts."

18          That means that the Shairiah courts are now making the

19   determination of the custody, care and control of the child.

20          THE COURT:  It may very well mean that.  It doesn't

21   mean a transfer.  If I stay this case pending an arbitration, I

22   have not transferred this case to arbitration.  If I stay this

23   case pending an appeal to the Third Circuit in some other

24   litigation, I have not transferred this case to the Third

25   Circuit or to some other court.
```

1        I will note for the record that the order that you

2   have in your hand has in capital letters, bold face,

3   underscored the following two words:  "by consent."

4        Unless you have some testimony you propose to offer,

5   this is not a transfer order.  If this is what you're relying

6   on, this is not a transfer order.  It is a consent order and it

7   appears to be that the court is continuing the custody

8   arrangements pending a determination by the Shairiah courts,

9   which is quite different than transferring it to the Shairiah

10  courts, and the order, whatever its meaning is, is an order by

11  consent.

12        MR. ARENSTEIN:  Can I respond?

13        THE COURT:  What are you responding to, Mr. Arenstein?

14        MR. ARENSTEIN:  There is an additional order that says

15  the case is staying in the Family Court of Singapore until

16  further order of the court.

17        THE COURT:  Please put your hand back so it is not

18  over the Court Reporter's machine.

19        MR. ARENSTEIN:  Okay.  There is an additional order

20  that is part of the document, and it is there where the court

21  says that it continues the order until further order of the

22  Family Court, the regular courts of Singapore.

23        THE COURT:  This is a different order?

24        MR. ARENSTEIN:  Yes.

25        THE COURT:  Where is it?

```
 1              (Pause)

 2              THE COURT:  Mr. Arenstein, I am not going to delay the

 3     testimony any further.  I have given you an opportunity to come

 4     up with a basis other than this conversation.  I am going to

 5     clear this up with the witness.

 6              MR. ARENSTEIN:  I found it.

 7              THE COURT:  What date is the order?

 8              MR. ARENSTEIN:  The date of the order, your Honor, is

 9     June 5th, 2012.

10              THE COURT:  One second.  Keep your voice down.  I have

11     that order in front of me.  One second, please.  What

12     paragraph?

13              MR. ARENSTEIN:  I'll tell you in one second.

14     Paragraph C.

15              MS. BAUM:  Which tab is it?

16              MR. ARENSTEIN:  It is Tab I.

17              (Pause)

18              THE COURT:  You're asking me whether I found it?  Yes,

19     sir, I found the reference paragraph.  The witness should

20     resume the stand.

21              (In open court)

