```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In the Matter of one infant child
    ABDOLLAH NAGHASH SOURATGAR,
4
                    Petitioner,
5
            v.                              12 Civ. 7797 PKC
6
    LEE JEN FAIR,
7
                    Respondent.
8
    ------------------------------x
9
                                        December 12, 2012
10                                      10:20 a.m.

11

12  Before:

13                      HON. P. KEVIN CASTEL,

14                                      District Judge

15

16                          APPEARANCES

17  ROBERT D. ARENSTEIN,
    SANDRA NUNEZ,
18      Attorneys for plaintiff

19  PATTON BOGGS LLP
        Attorneys for defendant
20  BY:  ANDREW J. McNALLY, Esq.
        DORCHEN A. LEIDHOLDT, Esq.
21              Of counsel

22  Also Present:
        JENNIFER BAUM,
23      JENNA DiCOSTANZO,
        Gardians ad Litem
24       – and –
        JANE KIM, Esq.

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              (Trial resumes)

 2              (In open court; case called)

 3              THE COURT:  Please be seated.  Mr. Arenstein, are you

 4    feeling any better?

 5              MR. ARENSTEIN:  A little bit, your Honor.  I was up

 6    half the night, but I will make an attempt to go through.

 7              THE COURT:  I am sorry to hear that.  Let me know if

 8    you need a break at any point.

 9              MR. ARENSTEIN:  Thank you.

10              THE COURT:  One second, please.  Please be seated,

11    Ms. Lee.  The court reminds you that you're still under oath.

12              THE WITNESS:  Yes.

13              MR. ARENSTEIN:  I'd like to move into evidence

14    Petitioner's Exhibit M, and we have an exhibit yesterday, I

15    believe it was or the day before we were given a copy of the

16    mother's, the grandmother's Malaysian passport.  I would like

17    to move both of those documents into evidence.

18              THE COURT:  I know what Exhibit M is.  I have it in my

19    hand.  I don't know what exhibit you're referring to otherwise,

20    sir.

21              MR. ARENSTEIN:  I'll take care of that, your Honor.

22              THE COURT:  Let's take the exhibits one at a time.

23    Any objection to Petitioner's Exhibit M?

24              (Off-the-record discussion).

25              MS. LEIDHOLDT:  No objection.
```

```
 1              THE COURT:  Exhibit M is received into evidence.

 2              (Petitioner's Exhibit M received in evidence)

 3              THE COURT:  Are you offering Petitioner's Exhibit N,

 4    like Nancy?

 5              MR. ARENSTEIN:  This is M like Mary, your Honor.  I am

 6    not offering N.

 7              THE COURT:  M has been received into evidence, Mr.

 8    Arenstein.  I am just clarifying.  You're withdrawing N, not

 9    offering N that is marked for identification?

10              MR. ARENSTEIN:  That is correct.

11              THE COURT:  Thank you.

12              MR. ARENSTEIN:  If I might proceed, your Honor?

13              THE COURT:  What is the exhibit you're offering?

14              MR. ARENSTEIN:  The exhibit is T is the passport of

15    the grandmother.

16              THE COURT:  All right.  Any objection?

17              MR. ARENSTEIN:  It was provided by counsel, I said.

18              THE COURT:  I said any objection?

19              MS. LEIDHOLDT:  No, your Honor.

20              THE COURT:  It is received into evidence.

21              (Petitioner's Exhibit T1 received in evidence)

22              THE COURT:  Exhibit T is received into evidence.  It

23    is marked as T1.  Are you offering it as T or as T1?

24              MR. ARENSTEIN:  It is T1 to 15 and has 15 pages in it.

25              THE COURT:  It is Petitioner's Exhibit T and I see
```

there are numbering on the pages.  Thank you.  You may proceed.

CROSS EXAMINATION (Continued)

BY MR. ARENSTEIN:

Q.  Ms. Fair, in March of 2009, did you and Mr. Souratgar go to Malaysia?

A.  Yes.

Q.  What, if anything, occurred during that time?

A.  We went to the Iranian consulate.

Q.  Sorry?

A.  We went to the Iranian consulate.

Q.  What occurred there?

A.  We went.  He wanted to register for Shayan's birth as well as our marriage.

Q.  Did you apply for a Malaysian long term stay visa for Mr. Souratgar?

A.  Yes.

Q.  Did you do it at that time?

A.  I believe so.

Q.  Do you have any proof that you made an application?

A.  No.

Q.  Did you apply for your Iranian citizenship during this visit?

A.  No.

Q.  Did the officer -- you went to the Iranian consulate.  Is that correct?

1   A.  Yes.

2   Q.  Did the officer require you to return in two weeks with

3   your birth certificate and new pictures?

4   A.  He told me the documents.  I don't know what the documents

5   were.

6   Q.  Didn't you say he took a picture?

7   A.  Yes.

8   Q.  Did you have to come back to the consulate with your birth

9   certificate and a picture?

10  A.  Yes.

11          THE COURT:  Wait a minute.  They took a picture at the

12  consulate?

13          THE WITNESS:  No.

14          THE COURT:  They did not take a picture?

15          THE WITNESS:  No.

16          THE COURT:  You were required to go and have a picture

17  taken and bring it.  How many copies of the picture did you

18  have to bring?

19          THE WITNESS:  I don't know because all of this was

20  handled by Mr. Souratgar, but the photo shop that we went to is

21  $10.00 for four pieces, something like that.

22          THE COURT:  $10.00 for four photos?

23          THE WITNESS:  Yes.

24          THE COURT:  Thank you.  Were the photos passport size?

25          THE WITNESS:  Yes.

```
1    BY MR. ARENSTEIN:

2    Q.  Did you apply for your Iranian citizenship during that

3    visit?

4    A.  I didn't apply.

5    Q.  You didn't apply?  Okay.

6              (Off-the-record discussion)

7              MR. ARENSTEIN:  I ask that this exhibit be marked

8    Petitioner's W1 and 2 for identification.

9    BY MR. ARENSTEIN:

10   Q.  Can you identify this document?

11   A.  Yes.

12   Q.  Tell the court what it is.

13   A.  This is my Malaysian birth certificate.

14   Q.  What is on the second page?

15             THE COURT:  I don't understand the question.

16   BY MR. ARENSTEIN:

17   Q.  Can you tell us what the document is on the second page?

18             MS. LEIDHOLDT:  Your Honor, objection.

19             THE COURT:  Basis?

20             MS. LEIDHOLDT:  First of all, I believe Mr. Arenstein

21   is asking the witness questions about a document not in

22   evidence.

23             THE COURT:  Sustained.  Thank you.

24   BY MR. ARENSTEIN:

25   Q.  Can you identify this document?
```

1   A.  Yes.

2   Q.  Can you tell the court what it is.

3   A.  My Malaysian birth certificate.

4   Q.  Is this a true and accurate copy of your Malaysian birth

5   certificate?

6   A.  This is a photocopy.

7   Q.  It is a photocopy.  Is it a true and accurate copy of your

8   birth certificate?

9   A.  Yes.

10  Q.  Is this document, the entire document, a true and accurate

11  copy of your birth certificate?

12          MS. LEIDHOLDT:  Objection.

13          THE COURT:  Basis for the objection?

14          MS. LEIDHOLDT:  First of all, we haven't been provided

15  with a translation of the document.  It is only in Malay.

16          THE COURT:  All right.  That objection is overruled.

17  BY MR. ARENSTEIN:

18  Q.  This is a true and accurate copy of your birth certificate?

19          THE COURT:  You have asked that question how many

20  times?

21          MR. ARENSTEIN:  I ask this document be moved into

22  evidence as Petitioner's Exhibit W1 and 2 in evidence.

23          MS. LEIDHOLDT:  May I add, your Honor, a further

24  objection, please?  There is writing on this document that does

25  not appear to be part of the document.

```
 1            THE COURT:  Wait a minute.  Stop, stop, stop.

 2            The testimony of the witness is the testimony of the

 3   witness.  You are free to bring out whatever you want to bring

 4   out on cross-examination.  The witness has said what she has

 5   said about this exhibit, and on that basis Petitioner's Exhibit

 6   W is received into evidence.

 7            (Petitioner's Exhibit W received in evidence)

 8            MR. ARENSTEIN:  Thank you.

 9   BY MR. ARENSTEIN:

10   Q.  Is there a stamp or endorsement on this document down at

11   the bottom here?

12            Are you familiar with this stamp or endorsement on the

13   second page of the document?

14   A.  Yes, I see the stamp.

15   Q.  Do you see this stamp right here?

16   A.  Yes.

17   Q.  Do you know what this stamp is?

18   A.  No.

19   Q.  You don't know what this stamp is?

20   A.  I have never seen it before.

21   Q.  You have never seen this before?

22            And you have never seen this birth certificate before,

23   this part of it?

24   A.  The first page is the correct one.  The second page I don't

25   know because my original birth certificate is still with
```

1    Mr. Souratgar.  So what he done with it --

2            MR. ARENSTEIN:  I move to strike, your Honor, as not

3    responsive to the question.

4            THE COURT:  Overruled.

5    BY MR. ARENSTEIN:

6    Q.  I ask you to look at the letter.  Is Straits Law firm the

7    law firm that represented you on December 1st, 2011?

8    A.  Yes.

9    Q.  I assume Mr. Ahmad Nizam Abbas is your attorney?

10   A.  Yes.

11   Q.  Are you familiar with this letter that was sent by your

12   attorney to Ms. Gomez?

13   A.  (Pause)  Yes.

14   Q.  I am sorry.  I didn't hear the answer?

15   A.  Yes.

16           THE COURT:  The answer was, "yes."

17           MR. ARENSTEIN:  I ask this document be moved into

18   moved into evidence as Petitioner's Exhibit AA1 and 2.

19           THE COURT:  Any objection?

20           MS. LEIDHOLDT:  Just one second, please, your Honor.

21           (Off-the-record discussion)

22           MS. LEIDHOLDT:  No objection.

23           THE COURT:  Received.

24           (Petitioner's Exhibits AA1 and AA2 received in

25   evidence)

1   BY MR. ARENSTEIN:

2   Q.  The letter states that:

3           "Our client maintains that your client had applied for

4   Shayan's Iranian passport.  On this point, our client has

5   instructed us that Shayan's birth certificate will reflect

6   this.  Our client recalls seeing at the back of the birth

7   certificate specific writings made by officials from the

8   Iranian embassy in Malaysia, from which it can be inferred an

9   Iranian passport has been applied for on Shayan's behalf.

10  Further, our client has obtained her own Iranian passport

11  through your client's efforts and is thus speaking from

12  experience."

13          Are you familiar with that statement by your lawyer?

14  A.  I don't know why he put that in.

15  Q.  You don't know why he put that there?

16  A.  Because he does not let me see the letter before he sent it

17  off.

18  Q.  He is saying you're familiar with the stamps and the

19  documents, and you're saying your lawyer did not write the

20  right thing on the letter to Ms. Gomez.  Is that correct?

21          MS. LEIDHOLDT:  Objection, your Honor.

22          THE COURT:  Sustained.

23  BY MR. ARENSTEIN:

24  Q.  Who informed your lawyer about the stamp on the birth

25  certificate?

1                 MS. LEIDHOLDT:  Objection, your Honor.

2                 THE COURT:  Sustained.

3    BY MR. ARENSTEIN:

4    Q.  How would your lawyer have found out that -- --

5                 MS. LEIDHOLDT:  Objection.

6                 THE COURT:  Sustained.  You can ask the question, but

7    the form of your question is objectionable.

8    BY MR. ARENSTEIN:

9    Q.  Did you not talk to your lawyer -- withdrawn -- so why was

10   this letter written?

11                MR. McNALLY:  Objection.

12                MS. LEIDHOLDT:  Objection.

13                THE COURT:  Sustained.  Let me rephrase it.  Do you

14   know why this letter was written?

15                THE WITNESS:  With regards to Shayan's Iranian

16   passport.

17                THE COURT:  Thank you.

18   BY MR. ARENSTEIN:

19   Q.  Is there a reason why the last sentence of the first

20   paragraph was put there?

21   A.  I don't know.

22                (Off-the-record discussion)

23                MR. ARENSTEIN:  I have the original birth certificate

24   plus I have copies, your Honor.  I am going to hand up the

25   original to the court, and I am going to leave a copy for your

1    Deputy, and I will give a copy to the witness.

2            THE COURT:  You're showing the witness what has been

3    marked as Petitioner's Exhibit BB, is that correct, sir?

4            MR. ARENSTEIN:  1 and 2 for identification.

5            THE COURT:  Exhibit BB1 and 2?

6            MR. ARENSTEIN:  BB1 and 2.

7            THE COURT:  That is the question I'm asking you?

8            MR. ARENSTEIN:  Yes, sir.

9            THE COURT:  Thank you.

10   BY MR. ARENSTEIN:

11   Q.  Can you identify this document?

12   A.  Yes.

13   Q.  Can you tell the court what it is?

14   A.  Shayan's Singapore birth certificate.

15   Q.  What is the second page of this document?

16   A.  Some writings.

17   Q.  Is this an endorsement by the Malaysian government on your

18   son's Singapore birth certificate?

19   A.  I believe so.

20           MR. ARENSTEIN:  I ask this document be admitted into

21   evidence as Petitioner's Exhibit BB1 and 2 in evidence.

22           THE COURT:  Any objection?

23           MS. LEIDHOLDT:  We object, your Honor.

24           THE COURT:  Basis?

25           MS. LEIDHOLDT:  The statement "I believe so" does not

1    indicate that the client recognizes it or understands it to

2    be -- or Malaysian endorsement "I believe so" does not indicate

3    her recognition or knowledge of the second page of this

4    document.

5             THE COURT:  Overruled.

6             (Petitioner's Exhibits BB1 and BB2 received in

7    evidence)

8    BY MR. ARENSTEIN:

9    Q.  Is there the same Iranian endorsement on his birth

10   certificate as there was on your birth certificate, Ms. Fair?

11            THE COURT:  I will simply note for the record, and

12   give respondent's counsel an opportunity to review, but BB1 and

13   BB2, which have now been received into evidence, I am a little

14   bit puzzled because what has been handed up to the court as the

15   Exhibit BB1 and BB2, BB1 is a certificate of registration of

16   birth.  BB2 is a blank page with some writings, some numbers at

17   the bottom, 137956, and illegible, then 17.2.2009.

18            Yet what was handed up to the court and represented to

19   be these exhibits was BB1, an accurate copy of BB1 and the

20   reverse side of it, but also a different document which has a

21   number 137956 on it at the top and appears to be a green piece

22   of paper.  It looks like a Malaysian birth certificate, but

23   counsel has not explained, in handing up these original

24   documents, what the relationship of the document that was

25   tendered to me is to anything else.

1          MR. ARENSTEIN:  Your Honor, that was my next question.

2   I am laying a foundation.

3          THE COURT:  Have you provided this to counsel?

4          MR. ARENSTEIN:  Yes, I have.

5          THE COURT:  What is this?

6          MR. ARENSTEIN:  This is the Malaysian Berang,

7   endorsement by the Malaysian government.

8          THE COURT:  Marked as what?

9          MR. ARENSTEIN:  It is going to be marked as

10  Petitioner's Exhibit CC.

11         THE COURT:  You probably ought not to be handing it up

12  to the court until --

13         MR. ARENSTEIN:  I think what happened, I handed up the

14  original birth certificate and the original endorsement, and

15  that got confused with the two, your Honor.

16         THE COURT:  I have confirmed that BB2 is a near

17  identical copy of the original, is not an identical copy of the

18  original because the original on the reverse side has the

19  number B067608 which does not appear on Petitioner's Exhibit

20  BB2.

21         The document, I am returning the document to my Deputy

22  for inspection by anyone who wants to along with this document

23  which you have now marked as Petitioner's Exhibit CC, returning

24  it to my Deputy who will return it to Mr. Arenstein, who I am

25  directing to show it to opposing counsel.

1          (Off-the-record discussion)

2          MR. ARENSTEIN:  May I proceed, your Honor?

3          THE COURT:  You may.

4          MR. McNALLY:  Your Honor, we would like to renew our

5   objection to BB1 and BB2 insofar as your Honor stated, the

6   copies provided are different, in fact, from the laminated

7   original that was presented to your Honor a few moments ago.

8          THE COURT:  Your objection is noted.

9          I identified one variance and I deemed that inclusion

10  to be in the exhibit received into evidence, and certainly on

11  cross-examination if there is anything else you wish to bring

12  out, you may.  I would just caution counsel that when there is

13  a representation that something is a true and accurate copy,

14  which is implicit in your handing up the original as well as a

15  copy, I would expect that that which you hand up to the court

16  is an accurate photocopy and does not omit materials which the

17  court has to search for and identify.

18         MR. ARENSTEIN:  I understand, your Honor.

19         THE COURT:  Go ahead.

20  BY MR. ARENSTEIN:

21  Q.  Are you familiar with this document, ma'am, the document

22  marked Petitioner's Exhibit CC?

23  A.  Yes.

24  Q.  Can you tell the court what it is.

25  A.  It is a registration for Shayan with the Malaysian High

Court.

Q.  And this document gives Malaysian citizenship to Shayan?
What is the purpose of this document?

A.  It is a Malaysian, to register his Malaysian citizenship.

          MR. ARENSTEIN:  I ask this document be admitted into
evidence as Petitioner's Exhibit CC.

          THE COURT:  Any objection?

          MS. LEIDHOLDT:  No objection, your Honor.

          THE COURT:  Received.

          (Petitioner's Exhibit CC received in evidence)

BY MR. ARENSTEIN:

Q.  Now, isn't the number on this document the same as the
number on the back of BB2, on BB2, the number of this Malaysian
document, Berang W?  Isn't this the same number that appears on
BB2?

A.  Yes.

          MR. McNALLY:  Objection, your Honor.  There are a lot
of numbers on both of these documents.

          THE COURT:  Yes.  Sustained.  Rephrase.

BY MR. ARENSTEIN:

Q.  Isn't the number 137956, doesn't that same number appear on
the endorsement on the back of your son's birth certificate?

A.  Yes.

Q.  So Shayan is not an Iranian citizen; he is a Malaysian
citizen.  Is that correct?

 1              MR. McNALLY:  Objection.

 2              MS. LEIDHOLDT:  Objection.

 3              THE COURT:  Overruled.  You may answer the question if

 4    you know.

 5    A.  Malaysian citizen he is.  Iranian, I believe Mr. Souratgar

 6    registered for him, too.

 7              MR. ARENSTEIN:  Objection, your Honor, and not

 8    responsive to the question.

 9              THE COURT:  Overruled.

10    BY MR. ARENSTEIN:

11    Q.  If he is Iranian, shouldn't he have the same endorsement on

12    his birth certificate as you have on yours if he is an Iranian

13    citizen?

14              MS. LEIDHOLDT:  Objection.

15              THE COURT:  Overruled, if you know.  Do you know

16    anything about the endorsements and why they're present or

17    absent on any of these documents?  Do you know what an

18    endorsement is?

19              THE WITNESS:  First of all, these writings are in

20    Persian, which I don't know what it says.  I haven't seen it

21    because in the Iranian consulate I remember seeing the consul

22    wrote something on Shayan's documents.

23    BY MR. ARENSTEIN:

24    Q.  Do you have any proof of that?  Do you have any proof of

25    that?

1          MR. McNALLY:  Objection.

2          THE COURT:  Sustained.  Sustained.

3   BY MR. ARENSTEIN:

4   Q.  Do you remember seeing him --

5          MS. LEIDHOLDT:  Objection.

6   Q.  Would you tell us exactly what you saw?

7          THE COURT:  Overruled.

8   A.  He wrote everything in Persian.  How would I understand

9   what is written?

10  Q.  So then you couldn't understand what you saw was in

11  Persian.  Isn't that correct?

12  A.  The same thing that you claim this birth certificate is.

13  Q.  You wouldn't know what was on that document if you couldn't

14  read it.  Is that correct?

15  A.  Correct.

16  Q.  Thank you.

17          Now, you stated that you applied for a long term stay

18  visa for your husband from the Malaysian immigration

19  authorities in 2009.  Is that correct?

20  A.  I believe it was in 2009.

21  Q.  Do you have any proof of that?

22          MS. LEIDHOLDT:  Objection; asked and answered.

23          THE COURT:  Yes.  Mr. Arenstein, you should be aware

24  that when a witness testifies to something in a judicial

25  proceeding, that is evidence.  Evidence is proof.  Do you

 1   understand that?

 2          MR. ARENSTEIN:  Yes.

 3          THE COURT:  So that's why I am sustaining the

 4   objection as to the form of the question.

 5          MR. ARENSTEIN:  I'll ask it in another form.

 6   BY MR. ARENSTEIN:

 7   Q.  Do you have any document proof of that?

 8   A.  No.

 9   Q.  You have no documentary proof?

10   A.  All documents are kept by Mr. Souratgar.

11          MR. ARENSTEIN:  Your Honor, I ask that this document

12   be marked as Petitioner's Exhibit DD1 to 4 for identification.

13          THE COURT:  All right.  You have handed to me

14   premarked, so it appears already to be marked.

15          MR. ARENSTEIN:  It is premarked and it is DD 1 to 5.

16          THE COURT:  I don't need to do anything then?

17          MR. ARENSTEIN:  No, you don't.

18          THE COURT:  Okay.  Thank you.

19   BY MR. ARENSTEIN:

20   Q.  Is it possible -- can you take a look at this document?

21   A.  (Pause)

22   Q.  And more particularly, if you'd look at page DD-5 of the

23   document, I ask you, is it possible that you made the

24   application for this Malaysian long term stay visa on February

25   7th, 2011?

 1          THE COURT:  Sustained as to possibilities.

 2   BY MR. ARENSTEIN:

 3   Q.  What would be the date that would show on this document?

 4          MS. LEIDHOLDT:  Objection, your Honor.

 5          THE COURT:  Sustained.  The document speaks for

 6   itself.