22              THE COURT:  Ms. Lee --

23              THE WITNESS:  Yes.

24              THE COURT:  -- have you ever had occasion to study

25     law?
```

1              THE WITNESS:  No.

2              THE COURT:  Okay.  There was a point in time when the

3    custody matter was pending in the Shairiah courts, correct?

4              THE WITNESS:  Yes.

5              THE COURT:  In Singapore?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  Do you know what order or have you

8    seen any order from the court in Singapore which explains how

9    it came about that it was in the Shairiah courts?

10             THE WITNESS:  It was during one of the mediations with

11   the judge.

12             THE COURT:  The mediation judge?

13             THE WITNESS:  Yes, me, my attorney, Mr. Abass,

14   Mr. Souratgar and Ms. Gomez, we were in the same room, the

15   mediation room, and the judge was flipping through some

16   documents and then she said, oh, you are both Muslim.  This

17   should be then referred to the Shairiah court.  That was her

18   words.

19             THE COURT:  All right.

20             THE WITNESS:  From there on I understood that this

21   case was going to be referred to the Shairiah court.

22             THE COURT:  But you explained to me before that the

23   mediation judge is different than the judge who presides in

24   your case, correct?

25             You have a judge who presides in your case who is the

1   judge to whom the case that you brought was pending before, and

2   that judge's name, let me just get it because I've never been

3   to Singapore, so this is all new to me, is Shoba Gopalakrishnan

4   Nair?

5           THE WITNESS:  Yes.

6           THE COURT:  That is the judge before whom the case is

7   pending that you brought, correct?

8           THE WITNESS:  Yes.

9           THE COURT:  That was not the mediation judge, correct?

10          THE WITNESS:  No.  That is the -- we didn't -- all

11  this was in mediation.  We never attended to -- we didn't go to

12  the courtroom.  I didn't go to the courtroom before.

13          THE COURT:  All right.  So I understand you didn't go

14  to the courtroom, but the question I'm asking you is do you

15  know who the mediation judge was?

16          THE WITNESS::  Yeah, this Shoba, Ms. Shoba.

17          THE COURT:  That's the mediation judge?

18          THE WITNESS:  Yes.

19          THE COURT:  Do either counsel have a copy of the order

20  of February 16, 2012?

21          Let me ask you, you explained to me before what

22  mediation is.  Do you remember that?

23          THE WITNESS:  Yes.

24          THE COURT:  And mediation is an effort to settle

25  matters, correct?

 1                 THE WITNESS:  Yes.

 2                 THE COURT:  And that's the session that you're

 3       referring to where you went to a mediation matter?

 4                 THE WITNESS:  Yes.

 5                 THE COURT:  Was your lawyer present during the

 6       mediation?

 7                 THE WITNESS:  For the custody?

 8                 THE COURT:  Yes.

 9                 THE WITNESS:  Yes.

10                 THE COURT:  The mediation?

11                 THE WITNESS:  Yes.

12                 THE COURT:  Does the person acting as mediator meet

13       separately with each side?

14                 THE WITNESS:  There will be a session, we meet

15       separately with both sides and then one session with everyone

16       in the room.

17                 THE COURT:  All right.  When they meet separately,

18       you're free to express how you feel about various things.  Did

19       you do the talking or did your lawyer do the talking?

20                 THE WITNESS:  Both.

21                 THE COURT:  Or both?

22                 THE WITNESS:  Both.

23                 THE COURT:  All right.  Does somebody have a copy of

24       the order?  I have a marked-up copy.

25                 MS. LEIDHOLDT:  I have a copy, your Honor, the

1        February 16th order.

2                THE COURT:  Yes.  Let me show you a copy of what's

3        part of Petitioner's C, which appears to be an order of the

4        court, dated 16 February 2012.

5                THE WITNESS:  Okay.

6                THE COURT:  Is that an order that was entered after

7        the mediation session?

8                THE WITNESS:  Yes.

9                THE COURT:  Have you seen this before?

10               THE WITNESS:  Yes.

11               THE COURT:  You obtained a copy from your lawyer?

12               THE WITNESS:  Yes.

13               THE COURT:  So it was sent to your lawyer first?

14               THE WITNESS:  I don't know who sent, which was sent

15       first.

16               THE COURT:  Wasn't it the practice of your lawyer to

17       send you copies of orders?

18               THE WITNESS:  You mean before this?

19               THE COURT:  No.  In the case when from time to time

20       the judge would issue a ruling of some sort?

21               THE WITNESS:  Yes.

22               THE COURT:  Issue an order?

23               THE WITNESS:  Yes.

24               THE COURT:  You received that, did you not, from your

25       lawyer?

1          THE WITNESS:  Yes, I did.

2          THE COURT:  Did you receive this from your lawyer?

3          THE WITNESS:  Yes.

4          THE COURT:  All right.  Take a minute to read it.

5          THE WITNESS:  (Pause)  Okay.

6          THE COURT:  Is this the order you were referring to

7    when you said before that the case was transferred to the

8    Shairiah courts?

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.  Is there any other order that you

11    were referring to or is it this one?

12          THE WITNESS:  This one.

13          THE COURT:  All right.  You're not a lawyer, but do

14    you see anything that's wrong or not in accordance with what

15    happened?

16          THE WITNESS:  During the mediation, Ms. Shoba said we

17    are Muslim and it will be referred to the Shairiah court, so I

18    just took it that --

19          THE COURT:  What did your lawyer say when she said

20    that?

21          THE WITNESS:  He just nodded his head and agreed.

22          THE COURT:  Nodded his head?

23          THE WITNESS:  Yes.

24          THE COURT:  Do you see where the order says in solid

25    capital letters -- do you know what capital letters are?

1              THE WITNESS:  Yes.

2              THE COURT:  You know what bold face is?

3              THE WITNESS:  Yes.

4              THE COURT:  And it is underscored, it says "by

5    consent, it is ordered," do you see those words?

6              THE WITNESS:  Ah-huh.

7              THE COURT:  Yes?

8              THE WITNESS:  Yes.

9              THE COURT:  Is that true or is that not true?

10             THE WITNESS:  I didn't consent to it.  I mean the

11   judge said that both of you are Muslim and it should be

12   referred, I just took it as this is the law, so I did not argue

13   or anything.

14             THE COURT:  You're not a lawyer, right?

15             THE WITNESS:  Yes.

16             THE COURT:  You had your lawyer with you?

17             THE WITNESS:  Yes.

18             THE COURT:  Did your lawyer challenge it?

19             THE WITNESS:  No, I don't recall him challenging it.

20             THE COURT:  All right.  Thank you very much.

21             Do you know whether he consented to this order?

22             THE WITNESS:  Who?

23             THE COURT:  Do you know whether your lawyer consented

24   to this order?

25             THE WITNESS:  No.

1          THE COURT:  You don't know one way or the other?

2          THE WITNESS:  Yeah, I don't know.

3          THE COURT:  Thank you very much.  Next question.

4    BY MS. LEIDHOLDT:

5    Q.  Ms. Lee, did you ever agree that the custody case involving

6    your son Shayan would be heard within the Shairiah court in

7    Singapore?

8          MR. ARENSTEIN:  Objection.

9          THE COURT:  Overruled.

10   A.  No, I never agreed.

11   Q.  I'm marking -- Ms. Lee, I am showing you a document marked

12   Respondent's 20 for identification.  Do you recognize this

13   document?

14   A.  Yes.

15   Q.  What do you recognize it to be?

16   A.  Notice of session.

17   Q.  What kind of session did you understand this letter to be

18   referring to?

19   A.  A session with the Singapore Shairiah court with regards

20   to --

21         THE COURT:  No, no, no.  The document isn't in

22   evidence yet.  If you would like to lay a foundation, offer it

23   into evidence, get it received into evidence and then the

24   witness can testify about the contents of the document.  That

25   is the way it works around here.

1    BY MS. LEIDHOLDT:

2    Q.  When did you receive this letter, if you recall?

3    A.  Sometime in February.

4           (Pause)

5           THE COURT:  We're going to be here forever.  Let me

6    show you what has been marked as Respondent's 20.

7           THE WITNESS:  Yes.

8           THE COURT:  Can you tell me what it is?

9           THE WITNESS:  It is a notice of session.

10          THE COURT:  Did you receive it on or about the date

11   that is referenced at the top under the word, "Reference"?

12          THE WITNESS:  Yes.

13          THE COURT:  This is a true and accurate copy of what

14   you received?

15          THE WITNESS:  Yes.

16          THE COURT:  Are you wishing to offer it?

17          MS. LEIDHOLDT:  Yes, your Honor.

18          MR. ARENSTEIN:  No objection.