 7   BY MR. ARENSTEIN:

 8   Q.  Are you familiar with this document?

 9          THE COURT:  Have you offered the document?

10          MR. ARENSTEIN:  I offer it into evidence.

11          THE COURT:  Well, don't question the witness about the

12   content of the document except to the extent necessary to lay a

13   foundation.

14          MR. ARENSTEIN:  Thank you.

15          THE COURT:  Is there an objection to the document?

16          MR. McNALLY:  It wasn't offered into evidence, your

17   Honor.

18          THE COURT:  Pardon me?

19          MR. McNALLY:  It has not been offered into evidence.

20          THE COURT:  I agree with you, but I just thought I

21   heard Mr. Arenstein just now offer it.

22          MR. ARENSTEIN:  I did, your Honor.

23          THE COURT:  That is what I just heard.

24          MR. McNALLY:  My apologies.

25          THE COURT:  That is all right.

```
 1              MR. McNALLY:  We do object.  There has been no
 2    foundation laid as far as this witness' familiarity with the
 3    document.
 4              THE COURT:  Let's see whether you can lay a
 5    foundation, Mr. Arenstein.
 6    BY MR. ARENSTEIN:
 7    Q.  Are you familiar with this document?
 8    A.  No.
 9    Q.  You've never seen this document?
10    A.  No response.
11    Q.  Isn't this the document that --
12              THE COURT:  Stop.  Mr. Arenstein did you ask a
13    question?
14              MR. ARENSTEIN:  Yes.
15              THE COURT:  All right.  I know you are not feeling
16    well, but you have to pause when you ask a question and give
17    the witness an opportunity to answer the question.
18              MR. ARENSTEIN:  Okay.
19              THE COURT:  Do you recall what the question was?
20              THE WITNESS:  No.
21              THE COURT:  The question, I believe, was have you seen
22    petitioner's Exhibit DD before?
23              THE WITNESS:  No, I never.
24              THE COURT:  Okay.
25              (Pause)
```

1          MR. McNALLY:  Is there a question pending?

2          THE COURT:  I don't believe there was.

3          MR. ARENSTEIN:  I thought there was.

4          THE COURT:  What is the question, Mr. Arenstein?

5   BY MR. ARENSTEIN:

6   Q.  Could you look at page DD-5, Ms. Fair.

7   A.  Yes.

8          MS. LEIDHOLDT:  Objection, your Honor.

9          THE COURT:  Let's hear the question.

10  BY MR. ARENSTEIN:

11  Q.  Is that your name that appears as an applicant for this

12  visa --

13         MS. LEIDHOLDT:  Objection.

14  Q.  -- on Page 5?  Does that refresh your memory as to this

15  document?

16         MS. LEIDHOLDT:  Objection.

17         THE COURT:  Some place in there is a proper question

18  not artfully phrased.

19         Ms. Lee?

20         THE WITNESS:  Yes.

21         THE COURT:  Take a look at page DD-5.

22         THE WITNESS:  Okay.

23         THE COURT:  Under, where it says "Lee Jen Fair" with

24  it --

25         THE WITNESS:  Yes.

```
 1              THE COURT:  Does that refresh your recollection that
 2    you have seen at least this page before?
 3              THE WITNESS:  No, I never seen this page before.
 4              THE COURT:  That is your answer.  Next question, Mr.
 5    Arenstein.
 6    BY MR. ARENSTEIN:
 7    Q.  So you didn't make an application to the Malaysian
 8    authorities for a long term stay visa for your husband?
 9              THE COURT:  Mr. Arenstein, that is not a fair
10    question.
11    BY MR. ARENSTEIN:
12    Q.  Did you make --
13              THE COURT:  That is a fair question.  Go ahead.
14    BY MR. ARENSTEIN:
15    Q.  Did you make an application to the Malaysian authorities
16    for a long stay visa for your husband, Mr. Souratgar?
17    A.  Yes.
18    Q.  Is this page evidence -- did you make an application on the
19    date that is stated on DD-5 on behalf of your husband?
20              THE COURT:  Restate the question.
21    BY MR. ARENSTEIN:
22    Q.  Did you make an application to the Malaysian authorities
23    pursuant to the statement that is made on page DD-5 --
24              THE COURT:  Sustained as to form.
25    BY MR. ARENSTEIN:
```

1   Q.  Did you not apply to the Malaysian authorities for a long

2   term stay visa for your husband?

3          MR. McNALLY:  Objection; asked and answered.

4          THE COURT:  No, I will allow that question to stand.

5   You may answer it.

6   A.  We applied once in 2009.

7   BY MR. ARENSTEIN:

8   Q.  Does this document refresh your memory as to when and what

9   you did with the Malaysian authorities to apply for a long term

10  stay visa for your husband?

11         MS. LEIDHOLDT:  Objection.

12         THE COURT:  Overruled.

13  A.  Yes, we applied once in 2009, and then this one is

14  probably -- because it is two years, and probably this is the

15  second time.

16         THE COURT:  Ms. Lee, when the question is asked

17  whether the document refreshes your recollection, what that

18  means is you look at the document, and then in your mind turn

19  it over to the other side, and then sit there and ask yourself

20  the question, having looked at the document, do I have a new

21  recollection, a different recollection than what I said before?

22         If you do, then you should say yes, it refreshes my

23  recollection and you can state what your refreshed recollection

24  is.  If you look at it, and looking at it doesn't give you a

25  new memory, a new recollection, then you should state that.

```
 1              Do you have a refreshed recollection, having looked at

 2   the document?

 3              THE WITNESS:  No.

 4              THE COURT:  Next question.

 5              MR. ARENSTEIN:  I'll go on.

 6              (Pause)

 7              MR. ARENSTEIN:  This is marked for identification as

 8   Petitioner's Exhibit EE for identification.

 9   BY MR. ARENSTEIN:

10   Q.  Ms. Fair, are you familiar with this document?

11   A.  No.

12   Q.  Isn't this the document that was submitted by your counsel

13   on your direct examination?

14              MR. McNALLY:  I believe this document is already in

15   evidence.

16              MR. ARENSTEIN:  I understand that.  She just said she

17   is not familiar with it.  I just wanted to refresh her memory

18   by the question I asked.

19              THE COURT:  Sustained.

20              (Off-the-record discussion)

21              THE COURT:  Ms. Lee --

22              THE WITNESS:  Yes.

23              THE COURT:  -- take a look at Petitioner's Exhibit EE

24   for identification.  Have you seen this document before?

25              MR. McNALLY:  This came in as R6, your Honor.
```

 1           THE COURT:  It is in evidence?

 2           MS. LEIDHOLDT:  Yes.

 3           THE COURT:  Is that correct, Mr. Arenstein?

 4           MR. ARENSTEIN:  I believe so.

 5           THE COURT:  Then if that is the case, Mr. Arenstein,

 6     don't mark it as a different exhibit.  If it is an identical

 7     copy of that which is already in evidence, then it is

 8     inappropriate to do what you are doing.

 9           MR. ARENSTEIN:  We didn't have the number, your Honor.

10           THE COURT:  Well, then, I have just asked you, is it,

11     in fact, in evidence as Respondent's 6?  You are the trial

12     lawyer here.  That is a question that you, with the assistance

13     of your colleagues, ought to be able to answer for the court.

14           MR. ARENSTEIN:  The answer is yes, your Honor.

15           THE COURT:  Then if that is the case, then it should

16     not be marked anew for identification.  Do you agree?

17           MR. ARENSTEIN:  I agree, your Honor.

18           THE COURT:  Could you please take this piece of paper

19     back and retrieve it from the witness.

20           MR. ARENSTEIN:  Can I have R6 in evidence, your Honor,

21     so I can show it to the witness.

22           THE COURT:  You should have a copy of the exhibits

23     that are in evidence.  Do you have copies of the trial

24     evidence?

25           MR. ARENSTEIN:  I do, your Honor.

1        THE COURT:  Okay.  I will place my copy of R6 in front

2   of the witness.  Do you have that document now?

3        THE WITNESS:  Yes.

4        THE COURT:  Okay.  The question is have you seen --

5   you already told me the answer, but I'll ask again because I've

6   now forgotten.  Have you seen this document before?

7        THE WITNESS:  After reading through it, yes.

8        MR. ARENSTEIN:  What did she say?

9        THE COURT:  "After reading through it, yes."

10  BY MR. ARENSTEIN:

11  Q.  Is there some reason you said before that you didn't see

12  it?  And I have a copy of R6 right here.  You said earlier when

13  I showed you this document that you were not familiar with it.

14  Did you give this document to your counsel?

15       THE COURT:  That is about three questions in there.

16  That is objectionable as to form.

17       MR. ARENSTEIN:  I'll withdraw it.

18  BY MR. ARENSTEIN:

19  Q.  How did you come by this document?

20  A.  The first time I see it was when my attorney showed it to

21  me here.

22  Q.  This document says that you applied for an Iranian passport

23  on February 2, 2011.  Is that correct?

24       THE COURT:  Is it correct that the document says that?

25  Is that the question you were asking?

1            MR. ARENSTEIN:  I'll withdraw.

2   BY MR. ARENSTEIN:

3   Q.  The document says, ma'am, you applied for an Iranian

4   passport on February 6th, 2011, and the passport was issued for

5   you on June 3rd, 2011 under the number R1924705.  Is that

6   right?

7            MR. McNALLY:  Objection.  There is a "3" at the end of

8   that number.

9            MR. ARENSTEIN:  I stand corrected.  19247053.

10           THE COURT:  Do you understand the question?

11           THE WITNESS:  Yes.

12  BY MR. ARENSTEIN:

13  Q.  Now, I show you a copy of --

14           THE COURT:  What is your answer?

15           THE WITNESS:  I did not apply.

16           THE COURT:  Next question.  "I did not apply."  Next

17  question.

18           (Continued on next page)

19

20

21

22

23

24

25

1    Q.  I show you a copy which is Respondent's R5 in evidence and

2    ask if you remember this document.

3    A.  Yes, I seen it.

4    Q.  Doesn't it say on this document, Ms. Fair, that the date of

5    issue was June 3, 2011, and the date of issue is June 3, 2011?

6    A.  Yes.

7    Q.  Didn't you have an agreement with your husband that you

8    would apply for his Malaysian long-term stay and you would

9    apply for an Iranian passport on the same day?

10   A.  No.

11   Q.  Wasn't it your plan to help each other make these

12   applications?

13   A.  I agreed to apply for a long-term visa for him because of

14   business dealings he wanted to do in Malaysia, but I never

15   agreed to become an Iranian citizen, because I do not get any

16   benefits out of it.

17        MR. ARENSTEIN:  Objection, your Honor.  Nonresponsive,

18   the second statement.

19        THE COURT:  Overruled.  Denied.

20   Q.  Both documents were filed on February 6, 2011.  Is that a

21   coincidence?

22   A.  Which documents?

23   Q.  The document for the Malaysian long-term stay and the

24   document for the Iranian citizenship.

25        MR. McNALLY:  Objection to form.  The term "filed,"

 1    I'm not sure what that means.

 2    Q.  Both documents were filed?

 3         THE COURT:  Sustained.  Rephrase it.

 4    Q.  Both documents have the date --

 5         THE COURT:  No, no.  Rephrase the question.

 6    Q.  The application that was made for both of those issues, the

 7    Malaysian certificate and the Iranian passport, were made on

 8    the same date.  Is that a coincidence?

 9         MR. McNALLY:  Your Honor --

10         THE COURT:  First of all, don't be testifying.  Ask

11    the question, and then you can ask the second question.

12    Q.  The application was made for the Malaysian passport on

13    February 6, 2011.

14         MR. McNALLY:  Objection, your Honor.  I think he is

15    referring to a document that is not in evidence.

16         THE COURT:  You may be right.  It's a stand-alone

17    question, it seems to me, that doesn't refer to a document or

18    incorporate a document, so I'll let the question stand.

19    Q.  Didn't you make an application for the long-term stay on

20    February 6, 2011?

21         THE COURT:  Do you understand the question?

22         THE WITNESS:  Yes.

23    A.  I don't remember.

24         THE COURT:  Next question.

25    Q.  You testified on direct examination that Mr. Souratgar

1   forced you to have anal and oral sex with you, is that correct?

2   A.  Yes.

3   Q.  Did you ever send to him any text messages inviting him to

4   have anal or oral sex with you?

5   A.  It was not by choice.

6           MR. ARENSTEIN:  Objection, your Honor.  Not responsive

7   to the question.

8           THE COURT:  Do you understand the question?

9           THE WITNESS:  Yes.

10          THE COURT:  Can you answer the question?

11          THE WITNESS:  It looks familiar.

12          THE COURT:  Pardon me?

13          THE WITNESS:  It looks familiar.

14          THE COURT:  What looks familiar?  This question does

15  not call for you to look at any document.  The question you're

16  being asked --

17          You can restate it again, Mr. Arenstein.

18          Listen to the question.  It doesn't relate to a

19  document at this stage.

20  Q.  I'll restate it.  Did you ever send him any text messages

21  inviting him to have anal and oral sex with you?

22          MS. LEIDHOLDT:  I object to the word "invite."

23          THE COURT:  Overruled.

24          Do you understand the question?  Pardon me?  Keep your

25  voice up.  The court reporter can't hear you.

1    A.  I didn't invite him.

2            THE COURT:  You didn't invite.  OK.

3    A.  The question invite.

4            THE COURT:  Next question.

5            MR. ARENSTEIN:  That's not an answer, your Honor.

6    I'll ask it again.

7            THE COURT:  Let me see counsel at the side bar,

8    please.

9            (At the side bar)

10           THE COURT:  I'm concerned by your last objection.  You

11   objected to the question because it used the word "invite."  I

12   don't understand the objection.

13           MS. LEIDHOLDT:  I don't think this is about inviting.

14   Inviting him, that does not seem a fair characterization of

15   these messages, "invite."

16           THE COURT:  That is an inappropriate objection and it

17   is coaching the witness.

18           MS. LEIDHOLDT:  Your Honor, I wasn't intending to.

19           THE COURT:  If the question was not based in fact or

20   based in the text messages, your client is perfectly capable of

21   saying no, I didn't invite.

22           Did you ever travel to the country of Thailand during

23   your marriage?  You don't object to "Thailand" because you

24   never traveled to Thailand.  That's a question.  The witness is

25   perfectly capable of saying no, I never traveled to Thailand.

1     It doesn't make the question necessarily objectionable,

2     assuming that the questioner has a basis for asking the

3     question.

4             Now I get back from the witness a dispute over the

5     word "invite."  I would caution you in your future objections.

6     OK?

7             MS. LEIDHOLDT:  Yes, your Honor.

8             (In open court)

9     BY MR. ARENSTEIN:

10    Q.  Did you ever send any text messages to Mr. Souratgar

11    regarding anal and oral sex?

12    A.  Yes.

13    Q.  I show the witness what is marked for identification as

14    Petitioner's Exhibit I1 to 4 and ask if those are your text

15    messages.  Are those your text messages?

16            THE COURT:  Mr. Arenstein, what are you doing?

17            MR. ARENSTEIN:  I asked a question and didn't get an

18    answer, I guess.

19            THE COURT:  You didn't.  I understand that.

20            Ms. Lee, do you understand the question?

21            THE WITNESS:  Yes.

22            THE COURT:  The answer is?

23    A.  Yes.

24            THE COURT:  Next question.

25            MR. ARENSTEIN:  I move that those text messages be put

1   into evidence, your Honor.

2             THE COURT:  Any objection to Petitioner's Exhibit I?

3             MS. LEIDHOLDT:  No objection, your Honor.

4             THE COURT:  Received.

5             (Petitioner's Exhibit I received in evidence)

6   Q.  Did your mother tell you that she saw Mr. Souratgar

7   boarding a Turkish Airlines plane on November 12th of this

8   year?

9   A.  Yes.

10  Q.  When did she tell you this?

11  A.  On I think 15th.

12            THE COURT:  November 15?

13            THE WITNESS:  Yes.  Either 14 or 15, I can't remember.

14  Q.  I'm sorry?

15  A.  14 or 15, I cannot remember.

16  Q.  Didn't you think it was urgent enough to alert your

17  attorney and the guardian ad litem and the Court with regard to

18  this incident?

19  A.  I did alert my attorney.

20  Q.  When did you alert her?

21            MR. McNALLY:  Objection.  Starting to get into a

22  privilege issue.

23            THE COURT:  Yes.  I think you should move on.

24  Q.  When you left Singapore in May 20, 2012, with Shayan, who

25  else traveled with you?

1    A.   My mother.

2    Q.   Your mother was on the plane with you?

3    A.   Yes.

4    Q.   When did you leave Singapore for the United States?

5    A.   20th of May 2012.

6    Q.   Did your mother come to Singapore to go with you on the

7    plane?

8    A.   Yes.

9    Q.   You both came from Singapore to Los Angeles to New York on

10   a flight on the 20th of May, is that correct?

11   A.   Correct.

12   Q.   Are you aware that your mother testified in this court that

13   she came from Kuala Lumpur and not from Singapore coming to the

14   United States?

15   A.   She might have mistaken.

16   Q.   Pardon me?

17   A.   She might have mistaken.

18   Q.   She might have been mistaken?

19          THE COURT:   The question you were asked is were you

20   aware of your mother's testimony.

21          THE WITNESS:   Yes.

22   Q.   I show you a copy which is marked Respondent's 20 in

23   evidence a letter that was submitted to this Court, and I ask

24   you, when did you receive this letter?

25          MS. LEIDHOLDT:   May we see a copy?

1          MR. ARENSTEIN:  Yes.  You have it.

2          MR. McNALLY:  Thank you.

3          THE COURT:  Is R20 in evidence?

4          MR. ARENSTEIN:  Yes, it is, your Honor.

5          THE COURT:  Thank you.  The question, sir, again?

6  Q.  When did you receive this letter?

7  A.  Sometime in February this year.

8  Q.  I'm sorry?

9  A.  Sometime in February this year.

10 Q.  Sometime in February this year.  It states in the first

11 sentence that you informed the Shariah court of difficulties in

12 the marriage, is that correct?

13 A.  Yes.

14 Q.  You confirm that the Shariah court proceedings were

15 commenced by you?

16         THE COURT:  No, no, no.

17         MR. ARENSTEIN:  I'll withdraw it.

18         THE COURT:  No, no, no.  Mr. Arenstein, you can't get

19 away with that.

20         Do you confirm that the letter says you inform this

21 court that there are difficulties in your marriage?  Yes.  So

22 you informed the Shariah court of difficulties in your

23 marriage?  That is an entirely different question.  You are

24 proceeding from an assumption.  You asked the witness.  You

25 could ask me to confirm that.  That is not a proper way to

 1    conduct an examination.

 2    Q.  Did you commence the Shariah court proceedings that are

 3    detailed in this letter that was sent to you?

 4    A.  Yes.

 5    Q.  You wanted to initiate a divorce proceeding in the Shariah

 6    court, is that correct?

 7    A.  I don't have a choice.

 8              MR. ARENSTEIN:  Move to strike the answer as not

 9    responsive.

10              THE COURT:  Overruled.

11    Q.  But you commenced the proceeding, is that correct?

12    A.  Yes.

13    Q.  Following this letter, did you attend a mediation session

14    there?

15    A.  Not a mediation.  Counseling.

16    Q.  Not mediation, a what?

17    A.  A counseling session.

18    Q.  Counseling session.  It states in the second line, "If you

19    did not attend, your case would be closed without further

20    notice and no further action," is that right?

21    A.  Yes.

22    Q.  Do you agree, therefore, that it was not mandatory for you

23    to attend?

24    A.  It is mandatory if you want to have a divorce, yes.

25    Q.  But if you don't want to proceed, it's not mandatory, is

1   that correct?

2            MS. LEIDHOLDT:  Objection.

3            THE COURT:  Yes, I think the witness has adequately

4   answered the question.  You mean if you don't want a divorce,

5   you don't have to attend, is that your question?

6            MR. ARENSTEIN:  That's correct.

7            THE COURT:  If you don't want a divorce, then you

8   don't have to attend presumably, is that correct?

9            THE WITNESS:  Yes.

10            THE COURT:  All right.

11   Q.  Do you agree that petitioner refused to attend?

12            MS. LEIDHOLDT:  Objection.

13            THE COURT:  Overruled.

14   A.  I don't know whether he agree or not.

15   Q.  You don't.  What is the status --

16            THE COURT:  Mr. Arenstein, we have had this

17   conversation.  What happens repeatedly is the witness will give

18   an answer and then you repeat the answer.  That's reiteration.

19   You're not permitted to do that.

20   Q.  What is the status of these proceedings today?

21   A.  I don't know.

22   Q.  You commenced the proceedings, is that correct?

23   A.  Yes.

24   Q.  You don't know what the status is of the proceedings today?

25            MS. LEIDHOLDT:  Objection.  Asked and answered.

 1          THE COURT:  Sustained.

 2  Q.  Since you initiated it, isn't it within your power to

 3  discontinue it?

 4          MS. LEIDHOLDT:  Objection.

 5          THE COURT:  Overruled.

 6  A.  Was there a question?

 7          THE COURT:  No, there is no question.

 8          MR. ARENSTEIN:  There was a question, your Honor.

 9          THE COURT:  Let me hear the question again.

10  Q.  I said, since you initiated it, isn't it in your power to

11  discontinue it?

12  A.  No.

13  Q.  You can't discontinue the action?

14          MS. LEIDHOLDT:  Objection.  Asked and answered.

15          THE COURT:  Sustained.

16  Q.  Can you tell us who has the power to discontinue the

17  action?

18          MS. LEIDHOLDT:  Objection.

19  Q.  If you know.

20          THE COURT:  If you know.

21  A.  Both parties have to attend the counseling.  In the event

22  one does not, the case will not proceed.  So whose power is

23  that, I don't know.

24  Q.  Let me understand.  If one party doesn't proceed to the

25  action, then the case doesn't go forward?