19          THE COURT:  Received.

20          (Respondent's Exhibit 20 received in evidence)

21          THE COURT:  Let's go.  I expect the attorneys before

22   me to be prepared and ready to go and both sides be familiar

23   with the rules of evidence.

24          Am I correct this is day six of this hearing?

25          MS. LEIDHOLDT:  Yes, your Honor.  I am almost at the

 1    end of my questions.

 2              THE COURT:  You may be, but I'd appreciate it if you

 3    would proceed without the long pauses which are going on in

 4    this courtroom.

 5    BY MS. LEIDHOLDT:

 6    Q.  What was your reaction upon receiving this letter?

 7    A.  I imagine I just have to attend a counseling session with

 8    the Shairiah court for marriage difficulties.

 9    Q.  Is that something you wanted to do?

10    A.  I think this is not by choice.  This is a procedure that is

11    required by the Shairiah court.

12              MR. ARENSTEIN:  Objection.

13              THE COURT:  Sustained.

14              MR. ARENSTEIN:  Move to strike.

15              THE COURT:  Stricken.

16    BY MS. LEIDHOLDT:

17    Q.  Did there come a time when you attended a counseling

18    session, a mandatory counseling session in the Shairiah court?

19    A.  Ah-huh.

20    Q.  Would you please describe what happened at that session.

21              MR. ARENSTEIN:  Objection.  Your Honor, this is --

22              THE COURT:  Yes, sustained.  This is a mediation

23    session, correct?

24              MS. LEIDHOLDT:  It is a mandatory counseling session,

25    your Honor, within the Shairiah court.

 1            THE COURT:  Yes, sustained.

 2            MR. ARENSTEIN:  Thank you.

 3            THE COURT:  Prior to February 16th, 2012, there was a

 4   divorce action pending in the Shairiah court, correct?

 5            THE WITNESS:  Yes.

 6            THE COURT:  And February 16th, 2012 is the day you

 7   testified previously you were before the mediation judge in the

 8   Singapore court, correct?

 9            THE WITNESS:  Yes.

10            THE COURT:  That was the date that you say the, over

11   your objection, the case was moved to the Shairiah court,

12   correct?

13            THE WITNESS:  I didn't object.  It is just the judge

14   said that, so I took it as --

15            THE COURT:  All right.  But you say this took place on

16   February 16th, is that correct, 2012?

17            THE WITNESS:  The mediation, yes.

18            THE COURT:  That is the same date this letter is

19   dated, correct?

20            THE WITNESS:  Yes.

21            THE COURT:  So this letter which is Respondent 20

22   related to the matrimonial action, did it not?

23            THE WITNESS:  Yes.

24            THE COURT:  It did not relate to the custody action.

25   Is that correct?

1              THE WITNESS:  This is an application, I applied for it

2    much earlier.

3              THE COURT:  Much earlier?

4              THE WITNESS:  Yes.

5              THE COURT:  Then you received this notice in the mail?

6              THE WITNESS:  Yes.

7              THE COURT:  So it didn't relate to the custody action,

8    this notice that you received, Respondent's 20, correct?

9              THE WITNESS:  Yes.

10             THE COURT:  Thank you.  Next question.

11             MS. LEIDHOLDT:  Your Honor, may I approach?

12             THE COURT:  No.  Ask your next question.

13             MS. LEIDHOLDT:  Your Honor, the mandatory counseling

14   session --

15             THE COURT:  If you're talking to me, don't.  Ask your

16   question.

17             MS. LEIDHOLDT:  Your Honor, I object to the fact that

18   I can't ask this witness about what transpired in the mandatory

19   counseling session within the Shairiah court because it

20   directly impacted on the custody case.

21             Representations were made about domestic violence and

22   treatment that Ms. Lee --

23             THE COURT:  Go ahead and ask your question.  Go ahead,

24   ask it.

25             MS. LEIDHOLDT:  Yes.

1  BY MS. LEIDHOLDT:

2  Q.  Ms. Lee, would you please describe what transpired in that

3  mediation session in the Shairiah court.

4          MR. ARENSTEIN:  Objection.

5          THE COURT:  Overruled.  Go for it!

6          THE WITNESS:  I met with a woman counselor, a woman,

7  and she asked me what are the difficulties facing the marriage?

8          So I told her there was domestic violence and

9  currently there is a custody case, and then she said that in

10 the Koran, the husband is allowed to beat the wife --

11         MR. ARENSTEIN:  Objection, your Honor.

12         THE COURT:  Overruled.

13         THE WITNESS:  -- using a stick that is no larger than

14 a pen.  Then I went on to ask her what about the custody?  Then

15 she told me that in the Shairiah law, girls aged above 9 goes

16 to the father.  Anything below goes to the mother, and for

17 boys, it is four years' old.

18         MR. ARENSTEIN:  Move to strike.

19         THE COURT:  Overruled.  I'll take it with the decision

20 on the merits.  Go ahead, next question.

21 BY MS. LEIDHOLDT:

22 Q.  What reaction did you have to this counseling session?

23         THE COURT:  Sustained.

24         MR. ARENSTEIN:  Objection.

25 BY MS. LEIDHOLDT:

1    Q.  What, if anything, transpired on March 1st -- withdrawn --

2    did there come a time on or around March 1st, 2012 when you

3    received a communication from your mother about a letter from

4    the National Registration Department of Malaysia?

5          MR. ARENSTEIN:  Objection; leading, your Honor.

6          THE COURT:  Overruled.

7    A.  Yes, I did.

8    Q.  Did you subsequently receive a copy of this letter?

9    A.  Yes.

10   Q.  To the best of your recollection, what were the contents of

11   the letter?

12         MR. ARENSTEIN:  Objection unless --

13         THE COURT:  That is sustained.

14         (Off-the-record discussion)

15   BY MS. LEIDHOLDT:

16   Q.  Ms. Lee, I am showing you what has been marked as

17   Respondent's 21 for identification.  Would you please look at

18   that document.

19   A.  (Pause)

20   Q.  Ms. Lee, do you recognize that document?

21   A.  Yes.

22   Q.  What do you recognize it to be?

23   A.  A letter from the Malaysia government regarding my

24   citizenship.

25   Q.  When did you receive this letter?

1   A.  Sometime in March when my mother received it and my brother

2   scanned and e-mailed me a copy.

3   Q.  Is this the exact letter that you received on that

4   particular date?

5   A.  Yes.

6           THE COURT:  Are you offering it?

7           MS. LEIDHOLDT:  I am offering into this evidence.

8           THE COURT:  Any objection to R21?

9           MR. ARENSTEIN:  I have an objection to the

10  translation.  I don't know whether it is accurate.  I don't

11  know who this person is that translated it.  I don't know

12  whether it is an --

13          THE COURT:  See whether you can lay a foundation of

14  the translation through this witness.

15  BY MS. LEIDHOLDT:

16  Q.  Ms. Lee, you speak Malay and English both.  Is that

17  correct?

18  A.  Yes.

19  Q.  Are you fluent in both languages?

20  A.  Yes.

21  Q.  Would you please read the letter in Malay and the letter in

22  English and state whether or not this is an accurate

23  translation of the letter.

24          MR. ARENSTEIN:  Objection.

25          THE COURT:  Basis?

1          MR. ARENSTEIN:  The witness is going to testify a

2     letter for herself on this trial?

3          THE COURT:  You're asking me a question or your

4     stating a basis for objection?

5          MR. ARENSTEIN:  Object to the witness translating the

6     letter.

7          THE COURT:  Overruled.

8     BY MS. LEIDHOLDT:

9     Q.  Would you please read it.

10    A.  Out loud?

11    Q.  No.  Read it silently.  First read the letter that is

12    written in Malay and the letter that has been written in

13    English.

14    A.  (Pause)  Okay.

15    Q.  Do you find the translation to be accurate?

16    A.  Yes.

17          THE COURT:  Any objection to R21?

18          MR. ARENSTEIN:  I do, your Honor.

19          THE COURT:  Basis?

20          MR. ARENSTEIN:  The basis that I don't know whether

21    this is an accurate translation.

22          THE COURT:  Any other basis?

23          MR. ARENSTEIN:  No other basis.

24          THE COURT:  Received.

25          (Respondent's Exhibit 21 received in evidence)

1          THE COURT:  Next question.

2    BY MS. LEIDHOLDT:

3    Q.  Ms. Lee, what did you understand the significance of this

4    letter to be?

5          MR. ARENSTEIN:  Objection.

6          THE COURT:  Sustained.

7    BY MS. LEIDHOLDT:

8    Q.  Ms. Lee, did you know why this letter was sent to you?

9          MR. ARENSTEIN:  Objection.

10          THE COURT:  Sustained.

11   BY MS. LEIDHOLDT:

12   Q.  What, if anything, did you do in response to your receipt

13   of this letter?

14   A.  I wrote them a letter explaining the content of the letter,

15   and I signed the relevant documents.

16          MR. ARENSTEIN:  I did not understand the witness's

17   answer, your Honor.

18          THE COURT:  Could you please state it again, Ms. Lee.

19          THE WITNESS:  I went down to give a statement of the

20   inquiry and also submitted the documents that is required in

21   this letter to the Malaysian government.

22          MS. LEIDHOLDT:  Just one second, please.

23          THE COURT:  Do you have much longer?

24          MS. LEIDHOLDT:  I am at the very, very end, your

25   Honor.