1    A.  I don't know.  That's why I say I don't know.

2    Q.  You testified on direct examination that you had no

3    communication with your husband from May 31, 2008, until

4    September 2008, is that correct?

5              MS. LEIDHOLDT:  Objection.

6              THE COURT:  Sustained.

7    Q.  Did you have any communication with your husband between

8    May 31, 2008, and September 2008?

9    A.  I don't think so.

10   Q.  I'm sorry?

11   A.  I don't think so.

12   Q.  You don't think so.  OK.  I direct your attention to

13   Petitioner's Exhibit G15 in evidence, which I think everybody

14   has a copy of.  I ask you to look at this text message and tell

15   me if you sent it.

16   A.  I don't remember.

17   Q.  You don't remember.

18             THE COURT:  Remember what we just talked about a

19   minute ago?  I don't know whether the record is reflecting

20   this, but the witness says "I don't remember" and then Mr.

21   Arenstein says "You don't remember."  This was the reiteration

22   which I was referring to before which is inappropriate.  I have

23   to ask you, Mr. Arenstein, to please refrain from that.

24             Mr. McNally?

25             MR. McNALLY:  For the sake of the record, the previous

1   question was whether there was any communication between the

2   witness and her husband between May and September of 2008.  I

3   don't think this was reflected in the record, but the document

4   that was shown to the witness a moment ago was G15 is dated

5   March 4, 2008, not during the period --

6          THE COURT:  Thank you.  The question and answer are in

7   the record and the document is in the record.  Thank you all.

8   Put your next question to the witness.

9   Q.  Didn't you in fact go to the doctor with your husband on

10  August 19, 2008?

11  A.  I don't remember.

12  Q.  You don't remember.

13         THE COURT:  Mr. Arenstein, how many times do we have

14  to have this conversation?

15         MR. ARENSTEIN:  I'm sorry, your Honor.  I'm not

16  feeling a hundred percent.

17         THE COURT:  Would you like a break?

18         MR. ARENSTEIN:  No.  I'm going to proceed.  I want to

19  get this over with so we can proceed on with this trial.

20  Q.  Didn't you send a text message to your husband on August

21  19, 2008, saying, "Thank you for going to the doctor with me

22  and baby"?  Did you not send that text message on August 19,

23  2008?

24  A.  I don't remember, because looking at the time, why would I

25  send him a message at 11:36 p.m. at night?

1   Q.  Do you deny that you went to the doctor with your

2   husband --

3   A.  I don't remember when --

4   Q.  -- on August 19, 2008?

5          MR. McNALLY:  Objection.

6          THE COURT:  Sustained.  It is arguing with the

7   witness.  The witness testified already on the subject.

8   Q.  You testified earlier that you resigned from the jewelry

9   company that you worked for, is that correct?

10  A.  Yes.

11  Q.  You also testified that Mr. Souratgar wanted to hire you,

12  but he made you sign papers to work for him, that you were

13  going to work or that he was going to pay you for working for

14  him, is that correct?

15  A.  Yes.

16  Q.  I show you this document and ask if you can identify it.

17  Are you familiar with this document?

18  A.  Only the (inaudible).  The other two are not.

19         THE COURT:  Say again, please.

20  A.  Only Exhibit FF1 and FF3.  The other two are not familiar.

21         THE COURT:  You have seen F1 and F3 before.

22         THE WITNESS:  Yes.

23         THE COURT:  You do not recall seeing F2 and F4, is

24  that correct?

25         THE WITNESS:  Correct.

1          THE COURT:  Thank you.

2          MR. ARENSTEIN:  I move that these documents, the ones

3    that she has testified that she is familiar with, be moved into

4    evidence.

5          THE COURT:  No, no.  Mr. Arenstein, the testimony was

6    she's seen them before.  And, by the way, saying "you are

7    familiar with" is inherently ambiguous, too.  I am familiar

8    with the documents that have been marked as exhibits in this

9    proceeding; that does not mean that I would be a good custodial

10   witness or foundational witness for the documents.  "Familiar

11   with" is inherently imprecise.

12         MR. ARENSTEIN:  I'll rephrase the question, your

13   Honor.

14   Q.  Did you file these documents that are marked Exhibits FF1,

15   2, 3, and 4 with the government of Singapore?

16   A.  This document is issued by Mr. Souratgar's company.

17   Q.  These are issued by him, they are not filed with the

18   government by you?

19   A.  Yes, then it has to be filed by me to the income tax

20   department.

21   Q.  Did you file these documents with the government?

22   A.  Yes.

23   Q.  You did?

24   A.  Yes.

25         MR. ARENSTEIN:  I ask that these be admitted into

1    evidence.

2            THE COURT:  Any objection?

3            MS. LEIDHOLDT:  No objection, your Honor.

4            THE COURT:  Received.

5            (Petitioner's Exhibits FF1 and FF3 received in

6    evidence)

7    Q.  Did you testify that this arrangement with Mr. Souratgar

8    was a sham?

9    A.  He told me it was for accounts purposes, and I was forced

10   to do it.

11           MR. ARENSTEIN:  Objection, your Honor.  I asked a

12   yes-or-no question, and I got more than that.

13           THE COURT:  Overruled.  I'll allow it to stand.

14   Q.  Did you get paid and was this credited to your account.

15   A.  Yes.

16   Q.  So you were paid by Mr. Souratgar?

17   A.  Yes, but he took back the money after that.

18           MR. ARENSTEIN:  Objection.  I didn't hear the rest of

19   the answer, but I object if there was more than a response to

20   that question.

21           THE COURT:  Overruled.

22           MR. ARENSTEIN:  Can I have a minute, your Honor?

23           THE COURT:  You may.

24           MR. ARENSTEIN:  I only have one or two more questions

25   and I'm almost done.

1   Q.  Were these amounts credited to your private fund or Social

2   Security?

3           THE COURT:  Do you understand the question?

4   A.  Yes.

5   Q.  Yes or no.

6           MR. McNALLY:  Objection, your Honor.  She already said

7   that she didn't keep the money.

8           THE COURT:  Overruled.  Do you understand the question

9   that is being asked of you?

10          THE WITNESS:  Yes.

11          THE COURT:  Can you answer that question?

12          THE WITNESS:  Yes.

13          THE COURT:  What is the answer?

14          THE WITNESS:  Yes.

15          MR. ARENSTEIN:  It was.  Your Honor, if I could have a

16  brief minute, I'm almost done.  I just have one or two more

17  questions and I'll be finished.

18          THE COURT:  Sure.  Thank you.

19          MR. ARENSTEIN:  Can we take a short break, your Honor,

20  for main, and then I'll come back?

21          THE COURT:  Yes.  Take your time.

22  Q.  You testified yesterday that you have no duty to inform Mr.

23  Souratgar where Shayan is, you had no duty to inform Mr.

24  Souratgar where Shayan is when you removed him from his home in

25  Singapore, is that correct?

 1  A.  What?  I got no duty?  I say I got no obligation.

 2  Q.  You have no obligation.  Is this why you didn't tell him

 3  you were leaving the house on May 25, 2011?

 4  A.  No.

 5  Q.  Is this why you didn't tell him that you were taking Shayan

 6  with you to Malaysia on June 2011?

 7  A.  Is this why I did not tell him that I was taking Shayan, is

 8  that your question?

 9  Q.  You said you had no obligation to inform him.

10  A.  Yes.

11  Q.  I ask you, is this why you didn't tell him you were taking

12  Shayan to Malaysia in June of 2011?

13  A.  Yes.

14  Q.  Is this why you didn't tell him when you left Malaysia and

15  returned to Singapore in July of 2011?

16  A.  Yes.

17  Q.  Is this why you didn't tell him you were leaving Singapore

18  to the U.S. on May 20, 2012?

19  A.  No.

20  Q.  Why didn't you tell him?

21  A.  Because I couldn't tell him.

22  Q.  Did you let Mr. Souratgar speak to Shayan on the phone

23  during the three times that I just enunciated?

24          MR. McNALLY:  Objection, your Honor.

25          THE COURT:  Yes, sustained as to form.

1   Q.  Did you permit Mr. Souratgar to have conversations with

2   your son when you left on May 25, 2011?

3   A.  No.

4   Q.  Did you permit Mr. Souratgar to have conversations with

5   your son when you left to Malaysia on June of 2011?

6           MR. McNALLY:  Objection to form.  Is he talking about

7   the specific day?

8   Q.  Any time around that time, did you permit him to speak

9   to --

10          THE COURT:  During your time in Malaysia with Shayan,

11  did you permit Mr. Souratgar to speak to Shayan?

12          THE WITNESS:  No.

13  Q.  Did you permit Mr. Souratgar to have conversations with him

14  when you first came to the United States around the time of May

15  20, 2012?

16  A.  How do I permit when there is no phonecall?

17  Q.  I'm sorry, I didn't hear that?

18  A.  How do I permit when there is no phonecall?  I don't

19  understand your question.

20          THE COURT:  During the period from approximately May

21  20, 2012, and on or about November 1, 2012, are you aware of

22  any contact between Shayan and Mr. Souratgar?

23          THE WITNESS:  No.

24          THE COURT:  Between May 20 and November 1, did you

25  tell Mr. Souratgar where Shayan was?

```
 1              THE WITNESS:  No.

 2              THE COURT:  Next question.

 3   Q.  Do you believe that you have the right to move from one

 4   place to another with your son in violation of the Singapore

 5   court order?

 6              MR. McNALLY:  Objection.

 7              THE COURT:  Overruled.  Do you understand which order

 8   he is referring to?

 9              THE WITNESS:  Yes.

10              THE COURT:  OK.

11   A.   Whether I have the rights?

12   Q.   Do you believe you have the right to violate the Singapore

13   court order?

14   A.   No.

15              THE COURT:  Anything further?

16              MR. ARENSTEIN:  No.  This is it, your Honor.  That's

17   my last question.  You may continue.

18   Take a 10-minute recess and then pick up.  Thank you.

19              (Recess)

20              (Continued on next page)

21

22

23

24

25
```

```
 1              THE COURT:  Please be seated.  Any redirect?

 2              MS. LEIDHOLDT:  Yes, your Honor.

 3              THE COURT:  Please take the stand.

 4    REDIRECT EXAMINATION

 5    BY MS. LEIDHOLDT:

 6    Q.  Ms. Lee, I am showing you Respondent's 5 in evidence.

 7              MR. ARENSTEIN:  I am sorry.  I didn't hear that.

 8              THE COURT:  "Ms. Lee, I am showing you Respondent's 5

 9    in evidence."

10              MR. ARENSTEIN:  Thank you, your Honor.

11    BY MS. LEIDHOLDT:

12    Q.  Ms. Lee, do you recognize the document in front of you?

13    A.  Yes.

14    Q.  Ms. Lee, did there come a time when you saw a copy of an

15    Iranian passport with your photograph on it?

16    A.  Yes.

17    Q.  When was the first time that you saw a copy of an Iranian

18    passport with your photograph on it?

19              MR. ARENSTEIN:  Objection, your Honor; asked and

20    answered on the direct examination of this witness.

21              THE COURT:  I'll allow it.

22              THE WITNESS:  When you showed it to me.

23    BY MS. LEIDHOLDT:

24    Q.  Do you remember approximately when that was?

25    A.  Three weeks back.
```

1   Q.  Where did that copy of the Iranian passport with your

2   photograph come from, if you know?

3   A.  From you.

4   Q.  Do you know where its original source was?

5   A.  No, I don't know.

6   Q.  Where were you when you first saw the copy of the Iranian

7   photograph with your photograph on it?  Where were you located

8   when you first saw it?

9   A.  In your office.

10  Q.  In whose office?

11  A.  Center for Family.

12  Q.  The photograph with you on it, you see on that document?

13  A.  Yes.

14  Q.  Do you remember when that photograph was made?

15          MR. ARENSTEIN:  Objection.

16          THE COURT:  Overruled.

17  A.  Back in 2009.

18  Q.  Do you remember the circumstances under which that

19  photograph was made?

20  A.  Yes.

21  Q.  What were those circumstances?

22  A.  Mr. Souratgar asked me to take a photograph of myself in

23  Malaysia wearing a head scarf.

24          MR. ARENSTEIN:  Your Honor, this was testified to both

25  on direct examination and it is the same question that was

1    asked at that time.

2              THE COURT:  Yes.  I am not going to run a course in

3    the proper scope of redirect, but I invite you to look it up.

4              Go ahead, next question.

5    BY MS. LEIDHOLDT:

6    Q.  Now, when was this passport issued?

7    A.  The 3rd of June, 2011.

8    Q.  Were you living with Mr. Souratgar on the 3rd of June,

9    2011?

10   A.  No.

11   Q.  When had you stopped living with Mr. Souratgar?

12   A.  25th of May, 2011.

13   Q.  Ms. Lee, the copy of this Iranian passport with your

14   photograph on it --

15             THE COURT:  Is it marked as an exhibit?

16             MS. LEIDHOLDT:  Your Honor, it is Respondent's 5 in

17   evidence.

18             THE COURT:  Fine.  You can refer to it then.

19   BY MS. LEIDHOLDT:

20   Q.  Does it contain your signature anywhere?

21   A.  No.

22   Q.  Ms. Lee, did there come a time when you learned that Mr.

23   Souratgar's first wife is, in fact, living?

24   A.  Yes.

25   Q.  Do you remember when, approximately, you learned that?

```
 1    A.  After I left him.

 2               THE COURT:  After?

 3               THE WITNESS:  I left him.

 4               THE COURT:  I am sorry?

 5               THE WITNESS:  After I left him the 25th of May.

 6               THE COURT:  Thank you.

 7               MR. ARENSTEIN:  After she left?

 8               THE COURT:  Him the 25th of May.

 9    BY MS. LEIDHOLDT:

10    Q.  What was the source of your information that Mr.

11    Souratgar's first wife, in fact, was alive?

12               MR. ARENSTEIN:  Objection.

13               THE COURT:  Overruled.

14    A.  Mr. Souratgar's office manager, she talked to me.

15               MR. ARENSTEIN:  Objection to what she said.

16               THE COURT:  Overruled.

17    BY MS. LEIDHOLDT:

18    Q.  Ms. Lee, when was the first time that you told someone

19    about Mr. Souratgar's sexual abuse of you?

20               MR. ARENSTEIN:  Objection.

21               THE COURT:  Overruled.

22    A.  When I met with you.

23    Q.  When was that, approximately?

24    A.  Last month, the first or second time.

25    Q.  Why didn't you tell anyone about this previously?
```

```
 1              MR. ARENSTEIN:  Objection.

 2              THE COURT:  Sustained.

 3  A.  I was --

 4              MR. ARENSTEIN:  Objection.

 5              THE COURT:  I sustained your objection.

 6              MR. ARENSTEIN:  She was answering the question.

 7              THE COURT:  Next question.

 8  BY MS. LEIDHOLDT:

 9  Q.  Have you told anyone about this, Mr. Souratgar's sexual

10  abuse of you before you told me?

11              MR. ARENSTEIN:  Objection.

12              THE COURT:  Didn't you ask that question?  I thought

13  you asked when was the first time you told anyone, and she

14  testified when she told you.

15              MS. LEIDHOLDT:  Yes.

16              THE COURT:  What is the question you're asking now?

17              MS. LEIDHOLDT:  The question is withdrawn, your Honor.

18              (Off-the-record discussion)

19              MS. LEIDHOLDT:  Your Honor, I believe this goes to --

20              THE COURT:  What is the question?

21              MS. LEIDHOLDT:  The question is why didn't you tell

22  anyone about the sexual abuse of you previously.

23              THE COURT:  I sustained the objection.

24              MS. LEIDHOLDT:  Your Honor, could your Honor help me

25  understand the basis for the sustaining the objection?
```

1          THE COURT:  Not relevant.

2          MS. LEIDHOLDT:  With all due respect, your Honor, I

3    believe it goes to Ms. Lee's credibility.  It was raised by Mr.

4    Arenstein, the fact these allegations were not made previously

5    in her affidavits.

6          THE COURT:  Is that, in fact, the case, Mr. Arenstein,

7    you asked about that?

8          MR. ARENSTEIN:  What?  I don't recall, your Honor.

9          THE COURT:  I don't recall, either, but on that basis,

10   I'll allow it if you're representing Mr. Arenstein got into it.

11         That's your representation?

12         MS. LEIDHOLDT:  Absolutely, your Honor.

13         THE COURT:  As to why it wasn't in the affidavits?

14         MS. LEIDHOLDT:  Yes, your Honor.

15         THE COURT:  Mr. Arenstein, what did you say?

16         MR. ARENSTEIN:  I did not go into why it was not in

17   the affidavits.

18         THE COURT:  Did you go into the fact it was not in the

19   affidavits?

20         MR. ARENSTEIN:  Yes.

21         THE COURT:  Okay.  Then I'll allow it.  I will reverse

22   myself and allow it on that basis.  Go ahead.

23   BY MS. LEIDHOLDT:

24   Q.  Ms. Lee, why didn't you tell anyone about Mr. Souratgar's

25   sexual abuse of you before you told me in my office?

1   A.  It was shameful and I was embarrassed about it.

2              MR. ARENSTEIN:  Objection.

3              THE COURT:  You're objecting to the answer?

4              MR. ARENSTEIN:  No.  I will withdraw the objection.

5              (Off-the-record discussion)

6   BY MS. LEIDHOLDT:

7   Q.  Ms. Lee, I am showing you what has been marked as

8   Petitioner's M2 and Petitioner's M in evidence.

9   A.  (Pause).

10  Q.  Ms. Lee, if you know, when was this issued?

11             MR. ARENSTEIN:  I don't even know what we're looking

12  at, your Honor.

13             THE COURT:  Petitioner's M in evidence, sir.

14             MR. ARENSTEIN:  Thank you.

15  BY MS. LEIDHOLDT:

16  Q.  Ms. Lee, what are you looking at?

17  A.  An expedited order.

18  Q.  Ms. Lee, when was this issued?

19  A.  One 16th August and the other one the 12th of December.

20             THE COURT:  I have as Petitioner's Exhibit M a single

21  document, one page, and I don't understand the witness's

22  testimony regarding, "the other".

23             What are you referring to, ma'am, when you referred

24  to, "the other"?

25             THE WITNESS:  I have two.

1        THE COURT:  Excuse me.  Okay.

2        I now have here a document which appears to be a

3   different version of the exhibit.  This is most frustrating as

4   the trial judge in this case.  What was presented to me as

5   Petitioner's Exhibit M was one page, and in the

6   lower-right-hand-corner is the number 55.

7        What has been placed before the witness and

8   represented to be Plaintiff's Exhibit M are two pages, one

9   labeled M1, one labeled M2, neither of which has the number 55

10  in the lower-right-hand corner.  I call upon counsel to confer

11  and tell me what's going on.

12       You can look at what I'm referring to.  With all due

13  respect, this is not the way a trial should be conducted in

14  this Court by anyone.

15       (Off-the-record discussion)

16       MS. LEIDHOLDT:  We have identified the correct

17  document and we can go forward and I am going to hand the

18  document that Mr. Arenstein agrees is Petitioner's M.

19       MR. ARENSTEIN:  Right.  That is fine.

20       THE COURT:  Let me see the document, please.  Let me

21  return to you the documents that were placed before the

22  witness -- no.  That other one is mine -- no, no.  This is

23  mine.  Give that back -- as Petitioner's M.

24       (Pause)

25       THE COURT:  You know, this has not been a big document

1    case.  They think this is -- you may think this is a big

2    document case.  This is not.  There are a handful of documents.

3    The handling of these exhibits by each side speaks for itself

4    on this record.  I don't have to characterize it.

5             Next question.

6    BY MS. LEIDHOLDT:

7    Q.  Ms. Lee, when was this order issued?

8    A.  16th of August.

9    Q.  If you know, how long was it in effect?

10   A.  To the next hearing, which is 9 or 10 days.

11   Q.  Was another order like this issued to you on this

12   particular case?

13   A.  No.

14   Q.  Did you ever obtain a final personal protection order from

15   Singapore Family Court?

16   A.  No.

17   Q.  Ms. Lee, did Mr. Souratgar take your original birth

18   certificate?

19   A.  Yes.

20   Q.  When did he take it from you?

21            THE COURT:  All right, avoid leading even on redirect.

22            MS. LEIDHOLDT:  May I continue your Honor?

23            THE COURT:  You may.

24            MS. LEIDHOLDT:  I will try to avoid leading.

25            THE COURT:  You may.

1   BY MS. LEIDHOLDT:

2   Q.  When did Mr. Souratgar take your original birth certificate

3   from you, if you recall?

4   A.  Back in 2009.

5   Q.  Where did he keep it, if you know?

6   A.  From my knowledge, he keeps all his, all the documents in a

7   safe in his office.

8   Q.  Is that office an office that was in your home or is that

9   an office that was located outside of your home?

10  A.  Outside of my home.

11  Q.  Since you gave this document to Mr. Souratgar in 2009, have

12  you had access to it?

13  A.  No.

14  Q.  Ms. Lee, I am showing you Petitioner's AA1 in evidence.

15  Would you please look at that document.

16  A.  (Pause)  Okay.

17  Q.  Have you had a chance to review it?

18  A.  Yes.

19  Q.  Ms. Lee, do you know why your Singapore attorney sent this

20  letter to Mr. Souratgar's attorney?

21          MR. ARENSTEIN:  Objection.

22          THE COURT:  Overruled.

23  A.  To inquire about Shayan's passport and birth certificate.

24  Q.  Were you in possession of Shayan's Iranian birth

25  certificate and passport?

1    A.  No.

2    Q.  Have you ever been in possession of Shayan's Iranian birth

3    certificate and passport?

4    A.  Never.

5    Q.  In reference to any Iranian passport for you, at this time

6    had you seen any evidence that there was an Iranian passport

7    with your photograph on it?