```
 1              THE COURT:  I heard that quite some time ago.

 2              (Off-the-record discussion)

 3   BY MS. LEIDHOLDT:

 4   Q.  Ms. Lee, I am showing you a document marked Respondent's 22

 5   for identification.  Would you please review that document.

 6   A.  Okay.  (Pause)

 7   Q.  Ms. Lee --

 8   A.  Yes.

 9   Q.  -- do you recognize this document?

10   A.  Yes.

11   Q.  What do you recognize it as?  What do you recognize it to

12   be?

13   A.  It is stating that I have an Iranian passport.

14   Q.  When did you receive this letter?

15   A.  Sometime in June this year.

16   Q.  Is this the precise letter that you received?

17   A.  Yes.

18   Q.  In June of this year?

19   A.  Yes.

20              (Continued on next page)

21

22

23

24

25
```

1           MS. LEIDHOLDT:  Your Honor, I offer this letter into

2     evidence.

3           THE COURT:  Any objection?

4           MS. LEIDHOLDT:  As Respondent's 22 in evidence.

5           MR. ARENSTEIN:  My only objection would be the

6     translation again.

7           THE COURT:  All right.  It's received.

8           (Respondent's Exhibit 22 received in evidence)

9     Q.  Ms. Lee, when you received this letter, what did you

10    understand it to mean?

11          MR. ARENSTEIN:  Objection.

12          THE COURT:  Sustained.

13    Q.  Ms. Lee, do you have any idea who initiated the complaint

14    that you were in possession of an Iranian passport and were in

15    violation of Malaysia's laws prohibiting its citizens to hold

16    dual citizenship?

17          MR. ARENSTEIN:  Objection.

18          THE COURT:  Sustained.

19    Q.  Ms. Lee, did anyone inform you that they were going to

20    report to the Malaysian authorities that you had Iranian

21    citizenship and were therefore in violation of Malaysia's

22    prohibitions against its citizens holding dual citizenship?

23          MR. ARENSTEIN:  Objection.

24          THE COURT:  Basis?

25          MR. ARENSTEIN:  To the form of the question.  It's a

1   compound question, and the last part of it isn't necessarily

2   correct.

3           THE COURT:  Overruled.  I was going to consider

4   sustaining it on the basis of asked and answered, but I'll

5   allow it as it stands.

6   A.  Yes.

7           THE COURT:  Didn't you elicit this testimony already?

8           MS. LEIDHOLDT:  I haven't, your Honor.

9           THE COURT:  I know what the answer is.  I have heard

10  it already from this witness.  Go ahead again.

11  A.  Yes, it was Mr. Souratgar.

12          THE COURT:  Didn't you previously tell me that, Ms.

13  Lee, today?  Do you recall testifying to that?

14          THE WITNESS:  The Iranian passport?

15          THE COURT:  Yes, that he threatened to tell the

16  Malaysian authorities that you had --

17          THE WITNESS:  Yes, and the embassy, yes.

18          THE COURT:  Yes.  You told me that already today,

19  correct?

20          THE WITNESS:  Yes.

21          THE COURT:  That's what I thought.  Next question.

22  Q.  Ms. Lee, to the best of your knowledge, what would happen

23  to your Singaporean permanent resident status if you lost your

24  Malaysian citizenship?

25          MR. ARENSTEIN:  Objection.