8           THE COURT:  I don't understand --

9           MR. ARENSTEIN:  Objection.

10          THE COURT:  -- the question.

11   BY MS. LEIDHOLDT:

12   Q.  Had you you at this time --

13          THE COURT:  What do you mean by, "at this time"?

14          MS. LEIDHOLDT:  At the time the lawyer sent the

15   letter, your Honor.

16          THE COURT:  Okay.

17   BY MS. LEIDHOLDT:

18   Q.  At the time that your lawyer sent this letter to Mr.

19   Souratgar's attorney, had you seen an Iranian passport with

20   your photograph on it?

21          MR. ARENSTEIN:  Objection.

22          THE COURT:  Overruled.

23   A.  No.

24   Q.  Did you ever tell your attorney that you had seen or been

25   in physical possession of an Iranian passport with your

1    photograph on it?

2              MR. ARENSTEIN:  Objection.

3              THE COURT:  Overruled.

4    A.  I told him that I suspected Mr. Souratgar made one for me

5    because of his threat and that he will report me to the

6    Malaysian High Commissioner in Singapore in June.

7    Q.  So in reference to my question, did you ever tell your

8    attorney that you had been in physical possession of an Iranian

9    passport with your photograph on it, the answer is?

10   A.  No.

11             MR. ARENSTEIN:  Objection.

12             THE COURT:  You have asked that.

13             MR. ARENSTEIN:  Objection.

14             THE COURT:  Didn't you ask that?

15             MS. LEIDHOLDT:  Thank your Honor.

16             THE COURT:  Next question.

17   BY MS. LEIDHOLDT:

18   Q.  Ms. Lee, after the birth of your son Shayan -- withdrawn --

19   Ms. Lee, who was in possession of Shayan's Singapore birth

20   certificate after it was prepared?

21   A.  Mr. Souratgar.

22             MR. ARENSTEIN:  Objection.

23   BY MS. LEIDHOLDT:

24   Q.  When did he take --

25             THE COURT:  Objection to the last question?  Well,

 1   I'll treat it as a motion to strike.  I am not sure if that was

 2   covered in the cross-examination.

 3          MS. LEIDHOLDT:  Your Honor, it was.

 4          THE COURT:  Okay.  So it will stand.  I will take your

 5   representation at face value, and so it is overruled.

 6   BY MS. LEIDHOLDT:

 7   Q.  When did Mr. Souratgar take Shayan's Singapore birth

 8   certificate, if you recall?

 9   A.  He had been keeping it since it was issued.

10   Q.  Where did he keep it, if you know?

11          MR. ARENSTEIN:  Objection, your Honor.  This was not

12   gone into in cross-examination.  This is new material that's

13   now on redirect.

14          THE COURT:  I'll give you a little bit of latitude.

15   I'll allow it.  Go ahead.  Try to confine it to subjects

16   covered on cross.  Go ahead, you can answer.

17          THE WITNESS:  He keeps it in his office safe with the

18   rest of the documents.

19   BY MS. LEIDHOLDT:

20   Q.  Did Shayan also have a Malaysian birth certificate?

21   A.  Yes.

22   Q.  Did Mr. Souratgar take the Malaysian birth certificate?

23   A.  Yes.

24   Q.  When did he take that birth certificate?

25   A.  When it was issued.

```
 1              MR. ARENSTEIN:  Objection again, your Honor.

 2              THE COURT:  Overruled.

 3  BY MS. LEIDHOLDT:

 4  Q.  If you know, where did he keep Shayan's Malaysian birth

 5  certificate?

 6  A.  At his office safe.

 7  Q.  Did Shayan have a Malaysian birth registration that was

 8  different from his birth certificate?

 9              MR. ARENSTEIN:  Objection to the form of the question,

10  your Honor.

11              THE COURT:  Overruled.

12  A.  I know it is the same one.

13  Q.  Now, Ms. Lee, I am showing you Respondent's 6 in evidence.

14  Would you please review this.

15              MR. ARENSTEIN:  I am sorry.  What number is that?

16              MS. LEIDHOLDT:  Respondent's 6 in evidence.

17              THE WITNESS:  Okay.

18              MS. LEIDHOLDT:  May I take it back.

19  BY MS. LEIDHOLDT:

20  Q.  Ms. Lee, Respondent's 6 in evidence, who prepared this

21  letter?  Who is the letter from?

22  A.  The Embassy of Iran, Kuala Lumpur.

23  Q.  Ms. Lee, the letter states, "Attention," and then there is

24  a name.

25  A.  Ah-huh.
```

1    Q.  Mrs. Noorazreen Idayu BT Kamarozzaman, do you recognize

2    this name?

3    A.  No.

4    Q.  Have you ever heard of this individual?

5    A.  No.

6              MR. ARENSTEIN:  Objection.

7              THE COURT:  Overruled.

8    BY MS. LEIDHOLDT:

9    Q.  Ms. Lee, did your attorney, if you know, ask the Iranian

10   consulate to prepare this letter?

11   A.  No.

12   Q.  Ms. Lee, the letter is dated September 28th of 2011.

13   A.  Okay.

14   Q.  Where were you living at this time?

15   A.  In Singapore.

16   Q.  Who were you living with at this time?

17   A.  My sister.

18   Q.  Do you have any idea who applied to the Iranian consulate

19   for this letter?

20             THE COURT:  Sustained as to form.  Do you know who may

21   have asked?  Do you know who asked for this letter?

22             THE WITNESS:  No.

23             THE COURT:  Okay.

24   BY MS. LEIDHOLDT:

25   Q.  Ms. Lee, this letter states that you applied for an Iranian

1  passport on February 6th of 2011.

2  A.  Yes.

3  Q.  Could you please describe what was happening in your

4  relationship with Mr. Souratgar on February 6th of 2011.

5         MR. ARENSTEIN:  Objection.

6         THE COURT:  Overruled.

7  A.  We were really not on good terms, and I was considering to

8  leave him and file for divorce.

9  BY MS. LEIDHOLDT:

10  Q.  Ms. Lee, the letter states that you applied for an Iranian

11  National Card on June 21st of 2011.

12  A.  Yes.

13  Q.  When did you leave Mr. Souratgar and move into your

14  sister's apartment?

15  A.  The 25th of May, 2011.

16  Q.  Ms. Lee, as part of your sexual relationship with

17  Mr. Souratgar, did he tell you to say specific things to him?

18         MR. ARENSTEIN:  Objection.

19         THE COURT:  Basis?

20         MR. ARENSTEIN:  There was nothing going on -- the only

21  thing that went in on cross-examination were the text messages

22  between the two parties.  There was no testimony or any

23  questions about the sexual relationships that existed.

24         THE COURT:  Overruled.

25  A.  Yes.

1   Q.  What kinds of things did he tell you to say to him?

2   A.  Things that --

3            MR. ARENSTEIN:  Objection to the relevance of the

4   question, your Honor.

5            THE COURT:  Mr. Arenstein, you offered Petitioner's

6   Exhibit I.  You elicited testimony about Petitioner's Exhibit

7   I, and this is now redirect.  Your objection is overruled

8   particularly on the grounds of relevance when you

9   cross-examined on this.  Go ahead.

10  A.  Yeah, he wanted me to talk dirty to him.

11  Q.  When he wanted you to do it, did you do it?

12  A.  I had to do it in order not to get a scolding from him.

13           MR. ARENSTEIN:  Objection, your Honor.

14           THE COURT:  Basis?

15           MR. ARENSTEIN:  It is not responsive to the question.

16  The question was --

17           THE COURT:  Are you objecting to the question or are

18  you object to go the answer?

19           MR. ARENSTEIN:  To the answer.

20           THE COURT:  I think you're moving to strike the

21  answer?

22           MR. ARENSTEIN:  I am moving to strike the answer.

23           THE COURT:  You object to the question and move to

24  strike the answer?

25           MR. ARENSTEIN:  Move to strike the answer, your Honor.

```
 1            THE COURT:  Overruled.  Next question.

 2   BY MS. LEIDHOLDT:

 3   Q.  Ms. Lee, did Mr. Souratgar travel frequently?

 4   A.  Yes.

 5   Q.  Did he travel frequently specifically in the early part of

 6   your relationship and marriage?

 7            MR. ARENSTEIN:  Objection, your Honor.  Now, this is

 8   not gone into in cross-examination and now we're going into

 9   some new area in redirect.

10            THE COURT:  Overruled.

11            MS. LEIDHOLDT:  Your Honor?

12            THE COURT:  Yes, Ms. Leidholdt?

13            MS. LEIDHOLDT:  I was simply going to say subject to

14   connection.

15            THE COURT:  I overruled the objection.

16            MS. LEIDHOLDT:  Thank you.

17   BY MS. LEIDHOLDT:

18   Q.  Did Mr. Souratgar want you to say things about sex to him

19   when he was traveling?

20   A.  Yes.

21   Q.  What did he tell you to do or say when he was traveling --

22            MR. ARENSTEIN:  Objection.

23   Q.  -- in relation to your sexual relationship?

24            MR. ARENSTEIN:  Objection to the form of the question.

25            THE COURT:  Overruled.
```

 1   A.  He would call me when he was traveling and ask me to talk

 2   dirty, if not to send dirty messages to him.

 3   BY MS. LEIDHOLDT:

 4   Q.  Ms. Lee, did you enjoy doing this?

 5              MR. ARENSTEIN:  Objection.

 6              THE COURT:  Overruled.

 7   A.  Not at all.

 8   Q.  Then why did you do it?

 9              MR. ARENSTEIN:  Objection.

10              THE COURT:  Overruled.  Are you eliciting an answer

11   different from the testimony that I've already heard or is this

12   reiteration of what I've already heard?

13              MS. LEIDHOLDT:  I don't, your Honor, I don't know

14   because I haven't had --

15              THE COURT:  Answer the question.

16              THE WITNESS:  What was the question?

17              THE COURT:  The question is, you were asked already

18   why you sent messages, and I think you testified, and now

19   you're being asked in essence again the same question, so you

20   can feel free to give the same answer or a different answer.

21              THE WITNESS:  Why did I do it?  Because if I don't,

22   when he returns, we're going to get into an argument and he is

23   going to get angry and I am afraid it will lead to him beating

24   me again.

25              THE COURT:  Next question.

1   BY MS. LEIDHOLDT:

2   Q.  Ms. Lee, what proceeding, if any, did you initiate in the

3   Shairiah court?

4   A.  A divorce.

5   Q.  Why did you initiate a divorce action in the Shairiah

6   court?

7              THE COURT:  That has been covered.  It has been

8   covered already in aces and spades.  I can recite the testimony

9   if you would like.  I know it by heart.

10             MS. LEIDHOLDT:  I'll move on, your Honor.

11  BY MS. LEIDHOLDT:

12  Q.  Ms. Lee --

13             THE COURT:  We are in day seven of this hearing.

14             MS. LEIDHOLDT:  I understand, your Honor.  My

15  adversary raised this issue again on his cross of the witness,

16  but I will not go into it any further.

17             THE COURT:  Thank you.

18             (Off-the-record discussion)

19             THE COURT:  I enjoy presiding over trials and

20  hearings.  It is the reason I became a judge.  It is a great

21  joy, honor and privilege in my life, but I am entitled to

22  expect that those who appear before me prepare.  That's what we

23  do as lawyers.

24             I was privileged to practice law for 26 years before I

25  became a judge, and when I practiced in federal court, I made

1    sure that I was prepared.  When I didn't know something about

2    the rules of evidence or how to get an exhibit into evidence or

3    how to keep my exhibits organized, I went to people with the

4    experience.

5            If that wasn't sufficient, I would take time on my

6    own, not billing the client, and sit in in the back of a

7    courtroom in that court.  Judicial systems have different

8    styles.  It may surprise you to know I appeared many times in

9    Family Court in Queens County.  I am familiar with the fact

10   that different courts have different practices.  I would no

11   sooner expect that the Family Court judge in Queens would adapt

12   to my style as someone who usually practiced in federal court

13   than vice versa.

14           I would set out to find out how things are done if I

15   didn't know.  The record in this case does not reflect that

16   level of preparation or organization by those who have appeared

17   in this case.

18           Next question.  Ms. Leidholdt, I think you know that

19   that comment by no means was directed specifically to you.  It

20   is a comment that can go generally across the board with a few

21   notable exceptions in this courtroom.

22           (Pause)

23   BY MS. LEIDHOLDT:

24   Q.  Ms. Lee -- (Pause)

25           THE COURT:  Well?

1                MS. LEIDHOLDT:  One second, your Honor.  I just --

2                THE COURT:  Excuse me a second.  The Court is talking.

3                (Off-the-record discussion between the Court and

4     Courtroom Deputy)

5                THE COURT:  You may proceed.

6     BY MS. LEIDHOLDT:

7     Q.  Ms. Lee, did Mr. Souratgar ever pay you for working for his

8     company?

9     A.  No.

10    Q.  Did he ever give you any checks as salary for working for

11    his company?

12    A.  He gave me a check, but it was supposed to be my

13    allowances.

14    Q.  How much were the checks that he gave you as allowances?

15    A.  2,000 to 300.

16    Q.  When you say "300," what do you mean?

17    A.  Initially it was a $2,000 check which was allowance.  After

18    he made me be part of his company, then he took the 3,000 and

19    he deducted the pension contribution, he deducted other

20    percentages and gave me the balance.

21    Q.  The document that you have in front of you, Petitioner's

22    FF1 in evidence, do you know who prepared that document?

23    A.  I believe it was his office manager, but it was signed by

24    him.

25    Q.  How was this document filed, if you know?

1    A.  This is an income tax form which is given to, usually given

2    to employees.  It is either both way, the company can file it

3    on your behalf or you file it personally.

4    Q.  Ms. Lee, why didn't you tell Mr. Souratgar that you were

5    leaving his house on May 25th of 2011?

6    A.  Because I had an ex-parte order already for custody of

7    Shayan, and I had already planned to leave him, so if I would

8    have told him, he would have stopped me, number one, and he

9    would have been very, very angry and probably start beating me

10   again.

11          MR. ARENSTEIN:  Objection.  I move to strike.  The

12   answer is not responsive to the question.

13          THE COURT:  Overruled.

14   BY MS. LEIDHOLDT:

15   Q.  Ms. Lee, how old was Shayan when you left Mr. Souratgar?

16   A.  Two and a half.

17   Q.  How old was Shayan when you took him to Malaysia in June of

18   2011?

19   A.  Two years five months.

20   Q.  At that time could Shayan carry on conversations over the

21   telephone?

22   A.  No.

23          (Off-the-record discussion)

24   BY MS. LEIDHOLDT:

25   Q.  I am showing you what is marked as Respondent's 23 for

 1   identification.  Ms. Lee, do you recognize this document?

 2   A.  Yes.

 3   Q.  What do you recognize it to be?

 4   A.  It was a letter to the judge of Singapore Family Court

 5   explaining my actions.

 6   Q.  When did you send this letter to the judge of Singapore

 7   Family Court?

 8   A.  11 of June 2012.

 9   Q.  Are these your words?

10   A.  Yes.

11   Q.  Is this your signature at the end of the letter?

12   A.  Yes.

13   Q.  Why did you write this letter and send it to the judge of

14   Singapore Family Court.

15         MR. ARENSTEIN:  Objection.

16         THE COURT:  Overruled.

17   A.  Because I am aware of my contact of the Singapore Family

18   Court, if I took Shayan out of jurisdiction without consent,

19   and it is because I didn't have a choice and I have to make

20   this decision and, therefore, I was responsible for the actions

21   that I have taken.

22         MS. LEIDHOLDT:  Just one second, please.

23         (Off-the-record discussion)

24         MS. LEIDHOLDT:  Your Honor, I would like to offer this

25   document into evidence.

```
 1              THE COURT:  All right.  Any objection?

 2              MR. ARENSTEIN:  Yes, your Honor, I object.

 3              THE COURT:  Basis?

 4              MR. ARENSTEIN:  It is a hearsay document prepared by

 5   the witness.  If she testifies -- I guess it is her testimony,

 6   so I withdraw my objection.

 7              THE COURT:  If she what?

 8              MR. ARENSTEIN:  If this is what she is testifying to,

 9   I guess I withdrawal my objections.

10              THE COURT:  Without objection, R23 is received.

11              (Respondent's Exhibit 23 received in evidence)

12              MS. LEIDHOLDT:  Just one second, please.

13              (Off-the-record discussion)

14              MS. LEIDHOLDT:  I have no other questions, your Honor.

15              THE COURT:  All right.  You may step down.  Call your

16   next witness.

17              MR. ARENSTEIN:  Your Honor, I have some brief recross

18   based on the testimony that was elicited on redirect.  It is

19   only two or three questions.

20              MS. LEIDHOLDT:  I have no objection.

21              THE COURT:  Go ahead, you may do it from where you

22   stand.

23   RECROSS EXAMINATION

24   BY MR. ARENSTEIN:

25   Q.  How did you travel from Singapore to the various countries?
```

 1    What documents did you use to travel on?

 2    A.  My Malaysian passport.

 3    Q.  Pardon me?

 4    A.  My Malaysian passport.

 5    Q.  Malaysian passport?

 6    A.  Yes.

 7    Q.  Isn't it a fact that there was another expedited order that

 8    you obtained on December the 1st of 2011 --

 9    A.  Yes.

10    Q.  -- from the court?

11    A.  Yes.

12    Q.  You testified on redirect that there was no other orders

13    other than the one on August 16th?

14         MR. McNALLY:  Objection; mischaracterized.

15         THE COURT:  Overruled.  That is a question.  Do you

16    understand the question?

17         THE WITNESS:  Yes.

18         THE COURT:  Go ahead.  And your answer?

19         THE WITNESS:  Expedited order?  I thought it was a

20    protection order.

21    BY MR. ARENSTEIN:

22    Q.  An expedited order?

23    A.  There were two.

24    Q.  There were two?  You said there was only one on redirect?

25         THE COURT:  The testimony will speak for itself.  What

 1   is your next question.

 2   BY MR. ARENSTEIN:

 3   Q.  Isn't it a fact you received a second expedited order from

 4   the court on December 1, 2011?

 5   A.  Yes.

 6          THE COURT:  Is that in evidence, Mr. Arenstein?

 7          MR. ARENSTEIN:  It is not, your Honor.  I only have

 8   two copies of it here.  I gave it out earlier by mistake with

 9   Exhibit M2, and this is a copy of the letter.  I could make

10   copies at the break.

11          THE COURT:  Are you offering it?

12          MR. ARENSTEIN:  Yes, I am offering it.

13          THE COURT:  Show it to the witness and see if you can

14   lay a foundation.

15   BY MR. ARENSTEIN:

16   Q.  Is this the expedited order you received from the court?

17   A.  Yes.

18          MR. ARENSTEIN:  I ask this be introduced into

19   evidence.

20          THE COURT:  Any objection?

21          MS. LEIDHOLDT:  No objection.

22          THE COURT:  Received.  How is it to be marked?

23          MR. ARENSTEIN:  Mark it M2, your Honor.

24          MR. McNALLY:  That was the confusion we experienced

25   earlier.

 1              (Petitioner's Exhibit M2 received in evidence)

 2              THE COURT:  Next question.

 3              MR. ARENSTEIN:  I don't think I have any further

 4    questions.

 5              THE COURT:  You may step down.

 6              (Witness excused)

 7              THE COURT:  We'll take our lunch break at this point,

 8    and I want to advise counsel that I've been advised that during

 9    the breaks there has been a difficulty with counsel comporting

10    themselves appropriately.

11              MR. ARENSTEIN:  Counsel?

12              THE COURT:  Counsel comporting themselves

13    appropriately, and I will not, contrary to any thoughts on the

14    subject, have the U.S. Marshals or CSO's babysit counsel in

15    this case, but I will, however, entertain any application for

16    sanctions against any attorney who operates improperly, and if

17    it is appropriate, under the rules of professional conduct,

18    lawyers have the obligation under certain circumstances to

19    report certain types of professional misconduct.

20              As the chair of the Court's Grievance Committee, I

21    will not preside and I will recuse myself from any disciplinary

22    charge, but I do caution counsel to comport themselves

23    consistent with the rules of practice.

24              Now, with regard to the parties, I expect the same

25    from the parties.  The parties should refrain from

1    communication with each other during the breaks, and if there

2    is any indication that that is not the case, I will take

3    appropriate action.

4           In that case, it may be appropriate for me to have the

5    U.S. Marshals.  In that case, I advise the parties to consult

6    with their lawyers as to what may transpire if it becomes

7    necessary for me to have a Deputy U.S. Marshal or a Court

8    Security Officer monitor the situation if it is appropriate.

9           MR. ARENSTEIN:  I don't know who stated that there was

10   any problems with the lawyers, but I can represent to the court

11   that we have been professional, all of us.  None of us have had

12   any altercations with each other whatsoever as far as I know.

13          I think you can ask the Guardian.  I don't know of any

14   of the lawyers having any arguments whatsoever, and the caution

15   you're making or whatever you said, I think maybe is misplaced.

16   We have not done anything unprofessional.

17          THE COURT:  So there has not been any incidents that

18   have taken place at the breaks at all?

19          MR. ARENSTEIN:  No, not at all.

20          THE COURT:  Between anyone in the courtroom?

21          MR. ARENSTEIN:  Not the lawyers.  There was an

22   incident between the parties where one cursed at the other and

23   there was other things, but I wasn't even here.  I was outside.

24   I wasn't even around to see what happened.

25          I was told by my client what happened, but as far as

1   the lawyers are concerned, we have been cordial with each

2   other.  We have had no problems with each other and we have had

3   conversations with each other.  We haven't done as much

4   communication as your Honor would like, but I don't think that

5   we have had any negative conduct with each other at all.

6            THE COURT:  That is good to hear because obviously I

7   don't have any first-hand knowledge, and I only know what I am

8   informed.  I was informed there was an incident, and maybe you

9   can tell me what the incident was.  Mr. McNally, perhaps you

10   can enlighten.

11            MR. McNALLY:  I wanted to say there was everything

12   that Bob said is true as far as interactions between counsel.