```
 1              THE COURT:  I'll allow the witness to answer.
 2  A.  I will lose my Singapore permanent residency if my
 3  Malaysian citizenship is revoked.
 4              MR. ARENSTEIN:  Objection.  Move to strike the
 5  response.
 6              THE COURT:  I'll take it under advisement.
 7  Q.  Where would you be able to go if you lost both your
 8  Malaysian citizenship and your Singaporean resident status?
 9  A.  I probably no place to go other than Iran.
10  Q.  In May of this year was there an active proceeding in the
11  Shariah court in Malaysia brought by Mr. Souratgar for custody
12  of Shayan?
13              MR. ARENSTEIN:  Objection.
14              THE COURT:  Overruled.
15  A.  There was an appeal for the outcome, for the dismissal of
16  custody proceeding in December 2011.
17  Q.  Who filed that appeal, if you know?
18  A.  Mr. Souratgar.
19              THE COURT:  Have you ever seen a copy of the appeal
20  papers, ma'am?
21              THE WITNESS:  Yes.
22              THE COURT:  Where did you get them?
23              THE DEFENDANT:  It was sent to my parents' home in
24  Malaysia, and my brother scanned it in.
25              THE COURT:  Who sent them to you?
```

1          THE DEFENDANT:  My brother.  He scanned it and email

2     it to me.

3          THE COURT:  You have these in your possession or

4     control?

5          THE WITNESS:  The scanned copies.

6          THE COURT:  Thank you.  Next question.

7     Q.  Ms. Lee, what, if anything, happened on May 20th of 2012?

8     A.  I took a flight with Shayan to the United States.

9     Q.  Why did you take a flight with Shayan to the United States?

10         MR. ARENSTEIN:  Objection.

11         THE COURT:  Basis?

12         MR. ARENSTEIN:  Withdrawn.

13    A.  Because I didn't felt safe in the place in Singapore as

14    well as Malaysia, and I just wanted to get away from

15    everything.

16    Q.  When you say you didn't feel safe in Malaysia and in

17    Singapore, what exactly do you mean?

18    A.  I understood that --

19         MR. ARENSTEIN:  Objection.

20         THE COURT:  Overruled.

21    A.  -- once you converted to Muslim in these two countries,

22    once you're Muslim, you're bound under the Shariah law.

23    Basically, you're going to be subjected to severe punishment if

24    you renounce Islam.  I also know that the law under the Shariah

25    court is very prejudiced towards women.  The fact that Mr.

1    Souratgar have come out with so many unnecessary proceedings in

2    Malaysia court and he started to get fake passports for me and

3    started reporting to the Malaysian government and getting me

4    into trouble, I'm just so tired of everything, so I just wanted

5    to get away.

6              MR. ARENSTEIN:  Move to strike.

7              THE COURT:  Overruled.

8    Q.  What concerns, if any, did you have about your relationship

9    with Shayan and about Shayan in particular?

10             MR. ARENSTEIN:  Objection.

11             THE COURT:  Overruled.

12   A.  I know for a fact that Shayan has an Iranian passport,

13   which Mr. Souratgar has been denying for more than a year.  I

14   seen it.  I was at the Iranian embassy when the Shayan passport

15   was given to Souratgar, and he denies it.  And I know how

16   capable this man is of coming up with scheming acts.  And I

17   know the moment he gets his hand on Shayan, he's going to take

18   Shayan to Iran.

19             MR. ARENSTEIN:  Objection, your Honor.  Move to

20   strike.  Not responsive to the question.

21             THE COURT:  Overruled.

22             MS. LEIDHOLDT:  One second, your Honor.

23             I have no further questions, your Honor.

24             THE COURT:  Thank you.

25             You may cross-examine. do it from the podium, sir.

1   CROSS-EXAMINATION

2   BY MR. ARENSTEIN:

3   Q.  Ms. Fair, when did you first retain your attorneys in

4   Singapore?

5   A.  When did I first retain?

6   Q.  Yes.  When did you first retain your attorneys in

7   Singapore?

8   A.  In April 2011.

9   Q.  Do they still represent you?

10  A.  Not anymore.

11  Q.  When did they stop representing you?

12  A.  After I left and came to United States.

13  Q.  Were they still representing you on the date of 8/15/11

14  when you filed a PPO application?

15  A.  Yes.

16  Q.  Were they representing you on 8/16/11 when you withdrew

17  your order in the Singapore court?

18  A.  He represent for custody, not for the PPO.

19          MR. ARENSTEIN:  Your Honor, will you ask the witness

20  to answer the question.

21          THE COURT:  I think the witness has highlighted an

22  ambiguity in the question.  The lawyers represented her on that

23  date for some matters but not for other matters.  That is a

24  perfectly acceptable response.  Next question.

25  Q.  Were they representing you on 5/31/08 when you went for an

1   order?

2   A.  5/31 --

3   Q.  May 31, 2008.

4   A.  2008?  I didn't file for an order on 2008.

5   Q.  What about January 6, 2010?

6   A.  No, I didn't file for any orders.

7   Q.  August 15, 2011?

8   A.  He wasn't representing me for the personal protection.

9   Q.  So you had the option of having your attorneys represent

10  you at the hearings on the PPOs, is that correct?

11  A.  I can hire them, but this is two separate case.

12  Q.  Did you have the option to have your attorney represent you

13  at the hearings on the PPOs?

14  A.  You mean option to hire?

15  Q.  Did you have the option to have your attorney represent you

16  at the hearings on the PPOs?  Yes or no.

17  A.  It's a yes and no answer because it's two separate.  He is

18  representing me on custody.  But for the PPO, it's a separate

19  case, which I have to open a new file, which there will be

20  additional retainer fees, which I do not have the funds for.

21          MR. ARENSTEIN:  Your Honor, I move to strike the

22  answer as not responsive to the question.

23          THE COURT:  Denied.  Next question.

24  Q.  You chose to represent yourself, is that correct?

25  A.  Yes.

1   Q.  Do you have any savings that you can cash in to pay your

2   attorneys?

3   A.  At the moment, no.

4   Q.  I show you a document.

5           MR. ARENSTEIN:  May I approach, your Honor?

6           THE COURT:  You may.  You have standing license to

7   approach the witness, which is revocable.

8   Q.  Are you familiar with this document?

9   A.  Yes.

10  Q.  Is that your account?

11  A.  This is an insurance account.

12  Q.  That's your account?

13  A.  Yes.

14  Q.  This document shows that you have a mutual fund of

15  $16,881 --

16          THE COURT:  Mr. Arenstein, what's wrong with what

17  you're doing?

18          MR. ARENSTEIN:  Absolutely.

19          THE COURT:  No.  What's wrong with what you're doing?

20          MR. ARENSTEIN:  I'm not playing a foundation to

21  introduce the document.

22          THE COURT:  No, that's not what's wrong with what

23  you're doing.  We're going to have continuations unless you

24  understand what's wrong with what you're doing.  You're reading

25  from a document that's not in evidence.

```
 1                MR. ARENSTEIN:  OK.

 2                THE COURT:  That's what you're doing that's wrong.  Do

 3      you understand?

 4                MR. ARENSTEIN:  Yes, I do.

 5                THE COURT:  Please don't do it again.

 6      Q.  Is this a statement of your account at January 9, 2012?

 7      A.  Yes.

 8      Q.  Is this an accurate statement of your account at that time?

 9      A.  Yes.

10                MR. ARENSTEIN:  I ask that this be introduced into

11      evidence.

12                THE COURT:  Any objection to Petitioner's R?

13                MS. LEIDHOLDT:  No, your Honor.

14                THE COURT:  Received.

15                (Petitioner Exhibit R received in evidence)

16      Q.  How much money did you have in that account on January 9,

17      2012?

18      A.  I don't know.

19      Q.  You don't know?

20      A.  This is an insurance account.

21      Q.  This is mutual fund, ma'am.

22                THE COURT:  Are you testifying, Mr. Arenstein?  Mr.

23      Arenstein, you're allowed to ask questions, you're not allowed

24      to testify.  Now go back to the podium.

25                MR. ARENSTEIN:  OK.
```

```
 1            THE COURT:  I have allowed you to approach to present
 2    the document.  I'm not allowing you to hover over the podium to
 3    badger the witness.  Now go back to the podium.  And if you
 4    didn't make multiple copies before you came to court, I can't
 5    help you.
 6            This witness first took the stand, my recollection --
 7    tell me when it was.  Thursday, is that correct?  Did this
 8    witness take the stand on Thursday or did she start on Monday?
 9            MR. ARENSTEIN:  I think it was Monday, your Honor.
10            MS. LEIDHOLDT:  Thursday, your Honor.
11            THE COURT:  She started on Thursday.  That's what I
12    thought.  If you didn't bring a copy, so that you have to share
13    a copy, that's your problem, Mr. Arenstein.  We're on day six.
14    Let's go.
15    Q.  Ms. Lee, there is an amount on there of that mutual fund.
16    Do you see it on the document?
17    A.  Yes.
18    Q.  The amount that's on that document is a mutual fund, is it
19    not?
20    A.  This is an assurance mutual fund.  This is bought by my
21    pension funds, so I cannot cash in for this.  If I cash in, the
22    funds will go back to my pension fund.  There's no such thing
23    as giving me outright cash.
24    Q.  Are you allowed to borrow on that?
25    A.  No.  It's under the central provision board of Singapore,
```

 1   which is a pension fund organization in Singapore.

 2          MR. ARENSTEIN:  Objection, your Honor.  That's not

 3   responsive to my question.

 4          THE COURT:  I think the witness is being quite

 5   responsive.  Ask your next question.

 6   Q.  Why didn't you use that fund to pay your lawyers?

 7          THE WITNESS:  She has already explained.  Next

 8   question.

 9   Q.  Did you have a business called Intoxicaked?

10   A.  It's not a business.  It's just an online.  I didn't

11   register the business, so I would not call it a business.

12   Q.  What is that business, can you tell the Court?

13   A.  It is just my passion, my hobby to bake cakes.  I was just

14   setting up a website and selling it.

15   Q.  You sold the cakes?

16   A.  Yes, mostly my friends.

17   Q.  Your friends?

18   A.  Yes.

19   Q.  The attorney who represented you in this case, was he one

20   of your friends in the Intoxicaked that you sold cakes to?

21   A.  No, I didn't sell him any cakes.

22   Q.  Did you have him listed as one of your friends on Facebook?

23          MS. LEIDHOLDT:  Objection.

24          THE COURT:  Yes, sustained.  Am I correct, Ms. Lee,

25   it's Intoxicake, C-A-K-E, at the end of that word?

 1                   THE WITNESS:  Yes.

 2                   THE COURT:  Thank you.  Next question.

 3     Q.  How much money did you make from selling the cakes?

 4     A.  Per month or per week?

 5     Q.  Either way.

 6     A.  I probably sell maybe two or three cakes a month.  Each

 7     cake is like -- it's just a hobby.  I probably get like 10 to

 8     $20, that's it.

 9     Q.  Were you informed by the police that you had the option of

10     pursuing your case with a criminal case in magistrate's court?

11     A.  I'm sorry.  I don't understand the question.

12     Q.  Were you informed by the police when you made your police

13     reports that you had the option of pursuing your case with a

14     criminal case in magistrate's court or making an application

15     for an expedited PPO in family court?

16     A.  They told me that if I wanted a personal protection order,

17     I have to go to the family court to obtain one.

18                   THE COURT:  That's not the question you were asked.

19     Q.  Do you want me to rephrase it or answer it again?  Could

20     you answer the question, ma'am?

21                   THE COURT:  Do you understand the question?

22                   THE WITNESS:  No, I don't.

23                   THE COURT:  Mr. Arenstein is asking whether you were

24     informed that you either could seek a PPO in family court.

25                   THE WITNESS:  Yes.

1             THE COURT:  Or you could pursue a case, not a PPO case

2    but a different kind of a case, in magistrate's court.  That's

3    what I understand the question to be.

4             Is that your question?

5             MR. ARENSTEIN:  That's correct, your Honor, yes.

6             THE COURT:  Your answer, ma'am?

7    A.  The police informed me that I could obtain a PPO in the

8    family court and nothing else.

9             THE COURT:  And not?

10            THE WITNESS:  He didn't say anything else.

11            THE COURT:  Thank you.  Next question.

12   Q.  I have two police reports that are marked 5/31/08 and

13   Exhibit R1 and R2.  In the reports that you made to the police

14   on May 31, '08, was there anywhere in these reports that you

15   made a statement that these reports were made to your attorney

16   to pursue this matter further?

17   A.  Which one again?  Sorry.

18   Q.  The police report of May 31, 2008.

19   A.  I don't have a copy.

20            THE COURT:  What is the exhibit number, sir?

21            MR. ARENSTEIN:  It's R1 and R2.

22            THE COURT:  In evidence?

23            MR. ARENSTEIN:  In evidence, your Honor.

24            THE COURT:  Go ahead.

25            MR. ARENSTEIN:  I'll go on until they find it.