13            THE COURT:  That is good.

14            MR. McNALLY:  No acrimony.

15            THE COURT:  Wonderful.  Glad to hear that.

16            MR. McNALLY:  Now, with regards to the parties, Ms.

17   Lee came off the stand earlier and she was speaking to me and

18   he said the word "fake" to me, okay?

19            I told her she has to go sit down, she is still on the

20   stand, okay?

21            At some point petitioner appeared behind and started

22   accusing Ms. Lee of cursing at him.  He raised his voice.  I

23   did not hear her curse at him at all.  I don't want to become a

24   witness in this case, but I could swear to that.

25            Quickly Ms. Baum intervened, asked the petitioner to

1    leave the courtroom, and that was the end of the incident dent.

2         THE COURT:  Well, if need be, I will reserve the right

3    to reopen the hearing if I have to, and this may have bearing

4    on the issues in the hearing.  So I think I've said enough at

5    this point, but I accept what Mr. McNally and Mr. Arenstein

6    said about counsel, and I'm pleased by that.

7         That makes me somewhat relieved and gratified to know

8    that it hasn't descended to that and that the information I

9    received lacked precision as to the type of incident, and I

10   appreciate Mr. McNally responding.  Is there anything you want

11   to say in response, Mr. Arenstein?

12        MR. ARENSTEIN:  Only that my client heard twice in

13   this courtroom Ms. Lee using the F word towards him, and I did

14   not see it, but I know it happened in Singapore and the judge

15   cautioned her on that.

16        THE COURT:  You know that it happened in Singapore?

17        MR. ARENSTEIN:  Yes.

18        THE COURT:  How do you know it happened in Singapore?

19        MR. ARENSTEIN:  I was told by Ms. Gomez and my client.

20        I can't be a witness, either, like Mr. McNally said.

21   I do think the parties should not be talking to each other and

22   I have told that to my client.  I spoke to Ms. Baum.  I

23   cautioned my client, and I ask Mr. McNally to do the same with

24   his client.  That way we can just go on with the trial without

25   any problems whatsoever.

1                 THE COURT:  Mr. McNally, have you so advised your

2     client?

3                 MR. McNALLY:  Yes, your Honor.

4                 THE COURT:  Thank you.  We will pick up at 2:00

5     o'clock.

6                 (Luncheon recess)

7                 (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:15 p.m.

3          THE COURT:  Please call your next witness.

4          MS. LEIDHOLDT:  Your Honor, I'd like to call Jen Pink

5     Lee, Ms. Lee's sister, to the witness stand.

6          THE COURT:  Where is the petitioner?

7          MR. ARENSTEIN:  He wasn't feeling well, your Honor.

8     May I step out?

9          THE COURT:  Yes, you may.  I prefer to have the

10    petitioner present for the proceeding, if he would like to be.

11         MS. LEIDHOLDT:  Your Honor, would it be possible for

12    Ms. Hassan, one of our expert witnesses, to sit in the

13    courtroom during the pendency of this testimony, or would you

14    prefer that she sit outside?

15         THE COURT:  I think that is a question that is best

16    raised when counsel for the petitioner, Mr. Arenstein, is

17    present in the courtroom.  It's a little bit unfair to raise

18    that when at present neither counsel for the petitioner nor the

19    petitioner is in the courtroom.

20         (Pause)

21         MS. LEIDHOLDT:  Your Honor, Mr. Arenstein would not

22    object to Ms. Hassan sitting in the courtroom during Ms. Jen

23    Pink Lee's testimony.

24         THE COURT:  Is that correct?

25         MR. ARENSTEIN:  That's correct, your Honor.

1            THE COURT:  All right.  The expert may stay in.

2            MR. ARENSTEIN:  If she is an expert, I don't have a

3    problem with it.

4            THE COURT:  Fine.  Call you are witness.

5     LEE JEN PINK,

6        called as a witness by the respondent,

7        having been duly sworn, testified as follows:

8            THE CLERK:  State your name and spell it for the

9    record, please.

10           THE WITNESS:  My name is Lee Jen Pink, L-E-E J-E-N

11   P-I-N-K.

12           THE COURT:  You may inquire.

13   DIRECT EXAMINATION

14   BY MS. LEIDHOLDT:

15   Q.  Good afternoon, Ms. Lee.

16           MS. LEIDHOLDT:  Just to avoid confusion, your Honor,

17   I'm going to refer to the witness as "Jen Pink" throughout my

18   questioning of her.

19   Q.  Jen Pink, what is your relationship to the respondent in

20   this case?

21   A.  The respondent is my sister.

22   Q.  What is your relationship to the petitioner, Mr. Majid

23   Souratgar?

24   A.  He's my brother-in-law.

25   Q.  Jen Pink, where do you live?

1    A.  I currently live in Singapore.

2    Q.  How long have you lived in Singapore?

3    A.  Almost two years.  In January it will be two years.

4    Q.  With whom do you live?

5    A.  I currently live with my husband.

6    Q.  Would you very briefly describe your educational and

7    employment background.

8    A.  I have a law degree from the University of Leicester in

9    England.  I went back to Malaysia after that and was clarked in

10   the Malaysian bar.  After that I practiced for 7 years.  After

11   that I'm with Citibank.  I am currently with Citibank.  I have

12   been with the bank for 7 years now, 5 years in Kuala Lumpur and

13   2 years in Singapore.

14   Q.  What is you are title at Citibank?

15   A.  I'm vice president regional counsel.

16   Q.  Jen Pink, when did you first meet Mr. Souratgar?

17   A.  I first met him when he came -- my sister brought him back

18   at my mother's birthday sometime in 2006, July 2006.

19   Q.  Briefly, what was your general impression, if any?

20            MR. ARENSTEIN:  Objection.

21            THE COURT:  Overruled.

22   A.  He seemed polite.  He was pleasant, well-mannered.

23            THE COURT:  I'm going to strike the testimony.  It is

24   not relevant to this proceeding.  Next question.

25   Q.  When was the next time you encountered him after that

1   initial meeting?

2   A.  It was during my sister's wedding reception.

3   Q.  Any impressions of Mr. Souratgar's relationship with your

4   sister at that point in time?

5   A.  They seemed very happy.

6          THE COURT:  That's not particularly relevant.  Unless

7   you were surprised by the witness's answer, it is not

8   particularly relevant.  Do you want to make a proffer of

9   relevance?

10          MS. LEIDHOLDT:  I'll move on, your Honor.

11          THE COURT:  Go ahead.

12  Q.  Jen Pink, did you spend much time with your sister and Mr.

13  Souratgar before January of 2011?

14  A.  No, not much time.

15          THE COURT:  When did you move to Singapore?

16          THE WITNESS:  January 2011.

17          THE COURT:  Thank you.

18  Q.  Prior to January 2007, from the time you were at your

19  sister's wedding reception, until January of 2011, did you

20  communicate much with your sister?

21  A.  No.

22          MR. ARENSTEIN:  Your Honor, I object to the relevance

23  of the question.

24          THE COURT:  Overruled.

25  Q.  Could you please speak up.

1   A.  No, I didn't spend much time before that, prior to me

2   moving to Singapore.

3   Q.  When precisely, if you recall, did you move to Singapore?

4   A.  January 2011.

5   Q.  When did you live once you moved to Singapore?

6   A.  I lived with my sister, Mr. Souratgar, Majid, and Shayan.

7   Q.  Why did you move in with your sister and Mr. Souratgar at

8   that time?

9   A.  It was just a temporary measure.  I was going to look for a

10  place for myself.  My then boyfriend was supposed to find a job

11  in Singapore, and we were supposed look for a place together

12  and move out.  So it was just a temporary stay with my sister.

13  Q.  How long did you live in the home of your sister and Mr.

14  Souratgar?

15  A.  About four months.

16          THE COURT:  From January till when?

17          THE WITNESS:  To May 18 or 19, about that.

18          THE COURT:  That's when you moved out?

19          THE WITNESS:  That's when I moved out, yes.

20          THE COURT:  Next question, please.

21  Q.  When you were living with your sister and Mr. Souratgar,

22  how much time did you actually spend in their home?

23  A.  A lot of time.  I was around most weekends and every day

24  after work.

25  Q.  What time, approximately, would you typically arrive home

1   after work, arrive at their home after work?

2   A.  6:00-plus, 7:00.

3   Q.  What observations did you make once you moved in, just

4   general observations about your sister and Mr. Souratgar?

5           MR. ARENSTEIN:  Objection, your Honor.

6           THE COURT:  Overruled.

7   A.  My sister didn't seem very happy.  Mr. Souratgar didn't

8   seem very happy with her as well.

9   Q.  Did there come a time that your sister told you anything

10  about her relationship with Mr. Souratgar?

11  A.  Yes.

12  Q.  When, approximately, did she tell you that?

13  A.  She told me that she was abused by him.  She told me about

14  the abuse that happened to her.

15          MR. ARENSTEIN:  Objection, your Honor.  The question

16  was did there come a time, there was a question did she tell

17  her something.  But it was when and it wasn't to ask --

18          THE COURT:  Yes.  Ask the next question.

19  Q.  When did your sister tell you about her relationship with

20  Mr. Souratgar?

21          MR. ARENSTEIN:  Objection to the form of the question.

22  It's too broad.

23          THE COURT:  Overruled.

24  Q.  If you recall.  When did she first tell you about her

25  relationship with Mr. Souratgar, if you recall?

1   A.  Sometime like a month or two months after I moved in, yes.

2   Q.  What, if anything, did she tell you about her relationship

3   with Mr. Souratgar?

4   A.  She told me she was being abused -- no, sorry -- she was

5   abused previously and she couldn't take it anymore.  He kicked

6   her, he slapped her, he pulled her hair.

7   Q.  How would you describe at this time --

8           MR. ARENSTEIN:  Your Honor, I'm sorry to interrupt,

9   but my client is about to vomit, and we need to take a break.

10          THE COURT:  You may continue.  Take a break,

11   five-minute break.

12          MR. ARENSTEIN:  He has sort of the flu or something

13   like that.

14          (Recess)

15          MR. ARENSTEIN:  I apologize to the Court.

16          THE COURT:  No apology necessary.  Is your client

17   doing better now?

18          MR. ARENSTEIN:  I think he threw up in the bathroom,

19   but I think he's OK.

20          THE COURT:  I didn't need that information.  I simply

21   asked you the question --

22          MR. ARENSTEIN:  He's doing better.

23          THE COURT:  Thank you very much.  Do you want to go

24   forward, Mr. Arenstein?

25          MR. ARENSTEIN:  I'm prepared.  I want to get this

1    trial over with just like you do, and I'm prepared to go

2    forward.

3              THE COURT:  I know you're prepared to go forward.  I'm

4    asking you to consult with your client and tell me whether you

5    want to go forward at this time.

6              MR. ARENSTEIN:  We will go forward and see what

7    happens, your Honor.  We are ready to proceed.

8              THE COURT:  Please ask your next question.

9    BY MS. LEIDHOLDT:

10   Q.  Jen Pink, how would you describe your sister's demeanor and

11   behavior during this time that you were living with her and Mr.

12   Souratgar?  How would you describe her demeanor and behavior

13   when Mr. Souratgar was around?

14             MR. ARENSTEIN:  Objection.  Time, place, framework.

15             THE COURT:  Yes, set a time and place.

16   Q.  Perhaps, let's say, the first two and a half months that

17   you were living with your sister and Mr. Souratgar.  That would

18   be perhaps from January until mid March of 2011.

19   A.  She was often quite uneasy whenever Majid was at home, Mr.

20   Souratgar was at home.  She would be quite restless.  She

21   seemed preoccupied and very uncomfortable whenever he was

22   around.

23             MR. ARENSTEIN:  Objection to the relevance of this

24   testimony, your Honor.

25             THE COURT:  Overruled.

1   Q.  Was there any time when you were staying with her in the

2   first two and a half months that your sister became emotional

3   or lost her composure?

4   A.  No.  Well, she would sometimes -- she actually broke down

5   and cried a couple of times, telling me about what was

6   happening, what happened previously, yes.  But otherwise she

7   was quite in control of her emotions.

8   Q.  Jen Pink, to the best of your knowledge, did your sister at

9   this time or previously have any mental health issues that you

10  are aware of?

11          MR. ARENSTEIN:  Objection.

12          THE COURT:  Overruled.

13  A.  No.  No, she didn't.

14  Q.  At this time or previously did you ever observe your sister

15  behaving in ways that you would consider erratic and

16  irrational?

17  A.  No.

18          MR. ARENSTEIN:  Objection.

19          THE COURT:  Overruled.

20  Q.  Jen Pink, how did Mr. Souratgar treat your sister during

21  the period that you were living -- I'm going to narrow the

22  focus of time.  How did he treat your sister when you were

23  present and could make observations during the first two and a

24  half months of you living with him and your sister?

25  A.  He treated her like she was a child sometimes.  He spoke to

1   her in a quite condescending tone.  He was basically like an

2   attitude of superiority.

3           MR. ARENSTEIN:  Like what?

4   A.  Like an attitude of superiority.  He talked to her and

5   spoke to her as if he was always right and she was always

6   wrong.  Basically, he spoke to her as if she was a child, she

7   was not very smart.  And sometimes he shouted at her as well.

8           MR. ARENSTEIN:  Objection, your Honor.  I move to

9   strike the testimony.

10          THE COURT:  Overruled.

11  Q.  I'd like to direct your attention to March of 2011

12  specifically.  Was there an incident that occurred during the

13  Iranian new year involving your sister and Mr. Souratgar, if

14  you recall?

15  A.  Yes.  During the Iranian New Year --

16          MR. ARENSTEIN:  Could the witness speak up?  I am

17  having trouble hearing.

18          THE COURT:  Yes.

19          THE WITNESS:  Is this better?

20          THE COURT:  Yes, that's better.

21  A.  During the Iranian New Year, my sister had baked a cake.

22  We were all supposed to go away to Majid's brother's house.

23  She had baked a cake for them and was going to bring it over to

24  celebrate the new year.  She had everything ready to go.  That

25  evening, when Majid came back, he saw a bean bag in the living

1  room on the floor, and he started shouting at my sister.

2            THE COURT:  Who was on the living room floor?

3            THE WITNESS:  Sorry.  It was a bean bag.

4            THE COURT:  Bean bag.  Thank you.  Go ahead.

5  Q.  What, if anything, did he say, if you recall, as he was

6  shouting at your sister?

7            MR. ARENSTEIN:  Objection --

8            THE COURT:  Overruled.

9            MR. ARENSTEIN:  -- to the characterization.

10           THE COURT:  It's not a characterization.  It's what

11  the testimony is.

12  A.  He blamed her for putting the bean bag on the floor.  He

13  said that it was a danger to Shayan because Shayan would jump

14  on the bean bag and fall down and hurt himself.  He scolded her

15  for having the bean bag on the floor.  But actually it was the

16  maid.  She had a maid with her at the time.  It was the maid

17  who had placed the bean bag on the floor, because I think she

18  was like vacuuming or cleaning the couch.

19  Q.  How loud was Mr. Souratgar's speaking when he was making

20  the statements?

21  A.  He was shouting at her.

22  Q.  What was his body language like during that time?

23            MR. ARENSTEIN:  Objection.

24            THE COURT:  Overruled.

25  A.  His body language, threatening.

1  Q.  During that time did he make any representations about the

2  quality of your sister's mothering?

3          MR. ARENSTEIN:  Objection.

4          THE COURT:  Overruled.

5  A.  Yes, he did.  He complained that she wasn't being a good

6  mom.

7  Q.  Was this the first time, Jen Pink, while you were staying

8  with your sister and Mr. Souratgar that you heard him shout at

9  your sister?

10 A.  No.

11 Q.  Jen Pink, during the time that you were staying with your

12 sister and Mr. Souratgar, did you have occasion to spend any

13 time alone with Mr. Souratgar?

14 A.  Yes.

15 Q.  Could you explain.

16 A.  He gave me a lift to work every morning -- not to work --

17 to the train station every morning so that I could go to work.

18 Q.  When Mr. Souratgar gave you the lift to the train station,

19 how long, typically, did those rides take?

20 A.  15, 20 minutes.

21 Q.  When Mr. Souratgar gave you a lift, it is your testimony he

22 dropped you off at the training station?

23 A.  Yes.

24 Q.  What, if anything, then would happen with Mr. Souratgar?

25          MR. ARENSTEIN:  Objection.

1   Q.  If you know.

2           THE COURT:  Sustained.

3   Q.  What, if anything, happened during those rides with Mr.

4   Souratgar?

5   A.  We would talk about general things, about politics, about

6   the war that was going on, about many things.  He used to tell

7   me -- well, we spoke a lot about the war.  He told me that he

8   doesn't like -- he told me, well, he doesn't like Americans, he

9   has been in the Iranian army before, he has been in the

10  revolution in Iran.  He told me that he knows how to use a gun

11  and that he can make a bomb.  He told me that if Iran wanted

12  to, they had the means to make a nuclear bomb.  Things like

13  that.

14          MR. ARENSTEIN:  Objection.  Move to strike the

15  response.

16          THE COURT:  Yes, I'm going to consider that seriously.

17  This strikes me as an appeal to passion and prejudice and

18  wholly inappropriate.  Ask your next question.

19  Q.  Did he make any representations about relationships that he

20  had with powerful people within the Iranian government?

21  A.  Yes.

22          MR. ARENSTEIN:  Objection.

23          THE COURT:  Sustained.

24          MS. LEIDHOLDT:  Your Honor, may I?  I believe this is

25  relevant, and it is not an appeal to passion and prejudice.

1              THE COURT:  Ask your next question.

2   Q.  Did Mr. Souratgar talk with you during these rides about

3   your sister and Shayan?

4   A.  Yes.  Yes, he did.  Initially, he complained a little bit

5   about my sister, about her parenting.  Then, towards the end,

6   it became very often like he complained about her parenting,

7   that she, my sister, bought the child too many toys, that she

8   wasn't taking care of him properly, she wasn't feeding him

9   right, and that, you know, he didn't want Shayan to have a

10  mother like my sister.  He just didn't want her around Shayan.

11  He didn't want Shayan to have a mother like her.

12             MR. ARENSTEIN:  Objection, your Honor.  Move to strike

13  the testimony.

14             THE COURT:  Overruled.

15  Q.  Did Mr. Souratgar use any specific derogatory terms about

16  your sister during those rides?

17             MR. ARENSTEIN:  Objection.  Leading.

18             THE COURT:  Overruled.

19  A.  Derogatory terms?

20  Q.  Negative terms.

21  A.  Yes.  He said, my sister is stupid, that she doesn't know

22  how to take care of Shayan.

23             MR. ARENSTEIN:  Objection, your Honor.  It's the same

24  testimony that was elicited.

25  Q.  Did Mr. Souratgar --

1      THE COURT:  Overruled.

2   Q.  -- make any representations about who he thought should be

3   raising Shayan or who should or should not be raising Shayan?

4      MR. ARENSTEIN:  Objection to the relevance, your

5   Honor.

6      THE COURT:  I'll allow it.

7   A.  He definitely didn't want Jenny, my sister, to raise

8   Shayan.  He said that he didn't want Shayan to have a mother

9   like her.

10  Q.  How, if at all, Jen Pink, did you respond to Mr.

11  Souratgar's complaints about your sister?

12  A.  I tried to pacify him.

13  Q.  During the period of time that you were living with your

14  sister and Mr. Souratgar, what were your observations about

15  your sister's parenting of Shayan?

16      MR. ARENSTEIN:  Objection, your Honor.  We are getting

17  into a custody case and talking about parenting and arguments

18  between spouses.

19      THE COURT:  No, I'll allow it.

20  A.  My sister is actually a very good mom.  She's an excellent

21  mom.  She loves Shayan a lot.  She takes care of him all the

22  time.  He's actually a very fussy eater.  Jen Fair will

23  actually gone online to do research to find ways to try and

24  sneak like protein or fiber into his food because he wasn't

25  eating vegetables, he was picky with the type of meat he was

1   eating.  So she had to make sure that he had a complete

2   balanced diet.

3          She took care of him every day.  She bathed him, she

4   cooked for him, she taught him things, she played with him, she

5   fed him, everything.

6          MR. ARENSTEIN:  Objection, your Honor.  Not responsive

7   to the question.

8          THE COURT:  I'll take your motion to strike under

9   advisement.  Next question.

10  Q.  Did you make any observations about Mr. Souratgar's

11  parenting, his level of involvement with Shayan at that time?

12         MR. ARENSTEIN:  Objection.

13         THE COURT:  I didn't hear the first part of the

14  question.  The who make any statements?

15         MS. LEIDHOLDT:  Did Jen Pink make any observations

16  about Mr. Souratgar's parenting and specifically his level of

17  involvement with Shayan.

18         MR. ARENSTEIN:  Objection.

19         THE COURT:  Sustained as to level of involvement.  Go

20  ahead, the rest of the question you can answer.

21  A.  He didn't do very much.  Once in a while he would make

22  Shayan a banana shake or get him some bread and cheese.  That

23  was about it, because he wasn't home most of the time.

24  Q.  During the rides to the train station, did Mr. Souratgar

25  make any statements to you about taking Shayan to Iran?

1           MR. ARENSTEIN:  Objection.

2   A.  Yes.

3           THE COURT:  Overruled.

4   Q.  Could you describe.

5   A.  During one of those rides, and this was I think sometime

6   after the incident during the Iranian New Year.  He told me

7   that he wanted to get divorced and that he would want to take

8   Shayan away to Iran because he doesn't want my sister to bring

9   Shayan up.  Can I add?

10          MR. ARENSTEIN:  Objection.  The question was answered.

11  Now we are having a further answer.

12          THE COURT:  Are you finished with your answer?

13          THE WITNESS:  I just wanted to add that Mr. Souratgar,

14  he used to tell me that he wants Shayan to be brought up in

15  Iran because it's not polluted there like in Singapore, there's

16  a lot of organic food, there's a lot of space for kids to run

17  about and to grow up, just things like that.