```
 1             May I approach, your Honor?  May I approach the

 2   witness?

 3             THE COURT:  Do you recall what I told you before?

 4   Q.  Did you not make a statement -- can you read the last line.

 5             THE COURT:  Go back to the podium.  One of the

 6   advantages of cameras in the courtroom would be that a

 7   reviewing court could see what's going on in my courtroom right

 8   now, which is pretty inexcusable in the first 15 minutes of

 9   cross-examination.  Counsel is showing the witness an exhibit

10   and then walking away, muttering, "No, that's not it."  This is

11   the most disorganized presentation.  I've seen better

12   presentations from pro ses.

13             I really urge you, sir.  This witness took the stand

14   on Thursday.  You had to have known that you were going to

15   commence a cross-examination.  I'm going to take a recess, and

16   I expect you to get your exhibits in order and be prepared to

17   conduct a cross-examination or to sit down.

18             MR. ARENSTEIN:  OK.  Thank you.

19             THE COURT:  I take it you're not offering M or N into

20   evidence, sir, is that correct?

21             MR. ARENSTEIN:  I am definitely.

22             THE COURT:  You haven't offered them as far as I know.

23             (Recess)

24             THE COURT:  You may proceed.

25             MR. ARENSTEIN:  May I approach?
```

1            THE COURT:  What did I say before about approaching?

2            MR. ARENSTEIN:  You told me.

3            THE COURT:  I told you what?

4            MR. ARENSTEIN:  Unless you revoke it, permission is

5    granted.

6            THE COURT:  OK.

7    Q.  I show you this document which is in evidence, R1, and also

8    R7.  I ask if you could read the last sentence of that

9    document.

10   A.  "I am lodging this report for my lawyer's action."

11   Q.  Thank you.  Ms. Lee, you lodged this report for your

12   lawyer's action?

13   A.  No.

14   Q.  Why did you state that to the police?

15   A.  Because the police told me to put it in.

16   Q.  The police told you --

17   A.  They say, do you want to take action?  If you want to take

18   action, then you can put it in.

19   Q.  Why did you say that you are "lodging this report for my

20   lawyer's action"?

21   A.  At the time I didn't have any lawyer.

22   Q.  Why did you say that you were doing it for your lawyer's

23   action?

24   A.  In case I want to file a personal protection order, then I

25   may require a lawyer; so therefore it was put into the report.

1    Q.  Why didn't you, after you made these reports, give it to a

2    lawyer?

3    A.  I was considering it, and I decided not to at that time,

4    because I was pregnant, I was going to have a baby, and I

5    wanted to give the marriage a second chance.

6    Q.  I draw your attention to R16, your police report, in

7    evidence.  That occurred on August 15, 2011?

8    A.  Yes.

9    Q.  I ask you if this is a picture of you on that day.

10            THE COURT:  Could you identify what you are showing

11   the witness.

12   A.  This is Petitioner's Exhibits E1 and E2 in evidence.

13            THE COURT:  Thank you.

14   Q.  I ask you if these are pictures of you on the day that you

15   filed that police report.

16   A.  Yes.

17   Q.  Do you see any marks or scratches on your chest in those

18   pictures?

19   A.  It's not very clear.

20   Q.  It's not very clear?  At least the one that I was looking

21   at over here, I don't see any scratches.  Can you show me

22   whether there are any scratches on this picture?

23            THE COURT:  Didn't you ask that question?

24            MR. ARENSTEIN:  Yes, and she said it wasn't very

25   clear.

1          THE COURT:  Now you're asking the same question again.

2    Sustained.  Next question.  The photograph is in evidence, sir.

3    Let's go.

4    Q.  Where did you go after this picture was taken?

5    A.  Where did I go?

6    Q.  Yes.

7    A.  I went back to my car and I drove off.

8    Q.  What happened between the time you were in the parking lot

9    and when you made this report that you sustained scratches that

10   you complained of?

11   A.  You mean in between when I got into my car to make a police

12   report?  I'm sorry, I don't understand your question.

13   Q.  You claim that you had scratches, but you really didn't

14   have any scratches at that incident, did you?

15          MR. McNALLY:  Objection.

16          THE COURT:  Overruled.

17   A.  I had scratches.

18   Q.  Why aren't they on the picture?

19   A.  How would I know whether you Photoshop this picture or not?

20   Q.  Isn't it possible those scratches were made after you left

21   the scene?

22   A.  No.

23   Q.  But you have no proof that the scratches were made on the

24   scene, do you?

25          THE COURT:  You testified that that's what happened,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1  correct?

 2          THE WITNESS:  Yes.

 3          THE COURT:  Next question.

 4  Q.  Today you testified that you had bruises, yet on the police

 5  report you put scratches.  How do you explain the difference

 6  between the two?

 7  A.  There were bruises and scratches on the police report.

 8          THE COURT:  Overruled.

 9  Q.  Bruises and scratches.  You didn't say -- all you said is

10  there were scratches.

11          MR. McNALLY:  Objection, your Honor.

12          THE COURT:  Is that a question, Mr. Arenstein?  I'm

13  sorry?

14          MR. ARENSTEIN:  Withdrawn.

15  Q.  Is that why you withdrew your application for a PPO --

16  A.  No.

17  Q.  -- when you saw these pictures?

18  A.  No.

19  Q.  That's not why?

20  A.  This is the first time I've seen these pictures.

21  Q.  How many times did you apply for an emergency PPO?

22  A.  Twice.

23  Q.  Pardon me?

24  A.  Twice.

25  Q.  Did you ask for a protective order only for yourself?

1    A.   Yes.

2    Q.   Did you ask for a protective order for the child?

3    A.   For the second PPO, yes.

4    Q.   Did you get it?

5    A.   No.

6    Q.   Why not?

7    A.   Because the magistrate told me that it was not a direct

8    abuse to the child.

9    Q.   What did you have to prove to get a PPO?

10        THE COURT:   Sustained.

11   Q.   How long did these expedited PPOs last for?

12        THE COURT:   If you know.

13   Q.   If you know.

14   A.   It's really from the day I applied to the hearing date.

15   Q.   Didn't they last from the date of your application until

16   the final determination in court?

17   A.   Yes.

18   Q.   So the first PPO lasted for ten days?

19   A.   The first one lasted to the first hearing.  And if there's

20   a next one, then they will do an extension.

21   Q.   You withdrew the first PPO?

22   A.   Yes.

23   Q.   The second PPO you got on November 22nd?

24   A.   Not on November 22nd.

25   Q.   Pardon me?

1  A.  Probably a week or ten days later.

2  Q.  How long did that last?

3  A.  They keep extending it to the end of the trial.

4        THE COURT:  That was sometime in February?

5        THE WITNESS:  March.  February, March.

6  Q.  That case was dismissed?

7  A.  Yes.

8  Q.  You were fined, were you not?

9  A.  I was not fined.  I was asked to pay.

10  Q.  Were there costs that you were ordered to pay?

11  A.  Yes.

12  Q.  Did you pay those costs?

13  A.  No.

14  Q.  You didn't pay them?

15  A.  No.

16  Q.  Were you unhappy with the outcome in family court when your

17  second PPO was dismissed?

18  A.  I was disappointed.

19  Q.  Did you complain to anyone about this outcome?

20  A.  I spoke to my sister.

21  Q.  Your sister.  Anybody else?

22  A.  No.

23  Q.  Did you call your attorney and ask him what to do?

24  A.  No, I didn't.

25  Q.  Did you try to appeal this decision?

1    A.  No.

2    Q.  You are aware of the options open to you to seek and find

3    protection with the authorities in Singapore, are you not?

4    A.  Seek and find?

5    Q.  I didn't hear the answer.

6    A.  I didn't --

7              THE COURT:  Sustained as to form.

8    Q.  Do you think that you will avail yourself of these options

9    in the event you need protection from Mr. Souratgar?

10   A.  I am sorry.  Can you speak slower?  I cannot catch.

11   Q.  Do you think you will avail yourself of these options in

12   the event that you feel you need protection from Mr. Souratgar?

13   A.  I will?  I'm sorry.  I really didn't catch "I will from Mr.

14   Souratgar," I didn't catch that word.

15   Q.  Do you think you will avail yourself of these options, of

16   all of these options in the event you feel you need protection

17   from Mr. Souratgar?

18             MR. McNALLY:  Objection, your Honor.

19             THE COURT:  Sustained.

20   Q.  Did you ever see Mr. Souratgar abuse Shayan?

21   A.  Physically?

22   Q.  Physically, yes.

23   A.  No.

24   Q.  Did you ever report any incident of any abuse to the police

25   of Shayan?

1    A.  No.

2    Q.  Did you ever make any statement in any affidavit in court

3    in Singapore about Mr. Souratgar abusing Shayan?

4    A.  No.

5    Q.  Do you own a car seat for Shayan?

6    A.  Yes.

7    Q.  What kind of a car seat is it?

8    A.  What do you mean?

9    Q.  When did you buy it?

10   A.  I bought it when Shayan was born.

11   Q.  Where?

12   A.  When Shayan was born.

13   Q.  What is the brand name of that car seat, ma'am?

14   A.  If I'm not wrong, it's Maxi Cozi or something like that.

15   Q.  Where did you buy it?

16   A.  Singapore.

17   Q.  Where?  What store?

18   A.  It's Baby Land.

19   Q.  In Baby Land.  Where is that located, ma'am?

20   A.  Somewhere in the east side of Singapore.  Kaki Bukit.

21            THE COURT:  Pause.

22            THE WITNESS:  The east side.

23            THE COURT:  Give it to the court reporter, the name,

24   again.

25            THE WITNESS:  The address I bought it from, the

 1   location is at the east side of Singapore, in K-A-K-I,

 2   B-U-K-I-T.

 3            THE COURT:  Thank you.  Next question.

 4   Q.  You have used this every time you have taken Shayan out in

 5   a car?

 6   A.  Of course.

 7   Q.  Where is this car seat now?

 8   A.  In Singapore.

 9   Q.  Where?

10   A.  I sent it back to my parents' home.

11   Q.  Are you aware of how a person is eligible for a Singapore

12   permanent residency?

13   A.  Yes.

14   Q.  Have you looked at the Singapore government website to

15   access this information?

16   A.  Yes.

17   Q.  You have.  Are you aware that it states, "Eligibility.  The

18   following categories of foreigners are eligible to apply for

19   permanent residence?"  Are you aware of the categories of the

20   people that are able to apply for permanent residency in

21   Singapore?

22   A.  The last I saw it is when I was applying for it.  If you

23   are talking about if they have changed the website, I don't

24   know.

25   Q.  When was the last time you looked at the website?

 1  A.  Many years back.

 2  Q.  Many years back?

 3  A.  Yes, when Shayan was applying for one under my --

 4  Q.  So you're not so sure, are you, that you could not now

 5  apply for a permanent residency in Singapore, is that correct?

 6  A.  Now?

 7  Q.  Yes.

 8  A.  Mine is on a renewal basis, so it is not a new application.

 9  Q.  Have you looked at the website to see what the eligibility

10  is at this time?

11  A.  No, no.

12  Q.  So you don't know whether you might be eligible now to

13  apply for Singapore permanent residency, is that correct?

14  A.  Why am I apply?  I already have one.

15       MR. ARENSTEIN:  Your Honor, could you ask the witness

16  to answer the question yes or no?

17       THE COURT:  Do you understand the question?

18       THE WITNESS:  Yes.  He is asking whether I applying

19  for one.  But I already have one.

20       THE COURT:  You already have one, right?

21       THE WITNESS:  Yes.

22       THE COURT:  And you have it today, so there would be

23  no reason for you to apply today?

24       THE WITNESS:  Yes, correct.

25       THE COURT:  I think what he is trying to get at is

 1    let's say you lost that.  Let's say they revoked that.  Do you

 2    know the grounds on which you would be able to reapply?  Have

 3    you done any investigation or checking or inquiry or looking at

 4    websites to determine the grounds on which you would be able to

 5    reapply?

 6            THE WITNESS:  As of today, no, I have not.

 7            THE COURT:  Thank you.  Next question.

 8    Q.  There is no mention of Malaysian citizenship as a

 9    requirement to be eligible --

10            MS. LEIDHOLDT:  Objection, your Honor.

11            THE COURT:  Basis.

12            MS. LEIDHOLDT:  She has testified that she is not

13    aware.  She hasn't looked at the grounds recently.

14            THE COURT:  This is cross-examination.  He can ask.

15    Q.  There is no mention of Malaysian citizenship as a

16    requirement to eligibility, is that correct?

17    A.  Correct.

18    Q.  If I told you that there was no requirement --

19            THE COURT:  Wait.  No requirement where, sir?

20    Q.  In the Singapore website.

21            THE COURT:  I'm going to sustain the objection as to

22    that.  She already told you she didn't look at it, and she

23    hasn't done any other investigation.  What more do you need,

24    sir?  What are you trying to establish?

25            MR. ARENSTEIN:  I was trying to establish that her

1   eligibility, she would not be in danger of losing her Singapore

2   permanent residency if she loses her Malaysian citizenship.

3          THE COURT:  Let's put it this way, Mr. Arenstein.  If

4   you read a question and you say, isn't it a fact that under the

5   following circumstances you wouldn't lose your citizenship, and

6   the witness testifies, consistent with her earlier testimony,

7   that she hasn't looked into this in years, would that be

8   evidence of anything?

9          MR. ARENSTEIN:  No, it wouldn't.

10          THE COURT:  Relative to whether she would be eligible?

11          MR. ARENSTEIN:  No.

12          THE COURT:  Then move on.

13  Q.  Were you in fact granted permanent residency because you

14  were working in Singapore first as a Singapore Airlines

15  stewardess, and then in a series of odd jobs, including Black

16  Box, then for an eye surgeon, and then for first for odd box,

17  then for Diageo?

18          MR. McNALLY:  Objection.  Compound.

19          THE COURT:  Sustained.

20  Q.  Were you in fact granted your Singapore permanent residency

21  because you were first as a Singapore Airlines stewardess?

22  A.  Yes.

23  Q.  Then you worked other jobs swell in Singapore, correct?

24  A.  Correct.

25  Q.  All of those aided you in getting permanent residency in

```
1   Singapore, is that correct?

2   A.   Correct.

3   Q.   Did you ever intend to return to Singapore when you left

4   with Shayan on May 20, 2012?

5   A.   At first, yes.

6   Q.   When did you intend to return?

7   A.   I intended to return somewhere in September.

8   Q.   When?

9   A.   September.

10  Q.   September what?

11  A.   I didn't fix a date, but September this year, 2012.

12  Q.   You were going to return on September 2012?

13  A.   Yes.

14  Q.   Did you tell your husband that you were going to return

15  then?