18          MR. ARENSTEIN:  Objection, your Honor.  Move to

19  strike.

20          THE COURT:  Overruled.  Next question, please.

21  Q.  When Mr. Souratgar told you that he wanted to take Shayan

22  to Iran, did he indicate whether that was temporarily or

23  permanently?

24          MR. ARENSTEIN:  Objection, your Honor.

25          THE COURT:  Overruled.

 1   A.  Permanently, especially when he told me that he doesn't

 2   want my sister to bring up Shayan because he thought she was a

 3   really bad mother:  Shayan doesn't deserve a mother like my

 4   sister.

 5   Q.  Was there one occasion in which Mr. Souratgar told you that

 6   he wanted to take Shayan to Iran or was there more than one

 7   occasion?

 8           MR. ARENSTEIN:  Objection to the form of the question,

 9   your Honor.

10           THE COURT:  Overruled.

11   A.  More than once.

12   Q.  When Mr. Souratgar indicated to you that he wanted to take

13   Shayan to Iran permanently --

14           MR. ARENSTEIN:  Objection to the form of the question.

15   That was not testified to, permanently.

16           MS. LEIDHOLDT:  I haven't finished the question.

17           THE COURT:  Go ahead.

18   Q.  Did it appear that he was joking?

19   A.  No.

20           MR. ARENSTEIN:  Objection.

21   Q.  Or did it appear that he was speaking seriously?

22           MR. ARENSTEIN:  Objection.

23           THE COURT:  Overruled.

24   A.  He was not joking.  He was serious.

25   Q.  What reaction did you have when Mr. Souratgar told you that

 1    he wanted to take Shayan to Iran permanently?

 2              MR. ARENSTEIN:  Objection to her reaction.

 3              THE COURT:  Overruled.  That's sustained.

 4    Q.  What action, if any, did you take after Mr. Souratgar told

 5    you that he wanted to take Shayan to Iran permanently?

 6    A.  I was very shocked to hear that, of course.

 7              MR. ARENSTEIN:  Objection to the statement.

 8              THE COURT:  I'll let it stand.

 9    A.  It reconfirmed whatever my sister had suspected all along,

10    because Majid had previously told her he didn't want Shayan to

11    be brought up by her, and she had told me that.  This just

12    reconfirms all that.  So I was actually very shocked to hear it

13    from him directly.  I called my sister to tell her about it.

14    Q.  Do you remember when this was, when you telephoned your

15    sister and told her about what had transpired with Mr.

16    Souratgar?

17    A.  When?

18    Q.  Do you remember when, approximately?

19    A.  I think it should be sometime the end of March, early

20    April, about then.

21    Q.  Did you find it odd that Mr. Souratgar was making these

22    kinds of representations to you?

23    A.  Yes --

24              MR. ARENSTEIN:  Objection, your Honor.

25              THE COURT:  Sustained.

1          MR. ARENSTEIN:  Move to strike the answer as well.

2          THE COURT:  Stricken.

3  Q.  Jen Pink, why do you think that Mr. Souratgar, if you know,

4  was --

5          MS. LEIDHOLDT:  Withdrawn, your Honor.

6          THE COURT:  Good.  Next question.

7  Q.  Did he take any action subsequent to Mr. Souratgar telling

8  you that he wanted to take Shayan to Iran permanently?

9          MR. ARENSTEIN:  Objection.  Asked and answered.

10          THE COURT:  You may answer other than what you have

11  already testified to.  You already testified you told your

12  sister, correct?

13          THE WITNESS:  Yes.

14          THE COURT:  Did you take any other action other than

15  that?

16          THE WITNESS:  Yes.  My sister and I decided that he's

17  serious about whatever he threatened my sister about

18  previously.  And then he told me that, so it reconfirmed her

19  fears.

20          THE COURT:  No, no.  Confine your answer to any action

21  that you took in response to the conversation with Mr.

22  Souratgar other than what you have already testified to, which

23  is you spoke to your sister.

24          THE WITNESS:  I started looking for an apartment, and

25  I found a two-bedroom apartment, so that she could move in with

 1   me.  We planned to do that.

 2   Q.  Prior to Mr. Souratgar telling you that he wanted to take

 3   Shayan to Iran permanently, had you taken any action to find

 4   another place for your sister to live?

 5             MR. ARENSTEIN:  Objection, your Honor.

 6             THE COURT:  Overruled.

 7   A.  Prior to him telling me?

 8   Q.  Yes.

 9   A.  No.

10   Q.  Did there come a time that you moved out of the apartment

11   of Mr. Souratgar and your sister?

12   A.  Yes.

13   Q.  Do you remember when that was, approximately?

14   A.  It's May 18 or 19, about then.

15   Q.  Of what year?

16   A.  2011.

17   Q.  What, if anything, happened a couple of days later, after

18   you moved out?

19   A.  My sister moved in with me together with Shayan, and she

20   brought her helper along.

21   Q.  Do you remember the name of the helper?

22   A.  Yes.

23   Q.  What's the name?

24   A.  Ram, Ram-Ram.

25   Q.  I'd like to direct your attention to May 26th of 2011.  Was

1    there an incident that took place on May 26th of 2011 outside

2    your offices at Citibank?

3    A.  Yes.

4    Q.  What happened?

5    A.  It was after work.  I came out of my office building and I

6    saw Mr. Souratgar sitting at a bench in an open area just

7    beside my office building.  He kind of like indicated for me to

8    come over.  I was quite nervous, but I walked over.  Then he

9    said, can you come closer, I want to speak to you.  I took a

10   step back and I told him that if you're going to talk to me

11   like that -- you cannot talk to me like that, if you're going

12   to talk to me like that, I'm not going to speak to you, I'm

13   just going to go.

14            Then he kind of like calmed down.  He said he wanted

15   to speak to me about Shayan and Jenny.  He asked me, where is

16   Jenny and Shayan.  I told him I couldn't tell him, it's between

17   you and my sister, and she had already filed.  She had papers

18   served on him.  So I said, you speak to her lawyer.

19            Then he told me that he wants them to come back and I

20   should tell my sister to come back with Shayan to the house, to

21   the house that they were living in, because otherwise he would

22   take all measures and spend his money, up to his single last

23   cent, to get them back.  He said, you don't know who I am and

24   you don't know who I know.

25            He told me that Jenny has an Iranian passport, she's

1   an Iranian because she married him, Shayan is an Iranian as

2   well, and that he would complain, he would make a report to the

3   Malaysian authorities and make sure that her Malaysian

4   citizenship was revoked, and therefore she would then be an

5   Iranian, and he would bring Shayan and her back to Iran and he

6   would have her thrown into jail.  That's what he said.

7            MR. ARENSTEIN:  Move to strike the entire testimony.

8            THE COURT:  I'll take it under advisement.  Next

9   question.

10  Q.  Was anyone with him when he showed up at that meeting?

11           MR. ARENSTEIN:  Objection.

12  A.  Yes.

13  Q.  Did he come alone or was anybody with him?

14  A.  There was a lady with him.

15  Q.  Did he explain to you who that lady was?

16  A.  I actually asked him at the beginning, who's this, and then

17  he said she's a friend.  Later on he mentioned something to the

18  effect that her father is like a chief police officer or

19  something like that.

20           MR. ARENSTEIN:  Objection, your Honor.  Move to

21  strike.

22           THE COURT:  Overruled.

23  Q.  Was this the first time that Mr. Souratgar told you --

24           MR. ARENSTEIN:  Is that a question?

25           MS. LEIDHOLDT:  I'm sorry.  If you could give me one

1      second.

2                THE COURT:  Do you have much more?

3                MS. LEIDHOLDT:  I'm almost finished, your Honor.

4                THE COURT:  Thank you.

5      Q.  Was this the first time that Mr. Souratgar indicated to you

6      that he had powerful connections back in Iran?

7                MR. ARENSTEIN:  Objection.

8      A.  No.  He had --

9                THE COURT:  Sustained.

10               MS. LEIDHOLDT:  The basis, your Honor?

11               THE COURT:  Ask your next question.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Did there come a time you learned Mr. Souratgar accused you

2   of sexually abusing Shayan?

3            MR. ARENSTEIN:  Objection.

4   A.  Yes.

5            THE COURT:  Basis?

6            MR. ARENSTEIN:  Accusing her of sexually abusing?

7            THE WITNESS:  Yes, he did.

8            THE COURT:  Excuse me a second.

9            THE WITNESS:  Sorry.

10           MR. ARENSTEIN:  I withdraw the objection and I'll take

11  it up on cross.

12  BY MS. LEIDHOLDT:

13  Q.  When did you first learn Mr. Souratgar was accusing you of

14  sexually abusing Shayan?

15  A.  I read his affidavit, an affidavit that he filed in the

16  Singapore courts.  That was the first time I read it.

17           In his affidavit he said that, he said that I molested

18  Shayan, I touched his private parts when he was watching TV as

19  in Majid was watching TV and I was behind them.  He said

20  something like he passed by my room door and he saw me lifting

21  up my shirt for Shayan to play with my breasts.  He said I

22  wanted to shower with Shayan as well.

23  Q.  After you learned of Mr. Souratgar's allegations about you

24  sexually abusing Shayan, did you take any action?

25  A.  Yes.

1   Q.  What was that?

2   A.  I made a police report.  I stated in my police report that

3   he has filed an affidavit with false allegations.

4   Q.  Now, it is your testimony that Mr. Souratgar accused you of

5   taking a shower with Shayan?

6   A.  Yes.

7          MR. ARENSTEIN:  Objection; asked and answered, your

8   Honor.

9          THE COURT:  Overruled.

10  BY MS. LEIDHOLDT:

11  Q.  As you understood Mr. Souratgar's allegation involving you,

12  your behavior towards Shayan, did you understand him to be

13  saying that you sexually abused Shayan in the course of that

14  shower?

15         MR. ARENSTEIN:  Objection.

16  A.  Yes.

17         THE COURT:  Overruled.

18         MR. ARENSTEIN:  Form of the question.

19  A.  Yes, he actually filed in his affidavit as an exhibit a

20  picture of me holding Shayan up in the shower -- no, in the

21  bath, but it was one of those -- it was during Chinese New Year

22  or something like that, one of those times that he and Jenny

23  and Shayan came back to visit.

24  BY MS. LEIDHOLDT:

25  Q.  Where did they come back to visit?

1   A.  At that time I was still living in Malaysia in my parents'

2   house, so it was one of those times that he came back to visit.

3        Well, he wasn't around that time, but Jenny came back

4   to visit with Shayan, and it was just play time.  I was

5   having -- it was in a bubble bath, in a bathtub in my mom's

6   room with my -- at that time my five-or-six-year old niece.  I

7   had my undergarments on and we just put bubble in the bathtub.

8        It was kind of like a, you know, just playing with my

9   niece and nephew.  My mom was there in the bathroom.  My sister

10  was there.  She took pictures of my sister-in-law,

11  sister-in-law all around and I was holding Shayan up taking a

12  picture.  I don't know why he put that in his affidavit as an

13  exhibit.  It is a totally innocent picture, and I was not

14  molesting Shayan at all.

15       MR. ARENSTEIN:  Objection, your Honor, and I move to

16  strike.

17       THE COURT:  Overruled.

18  BY MS. LEIDHOLDT:

19  Q.  Was there one picture taken then or were there multiple

20  pictures taken?

21  A.  My sister took many pictures.  Some pictures were of my

22  niece.  My niece was there as well.

23  Q.  At that time or at any other time did you sexually abuse

24  Shayan?

25       MR. ARENSTEIN:  Objection.

1   A.  No.

2   BY MS. LEIDHOLDT:

3   Q.  When you were taking the bubble bath with Shayan and your

4   niece in your undergarments, how old was Shayan, approximately?

5   A.  I think he was just a baby.

6   Q.  Could you --

7   A.  Maybe like a year old, less than that.  I am not sure.  I

8   think we can tell from the picture how big he was at that time.

9           Sorry.  Can I just add that, you know, if I was really

10  molesting Shayan, why would I have a picture taken of it?

11          And if it was true, why he didn't make a police report

12  and not just had it as an exhibit in an affidavit when during a

13  custody proceeding, divorce proceedings in the Singapore court.

14  I never had a chance to say this to him, but this is is really,

15  really low of him and this goes to show he would stoop that

16  low.

17          THE COURT:  Next question.

18          MR. ARENSTEIN:  Objection and move to strike the

19  testimony.

20          THE COURT:  I will take it under advisement.

21          Next question, please.

22  BY MS. LEIDHOLDT:

23  Q.  Jen Pink, I am showing you Exhibits Respondent's 24 to

24  Respondent's 29.  Would you please look at those photographs.

25  A.  Yes.

1   Q.  Jen Pink --

2   A.  Yes.

3   Q.  -- have you had a chance to look at all the photographs?

4   A.  Yes.

5   Q.  Do you recognize these photographs?

6   A.  Yes.

7   Q.  What do you recognize these photographs to be?

8           MR. ARENSTEIN:  Objection.

9           THE COURT:  Excuse me?

10          MR. ARENSTEIN:  Withdrawn.

11          THE WITNESS:  These photographs were taken by my

12  sister.  It is a picture of me and Shayan and my niece playing

13  bubble, having a bubble bath in the bathtub.

14  BY MS. LEIDHOLDT:

15  Q.  Were these photographs taken at that time during Chinese

16  New Year when you were visiting your mother's home in Malaysia

17  in 2010?

18  A.  Yeah, I think it was -- I cannot recall whether it was

19  Chinese New Year or one of those occasions that she came back

20  to visit.

21  Q.  Is this a fair and accurate representation of the scene

22  that you've described when you were in the bubble bath with

23  Shayan and your five-year-old niece?

24  A.  Yes.

25          MS. LEIDHOLDT:  Your Honor, I'd like to ask that

1   Respondent's 24, 25, 26, 27, 28 and 29 be entered into

2   evidence.

3          MR. ARENSTEIN:  No objection.

4          THE COURT:  Received.

5          (Respondent's Exhibits 24, 25 26, 27, 29 and 29

6   received in evidence)

7          MS. LEIDHOLDT:  I have no further questions of this

8   witness.

9          THE COURT:  All right.  You may cross-examine.

10         MR. ARENSTEIN:  One second, your Honor.

11         (Pause)

12  CROSS EXAMINATION

13  BY MR. ARENSTEIN:

14  Q.  If Mr. Souratgar was planning to take Shayan to Iran

15  surreptitiously, why would he tell you?

16         MR. McNALLY:  Objection.

17         THE COURT:  Overruled.

18  A.  Well, probably he thought I was on his side.

19  BY MR. ARENSTEIN:

20  Q.  Aren't you the sister of Lee Jen Fair?

21  A.  Yes.

22  Q.  She is part of your family.  Is that correct?

23  A.  Yes.

24  Q.  Wouldn't he be in a position -- why would he be in a

25  position to tell you if you were part of their family?

1    A.  I don't know.  Maybe because I didn't challenge him

2    whenever he told me things like that.  I just tried to pacify

3    him.  I told him that Shayan needs his mom, Shayan is three

4    years' old at that time is still breastfeeding.  He needs his

5    mother.  All children need their mother.

6    Q.  Aren't you loyal to your sister?

7    A.  Sorry?

8    Q.  Aren't you loyal to your sister?

9    A.  Yes, that is why I told my sister, that is why I told my

10   sister what happened.

11             MR. ARENSTEIN:  No further questions.

12             THE COURT:  Any redirect?

13             MS. LEIDHOLDT:  No redirect.

14             THE COURT:  You may step down.  Thank you.

15             (Witness excused)

16             THE COURT:  Call your next witness.

17             MS. LEIDHOLDT:  My witness is Yasmeen Hassan and she

18   is just taking the witness stand.  She is our witness.

19    YASMEEN HASSAN,

20        called as a witness by the Respondent,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MS. LEIDHOLDT:

24   Q.  Good afternoon, Ms. Hassan.

25   A.  Good afternoon.

1   Q.  Ms. Hassan, would you please succinctly describe your

2   expertise in human rights and Shairiah law particularly in

3   relation to women and minorities.

4           MR. ARENSTEIN:  Objection, your Honor.  I don't know

5   how we're getting into Malaysia when this is a Singapore case,

6   your Honor.

7           THE COURT:  We are going to find out.  You may answer.

8   A.  I didn't hear Malaysia.  I am sorry.  Did you say Malaysia?

9   Q.  I didn't say Malaysia.

10          I asked for your expertise in relation to Shairiah law

11  and human rights particularly in relation to women and

12  minorities?

13  A.  Yes.  I have been studying the subject of Islamic law,

14  Shairiah and women's rights since I was in college.  I was

15  raised in a Muslim country where Shairiah law applies.

16          I went to Mount Holyoke College, where I studied human

17  rights and women's rights under the Islamic system with

18  Professor Kamali of Iran.

19          From there went to Harvard Law School, where I studied

20  Shairiah law and human rights with professor Frank Vogel.  In

21  all of these women's rights was my focus, the rights of women

22  and minorities particularly in countries following Shairiah.

23          After law school I worked in a law firm, clerked for

24  the D.C. Court of Appeals which is the District of Columbia,

25  not the federal court, and after that worked at Davis Polk &

 1  Wardwell for eight years, where I did a lot of pro bono cases

 2  on behalf of Muslim women, particularly political asylum cases

 3  and some cases of self-petition for immigration status based on

 4  domestic violence.

 5          From 2003 till 2008, I worked at the United Nations

 6  Division for the Advancement of Women, where I worked with the

 7  CEDAW, the Convention on the Elimination of Discrimination

 8  Against Women, and I worked in particular on a lot of Islamic

 9  countries including Afghanistan, Jordan, Malaysia.

10          I have also worked in countries emerging out conflict,

11  particularly Afghanistan and in the issue of integrating

12  Shairiah and human rights in the new legal framework.

13          Since 2008 I have worked at Equality Now and am now

14  the global director.  We are an international human rights

15  organization focusing on rights of women, and one of our

16  expertise is looking at Shairiah law, and we work a lot in the

17  countries of the Middle East.

18          In this regard, we have worked on Singapore.  It was

19  featured on our report on discriminatory laws particularly with

20  the marital rape exception and submitted expert reports to the

21  Commission on the Status of Women.  It is an intergovernmental

22  body at the United Nations as well as to the CEDAW, C E D A W,

23  convention on Elimination of Discrimination Against Women.

24  Q.  What is your relationship if any with Hasheem Kamali.

25  A.  Hasheem Kamali, the former dean of the Islamic Law School

1   in Malaysia, and I worked extensively with him in particular in

2   Afghanistan on the issue of human rights and women's rights

3   under Shairiah.

4   Q.  Ms. Hassan, would you please describe what, if anything,

5   you did to prepare for your testimony in court today.

6              MR. ARENSTEIN:  Your Honor, is this witness being

7   offered as an expert?  Because if she is, I want a voir dire.

8              THE COURT:  We haven't gotten to that point yet, I

9   don't think.

10             MS. LEIDHOLDT:  I am offering Ms. Hassan as an expert

11  on human rights, women's rights especially in relation to

12  issues of violence against women, Shairiah law and the

13  treatment of women and minorities under Shairiah law, and I

14  brought a CV for Ms. Hassan which I would like to offer into

15  evidence as Exhibit 30.

16             MR. ARENSTEIN:  It is already marked.

17             MS. LEIDHOLDT:  I already submitted the resume to Mr.

18  Arenstein.

19             THE COURT:  It will be customary to show it to the

20  witness, ask her if this is her curriculum vitae, see what she

21  says, and then offer it.

22             THE WITNESS:  Yes, it is.

23             THE COURT:  Any objection?

24             MR. ARENSTEIN:  I would like to see a copy.

25             THE COURT:  First of all, any objection to the CV?

1          MR. ARENSTEIN:  I have no objection to the CV, your

2     Honor.

3          THE COURT:  Now I'll hear your objection.

4     BY MR. ARENSTEIN:

5     Q.  Have you ever testified in court before?

6          THE COURT:  No.  I said I would hear your objection.

7     You want to conduct a voir dire?

8          MR. ARENSTEIN:  I do.

9          THE COURT:  Then ask me if you can conduct a voir

10    dire.

11         MR. ARENSTEIN:  May I conduct a voir dire?

12         THE COURT:  You may.

13    VOIR DIRE EXAMINATION

14    BY MR. ARENSTEIN:

15    Q.  Have you ever testified in court before?

16    A.  No, I have not.

17    Q.  Have you ever done any testimony on Singapore Shairiah law?

18    A.  I have not testified in court before.

19    Q.  What have you done with regards to Shairiah law in

20    Singapore?

21    A.  We have taken up the issue in front of the CEDAW.

22         THE COURT:  Do me this favor, if you will:  When you

23    answer, answer as to yourself, not organizations with which you

24    have been affiliated.

25         THE WITNESS:  Okay.  I have not testified on Singapore

1  Shairiah law.

2  BY MR. ARENSTEIN:

3  Q.  What work have you done with regard to Singapore Shairiah

4  law at all?

5  A.  To prepare for this case in particular, I have consulted

6  with experts in Singapore.  They are experts in Shairiah law

7  and on women's rights and academics.  That would be the extent

8  of it.

9  Q.  Are you familiar with the Hague Convention at all?

10  A.  Yes, I am.

11  Q.  Have you done any testimonial work on the Hague Convention?

12  A.  No, I have not.

13         MR. ARENSTEIN:  I would object, your Honor, to this

14  witness being testifying as an expert witness for whatever

15  reason other than women's rights, and the issues that she

16  studied are not relevant to this proceeding.

17         THE COURT:  All right.  Let me ask you, Ms. Leidholdt,

18  on this very impressive resume of this witness, and I will

19  allow her to testify as an expert on Shairiah law and even

20  Shairiah law in Singapore, but I don't understand the proffer

21  with regard to human rights, rights of women.