16  A.   I have no communication with him.

17  Q.   Who knew that you were going to return?

18  A.   Nobody knew.  Myself.

19  Q.   Nobody.  Are you an Iranian citizen?

20  A.   As far as I know, I'm not.

21  Q.   You're not?

22  A.   I'm not.  I do not acknowledge.  But if he applies on my

23  behalf --

24  Q.   Do you have an Iranian passport?

25  A.   I'm not aware of it.
```

1  Q.  Are you aware that there are many Iranian citizens who have

2  become Singapore SPRs?

3  A.  No.

4  Q.  How often do you have to renew your Singapore permanent

5  residence?

6  A.  Every five years.

7  Q.  When do you have to renew it next?

8  A.  2015.

9  Q.  2015.  Is Shayan a Singapore permanent resident?

10  A.  Yes.

11  Q.  When does his permanent residency have to be renewed?

12  A.  2014.

13  Q.  Are you aware that Mr. Souratgar's first wife did not

14  drown, as he told you, but is very much alive and well and

15  living in Australia?

16       MR. McNALLY:  Objection.  Mischaracterizes.

17  Withdrawn.

18  Q.  Are you aware that Mr. Souratgar's first wife did not

19  drown, as you say he told you, but is very much alive and

20  living in Australia and she is still in touch with Mr.

21  Souratgar?

22  A.  No.

23  Q.  You're not aware of that?  Did you tell your mother that

24  Majid kicked you in the stomach?

25  A.  I don't remember.

1  Q.  You don't remember.  Earlier in your testimony you have

2  said you were fighting over the remote.  Was there only one TV

3  in the house?

4  A.  There were two TV.  One was upstairs.  But the one was not

5  connected to any cables.

6  Q.  Did you report these incidents to the police?

7  A.  This incident?

8  Q.  Yes.

9  A.  No.

10  Q.  You say your husband raped you in front of the child.  Did

11  you mention any of these allegations in your affidavit or any

12  reports, police reports?

13  A.  No.

14  Q.  You have stated that Mr. Souratgar would take Shayan to

15  Iran.  Did he ever take him to Iran without your consent?

16  A.  No.

17  Q.  How many times did you take Shayan to an unknown location

18  without Mr. Souratgar's knowledge or consent?

19  A.  To an unknown location, is that your question?

20  Q.  In other words, you and Mr. Souratgar took Shayan to

21  places, he took Shayan to places that you knew about.  How many

22  times did you take Shayan to places that he didn't know about?

23  A.  To places that he didn't know about?

24  Q.  Yes.  How many times did you take Shayan to places that you

25  did not inform your husband where Shayan was?

 1   A.  Once.

 2   Q.  Just once?

 3   A.  Yes, this time.

 4   Q.  There were no other times that you took Shayan to other

 5   places where you didn't inform your husband?

 6   A.  I was not required to.

 7   Q.  That was not the question.  The question was, how many

 8   times did you not inform your husband where you took Shayan to

 9   places where he did not know where Shayan was?

10          MR. McNALLY:  Objection.

11          THE COURT:  Sustained, because the answer to the

12   question would be meaningless.  If the witness said 500 times,

13   we wouldn't know whether those are trips to the supermarket,

14   down the street, what-have-you.  The answer would be

15   meaningless.  The objection is sustained.  Next question.

16   Q.  From May 2008, when you were pregnant, did you tell your

17   mother that Mr. Souratgar was leaving you?

18   A.  After the incident or before the incident?

19   Q.  At the end of May of 2008, when you were pregnant, did you

20   tell your mother that Mr. Souratgar was leaving you?

21   A.  No.

22   Q.  Did you tell your mother he kicked you in the stomach?

23   A.  I don't remember.

24          MS. LEIDHOLDT:  Objection.  Asked and answered.

25          THE COURT:  Sustained.

1   Q.  Isn't it a fact that you quit your job, that you had a

2   business of real estate investments?  Did you quit your job

3   that had real estate investments?

4   A.  No.

5   Q.  Did you quit your job because you didn't get along with

6   your boss?

7   A.  No.

8   Q.  You testified that you never had an Iranian passport, is

9   that correct?

10  A.  Yes.

11  Q.  Did you inform Mr. Souratgar when you left for Malaysia?

12          MS. LEIDHOLDT:  Objection.

13          THE COURT:  Overruled.

14  A.  You mean I went to Malaysia when?

15  Q.  Did you inform Mr. Souratgar when you left for Malaysia --

16          MS. LEIDHOLDT:  Objection.  Time.  It's unclear what

17  time Mr. Arenstein is --

18          THE COURT:  Rephrase the question.

19  Q.  How many times did you go to Malaysia?

20  A.  When?  I went many times.

21  Q.  When you went with Shayan the last time you went to

22  Malaysia, did you inform Mr. Souratgar that you were going to

23  Malaysia?  In or around July 2011, did you inform Mr. Souratgar

24  that you were going to Malaysia?

25  A.  I did not go to Malaysia in July.

1   Q.  When did you go to Malaysia around that time?

2   A.  I went in June.

3   Q.  In June.  Did you inform Mr. Souratgar that you were going

4   to Malaysia?

5   A.  No.

6   Q.  Why not?

7   A.  Why?  I was not obligated to inform him of my movements.

8   Q.  You didn't tell him --

9           THE COURT:  Next question.

10  Q.  You took Shayan with you to Malaysia, did you not?

11  A.  Yes.

12  Q.  You didn't inform Mr. Souratgar that you took Shayan with

13  you, did you?

14  A.  Yes, I didn't inform him.

15  Q.  You did not inform him?

16  A.  I did not.

17  Q.  That's why you brought the action in Malaysia, so he could

18  see his child there, is that correct?

19          MR. McNALLY:  Objection.

20          THE COURT:  Sustained.

21          Mr. Arenstein, are you finished with your cross?

22          MR. ARENSTEIN:  No.

23          THE COURT:  Go ahead.

24  Q.  When did say that you first saw that you had an Iranian

25  passport?

1    A.  I saw?

2           THE COURT:  I didn't understand the question, either.

3    Q.  When did you say that you first saw that you had an Iranian

4    passport?

5    A.  When you all sent me to the court here.  It was the first

6    time I seen the passport.

7    Q.  The first time you saw the passport.

8    A.  A photocopy of the passport, sorry.

9    Q.  I'm sorry.  I didn't hear that.

10   A.  A copy of the passport, not the original one.

11   Q.  When you were in Malaysia, did you apply for an Iranian

12   passport?

13   A.  No, I didn't.

14   Q.  Was an Iranian passport applied for on your behalf?

15   A.  I don't know.

16          MR. ARENSTEIN:  One second, your Honor.

17          THE COURT:  I'm going to have to request that you

18   refrain from these extended conferences with co-counsel during

19   the cross-examination after many of your questions.  Put your

20   question to the witness, please.

21   Q.  You testified earlier that you didn't take anything other

22   than three items out of the marital home, is that correct?

23   A.  Correct.

24   Q.  I show you --

25          MR. ARENSTEIN:  Can I have the picture of the house.

1              THE COURT:  Mr. Arenstein, I'm going to have to ask

2    that you get yourself organized.  The record is not reflecting

3    the long pauses, the consultations with counsel.  This is

4    exactly why I took a break before, so you could get yourself

5    organized.  Now in a stage whisper you're asking your

6    colleagues for copies of various things.  Please get on with

7    your cross-examination.

8    Q.  I show you Petitioner's Exhibit X and ask you to take a

9    look at this document.  Is this a letter, the second part of

10   it, is this the law firm that represents you?

11   A.  Yes.

12   Q.  Is this a letter signed by your lawyer?  Is that your

13   lawyer's signature?

14   A.  Correct.

15             MR. McNALLY:  Your Honor, it is unclear which pages he

16   is referring to.  This is composed of a number of documents.

17             MR. ARENSTEIN:  I'm referring to the second document

18   in Exhibit X, which is a letter from Straits's law firm, which

19   is signed by a Mr. Ahmad Nizam Abbas?

20             THE COURT:  I have as the second document under

21   Plaintiff's Exhibit X, Mr. Arenstein, a letter dated 19 July

22   2011 from Winifred Gomez.

23             MR. ARENSTEIN:  The letter that I'm referring to, your

24   Honor, is dated July 20, 2011, to Ms. Winifred Gomez from Mr.

25   Ahmad Nizam Abbas.

```
 1              THE COURT:  The record was going to make this clear

 2   from the question you asked:  Is this from your lawyer?

 3   Q.  Is this document, which dated July 28th --

 4              THE COURT:  No.  I asked you a question.  How is that

 5   supposed to be apparent from the way you proceeded, sir?

 6              MR. ARENSTEIN:  I did it incorrectly.  I apologize.

 7   I'm trying to do it properly now.

 8              THE COURT:  You're referring to the last page of

 9   Petitioner's Exhibit X?  Is that what you are referring to?

10              MR. ARENSTEIN:  I'm referring to not the last page,

11   your Honor.  The first letter is a letter from Mrs. Gomez to

12   the Straits law firm.  The second letter is a letter from Mrs.

13   Gomez to the Straits law firm dated July 19th.  The third is a

14   letter from the Straits law firm dated July 20, 2011, to Mrs.

15   Gomez from Ahmad Nizam Abbas.  That's the letter I'm referring

16   to.

17              THE COURT:  What's your question?

18   Q.  Is this letter from your lawyer to Mrs. Gomez?

19   A.  Yes.

20   Q.  I ask you if this letter --

21              MR. ARENSTEIN:  I ask that this letter be introduced

22   into evidence, your Honor.