22         The issues of law presented in this case are for this

23  Court to decide under the treaty and to the extent they arise

24  under the laws of the United States.  Human rights is a very

25  important field, but I don't see where that expertise or

1   expertise generally on the rights of women internationally has

2   bearing on this case.

3           I will allow the witness to testify, however, on

4   Shairiah law.

5           MS. LEIDHOLDT:  Your Honor, Ms. Hassan also has

6   considerable expertise on the protection of human rights in

7   relation to issues of violence against women in Singapore, as I

8   understand it.

9           The organization she directs, Equality Now --

10          THE COURT:  No, no, I am not challenging her

11  expertise.  This is not an expertise issue.  I assume for the

12  sake of my question that she is very expert in human rights

13  law, okay?  I am assuming that.

14          My question still stands.

15          MS. LEIDHOLDT:  Your Honor, would I be permitted to

16  inquire of Ms. Hassan about laws in Singapore that are

17  discriminatory to women in particular as they relate to issues

18  of violence against women; for example, the marital rape law in

19  Singapore that is part of the civil law system and not the

20  Shairiah system within Singapore?

21          THE COURT:  Only to the extent that it bears on the

22  issues in this case.  Well, let me ask you, Ms. Hassan, you

23  have testified that you have consulted with others to learn

24  about Shairiah law as applied in Singapore?

25          THE WITNESS:  Singapore.

1      THE COURT:  You have studied Shairiah law in other

2 countries, have you not?

3      THE WITNESS:  Yes, I have.

4      THE COURT:  Now I want to ask you a very different

5 question.  Have you studied the civil law of Singapore outside

6 of the Shairiah courts?

7      THE WITNESS:  Yes, in terms of protection orders and

8 the marital rape exception, my organization, under me, has been

9 doing a lot of research on it and we have submitted expert

10 affidavits to UN bodies on those issues.

11      THE COURT:  How have you gone about studying Singapore

12 family law, for example?

13      THE WITNESS:  Right, our methods with taught now on

14 the organization on the ground in the country.  Our partner in

15 this particular instance an organization called Aware, which is

16 providing legal services to victims and they were very

17 concerned about the issue of personal protection orders, and we

18 worked on that issue with them.

19      THE COURT:  All right.  Are you offering this witness

20 as an expert on Singapore family law?

21      MS. LEIDHOLDT:  Yes, your Honor, Singapore family law

22 specifically as it relates to the protections offered victims,

23 women who are victims of violence, domestic violence and

24 related forms of violence.

25      THE COURT:  All right.  So I'm inclined to allow the

1    witness to testify in that area as well as Shairiah law as

2    interpreted specifically by the Shairiah courts of Singapore.

3    What other area are you tendering her on, or is that it?

4            MS. LEIDHOLDT:  Your Honor, I would also respectfully

5    request the permission of this Court to ask of Ms. Hassan

6    questions about the country of Malaysia in terms of its

7    Shairiah system, the relevance to this case being there was a

8    case for custody brought in the Shairiah courts of Malaysia

9    involving the subject child Shayan.

10           THE COURT:  What do you know about Shairiah law in

11   Malaysia?

12           THE WITNESS:  I have worked with Abdul Aziz, A B D U

13   L, A Z I Z, who is a practicing attorney in Malaysia, and she

14   is also a board member of women living under Muslim laws, an

15   organization we partner with in Malaysia.  Also Zainah Anwar, Z

16   A I N A H, A N W A R, who is an attorney who is the head of

17   Musaba, an organization working for equality within Shairiah

18   court in Malaysia.

19           And I have also extensive experience with Hasheem

20   Kamali, former dean of Islamic Law School in Malaysia.

21           THE COURT:  What else is it you're seeking to have her

22   testify about?

23           MS. LEIDHOLDT:  Your Honor, in addition I'd like to

24   respectfully request that Ms. Hassan be permitted to testify

25   about the Shairiah system in Iran since there has been

1    considerable testimony of the danger of the subject child

2    Shayan being taken by his father to Iran, and there have been

3    questions as to the ability of our client to protect herself

4    and Shayan in Iran.

5            MR. ARENSTEIN:  If I might?

6            THE COURT:  The question is the possibility of grave

7    risk to the child --

8            MS. LEIDHOLDT:  Yes.

9            THE COURT:  -- is the issue in this proceeding.  Have

10   you studied Shairiah law in Iran?

11           THE WITNESS:  We have worked on Iran with the Shairiah

12   courts on the issues of stoning.

13           THE COURT:  Again confine yourself to what you have

14   done and in relation to the Shairiah courts insofar as family

15   law is concerned.

16           THE WITNESS:  Right, okay.  I have some experience in

17   Iran, not as extensive as in Malaysia.

18           THE COURT:  Okay.

19           MR. ARENSTEIN:  If I might be heard?

20           THE COURT:  Is there anything else, Ms. Leidholdt,

21   you're seeking to have this individual qualified as an expert

22   on?

23           MS. LEIDHOLDT:  No, your Honor.

24           THE COURT:  So let me understand you.

25           You're seeking to have her qualified as an expert on

1   Shairiah law in relation to family matters in Malaysia,

2   Singapore and Iran as well as the domestic law relating to

3   family matters in Singapore.  Is that correct?

4           MS. LEIDHOLDT:  That's correct, your Honor.

5           THE COURT:  And not anything else?  Not any other

6   subject that you heretofore mentioned; is that correct?

7           MS. LEIDHOLDT:  Yes, that's correct, your Honor.

8           MR. ARENSTEIN:  If I might be heard?

9           THE COURT:  Yes.

10          MR. ARENSTEIN:  This case involves Singapore.  It does

11  not involve Iran.  It does not involve Malaysia.  Certainly

12  that is where the parties have traveled.  The case that is

13  pending in the court is in Singapore.

14          This is a Hague case from the Republic of Singapore,

15  which is one of the signatories to the Hague Convention to

16  return the child back to Singapore, not to Iran, not to

17  Malaysia; and, therefore, those laws are not relevant to this

18  case.

19          The most relevant part is Singapore.  If she is going

20  to testify to Singapore law, she has very little experience,

21  from what I hear.  She has never testified in court before.

22  This is her first time, and the "we" that I hear from the

23  organization is basically the "we."  From what I have heard of

24  what she just testified to, it is very little work on her own

25  part.

1      I would have an objection to her testifying to

2  anything but Singapore because Singapore is the issue in this

3  case.  Singapore is the country as to where the child -- we

4  want the child returned to.  That is what the petition is for.

5  It is not returning to Iran, not returning to Malaysia.  It is

6  returning the child to Singapore, your Honor.

7      THE COURT:  Understood.  You have preserved your

8  position and you're free to object to specific questions that

9  are asked when they're asked.

10     Let me, let me overrule the objection to the witness

11  testifying as an expert in the areas which I previously

12  mentioned.  Go ahead, ask your next question.

13     MS. LEIDHOLDT:  Your Honor, I respectfully request

14  your Honor take judicial notice of three documents, and the

15  first is the United States Department of State Human Rights

16  Report on Malaysia, the United States Department of State Human

17  Rights Report on Iran, and the third is the report, the

18  concluding observations of the committee on the elimination of

19  discrimination against women.

20     This is the committee that monitors the implementation

21  of the convention on the elimination of all forms of

22  discrimination against women, the United Nations convention on

23  elimination of all forms of discrimination against women, and

24  this particular report is specifically on Singapore and

25  specifically references --

1          THE COURT:  You have three documents that you say are

2     generated by the State Department.  Don't give them to me

3     unless you have first given them to Mr. Arenstein.  Have you?

4          MS. KIM:  This morning, yes.

5          THE COURT:  That is fine.  Then you can give them to

6     me.  Thank you.  There are three documents by the United States

7     Department of State, and one document I have not understood the

8     author.  You said it is a committee that looks at compliance

9     with the U.N. Convention, but you have not identified who or

10    what this organization is.

11         MS. LEIDHOLDT:  Yes, your Honor.  First there is only

12    two State Department reports --

13         THE COURT:  I see.

14         MS. LEIDHOLDT:  -- on Iran and Malaysia.

15         The third is the report concluding observations of

16    United Nations committee on the elimination of discrimination

17    against women.  This is a United Nations, official United

18    Nations monitoring body that monitors the implementation of the

19    convention on elimination of discrimination against women.

20         Ms. Hassan is far more knowledgeable about this body

21    than I am.  It meets regularly at the United Nations

22    Headquarters alternatively in New York and in Geneva.

23    Countries that have ratified the convention on elimination of

24    all forms of discrimination report, to wit, about their

25    compliance with their obligations under this convention and

1    then the committee issues reports about ratifying countries

2    compliance with this.

3            THE COURT:  What is the relevance of this?

4            MS. LEIDHOLDT:  The relevance is it addresses

5    Singapore in particular.

6            THE COURT:  I understand it addresses discrimination

7    against women in Singapore.  We have discrimination against

8    women in the United States also.  What is the relevance of this

9    document?

10           MS. LEIDHOLDT:  Yes, and it specifically addresses

11   discrimination in key areas that are directly relevant to this

12   case, protections of women in Singapore, against domestic

13   violence and sexual assault.

14           THE COURT:  Has this body also done a report on the

15   United States?

16           MS. LEIDHOLDT:  The United States is has not ratified

17   the CEDAW convention, your Honor, so the reports are countries

18   that have ratified the convention.

19           THE COURT:  The answer is no?

20           MS. LEIDHOLDT:  The answer is "no," yes, your Honor.

21           THE COURT:  Mr. Arenstein?

22           MR. ARENSTEIN:  I object to all three documents, your

23   Honor.

24           First of all, the State Department reports on human

25   rights of Iran and Malaysia?  Again I stated earlier this case

1    involves Singapore, not that.

2            The third one, this group, I could produce reports

3    from the Hague Convention on which they've said domestic

4    violence is not a factor for grave risk of danger.  If I ask

5    that to be in, I am sure Ms. Leidholdt would object to it.  I

6    object on the same basis she would object to me putting in that

7    report, which they had at their last three sessions about

8    saying grave risk is not domestic violence.

9            I object to this report.  This is merely elimination

10   of discrimination against women.  We have discrimination in the

11   United States.  We are not even a signatory to this treaty or

12   this convention that is here.  I don't think any of these three

13   documents are relevant to your Honor's quest in making a

14   decision in this case.

15           THE COURT:  All right.  I will take the request that I

16   take judicial notice under advisement.  Ask your next question.

17           MS. LEIDHOLDT:  Thank you.

18   DIRECT EXAMINATION (Continued)

19   BY MS. LEIDHOLDT:

20   Q.  Ms. Hassan, are you familiar with Article XX of the Hague

21   Convention?

22   A.  Yes, I am.

23   Q.  What, to the best of your knowledge, does Article XX, in

24   fact, provide?

25           THE COURT:  Sustained.

1          MR. ARENSTEIN:  Objection.

2          MS. LEIDHOLDT:  Your Honor, withdrawn.

3    BY MS. LEIDHOLDT:

4    Q.  Ms. Hassan, I would like to direct your attention to the

5    legal system in Singapore.  How, if at all, are family

6    law-related issues divided between the courts in Singapore, if

7    you know?

8    A.  The family law for Muslims in Singapore go to the Shairiah

9    court, for non-Muslims it goes to the Family Court.

10         Anything related to a divorce between Muslims goes to

11   Shairiah court, and the ancillary matters such as custody, that

12   would go to the Shairiah court.  If there is a custody matter

13   and no divorce has been, proceedings have been initiated,

14   Family Court can hear that custody matter.

15         Does that answer your question?

16   Q.  Yes.  Thank you.

17         Could you explain where are personal protection orders

18   litigated, if you know, in the court system in Singapore?

19   A.  Those are in the Family Court, not the Shairiah court.

20   Q.  Is this structure that you've just described a structure

21   dual and concurrent jurisdiction, is it --

22         THE COURT:  No.  Sustained.

23         MR. ARENSTEIN:  Objection.

24         THE COURT:  Rephrase your question.  You are not

25   permitted to testify, Ms. Leidholdt.

 1                   MS. LEIDHOLDT:  Yes.

 2    BY MS. LEIDHOLDT:

 3    Q.  Is the structure that you've just described, is it

 4    concerning to you in any way in relation to the protection of

 5    the human rights of women in Singapore, specifically in

 6    relation to violence against women and the equality of women?

 7                   MR. ARENSTEIN:  Objection.

 8                   THE COURT:  Sustained as to form.

 9    BY MS. LEIDHOLDT:

10    Q.  Is this system that you've just described in Singapore of

11    concern to you in relation to discrimination against women in

12    the court systems in Singapore?

13                   MR. ARENSTEIN:  Objection.

14                   THE COURT:  Sustained.

15    BY MS. LEIDHOLDT:

16    Q.  Is this system in Singapore of concern to you in relation

17    to the protection of women from violence?

18                   MR. ARENSTEIN:  Objection.

19                   THE COURT:  Sustained.

20                   (Off-the-record discussion)?

21    BY MS. LEIDHOLDT:

22    Q.  In relation to women's equality in particular and the

23    protection of women against violence -- withdrawn.

24                   In your expert opinion, do you believe that this

25    system in Singapore is adequate to protect women in Singapore

 1   from discrimination, especially in relation to gender violence?

 2          MR. ARENSTEIN:  Objection.

 3          THE COURT:  Sustained.

 4   BY MS. LEIDHOLDT:

 5   Q.  Is there anything about this system in Singapore that

 6   concerns you?

 7          MR. ARENSTEIN:  Objection.

 8          THE COURT:  Sustained.

 9   BY MS. LEIDHOLDT:

10   Q.  Ms. Hassan, in the system that you've just described in

11   Singapore, is it possible for women -- and I am specifically

12   directing your attention to the Shairiah system in Singapore --

13   is it possible for women to opt out of this system if they're

14   Muslim?

15          MR. ARENSTEIN:  Objection.

16          THE COURT:  As to what type of action?

17          MS. LEIDHOLDT:  Specifically to family law matters.

18          MR. ARENSTEIN:  Objection.

19          THE COURT:  Sustained as to form.  You can narrow, ask

20   it in a -- can a woman who is Muslim, who has converted to the

21   Muslim religion in Singapore obtain a divorce in Singapore

22   outside of the Shairiah courts?

23          THE WITNESS:  In limited circumstances, according to

24   my reading from the statute.

25          THE COURT:  What are the limited circumstances?

1          THE WITNESS:  If there is leave from the Shairiah

2     court, number one.  Number two is if there is consent of both

3     parties and they have attended some sort of counseling.

4          THE COURT:  But if there is no consent by both parties

5     and there is no permission from the Shairiah court, then a

6     person who is Muslim, male or female, who wishes to get a

7     divorce, the couple is both Muslim, they must proceed in a

8     Shairiah court?

9          THE WITNESS:  Yes.

10         THE COURT:  Next question.

11    BY MS. LEIDHOLDT:

12    Q.  How often, if you know, are divorce and custody proceedings

13    moved from the Shairiah court to the Family Court in Singapore?

14         MR. ARENSTEIN:  Objection.

15         THE COURT:  I'll allow it.

16         THE WITNESS:  In my consultations, I have only heard

17    about one case where the man in question became non-Muslim and

18    his wife consented to the transfer -- not the transfer, moving

19    the case to Family Court.

20         THE COURT:  All right.  Let me ask you, there has been

21    testimony in this proceeding consistent with what you testified

22    about divorces in Singapore between Muslims.

23         The testimony that I've heard thus far has been that

24    with regard to custody, a Muslim can bring a petition relating

25    to custody in the civil courts of Singapore.

1              THE WITNESS:  Right.

2              THE COURT:  Is that correct or not correct?

3              THE WITNESS:  That is correct.

4              THE COURT:  Okay.  Can the court, the civil court in

5    Singapore adjudicate custody matters relating to the child of

6    Muslim parents without the permission of the Shairiah court?

7              THE WITNESS:  Yes, as long as it is not part of a

8    divorce proceeding.

9              THE COURT:  All right.  What makes a custody issue

10   part of a divorce proceeding?

11             THE WITNESS:  If either party initiates a divorce,

12   that has to go to Shairiah court.

13             THE COURT:  I understand that, but what makes custody

14   part of a divorce proceeding in Shairiah court?

15             THE WITNESS:  It is an ancillary, it is ancillary to

16   the divorce proceeding, so it is part of just like maintenance

17   and all of that is ancillary to it and it goes to the Shairiah

18   court.

19             THE COURT:  If one party has already brought a

20   petition in the civil court relating to custody, and there is

21   then a proceeding for divorce in Shairiah court, the civil

22   court in Singapore may not hear the case?

23             THE WITNESS:  It has to stay the proceedings, and my

24   understanding is that the matter will be moved to Shairiah

25   court.

 1                THE COURT:  All right.  What's your understanding

 2      based on?

 3                THE WITNESS:  It is based on conversations with

 4      practicing Shairiah attorneys in Singapore.

 5                THE COURT:  Who did you speak to on this subject?

 6                THE WITNESS:  Mr. Ahmad Abbas.

 7                THE COURT:  Mr. Abbas is the attorney for the

 8      respondent here?

 9                THE WITNESS:  Yes, he is.

10                THE COURT:  And who else, if anyone?

11                THE WITNESS:  Ms. Corinna Lim of Aware.  She is an

12      attorney there.

13                THE COURT:  What is Aware?

14                THE WITNESS:  It is a women's rights organization that

15      we partner with, Equality Now partners with that organization.

16                THE COURT:  Did Mr. Abbas tell you of this individual?

17                THE WITNESS:  No, no.  She was a part, she was a

18      partner of Equality Now that we are aware of.

19                THE COURT:  When did you speak to Mr. Abbas?

20                THE WITNESS:  About a week ago.

21                THE COURT:  All right.  How long did you speak to him

22      for?

23                THE WITNESS:  I would say about an hour to an hour and

24      a half.  I had already read his articles that he had written

25      beforehand.

1          THE COURT:  What articles has Mr. Abbas written?

2          THE WITNESS:  The one on the Shairiah system in

3    Singapore.  I could only find one of his articles.

4          THE COURT:  Is Mr. Abbas someone who is expert on

5    Shairiah law in Singapore?

6          THE WITNESS:  Well, they don't seem to be many experts

7    on Shairiah law in Singapore.  I just have to say that because

8    the system is pretty new and they follow Malaysia for the most

9    part, and the system seems to be very confused because they're

10   not teaching Shairiah law in law schools.  The lawyers are not

11   trained in Shairiah law.

12         The statute that says Shairiah law will -- AMLA, the

13   statute that Shairiah law will apply to, Muslims do not codify

14   that law so it is based on the interpretation of judges.  So it

15   is very difficult to get complete expertise.  I don't believe

16   it really exists in Singapore.

17         THE COURT:  All right.  But having published an

18   article, what was your view of Mr. Abbas' article?

19         THE WITNESS:  I thought it was well written, and he

20   points out the difficulties with the system a little bit and

21   also the good points of it.

22         THE COURT:  Do you know Mr. Abbas' standing in the Bar

23   in Singapore?

24         THE WITNESS:  I asked a couple of attorneys, and they

25   said he was very well respected.

```
 1              THE COURT:  All right.  Okay.  Thank you.

 2              Next question.

 3    BY MS. LEIDHOLDT:

 4    Q.  Ms. Hassan, to the best of your knowledge, based on your

 5    interviews and research about the Shairiah system in Singapore,

 6    once there is a divorce action commenced or recommenced in the

 7    Shairiah court, what, if anything, happens to any custody

 8    matter involving the parties in that divorce?

 9              MR. ARENSTEIN:  Objection to the question.

10              THE COURT:  Overruled.

11    A.  It is moved to Shairiah court.

12              THE COURT:  Now, is that what Mr. Abbas told you?

13              THE WITNESS:  Yes, he did.

14              THE COURT:  And the other attorney you mentioned, do

15    you know whether they practice in court or do they study

16    subjects?

17              THE WITNESS:  They do practice in courts, particularly

18    in relation to domestic violence.

19              THE COURT:  What is the person's name again?

20              THE WITNESS:  Corinna Cecilia Lim, and I have her

21    resume.  Do you want me to give you?

22              THE COURT:  Yes.  Tell me who she is?

23              THE WITNESS:  I have it somewhere here.  Hold on.

24              (Pause)

25              MS. LEIDHOLDT:  Your Honor, I have the resumes of the
```

1    two individuals Ms. Hassan just referred to.

2            THE WITNESS:  Your Honor, I do have two.

3            MS. LEIDHOLDT:  May I approach the witness?

4            THE COURT:  Sure.

5            MR. ARENSTEIN:  If I could see what is being handed to

6    the witness.

7            MS. LEIDHOLDT:  We have spare copies.

8            (Pause)

9            THE COURT:  All right.  Where did you get the -- I

10   have here two resumes, Vivienne Wee and Corinna Lim.

11           Who is Vivienne Wee?

12           THE WITNESS:  Vivienne Wee is also working at Aware

13   and she is a women's rights activist.  Corinna Lim is a lawyer.

14   Her resume is much more relevant.

15           THE COURT:  Did you speak to Vivienne Wee?

16           THE WITNESS:  Yes.

17           THE COURT:  She is not a lawyer?

18           THE WITNESS:  No.

19           THE COURT:  Okay.

20           MS. LEIDHOLDT:  Your Honor, if I may, I also have the

21   resume of Mr. Ahmad Nizam Abbas.

22           (Pause)

23           MS. LEIDHOLDT:  Your Honor, we have also obtained an

24   expert affidavit from Mr. Ahmad Nizam Abbas about the matters

25   in issue, and I was wondering if -- your Honor, it is

1    notarized, signed by Mr. Abbas.  It contains extensive

2    description of his credentials.  If your Honor would like to

3    see the expert, this expert affidavit, we can make it

4    available.

5              MR. ARENSTEIN:  I would object, your Honor.

6              THE COURT:  Yes.  That is not what I do for a living.

7              I simply ask the question about the qualifications of

8    the individuals with which she spoke.  If you would like to

9    mark these two resumes for the record, we will at least know

10   what we're referring to.