23              THE COURT:  As what?

24              MR. ARENSTEIN:  As Petitioner's Exhibit X.

25              THE COURT:  Petitioner's Exhibit X, as presented to me
```

1    by you a moment ago, has multiple letters to and from in

2    addition to this.  What are you offering?  Mr. Arenstein, I

3    don't understand what you're offering.

4            MR. ARENSTEIN:  Can I ask a question?

5    Q.  Are you familiar with the correspondence between your

6    lawyers and Mrs. Gomez, these documents that I show you here?

7    A.  OK.

8    Q.  You are familiar with it?

9    A.  Yes.

10           MR. ARENSTEIN:  I ask that this be introduced into

11   evidence, the entire Exhibit X.

12           THE COURT:  Any objection?

13           MS. LEIDHOLDT:  No objection, your Honor.

14           THE COURT:  Received.

15           (Petitioner's Exhibit X received in evidence)

16   Q.  I show you on the letter dated July 20th from the Straits

17   law firm a statement made by your lawyer over here that reads,

18   "Our client is extremely disturbed that your client still

19   insists that the Iranian passport of herself and her son does

20   not exist.  Client wishes to place on the record that she has

21   seen the Iranian passport of herself and her son which your

22   client has personally shown her but has always been in his

23   possession."  Are you familiar with that statement?  Your

24   lawyer made that statement, isn't that right?

25           THE COURT:  Stop.  You asked a question.  Do you want

1    an answer to your question?

2              MR. ARENSTEIN:  Yes.

3              THE COURT:  Don't interrupt while the witness is

4    entertaining your question.

5    A.  Yes?

6    Q.  Is that a correct statement or is it not?

7    A.  It's not.

8    Q.  It's not?

9    A.  I seen my son's, but I haven't seen mine.

10   Q.  Why would your lawyer say that you have seen it?  He

11   represented you, is that correct?

12   A.  Yes.

13   Q.  He was your lawyer at the time he wrote that letter?

14   A.  Yes.

15   Q.  To Mrs. Gomez?

16   A.  Yes.

17   Q.  He represented to Mrs. Gomez that you have seen both your

18   and your son's Iranian passports?

19             MR. McNALLY:  Objection.  The letter speaks for

20   itself.

21             THE COURT:  It does.

22             MR. ARENSTEIN:  Thank you.

23             THE COURT:  Let the record reflect that we are sitting

24   here in silence as Mr. Arenstein is marking exhibits which

25   could have been premarked before this hearing and before the

1    cross-examination of this exhibit.  I was tendered an

2    Exhibit Y.  I was asked for it back.  Now I've been given a new

3    Exhibit Y.

4            MR. ARENSTEIN:  This was a better picture of the

5    documents, your Honor.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  I show you a series of pictures from Y1 to Y7 and ask you

2   if you can identify these pictures, ma'am?

3   A.  Yes.

4   Q.  I ask you on the third picture --

5           THE COURT:  No, no.  You said you can identify them.

6   What are they?

7   BY MR. ARENSTEIN:

8   Q.  What are these pictures?

9           THE COURT:  Excuse me.  What are you doing, Mr.

10  Arenstein?

11          MR. ARENSTEIN:  I am trying to put these into

12  evidence, your Honor.

13          THE COURT:  Okay.  I asked the witness a question.  It

14  seemed you started repeating what I just said.

15          MR. ARENSTEIN:  No.  I backed off, your Honor.

16          THE COURT:  When I said excuse me, you backed off,

17  yes, that's correct.

18          You were asked whether you can identify these pictures

19  which are Petitioner's Exhibit Y, correct?

20          THE WITNESS:  Correct.

21          THE COURT:  You said you can?

22          THE WITNESS:  Yes.

23          THE COURT:  What are they pictures of?

24          THE WITNESS:  The pictures of the home that we used to

25  stay in.

1          THE COURT:  All right.

2          Mr. Arenstein, I will give you the privilege of asking

3    the next question.

4    BY MR. ARENSTEIN:

5    Q.  These are the pictures of the condition of your house at

6    the time after you left.  Is that correct?

7    A.  No.

8    Q.  Is this the way you left the house, ma'am?

9    A.  No.

10   Q.  Did you take anything out of this room on Y3?

11   A.  Yes, I said I took the big mattress, which I did.

12   Q.  Is there anything else you took out of there that was in

13   this apartment before you left?

14   A.  No.  From this room is only the bed.

15   Q.  Pardon me?

16   A.  From this, this is the master bedroom.  This is the

17   kitchen.  This is the maid's room.

18   Q.  What room is that?

19   A.  This is --

20          MS. LEIDHOLDT:  Objection, your Honor.

21   A.  -- one of the rooms upstairs.

22          MS. LEIDHOLDT:  Mr. Arenstein is asking the witness

23   about photographs, the contents of photographs that are not yet

24   in evidence.

25          THE COURT:  That's correct, and he is trying to lay a

1    foundation, and thus far he has not to the extent you're

2    offering them as the condition of the apartment on the date, on

3    a particular date.

4    BY MR. ARENSTEIN:

5    Q.  Now, are these pictures an accurate description of the

6    apartment after you left?

7            MR. McNALLY:  Objection.

8            THE COURT:  Sustained.  Mr. Arenstein, did you ask

9    that question?

10            MR. ARENSTEIN:  I did.  She said yes -- well,

11    withdrawn.

12    BY MR. ARENSTEIN:

13    Q.  You testified you recognize these pictures as the

14    apartment, is that correct, the apartment you lived in with

15    your husband.  Is that correct?

16            MS. LEIDHOLDT:  Objection.

17            THE COURT:  Sustained.  You may return to the podium,

18    sir.

19            (Pause)

20    BY MR. ARENSTEIN:

21    Q.  What was the condition of the apartment on May 25th, 2011?

22    A.  Most certainly not what the picture showed.

23    Q.  I am sorry, I didn't hear you?

24    A.  Not similar to what the photograph.

25    Q.  Similar to what --

 1   A.  No, it is not.

 2   Q.  On November 22nd, what were you doing while you were

 3   driving November 22, 2010?

 4   A.  What was I doing when I was driving?

 5   Q.  Yes.

 6   A.  I was driving.

 7   Q.  Were you breastfeeding the child Shayan?

 8   A.  No.

 9   Q.  You weren't breastfeeding the child?

10   A.  How does one breastfeed and drive?

11          MR. ARENSTEIN:  Objection to the response.  I move to

12   strike.  Not responsive.

13          THE COURT:  Overruled and denied.

14   BY MR. ARENSTEIN:

15   Q.  When you were going to the family center to report the

16   actions that you stated Mr. Souratgar did to you, was there a

17   police station right next to the family center?

18   A.  At the time I didn't know there was one.

19   Q.  At the time you didn't know there was one?

20   A.  No.

21   Q.  When did you find out there was a police station there?

22   A.  Much later.

23   Q.  So you had no idea there was a police station on the way to

24   the Family Harmony?

25          MR. McNALLY:  Objection; asked and answered.

 1              THE COURT:  Sustained.

 2              (Off-the-record discussion)

 3              MR. ARENSTEIN:  Your Honor, I am not feeling well

 4   right now.  I am wondering if I can take a break and come back

 5   tomorrow and resume my examination?

 6              MR. McNALLY:  The witness is on the stand.  She has

 7   been on the stand for quite some time.

 8              MR. ARENSTEIN:  I only started a half hour, 45 minutes

 9   ago.

10              THE COURT:  Why don't we take a break and see whether

11   you can compose things, all right?  We'll take a break.  Take

12   10 minutes.

13              MR. ARENSTEIN:  Thank you.

14              (Recess)

15              THE COURT:  Please be seated.

16              Mr. Arenstein, are you ready to proceed?

17              MR. ARENSTEIN:  I'm not, your Honor.  I have both a

18   diabetes and prostate problem.  I have spoken to my adversary,

19   and they don't object to continuing tomorrow morning.

20              THE COURT:  Okay.

21              MR. ARENSTEIN:  I had diarrhea all day on top of

22   everything else.

23              THE COURT:  I am very sorry to hear that.  We'll pick

24   up tomorrow morning then at -- let me double-check -- how long

25   do you think your cross-examination will be?

1          MR. ARENSTEIN:  Probably about an hour at the most,

2    maybe less.

3          THE COURT:  We'll pick up tomorrow morning at 10:00

4    o'clock.  Thank you, all.  I hope you feel better.

5          (Court adjourned until Wednesday, December 12, 2012,

6    at 10:00 o'clock am)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                    Page

LEE JEN FAIR

        Direct By Ms. Leidholdt . . . . . . . . 585
        Cross By Mr. Arenstein  . . . . . . . . 684

PETITIONER EXHIBITS

Exhibit No.                              Received

R   . . . . . . . . . . . . . . . . . . . 687

X   . . . . . . . . . . . . . . . . . . . 714

RESPONDENT EXHIBITS

Exhibit No.                              Received

16   . . . . . . . . . . . . . . . . . . 595

17   . . . . . . . . . . . . . . . . . . 596

18   . . . . . . . . . . . . . . . . . . 640

20   . . . . . . . . . . . . . . . . . . 669

21   . . . . . . . . . . . . . . . . . . 676

22   . . . . . . . . . . . . . . . . . . 679