11             Who provided you with a copy of Mr. Abbas' resume?

12             THE WITNESS:  Defense counsel.

13             THE COURT:  Who provided you the copy of the resume of

14   the other individuals individual?

15             THE WITNESS:  She did.

16             THE COURT:  Okay.  Thank you.  We'll take a brief

17   recess at this point.

18             (Recess)

19             (Continued on next page)

20

21

22

23

24

25

1          MR. ARENSTEIN:  Your Honor, if I might address the

2     Court for a minute?

3          THE COURT:  On what matter?

4          MR. ARENSTEIN:  The matter of the Shariah courts and

5     Singapore.

6          THE COURT:  You have an opportunity to conduct a

7     cross-examination.

8          MR. ARENSTEIN:  It has to do with the undertaking that

9     we made and what occurred in Singapore now.

10         THE COURT:  Go ahead.

11         MR. ARENSTEIN:  The courts of Singapore have approved

12    the undertaking that was given by my client, and the case will

13    now remain in the family courts of Singapore, from what I'm

14    told by Mrs. Gomez.  I just received an email from her

15    regarding that today.

16         THE COURT:  Fine.  Ask your next question, please.

17    BY MS. LEIDHOLDT:

18    Q.  Ms. Hassan, does the family court in Singapore have any

19    authority over the Shariah court, if you know?

20         MR. ARENSTEIN:  Objection.

21         THE COURT:  Overruled.

22    A.  No.

23    Q.  Ms. Hassan, when a custody case is pending in the civil

24    court in Singapore and a party then files for divorce in the

25    Shariah court, what happens, if you know?

1          MR. ARENSTEIN:  I object.

2          THE COURT:  If you know.

3   A.  My understanding in talking with counsel there is that the

4   proceeding in family court is stayed and the matter is then

5   moved to Shariah court.

6          THE COURT:  How is it moved?  Is it the matter or is

7   it simply a stay?

8          THE WITNESS:  My sense is it's stayed.  This is where

9   I'm unclear, because I wasn't able to get a clear answer.  I

10  did ask this question.  Since custody is ancillary to divorce,

11  it would then move, unless there is an undertaking by both

12  parties or the Shariah court has consented to custody being in

13  the family court.

14         THE COURT:  Thereafter, the civil court would not have

15  jurisdiction to enter any further orders relating to the

16  custody or care of the child, correct?

17         THE WITNESS:  That's my understanding.

18         THE COURT:  Those matters would then be matters

19  presented exclusively to the Shariah court and not to any other

20  court?

21         THE WITNESS:  That's my understanding.

22         THE COURT:  Next question.

23  Q.  In your opinion, Ms. Hassan, would an undertaking to keep

24  family- or custody-related proceedings in the family court in

25  Singapore be binding on the Shariah court?

```
 1              MR. ARENSTEIN:  Objection.

 2              THE COURT:  Overruled.

 3   A.  My understanding, no, it wouldn't be.

 4              THE COURT:  Do you know when the statute relating to

 5   the Shariah courts in Singapore was enacted, approximately?

 6              THE WITNESS:  I believe it's 1995 or something, yes.

 7              THE COURT:  This is something that you may not know,

 8   so you'll just tell me if you don't.  Do you know approximately

 9   the percentage of the population in Singapore that is Muslim?

10              THE WITNESS:  I believe it is 10 to 15 percent, but

11   I'm not sure.

12              THE COURT:  Do you know if there is an appellate

13   system within the Shariah courts?

14              THE WITNESS:  I am not sure about that, no.

15              THE COURT:  Do you know who enforces the orders of the

16   Shariah courts?  Are they enforceable on their own?

17              THE WITNESS:  I believe it is the same enforcement

18   mechanism as any other court, because they are dual court

19   systems, so the judgments are binding.

20              THE COURT:  A Shariah court can enter an order, and

21   that order on its face is an enforceable as an order of the

22   civil courts?

23              THE WITNESS:  That is my understanding.

24              THE COURT:  Next question.

25   BY MS. LEIDHOLDT:
```

1   Q.  Ms. Hassan, would you please describe briefly, to the best

2   of your understanding, Singapore's system of obtaining a

3   personal protection order.

4   A.  My understanding is that a victim of domestic violence,

5   when she calls the police, unless she has a personal protection

6   order already, the police is not going to respond, with the

7   exception of there being a grievous hurt.  If it's a very bad

8   battery case, where they can see injuries, they can intervene,

9   but otherwise not.

10              MR. ARENSTEIN:  I'm sorry, I'm having trouble hearing

11  the witness.

12              THE COURT:  Move your chair closer, Mr. Arenstein.

13              Try to keep your voice up.

14              MR. ARENSTEIN:  Could you speak into the microphone.

15              THE WITNESS:  Yes, I will.  Is that better?

16              MR. ARENSTEIN:  That's much better.

17  A.  My understanding is that a victim of domestic violence, if

18  they call the police in Singapore, the police, unless the

19  victim already has a personal protection order or there is a

20  situation of grievous hurt, the police are not likely to

21  intervene to get the personal protection order.

22              If the victim goes to the police, she is most likely

23  directed to get a medical examination, to get evidence of

24  injuries.  After that, she files a complaint and swears to it

25  at the family court.  The family court judge would then issue a

1    summons that would be issued on the respondent, the batterer.

2         After that, the family court judge will determine

3    whether mediation or counseling is necessary in the court's

4    view.  If so, after the counseling and the parties are not able

5    to reach agreement, then the case would proceed to trial.  In

6    that trial, in particular, if a victim is already separated

7    from the batterer, she would have to prove that there is

8    imminent danger still of being battered and that harm is

9    imminent to get that personal protection order.

10        MR. ARENSTEIN:  Objection to the response, your Honor.

11        THE COURT:  Overruled.

12   Q.  Ms. Hassan, were you able to get information about what

13   kind of physical injury in Singapore rises to the level of

14   grievous hurt?

15        MR. ARENSTEIN:  Objection, your Honor.

16        THE COURT:  Overruled.

17   A.  Something that a medical exam would show that there were

18   marks of injury.  It would be a serious assault.  It would not

19   be something that doesn't leave marks.  A lot of stuff that we

20   understand as domestic violence would not be covered.  For

21   example --

22        MR. ARENSTEIN:  Objection.

23        THE COURT:  Thank you.

24   Q.  In your expert opinion, is it problematic, the requirement

25   of grievous hurt before the police will intervene?

```
 1              MR. ARENSTEIN:  Objection.

 2              THE COURT:  Sustained.

 3   Q.  Is that problematic?

 4              MR. ARENSTEIN:  Objection.

 5              THE COURT:  Sustained.

 6   Q.  In your expert opinion, what difficulties, if any, would

 7   this grievous hurt requirement for police response pose for

 8   victims of domestic violence seeking protection and assistance

 9   in Singapore?

10              MR. ARENSTEIN:  Objection.

11              THE COURT:  Overruled.

12   A.  It's a very high bar.  This is also compounded by the fact

13   that Singapore does not recognize marital rape as a crime,

14   because in a lot of intimate partner violence, marital rape is

15   part of the domestic violence.  Grievous hurt, to be able to

16   show that, to be able to show intense injuries as a bar, like

17   you're pretty much near death or severe injury, is a huge bar

18   for police intervention.

19              MR. ARENSTEIN:  Objection.

20   A.  We don't see that in many other countries.

21              MR. ARENSTEIN:  Objection, move to strike.

22              THE COURT:  In terms of getting a personal protective

23   order, is that required to get a personal protective order?

24              THE WITNESS:  No, it is not.  This is police

25   intervention if you don't have a personal protection order.
```

1            MR. ARENSTEIN:  Objection.

2            THE COURT:  But you don't need to make that kind of a

3     showing to get a personal protection order, is that correct?

4            THE WITNESS:  No, that is correct.

5            THE COURT:  Thank you.

6     BY MS. LEIDHOLDT:

7     Q.  Ms. Hassan, what would the problems be for a domestic

8     violence victim in Singapore who is residing with her abuser in

9     terms of this situation that you are describing where the

10    police will not respond until the victim first has a personal

11    protection order?

12           MR. ARENSTEIN:  Objection.

13           THE COURT:  I'm going to sustain that objection

14    because those are not the facts presented in this case.  Next

15    question.

16    Q.  Would a domestic violence victim in Singapore who is living

17    with her batterer -- withdrawn.  Is there anything about the

18    Singapore system as it relates to violence against women,

19    expecially in relation to protective orders, that would deter a

20    victim of domestic violence who is living with her abuser from

21    seeking a personal protection order?

22           MR. ARENSTEIN:  Objection.

23           THE COURT:  Sustained.

24    Q.  Is there a difference between a personal protection order

25    in Singapore and an exclusionary order?  If so, would you

1    please explain what that difference is.

2              MR. ARENSTEIN:  Objection.

3              THE COURT:  Overruled.

4    A.  Yes, there is a difference.  A personal protection order

5    just is an order to stop the batterer from battering the

6    victim.  An exclusion order is an order that would exclude the

7    batterer from the house.  In Singapore a personal protection

8    order does not encompass an exclusion order, which is quite

9    usual for other places.

10             MR. ARENSTEIN:  Objection to what is quite usual.

11   Move to strike that part.

12             THE COURT:  Overruled.

13   A.  So a woman who is in a battering situation, if she were to

14   get a personal protection order and was not free to leave the

15   family house, she would have really no remedy.

16             MR. ARENSTEIN:  Objection.  Move to strike the

17   response.

18             THE COURT:  I'll take it under advisement.  Next

19   question.

20   Q.  To the best of your knowledge, Ms. Hassan, does a personal

21   protection order in Singapore include a provision that requires

22   the alleged abuser to stay away from the person the order

23   protects?

24             MR. ARENSTEIN:  Objection.  I don't know what

25   circumstance we are talking to, whether it relates to this case

1    or not.  I would object to the question, your Honor.

2         THE COURT:  If you feel that you know enough about the

3    types of orders that are entered by the civil courts in

4    Singapore -- first of all, I'll ask that as a question.  Do you

5    know enough about the types of orders entered in the civil

6    courts of Singapore to answer that question?

7         THE WITNESS:  I believe so, yes.

8         THE COURT:  What is that based on?

9         THE WITNESS:  That's based on talking to attorneys

10   that are aware, who have made me aware of the types of orders.

11   So in my understanding there is a personal protection order and

12   exclusion order.  The personal protection order does not say

13   that the batterer would stay away; it basically says do not

14   batter, refrain from battering.

15        THE COURT:  Do you know if courts in Singapore have

16   jurisdiction and authority to fashion relief appropriate to the

17   circumstances presented, or are they precluded from doing so?

18        THE WITNESS:  I do not know the answer to that.

19        THE COURT:  Thank you.  Next question.

20   BY MS. LEIDHOLDT:

21   Q.  Ms. Hassan, do you know, were you able to determine from

22   the consultations that you had with attorneys practicing in

23   this Singapore system or advocates working on behalf of victims

24   in the Singapore system whether it's common practice for

25   personal protection orders to require alleged perpetrators to

1   stay away from their victims?

2          MR. ARENSTEIN:  Objection.

3          THE COURT:  Overruled.

4   A.  I did not get that that was common practice.

5   Q.  Ms. Hassan, are victims, or I believe the term is

6   "complainants," pursuing personal protection orders in

7   Singapore family court provided with representation by the

8   court when they cannot afford counsel?

9   A.  Not to my knowledge, no.

10  Q.  Ms. Hassan, to the best of your knowledge, are children of

11  complainants alleging domestic violence in the family court in

12  Singapore, are children covered under their parents' personal

13  protection order?

14         MR. ARENSTEIN:  Objection.

15         THE COURT:  Overruled.

16  A.  To my knowledge, no.

17  Q.  What, if anything, is the requirement in Singapore family

18  court for a child to receive the protection afforded by a

19  personal protection order?

20  A.  Based on my consultations, the child would have had to have

21  undergone violence and have a protection order for the child.

22  It wouldn't be covered under the mother's.

23         THE COURT:  But the family courts in Singapore have

24  jurisdiction to enter a protection order for the child, is that

25  correct?

 1              THE WITNESS:  That is my understanding.

 2              THE COURT:  Thank you.

 3              THE WITNESS:  But I'm not a hundred percent this came

 4  up.

 5              THE COURT:  Thank you.

 6  Q.  To the best of your knowledge, would a child be afforded a

 7  protection order in Singapore family court in order to protect

 8  that child from exposure to the domestic violence of a parent?

 9              MR. ARENSTEIN:  Objection.

10              THE COURT:  Overruled.

11  A.  No.  I was told it's extremely rare to get such.

12  Q.  Were you told of any occasion in which there was an order

13  of protection issued in Singapore family court to protect a

14  child from exposure to domestic violence directed against a

15  parent?

16  A.  I don't know of any single case.

17              MR. ARENSTEIN:  Objection.

18              THE COURT:  Overruled.

19  Q.  Ms. Hassan, would you briefly --

20              THE COURT:  You don't of any where there were granted,

21  they don't know of any where they were denied?

22              THE WITNESS:  Absolutely.

23              THE COURT:  Thank you.

24  Q.  Ms. Hassan, how do domestic violence laws in Singapore

25  compare to domestic violence laws in this system, for example,

1   in the system in New York State in particular?  Could you

2   briefly describe how the laws and the application of those laws

3   compare.

4   A.  Yes.  From the onset, if a woman is a victim of domestic

5   violence and she calls the police, the police have to arrive

6   and act.  And if there is reasonable cause, they have to make

7   an arrest.

8   Q.  In which system, please?

9   A.  In the New York system.  I'm sorry.  We already went

10  through the Singapore system, right?

11  Q.  Yes, thank you.

12  A.  I'm assuming you don't want me to repeat.  The differences,

13  key differences, are, number one, the police will respond and

14  protect you.  Number two, the woman does not have to have a

15  medical examination to prove injuries, because there is an

16  understanding that she is not directed immediately to medical

17  examination.  Number three, she is not required to undergo

18  mediation or counseling with the batterer.  Number four --

19  Q.  Do you know why mediation or counseling is not being

20  required in our system --

21          MR. ARENSTEIN:  Objection.

22          THE COURT:  Sustained.

23  Q.  -- in cases of domestic violence?

24          MR. ARENSTEIN:  Objection.

25          THE COURT:  Sustained.

1    Q.  I'm sorry.  Please continue.

2            THE COURT:  No.  I sustained the objection.  Next

3    question.

4    Q.  Are there any other respects in which the system in New

5    York differs in terms of protection of victims from the system

6    in Singapore?

7    A.  A woman would not be required to leave her house if she is

8    battered, so exclusion orders would be entered so she can lead

9    her normal life while the case is being --

10           MR. ARENSTEIN:  Objection.  Move to strike.

11           THE COURT:  Overruled.  Take your motion under

12   advisement.

13   Q.  In protection order proceedings in New York, if you know,

14   is a history of domestic violence considered relevant and is it

15   typically admitted in protection order cases in the court

16   system in New York?

17           MR. ARENSTEIN:  Objection.

18           THE COURT:  Sustained.

19   Q.  What, if anything, do you know about whether courts

20   presiding over protective order proceedings in this system

21   permit evidence about the history of domestic violence in the

22   parties' relationship?

23           MR. ARENSTEIN:  Objection.

24           THE COURT:  Overruled.

25   A.  The courts will allow.  That is seen as highly relevant.

1          THE COURT:  Read that answer back, please.

2          (Answer read)

3          THE COURT:  Next question.

4     Q.  In your preparation for your testimony, did you hear about

5     instances in Singapore when the family court kept out,

6     excluded, evidence of the history of domestic violence?

7          MR. ARENSTEIN:  Objection.

8          THE COURT:  Sustained as to anything you learned from

9     respondent's counsel about the facts of this case, any other

10    instance you're free to testify as to.

11    A.  I don't think I know of any.

12         THE COURT:  Thank you.  Next question.

13    Q.  I'd like to direct your attention, Ms. Hassan, specifically

14    to the situation of immigrant victims of domestic violence.

15    Are there any protections conferred on immigrant victims of

16    domestic violence in this system?

17         THE COURT:  Which system?

18    Q.  The system in the United States, if you are aware.

19         MR. ARENSTEIN:  Objection.

20         THE COURT:  What is that relevant to?

21         MS. LEIDHOLDT:  It's relevant, your Honor, because the

22    system in the United States recognizes that immigrant victims

23    are especially susceptible to abuse, to their abusers using

24    their immigration status or lack of immigration status against

25    them.

1          THE COURT:  Yes?

2          MS. LEIDHOLDT:  And have promulgated protections under

3     federal law.

4          THE COURT:  I understand that.  What is it relevant

5     to?

6          MS. LEIDHOLDT:  And there are no comparable

7     protections in Singapore for immigrant victims of domestic

8     violence.

9          THE COURT:  You have asked about U.S., and I'm asking

10    you what the relevance of the protections afforded under U.S.

11    law is.

12         MS. LEIDHOLDT:  Generally, the difference between

13    protections afforded victims in the United States and in

14    Singapore, but more specifically to the fact that in

15    Singapore --

16         THE COURT:  No, no.  My inquiry only related to the

17    United States.

18         MS. LEIDHOLDT:  Yes.

19         THE COURT:  I'm sustain the objection.

20         MR. ARENSTEIN:  Thank you, your Honor.

21    Q.  Does Singapore criminal law penalize all forms of marital

22    rape?

23         MR. ARENSTEIN:  Objection.

24         THE COURT:  Overruled.

25    A.  They don't penalize any form, with three exceptions.

1  Marital rape is not a crime if your wife is over 13, and it

2  would only be unlawful if there is a separation agreement or

3  there is a divorce proceeding or a separation proceeding.

4  Q.  If you know, Ms. Hassan, how prevalent is marital rape in

5  the context of intimate partner abuse?

6         MR. ARENSTEIN:  Objection.

7         THE COURT:  Sustained.

8  Q.  To the best of your knowledge, Ms. Hassan, if a party has a

9  personal protection order in Singapore, is the Shariah court

10 obligated in any way to consider that order in any custody or

11 divorce proceedings?

12 A.  No.

13        MR. ARENSTEIN:  Objection to the form of the question.

14        THE COURT:  Overruled.  As I understand it, the

15 Shariah court in Singapore in this dual system is relatively

16 young.  You mentioned 1995 perhaps.

17        THE WITNESS:  Right.

18        THE COURT:  Do you know how many disputed custody

19 cases are heard in Shariah court in Singapore, approximately,

20 in the course of a year?

21        THE WITNESS:  I do not.

22        THE COURT:  Thank you.  Next question.

23 Q.  You testified that Shariah is not taught in law school in

24 Singapore, and you have testified that Shariah law is not

25 codified under AMLA.

1              THE COURT:  Do you know what "AMLA" stands for?

2              THE WITNESS:  I have the statute right here, so I can

3       tell you.

4              MR. ARENSTEIN:  Is the witness going to refer to a

5       document for this testimony?

6              THE COURT:  Yes.

7              MR. ARENSTEIN:  Can I see the document she is looking

8       at?

9              THE COURT:  Yes.  She said the statute.

10             THE WITNESS:  I have all the statutes.  But these are

11      the rape statutes.

12             MR. ARENSTEIN:  You asked the witness for what it was

13      called, and she is looking to find out the name?

14             THE COURT:  What are you doing, Mr. Arenstein?

15             MR. ARENSTEIN:  I'm just trying to understand what's

16      going on.

17             THE COURT:  Are you making an objection of some sort?

18             MR. ARENSTEIN:  I'm making an objection, your Honor.

19             THE COURT:  Then your commentary is unnecessary.

20      Please be seated.

21             THE WITNESS:  In every jurisdiction these statutes

22      have different names.  That's why I don't know, because we do

23      Shariah law in every -- let me find the statute.

24             MS. LEIDHOLDT:  Your Honor, may I refresh the

25      witness's recollection?

 1              MR. ARENSTEIN:  Objection.

 2              THE COURT:  Sustained.

 3              MR. ARENSTEIN:  Objection.

 4              THE WITNESS:  No, it's fine, I'll get it.  It's

 5     Administration of Muslim Law Act.

 6              THE COURT:  Thank you.  We are going to break for the

 7     day and we'll pick up tomorrow morning.  Are you available

 8     tomorrow morning?

 9              THE WITNESS:  Yes, I am.

10              THE COURT:  I think we can begin at 10 o'clock

11     tomorrow morning.  Hope you all have a very pleasant evening.

12     See you tomorrow morning.

13              (Adjourned to 10:00 a.m., December 13, 2012)

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                    Page

        Cross By Mr. Arenstein  . . . . . . . . 727
        Redirect By Ms. Leidholdt . . . . . . . 772
        Recross By Mr. Arenstein  . . . . . . . 796

LEE JEN PINK

        Direct By Ms. Leidholdt . . . . . . . . 805
        Cross By Mr. Arenstein  . . . . . . . . 833


YASMEEN HASSAN

Direct By Ms. Leidholdt  . . . . . . . . . . 834


                       PETITIONER EXHIBITS

Exhibit No.                                Received

AA1 and AA2  . . . . . . . . . . . . . . . 732

 BB1 and BB2  . . . . . . . . . . . . . . . 736

 CC   . . . . . . . . . . . . . . . . . . . 739

 FF1 and FF3  . . . . . . . . . . . . . . . 767

 I  . . . . . . . . . . . . . . . . . . . . 757

 M  . . . . . . . . . . . . . . . . . . . . 726

 M2  . . . . . . . . . . . . . . . . . . . . 799

 T1  . . . . . . . . . . . . . . . . . . . . 726

 W  . . . . . . . . . . . . . . . . . . . . 731

                       RESPONDENT EXHIBITS

Exhibit No.                                Received

23  . . . . . . . . . . . . . . . . . . . . 796

 24, 25 26, 27, 29 and 29  . . . . . . . . 833