Ccdrsou1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   In the Matter of one infant child
    ABDOLLAH NAGHASH SOURATGAR,
4
                    Petitioner,
5
              v.                        12 Civ. 7797 PKC
6
    LEE JEN FAIR,
7
                    Respondent.
8
    -------------------------------x
9
                                        December 13, 2012
10                                      10:15 a.m.

11

12  Before:

13                  HON. P. KEVIN CASTEL,

14                                      District Judge

15

16                      APPEARANCES

17  ROBERT D. ARENSTEIN,
    SANDRA NUNEZ,
18       Attorneys for plaintiff

19  PATTON BOGGS LLP
         Attorneys for defendant
20  BY:  ANDREW J. McNALLY, Esq.
         DORCHEN A. LEIDHOLDT, Esq.
21                 Of counsel

22  Also Present:

23       JENNIFER BAUM,
         JENNA DiCOSTANZO,
24       Guardians ad Litem
          – and –
25       JANE KIM, Esq.

Ccdrsou1

 1              (Hearing resumed)

 2       YASMEEN HASSAN, resumed.

 3              THE COURT:  The Court reminds the witness that you are

 4       still under oath.

 5              You may continue.

 6              MS. LEIDHOLDT:  Thank you, your Honor.

 7       DIRECT EXAMINATION

 8       BY MS. LEIDHOLDT:

 9       Q.  Ms. Hassan, what is Shariah law?

10       A.  Shariah, the word means the straight path.  It's the path

11       all Muslims are supposed to follow.  From Shariah comes a whole

12       list of jurisprudence that applies to Muslims.  There are four

13       main sources of Shariah law.  Two of the most important ones

14       are the holy Qur'an and the Hadith of the prophet, the actions

15       and words of the prophet when he lived 1400 years ago.

16              THE COURT:  It means the path, is that what it

17       literally means?

18              THE WITNESS:  Yes.

19              THE COURT:  Thank you.

20       BY MS. LEIDHOLDT:

21       Q.  In addition to the Qur'an and the Hadith or the sayings and

22       actions of the prophet, are there any other sources of Shariah

23       law.

24       A.  There is consensus among the jurists, like the religious

25       community.  And there was another source which is ijtahad,

Ccdrsou1                          Hassan - direct

```
 1  which was reasoning which was closed about 800 years ago,
 2  wherein lies the problem with the Islamic law today.
 3  Q.  What do you mean which was closed approximately 800 years
 4  ago?
 5  A.  At the time of the Ottoman Empire, there was a decision
 6  made that there are no Islamic scholars who are wise enough to
 7  apply their own legal reasoning to a situation that exists in
 8  the world, so they literally closed the door to ijtahad.  As a
 9  result, people are now bound by only the Qur'an, the Hadith,
10  and consensus from the jurist community derived from the Qur'an
11  and Hadith but not independent reasoning.
12           THE COURT:  Let me ask a question.  It may be
13  something you have thought about or it may be something you
14  haven't.  What, in your view, is AMLA?  Is it Shariah law or is
15  it civil law of the Republic of Singapore that governs how a
16  Shariah court may operate?
17           THE WITNESS:  AMLA gives a lot of discretion, which is
18  very common.  All Shariah courts are.  Usually Shariah law is
19  not codified, as you see in Saudi Arabia and a lot of other
20  countries.  At the time of colonization, the British and the
21  French and who-have-you codified these laws because there was a
22  lot of uncertainty among people about what their rights
23  actually were.  So every form of codification is not completely
24  accurate, and it still gives the judge a lot of discretion and
25  leeway in applying principles of the Qur'an and the Hadith to
```

Ccdrsou1                         Hassan - direct

1    judgment.

2              THE COURT:  I understand that.  What I'm driving at,

3    is AMLA an enactment of the Republic of Singapore?  Is it a law

4    of the Republic of Singapore which binds those who would

5    operate a Shariah court, or is it something different from

6    that, some principle adopted by the Shariah courts themselves?

7              THE WITNESS:  No.  The Republic of Singapore has given

8    authority to the Shariah court to decide certain matters

9    relating to Muslims, and AMLA gives the judges wide latitude in

10   deciding what those things are.  So its not perfectly codified.

11   In other countries you would see that they tried to codify the

12   principles more.

13             Here there is a lot more discretion on fundamental

14   principles of evidence, what kind of evidence is acceptable to

15   the court, whether Muslims or non-Muslims or women's evidence

16   will be given certain weight.  In other countries you see this

17   is already codified.  For example, in Pakistan they say a

18   woman's testimony will be half that of a man.  That's codified.

19   In AMLA, the judges are free to apply those principles from the

20   Qur'an and Hadith, but it is not written down, but it gives

21   them a lot of latitude.

22             THE COURT:  AMLA is not a rule of the Shariah court,

23   it is a statute of Singapore?

24             THE WITNESS:  Yes, which gives then the Shariah judges

25   a lot of latitude in decisions.

Ccdrsou1                          Hassan - direct

1          THE COURT:  Thank you.  Next question.

2    BY MS. LEIDHOLDT:

3    Q.  Are there different schools of Islamic law?

4    A.  Yes, there are four main schools.  In Sunni Islam there is

5    the Hanafi, the Hanbali, the Shafi'i, and the Maliki.  Then

6    Shia Islam applies to Iran, which is also a fifth school.

7          MR. ARENSTEIN:  Objection to Iran.

8          THE COURT:  Overruled.

9    Q.  Briefly, are there principle differences among these

10   schools of Islamic thought or is there a fundamental consensus?

11   A.  There are slight differences.  I don't know if you want me

12   to go into this now.  But on principles of human rights -- not

13   human rights.  I will take that back.  Principles on women's

14   rights and rights of minorities, there is generally consensus

15   among the schools.

16         THE COURT:  Yesterday you enlightened me that your

17   understanding is that the Muslim population of Singapore is a

18   minority perhaps in the neighborhood of about 15 percent of the

19   population.  Do you recall that testimony?

20         THE WITNESS:  Yes, I do.

21         THE COURT:  Do you know whether that minority is

22   principally Shiite or principally Sunni or principally of one

23   school of thought, or is there diversity among the members of

24   this minority population in Singapore, as there is diversity in

25   the Muslim population, as I understand it, in the United

Ccdrsou1                          Hassan – direct

1    States?

2          THE WITNESS:  Right.  These are schools of law.  You

3    can ascribe to a particular person what School of Law they

4    belong to.  Singapore follows the Shafi'i School of Law.  That

5    has been mentioned before.  That is what Malaysia also follows,

6    and Singapore is very influenced by that School of Law.

7    Q.  Ms. Hassan, is Shariah law codified within AMLA, the

8    Administration of Muslim Law Act, in Singapore?

9    A.  No.  As I said before, AMLA gives general guiding

10   principles of how the procedures work a little bit.  But it

11   gives a lot of discretion to the qadi to decide the

12   application.

13   Q.  Ms. Hassan, given that Shariah is not in fact codified

14   under AMLA and given that judges have discretion, do you have

15   any indication of the latitude of that discretion?

16         MR. ARENSTEIN:  Objection to the form of the question.

17         THE COURT:  It is not artful, but I think the witness

18   understands it and I understand it.  You don't need premises in

19   your question.  You have established or you have elicited

20   testimony on the other two points.  Just ask your question.

21         Do you understand the question?

22         THE WITNESS:  Yes, I do.

23         THE COURT:  All right.

24   A.  As I said before, the sources, the main sources, are the

25   Qur'an and the Hadith.  On issues relating to women and

Ccdrsou1                          Hassan - direct

1    minorities and children, it is very clear.  There is a verse in

2    the Qur'an, and I can read it to you, which requires wives to

3    be obedient to husbands and gives husbands the right to

4    physically discipline them.  That is from chapter 4 of the

5    Qur'an, verse 34.  Do you have permission to read that?

6              THE COURT:  It's not necessary.  You have testified,

7    and that's fine.

8    A.   They are Hadith of the prophet and his companions which

9    clearly discourage women from coming forward and in a public

10   forum complaining about their husbands.  Those women are seen

11   to be cursed by God.  There is provisions in the Hadith that

12   say that bad women will have no place in heaven.  So there is a

13   lot of, not jurisprudence, but the sources of the Qur'an and

14   the Hadith that discourage women from coming forward to report

15   anything from the husband, and it gives husbands right to

16   discipline their wives.

17             Generally speaking, in Shariah law and based on the

18   Qur'an and the Hadith, a marriage contract is seen as a

19   contract between a man and a woman whereas the man has to

20   provide support for the woman and the woman gives him her

21   sexual and reproductive service and her duty of obedience.

22             THE COURT:  And a duty of obedience?

23             THE WITNESS:  Obedience, yes.

24   Q.   You testified yesterday that Shariah law is not taught in

25   law schools in Singapore.  Are Shariah law attorneys in

Ccdrsou1                          Hassan – direct

1   Singapore required to obtain any special accreditation or
2   license to practice in the Shariah court?
3   A.   No, they are not.  My understanding is they have to consult
4   with religious authorities, look at past judgments.  I wasn't
5   able to figure out how they get the past judgments, because
6   they are not published.  I was trying to ascertain how many
7   cases have ruled this way.  It's not possible to get that
8   information, because the judgments are in the court, they are
9   not published in a forum.  So I don't understand how they even
10  study Shariah law.  It is with religious authorities, with
11  other lawyers.  The system seem a little bit confusing to me.
12  Q.   How, then, Ms. Hassan, do Shariah law attorneys and judges
13  actually learn what Shariah law is in Singapore?
14            MR. ARENSTEIN:  Objection.
15            THE COURT:  Overruled.
16  A.   From what I could gather, they practice before qadis and
17  the qadis have extreme discretion.  There is no system where
18  they learn what it is.  Again, it is from consulting religious
19  authorities.  There is a majlis that they can get of lawyers,
20  and people can submit to a majlis for a fatwa on a particular
21  question.  That body gives a fatwa.  But there doesn't seem to
22  be any way in which people can know how the Shariah law is
23  going to rule on a particular instance, and there doesn't seem
24  to be some training of lawyers on these matters.
25            THE COURT:  Did you say "qadis" before?

Ccdrsou1                          Hassan – direct

1          THE WITNESS:  "Qadi," yes.

2          THE COURT:  Meaning?

3          THE WITNESS:  Judges.  Sorry.

4          THE COURT:  That's spelled?

5          THE WITNESS:  Q-A-D-I.

6          THE COURT:  Thank you.

7   Q.  What is a fatwa?

8   A.  A fatwa is a religious body of religious people who are

9   ulama.  "Ulama" means learned in religious law and religious

10  custom.  This is very common in Muslim countries.  They get a

11  question of daily life and they say, how will you decide this

12  based on Islam?  Then they study that question and they give an

13  answer about the application of Islamic principles to that

14  question.

15          How it's seen over here is generally fatwas, like

16  there was one on Salman Rushdie, that he is an apostate and

17  should be killed.  That was a very extreme measure.  But on

18  every day matters, on marriage, divorce, and all, you can get a

19  fatwa from a religious authority to determine how Islam would

20  view that situation.

21          THE COURT:  That could be specific to a particular set

22  of facts?

23          THE WITNESS:  Yes.

24          THE COURT:  Is that done by a court?

25          THE WITNESS:  It's not a court the way I see it in

1     Singapore.  It's a collection of learned religious leaders who

2     sit down and deliberate on that matter, and then they will

3     give -- according to what I know about Singapore, the courts

4     usually follow that fatwa.  If a court has asked the religious

5     leaders or if a lawyer or a party has asked for a fatwa and the

6     religious authorities give that fatwa, that seems to be

7     generally followed.

8              THE COURT:  Is the fatwa weighing the facts and

9     circumstances of the case or is it announcing a principle or

10    rule or interpretation?

11             THE WITNESS:  It's more the latter.

12             THE COURT:  Thank you very much.

13    Q.  Are there women among the religious authorities who are

14    authorized to issue a fatwa?

15             MR. ARENSTEIN:  Objection.

16    A.  Not to my knowledge.

17             THE COURT:  Overruled.

18    Q.  Ms. Hassan, could you specify what are the core fundamental

19    principles of Shariah law as they relate to women.

20             MR. ARENSTEIN:  Objection to the form of the question.

21    It's a broad question.

22             THE COURT:  Sustained.

23    Q.  What are the fundamental principles of Shariah law as

24    related to the treatment of women?

25             MR. ARENSTEIN:  Objection.

1          THE COURT:  Sustained.

2          MS. LEIDHOLDT:  Your Honor, I haven't finished my

3     question.

4          THE COURT:  That might explain why I sustained the

5     objection.  Go ahead and restate your question.

6          MS. LEIDHOLDT:  I'll rephrase my question, your Honor.

7     Q.  What, if any, are the principles of Shariah specifically as

8     related to women and to marriage?

9          MR. ARENSTEIN:  Objection.  It's a broad question.

10         THE COURT:  I will allow the question if it is

11    modified to be women in relation to marriage, not women and

12    marriage.  Women in relation to marriage.

13         MS. LEIDHOLDT:  Women in relation to marriage, yes,

14    your Honor, that is perfectly acceptable.

15         THE COURT:  Otherwise, the two topics, it's compound

16    and it's way too broad.

17         MS. LEIDHOLDT:  Thank you, your Honor.

18         THE COURT:  I'm not sure any of it is relevant, but

19    I'm going to take the testimony anyway.  Go ahead.

20    A.  I already talked about the principles of marriage.  But

21    it's the exiting out of marriage and the women's rights to

22    divorce.  Shariah law is very discriminatory as we understand

23    discrimination based on equality between the sexes.  Men have a

24    unilateral right to divorce.  They can pronounce divorce on

25    their wife any time under any circumstances. Jurisdictions,

including Singapore, try to modify that so they make a waiting

period where you have to get some mediation and all that.

        Women have very limited rights to divorce under

Islamic law.  Generally, they have to prove certain grounds of

cruelty, bad treatment, abandonment, impotence, and that has to

be litigated.  So there is a very unequal right of men and

women to divorce.

        Shariah courts generally are not willing to -- they

are very antidivorce.  Even though men have unqualified rights

to divorce, they look at divorce by women in a very bad angle,

given that there is all this wife obedience stuff in the Qur'an

and the Hadith.  So there is not an equal right to divorce.

        On custody of children, which is also related to

divorce and marriage, the Shariah very clearly says that men

are the guardians of their children.  How that has been

interpreted is that legal custody of a child always remains in

the father.

        Different jurisdictions have done different things

about physical custody.  There is a presumption that in very

early years of a child's development, the mother is the best

guardian, physical guardian, not legal, of the child.

Different schools of law have different ages that they have

given to it.

        So in a particular school there is a boy at 4 years

old and a girl at 7 years old.  Malaysian law, which I think

Ccdrsou1                              Hassan - direct

applies -- which I know applies in Singapore, puts the ages at

7 for boys and 9 for girls.  At that time there is a custody

transfer, so the physical and legal custody after that age is

presumed to be with the father.

          This is also qualified by if the woman is not a Muslim

in a marriage, she does not retain custody of her child.  So

different schools of law.  Certain schools, like the Hanbali

school, will say if the woman is not a Muslim, she is apostate

and that is out, she will not have any rights to the child.

          Other schools are a little bit -- which is not the

Shafi'i school.  Shafi'i school says a woman who is not a

Muslim cannot have the child.  In determining whether you are

Muslim or not, they will look at what is your religious

influence on the child.  If the child, for example, is taken to

church or given some other kind of religious training, that

would go against the thing.

          So I think basically the issues are divorce and

custody and rights within marriage.

Q.  What is the basis for your assertion that the Shariah law

discourages divorce?

A.  There are a lot of, again, Qur'anic verses in Hadith that

God does not look well on divorce, which is funny because it

also gives the men the unilateral right to divorce.  Most of

the jurisprudence comes from the Hadith of the prophet in

relationship to women asking for divorces.

Ccdrsou1                              Hassan – direct

1              So there are sources of Islamic law that discourage

2     divorce.  Seen together with the wife obedience statute and

3     that women are meant to provide sexual services and just

4     services to their husband, it is very frowned upon.  So the

5     woman's rights to divorce across the board in Islamic countries

6     is very hard.  It's called faskh divorce in Singapore, I

7     believe.  It's called khul divorce in other places.  But it is

8     a very high standard.

9     Q.  Do you have any evidence that what you have just detailed

10    is true of the Shariah court system in Singapore?

11    A.  From the facts of this case as I see them, I have seen that

12    the defendant in the case was strongly discouraged.  She was

13    sent over to mediation, where she was told that her husband has

14    the right to beat her and she was told that she would not get a

15    divorce and this would not be in the best interests of the

16    child.  So it seems to follow everything that I know about

17    Shariah law.

18              MR. ARENSTEIN:  Objection, your Honor.

19              THE COURT:  Your answer is limited to what you have

20    been told by someone else transpired, right?

21              THE WITNESS:  Yes, and the papers that I read related

22    to this case.

23              MR. ARENSTEIN:  Objection.

24              THE COURT:  I'll let it stand subject to a motion to

25    strike.

Ccdrsou1                              Hassan - direct

1              MR. ARENSTEIN:  Motion to strike.

2              THE COURT:  Next question.

3    Q.  Are you familiar with a website that is published by the

4    Shariah court in Singapore?

5    A.  Yes, I am.

6    Q.  Did you have the opportunity to review that website?

7    A.  Yes, I did.

8    Q.  What, if anything, did you observe on that website related

9    to the issue that we are discussing, whether or not the Shariah

10   court in Singapore discourages divorce?

11             MR. ARENSTEIN:  Objection, your Honor.

12             THE COURT:  Basis?

13             MR. ARENSTEIN:  The website speaks for itself.  And

14   apparently testimony was elicited yesterday that she hadn't

15   looked at the website.  If she has looked at it now --

16             THE COURT:  You can save that for cross-examination.

17   I'll allow the question.

18   A.  I don't believe I said I didn't look at the website.  I

19   have looked at the website.  There are principles on it which

20   strongly discourage divorce.  They say that there will be

21   mediation with the whole hope of bringing the parties back

22   together.

23   Q.  What specifically would a domestic violence victim in the

24   Shariah court in Singapore need to establish in order to obtain

25   a divorce from her husband if the husband did not consent to

Ccdrsou1                              Hassan - direct

1  the divorce?

2          MR. ARENSTEIN:  Objection.

3          THE COURT:  Pause.  How is this relevant to this case?

4          MS. LEIDHOLDT:  Your Honor, it goes to women's rights

5  in the Shariah system in Singapore vis-a-vis divorce in

6  particular.

7          THE COURT:  How is that an issue in this case?

8          MR. McNALLY:  It's an issue in this case because one

9  of the issues is to what extent it might be possible for our

10 client, Ms. Lee, to obtain a divorce from her husband.

11         THE COURT:  How is that relevant to this case?

12         MR. McNALLY:  Her ability to obtain a divorce from her

13 husband goes to her rights to protect herself and her child

14 from the abuse of the husband.

15         THE COURT:  Let me say unequivocally I want the

16 respondent to be able to protect herself.  I want the

17 petitioner to be able to protect himself.  I want everyone's

18 human rights to be observed.  But none of that has to do with

19 my job as a judge presiding in this case.

20             Domestic violence is a scourge, it is a horrible

21 thing, it is terrible.  Forcing people to remain in a marriage

22 they don't want may be a terrible thing.  But the treaty

23 doesn't give me the right to pronounce such judgments, and

24 anything I say on that subject is purely gratuitous and has

25 nothing to do with my job as a judge.

Ccdrsou1                        Hassan – direct

1           The issue in this case is whether or not the return of

2    this child presents a grave risk of harm to him, psychological

3    or physical, or otherwise creates an intolerable situation to

4    him, and also the issue that arises under article 20.  There

5    the issue of how custody will be dealt with is relevant here.

6    You have the right to put on your case under article 20, but,

7    sad though it may be as to the ease or difficulty of obtaining

8    a divorce in a Shariah court, you have to tie that in to the

9    article 20 defense.

10          If you have some evidence that a Shariah court can

11   compel your client to cohabitate with Shayan with Mr.

12   Souratgar, that I would encourage you to develop.  That could

13   be highly relevant to this proceeding.  But I haven't heard any

14   such evidence thus far, so I'm sustaining the objection to the

15   question.

16          MS. LEIDHOLDT:  Your Honor, I respectfully submit that

17   if there is discrimination that is applied to Ms. Lee on the

18   basis of gender in the Shariah courts in Singapore that would

19   discourage or make it difficult or impossible for her to obtain

20   a divorce from her husband, especially her husband who has been

21   severely abusive to her, that that system in Singapore is not

22   protecting her human rights.  We believe that this goes to the

23   core of our article 20 defense.

24          THE COURT:  Say Mr. Arenstein stood up –- I'm not

25   saying he will –- say he stood up and said as to your factual

premise, so stipulated.  What does that do for you?

          MS. LEIDHOLDT:  He would stipulate that the Shariah

court discriminates against women on the basis of gender in

terms of their ability to obtain a divorce from an abusive

husband in Singapore.  Your Honor, I believe that that would

significantly advance our claim that article 20 of the Hague

Convention is applicable here and that our client's rights, her

human rights -- that, of course, includes the right to

security -- are being violated.

          THE COURT:  I think you may be right that it may go to

whether her human rights are being violated.  But you haven't

asked me, no one has asked me, to determine whether her human

rights are being violated.  That is not a question that I

understand we are trying here.  Am I wrong about that?  We are

not trying that issue, are we?  Should I say her human rights

are being violated or her human rights are not being violated?

Is that something that I am being asked to make a finding of

fact on?

          MS. LEIDHOLDT:  Your Honor, article 20 provides that

this Court may refuse to repatriate the subject child if the

repatriation would not be permitted by the fundamental

principles of the United States relating to the protection of

human rights and fundamental freedoms.

          If your Honor funds that the human rights of our

client were systematically being violated in Singapore and that

Ccdrsou1                          Hassan - direct

the human rights of women who are victims of gender-motivated

violence are not being protected by the government in

Singapore, I believe that it would be highly likely that your

Honor would rule that the article 20 defense applies in this

case.

          THE COURT:  Because?

          MS. LEIDHOLDT:  Because article 20 looks at the

protection of human rights and fundamental freedoms in the

country that the subject child would be sent to, in this case

Singapore.  It doesn't say that it considers the protection of

the human rights and the fundamental freedoms of the child

alone.  It doesn't say that.  If it did, it's so clear that the

rights of our client and the rights and well-being of this

child are so profoundly intertwined.

          THE COURT:  Let me ask you a question.  You raise an

interesting argument.  Let us assume that in a hypothetical

country there is a minority group which is systematically

beaten, tortured, impressed, imprisoned for no reason other

than their membership in that minority group, their human

rights are systematically being deprived.  And let us assume

that the two parents and the child have nothing whatsoever to

do with that minority group -- they are not members, they have

not opposed that practice -- and there is no evidence that

individuals who are not of that group are discriminated against

in any way.

Ccdrsou1                          Hassan - direct

1           In that situation would your position be that under

2     article 20, because there are citizens of that country whose

3     human rights are systematically deprived, a court should

4     sustain an article 20 defense by persons who are not members of

5     that minority?

6           MS. LEIDHOLDT:  Your Honor, the answer is no.  I think

7     the courts would have to find some nexus between the

8     deprivation of human rights and fundamental freedoms and the

9     parties in the case, some nexus.  We submit that this nexus

10    exists in this particular case.

11          THE COURT:  It seems to me that what you are eliciting

12    could have some relationship to this matter, so I'll let you

13    elicit it.  Again, oftentimes with evidence it's a question of

14    whether it makes some other proposition more likely so than

15    not.  You can ask the questions.

16          MR. ARENSTEIN:  Could I respond, your Honor, or should

17    I not respond?

18          THE COURT:  Your choice, Mr. Arenstein.  I've ruled.

19    Do you have anything else you want to say?

20          MR. ARENSTEIN:  Just one thing I want to say.  Article

21    20 was intended to address the rare occasion of return of a

22    child which would utterly shock the conscience of the court or

23    offend all notions of due process.  That statement is contained

24    in the analysis of the treaty on note 65 in the treaty.  The

25    fact is that if any testimony is coming in on article 20, it

Ccdrsou1                         Hassan - direct

1   should be testimony that shocks the conscience of the court as

2   far as that.

3         THE COURT:  Until I hear the testimony, I wouldn't

4   know whether it's going to shock my conscience.

5         MR. ARENSTEIN:  Thank you.

6         THE COURT:  If that's your objection, it's most

7   emphatically overruled.  Go ahead.  Next question.

8   BY MS. LEIDHOLDT:

9   Q.  Ms. Hassan, are parties to a divorce proceeding in Shariah

10  court required to undergo counseling?

11        MR. ARENSTEIN:  Objection, your Honor.

12        THE COURT:  Overruled.

13  A.  Yes, they are.

14  Q.  If you know, who conducts these counseling sessions in the

15  Shariah court in Singapore?

16  A.  My understanding is that the counseling sessions are

17  outsourced to other companies.  It is not somebody who is

18  trained in Shariah or it is not somebody who is controlled by

19  the court.

20  Q.  Who decides in these counseling sessions what permutation

21  of Islamic law is applied?

22        MR. ARENSTEIN:  Objection to the form of the question.

23        THE COURT:  Overruled.

24  A.  My understanding is the counselors.

25  Q.  To the best of your knowledge, does the Islamic Council of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ccdrsou1                         Hassan – direct

1   Singapore monitor these counseling programs?

2   A.   Not to my knowledge.

3   Q.   What, if anything, results from this lack of monitoring?

4   A.   Again, it's the problem throughout the system in Singapore.

5   There is no codified Shariah law there.  People are not trained

6   in what to even expect.  So it is not surprising that there is

7   confusion and people bring in every interpretation of Shariah.

8   There is no regularity in the system.

9        I was told that petitioner was told that her husband

10  has a right to chastise her, she wouldn't have rights over her

11  child, she couldn't get a divorce.  It is not surprising to me

12  because these all rise from principles based on the Qur'an and

13  Hadith.

14            MR. ARENSTEIN:  Objection.  Move to strike.

15            THE COURT:  Overruled.

16  Q.   Ms. Hassan, what rights, if any, do women have to bodily

17  and sexual integrity under Shariah law?

18            MR. ARENSTEIN:  Objection.

19            THE COURT:  I'm going to take this testimony for what

20  it is worth.  I reserve the right to consider your objection as

21  a motion to strike at the conclusion of the case.

22            MR. ARENSTEIN:  Thank you.

23            THE COURT:  You may answer.  Go ahead.

24  A.   Under Shariah law, no right to bodily or sexual integrity.

25  Women in a marriage contract are obligated to provide sexual

Ccdrsou1                               Hassan - direct

1   services to their husbands.  Their husbands have the right to

2   chastise them if they don't.  This is compounded by under

3   Singaporean law there is no marital rape recognition unless

4   you're separated.

5   Q.  Ms. Hassan, what are the fundamental principles of Shariah

6   law as related to children?

7             MR. ARENSTEIN:  Objection to the broad question, your

8   Honor.

9             THE COURT:  Overruled.

10  A.  Children are seen as the property of their fathers.  The

11  father is the legal guardian of children.  It's called the

12  wali.  The father has the right to make determinations about

13  the welfare of the child.

14  Q.  How is child custody determined under Shariah law?

15  A.  Again, it is the father, as I think I answered part of this

16  before.  The legal custody of a child is always with the

17  father.  The physical custody can be given to the mother in

18  early years, but the legal custody remains with the father.

19  The exceptions to that are if the mother is a non-Muslim, she

20  will not get physical custody.  Also, if the mother remarries,

21  the physical custody reverts to the father.  This is under the

22  Shafi'i school of law.

23            THE COURT:  Let me inquire, do you happen to know what

24  other Muslim countries are signatories to the Hague Convention?

25            THE WITNESS:  I know who are not signatories to the

Ccdrsou1                          Hassan – direct

1    Hague.  Those are most of the countries we work in.  No, I

2    don't know which are.  I'm sure Turkey is a signatory.

3              THE COURT:  Thank you.  Does Turkey have Shariah

4    courts?

5              THE WITNESS:  Yes, they do.

6              THE COURT:  Do they follow, generally speaking, the

7    principles that you have outlined in your testimony here?

8              THE WITNESS:  The Shariah courts do.  We have problems

9    with every country that has this dual system, civil and

10   Shariah.  Saudi Arabia only has Shariah.

11             THE COURT:  Saudi Arabia?

12             THE WITNESS:  Only has Shariah, and there is no

13   codification of law there.

14             THE COURT:  Thank you.

15   Q.  When you say we have problems with countries that have that

16   dual system of civil/Shariah law, will you please elaborate on

17   that.

18             MR. ARENSTEIN:  Objection to the form of the question.

19   Objection to the question.

20             THE COURT:  Sustained.  I think we have gone too far

21   afield, and I may be the one who was guilty of that in my last

22   question.  Ask your next question.

23   Q.  Ms. Hassan, if you know, is Malaysia a party to the Hague

24   Convention?

25   A.  No, it is not.

Ccdrsou1                         Hassan – direct

```
 1   Q.  If you know, is Iran a party to the Hague Convention?
 2   A.  No, it is not.
 3   Q.  How, if at all, with a mother who is officially Muslim but
 4   is a recent convert and does not practice Islam fare within the
 5   Shariah system in Singapore?
 6              MR. ARENSTEIN:  I didn't hear the question, your
 7   Honor.  I'm sorry.  Could I have it repeated?
 8              THE COURT:  Restate the question.
 9   Q.  How, if at all, would a mother who is a recent convert to
10   Islam and does not practice Islam fare in a custody proceeding
11   in the Shariah court in Singapore?
12              MR. ARENSTEIN:  Objection.
13              THE COURT:  I have the same issue that I have with Mr.
14   Awad's testimony.  This witness is qualified to testify as an
15   expert.  However, based on the testimony that I have heard so
16   far, you are familiar with the principles that are applied in
17   Shariah court, correct?
18              THE WITNESS:  Yes.
19              THE COURT:  You have read AMLA?
20              THE WITNESS:  Yes, I have.
21              THE COURT:  You have spoken to two individuals in
22   Singapore regarding the Shariah courts, correct?
23              THE WITNESS:  Right, yes.
24              THE COURT:  One of them was respondent's counsel?
25              THE WITNESS:  Yes.
```

Ccdrsou1                          Hassan - direct

1                THE COURT:  You have made inquiry about whether there

2     are reported decisions or how you get reported decisions,

3     correct?

4                THE WITNESS:  Right, yes.

5                THE COURT:  You have learned that they are not

6     available, is that correct?

7                THE WITNESS:  That's right.

8                THE COURT:  Looking at this --

9                THE WITNESS:  Can I qualify the last answer?

10               THE COURT:  Sure.

11               THE WITNESS:  The reported decisions, they are

12    decisions that they keep in every court.  They don't publish

13    them, so you can't get them.

14               THE COURT:  So they are not published or reported?

15               THE WITNESS:  Yes.  So you would have to go to each of

16    the branches of the courts to get at it.

17               THE COURT:  Like Mr. Awad, who testified in this

18    courtroom, you have never practiced in the Shariah courts in

19    Singapore?

20               THE WITNESS:  No.

21               THE COURT:  It seems to me that it is appropriate for

22    this witness to testify about general principles of law,

23    including her understanding of Shafi'i principles that may be

24    applicable.  I'll allow that.  But to testify as to what the

25    Shariah court in Singapore has done or will do, unless you have

Ccdrsou1                                  Hassan – direct

1    a statute, a case, or a point of reference, I will not allow

2    that general testimony.

3              If you can confine yourself to a case, a statute, a

4    principle of interpretation, making it clear that this is not

5    based on your own firsthand experiences, then I'll allow you to

6    answer.  Otherwise, if you can't answer in that fashion, then I

7    would not allow you to answer.  Do you understand my

8    instruction?

9              THE WITNESS:  Yes, I do.

10             THE COURT:  You are obviously very bright.  You are a

11   member of the bar of the State of New York?

12             THE WITNESS:  Yes.

13             THE COURT:  And practiced for many years in one of the

14   leading firms in this country.  I'll allow you to testify.  Go

15   ahead.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

CCDJSOU2                        Hassan - direct

1              MS. LEIDHOLDT:  Your Honor, if I may?

2              Ms. Hassan has testified that the Shairiah system in

3    Singapore --

4              THE COURT:  I heard the testimony.  What is your

5    point?

6              MS. LEIDHOLDT:  -- is deeply interconnected with the

7    Shairiah system in Malaysia and, in fact, takes guidance from

8    the Shairiah system in Malaysia.

9              When Ms. Hassan detailed her credentials, she has had

10   extensive interaction with the Shairiah system in Malaysia, has

11   studied under and worked with one of the leading scholars of

12   the Shairiah system in Malaysia, and in addition to her

13   consultations with two lawyers and one practitioner in the

14   Shairiah system in Singapore, has had extensive consultations

15   for many years about the Shairiah system in Malaysia.

16             I respectfully submit that this expertise and the body

17   of knowledge she obtained in this way qualifies her to respond

18   to questions about the Shairiah system as practiced in

19   Singapore.

20             THE COURT:  Thank you.  My ruling stands.

21             MS. LEIDHOLDT:  Thank you.

22             THE WITNESS:  Could you repeat the question.

23             MS. LEIDHOLDT:  I am posing a new question.

24             THE WITNESS:  Sorry.

25             (Off-the-record discussion)

1    BY MS. LEIDHOLDT:

2    Q.  In relation to the Shafi School of Islamic Law and the

3    principles of that particular school, how would a Shairiah

4    court that applies Shafi law respond to the custody case, and

5    really to the custody case of a recent convert, a woman who was

6    a recent convert to Islam and is a non-practicing Muslim, if

7    the other parent is a Muslim by birth, how would the custody

8    case under those circumstances be evaluated?

9              MR. ARENSTEIN:  Objection.

10             THE COURT:  Sustained.  I'll allow you to testify to

11   what principles from the Shafi School would be applied, in your

12   view, to a judge looking to the Shafi School, what principles

13   would he learn that might be applicable in such a circumstance.

14   That I'll allow you to testify to.

15   Q.  Okay.  So under the Shafi School, as I mentioned, there is

16   an -- and as applied in Malaysia -- there is the physical

17   custody.  Legal custody goes to the father.  The physical

18   custody of boys up to the age of 7 and girls up to the age of 9

19   stays with the mother.

20             Upon attainment of age 7 for boys and 9 for girls,

21   there is a transfer of physical custody to the father, but if

22   the mother -- when the courts are looking at what they call the

23   best interest of the child, paramount in that consideration is

24   will the child be raised as a Muslim -- so if the mother in

25   that situation is not a Muslim, then the custody will not be

CCDJSOU2                        Hassan - direct

1    given to the mother, or if the mother is of Muslim in name only

2    and she cannot say that she will raise that child as a Muslim,

3    because best interests an seen in a Shairiah court, the

4    paramount consideration is will the child be raised as a

5    Muslim.  In that situation, a mother who is not a practicing

6    Muslim will not be given custody.

7              (Off-the-record discussion)

8    BY MS. LEIDHOLDT:

9    Q.  Ms. Hassan, what are the fundamental principles of Shairiah

10   law as related to non-Muslims?

11             MR. ARENSTEIN:  Objection.

12             THE COURT:  I think we're far afield, but I'll allow

13   it.  Go ahead.

14   A.  I am assuming this question is about how Shairiah court

15   will look at non-Muslims.

16             First of all, testimony of non-Muslims is not on the

17   same level as that of a Muslim.  Just like in Shairiah court,

18   the testimony of a woman is much less than a man.  So it is,

19   according to defense school, sometimes people don't allow women

20   to testify and they don't allow non-Muslims to testify in

21   certain situations.

22             Shairiah law considers non-Muslims basically second

23   class citizens, so it is never an equal situation in a Shairiah

24   court.  I have seen in AMLA statute it says the oath that you

25   take, Section 42 of AMLA, that the oath that is required to be

CCDJSOU2                          Hassan - direct

1    taken before a court is a Muslim oath and that the court has

2    discretion in allowing an affirmation, which I assume is for

3    non-Muslims instead, but it is in the discretion of the court

4    to even allow it.  That is very specific to AMLA.

5    Q.  What weight does the Shafi School give to the testimony of

6    a woman witness?

7              MR. ARENSTEIN:  Objection.

8              THE COURT:  Overruled.

9    A.  In most cases, women's evidence is not given the same

10   weight as a man.  There is a verse from Koran that says in

11   matters related to financial matters, which is property and

12   all, two women must be called to testify in place of one man.

13   In that situation, the testimony of a woman is equal to half

14   that of a man.  You always have to get two women to testify,

15   and that counts as one male, one male.

16             In other cases, they are, particularly to testimony to

17   adultery, fornication, only the testimony of Muslim male

18   witnesses will stand.  So according to different things,

19   women's testimony definitely is not given the same weight as

20   that of a man.

21             Depending on what the crime or issue is, there are

22   different Koran rules that apply.

23   Q.  What weight does the Shafi School of Shairiah law give to

24   the testimony of a non-Muslim witness?

25             MR. ARENSTEIN:  Objection.

CCDJSOU2                           Hassan - direct

1              THE COURT:  Overruled.

2   A.   Not much.  Again in Singapore it is in the discretion of

3   the court to take that, but it is never the same as a Muslim's,

4   the weight of that testimony will not be the same.

5              THE COURT:  Pursuant to the Shafi School?

6              THE WITNESS:  Yes.

7              THE COURT:  But pursuant to the statute, the court has

8   the discretion to consider the testimony of --

9              THE WITNESS:  I think all four schools, if I must, are

10   the same on this matter.

11              THE COURT:  When you say the court has the discretion

12   to consider the testimony of a non-Muslim, you base that on the

13   oath provision?

14              THE WITNESS:  Yes.

15              THE COURT:  Next question.

16   BY MS. LEIDHOLDT:

17   Q.   Did you find any other evidence that under the Shafi

18   School, other than looking at your testimony as applied in

19   Singapore, that the weight of a woman witness' testimony is

20   accorded -- a woman witness testimony is accorded less weight

21   than that of a male witness' testimony?

22   A.   Yes, I did.  In my conversations with Ahmad Abbas, we went

23   over cases that he had litigated in Shairiah court where women

24   witnesses were not allowed to testify in a divorce proceeding.

25              This was an adult daughter of a petitioner asking for

CCDJSOU2                          Hassan – direct

1    a divorce, and the adult daughter was not allowed to testify on

2    domestic violence because she was a woman and other relatives

3    of that same woman were not allowed to testify because they

4    were non-Muslims.

5              MR. ARENSTEIN:   Objection and move to strike the

6    testimony.

7              THE COURT:   Overruled.

8              (Off-the-record discussion)

9    BY MS. LEIDHOLDT:

10   Q.  Under Shairiah law, Ms. Hassan, do Muslims have the right

11   to renounce Islam?

12   A.  No.  Under most schools in Malaysia, for example, which is

13   the country that is closest to Singapore, that is called

14   apostasy and is punishable by death.  In Singapore, you are

15   allowed to renounce it, but then I think there are consequences

16   if you are in a custody or divorce proceeding.

17   Q.  What kinds of consequences are you talking about?

18   A.  Most particularly, you would not get custody of your child.

19   Q.  Ms. Hassan, did you have the opportunity to review the

20   testimony in this Court of the petitioner's expert witness on

21   Shairiah law, Mr. Awad?

22   A.  Yes, I did.

23   Q.  Did you read statements made by Mr. Awad to the effect that

24   the Shairiah courts in Singapore are exceptionally progressive?

25   A.  Yes, I did.

CCDJSOU2                          Hassan – direct

1   Q.  Would you concur or disagree with that statement?

2   A.  I would disagree based on my conversations with

3   practitioners before the Shairiah court as well as my

4   consideration of this matter before the CEDAW Committee.

5        I know this has been proffered into evidence, but the

6   CEDAW Committee is one of the human rights treaty bodies, And

7   they in their concluding comments issued to Singapore were

8   very, very concerned about the discrimination against women in

9   the Shairiah court and that Muslim women did not have the right

10  to bypass the Shairiah courts.

11       MR. ARENSTEIN:  Objection and move to strike the

12  testimony.

13       THE COURT:  Overruled.

14  BY MS. LEIDHOLDT:

15  Q.  Ms. Hassan, are you a practicing Muslim?

16  A.  Yes, I am.

17       MR. ARENSTEIN:  I didn't hear that.

18  A.  Yes, I am.

19       MR. ARENSTEIN:  I didn't hear the question.  I heard

20  the answer.

21       THE COURT:  Mr. Arenstein, you are free to move your

22  chair, but you're going to have to move your chair in a manner

23  which enables you to hear the testimony and the questions which

24  are otherwise audible or we will not be able to continue this

25  proceeding.

CCDJSOU2                         Hassan - direct

1              (Pause)

2              MR. ARENSTEIN:  May I just hear the last question,

3      your Honor?

4              THE COURT:  The question, if I recall it, was of the

5      witness whether she was a practicing Muslim and the answer was

6      yes.  Is that accurate?

7              THE WITNESS:  That is accurate.

8              MR. ARENSTEIN:  Thank you.

9      BY MS. LEIDHOLDT:

10     Q.  Ms. Hassan, to what extent are the rights of women and

11     children, the fundamental human rights of women and children

12     protected within the country of Iran?

13             MR. ARENSTEIN:  Objection.

14             THE COURT:  How is it relevant?

15             MS. LEIDHOLDT:  It is relevant, your Honor, because

16     there has been testimony in this case that Mr. Souratgar has an

17     intention and a desire and has been implementing a plan to take

18     the subject child Shayan to Iran, and we have had

19     conversations, your Honor, we have submitted, that if Shayan is

20     taken to Iran and if our client, Ms. Lee, goes to Iran, that

21     their fundamental human rights will not be protected,

22     specifically their fundamental rights to personal security as

23     well as other rights.

24             There are fundamental rights to protect themselves

25     from domestic violence, the domestic violence of Mr. Souratgar.

CCDJSOU2                      Hassan - direct

1    Your Honor has asked me if Ms. Lee does go to Iran, will she

2    receive protection from domestic violence by the government of

3    Iran, will she be required to cohabit with her husband in Iran.

4    I believe this is quite highly relevant to this case.

5              THE COURT:  I am asking a question of relevance.  I

6    expected that you were going to tie it into one of the two

7    defenses that you've asserted.  Which defenses does it apply

8    to, in your view?

9              MS. LEIDHOLDT:  In my view, it applies to both

10   defenses.

11             THE COURT:  Address for me how it applies to the

12   Article XX defense?

13             MS. LEIDHOLDT:  The Article XX defense?  Just one

14   second, please.

15             (Off-the-record discussion)

16             MS. LEIDHOLDT:  Your Honor, upon reflection, it really

17   is the grave risk, goes to the grave risk of harm defense

18   because the Article XX defense looks at whether or not the

19   human rights of -- and I believe there must be a nexus between

20   the parties -- will be protected and the subject child will be

21   protected in Singapore.

22             THE COURT:  Okay.  I will allow the testimony as to

23   Article XIII.  Go ahead.

24             THE WITNESS:  Okay.  There is very little protection

25   of fundamental human rights in Iran as I am aware of, and I

CCDJSOU2                         Hassan - direct

1    base this on working with human rights groups on the ground in

2    Iran that Equality Now has.  There is a lot of repression even

3    of the human rights groups there, so information that we get is

4    very hard to come by, but we get it, but at risk to the human

5    rights defenders.  They have been tortured, but there is

6    definitely no equality for women.

7         All the principles that I described of Shairiah law on

8    custody, marriage, divorce apply in Iran.  Children's rights,

9    again they're property of their father, and women's rights is

10   very qualified.  Up to the age of 7 again I believe of the

11   custody transfers to the father.  You cannot renounce Islam.

12   As a non-Muslim, you would have very, very limited rights in

13   that system.  It is a very repressive regime.

14        MR. ARENSTEIN:  Objection and move to strike the

15   testimony as -- move to strike the testimony.

16        THE COURT:  Reserved.  Next question.

17   BY MS. LEIDHOLDT:

18   Q.  To what extent within Iran would victims of domestic

19   violence, adult and child, be equipped to protect themselves

20   from the abuse of a perpetrator of domestic violence, if you

21   know?

22        MR. ARENSTEIN:  Objection, your Honor.  Iran, again as

23   I stated again, your Honor will overrule, Iran is not the

24   country involved in this case.  Nobody is going to Iran.  There

25   is no testimony to Iran.

CCDJSOU2                          Hassan - direct

1          If the theory of the respondent is that my client has

2     more than one passport and he is going to move to Iran, that is

3     not so.  Basically Iran is not the country that is being

4     litigated here.  The country that is being litigated here is a

5     return to Singapore.

6          Whether Article XX applies, Article XIII, a grave risk

7     of danger, returning to habitual residence of the child which

8     is Singapore.  It is not Iran.  Iran is not the habitual

9     residence of the child.

10         THE COURT:  Ms. Leidholt has renounced reliance of

11    Article XX with regard to this testimony.  I will take it for

12    what it is worth on the Article XIII defense.

13         Go ahead.

14         THE WITNESS:  To my knowledge, there is no domestic

15    violence law in Iran, and to my knowledge, there are no

16    statutes on child protection and there is no system of child

17    protection there, either.

18    BY MS. LEIDHOLDT:

19    Q.  Is marital rape legal in Iran?

20    A.  Yes, it is.

21    Q.  How does Iran address issues relating to custody of

22    children?

23         MR. ARENSTEIN:  Objection, your Honor.  Again I can't

24    understand how we are going into the laws of Iran when Iran

25    isn't even the subject of this case.

CCDJSOU2                           Hassan - direct

1              The fact is that --

2              THE COURT:  You have heard the respondent's theory of

3     the case.

4              MR. ARENSTEIN:  I understand that, but --

5              THE COURT:  You are not being asked to agree with the

6     theory.  The burden of proof is on the respondent on the

7     affirmative defenses, and I will allow the testimony subject to

8     a motion to strike.  Go ahead.

9     A.  Again in Iran the custody, is that the question?

10    Q.  Yes.

11    A.  It would be the same at the age of 7.  Before 7, the

12    physical custody would be given to the mother under the tender

13    years doctrine.  The legal custody would be the father.  At 7,

14    it would revert, but if a mother is non-Muslim or if the court,

15    if the Shairiah court there determines under general principles

16    of Shairiah law that the woman will not raise the child as a

17    Muslim, she will not get custody.

18    BY MS. LEIDHOLDT:

19    Q.  What, if anything, do you know about how women are treated

20    vis-a-vis men in terms of punishment for crimes in Iran?

21             MR. ARENSTEIN:  Objection.

22             THE COURT:  Now I think you're way afield.  Overruled.

23             MR. ARENSTEIN:  Overruled or sustained?

24             THE COURT:  I am sorry.  Sustained.

25             MR. ARENSTEIN:  Thank you.

CCDJSOU2                          Hassan - direct

1              MS. LEIDHOLDT:  Your Honor, if I may?

2              THE COURT:  Move on.  Next question.  We are not going

3    to have a debate.  You have my ruling.  Next question.

4    BY MS. LEIDHOLDT:

5    Q.  Are there any other forms of discrimination that are

6    imposed by the government of Iran against women?

7              MR. ARENSTEIN:  Objection.

8              THE COURT:  Overruled.

9    A.  Yes, there are.  Again the testimony of women is given much

10   less weight than the testimony of a man, and as a result, there

11   are also adultery and fornication provisions which are given

12   disproportionate protections such as stoning, stoning women if

13   the husband alleged the wife was unfaithful.  In the Iran

14   system, she would be given the punishment of stoning.

15             MR. ARENSTEIN:  Objection to relevance, your Honor.

16             THE COURT:  I will take your motion to strike under

17   advisement.  Next question.

18   BY MS. LEIDHOLDT:

19   Q.  I would like you to give your attention, Ms. Hassan, to the

20   protection of women's and children's rights in the country of

21   Malaysia.  To what extent are women and children protected, the

22   human rights of women and children protected in Malaysia,

23   especially in relation to the human right to physical security?

24             MR. ARENSTEIN:  Objection.

25             THE COURT:  Sustained as to form.

CCDJSOU2                          Hassan – direct

1    BY MS. LEIDHOLDT:

2    Q.  Ms. Hassan, does Malaysia protect the human rights of women

3    and children to physical security?

4                MR. ARENSTEIN:  Objection.

5                THE COURT:  Offer of proof?  How is this relevant?

6                MS. LEIDHOLDT:  It is relevant, your Honor, because

7    Mr. Souratgar initiated a custody case that, to the best of our

8    knowledge, is pending in the Shairiah court in Malaysia.

9                THE COURT:  What kind of case?

10               MS. LEIDHOLDT:  Custody case.

11               THE COURT:  Where is the testimony about a custody

12   case having been commenced in Shairiah court in Malaysia?

13               MS. LEIDHOLDT:  Your Honor, Ms. Lee testified about it

14   at great length.  You received into evidence correspondence

15   between Mr. Souratgar's attorney, Ms. Gomez, with her attorney,

16   Mr. Abbas, about the custody case that Mr. Souratgar initiated

17   in Malaysia at the same time that the custody case in Singapore

18   was pending.

19               I believe there is not a disputed question of fact

20   about whether or not Mr. Souratgar initiated a custody case.

21   There was testimony Ms. Lee had to hire an attorney to

22   represent her in the custody case in Malaysia, and that it was

23   dismissed on jurisdictional grounds, and that Mr. Souratgar

24   appealed the dismissal, and to the best of her knowledge and

25   the best of the knowledge of her attorney in Singapore

CCDJSOU2                          Hassan – direct

1    currently, that case is proceeding on appeal in Malaysia.

2              So, your Honor, that is the connection between --

3              THE COURT:  Where is the appeal taken to in Malaysia?

4              MS. LEIDHOLDT:  It is within the Shairiah court.  So

5    there obviously is some form that an appeal can happen within

6    the Shairiah court in Malaysia.  Our understanding is that it

7    was dismissed because Mr. Souratgar was not residing in

8    Malaysia, and he appealed that determination because

9    Mr. Souratgar submitted papers to the court in relation that he

10   owned or was residing in Malaysia.  So that is --

11             THE COURT:  Where is the testimony he submitted papers

12   that he was residing in Malaysia?

13             MS. LEIDHOLDT:  Your Honor, I believe that -- your

14   Honor, we have documentation, an affidavit from Mr. Souratgar

15   that he was residing in Malaysia.  We have that affidavit.  I

16   do not believe that that affidavit was submitted into evidence

17   because we were unable to have it translated until he left the

18   stand, but we have an affidavit from Mr. Souratgar himself

19   stating that he was residing in Malaysia and had rented an

20   apartment in Malaysia.

21             THE COURT:  And that was submitted to what tribunal?

22             MS. LEIDHOLDT:  It was submitted to the court in

23   Malaysia, the Shairiah court in Malaysia.

24             THE COURT:  All right.  It seems to me that what is

25   going on in Malaysia has little or no relevance to this case.

CCDJSOU2                          Hassan - direct

1   I think for the sake of -- we are now in Day 8 of this

2   proceeding, and I've explained why I believe we're in Day 8,

3   and I think the record reflects why we're in Day 8.

4          We'll probably be who knows how many additional dates

5   the way we are, but I am going to allow you to elicit this

6   testimony subject to a motion to strike.

7          MR. ARENSTEIN:  Your Honor --

8          THE COURT:  Go ahead.

9          MR. ARENSTEIN:  -- the Malaysia case which was

10  originally brought was brought because the children were

11  abducted to Malaysia and Mr. Souratgar could not see his

12  children.  He brought an action to be able to see his children.

13         That action was dismissed by the court.  There was an

14  appeal taken, and the appeal was withdrawn.  So there is no

15  case in Malaysia right now, and they wanted to bring it into

16  the Shairiah court.

17         Ms. Fair wanted to bring the case into the Shairiah

18  courts in Singapore, so she brought the action in the Shairiah

19  courts in Singapore.  She brought an action for divorce in

20  Shairiah courts in Singapore, which has been dismissed.  There

21  is no action in Singapore right now, no action for anything in

22  Malaysia right now.  The only actions that are pending right

23  now is the action in the secular courts of Singapore at the

24  moment.  That is the only action that is pending.

25         To go into Malaysia or go into anything with Malaysia

CCDJSOU2                          Hassan - direct

1    at this point is just prejudicial at this point.  It has

2    nothing to do with this case.

3              THE COURT:  Ms. Leidholdt has represented to the court

4    there is testimony before this Court that the appeal was not

5    dismissed.  Isn't that your representation?

6              MS. LEIDHOLDT:  To the best of our knowledge, your

7    Honor, the appeal has not been dismissed.

8              THE COURT:  Your representation is that the appeal has

9    been dismissed?

10             MR. ARENSTEIN:  My client has instructed his

11   solicitors or whatever they call them in Malaysia --

12             THE COURT:  What are you urging, I accept your

13   representation and --

14             MR. ARENSTEIN:  Well --

15             THE COURT:  Let me finish.

16             Are you urging I accept your representation and reject

17   Ms. Leidholdt's representation?  Is that what you're urging?

18             MR. ARENSTEIN:  No.  I am urging this is not relevant

19   to this case.

20             THE COURT:  You're standing up and you're making the

21   assertion that the appeal in Malaysia does not exist, correct?

22             MR. ARENSTEIN:  I am making the assertion my client

23   instructed his solicitors or whatever they call them in

24   Malaysia to withdraw the appeal because the only actions that

25   are pending right now --

1          THE COURT:  Yes, I understand, I understand your

2    representation.  Ms. Leidholdt is representing the appeal is

3    very much alive.  Isn't that what she has just said.

4          MR. ARENSTEIN:  I heard her say that.

5          THE COURT:  Now the question is whether I am going to

6    allow testimony about what goes on in Malaysia, and if Ms.

7    Leidholdt stood up and said I have to concede there is no

8    testimony in this case that there is an appeal pending in

9    Malaysia, I would immediately sustain your objection, but those

10   are not the facts as they are right now.

11         There is a representation that testimony has been

12   elicited in this case that the appeal is pending.  Do you agree

13   the testimony was elicited that the appeal is pending?

14         MR. ARENSTEIN:  The only thing I heard about that was

15   a representation by Ms. Leidholdt.  I didn't hear testimony

16   that there appeal was pending from anybody.

17         THE COURT:  Was there testimony there is an appeal

18   pending?

19         MS. LEIDHOLDT:  Yes, your Honor.

20         THE COURT:  From whom?

21         MS. LEIDHOLDT:  From our client.

22         THE COURT:  That is the representation.  There is

23   testimony from your client that it is not pending correct.

24         MR. ARENSTEIN:  There is testimony my client

25   instructed his solicitors to withdraw it.

CCDJSOU2                          Hassan - direct

1          THE COURT:  What are you urging me to do with regard

2     to resolving the question of whether the appeal is pending,

3     accept your client's version and representation at this stage

4     before the conclusion of the hearing, is that what you're

5     asking me to do?

6          MR. ARENSTEIN:  No, but I would make one other point

7     for the court.  My client has given an undertaking to --

8          THE COURT:  I understand that.  You stood up here and

9     you made an objection on the basis that there is no appeal

10    pending in Malaysia.

11         MR. ARENSTEIN:  That is my understanding, your Honor,

12    there was an instruction by my client to his solicitors to

13    withdraw, and I believe that it was withdrawn.  I don't have --

14    I can probably get the proof that it was.  I don't have it with

15    me at this moment, but if I called Malaysia or the Malaysian --

16    whoever represented him in Malaysia, I can probably get

17    something to show that it was withdrawn.

18         THE COURT:  Isn't it very interesting, because it

19    would seem to me that both sides could do that, and neither

20    side has, neither side has.

21         MR. ARENSTEIN:  Your Honor, I didn't --

22         THE COURT:  It is overruled.  You can answer the

23    question.

24    BY MS. LEIDHOLDT:

25    Q.  The question, Ms. Hassan, is to what extent are the human

1    rights of women and children protected within the country of

2    Malaysia specifically in reference to the human right to

3    personal security?

4              MR. ARENSTEIN:  Objection to the form of the question.

5              THE COURT:  I already sustained an objection to the

6    form of the question and I will sustain it again.

7    BY MS. LEIDHOLDT:

8    Q.  Ms. Hassan, does the country of Malaysia -- Ms. Hassan,

9    what information, if any, have you obtained about the

10   protection of the human rights of women and children in

11   Malaysia to personal security?

12             MR. ARENSTEIN:  Objection; broad question.

13             THE COURT:  Overruled.

14   A.  Malaysia has issues on domestic violence and violence

15   against women that have been brought up by many treaty bodies,

16   human rights treaty bodies, so it appears violence against

17   women is an issue that hasn't been completely addressed by

18   Malaysia.  On Malaysia Shairiah courts, again I have testified

19   about there is no -- renounce-ment of Islam is not allowed by

20   the law or it is punishable by death.

21             The rights of women in a Shairiah court in Malaysia to

22   custody of their children again is governed by the Shafi

23   School, which again says that if the mother is a non-Muslim,

24   she would not get custody, physical custody, that is, and if

25   the mother remarries, the custody would immediately belong to

CCDJSOU2                         Hassan - direct

1    the father.

2            It is not a country where the rights to physical

3    safety to women or children are completely protected.

4            MR. ARENSTEIN:  Objection; not responsive and --

5            THE COURT:  I'll take your motion under advisement.

6            (Off-the-record discussion)

7            MS. LEIDHOLDT:  No further questions, your Honor.

8            THE COURT:  All right.  You may cross-examine.

9            MR. ARENSTEIN:  May I have 5 or 10 minutes to get

10   myself together with the cross-examination?

11           THE COURT:  You may.

12           MR. ARENSTEIN:  Thank you.

13           (Recess)

14           THE COURT:  Please be seated.  Mr. Arenstein, you may

15   proceed.

16           MS. LEIDHOLDT:  Before Mr. Arenstein proceeds, may I

17   just briefly address the court?

18           THE COURT:  Sure.

19           MS. LEIDHOLDT:  Your Honor, your Honor raised the very

20   important question of the relevance of Ms. Hassan's testimony

21   about Malaysia, and if I may briefly address that question?

22           THE COURT:  Sure.

23           MS. LEIDHOLDT:  Your Honor, the issue is not simply

24   whether or not Mr. Souratgar is continuing to proceed in that

25   forum.  We have every reason to believe that the appeal is

CCDJSOU2                        Hassan - direct

1    pending.

2              There is another -- the issue is at the time the

3    custody case was proceeding in the civil court in Singapore,

4    Mr. Souratgar went to Malaysia and initiated within the

5    Shairiah court in Malaysia, initiated a custody case there

6    which he can do at any time, your Honor.

7              THE COURT:  Was there a divorce case also?

8              MS. LEIDHOLDT:  He subsequently initiated a divorce

9    case in the Shairiah court in Malaysia as well.

10             THE COURT:  Thank you.

11             MS. LEIDHOLDT:  Your Honor, the papers that

12   Mr. Souratgar submitted in the custody case in Malaysia we have

13   only recently been able to have translated because they were

14   all in Malay.  We now have obtained the translation, and in

15   those papers there are two separate affidavits that

16   Mr. Souratgar submitted to the Shairiah court in Malaysia.

17             THE COURT:  You're still on your case.  You'll have an

18   opportunity to offer your evidence, okay?  You haven't rested

19   yet, correct?

20             MS. LEIDHOLDT:  I have not, your Honor.

21             THE COURT:  At the appropriate juncture.  Right now we

22   just finished the direct examination and are about to take up

23   the cross of this witness.  Presumably if you have other

24   relevant evidence, you will be able to offer it.

25             Am I missing something?

CCDJSOU2                     Hassan - direct

1           MS. LEIDHOLDT:  Your Honor, I didn't know if that

2      would be the case.  Thank you very much.

3           THE COURT:  Well, I didn't say it is going to be

4      received in evidence.  It is just the way these things

5      customarily go, you have a witness who testifies on direct and

6      then they're cross-examined and then there is a redirect, and

7      we are not up to the point of anything beyond it.

8           MS. LEIDHOLDT:  Thank you, your Honor.

9           THE COURT:  Okay.

10     CROSS EXAMINATION

11     BY MR. ARENSTEIN:

12     Q.  Ms. Hassan, you testified that mediation is --

13          THE COURT:  Do you disagree, Mr. Arenstein?

14          MR. ARENSTEIN:  No, I don't disagree.

15          THE COURT:  Okay.

16          THE COURT:  Have you shown it to your adversary, Ms.

17     Leidholdt?  Have you shown this, whatever it is to your

18     adversary?

19          MS. LEIDHOLDT:  I will, your Honor.

20          THE COURT:  That is a good idea.  Thank you.  Why

21     don't you take a moment and show it to him now.

22          (Off-the-record discussion)

23          MR. ARENSTEIN:  Your Honor, I don't know who

24     translated this document.  I am not sure -- do you want me to

25     take the time to read it over?

1          THE COURT:  No.  My experience as the Judge in this

2     case is that if you provide Ms. Leidholdt with a document that

3     you plan to offer in an early and timely fashion, then I can

4     have a more intelligent discussion with you and with her on

5     that document.

6          The same is true in the case of Ms. Leidholdt, if she

7     provides you with an early delivery of the document, as lawyers

8     usually do, opposing counsel do, then when the time comes to

9     hear an offer, I don't know if I am going to have a witness who

10    is called on this, I don't know how this is supposed to come

11    into evidence, I don't know what it is and I'm not concerned

12    with what it is.

13         All I'm concerned is that the parties exchange their

14    documents as early as possible so that we can have a discussion

15    which comports with the Federal Rules of Evidence about the

16    document, okay?

17         MR. ARENSTEIN:  I understand that, your Honor.

18         I am not going to take the court's time right now to

19    read this.  I will do this over the luncheon break and I'll

20    proceed with my cross-examination of this witness.

21         THE COURT:  Please do.

22    BY MR. ARENSTEIN:

23    Q.  Ms. Hassan, you testified that mediation is conducted in

24    the Shairiah courts on an ad hoc basis outsourced.  Is that

25    correct?

CCDJSOU2                          Hassan - cross

1   A.   Right.

2   Q.   Have you read Page 180 of Mr. Abbas' article entitled, "The

3   Islamic Legal System in Singapore," dated January 2012?

4   A.   What page?  Again can you repeat the page?

5   Q.   Mr. Abbas' article --

6               THE COURT:  No.  The question was can you repeat the

7   page?

8               MR. ARENSTEIN:  Page 180.

9               THE WITNESS:  Yes, I am on it.

10  BY MR. ARENSTEIN:

11  Q.   At 180 it states, and I quote:

12              "Based on the profile of all mediators that have been

13  appointed in the Shairiah courts, it would appear that all

14  mediators must possess at a minimum either a law degree or a

15  degree from a recognized Islamic institution."

16              Would you agree that is a correct statement of the

17  Shairiah courts and mediators in Singapore?

18  A.   That must be correct.

19  Q.   Do lawyers have to be Muslim to practice in the Shairiah

20  courts?

21  A.   No, they don't.

22  Q.   Do you agree with Mr. Abbas' statement on Page 171 and 176

23  of his article on the Islamic legal system of Singapore, and I

24  quote, it states:

25              "The AMLA also establishes and regulates Singapore

CCDJSOU2                         Hassan - cross

1      Shairiah court.  Hasheem Kamali, the registrar summed up the

2      ambit of the Shairiah courts as follows:  The Shairiah court is

3      a creature of statute.  It derives its jurisdiction and power

4      under the AMLA.  Any jurisdiction or power it purports to

5      possess must be expressly provided in AMLA.  Appeals from the

6      Shairiah court are taken to an appeals board, supervised by the

7      M U I S, which is thus below."

8            Do you agree with that statement?

9      A.  Yes, I do.

10     Q.  Further, he states on Page 176:

11           "Singapore does allow for consolidation of related

12     cases being litigated simultaneously in both the Family Court

13     and Shairiah court.  At any point during course of divorce

14     proceedings in the Shairiah court, parties my agree to have

15     questions of custody and access to, or division of matrimonial

16     assets on divorce moved from the Shairiah court to the civil

17     courts.  In such case, the parties must first undergo

18     counseling in the Shairiah court.  The Shairiah court may, in

19     appropriate cases, grant leave for the party to proceed in the

20     civil court even in the absence of agreement by both parties.

21           "A commencement certificate will then be issued where

22     the parties proceed in a civil court whether by consent or with

23     leave of the Shairiah court.  The court applies by the civil

24     courts to determine questions of custody and access to or

25     division of matrimonial assets as the civil law is provided for

1    by Section 17 (a) of the Supreme Court of Judicature Act."

2              Do you agree with that statement?

3    A.  Yes, I believe I also said the same thing, either by leave

4    of the Shairiah court or by consent of the parties, but I also

5    testified that based on Mr. Ahmad's conversation with me, he

6    knew of only one case where that happened and that was where

7    the man renounced Islam and the wife consented to the case

8    being moved.

9              MR. ARENSTEIN:  Move to strike the response other than

10   the agreement to the quote that was in the article.

11             THE COURT:  Overruled.  Do you have any information on

12   how many such applications have been made to the Shairiah

13   court?

14             THE WITNESS:  No, I do not.  It was very difficult to

15   determine that.  I did try because there is no system of

16   recorded judgments.

17             THE COURT:  Thank you.  Next question.

18   BY MR. ARENSTEIN:

19   Q.  You're familiar with AMLA.  Is that correct?

20   A.  Yes.

21   Q.  Yesterday you had -- you were not familiar with the title

22   of AMLA?

23   A.  Because I do so many Shairiah law similar statutes and they

24   all have different titles.

25   Q.  Now, are you familiar with Article 17 (a)(5) of the Supreme

CCDJSOU2                        Hassan - cross

1   Court Judiciary Act which I just referred to in --

2   A.  No, I am not.

3   Q.  You're not familiar with that act?

4   A.  No, I am not.

5   Q.  Let me read you what the -- excuse me.  Withdrawn.

6           You're not familiar with that Act?  Well, if I told

7   you that the Act states, and I quote:

8           "Article 17 (a) is" --

9           MS. LEIDHOLDT:  Objection, your Honor.

10          THE COURT:  Basis?

11          MS. LEIDHOLDT:  The witness stated she is not familiar

12  with the Act.

13          THE COURT:  Yes.  Sustained.

14          By the way, I don't think very much about initials on

15  statutes.  I frequently don't know what initials stand for in

16  statutes.  In fact, on ICARA, which is the statute at issue

17  here, I had to look up what the R in ICARA stands for.

18          Mr. Arenstein, you know what it stands for, right?

19          MR. ARENSTEIN:  Yes, I do.

20          THE COURT:  Which is what?

21          MR. ARENSTEIN:  American Muslim Law Act.

22          THE COURT:  No.  The R in ICARA?

23          MR. ARENSTEIN:  International Child Abduction Recovery

24  Act.

25          THE COURT:  According to what I just looked up, it is

CCDJSOU2                        Hassan - cross

1    International Child Abduction Remedies Act.  I don't know.  You

2    may be right.  The point is I don't put a lot of weight on -- I

3    certainly don't know all the U.S. statutes by their initials,

4    but that is just me, and what I looked up may be wrong, but it

5    appeared to have been the word "remedies," but maybe it's as

6    you state it.  Go ahead.  Next question.

7    BY MR. ARENSTEIN:

8    Q.  Article 17 (a) states:

9            "Notwithstanding Section 16 and 17, the High Court

10   shall have no jurisdiction" --

11           MS. LEIDHOLDT:  Objection, your Honor.

12   BY MR. ARENSTEIN:

13   Q.  Article 17 (a) --

14           THE COURT:  The witness already testified she is not

15   familiar with Article 17.  What is your question?

16           Why are you reading Article 17?

17   BY MR. ARENSTEIN:

18   Q.  Are you familiar there are articles in the Singapore acts

19   which provide the case will remain in the Singapore secular

20   courts rather than in the Shairiah courts?  Are you familiar

21   with that?

22   A.  No, I'm not.

23   Q.  So you're not --

24   A.  What I testified to --

25           MS. LEIDHOLDT:  Objection.

CCDJSOU2                        Hassan – cross

1    A.   -- what I testified to yesterday, if there is a custody

2    proceeding in civil court, it will be stayed.  If there is a

3    divorce proceeding that happens in Shairiah court, and then the

4    matter will be moved to the Shairiah court unless there is

5    consent from both parties that it remains in the Shairiah

6    court, and for that they have to also undergo counseling or the

7    Shairiah judge agrees to move, to let the custody proceeding be

8    in the civil court.

9    BY MR. ARENSTEIN:

10   Q.   Ms. Hassan, if I told you that Section 5 of Section 17

11   (a)(5) states --

12            MS. LEIDHOLDT:  Objection, your Honor.

13            THE COURT:  I haven't heard the question yet.

14            MR. ARENSTEIN:  Am I permitted to ask the witness

15   about the laws of Singapore which she is supposed to be an

16   expert on to show that there is a statute that provides for

17   relief for the client?

18            THE COURT:  Mr. Arenstein, did you hear what I said in

19   response to the objection?

20            MR. ARENSTEIN:  No, I didn't.

21            THE COURT:  Okay.

22            MR. ARENSTEIN:  Somebody talked over it.

23            THE COURT:  I said I have to hear the question first,

24   or words to that effect.

25            MR. ARENSTEIN:  Okay.

CCDJSOU2                      Hassan - cross

1    BY MR. ARENSTEIN:

2    Q.   If I told you that Section 17 (a), Subdivision 5, states

3    that Subsection 3 (a) of 17 (a), which talks about the custody

4    action, states it shall not apply if civil proceedings referred

5    to therein are commenced in the High Court by consent of the

6    parties to the proceeding and the certificates of attendance of

7    the parties issued under Section 35 (a)(7) of the

8    Administration of Muslim Act have been filed in accordance with

9    the rules of court.

10             Are you familiar with that?

11   A.   I think I testified to the same thing, they have to attend

12   a mediation and have consented to keeping the case in the civil

13   court.   I think that is what you --

14   Q.   Under 17 (a)(5), the High Court is not required to stay if

15   the parties consent to keep the matter in the civil court

16   despite the filing of the divorce action in the Shairiah court?

17   A.   That is what I testified yesterday exactly.

18   Q.   Thank you.  Have you ever heard of an expedited protection

19   order?

20   A.   Yes, I have.

21   Q.   What if the police in Singapore are called to a site where

22   a woman has been hurt, and there is probable -- if there is

23   probable cause that there has been a battery, will the batterer

24   be arrested?

25   A.   If there is grievous hurt that rises to that level, assault

CCDJSOU2                          Hassan - cross

and battery, yes.  If that is not the case, and the woman does

not have a personal protection order, the police do not have to

do anything.

Q.  But if there was probable cause to see there was injury

there, the police would act?

A.  Yes, in grievous hurt, yes, that's what I said yesterday.

          THE COURT:  As I understand your testimony, where

there is not grievous hurt, but evidence of an injury, the

police could say to the individual go secure an order of

protection, correct?

          THE WITNESS:  They could, yes, and then generally my

understanding is what happens is that they send her to a

medical examination to get proof of her injuries, and then she

would take that and go to the court for a personal protection

order, yes.

          THE COURT:  Another alternative is they could decide

on those facts without a personal protection order to arrest

the individual?

          THE WITNESS:  They could, but from talking to

practitioners, I don't think that is the case.  There has to be

some kind of hurt.

          THE COURT:  The two practitioners who you spoke to?

          THE WITNESS:  Yes.

          THE COURT:  Next question.

BY MR. ARENSTEIN:

CCDJSOU2                          Hassan – cross

1   Q.   So you don't have any personal knowledge of how that works

2   in Singapore, do you?

3   A.   Some knowledge based, because we submitted an expert

4   affidavit to CEDAW while we were working in connection with

5   marital rape and hurt that is inflicted on a wife, and the

6   police do not intervene unless there is grievous hurt, so we

7   have –– "we" meaning me and the rest of my organization which

8   is Equality Now –– we had conferred with Aware, the crew that

9   works on these matters, and Corinna Cecilia Lim, the executive

10  director of that group, the practice is unless there is

11  grievous hurt, they're not going to intervene.

12  Q.   I asked you if you had any personal knowledge yourself?

13  A.   That is personal knowledge, yes.

14  Q.   Were you you ever in Singapore?

15  A.   I have never been in Singapore.

16  Q.   Have you spoken to the police in Singapore?

17  A.   I have not.

18  Q.   You have no personal knowledge of that.  Is that correct?

19  A.   No.

20           MR. McNALLY:  Objection.

21           THE COURT:  Overruled.

22  BY MR. ARENSTEIN:

23  Q.   Is that correct?

24  A.   That's correct.

25  Q.   Thank you.  Are you aware of the provisions of the penal

CCDJSOU2                         Hassan - cross

1   law in Singapore that protect women who are victims of forcible

2   acts of sex?

3   A.  Yes, the rape laws.

4   Q.  Are you aware of --

5   A.  I am aware of the rape laws, but I don't know the details

6   of the rape laws.

7   Q.  You don't know the details?

8   A.  I know --

9            THE COURT:  Mr. Arenstein, that is inappropriate.

10   That is what we had a conversation about yesterday, and it went

11   on several times yesterday.

12            How do I get you to stop, Mr. Arenstein?

13            MR. ARENSTEIN:  I will stop, I promise you.

14   BY MR. ARENSTEIN:

15   Q.  I ask you again, are you aware of the provisions of the

16   penal code in Singapore that protect women who are victims of

17   forcible acts of sex?

18   A.  I know that Singapore has a law on rape, yes.  Do I know

19   the details of that law?  No.

20   Q.  Is Aware, the organization, your organization Aware,

21   available to women in Singapore if they feel they are victims

22   of violence or any type of acts of violence in Singapore?

23   A.  They are a small organization so I don't think they're

24   available to every woman in Singapore who experiences an act of

25   violence, but to the extent that women approach them, do their

1    best to provide legal services.

2    Q.  If a party makes an application for counsel and shows that

3    they are not able or capable to afford counsel, isn't there a

4    procedure in Singapore where counsel will be appointed for one

5    who is not of means to have counsel to represent themselves?

6    A.  I am not aware of any such provision.

7    Q.  So you're not aware, but it is possible it is there.  Is

8    that correct?

9    A.  I have heard that it is not there, but from talking to

10   people, counselors at Aware, their NG0, they provide legal

11   services, but there is nothing in the law of Singapore that

12   provides a counsel for somebody who cannot afford it.  This is

13   what I have been told.

14        MR. ARENSTEIN:  Objection to the answer she heard from

15   somebody, that she is not aware, but heard from somebody.

16        THE COURT:  I think you mean a motion to strike?

17        MR. ARENSTEIN:  Motion to strike, yes.

18        THE COURT:  I will take it under advisement.

19        Next question.

20   BY MR. ARENSTEIN:

21   Q.  Is it true under Section 35 (a) of AMLA, if the divorce

22   proceedings are commenced in the Shairiah court, and a party

23   wants to commence civil proceedings in the Family Court

24   involving any matter relating to custody, the custody of the

25   children, they can do so?

CCDJSOU2                      Hassan - cross

1   A.   Upon leave from the Shairiah court or upon consent of both

2   parties after they receive mediation counseling.

3   Q.   What about a situation where a custody order is commenced

4   in the Singapore Family Court and the custody action is in

5   progress by the choice and consent of both parties?

6   A.   Yeah, I just said if it is by the consent of both parties

7   and they have done the counseling recommended by Shairiah court

8   and have a certificate, then yes.

9   Q.   What if the party who feels the Shairiah court has for some

10  reason attempted to commence an action in divorce in a Shairiah

11  court and has not pursued this action because of defect in her

12  application, what happens to the application if both parties

13  don't want to proceed in the Shairiah court?

14  A.   If they drop the divorce action?

15  Q.   Yes.

16  A.   Then if the custody proceeding is on its own, my

17  understanding is that the Family Court can hear that and make

18  that determination if it is outside of a divorce action.

19  Q.   Did any of your contacts in Singapore provide you with a

20  list of cases or statistics about custody decisions in the

21  Shairiah courts awarding custody to the father as opposed to

22  the mother in accordance with the guidelines you stated?

23  A.   I have asked for this, and as I have said before, there are

24  no reported decisions, and I have been told that to get the

25  decisions, you have to go to every court and look up and do a

1   systematic search for those decisions, so they're impossible to

2   get.

3           In talking to practitioners before the Shairiah court,

4   it is clear that the principles of Shafi law are of right.  No,

5   I do not have a list of decisions.

6   Q.  Do you agree when a party attempts to commence an action in

7   the Shairiah courts and does not pursue this action, the

8   attempted action dies?

9   A.  I don't see where that is in the code, but I am sure that

10  where there is a lapse of time, I know --

11  Q.  What if the other party --

12          THE COURT:  Don't talk over the witness' answer,

13  please.

14  BY MR. ARENSTEIN:

15  Q.  What if the other party has never participated --

16          THE COURT:  Excuse me.  Were you finished with your

17  answer?

18          THE WITNESS:  Yes.

19          THE COURT:  Thank you.

20  BY MR. ARENSTEIN:

21  Q.  What if the other party has never participated in this

22  action that never commenced?

23  A.  I have no idea.

24  Q.  What if both parties in this attempted action do not want

25  to pursue the action in the Shairiah court?

CCDJSOU2                        Hassan - cross

1    A.  I would imagine that they would have to file something to

2    the court saying we abandon this action and then they could

3    proceed to whatever they wanted to do.

4    Q.  What if one party does not want to pursue an action in the

5    Shairiah court and both agree that the custody action should

6    remain in the Singapore Family Court?

7    A.  If both agree to that and they file something with the

8    court and attend the counseling of the court, then the custody

9    action could remain in the civil court.

10   Q.  What if both husband and wife want a divorce, do the rules

11   change regarding the Shairiah court?

12   A.  If they both want a divorce?

13   Q.  Yes.

14   A.  If the husband can do, he has unilateral right of divorce,

15   so if the husband wants to divorce the wife, he can pronounce

16   divorce on it and he doesn't have to go through all the

17   evidence, it is his right to divorce the wife.

18            In that situation, custody would be adjudicated in the

19   Shairiah court, custody of the child and ancillary matters,

20   unless both parties agree and they go to counseling and then

21   the matter is moved to the civil court.

22   Q.  What if a wife does not want to go to the Shairiah court

23   and the husband provides an undertaking to take the Singapore

24   Family Court -- undertake to go to Singapore Family Court, he

25   will not pursue any proceeding in the Shairiah court, and this

CCDJSOU2                          Hassan – cross

1    undertaking is accepted by the Singapore Family Court?

2              MR. McNALLY:  Objection.

3              THE COURT:  Overruled.

4    A.  I don't think –- there is nothing that says the Shairiah

5    court is bound by that undertaking.  If the husband did go back

6    on that undertaking and file the divorce case in Shairiah

7    court, I think it would go forward.

8    Q.  If the undertaking is filed in the Family Court, and it is

9    an undertaking he swears to in the Family Court in Singapore,

10   wouldn't he be liable to his undertaking to the Singapore

11   Family Court if he violated it?

12   A.  I have no –- I don't think –- well, the Shairiah court is

13   not bound by the rules of evidence of the Family Court or to

14   consider personal protection orders as evidentiary matters, so

15   just looking at those issues, I don't think the Shairiah court

16   is bound.

17             I cannot speak as to whether, if he gets a conflicting

18   judgment from the Shairiah court, this could be still taken up

19   with the Family Court.  The jurisprudence on conflict of laws

20   is not not clear in Singapore.

21             (Continued on next page)

22

23

24

25

Ccdrsou4                        Hassan – cross

| | |
|---|---|
1          THE COURT:  In terms of the civil court in Singapore,

2     it would have personal jurisdiction over the individual

3     provided with an affidavit, correct?

4          THE WITNESS:  Yes.

5          THE COURT:  I could imagine, for example, in this

6     jurisdiction an agreement by parties to proceed with a

7     commercial dispute before a rabbinical court would be binding

8     and enforceable in this court.  I could envision, for example,

9     that perhaps maybe the rabbinical court might not honor an

10    undertaking not to proceed in the rabbinical court but a civil

11    court could enjoin that party from proceeding before the

12    rabbinical court.

13         Could a civil court in Singapore enjoin a party who

14    had given the civil court an undertaking from proceeding in

15    some other court?

16         THE WITNESS:  This is outside I my expertise.

17         THE COURT:  That's fair.  Thank you.  Next question.

18         MR. ARENSTEIN:  One second, your Honor.

19    BY MR. ARENSTEIN:

20    Q.  Is it fair to say that a woman who is alleging that she was

21    a subject of domestic violence could go to AWARE and seek help

22    from AWARE to help her in Singapore?

23    A.  If she was aware of AWARE, yes.  If she knew about it.

24    It's a small organization.

25    Q.  But there is help for women who want to seek help and can

Ccdrsou4                        Hassan - cross

1   find the help to help them, is that correct?

2   A.  In a limited way.

3   Q.  Yes or no.

4   A.  I would say no, because they are limited.  They can't take

5   all the cases that they get.

6           THE COURT:  What makes you think that is a yes-or-no

7   question, Mr. Arenstein?

8           MR. ARENSTEIN:  I guess it's not.

9           THE COURT:  OK.  Have you completed your answer?

10          THE WITNESS:  Yes.

11          MR. ARENSTEIN:  I have no further questions.

12          THE COURT:  Any redirect?

13          MS. LEIDHOLDT:  Very briefly, your Honor.

14  REDIRECT EXAMINATION

15  BY MS. LEIDHOLDT:

16  Q.  Ms. Hassan, how high is the threshold of harm that is

17  considered necessary in Singapore to establish grievous hurt,

18  if you know?

19          MR. ARENSTEIN:  Objection.

20          THE COURT:  Do you understand the question?

21          THE WITNESS:  Yes, I do.

22          THE COURT:  Go ahead, you may answer.

23  A.  It is a high threshold.  My understanding is evidence of

24  high physical injury, like breaking of bones or marks of

25  violence, are required to prove grievous hurt.

Ccdrsou4          Hassan - redirect

1     Q.  When you say marks of violence, would typically bruises or

2     scratches or low-level injuries be considered sufficient to

3     constitute grievous harm?

4               THE COURT:  Don't answer.

5               MR. ARENSTEIN:  I object.

6               THE COURT:  Sustained.

7     Q.  Ms. Hassan, in Singapore, if a wife wants to initiate a

8     divorce in the Shariah court and the husband does not want to

9     proceed with the divorce, and the parties are Muslim, what

10    options are available to the wife, if you know?

11    A.  She has to proceed --

12              MR. ARENSTEIN:  Objection.

13              THE COURT:  Overruled.

14    A.  She must proceed in Shariah court.  She doesn't have

15    unilateral right to divorce.  She must either agree with the

16    husband to have a khul divorce, which means the husband agrees

17    that she can make a payment to him and get out of the marriage,

18    or she has to proceed to prove that there was harm to her, he

19    was impotent.  There is a whole list that is actually in AMLA,

20    grounds that she has to prove.  Abandonment, abuse, impotence

21    are three that I can think of right off the bat.  So she has to

22    make that.  In that case the Shariah court does not have to

23    look at evidence of abuse from previous personal protection

24    orders.

25              MR. ARENSTEIN:  Objection.  Move to strike.

Ccdrsou4                 Hassan - redirect

1           THE COURT:  Overruled.

2    Q.  Ms. Hassan, if the wife is alleging abuse in the Shariah

3    court, what is the level of harm that she needs to establish in

4    order to make out the grounds for divorce based on abuse?

5           MR. ARENSTEIN:  Objection.

6           THE COURT:  Overruled.

7    A.  I would expect that they would look at again the same thing

8    that qualifies as grievous hurt:  Evidence of marks and bruises

9    and broken bones, and so forth.

10   Q.  Does AMLA, if you know, state whether that harm is

11   sufficient if it is incidental and sporadic?

12          MR. ARENSTEIN:  Objection.

13          THE COURT:  Overruled.

14   A.  AMLA does not state.  I can say that proving that harm is

15   very hard, because most of the witnesses, if any, to that harm

16   are likely to be female, and the Shariah court does not take

17   that testimony of female witnesses, according to Shafi'i school

18   as well as what I have heard from Mr. Ahmad Abbas.

19   Q.  Ms. Hassan, if the wife initiates a divorce in the Shariah

20   court in Singapore and the husband refuses to proceed with the

21   divorce, will the divorce and ancillary matters remain in the

22   Shariah court?

23          MR. ARENSTEIN:  Objection.

24          THE COURT:  Overruled.

25   A.  Yes, it would, because she would have filed there, and

Ccdrsou4          Hassan - redirect

1    until that matter is adjudicated, it would stay in the Shariah

2    court.

3    Q.  Ms. Hassan, what weight, if any, do personal protection

4    orders obtained in the civil court in Singapore hold in the

5    Shariah court in Singapore?

6          MR. ARENSTEIN:  Objection.

7          THE COURT:  Overruled.  If you know.

8    A.   The Shariah court is not bound to look at personal

9    protection orders or any evidence given, any evidence of having

10   obtained them.  They do their own.

11   Q.  Do you have any information about the weight given -- I

12   understand that they are not bound -- the degree of weight that

13   is given to the existence of a personal protection order?

14         MR. ARENSTEIN:  Objection.

15         THE COURT:  Overruled.

16   A.   I have heard, based on consultations of Mr. Ahmad Abbas and

17   others, that not much weight is given.

18         MR. ARENSTEIN:  Objection.

19         THE COURT:  When was your consultation with Mr. Abbas?

20         THE WITNESS:  About a week ago.

21         THE COURT:  Who was on that call?

22         THE WITNESS:  It was myself, Mr. Abbas, and I believe

23   somebody from defense counsel.

24         THE COURT:  Thank you.

25         MS. LEIDHOLDT:  Your Honor, I'd like --

Ccdrsou4          Hassan - redirect

1          THE COURT:  Who from defense counsel, if you know?

2          THE WITNESS:  I believe it was Jane Kim.

3          THE COURT:  Thank you.

4          MS. LEIDHOLDT:  Your Honor, I'd like to offer into

5     evidence the résumés of the three individuals who are in

6     Singapore that the witness has spoken to.  May I show those

7     résumés to the witness to identify?

8          THE COURT:  You're welcome.  If you show something to

9     the witness, have it marked and show it to Mr. Arenstein.

10    Q.  Ms. Hassan, I'm showing you Respondent's 31, 32, and 33 for

11    identification.

12    A.  Yes.

13         MR. ARENSTEIN:  Your Honor, I have objected to these

14    before.  I think you sustained the objection at that time.  If

15    we are redoing this to reintroduce it, I'm going to make the

16    same objection.

17         THE COURT:  Ms. Leidholdt, is what Mr. Arenstein said

18    accurate or is he mistaken?

19         MS. LEIDHOLDT:  I believe he is mistaken, your Honor.

20         THE COURT:  All right.  Go ahead.

21    Q.  Ms. Hassan, do you recognize those three documents in front

22    of you?

23    A.  Yes, I do.

24         MR. ARENSTEIN:  Objection.  This was not gone into on

25    my cross.  Now this is redirect.  I would object.

Ccdrsou4            Hassan - redirect

1          THE COURT:  I think it is fair.  Go ahead.

2     A.  Yes, I do.

3     Q.  What do you recognize these résumés to be?

4     A.  These are all three people that I have spoken to over the

5     last two weeks about the legal system in Singapore.

6     Q.  How much time, approximately, did you spend conferring with

7     these individuals about the legal system in Singapore?

8     A.  I would say on average an hour to an hour and a half each.

9          MS. LEIDHOLDT:  Your Honor, I respectfully request

10    that these documents be submitted into evidence.

11         THE COURT:  Any objection?

12         MR. ARENSTEIN:  I object, your Honor.

13         THE COURT:  I'll allow it.  They are received.  Go

14    ahead.

15         (Respondent's Exhibits 31, 32, and 33 received in

16    evidence)

17         MS. LEIDHOLDT:  No further questions, your Honor.

18         THE COURT:  You may step down.  Thank you very much.

19         (Witness excused)

20         THE COURT:  You may call your next witness.

21         MR. ARENSTEIN:  Your Honor, I have a witness that is

22    going to be helping me with the cross-examination of their

23    witness, but I'm going to be objecting to this witness on

24    various bases.

25         THE COURT:  No one has been called, sir.

Ccdrsou4                         Cling - direct

1                    MS. LEIDHOLDT:  Your Honor, I respectfully request

2          that your Honor take judicial notice -- I withdraw that.  I

3          will make the application subsequently.

4                    THE COURT:  Are you calling a witness or not?

5                    MS. LEIDHOLDT:  I believe the witness is here.

6                    THE COURT:  Call your witness.  Ms. Leidholdt, if you

7          would like to call your witness, please do.

8                    MS. LEIDHOLDT:  Your Honor, I'm calling Dr. B.J. Cling

9          to the stand.

10          B.J. CLING,

11             called as a witness by the respondent,

12             having been duly sworn, testified as follows:

13                    THE CLERK:  State your full and spell it for the

14          record.

15                    THE WITNESS:  Dr. B.J. Cling, B period J period

16          C-L-I-N-G.

17          DIRECT EXAMINATION

18          BY MS. LEIDHOLDT:

19          Q.  Dr. Cling, would you please describe your educational

20          background.

21          A.  Yes.  May I have one moment to take out some papers?

22                    THE COURT:  Absolutely.

23          A.  I'm sorry.  Go ahead.

24          Q.  Would you please describe your educational background, Dr.

25          Cling.

```
                      Ccdrsou4                    Cling - direct
```

1    A.  I'm a clinical and forensic psychologist.  I'm also a

2    lawyer, actually.  I did my Ph.D., my clinical training, at

3    NYU.  I then did a post-doctoral training at USC in psychiatry

4    and law.  Then I went to UCLA Law School, and I clerked on the

5    Ninth Circuit.  Is that relevant?  Then I returned to New York.

6    I did another post-doctoral at NYU in psychotherapy and

7    psychoanalysis.  I worked at some law firms.  I started

8    teaching forensic psychology at John Jay College of Criminal

9    Justice, where I still teach.

10           THE COURT:  What law firms did you work for?

11   A.  I worked for Davis Polk & Wardwell, I worked for Debevoise

12   & Plimpton, then I switched to the field of bankruptcy and

13   worked for Fried Frank.  Then I clerked actually also for Judge

14   Lifland in the bankruptcy court.

15           THE COURT:  Burton Lifland, one of our respected

16   bankruptcy court judges.

17           THE WITNESS:  Yes.

18           THE COURT:  Davis Polk & Wardwell, Debevoise, Judge

19   Lifland, and where else?

20           THE WITNESS:  Fried Frank.

21           THE COURT:  In what area did you practice at Davis

22   Polk and Debevoise?

23           THE WITNESS:  I was a lowly associate, so I did a

24   variety of everything.  But I focused mainly in corporate.

25           THE COURT:  At Fried Frank?

Ccdrsou4                            Cling - direct

1            THE WITNESS:  At Fried Frank I did bankruptcy.

2            THE COURT:  Thank you.  Go ahead.

3   A.  I then I stopped working as a lawyer.  I had a small

4   private practice up until that time, I expanded it.  I started

5   teaching at John Jay College, where I still teach.  I do some

6   teaching or did some teaching at St. John's University as well.

7   We were developing a post-doctoral program in forensic

8   psychology and science.

9            I write in the area of forensic psychology and I guess

10  do private forensic work.

11  Q.  Are you licensed to practice clinical psychology?

12  A.  Yes, in New York and California.

13  Q.  You have testified that you have published in the field of

14  clinical and forensic psychology?

15  A.  Yes.

16  Q.  Could you briefly describe any publications.

17           THE WITNESS:  Excuse me, your Honor, I have to put my

18  glasses on.

19           THE COURT:  Absolutely.

20  A.  I published a chapter on "Allegations of Child Sexual

21  Abuse" in the Handbook of Divorce and Custody.  I published a

22  book called Sexualized Violence Against Women and Children:  A

23  Psychology and Law Perspective.  I wrote the supplement for the

24  APA publication Law and Mental Health Provisions in New York.

25  My other publications are clinical psychology but not

1   necessarily forensic-related.

2   Q.   Have you testified in court as a clinical psychologist?

3   A.   Yes.

4   Q.   When was that?

5   A.   When I was in California, I testified in California state

6   court on a variety of forensic issues.  Since I have been in

7   New York, I actually was in court about a year ago on a Hague

8   Convention case in the Southern District, Judge Karas.

9   Q.   Have you prepared expert reports and affidavits for courts?

10  A.   Yes.

11  Q.   Could you give us an approximate number of how many expert

12  affidavits and reports you have prepared for courts.

13  A.   Probably 20, something like that.

14  Q.   For what kinds of cases?

15  A.   A variety of cases.  Sometimes custody, sometimes

16  affidavits, varying on the case, I guess a variety of forensic

17  issues.  In California I did also criminal work:  Sentencing

18  hearings, assessment of child sexual assault, and so forth.

19  Q.   Do you treat patients in clinical practice?

20  A.   Yes.

21  Q.   How long have you been treating patients in clinical

22  practice?

23  A.   Quite a while.  Let's see, since about 1980, so 35.

24  Q.   How many, if any, of the patients that you treat in

25  clinical practice have been victims of domestic violence?

Ccdrsou4                          Cling - direct

1    A.  Overall --

2              MR. ARENSTEIN:  Objection.

3              THE COURT:  Overruled.

4    A.  Probably 20 percent of my clinical practice turns out to be

5    people who have suffered domestic violence one way or another.

6    Q.  Would you please describe your preparations for your

7    testimony in this case.

8    A.  I reviewed the literature.  I read the papers available.

9    Q.  The literature in what area?

10   A.  The area of domestic violence.  I interviewed Ms. Lee for

11   six and a half hours.  Two hours of that I observed her with

12   Shayan, her child.

13             MR. ARENSTEIN:  Objection, your Honor.

14             THE COURT:  Overruled.

15   A.  I watched the first day of proceedings here in the court.

16   I saw Mr. Souratgar testify in part.  I read the transcripts of

17   Mr. Souratgar's testimony.  I interviewed Ms. Lee's sister for

18   two hours, Jen Pink Lee, and I interviewed Ms. Lee's mother, I

19   believe Ms. Chew, for a half hour.

20   Q.  Dr. Cling, would it be possible to give a working

21   definition of how mental health professionals define domestic

22   violence?

23             MR. ARENSTEIN:  Objection, your Honor.

24             THE COURT:  Is that foundational or does this go to

25   your case?

Ccdrsou4                          Cling – direct

1          MS. LEIDHOLDT:  It goes to the case.

2          THE COURT:  First lay the foundation, and we'll see

3   where we go as to what areas of expertise you're offering the

4   individual on.  I thought it might have been on that subject,

5   and I was going to allow it.  And then we'll see where you can

6   go from there.

7          MS. LEIDHOLDT:  Your Honor, I'm asking her about her

8   expertise generally in the field of domestic violence in the

9   psychological realm and if there is a consensus on the part of

10  psychologists in the field about definitions of domestic

11  violence.

12         THE COURT:  I may or may not allow you to do that once

13  the witness is qualified as an expert.  But first, I don't know

14  what you are offering the individual as an expert on.  If

15  you're asking the question in order to get to that point, then

16  I'll allow you to ask the question.  If you're asking the

17  question to get the witness's opinion on the subject, let's

18  first out what you are offering the witness as an expert on.

19         MS. LEIDHOLDT:  Thank you very much for that guidance,

20  your Honor.  Your Honor, first I will approach the witness to

21  ask her to identify a document.

22         MR. ARENSTEIN:  Your Honor, this witness has not been

23  qualified as an expert.

24         THE COURT:  Did you provide a copy of the document to

25  Mr. Arenstein?

Ccdrsou4                          Cling - direct

1            MS. LEIDHOLDT:  Yes.  He has it, your Honor.

2            MR. ARENSTEIN:  I don't have it.

3            MS. LEIDHOLDT:  He has had it all along.  I sent it to

4     him.

5            MR. ARENSTEIN:  I don't have it.

6            THE COURT:  What is it marked as, Ms. Leidholdt?

7            MS. LEIDHOLDT:  Your Honor, it is marked as

8     Respondent's 34 for identification.

9            THE COURT:  All right.

10           MR. ARENSTEIN:  I don't have a copy, your Honor.

11           THE COURT:  It appears that you now do.

12           MR. ARENSTEIN:  Now I do.

13    BY MS. LEIDHOLDT:

14    Q.  Dr. Cling, I have shown you a document marked Respondent's

15    34 for identification.  Do you recognize that document?

16    A.  Yes.

17    Q.  What do you recognize it to be?

18    A.  It's my CV.

19           MS. LEIDHOLDT:  Your Honor, I respectfully offer Dr.

20    Cling's résumé into evidence.

21           THE COURT:  Any objection?

22           MR. ARENSTEIN:  No objection.

23           THE COURT:  Proceed.

24           (Respondent's Exhibit 34 received in evidence)

25           MS. LEIDHOLDT:  Your Honor, I would like to ask that

Ccdrsou4                          Cling – direct

1     Dr. Cling be qualified as an expert in clinical psychology and
2     an expert in the field of domestic violence and psychology.
3             THE COURT:  I have no doubt that she is expert in all
4     of those fields.  What do you propose to have her opine on?
5     The question is not the witness's level of expertise.  The
6     question is how the expertise bears on an issue of relevance in
7     this case and what it is you intend to have the witness opine
8     on.
9             MS. LEIDHOLDT:  Your opinion, Dr. Cling will testify
10    that the respondent's psychological condition is consistent
11    with that of victims of prolonged and severe domestic violence,
12    that the petitioner's treatment of the respondent and the
13    petitioner's personality profile is consistent with that of
14    perpetrators of domestic violence, and in particular an acute
15    form of domestic violence.
16            She will testify as to the impact of the exposure to
17    children of domestic violence, about the effects on children of
18    exposure to domestic violence.  She will testify, too, that
19    perpetrators of domestic violence engage in a course of
20    conduct, a pattern of actions towards their victims in order to
21    obtain control and domination over them.
22            THE COURT: Mr. Arenstein?
23            MR. ARENSTEIN:  I object, your Honor.  I'm impressed
24    with Ms. Cling's broad range of experience in many areas of
25    psychology and law.  However, I have to object to the relevance

Ccdrsou4                              Cling – direct

of her testimony in this case.  Although we have asked, we have
received no reports under Rule 26(a)(2)(B) of the Federal Rules
of Civil Procedure, received no reports from this witness of
any matter relating to this case.

     In fact, Ms. Cling interviewed the child without
giving any notice to us, with the mother for two hours, as she
testified there, which I think was --

     THE COURT:  Mr. Arenstein, I listened very carefully,
and I didn't hear that the witness is planning on offering any
opinion as to Shayan in particular.

     MR. ARENSTEIN:  I do not have any reports under rule
26(a)(2)(B) of the federal rules, which provide that a party
must disclose to other parties the identity and opinions of
each testifying witness with a report containing (1) a complete
statement of all opinions to be expressed and the basis and
reasons for that opinion, (2) the data or other information
considered by the witness in forming the opinion, (3) --

     THE COURT:  I have a copy of Rule 26 in front of me.
I'm generally familiar with it, Mr. Arenstein.  What I would
like Ms. Leidholdt to address is, my recollection is there was
an order that I entered in this case.

     MS. LEIDHOLDT:  Yes.

     THE COURT:  Can you tell me what that order required
with regard to expert witnesses and how the respondent complied
with that order.

Ccdrsou4                        Cling - direct

1          MS. LEIDHOLDT:  Your Honor, may I ask Mr. McNally to

2     address this, please?

3          THE COURT:  Sure.

4          MR. McNALLY:  Your Honor entered an order I believe on

5     November 19th in response to a letter that we sent in

6     addressing the fact that we intend to call expert witnesses

7     here and what do you intend for us to do as far as the normal

8     disclosures that are normally made pursuant to Rule 26 that Mr.

9     Arenstein has cited.

10          In response to that, and given the procedural posture

11     of the case that we were starting trial on November 3rd, in

12     response to that letter your Honor issued an order stating --

13          THE COURT:  I have the order.  I'll read the second

14     decretal paragraph.  "Respondent shall transmit to petitioner's

15     counsel by 3 p.m. on November 26th the résumé, copies of prior

16     testimony in any proceeding, and a description of any expert's

17     testimony.  Petitioner shall follow the same procedure if he

18     intends to call an expert."  That is an order of the Court

19     dated November 19, 2012.

20          MR. McNALLY:  That is correct, your Honor.

21          THE COURT:  What did you do in compliance with that

22     with regard to Dr. Cling?

23          MR. McNALLY:  We did exactly as the order stated, your

24     Honor.  We provided a summary of the anticipated opinion, the

25     CV and --

Ccdrsou4                            Cling - direct

1          THE COURT:  Prior testimony?

2          MR. McNALLY:  We also provided a copy of her testimony

3     in the Hague Convention action that Dr. Cling mentioned.  Her

4     prior testimony before that was in 1986, and therefore it was

5     inaccessible.

6          THE COURT:  Mr. Arenstein, you have heard what Mr.

7     McNally has said.  Is that accurate?

8          MR. ARENSTEIN:  That is accurate.  We did receive a

9     brief summary, a page or two, page and a half.  We have no

10    knowledge of any testimony whatever.

11         Your Honor, we would respectfully request that the

12    Court begin testimony, after the argument, of this witness

13    after lunch.  We have an expert that is going to be helping us

14    cross-examine if she does testify, Dr. Cling.

15         We have no information here from counsel with regard

16    to what the testimony is going to be or what she is going to

17    say.  We haven't been given any documentation whatsoever.  We

18    did ask for a report after your Honor's order, and we never got

19    a report.

20         THE COURT:  Mr. Arenstein, what you said in the first

21    half of your statement contradicts what you said in the second

22    half of your statement.  In the first half of your statement,

23    if I heard you correctly -- and there is a transcript, thank

24    goodness, of the proceedings, and we can all go back and read

25    it -- I understood you to say that Mr. McNally had accurately

Ccdrsou4                          Cling - direct

1    represented what had transpired.  Did you not say that?

2                MR. ARENSTEIN:  I said --

3                THE COURT:  Did you not say that?

4                MR. ARENSTEIN:  I did say that.  I said I received --

5                THE COURT:  In the second half you told me that he did

6    not accurately set forth what had transpired, that no one gave

7    you a description of the expert's testimony or prior testimony

8    in any proceeding.  Did I misunderstand you or is that what you

9    told me in the second half of your statement, Mr. Arenstein?

10               MR. ARENSTEIN:  Your Honor, we had no knowledge that

11   there was going to be an interview of the parent, the child,

12   those other things.

13               THE COURT:  Stick with the questions I've asked you.

14               MR. ARENSTEIN:  What we received was a biography and

15   summary of the opinions of Dr. Cling in a one-and-a-half page

16   document.

17               THE COURT:  Is it consistent with what Ms. Leidholdt

18   said from the podium?

19               MR. ARENSTEIN:  I don't believe it is totally

20   consistent.  All we received in this document, from what I

21   gleaned, is general areas that she was going to testify to in

22   court, nothing specific with regard to her testimony in this

23   court.

24               THE COURT:  With regard to the prior testimony, I've

25   heard from Mr. McNally that you were furnished with a copy of

Ccdrsou4                        Cling - direct

1   the transcript of Dr. Cling's testimony before Judge Karas.  I

2   heard from you that Mr. McNally accurately stated things.  Then

3   I heard from you that you received no prior testimony of Dr.

4   Cling.  Those statements can't all be true at the same time.

5           MR. ARENSTEIN:  Can I correct that?  I did receive the

6   testimony of Dr. Cling in a case of Lozano v. Alvarez in which

7   Judge Karas found that there was no grave risk of danger.  I

8   did receive that testimony.

9           THE COURT:  You told me a moment ago that you did not

10  receive any testimony.  That's what you said on the record.

11          MR. ARENSTEIN:  No, that's not what I'm talking about.

12  I'm talking about what she is going to testify to in this case

13  today.  I have received nothing from a report about the

14  testimony that was going to happen in this court nor of the

15  interviews she had with the child and the parent or anything

16  like that.  I've gotten no documentation from this witness or

17  from Ms. Leidholdt on the testimony or substance which is going

18  to take place in this court.

19          THE COURT:  Do you understand Mr. Arenstein, I'm

20  concerned about your candor with the Court.  You told me a few

21  moments ago you had not received any testimony.  Now you tell

22  me you have received testimony from the case before Judge Karas

23  but that you are referring to something else, the prospective

24  testimony.

25          MR. ARENSTEIN:  Your Honor, I am talking about the

Ccdrsou4                              Cling - direct

1    prospective testimony.

2              THE COURT:  Mr. Arenstein, I would ask you to be more

3    cautious in your comments to the Court.  A fair-minded reading

4    of what you said was that you had not received any prior

5    testimony of this witness.

6              MR. ARENSTEIN:  That's not what I said, your Honor.

7              THE COURT:  The transcript will reflect what you said.

8              MR. ARENSTEIN:  May I have a chance to respond?

9              THE COURT:  No, no.  I said the transcript will

10   reflect what you said.

11             MR. ARENSTEIN:  I'm going to state again, I

12   received --

13             THE COURT:  Mr. Arenstein, you're not understanding.

14   My concern is your candor when you speak and you make a

15   statement, you need to be accurate when you speak.

16             MR. ARENSTEIN:  Can I be accurate now?  Can I at least

17   respond?

18             THE COURT:  I was asking you to address the accuracy

19   of what you said to the Court.  But move on.  What would you

20   like to say?

21             MR. ARENSTEIN:  I would like to say that what I did

22   receive and I got from Mr. McNally was the résumé of Dr. Cling,

23   a brief two-page document called "Biography and Summary of

24   Opinions of the Expert Dr. B.J. Cling," and the testimony that

25   was elicited in the case of Lozano v. Alvarez in front of Judge

Ccdrsou4                          Cling – direct

1    Karas in which he found that domestic violence was not a grave

2    risk of danger.  Those are the three documents that I received

3    from counsel.

4            What I objected to earlier was we requested from

5    counsel a report of the testimony that was going to be elicited

6    in this court by this witness.  I did not receive anything

7    other than this two-page statement that was made by counsel on

8    ECF that I'm sure your Honor received a copy of.  I have not

9    received a report or anything based on the interviews that Dr.

10   Cling had with Shayan or with Ms. Lee or anything she did with

11   any of the parties in this case at all.  I did not receive

12   anything other than this two-page document.

13           THE COURT:  Thank you.

14           MR. ARENSTEIN:  I would object to her testifying,

15   especially when she interviewed Shayan and the mother when your

16   Honor issued a visitation order and during that time we were

17   not given any notice of it.  Everything was done without us

18   being told about it until after the fact.  We never had an

19   opportunity to have anybody examined.

20           Frankly, I don't see the relevance of the testimony if

21   she hasn't examined my client and she's going to be testifying,

22   just examining Shayan with his mother, when it was supposed to

23   be a visitation, and she comes and goes into the visitation and

24   interviews them at a place that was set up by respondent.

25           THE COURT:  Thank you.  There is no indication that

Ccdrsou4                      Cling – direct

1    this witness is going to utter one word about Shayan and

2    Shayan's demeanor, Shayan's statements, Shayan's reactions.

3    That has not been proffered in this case.

4            With regard to rule 26, this is a petition under the

5    Hague Convention.  The Court is required to act with

6    expedition.  I've done so.  I've set aside eight days in my

7    calendar thus far, putting aside other matters, because this is

8    a matter of urgency and importance.  I've cleared my calendar

9    to do this and to make this a priority because it is a priority

10   and the parties have asked me to treat it as a matter of

11   priority.

12           I have done that at great inconvenience not to me,

13   because I come to work every day.  The inconvenience is to the

14   other litigants before this Court whose hearings have been

15   adjourned, postponed, rescheduled, moved to accommodate you

16   all.  It's right, proper, and just that I do that even though

17   it does inconvenience other litigants.

18           Pursuant to the authority this Court has in an

19   expedited matter, when I had set the hearing, I entered an

20   order on the 19th which described what I was going to require

21   with regard to expert witnesses.  It was an appropriate

22   exercise of discretion on the Court's part to set an

23   abbreviated schedule and a reduced disclosure requirement that

24   applied equally to the petitioner and the respondent.

25           It was not required of the respondent to comply with

Ccdrsou4                          Cling - direct

1    the full procedures in rule 26 for this expedited proceeding.

2    It was necessary and is necessary that the respondent comply

3    with the order which I issued.  You have been invited to tell

4    me in what respect the respondent has been noncompliant with

5    that order, and you have not done so.  That's where we are.

6              We are going to break for lunch.  I have not ruled on

7    anything quite yet.  We'll take it up after lunch.  Thank you.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ccdrsou4                        Cling – direct

                            AFTERNOON SESSION

1

2                                   2:10 p.m.

3    B.J. CLING, resumed.

4          THE COURT:  Having considered the matter, I will allow

5    the witness to testify based on her interviews with respondent

6    as to whether or not what she observed and saw of respondent

7    was consistent with post-traumatic stress disorder, as I

8    understand what she proposes to testify to, and whether same

9    was the result of domestic violence.  She can base that on her

10   interview with and observations of the respondent, Ms. Lee, and

11   that alone.

12         Go ahead, Ms. Leidholdt.

13         MS. LEIDHOLDT:  Your Honor, some guidance from the

14   Court.  Would Dr. Cling also be able to testify about whether

15   or not exposure to domestic violence generally has a negative

16   effect on children and the kind of effect that it has on

17   children, not referring to, because there was no evaluation of,

18   the child Shayan.

19         THE COURT:  I will allow that testimony in.  Go ahead.

20         MS. LEIDHOLDT:  There is just one more, and this was

21   all submitted to opposing counsel about her testimony.

22         THE COURT:  Raise your voice.

23         MS. LEIDHOLDT:  There is one other issue that I

24   respectfully request that Dr. Cling be permitted to address as

25   an expert on domestic violence.  That is if she could testify

                   Ccdrsou4                      Cling - direct

1    about how mental health professionals understand domestic

2    violence and the forms that it takes towards victims.

3              THE COURT:  I'm probably not going to allow that.

4    "Domestic violence" is not a term in the statute.  If I was

5    trying to determine what statutory domestic violence was, that

6    might be relevant.  I think I have indicated what I have said

7    she could testify to.  I'll take that other area, which I don't

8    think I understand your point, on a question-by-question basis.

9    Ask your question.

10             MS. LEIDHOLDT:  Thank you very much, your Honor.  I

11   just have one more matter.  Your Honor, I have a publication

12   that I --

13             THE COURT:  You're not going to ask your question?

14             MS. LEIDHOLDT:  Of my client?

15             THE COURT:  Of your witness.

16             MS. LEIDHOLDT:  Of my witness, yes.  Before I called

17   Dr. Cling to the stand, I was preparing to ask your Honor to

18   take judicial notice of a publication that is highly relevant

19   to Dr. Cling's testimony.  I would like to show this to your

20   Honor and see if your Honor would take judicial notice of it.

21             THE COURT:  Have you put Mr. Arenstein on notice of

22   it?

23             MS. LEIDHOLDT:  Yes, I have, your Honor.

24             THE COURT:  What is the matter?

25             MS. LEIDHOLDT:  Your Honor, it is an American Bar

Ccdrsou4                                   Cling - direct

1    Association Commission on Domestic Violence publication

2    entitled "Assessing Risk to Children of Batterers."

3              THE COURT:  There is another way you can perhaps get

4    this in.  It would seem to be a much simpler way.  If this is

5    material on which the witness has relied in forming whatever

6    opinion, that seems to be a more appropriate way.  But if you

7    want me to take judicial notice of it instead, I'm not going to

8    foreclose you.  You tell me what you want to do.

9              MS. LEIDHOLDT:  Thank you so much, your Honor.

10             MR. ARENSTEIN:  Your Honor, given that both sides were

11   not evaluated in this case, is it not important or required to

12   do the same in a domestic violence situation, that both sides

13   have to be evaluated?  To use this document even in judicial

14   notice I don't think would be proper in this case.

15             THE COURT:  I'm not sure whether it is going to be

16   offered in judicial notice at this stage of the game.  It may

17   be something which a person in this area of expertise

18   customarily relies on, in which event they are allowed to rely

19   on it in part as a basis for their opinion.  What do you want

20   to do, Ms. Leidholdt?

21             MS. LEIDHOLDT:  I think, your Honor, I will show this

22   to Dr. Cling and ask if she relied on this in the formation of

23   her expert opinion.

24             THE COURT:  Why don't you ask her what she relied on.

25   I think that is a more fruitful way.  Just ask your question.

Ccdrsou4                          Cling – direct

1   Let's go.  Find out what her opinions are and what they are

2   based on.  Find out what she is going to base her opinion on.

3   The document doesn't come into evidence because it's something

4   that she bases her opinion on.  She may base her opinion on

5   what she's read in learned treatises and the like and her

6   training and education and experience, but it doesn't mean that

7   the learned treatises are admissible into evidence.

8   CROSS-EXAMINATION (continued)

9   BY MS. LEIDHOLDT:

10  Q.  Dr. Cling, how do mental health professionals define

11  domestic violence?

12          MR. ARENSTEIN:  Objection.

13          THE COURT:  What is the relevance of how mental health

14  professionals define domestic violence?

15          MS. LEIDHOLDT:  Your Honor, I think the relevance is

16  that mental health professionals, there is a good bit of

17  literature on the fact that they believe that there are

18  different kinds of domestic violence, different kinds of

19  domestic violence that differ in terms of severity, of harm to

20  victims, and of harm to children who are exposed to domestic

21  violence.

22          Mental health professionals in the fields of

23  psychology and psychiatry have found that there are two to

24  three different forms of domestic violence.  Some are not

25  particularly injurious, are not escalating, are not continuous,

Ccdrsou4                          Cling – direct

1    and there are others that pose grave risks of harm to victims,

2    both adults and children, that are more likely to result in

3    physical injury to victims and to lethality of victims.

4         THE COURT:  I'm trying to find out how will defining

5    how mental health professionals define domestic violence, how

6    is that probative in this case?

7         MS. LEIDHOLDT:  As I understand it, Dr. Cling will

8    then apply -- I will ask her what kind of domestic or family

9    violence, in her expert opinion, is happening in this

10   particular case primarily based on her interview with Ms. Lee,

11   but the other information that she has gleaned friction,

12   including petitioner's exhibits and petitioner's documents,

13   police reports, etc.  Then, if she can reach an expert opinion

14   about the kind of domestic violence in this particular case,

15   how it likely affected the petitioner and the subject child,

16   whether or not this form of domestic violence is consistent

17   with the development of post-traumatic stress disorder on the

18   part of victims.

19        THE COURT:  This is what we are going to do.

20        MR. ARENSTEIN:  Can I respond?

21        THE COURT:  You have an objection, right?

22        MR. ARENSTEIN:  Yes, I do.

23        THE COURT:  I'm overruling it subject to a motion to

24   strike.  Let me hear the testimony.  Then I can decide it in

25   context.  Go ahead.

Ccdrsou4                              Cling – direct

1                MS. LEIDHOLDT:  Thank you so much, your Honor.

2       BY MS. LEIDHOLDT:

3       Q.   Dr. Cling, how have mental health professionals come to

4       define domestic violence?

5                MR. ARENSTEIN:  Objection.

6                THE COURT:  Overruled.  Go ahead.

7       A.   There are two basic, I think.  Recent research, I'd say

8       from the about the year 2000, have focused on largely two

9       categories of domestic violence.  One is situational couple

10      violence, which is sporadic, based on specific fights that

11      couples might have.  It's not usually escalating, it does not

12      usually involve grave injury to either party, and it is not

13      usually lethal.

14               However, there is the other kind of domestic violence,

15      which researchers are now really focusing on, which is called

16      intimate terrorism.

17               MR. ARENSTEIN:  Objection.

18      A.   Or intimate partner terrorism.

19               THE COURT:  Overruled.  Called by whom?

20               THE WITNESS:  Researchers in the field, Johnson and --

21      hold on -- Evan Stark talks about coercive control.

22               THE COURT:  You said Johnson.  Where is that

23      published?

24               THE WITNESS:  Johnson and Ferraro.  I did have the

25      cite with me, in a major psychological journal in the year

Ccdrsou4                          Cling - direct

1    2000.

2              THE COURT:  How about Evan?

3              THE WITNESS:  Evan Stark?

4              THE COURT:  Yes, Evan Stark, where is that published?

5              THE WITNESS:  This one is in Louisiana Law Review.

6    Oh, no, this is from the Louisiana Law Review.  His article is

7    "Journal of Child Custody," Evan Stark.

8              THE COURT:  Do you have that?

9              THE WITNESS:  Yes.

10             THE COURT:  Thank you.

11             THE WITNESS:  He talks about coercive control.  Let me

12   give you the cite for Johnson and Ferraro.

13             THE COURT:  Let me look at this first for second.

14             THE WITNESS:  Here is Johnson and Ferraro.  I found

15   it.  Journal of Marriage and Family.  That article discusses

16   the issue that I am just talking about of coercive control and

17   understanding that particular kind of domestic violence.

18             THE COURT:  I'm looking for the reference of what you

19   refer to as intimate terrorism.

20             THE WITNESS:  He calls it coercive control.

21             THE COURT:  He does not use the term "intimate

22   terrorism"?

23             THE WITNESS:  He refers to Johnson.  Different people

24   use different terms for the same thing.  So he at the beginning

25   refers to Johnson.

Ccdrsou4                        Cling - direct

1          THE COURT:  Listen to my question.  Does Dr. Stark use

2     the term "terrorism" in his article?

3          THE WITNESS:  His term is "coercive control."  I can't

4     remember if he specifically cites Johnson as using the term

5     "intimate terrorism."

6          THE COURT:  Let me give the article back to you.  I

7     have perused it.  He certainly cites Johnson and Campbell, but

8     I have thus far not seen the terminology utilized.  I didn't

9     see the term utilized in there.

10          THE WITNESS:  His term is "coercive control" for the

11     same thing.

12          THE COURT:  What are you referring to now?  You're

13     referring to an article in the Louisiana Law Review?

14          THE WITNESS:  That is a review of the psychological

15     research.  If you're looking for the cite from Johnson, it's

16     here.

17          THE COURT:  For the record, what I have been shown is

18     volume 65 of the Louisiana Law Review at 1379, an article by

19     Nancy ver Steegh, V-E-R then capital S-T-E-E-G-H, which at page

20     1384 says, "Intimate terrorism.  While family conflict

21     researchers are predominantly measuring another type of

22     violence, situational couple violence" -- I'm sorry.  I didn't

23     read that sentence right.

24          "Based on his analysis of the 'family conflict,'" and

25     that's in quotes, "family conflict," "and the 'feminist

Ccdrsou4                          Cling - direct

1    studies' discussed above, he concludes that women's advocates

2    and service providers are primarily observing one type of

3    domestic violence, Intimate Terrorism," that is initial cap but

4    it is not in quotes, "while family conflict researchers are

5    predominantly measuring another type of violence, situational

6    couple violence."  Then there is a footnote reference 16 to

7    "Michael P. Johnson and Kathleen J. Ferraro research on

8    domestic violence in the 1990s, making distinctions," and it is

9    672 Journal of Marriage and Family 948, 2000.

10              Is that what you are referring to, or are you

11   referring to anything else?

12              MS. LEIDHOLDT:  Your Honor, if I may, Dr. Cling made a

13   publication available to me that I don't believe she has with

14   her.

15              MR. ARENSTEIN:  Objection, your Honor.

16              THE COURT:  Overruled.

17              What has been placed before you?

18              MS. LEIDHOLDT:  And other publications that she has

19   made available.

20              MR. ARENSTEIN:  Objection, your Honor.

21              THE COURT:  Stop talking, Ms. Leidholdt.  Go ahead,

22   what is in front of you?

23              THE WITNESS:  This is an article from the Journal of

24   Family issues 2007 entitled "The Differential Effects of

25   Intimate Terrorism in Situational Couple Violence:  Findings

Ccdrsou4                              Cling – direct

1   from the National Violence Against Women Survey by Michael

2   Johnson and Janel Leone.

3            THE COURT:  Is that the same Johnson?

4            THE WITNESS:  Yes.

5            THE COURT:  Let me see it.

6            MR. ARENSTEIN:  Your Honor, objection.  She just

7   handed the witness another document while you were looking at

8   that document.  This is improper.

9            MS. LEIDHOLDT:  Your Honor, these are the documents --

10           THE COURT:  Ms. Leidholdt, I would ask you not to do

11   that.

12           Can you please return those to Ms. Leidholdt.

13           MS. LEIDHOLDT:  Of course.

14           THE COURT:  Excuse me.  If the witness asks for a

15   particular article, we can take up whether it is appropriate

16   for you to give it to the witness.  All right?

17           MS. LEIDHOLDT:  Thank you.

18           THE COURT:  One of the things that a judge has to

19   protect against and I know you're concerned about -- please

20   return to your seat -- with other witnesses in this case is we

21   don't want anyone in the case to coach a witness.  I know you

22   would never do that.  But that is part of what I do for a

23   living, to make sure that that doesn't happen by participants

24   in a trial.

25           MS. LEIDHOLDT:  I understand, your Honor.

1          THE COURT:  Now, you have an objection to the

2    testimony and move to strike the testimony?

3          MR. ARENSTEIN:  I move to strike the testimony and I

4    would like to make one statement.  Given the fact in custody

5    cases both parties are interviewed, in this case even in

6    domestic violence, you need to interview both parties.  Both

7    parties have not been interviewed here and the testimony of

8    this witness, if it is going to be about both parties and

9    making a conclusion would be improper.

10         THE COURT:  You didn't hear what I said before in my

11   ruling, Mr. Arenstein.  It is apparent you didn't.

12         MR. ARENSTEIN:  You said you would wait for my motion

13   to strike at the end if it was proper.

14         THE COURT:  No.  I said I told Ms. Leidholdt in your

15   presence what I was allowing the witness to testify to.  I

16   don't know whether you heard that or --

17         MR. ARENSTEIN:  I did.  It was limited to certain

18   observations, which you said, your Honor --

19         THE COURT:  Then why are you arguing something

20   different, Mr. Arenstein?

21         Can you explain that to me?

22         MR. ARENSTEIN:  Yes, because if she is going to make

23   an evaluation of one party without looking at both sides and

24   making a full evaluation of the entire picture, it would be

25   improper.

CCDJSOU4                         Cling - direct

```
 1              THE COURT:  She is making an evaluation of the entire
 2    picture?  Who says?
 3              MR. ARENSTEIN:  Terrorism by partners, what I am
 4    hearing here, she is diagnosing my client is a terrorist or
 5    terrorism by partners with these articles without having even
 6    interviewing my client.
 7              THE COURT:  I haven't heard of any diagnosis of your
 8    client or of anyone.  Have you?
 9              MR. ARENSTEIN:  Not at this stage, your Honor.
10              THE COURT:  Please sit down.  Next question.
11    BY MS. LEIDHOLDT:
12    Q.  Dr. Cling, what do psychologists mean by the term intimate
13    terrorism or coercive control?
14              MR. ARENSTEIN:  Objection.
15              THE COURT:  Overruled.
16              THE COURT:  Can you answer that without --
17              THE WITNESS:  I don't want to say the wrong thing.
18              THE COURT:  You shouldn't be saying the wrong thing.
19              THE WITNESS:  My papers got slightly messed up here.
20              THE COURT:  Why don't you take your time and get
21    organized.
22              THE WITNESS:  Thank you.
23              THE COURT:  Try to answer the question if you can
24    without with regard to the papers, and then if you need to
25    consult with the papers, just indicate, "I would need to
```

CCDJSOU4                        Cling - direct

1    consult with the papers to answer that question," and I'll give

2    you an opportunity to do so.  Is that fair?

3                THE WITNESS:  I got it.  Yes, I am sorry.

4                THE COURT:  Fine.  Can you answer that without regard

5    to the papers or do you need to consult the papers?

6                THE WITNESS:  I would like to look at my notes which

7    are just a list.  It is right here.

8                THE COURT:  Okay.

9                MR. ARENSTEIN:  Might I see a copy of those notes she

10   is consulting?

11               THE COURT:  Sure.  First let the witness testify.  You

12   will have an opportunity.

13               MR. ARENSTEIN:  We have asked for notes and did not

14   receive any.

15               MS. LEIDHOLDT:  There was never a request for notes.

16               THE COURT:  Mr. Arenstein, why are we doing this?  I

17   said, "sure."  Did you hear me?

18               MR. ARENSTEIN:  I did.

19               THE COURT:  Why did you continue beyond that when I

20   said, "sure"?

21               MR. ARENSTEIN:  I said nothing else, your Honor.

22               THE COURT:  I think you did.  You said, "because we

23   asked for the notes" after I said, "sure."

24               Then I believe you said, if I didn't misquote you,

25   "because we asked for the notes."  Do you recall that, sir?

CCDJSOU4                        Cling - direct

1           MR. ARENSTEIN:  I don't recall saying because we

2    asked -- I said that before your Honor said "sure," your Honor.

3           THE COURT:  All right.  Jerry, can you read it back,

4    please.

5           (Record read)

6           THE COURT:  Mr. Arenstein, do you have something to

7    say?

8           MR. ARENSTEIN:  Not now.  I am not going to say

9    anything.  I will wait.  I am sorry.

10   BY MS. LEIDHOLDT:

11   Q.  Dr. Cling --

12   A.  Yes.

13   Q.  -- when psychologists refer to intimate terrorism or to

14   coercive control, what is it that they're talking about?

15          MR. ARENSTEIN:  Objection.

16          THE COURT:  Overruled.

17   A.  They're talking about a very prevalent type of domestic

18   violence that escalates, that has as its main focus the

19   domination and control of the victim that although it may be

20   punctuated by physical assaults, the underlying characteristic

21   of the domestic violence is the power and control.

22          It is severe, it is frequent.  Injuries often follow.

23   It is very harmful to children and also those victims

24   frequently seek help.

25   BY MS. LEIDHOLDT:

CCDJSOU4                          Cling - direct

1    Q.  What are the specific strategies of control that

2    perpetrators of this form of domestic violence typically engage

3    in?

4              MR. ARENSTEIN:  Objection.

5              THE COURT:  Overruled.

6    A.  The first kind of strategy is really called "Psychological

7    Battering" by Maryann Dutton, and what it refers to is a more

8    or less constant starting as low level and escalating,

9    undermining of the victims autonomy and self-esteem by things

10   like frequent shouting, name calling, humiliation, abuse of

11   other family members, abuse of pets in the home.  The batterers

12   often direct this abuse against the victim and also the

13   children.  Anyway, that is the first characteristic.

14             Another characteristic is an attack on the victim's

15   economic independence, where the perpetrator focuses on

16   sometimes directly taking the money, taking the victim's money

17   or pressuring the victim to quit her job, for example, so she

18   doesn't make any money, with the outcome of having her become

19   dependent on the perpetrator.  Then perhaps requiring her to

20   deplete her savings and/or putting her on an allowance and

21   limiting her money, basically with the strategy, sort of a

22   long-term goal of making the victim economically dependent,

23   which actually does make victims -- it is difficult to leave a

24   batterer on a mere economically dependent.

25             THE COURT:  All right.  You have answered the

CCDJSOU4                          Cling - direct

1   question.

2              MR. ARENSTEIN:  Objection.  I move to strike.

3              THE WITNESS:  There are more characteristics.

4              THE COURT:  You can testify to the characteristics,

5   but you went on, ma'am, to say which makes it --

6              THE WITNESS:  The types?

7              THE COURT:  -- you went on to testify that which makes

8   it more difficult for the victim to leave the abuser, okay?

9              THE WITNESS:  Okay.

10             THE COURT:  You were asked a specific question.  Do

11  you recall the question you were asked?

12             THE WITNESS:  What are the characteristics of coercive

13  control or intimate terrorism?

14             THE COURT:  Okay.  If you don't understand the

15  question, you're entitled to have the question clarified, but I

16  would ask that you try to listen to the words of the question

17  and answer what is asked of you, okay, and wait for the next

18  question.

19             MR. ARENSTEIN:  I move to strike part of the testimony

20  as not --

21             THE COURT:  Overruled.

22             MR. ARENSTEIN:  -- not responsive to the answer.

23  A.  A third strategy is threats, intimidation and threats that

24  are geared to frighten --

25             THE WITNESS:  Am I allowed to give examples of what a

CCDJSOU4                          Cling - direct

1      threat would be?

2                 THE COURT:  Give your testimony, ma'am, and we'll see

3      where we go.

4                 THE WITNESS:  Okay.

5                 THE COURT:  Do you understand what the problem was

6      with the last go-around, ma'am?

7                 THE WITNESS:  Was it was an example?

8                 THE COURT:  No, not that it was an example.

9                 THE WITNESS:  Then I don't understand.

10                THE COURT:  Besides the characteristic, you then

11     proceeded to testify as to your opinion of what the consequence

12     of that type of --

13                THE WITNESS:  I understand that.

14                THE COURT:  Right now we are talking about

15     characteristics.  We might get another question on

16     consequences, and then I'll be able to hear the objections, if

17     any, of counsel, have a discussion and then I can rule on it,

18     okay?  I would ask you to follow those rules, okay?

19                Thank you.

20                THE WITNESS:  Okay.  So characteristics of

21     intimidation and threats are threats, for example, to kill,

22     threats to take away the victim's children, threats to the

23     immigration status of the victim, threats involving technology.

24     That would be the third character.

25                The fourth characteristics would be isolation of the

CCDJSOU4                    Cling - direct

victim from support, usual systems of support, for example,

isolation from the family, forbidding them to see their family

or friends or forbidding them to partake in religious

observances or to be part of a religious community or a

community in general, isolating them from work or professional

communities.

          Examples of isolation of child victims would be not

allowing them to go to school, not allowing them to play with

family members of the victim's family, not allowing people to

come over, et cetera.

          Another characteristic would be that is particularly

true if any immigration issues are at stake, taking all the

papers of the victim and/or the children and holding onto them.

          Another characteristic would be imposing rigid general

rules so that a woman would be pressured to only do what is

perceived by the culture as womanly things.  This could also

take the form in terms of interactions with victim's children,

of telling boys they shouldn't cry, making girls, I don't know,

do various stereotypic female tasks.

          MR. ARENSTEIN:  Objection.  I move to strike the

testimony as not responsive to the question.

          THE COURT:  Overruled.

BY MS. LEIDHOLDT:

Q.  Dr. Cling, has this understanding of domestic violence as

an interconnected set of strategies of power and control been

CCDJSOU4                        Cling - direct

1   validated by any researchers?

2            MR. ARENSTEIN:  Objection.

3            THE COURT:  I don't understand the question.

4            MS. LEIDHOLDT:  Yes.

5   BY MS. LEIDHOLDT:

6   Q.  Has this definition or this understanding of domestic

7   violence as a set of strategies of power and control been

8   validated in psychological research?  Has it been validated?

9            MR. ARENSTEIN:  Objection.

10           THE COURT:  I still don't understand the question.

11  BY MS. LEIDHOLDT:

12  Q.  Has it been studied?

13           THE COURT:  What been studied?

14           MS. LEIDHOLDT:  The understanding of domestic violence

15  as a set of interconnected strategies of power and control, the

16  strategies Dr. Cling just identified, has this --

17           THE COURT:  Have they been studied?

18           MS. LEIDHOLDT:  Have they been tested?

19           MR. ARENSTEIN:  Objection.

20           THE COURT:  Overruled.

21  A.  Yes, and found valid.  They have been found to --

22           THE COURT:  I don't understand what "valid" means in

23  this context.

24           THE WITNESS:  In this context, it would mean when you

25  do studies and you see if these characteristics all come up

CCDJSOU4                        Cling - direct

1   within the context of a particular relationship believed to be

2   a battering one as opposed to other relationships not believed

3   to be battering, it stands up, it is statistically significant

4   that these characteristics could vary statistically.

5              MR. ARENSTEIN:  Objection and move to strike.

6              THE COURT:  Overruled.

7   BY MS. LEIDHOLDT:

8   Q.  Dr. Cling, are you aware of which researcher or group of

9   researchers has validated this understanding of domestic

10  violence as a set of strategies, a course of control?

11  A.  Yes.

12             MR. ARENSTEIN:  Objection to the form of the question,

13  your Honor.

14             THE COURT:  Overruled.

15  A.  Yes, Donald Dutton, Journal of Interpersonal Violence.

16             MR. ARENSTEIN:  There is no question, your Honor.  The

17  answer was elicited after --

18             THE COURT:  Overruled.

19  BY MS. LEIDHOLDT:

20  Q.  Is the form of domestic violence you're talking about, that

21  you're describing and you've used two terms, course of control

22  and intimate terrorism, is it a set of discrete acts of

23  violence --

24             MR. ARENSTEIN:  Objection.

25  Q.  -- typically or is it typically a pattern or a course of

CCDJSOU4                        Cling - direct

1    conduct?

2              MR. ARENSTEIN:  Objection.

3              THE COURT:  Overruled.

4    A.  It is a course of conduct.  In fact, that is one of the

5    main distinctions between these types of domestic violence and

6    why researchers have been particularly interested in studying

7    it in recent times starting in Year 2000 because they feel -- I

8    would agree -- a mistake to look at isolated incidents because

9    when you have coercive control, you have a more or less low

10   level, steady state of intimidation and threats perhaps on a

11   daily basis, punctuated by maybe once a month or once every few

12   months actual beating which really reinforces the general

13   message.

14             So that you don't have to in that kind of a

15   relationship as a perpetrator beat or batter all the time

16   because your victim gets the message that you're threatening,

17   and you could beat them at will but not that regularly.  So for

18   learning purposes, it is actually not necessary, and the

19   pattern is different for this type of cocercive control type of

20   domestic violence as opposed to the situational type.

21             MR. ARENSTEIN:  Objection to the answer.

22             THE COURT:  Overruled.

23   BY MS. LEIDHOLDT:

24   Q.  Dr. Cling, in the form of domestic violence that you

25   variously designated as coercive control or intimate

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CCDJSOU4                          Cling - direct

terrorism, does it typically terminate when the perpetrator and

his victim are separate?

          Does it typically terminate when the perpetrator and

victim are separate?

          MR. ARENSTEIN:  Objection.

          THE COURT:  Overruled.

A.  No.  No.  In fact, the episodic or situational type may

stop, but one of the characteristics of cocercive control is it

often escalates when they're separated.  This is because the

perpetrator really feels a pressing need to exert even more

control even though the form may change because the

possibilities may, different possibilities may be open.  So it

can take other forms.

          For example, surveillance, hassles over or

interactions at the exchange of visitation, massive legal

actions in many different forums depending I guess on the

wealth of the perpetrator.  It shifts after separation, but it

does not discontinue.  In fact, it often escalates, and the

finding is that with cocercive-control type of domestic

violence, the injuries and lethality can increase after

separation.

Q.  Is there a generally agreed upon psychological profile of

perpetrators of the kind of domestic violence that you

characterize as cocercive control?

          MR. ARENSTEIN:  Objection.

CCDJSOU4                              Cling - direct

1    A.  Yes.

2              THE COURT:  Overruled.

3    BY MS. LEIDHOLDT:

4    Q.  What is that psychological profile?  What does it consist

5    of?

6    A.  Well --

7              MR. ARENSTEIN:  Continuing objection, your Honor.

8              THE COURT:  So noted.

9    A.  -- they engage in self-serving denial, I never did it, I

10   didn't do this, I didn't do that even if there are police

11   reports to that effect.

12             They shift the responsibility regularly onto the

13   victim.  It was really her fault.  She made me do it.  She did

14   this or whatever, blaming the victim for the abuse, that is

15   actually saying the victim attacked the perpetrator, generally

16   engaging in psychological mechanisms of projection and

17   externalization, and that means that where a perpetrator

18   perceives incorrectly that hostility is coming from the victim

19   when, in fact, it is really coming from the perpetrator,

20   psychologically speaking, projection refers to the fact you

21   take your own thoughts that you may not be aware of, project

22   them into somebody else like your victim-spouse and then

23   perceive her as doing something wrong and attacking you, so you

24   feel justified in attacking her.  That is referred to as

25   projection and externalization.  It serves the function of

CCDJSOU4                          Cling - direct

externalizing blame; that is, I had to do it because it was her

fault and that's how she is.  It leads to demonization of the

victim.

        Another psychological mechanism that is typical is

splitting.  Splitting refers psychologically to a mechanism

where instead of seeing the nuances of people, you tend to see

all black or all white.  So in the case of domestic violence,

the perpetrator would see the wife as all bad, no good, she is

worthless, et cetera.  That would be the total perception.

These are really paranoid perceptions.  They're incorrect and

they escalate the abuse because the perpetrator feels angrier

and angrier as he projects more and more into the victim.

        Perpetrators are frequently very grandiose, sort of

egomaniac-type people.  They characterize or maybe

mischaracterize themselves as having amazing connections to

other people, all kinds of expertise.  They particularly feed

their grandiosity by causing their victims, their wives who

live with them, to debase themselves, which makes them feel

better on a regular basis, not just beating them, but in every

way.

        For example, you know, the napkin is not in the right

place because you're such a mess.  You, I don't know, all kinds

of obsessive things that become occasions to debase the victim;

and, therefore, psychologically make the perpetrator feel good

and feed his grandiosity.

CCDJSOU4                         Cling - direct

1          They're narcissistic and self-centered.  Because

2     narcissism is a particular characteristic of perpetrators, they

3     really don't make very good parents because they are

4     fundamentally concerned with how they feel and what their

5     issues are, so they may see a child as feeding that narcissism.

6          They may want control of the child.  They may want the

7     child, but not necessarily because they are capable of

8     considering what the best interests of the child would be

9     because they often can't see what that is because of their

10    narcissism, their inability to actually see the other person.

11         They're also highly ah authoritarian.  They frequently

12    have various bigoted attitudes about minority groups and other

13    people.  This fits into the rigid gender role perception.  They

14    may be very strict with their children.  They may, with an

15    authoritarian personality profile, might be prone to spanking

16    or strict discipline or yelling or lack of empathy.  Those

17    would be the characteristics of a perpetrator.

18         MR. ARENSTEIN:  During the course of the testimony,

19    the witness was reading from a document throughout the course

20    of her testimony.  I think it would be proper for her to

21    testify without looking at the document, and I would like to

22    see the document she has been reading from or at least ask that

23    the witness not look at the document unless she wants to use it

24    to refresh her recollection.

25         THE COURT:  Didn't I rule on whether you could look at

CCDJSOU4                        Cling - direct

1    the document?

2                MR. ARENSTEIN:  I understand that.

3                THE COURT:  What did I rule?

4                MR. ARENSTEIN:  You ruled I could look at the

5    document.

6                THE COURT:  What are you asking me with regard to your

7    ability to look at the document?

8                MR. ARENSTEIN:  Can I see it now or do I have to wait?

9                THE COURT:  Wait until the testimony is finished and

10   you may see it.  As I indicated, if you refer to a document, I

11   ask you say, "referring to my notes."

12               MS. LEIDHOLDT:  I have no objection if Dr. Cling does

13   not refer to notes.  I have no objection whatsoever.

14   BY MS. LEIDHOLDT:

15   Q.  Dr. Cling, is it possible to assess the danger that

16   perpetrators of this more severe form of domestic violence that

17   you've articulated present to their victims and, if so, how

18   does that happen?

19               MR. ARENSTEIN:  Objection.

20   A.  Yes, there is --

21               THE COURT:  Sustained.

22   BY MS. LEIDHOLDT:

23   Q.  Dr. Cling, are you aware of, or in your training have you

24   encountered any tools psychologists can use to measure the

25   level of dangerousness that a perpetrator of domestic violence

1   poses to a victim?

2   A.  Yes.

3           MR. ARENSTEIN:  Objection.

4   A.  There is a danger assessment tool --

5           THE COURT:  Go ahead.  Overruled.

6   A.  -- danger assessment tool that is used in the field by Dr.

7   Campbell which has been tested and normed.  It asks specific

8   questions of the victim.  Depending on what the answer is, yes

9   or no -- would you like me to read some examples?

10          THE COURT:  I am not -- ma'am, you can ask that of the

11  questioner, I suppose.

12          THE WITNESS:  Okay.

13          THE COURT:  That is not what I do for a living here.

14          THE WITNESS:  Sorry about that.

15          MR. ARENSTEIN:  Again she is reading from her notes.

16          THE WITNESS:  I am sorry.

17          For the record, I am reading from the Danger

18  Assessment Tool which is basically available out there, a test

19  that has been standardized, that asks questions of victims such

20  as does he threaten to kill you?  Did he beat you when you were

21  pregnant?  Did he ever try to choke you, et cetera?  Those are

22  the kinds of questions that are on this danger assessment tool,

23  and there is a way of scoring it.

24          Then there are levels of dangerousness that are

25  attributed to different scores.  The least dangerous is

CCDJSOU4                          Cling - direct

1    variable danger.  The most dangerous is extreme danger.

2              MR. ARENSTEIN:  Objection, your Honor.  She is reading

3    from the document.  The document is not in evidence.  She is

4    not using it to refresh her recollection.  She is testifying as

5    if it was her testimony.  I would object.

6              THE COURT:  Overruled.  It is perfectly appropriate

7    for an expert -- go ahead.  Next question -- to refer to notes

8    in the course of their testimony.

9    BY MS. LEIDHOLDT:

10   Q.  Dr. Cling, did you have the opportunity to score --

11   withdrawn.

12             Dr. Cling, did you have the opportunity to conduct a

13   dangerous assessment, dangerousness assessment based on your

14   interviews with Ms. Lee?

15   A.  Yes.

16   Q.  And family members?

17             MR. ARENSTEIN:  Objection.

18             THE COURT:  What is your objection?

19             MR. ARENSTEIN:  She has not interviewed the entire

20   population of the issue of domestic violence or custody or

21   anything else.  For her to testify, to do that would be

22   improper without having a full picture, your Honor.

23             THE COURT:  Okay.  A couple of questions.

24             THE WITNESS:  Yes.

25             THE COURT:  In interviewing, you interviewed the

1    respondent, her mother and her sister?

2              THE WITNESS:  Yes.

3              THE COURT:  You understand what you do for a living as

4    a clinical psychologist and what I do for a living as a

5    fact-finder are two different jobs.  You understand that?

6              THE WITNESS:  Yes.

7              THE COURT:  As a clinical psychologist, I assume that

8    when you're provided with information by a person, you assume

9    the truth of what they tell you?

10             THE WITNESS:  Not necessarily in a forensic

11   assessment.  In a forensic assessment, I think you would, as a

12   psychologist, do an in-depth interview to assess the

13   credibility of the person who you're interviewing.  You would

14   see how their account of things matches general accounts of the

15   type of thing that they're reporting.

16             So it is not exactly the same as, for example, a

17   clinical interview that you might do where someone comes into

18   your office and tells you whatever they tell you and you just

19   go from there.  So it is not --

20             THE COURT:  You mean you would reject, in doing an

21   assessment, what the victim told you?

22             THE WITNESS:  Not necessarily.  I would assess it in

23   the context of everything they're telling me, corroborating

24   other documents, the usual course of conduct of what they're

25   talking about.  I would take all of those things into

CCDJSOU4                        Cling - direct

1      consideration.  In terms of the danger assessment if that is

2      what you're asking me about --

3                   THE COURT:  Yes.

4                   THE WITNESS:  -- the way this test is given and

5      normed, they don't know how it is scored, you simply ask the

6      questions, and just it is yes or no.

7                   THE COURT:  So, in other words --

8                   THE WITNESS:  As to this, yes.

9                   THE COURT:  Yes, so if somebody says the individual

10     choked me --

11                  THE WITNESS:  Yes.

12                  THE COURT:  -- then quite appropriately you would

13     check the box of choking, correct?

14                  THE WITNESS:  That's right, yes, that's correct.

15                  THE COURT:  Okay.  That's what I thought.

16                  THE WITNESS:  Okay.

17                  THE COURT:  Okay.  You wouldn't, you wouldn't not

18     check the box if they said somebody tried to choke them,

19     correct?

20                  THE WITNESS:  Correct.

21                  THE COURT:  Okay.  All right.  Next question.  The

22     objection is overruled to the question that was asked.

23                  Go ahead, next question.

24     BY MS. LEIDHOLDT:

25     Q.  Dr. Cling, did you give the dangerousness assessment tool

CCDJSOU4                        Cling - direct

1    to Ms. Lee to complete or did you complete the dangerousness

2    assessment yourself based on your interviews with Ms. Lee and

3    her family members and your interviews of the materials related

4    to this particular case including police reports and other

5    documentation?

6    A.  The latter.

7            MR. ARENSTEIN:  Objection to the question, your Honor.

8            THE COURT:  Did you take into account Mr. Souratgar

9    and your observations of him in the half a day that you spent

10   in the courtroom and your reading of the testimony in doing the

11   assessment?

12           THE WITNESS:  The dangerousness assessment?

13           THE COURT:  Yes.

14           THE WITNESS:  Not directly, although it is true that I

15   heard his testimony.  I read his police reports, I read his

16   testimony, but that's -- that wasn't -- I mostly am basing it

17   on what the respondent said, as you said.

18           THE COURT:  Okay.  On the basis that this is an

19   assessment based on the assumption of the truth of what the

20   respondent, her mother and her sister said and what respondent,

21   the truth of what respondent said in the police reports, I'll

22   allow it.

23           MS. LEIDHOLDT:  Thank you, your Honor.  The

24   credibility of the witnesses most emphatically is for the court

25   to determine and only the court.

CCDJSOU4                          Cling - direct

1              MS. LEIDHOLDT:  Yes.

2              THE COURT:  Go ahead.  Next question.

3      BY MS. LEIDHOLDT:

4      Q.  Were you able to score the tool after you completed it?

5              MR. ARENSTEIN:  Objection.

6      A.  Yes.

7              THE COURT:  Overruled.

8      A.  Yes.

9      BY MS. LEIDHOLDT:

10     Q.  What score did you reach?

11             MR. ARENSTEIN:  May I have a continuing objection.

12     A.  Extreme danger.  Extreme danger.  That was the most

13     dangerous.

14     BY MS. LEIDHOLDT:

15     Q.  What was the basis for that score?

16     A.  Well, you read each one, you score yes or no, then certain

17     ones count for extra credit, and you arrive at a score which is

18     normed, and the score was 18.  Then you look up what level that

19     is, and the level is extreme danger.

20             THE COURT:  Do you have the responses --

21             THE WITNESS:  Yes.

22             THE COURT:  -- of the respondent?

23             THE WITNESS:  I do.

24             THE COURT:  Are they in a separate document?

25             THE WITNESS:  No.  This is it.

CCDJSOU4                          Cling - direct

1           THE COURT:  Well, do you have the information you got

2      from the respondent's mother?

3           THE WITNESS:  Not with me today.  You mean my notes

4      during that interview?

5           THE COURT:  No.  What you have in your hand, can you

6      hand that to me.

7           THE WITNESS:  Sure.

8           THE COURT:  This is the danger assessment, and there

9      are various boxes checked, correct?

10          THE WITNESS:  Yes.

11          THE COURT:  And the question I'm asking you is, is

12     this based on the information from the respondent alone, the

13     respondent's mother, the respondent's sister, the police

14     report?

15          Is it a composite of all of those sources of

16     information or is it simply from what the respondent told you?

17          THE WITNESS:  It is mostly what the respondent told

18     me.  There were corroborating things, though, that family

19     members did say and there were corroborating things on the

20     police report, but it is mostly what the respondent told me.

21          THE COURT:  All right.  For example, you have checked

22     here, if I am correct, is he an alcoholic or problem drinker?

23          THE WITNESS:  I don't have that checked.  It is not

24     checked.

25          THE COURT:  Next to No. 12, it appears that the box is

CCDJSOU4                           Cling - direct

1    checked.  Am I correct?

2                THE WITNESS:  No.  He is not a problem drinker or

3    alcoholic.  The one refers to does he control most of all or

4    all of your daily activities, No. 13.  It is a little out of

5    alignment.  That is a check to No. 13.  No. 12 is no.  No. 13

6    is yes.

7                THE COURT:  Well, I'm having -- let me just see.

8    (Pause)  It appears that you have the 12th line checked.

9                THE WITNESS:  It is the 13th line.

10               THE COURT:  I am wrong, you don't have the 12th line

11   checked?  Please help me out here.

12               THE WITNESS:  Okay.

13               THE COURT:  I just counted down and it appears that to

14   the court, you have the 12th line checked corresponding to the

15   12th question.  Is that right or is that wrong?

16               THE WITNESS:  It shouldn't be.  It is referring to --

17               THE COURT:  Ma'am, don't hold the document, please.

18               THE WITNESS:  It is No. 13.  I thought it was next to

19   No. 13.  No. 12, the question itself, the answer is no.

20               THE COURT:  The question I would have with that,

21   should I make that same adjustment on all other lines?  Should

22   they all be down one?

23               THE WITNESS:  No.  That particular one, if you look at

24   Question 13, it is very long, and so I don't know, maybe

25   visually something happened in my looking at it.

CCDJSOU4                        Cling - direct

1          I think all the other ones are clearly one-line

2     questions, but Question No. 13 is like a whole paragraph, and

3     so maybe that's why, why that happened.  I know the answer to

4     No. 12 is no.  The answer to No. 13 is yes.

5          THE COURT:  Now, you have checked here No. 7, has he

6     avoided being arrested for domestic violence?

7          What was the source of -- that is a yes?

8          THE WITNESS:  That is a yes.

9          THE COURT:  What was the source of that information?

10         THE WITNESS:  The police reports, I guess, on the

11    report.

12         THE COURT:  Do you recall what you saw that said he

13    has avoided being arrested for domestic violence?

14         THE WITNESS:  I think that may be related to the

15    Singapore courts, but my understanding is that if you assault

16    your wife, they only arrest you if you have filed a prior order

17    of protection, and that was an issue that the respondent

18    discussed with me.

19         THE COURT:  On the danger assessment document where

20    the question is has he avoided being arrested for domestic

21    violence, your view is if his arrest is not sought, the answer

22    to that question can still be yes?  Is that your view?

23         THE WITNESS:  I took it to mean if --

24         THE COURT:  Or sought by the police, I should say?

25         THE WITNESS:  If there is domestic violence and he is

CCDJSOU4                         Cling - direct

1   not arrested, clear domestic violence and he is not arrested

2   for it, I would take the answer on that question to be yes.

3              THE COURT:  Okay.  Thank you.

4              The source of the question do you believe he is

5   capable of killing you, where does that come from?  Is that

6   from the respondent?

7              THE WITNESS:  Respondent.

8              THE COURT:  How about the respondent's mother?

9              THE WITNESS:  I didn't ask her that.

10             THE COURT:  All right.  Or the respondent's sister?

11             THE WITNESS:  I don't think I asked her that.  I think

12  that comes from the respondent.

13             THE COURT:  Do you know which of these questions the

14  answer came in part from the respondent's sister or mother?

15             THE WITNESS:  I think in terms of No. 2, does he own a

16  gun, the respondent's sister discussed his talking about that

17  to her.

18             THE COURT:  What did she tell you?

19             THE WITNESS:  She said he told her on a number of

20  occasions he owned a gun, he knew how to use it, and some other

21  things very similar about bombs.

22             THE COURT:  Did the respondent say that he owned a

23  gun?

24             THE WITNESS:  I believe so, but I'd actually have to

25  go back and check my notes.

1    THE COURT:  You have that in your notes?

2    THE WITNESS:  I believe so.

3    THE COURT:  Do you have those with you?

4    THE WITNESS:  No, not those notes, those are

5    handwritten, scratched-out notes.  I have them at home and I

6    can submit them.

7    THE COURT:  Next question.

8    BY MS. LEIDHOLDT:

9    Q.  What were the most salient factors in arriving in the

10   dangerous assessment tool, in arriving at the score, Dr. Cling?

11   A.  Well --

12   MR. ARENSTEIN:  Objection.

13   THE COURT:  Overruled.

14   A.  -- the way --

15   MR. ARENSTEIN:  May I make a continuing objection so I

16   don't have to keep standing?

17   A.  -- the way a scale works, and this is true for most tests,

18   you score it.  You don't personally decide which ones are

19   important or not important necessarily with a test like this.

20   You just answer the questions and then they are assigned scores

21   and you look at the score.

22          Then the scores, you know, over a large population are

23   compared to actual lethal violence or dangerous behavior

24   towards the victim, so that is how you arrive at a norm for the

25   test, but you don't make an assessment or an evaluation, as the

CCDJSOU4                        Cling - direct

1    person scoring the test, about which one is important and which

2    one is not important.  You just answer it yes or no based on

3    your information which you were asking me about, and that's the

4    answer.  It is either yes or no.  That is the assessment.

5              Then the score, you have to follow the directions on

6    the score.  It is not a judgment you make about the score, and

7    then once you have the score, you look it up.

8              THE COURT:  So, for example, in calculating the score,

9    is there a grid that you consult?

10             THE WITNESS:  Yes, it tells you exactly what number

11   each question gets.

12             THE COURT:  What numerical score did this individual

13   get?

14             THE WITNESS:  18.

15             THE COURT:  Let me see.  This is -- I see the score is

16   over here.

17             THE WITNESS:  The instructions.

18             THE COURT:  Yes.  (Pause)

19             So, for example, the question does he own a gun, that

20   gets four points for a "yes," correct?

21             THE WITNESS:  That's correct.  There are extra points

22   for assaulting a victim while she is pregnant.  There are a

23   couple of them that get extra points.

24             THE COURT:  All right.  Where do you find assaulting

25   the victim while she is pregnant on here?

CCDJSOU4                          Cling - direct

1              THE WITNESS:  No. 15, have you ever been beaten by him

2       while you were pregnant?

3              THE COURT:  All right.  Let me see.

4              That one is not checked?

5              THE WITNESS:  It is checked, No. 15.

6              THE COURT:  It looks like 14 is checked.  Is he

7       violently and constantly jealous of you?

8              THE WITNESS:  No, that -- oh, well -- no.  14 is up

9       here.  Well, we have that confusion or I had the confusion,

10      let's say, because of that paragraph, but this is meant to

11      refer to 15.  That is what I understood it to refer to.

12             THE COURT:  I see.  Okay.  Next question.

13      BY MS. LEIDHOLDT:

14      Q.  Other than whether or not the perpetrator owned a gun or

15      was violent to the victim during pregnancy or uses alcohol or

16      drugs which you did not find -- withdrawn.

17             Are there any other key salient factors in the

18      dangerousness assessment that you checked in this particular

19      case?

20             MR. ARENSTEIN:  Objection.

21      A.  I see --

22             MR. ARENSTEIN:  Objection.

23             THE COURT:  Overruled.

24      A.  -- do you believe he is capable killing you?  Does he

25      follow or spy on you?  Does he threaten to kill you?  Has he

CCDJSOU4                              Cling - direct

1    forced you to have sex when you didn't wish to?  Did he ever

2    try to choke you?  Those are the questions I checked.

3              THE COURT:  Approximately when did you interview

4    Ms. Lee?

5              THE WITNESS:  A few weeks ago.

6              THE COURT:  All right.  Thank you.  Next question.

7    BY MS. LEIDHOLDT:

8    Q.  How long did you spend interviewing Ms. Lee in totality?

9    A.  I spent four and a half hours with Ms. Lee and then I spent

10   two additional hours with her, observing her with Shayan.

11   Q.  Dr. Cling, what is the impact of this form of domestic

12   violence that you were describing which you called coercive

13   control or intimate terrorism, how does it impact victim

14   psychologically?

15             MR. ARENSTEIN:  Objection.

16             THE COURT:  Overruled.

17   A.  The most common impact is post-traumatic stress disorder

18   where the stressor is the domestic violence.  Other possible

19   effects psychologically are in victims, PTSD, remember, is a

20   normal reaction to a trauma, but some people are very resilient

21   and strong and they don't necessarily have all the symptoms of

22   post traumatic stress disorder.  However, they may show

23   traumatic stress at certain kinds of symptoms, but they don't

24   rise quite to the level of the DSM IV, which is the guideline

25   of determining whether someone has PTSD.  Also depression is

CCDJSOU4                          Cling - direct

1    very common.

2              MR. ARENSTEIN:  Objection and move to strike.

3              THE COURT:  Overruled.

4    BY MS. LEIDHOLDT:

5    Q.  What are the key symptoms of PTSD?

6    A.  There are three categories of symptoms from post traumatic

7    stress disorder.  The first category is re-experiencing or

8    intrusion.  So everyone understands, the DSM has very specific

9    categories, and you have to evaluate whether or not certain

10   symptomatology is present in certain amounts, but the first

11   group would be things having to do with re-experiencing or

12   having intrusive thoughts of the events related to the trauma,

13   like nightmares or flashbacks or general intrusive images.

14   That is the first category.

15             The second category really in response psychologically

16   to that would be psychological efforts at disassociating or

17   distancing or avoiding these intrusive thoughts.  So you might

18   have evidence of dissociation, where you just don't think about

19   it, you put it in another part of your mind or minimizing of

20   the problems, a numbing of affect or constricted affect or

21   denial for part of the time.  Basically psychologically to deal

22   with, sort of get through your day, having experienced a

23   trauma.

24             Then the third part of PTSD is arousal.  So in spite

25   of you have the intrusive thoughts or flashbacks or nightmares,

CCDJSOU4                          Cling - direct

1   then you have a general numbing to keep it away from you, but

2   in spite of those efforts to keep it off you psychologically,

3   you still have a generalized kind of arousal, a

4   hyper-alertness, usually difficulty concentrating, insomnia,

5   sleep disturbance.  Those are the main characteristics of PTSD.

6   Q.  How likely is it for victims of cocercive control or

7   intimate terrorism to display signs of minimization?

8   A.  That is very common.

9            MR. ARENSTEIN:  Objection.

10            THE COURT:  Overruled.

11   A.  That is very common.

12   BY MS. LEIDHOLDT:

13   Q.  What is more typical among victims of domestic violence, to

14   minimize in their accounts of their experience or to

15   exaggerate?

16   A.  To minimize.

17            MR. ARENSTEIN:  Objection, your Honor.

18            THE COURT:  Overruled.

19   A.  It is psychologically understood they have been living this

20   way for a long time and really to get through their day, they

21   try to minimize how bad it is.  So they have a very strong

22   tenancy to minimize.  That is why you have to interview them

23   for a significant period of time until they relax and can tell

24   you really everything that was happening.

25   BY MS. LEIDHOLDT:

CCDJSOU4                          Cling - direct

1    Q.  Based on your knowledge of the literature in the field and

2    your own clinical practice, how, if at all, does exposure to

3    domestic violence affect children?

4              MR. ARENSTEIN:  Objection.

5              THE COURT:  Overruled.

6    A.  It has an extremely negative effect.  Witnessing domestic

7    violence actually has a very similar effect to experiencing

8    child abuse.  It causes a variety of symptomatology.  It causes

9    changes in the brain.  Frequently the effects are not

10   observable until later, much later.

11             Examples of problems would be PTSD for the child,

12   sleep disturbances, separation anxiety, very aggressive

13   behavior or possibly the opposite, a lot of passivity and

14   withdrawal, distractibility, trouble with concentration,

15   hyper-vigilance and possibly de-sensation to violence in

16   general.

17             MR. ARENSTEIN:  Motion to strike.

18             THE COURT:  Overruled.

19   A.  Long term it could also have -- it also can, frequently

20   have the effect of having the child use violence him or

21   herself.

22   BY MS. LEIDHOLDT:

23   Q.  How does the age of the child factor into the harm of

24   exposure to domestic violence, if at all?

25             MR. ARENSTEIN:  Objection.

CCDJSOU4                        Cling - direct

1          THE COURT:  Overruled.

2     A.  The younger the child, the bigger the effect, negative

3     effect.

4     BY MS. LEIDHOLDT:

5     Q.  How easy, if at all, is it to detect trauma or traumatic

6     symptomatology in small children, if you know?

7          MR. ARENSTEIN:  Objection.

8          THE COURT:  Overruled.

9     A.  -- well --

10         THE COURT:  By the way, what is the basis?

11         MR. ARENSTEIN:  The basis, she is going into the child

12    now.  Your Honor told us that the witness was only going to be

13    testifying about Lee Jen Fair.  Now she is testifying to

14    effects on the child which your Honor said --

15         THE COURT:  Not this child, correct?

16         MS. LEIDHOLDT:  That's correct, your Honor.  I am

17    asking about children in general.

18         THE COURT:  Thank you.  You may continue.  You may

19    answer.

20         THE WITNESS:  So could you repeat the question.

21         MS. LEIDHOLDT:  Yes.

22    BY MS. LEIDHOLDT:

23    Q.  How easy or difficult it is to detect the signs of trauma

24    in very young children?

25    A.  Well, it varies.  As I said, some children react very

CCDJSOU4                        Cling - direct

1    strongly, and a good, in-depth interview can reveal it.

2    Sometimes the effects take longer to reveal themselves.

3    Studies show, studies show, longitudinal studies that study

4    children who have witnessed domestic violence and they test

5    them later as compared with at that time.

6            Very recently they're starting to develop some very

7    interesting ways to actually look at brain scans of children

8    that show difference, negative difference from exposure to

9    domestic violence.

10           One more thing I wanted to add, that there also is the

11   possibility, and this is an important factor in the effect of

12   domestic violence on children who witness it, that a positive

13   relationship with a non-abusing parent can be a very positive

14   factor in shielding the child from all the effects of

15   witnessing the domestic violence and has a very strong impact

16   on healing, so that that can also influence it actually in a

17   positive direction.

18           MR. ARENSTEIN:  Objection, your Honor.

19           THE COURT:  Overruled.

20   BY MS. LEIDHOLDT:

21   Q.  Based on your review of the literature in the field, is

22   there a relationship between domestic violence against an

23   intimate partner and child abuse?

24           MR. ARENSTEIN:  Objection.

25           THE COURT:  Overruled.

CCDJSOU4                          Cling - direct

1    A.   Yes, there is a strong relationship.   Men who are batterers

2    of their wives have a highly increased risk of battering their

3    children.   I think they're twice as likely.   That includes

4    post-separation.   That can be enhanced, the risk can be

5    enhanced post-separation because if the non-battering spouse is

6    having the effect of monitoring what's going on or getting

7    in-between or counteracting the effects, the absence of the

8    non-abusing parent makes it harder for her to monitor what is

9    going on and also, you know, doesn't have as much of a

10   neutralizing effect.

11             THE COURT:   If I understood your testimony, a person

12   who engages in domestic violence against a spouse is twice as

13   likely to abuse a child as a person who does not engage in

14   domestic violence against a spouse, is that your testimony?

15             THE WITNESS:   Yes.

16             THE COURT:   All right.   What is the baseline of

17   domestic violence that is used?

18             In other words, what is the report of percentage of

19   those who do not abuse a spouse who abuse a child?

20             THE WITNESS:   You mean how frequent is child abused in

21   the general population of the people who have never abused --

22             THE COURT:   A spouse?

23             THE WITNESS:   I don't know the answer to that.

24             THE COURT:   Okay.   Thank you.   Next question.

25   BY MS. LEIDHOLDT:

1    Q.  How likely, if you know, how likely is it in an intimate

2    partner abuse situation when there are children, if you know,

3    how likely is it for the abusive parent to be the primary

4    caretaker?

5              MR. ARENSTEIN:  Objection.

6              THE COURT:  Overruled.

7    A.  You mean prior to separation?  I didn't understand the

8    question.

9    BY MS. LEIDHOLDT:

10   Q.  Yes, prior to separation, yes?

11   A.   Is the battering parent usually the primary caretaker, is

12   that the question?

13   Q.  Or how often, if you know, perhaps based on clinical

14   practice and review of literature in the field, is the

15   battering parent the primary caretaker of the child or

16   children?

17   A.  Usually not.  It is usually the battered parent that is the

18   primary caretaker.

19   Q.  Directing you specifically to this particular case, Dr.

20   Cling, you testified that psychological control is common in

21   cases involving a particular type of domestic violence.

22          Looking at the facts of this particular case as you

23   know it from the various sources that you detailed, was there

24   this sort of psychological control in this particular case, the

25   case involving Mr. Souratgar and Ms. Lee?

CCDJSOU4                         Cling - direct

1              MR. ARENSTEIN:  Objection.

2   A.  Yes.

3              THE COURT:  This is based on your interview of the

4   respondent, the mother, the sister, your review of police

5   reports taking the respondent's version as true.  Is that

6   correct?

7              THE WITNESS:  Well, there also were police reports by

8   the petitioner.

9              THE COURT:  Are you taking those as true or not true?

10             THE WITNESS:  Not true.

11             THE COURT:  Okay.  That is fine, you can give your

12  opinion.

13             MR. ARENSTEIN:  Objection.

14             THE COURT:  That is fine.  Overruled.

15             THE WITNESS:  Shall I explain why or how I assessed

16  the police reports?

17             THE COURT:  If you --

18             THE WITNESS:  That might be helpful.

19             THE COURT:  -- if you decided one was more credible

20  than the other, is that what you did?

21             THE WITNESS:  Yes, based on my psychological

22  assessment.

23             THE COURT:  That is not permissible, okay?

24             THE WITNESS:  Okay.

25             THE COURT:  Circumstances have put me in the role of

CCDJSOU4                          Cling - direct

1    fact-finder.

2              THE WITNESS:  Okay.

3              THE COURT:  That is what I have been asked to do for a

4    living, and I am trying to do it as best as I can.

5              THE WITNESS:  Okay.

6              THE COURT:  I don't have the luxury of subcontracting

7    out.

8              THE WITNESS:  Okay.

9              THE COURT:  Okay?

10             THE WITNESS:  Yes.

11             THE COURT:  So it might make my job a lot easier if I

12   could have a bunch of subcontractors who decide who's telling

13   the truth and who is not and then I can distance myself and say

14   I'm not going to say who's telling the truth and who's not,

15   I've given it to somebody else and they're saying that they're

16   telling the truth.

17             Appellate Courts can of can do that a little bit, but

18   District Court Judges and juries don't get that luxury.

19             As I understand your testimony, you have accepted the

20   respondent, her mother and her sister and her versions in the

21   police reports as true and rejected for the purposes of your

22   analysis the petitioner's version of the facts.  Is that

23   accurate?

24             THE WITNESS:  Yes.

25             THE COURT:  You can give your opinion.

CCDJSOU4                          Cling - direct

1              MR. ARENSTEIN:  Objection.

2              THE COURT:  Overruled.

3              MR. ARENSTEIN:  Based on that.

4              THE COURT:  Overruled.

5    BY MS. LEIDHOLDT:

6    Q.  May I just ask one other thing.

7              Dr. Cling, what documents, if any, did you review that

8    pertained to the -- that supported the petitioner's case in

9    this matter?  Were you given documents that were part of the

10   petitioner's case?

11             MR. ARENSTEIN:  Objection, your Honor.  We had a

12   question on the floor, with a second question.  The first

13   question wasn't answered, and now we are talking --

14             THE COURT:  Yes.  Why don't we get an answer to the

15   question first.

16             THE WITNESS:  Can you repeat the question.  I am not

17   sure what question I'm answering.

18   BY MS. LEIDHOLDT:

19   Q.  You testified that psychological control is common in cases

20   of a particular form of domestic violence?

21   A.  Yes.

22   Q.  And it often involves control.  Did you find that there was

23   psychological control in this particular case?

24             MR. ARENSTEIN:  Objection.

25   A.  Yes.

CCDJSOU4                          Cling - direct

1              THE COURT:  You may answer provided it is based on

2     what you testified to in response to the questions I just asked

3     you two minutes ago.

4              THE WITNESS:  Yes.

5              THE COURT:  Go ahead.

6     BY MS. LEIDHOLDT:

7     Q.  Did you find that there was psychological control in this

8     particular case and, if so, what forms did it take?

9              MR. ARENSTEIN:  Objection.

10             THE COURT:  Overruled.

11    A.  Well, of course, she had symptoms of PTSD and she was

12    depressed, and she told me in a lot of detail about --

13    BY MS. LEIDHOLDT:

14    Q.  When you say "she," who are you referring to?

15    A.  I am sorry.  Ms. Lee, Ms. Lee told me in quite a bit of

16    detail about various, various course of conduct which involved

17    initially having to meet certain demands about preparing food

18    or fixing the house in certain ways.  It then escalated to a

19    long-term situation of sexual abuse.

20             She outlined constant yelling, scenes that were

21    created over relatively minor household issues.  She recounted

22    having to quit her job, how she then became economically

23    dependent, how she was forced to use her own savings.  This is,

24    I believe, after she quit her job.  To pay for her pregnancy

25    care that was expensive, so that she spent down her money and

CCDJSOU4                          Cling - direct

1    then was put on a tight allowance.

2            Many, many different things that indicated to me in

3    addition to a number of the, I think the most frightening more

4    recent one for her having to do with an apparent Iranian

5    passport and legal implications for her that she report many,

6    many, many, many, many different instances of what I would call

7    cocercive control in addition to the police reports that she

8    filed with the medical records.

9    Q.  Did you conduct a clinical evaluation of Ms. Lee?

10   A.  Well, forensic evaluation, yes.

11   Q.  A forensic evaluation of Ms. Lee?

12   A.  Yes.

13   Q.  What did you find in your clinical evaluation?  I believe

14   you started to address this in terms of symptomatology related

15   to domestic violence?

16           MR. ARENSTEIN:  Objection.

17           THE COURT:  Overruled.

18   A.  I felt that she had PTSD and I thought she was also

19   depressed.  On the other hand, I felt that she had a lot of ego

20   strength, I would call it.  She seemed able to function,

21   although it was more limited.

22           She was able to take actions that were helpful to her

23   or at least she attempted, perhaps were supposed to be helpful

24   in reporting these problems to the appropriate authorities.  I

25   thought she did a very good job with her son which I observed

CCDJSOU4                        Cling - direct

1    directly.

2              MR. ARENSTEIN:  Objection.  Objection, your Honor.

3              THE COURT:  Overruled.  Go ahead.

4    A.  I felt she was very attuned in spite of the extreme stress

5    that she was under.  She was able to pay attention to him in

6    the appropriate ways, take care of his needs, respond to him.

7    She seems a source of strength.  So I think these are very

8    positive things perhaps.  Well, anyway --

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ccdrsou5                          Cling - direct

1          MR. ARENSTEIN:  Your Honor, objection and move to

2     strike the testimony regarding the son pursuant to your limited

3     instructions earlier today.

4          THE COURT:  The testimony I heard was about the

5     mother.

6          MR. ARENSTEIN:  There was testimony about the son as

7     well.

8          THE COURT:  There was testimony about the mother, the

9     respondent, in relation to her husband and in relation to her

10    child.  It's in the same status.  Overruled.

11    Q.  Dr. Cling, in the course of your work in this case, did you

12    have the opportunity to review testimony and documents about

13    the petitioner's allegations about the mother in terms of her

14    mental health, specific allegations about suicidality and

15    violence towards him?

16         MR. ARENSTEIN:  Objection.

17    A.  Yes.

18         THE COURT:  Overruled.

19    Q.  How, if at all, did your assessment of the respondent's

20    psychological characteristics, how, if at all, did it square

21    with the statements by the petitioner about her behavior and

22    psychology?

23         MR. ARENSTEIN:  Objection to the question.

24         THE COURT:  Sustained as to form.

25    Q.  Did the respondent exhibit any signs that would be

Ccdrsou5                        Cling - direct

1   consistent with suicidality?

2   A.   No.   I found that that did not seem likely at all, and I

3   really did investigate in depth.  She did have some symptoms of

4   PTSD, as I testified, and she is depressed and in a difficult

5   situation realistically, but she did not seem to me at all to

6   be suicidal.  That is something that I usually do assess for.

7   Q.   Was her personality profile consistent with someone with

8   suicidality?

9            MR. ARENSTEIN:  Objection.

10           THE COURT:  Overruled.

11  A.   No.

12  Q.   How would you characterize her personality?

13           MR. ARENSTEIN:  Asked and answered, your Honor.

14           THE COURT:  Yes, I think the witness has testified to

15  that.

16  Q.   Was her personality profile consistent with someone who is

17  violent and aggressive?

18           MR. ARENSTEIN:  Objection.

19  A.   No.

20  Q.   Repeatedly?

21           THE COURT:  Overruled.

22  A.   No.   There I found that particularly inconsistent.  I found

23  that, as a person through a long interview, she seemed very

24  controlled and subdued and more the type of person who would

25  perhaps accept blame or minimize the difficulty and would be

Ccdrsou5                        Cling - direct

1  unlikely actually to blow up and chase someone around a house

2  and pick up a knife and run around.  I found that particularly

3  inconsistent with her personality profile as I understood it in

4  six and a half hours of interviews.

5          MR. ARENSTEIN:  Your Honor, I think the witness

6  testified earlier that it was four hours.  Now we are hearing

7  six hours.  I'm not sure if there was --

8          THE COURT:  I heard the testimony of the witness.  I

9  could recount it, but I invite you to look at the transcript.

10         MR. ARENSTEIN:  Thank you.

11         THE COURT:  Next question.

12  Q.  Dr. Cling, I'm showing a document to you marked

13  Respondent's 36 for identification.  Do you see that document?

14  A.  Yes.

15  Q.  Do you recognize that document?

16  A.  Yes.

17  Q.  What is that document?

18  A.  It's an article called "Assessing Risk to Children from

19  Batterers" by Bancroft and Silverman, from the Commission on

20  Domestic Violence Quarterly Newsletter.

21  Q.  Are you familiar with the work of Bancroft and Silverman in

22  general on assessing risk to children from domestic violence?

23  A.  Yes.

24  Q.  Is this one of the documents that you relied on in the

25  preparation of your expert testimony?

(212) 805-0300

Ccdrsou5                          Cling - direct

A.   Yes.  They also wrote a book, I believe, called The

Batterer as Parent.

            MS. LEIDHOLDT:  Your Honor, I ask that Respondent's 36

for identification be entered into evidence as Respondent's 36

in evidence.

            MR. ARENSTEIN:  Objection, your Honor.  Can I give you

my objection?

            THE COURT:  You certainly can.

            MR. ARENSTEIN:  Your Honor, this talks about

assessments of risk to children from batterers.  This witness

is not allowed to testify to the risk, at least the effects on

a child, on the child in this case, at least according to your

Honor's ruling on what she is limited to testify to.  If she is

using this to assess the child based on, and I haven't seen her

notes yet, I'm going to be objecting to this going into

evidence because it is not relevant to the testimony that she

is giving before this Court.

            THE COURT:  It seems to me that as an expert, the

expert is entitled to rely on learned treatises and other

material in the literature and counsel is entitled to cross-

examine on such literature.  However, the mere fact that the

opinion is based on such literature does not make the

literature itself admissible as evidence.  So the objection is

sustained.

            MR. ARENSTEIN:  Thank you.

Ccdrsou5                        Cling – direct

1              MS. LEIDHOLDT:  Your Honor, I would respectfully

2      request that the Court take judicial notice of this document.

3      It is a document that was published by the American Bar

4      Association on its website.  I think it is highly relevant to

5      the instant proceedings, especially in the area of the impact

6      of domestic violence on children.  One of the issues in this

7      case is should the subject child be returned to Singapore, will

8      that child be at a grave risk of harm.  The literature provides

9      a great deal of information about harm to children by exposure

10     to domestic violence.

11             THE COURT:  Let me see the document, please.

12             MR. ARENSTEIN:  Your Honor, if I might be heard?

13             THE COURT:  Yes.

14             MR. ARENSTEIN:  This article involves custody

15     evaluations.  It does not involve grave risk of danger.  It is

16     not an issue to do with Hague Convention cases and for your

17     Honor to decide grave risk.  This is merely domestic violence

18     and custody cases.  Again I would object to this.  This is not

19     a statute or something that under article 14 you could take

20     judicial notice of.  I would object to this document being

21     taken judicial notice of.  It is merely an article by people

22     discussing domestic violence in custody situations.

23             THE COURT:  How does 803(18) factor in?

24             MR. ARENSTEIN:  Are you asking me?

25             THE COURT:  Yes.

Ccdrsou5                          Cling - direct

1              MR. ARENSTEIN:  803(13)?

2              THE COURT:  (18).

3              MR. ARENSTEIN:  I'm not sure what we are talking

4    about, your Honor.

5              THE COURT:  Federal Rules of Evidence.

6              MR. ARENSTEIN:  It is an article which is written by

7    somebody who published it, but it is not necessarily relevant

8    to this issue in this case.  It is not relevant to grave risk

9    of danger.  It is not relevant to article 13(b).  And I don't

10   see why this article, just like any other article that could be

11   submitted to the Court, unless it's relevant, would go in.

12             THE COURT:  What about 803(18)?

13             MR. ARENSTEIN:  I'm not sure what 803(e) is, your

14   Honor.

15             THE COURT:  803(18).  Are you familiar with the

16   Federal Rule of Evidence?

17             MR. ARENSTEIN:  I am not familiar with that section.

18             THE COURT:  Why don't you take a look at it.  The

19   record will reflect that Ms. Leidholdt is taking a look at the

20   rule.  No one has cited it.  I think one of the requirements to

21   become a member of the bar of this Court is you have to be

22   familiar with the Federal Rules of Civil Procedure, the local

23   rules of the court, and the Federal Rules of Evidence.  Maybe,

24   when I wasn't looking, that is no longer a requirement, I don't

25   know.  I certainly would expect it of lawyers who appear here.

Ccdrsou5                          Cling - direct

1           MR. ARENSTEIN:  I understand that this is a learned

2      treatise, but I still think that the treatise is not relevant.

3      It's a scholarly article, but I don't see it as being relevant

4      to this issue.

5           MS. LEIDHOLDT:  Your Honor, may I address the

6      relevance of this treatise in particular?  This article

7      specifically addresses the assessment of post-separation risk

8      to children from perpetrators of domestic violence.  It is

9      forward-looking, and it describes in great detail, supported by

10     the research, the kind of harm that children can incur when

11     exposed to not only domestic violence but also the

12     psychological characteristics and typical behavior of domestic

13     violence perpetrators.  It's post-separation, meaning after the

14     parties have separated, which is the case here and very likely

15     will be the case permanently.  It assesses the risk to children

16     of the parenting of perpetrators long range.

17          THE COURT:  I think you are both missing the point of

18     803(18).  It is an exception to the hearsay rule.

19          "A Statement contained in a treatise, periodical or

20     pamphlet is an exception to the hearsay rule if the statement

21     is called to the attention of an expert witness on cross-

22     examination or relied on by the expert on direct examination,

23     and the application is established as a reliable authority by

24     the expert's admission or testimony.  If admitted, the

25     statement may be read into evidence but not received as an

Ccdrsou5                         Cling - direct

1    exhibit."

2              If the witness is offering an opinion and the opinion

3    itself is admissible, it's relevant.  If in formulating the

4    opinion the expert relied on the literature and it's

5    established as reliable by the expert's testimony, then a

6    statement in that literature can be read but the document is

7    not received into evidence.

8              I know, Mr. Arenstein, you have a copy of the rule in

9    front of you, and I know, Ms. Leidholdt, you do also, because

10   I've seen you both looking at it.  If you want to comply with

11   803(18), you may.  I realize it's maybe late in the game to ask

12   the attorneys in this case to focus on the Federal Rules of

13   Evidence, but they are the charter by which we operate on the

14   admission of evidence and testimony, including testimony.

15             MS. LEIDHOLDT:  I understand, your Honor.  I have no

16   further questions of my witness, your Honor.

17             THE COURT:  All right.  Thank you very much.  You may

18   cross-examine.

19             MR. ARENSTEIN:  Your Honor, I'm going to need a brief

20   recess.

21             THE COURT:  That's fine.  Thank you.

22             (Recess)

23             THE COURT:  Before you begin, over the break I went

24   upstairs to my chambers, and what to my wondering eyes should

25   appear but a package from Singapore labeled "On Government

Ccdrsou5                         Cling - direct

Service" addressed to me from the subordinate courts of

Singapore.  Inside is 34 pages of reports about the

interactions between the petitioner and his son and the

respondent and her son and their interactions with each other.

There is the assisted access in counseling report

dated September 23, 2011, which reports on six separate

sessions.  There is assisted access progress report dated

January 20, 2012, which reports on six other sessions, noting

what happened in each session, noting the demeanor of the

parties and the child.  There is an assisted access progress

report dated February 16, 2012, which reports on additional

sessions.  Same thing March 5, 2012.

Then a counselor note dated June 7, 2012, and one

dated June 16, 2012.  I don't know whether the notes bear up,

whether the table of contents of closures match up, but these

are notifications to the district judge of the counselor's

interactions with the petitioner and the respondent in this

case.

I have personally numbered the pages.  There are 40,

not including the envelope.  I am going to tender them to Mr.

McNally, an officer of this court, and direct that Mr. McNally

have copies made, including of the envelope, both sides, and

provided to Mr. Arenstein, Ms. Leidholdt, and Professor Baum.

Would you be willing to undertake that, Mr. McNally?

MR. McNALLY:  Absolutely, your Honor.

Ccdrsou5                          Cling - direct

1           THE COURT:  I see that there is a copy that was sent

2    to the petitioner's counsel in Singapore.  I now tender the

3    originals to Mr. McNally with the thanks of the Court.

4           MR. McNALLY:  I'll have them returned as soon as the

5    copies are made.

6           THE COURT:  That's fine.  Thank you very much.

7           You may inquire.

8           MR. ARENSTEIN:  Your Honor, if I might have the notes

9    of the witness?  I was not given those notes.

10           THE COURT:  Yes, you may.

11           MR. ARENSTEIN:  All her notes.

12           THE WITNESS:  Those are the notes I was using.

13           THE COURT:  What are the notes on the chair, if I may

14    ask?

15           THE WITNESS:  These are articles.

16           MR. ARENSTEIN:  May I have all the stuff you were

17    referring to.

18           THE COURT:  Do you have danger assessment there?

19           THE WITNESS:  Yes, I do.  This is that.

20           THE COURT:  Anything else you relied on?

21           THE WITNESS:  We never did talk about this.

22           THE COURT:  That's fine.  You're going to bring with

23    you tomorrow --

24           THE WITNESS:  Tomorrow?

25           THE COURT:  Yes, tomorrow, the notes of your

Ccdrsou5                         Cling – direct

1    conversations with the individuals that you referred to.  Or do

2    you have them with you?

3             THE WITNESS:  I don't have them with me.

4             THE COURT:  All right.  Thank you.

5             THE WITNESS:  They are handwritten.

6             THE COURT:  All right, go ahead.

7             THE WITNESS:  Your Honor, may I inquire about

8    tomorrow?  I teach at John Jay College.

9             THE COURT:  What time do you teach?

10            THE WITNESS:  I finish at 1:30.  I could be hear at

11   2:00.

12            THE COURT:  What time is you are class?

13            THE WITNESS:  I have two classes in a room 9:25 to

14   11:25 and 11:30 to 1:30.

15            THE COURT:  Let's see whether we can accommodate your

16   schedule.  Go ahead, Mr. Arenstein.

17   CROSS-EXAMINATION

18   BY MR. ARENSTEIN:

19   Q.  Dr. Cling, how do you know if the person is telling the

20   truth or not based on your interview?

21   A.  In an interview, a forensic interview, where domestic

22   violence is an issue, what you usually look for is consistency

23   with general facts understood in domestic violence situations.

24   You also would clinically assess I guess believability as the

25   facts are being recounted.  You would also take into

Ccdrsou5                         Cling - cross

1    consideration detail.  Those are three things that come to

2    mind.

3    Q.  What does the literature say about the accuracy of

4    determining if someone is lying or not in these interviews?

5    A.  What was the first part of that question?

6    Q.  What does the literature say about the accuracy of

7    determining if someone is lying or not in these interviews?

8    A.  Are you talking about any party or the victim?

9    Q.  Of the people that you interviewed to determine whether or

10   not --

11   A.  I interviewed the victim and I interviewed the sister of

12   the victim and the mother.  Usually, the literature might refer

13   to -- I don't know which particular article you're thinking of,

14   but the literature would also refer to interviewing, which

15   would be more ordinary, the perpetrator as well.

16   Q.  You did not interview him?

17   A.  No, I did not.  You would I think generally assess -- you

18   would ordinarily do all these interviews.  You would also see

19   both parties with the child.  Based on all the information,

20   including the extrinsic information, like police reports and

21   third parties who may or may not be adding evidence, you would

22   determine what you felt was believable.

23          Did you have a particular article in mind?

24   Q.  What would be the percentage of one who you would believe

25   is telling the truth?

Ccdrsou5                          Cling - cross

1   A.  What would be the percentage of what?

2           MS. LEIDHOLDT:  Objection.

3   Q.  The one you would be interviewing with --

4           THE COURT:  Sustained.

5   Q.  Have you studied anything about terrorism, terrorists?

6   A.  Terrorists.

7   Q.  A terrorist, yes.

8   A.  You mean state terrorism?

9   Q.  A terrorist, yes.

10  A.  As in state terrorism?

11  Q.  Yes, state terrorism.  Have you studied anything about it?

12  A.  Tangentially, but that is not my area of focus.  .

13  Q.  Are you aware that Jen Lee Fair called Mr. Souratgar,

14  called him to be a terrorist?  Were you aware?

15  A.  No, I haven't heard that.

16  Q.  How would you evaluate someone who might call a person a

17  terrorist?  How would that evaluation take place?  If the

18  victim --

19  A.  If I had been told, if someone said to me this person is a

20  terrorist, how would I assess the credibility?

21  Q.  That's correct.

22  A.  I'm not sure what I'm assessing.  I'm assessing whether he

23  really is a terrorist or whether the person saying it has a

24  credible belief that that person is a terrorist?  I'm not sure

25  what --

Ccdrsou5                    Cling - cross

1  Q.  Whether the story would be true based on the fact that you

2  were accusing somebody of something.

3  A.  I'm not an expert on terrorism, state terrorism.  To reach

4  a conclusion about witnesses or people I'd interviewed telling

5  me about state terrorism, I would have to have a background on

6  what is believable in terms of what's being alleged for me to

7  reach a reasonable conclusion.

8        THE COURT:  Let me give you a hypothetical question.

9  Mr. Arenstein, if you will pause.

10        Let's assume hypothetically, and this is a

11  hypothetical, I want you to assume that respondent called

12  petitioner a terrorist, one who would assist another country in

13  terrorist activities or export materials for the purpose of

14  engaging in terrorism.  I want you to further assume that that

15  was not true.  Those are hypotheticals.  Either one of them is

16  not necessarily the facts.  But I want you to assume those.

17        THE WITNESS:  Yes.

18        THE COURT:  What would you conclude, if anything, from

19  a respondent or a person in Ms. Lee's situation from that?

20  Would you draw any conclusions from that or not?

21        THE WITNESS:  What I would want to know would be why

22  she is saying that, in other words, what happened, what did she

23  hear, what did she say he said to her.  In this particular case

24  I'd actually be interested in what her sister said, too.  I'd

25  like to know the specifics of what made her believe that.

Ccdrsou5                          Cling - cross

1            Then I would want to, based on whatever they said, I
2    would be thinking about whether or not -- I don't think I would
3    be likely to reach any conclusion about whether I should report
4    this to the police because these are terrorists, but I might be
5    thinking about was that, from the point of view of all the
6    different things that she had reported that he said, that other
7    people reported that he said, was it believable from her point
8    of view even if it is or isn't true.  That's what I would be
9    thinking about as a psychologist.
10           THE COURT:  Thank you.  Next question.
11   Q.  How would you tell the difference between someone who is
12   abused and someone who claims to be abused?
13   A.  That's the basic issue of malingering.  Every forensic
14   psychologist is always looking for in some way the possibility
15   of malingering.  Any time you do a psychological evaluation of
16   anybody, that's always a potential issue.  You assess the
17   symptomatology.
18           For example, PTSD, most people actually don't know
19   what the symptoms really are.  They are also not that easy to
20   fake.  If you're a credible forensic psychologist, presumably
21   you have some expertise in determining when symptoms are fake
22   or when they appear to be real.  You take those factors into
23   consideration all the time any time you do any forensic
24   evaluation.
25   Q.  What psychological test would be helpful in diagnosing

Ccdrsou5                         Cling - cross

1  malingering?

2  A.   I don't think they are very useful.  There are some, but I

3  don't think they are particularly accurate.  It is particularly

4  difficult.  A test that is often misused actually is the MMPI,

5  so I wouldn't recommend that one.

6          I don't think there are tests for malingering.  I

7  think you have to rely on what I said:  Your expertise as a

8  forensic -- there are some, I just don't have tremendous

9  confidence in them.  You usually rely on your expertise as an

10 experienced forensic psychologist, actually any psychologist.

11         Also, listening to symptomatology, you rely on your

12 conclusion about the accuracy of symptoms that are being

13 reported to you.  Are they actually symptoms that appear on

14 your list in the DSM or are they kind of made up, what seem to

15 be something that people might believe would be symptoms but

16 actually aren't symptoms of this particular disorder?  That's

17 what you would ordinarily do.

18 Q.   Isn't the MMPI a very common, basic test given to people

19 who are the subjects of forensic evaluations to determine if

20 they are lying or not?

21 A.   Sadly, it is.  But in fact the MMPI, particularly in a

22 highly litigated custody evaluation, have been shown to be

23 extremely inaccurate.  In fact, the MMPI is usually scored by

24 computer, and the computerized printout issues a warning never

25 to use these, they are unreliable, in any case having to do

Ccdrsou5                          Cling - cross

1    with custody.

2            So, while it actually is used, because I can only

3    guess that people just feel they have to keep using it, it

4    itself denies that it is valid or reliable in those

5    circumstances, so I don't use it for that.

6            THE COURT:  You mentioned a highly litigated

7    situation.  What is different in your professional opinion in

8    the highly litigated situation?

9            THE WITNESS:  It really has to do with custody issues.

10   The MMPI is a self-report test of about 500 items and you

11   report how you are:  I always think about this, I never think

12   about that, that sort of test.  It requires a certain level of

13   neutrality on the part of the reporter, which is the person.

14           Because custody evaluations kind of press you to want

15   to make yourself look really, really good, there is also a lie

16   scale embedded in the MMPI.  Frequently, the lie scale is

17   elevated because people are, understandably in that context,

18   trying to make themselves look really great.  That's why it is

19   not generally properly used.

20           THE COURT:  Thank you.  Next question.

21   Q.  Isn't your danger assessment similar to scoring like an

22   MMPI is?

23   A.  The dangerous assessment doesn't have a lie scale.  The

24   dangerous assessment is used in research to establish whether

25   people, not necessarily in a litigation context but just

Ccdrsou5                    Cling - cross

1    usually women who have been subjects of domestic violence,

2    maybe have gone to a shelter or whatever they have done -- they

3    participate in filling out this profile.  Then studies that are

4    done link it up with whether or not later they were attacked or

5    killed.  That's what the basis of the studies are.  It is not

6    really used the way that the MMPI is used.

7    Q.  You testified on direct that there are numbered scales an

8    how you would evaluate what somebody would turn out to be under

9    this danger assessment, is that correct?

10   A.  No.  I said that the dangerous assessment scale -- you just

11   asked the question:  Did the perpetrator do this, yes or no?

12   Can the perpetrate do that?  Yes or no.  Then you add up the

13   numbers, as your Honor looked at the scale, and then you arrive

14   at a particular number.

15          The number refers you to what is called a level of

16   dangerousness.  You can or cannot take action on it.  But later

17   when people research these things, they try to match up.  In

18   the extremely dangerous category were 50 percent of those women

19   subsequently murdered by their perpetrators?  That's how the

20   research would be done and that's what that is used for.

21   Q.  You came to a number of 18 by adding up numbers?

22   A.  Yes.

23   Q.  Isn't the MMPI a score when they look at things that are

24   checked off and weighted by numbers as well?

25   A.  No.  It's really quite different.  The MMPI is an extremely

Ccdrsou5                         Cling - cross

1  elaborate test that has a series of scales embedded within it.

2  I think it has 500 some-odd questions.  It has complicated

3  statistics to determine personality profiles.  Then you have

4  many different scales, and then you connect the different

5  scales to try and arrive at what kind of a personality profile

6  you have.  So it's radically different.

7  Q.  What do you look for to assess malingering?

8  A.  As I said --

9           THE WITNESS:  Didn't I already answer that?

10          THE COURT:  Yes, please.  There is no objection to go

11  ahead and answer it.

12  A.  I, as a forensic psychologist, conduct a long interview.  I

13  look for detail.  If I'm doing an assessment based on the DSM,

14  I look for consistency with what I'm looking for, what I'm

15  required to look for.  I guess I make an assessment of the

16  person's personality and how likely I believe, based on the

17  long interview, with corroborating evidence, if there is, that

18  I'm being spoken to in an honest manner.

19  Q.  How much time did you spend on each of those individuals in

20  this case?  How much time did you spend on each of the people

21  in this case to interview for your testimony?

22  A.  I believe I already testified that I spent six and a half

23  hours with Ms. Jen Fair Lee, I spent two hours with Ms. Jen

24  Pink Lee, and I spent a half hour with Ms. Chew.

25  Q.  Would you consider that a long time to spend with those

Ccdrsou5                    Cling - cross

1   people to evaluate and make a diagnosis here in court?

2   A.  I consider the six and a half hours sufficient to make a

3   diagnosis for PTSD, yes.

4   Q.  You never interviewed Mr. Souratgar?

5   A.  No, I did not.

6   Q.  You spent no time interviewing Mr. Souratgar?

7   A.  That's correct.

8   Q.  Would you characterize the behavior of a person who takes a

9   child away from his house and keeps the child locked up in a

10  strange house for a period of over two weeks without him seeing

11  the light of day over a period of six months abuse?

12  A.  What?  I'm sorry.

13          THE COURT:  You're presenting a hypothetical to the

14  expert, is that correct?

15          MR. ARENSTEIN:  Yes.  I'm presenting a hypothetical

16  which was testified to in this court.

17  Q.  How would you characterize --

18  A.  Could you repeat that?

19  Q.  I'll rephrase the question.  How would you characterize the

20  behavior of a person who takes a child away from his house and

21  keeps the child locked up in a strange house for a period of

22  over two weeks without him seeing the light of day over a

23  period of six months?

24  A.  I don't understand the two weeks and the six months part.

25  Over two weeks, over six months, I just didn't understand what

Ccdrsou5                          Cling - cross

1   you mean.

2                 THE COURT:  I'm with you.  I didn't understand it.

3                 MS. LEIDHOLDT:  Objection, your Honor.

4   Q.  How would you characterize the behavior of a person who

5   takes a child away for two-week periods without him seeing the

6   light of day over a period of six months?  Every, say, two-week

7   period he would be locked up in a place and not see the light

8   of day, and then eventually he might come out.

9                 MS. LEIDHOLDT:  Objection, your Honor.

10                 THE COURT:  Sustained.

11                 (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CCDJSOU6                        Cling - cross

1    Q.  Would you consider child abduction child abuse?

2    A.  It depends on the circumstances.

3    Q.  On what circumstances?

4    A.  Well, battered women do usually flee from a battering

5    situation, so depending on your point of view, it can be viewed

6    as protecting the child or it could be viewed as abduction.  It

7    depends on the circumstances of the case.

8    Q.  If one violates the law, do you think that is proper to

9    violate the law to do that?

10   A.  Well, I guess Martin Luther King opined it depends on the

11   law.

12   Q.  Are you aware of the studies, of any of the studies you

13   referred to that only one party in the relationship, in the

14   domestic violence has been injured.

15          THE COURT:  I don't understand the question.

16   BY MR. ARENSTEIN:

17   Q.  Are any of the studies you referred to by interviewing only

18   one party in a relationship where domestic violence is alleged

19   to have occurred?

20   A.  Am I aware of any instances --

21   Q.  Are any of the studies that you referred to have

22   interviewed by only one party in the relationship where

23   domestic violence is alleged to have occurred?

24   A.  You know, I am not sure if that information is available,

25   but I think there are very many different kinds of

CCDJSOU6                         Cling - cross

1    circumstances of studies and people who were studied in those

2    studies.  Sometimes perpetrators are available, sometimes they

3    are not, so I actually can't answer that.

4    Q.  Isn't it proper to evaluate all sides when you make an

5    evaluation in a custody or any type of domestic violence

6    dispute so that you get the entire picture rather than one

7    side?

8              THE COURT:  How is that question relevant, Mr.

9    Arenstein?

10             MR. ARENSTEIN:  Withdrawn.

11   BY MR. ARENSTEIN:

12   Q.  What is it about Ms. Lee that leads you to believe that she

13   is telling you the truth?

14   A.  I felt that her demeanor, her reluctance to talk about some

15   of the details, especially of the sexual abuse, her detailed

16   accounting which I didn't feel she understood exactly what the

17   psychological mechanisms were, but that she was telling me a

18   detailed account really from her experience of what happened.

19             She wasn't making big leaps or accusations; she was

20   really recounting the details of her life and what happened.  I

21   found that credible.  I reached some conclusions based on the

22   things she said, but she was not very accusatory, histrionic.

23   She didn't make wild accusations.

24             She told a very consistent, detailed story

25   particularly when I asked for detail, so I found her quite

CCDJSOU6                         Cling - cross

1   credible.

2   Q.  Did you find Mrs. Lee's mother credible?

3   A.  I did.  I interviewed her very briefly, however, a half

4   hour.

5   Q.  You found her to be credible?

6   A.  In what she told me, yes.

7   Q.  If I told you that she testified in court that she left

8   from one place and the documents in the court show that she

9   left from another place, would that change your opinion of her

10  being credible?

11          THE COURT:  Sustained.

12  BY MR. ARENSTEIN:

13  Q.  How often do you find someone not credible?

14  A.  Sometimes --

15          THE COURT:  Do you want to give a context, Mr.

16  Arenstein, in your question.

17  BY MR. ARENSTEIN:

18  Q.  In your evaluation of people --

19          THE COURT:  In her clinical work?  In her forensic

20  work or what kind of work?

21          MR. ARENSTEIN:  In her forensic work similar to this

22  situation.

23          THE COURT:  Do you have any situations similar to this

24  situation?  Have you ever had a situation similar to this

25  situation?

CCDJSOU6                        Cling - cross

1            THE WITNESS:  Well, I have certainly had other

2    situations where I interviewed victims, but I've had many other

3    forensic situations where I determined at least for my purposes

4    of my report that the report I was getting was not accurate, so

5    yes.

6            THE COURT:  Because you sometimes interview both

7    sides, and it would be likely that one of the two sides would

8    not be accurate?

9            THE WITNESS:  That's correct, and then there are other

10   kinds of forensic evaluations that I might do that would,

11   depending on the case, make me not believe whatever I was being

12   told.

13           THE COURT:  Next question.

14   BY MR. ARENSTEIN:

15   Q.  How would you characterize a person who keeps a child

16   locked up for six months in a strained house and allowed him to

17   leave the house only once every two weeks?

18           MR. McNALLY:  Objection; assumes facts not in

19   evidence.

20           THE COURT:  No.  You can answer it as a hypothetical.

21           THE WITNESS:  What is the hypothetical?

22           MR. ARENSTEIN:  I'll repeat the question for you.

23   BY MR. ARENSTEIN:

24   Q.  How would you characterize a person who keeps a child

25   locked up for six months in a strange house and allowed him to

CCDJSOU6                         Cling - cross

1   leave the house only once every two weeks?

2              THE COURT:  Do you understand what a strange house is?

3              THE WITNESS:  No.

4              THE COURT:  I don't, either.

5              MR. ARENSTEIN:  I didn't hear the response.

6              THE COURT:  Is that one that is off-kilter?

7              THE WITNESS:  Weird?

8              THE COURT:  Or has a weird color to it or weird

9   geometric design.

10  BY MR. ARENSTEIN:

11  Q.  A house that a child was not lived in before, was taken to,

12  was not acquainted with, that is my definition to you of a

13  strange house?

14  A.  You mean if a child moved --

15  Q.  The child was moved by a person, a parent?

16  A.  -- to a new house?

17  Q.  A strange place he has never been before, and how would you

18  characterize a person who keeps a child locked up for six

19  months in that strange house and allowed him to leave the house

20  only once every two weeks?

21  A.  Well, I guess it depends on what you mean by, "locked up."

22              You're implying in your hypothetical that -- I don't

23  know, it would depend on how old the child is, too, and what

24  the weather is.

25  Q.  Are you finished?

CCDJSOU6                         Cling - cross

1  A.  I am just trying to get -- it seems to me there aren't

2  enough -- you are not giving me enough facts.

3  Q.  He was not allowed to leave the house, he was kept

4  surreptitiously in the house and not allowed to see the light

5  of day except once every two weeks?

6            MR. McNALLY:  Objection.  Are we still speaking

7  hypothetically?

8            THE COURT:  Are you speaking hypothetically?

9            MR. ARENSTEIN:  I am.

10            THE COURT:  Then it is not relevant.

11            MR. ARENSTEIN:  I am talking about the case itself.

12            THE COURT:  Then it is sustained.

13  BY MR. ARENSTEIN:

14  Q.  How do you assess if someone is suicidal or engaged in

15  violence?

16  A.  Which one, or both?

17  Q.  Do either one, one at a time?

18  A.  Either one?  Suicidal, people who are suicidal usually have

19  thoughts of suicide, which would be a basic question you would

20  ask.

21            Then there are levels of suicide-ality.  You might be

22  vaguely thinking about suicide or you might be -- you might

23  have a plan, that would be more serious.  People who are

24  suicidal usually tell you these thoughts, especially if you

25  ask.

CCDJSOU6                        Cling - cross

1            MR. ARENSTEIN:  I have no further questions.

2            THE COURT:  Any redirect?

3            MS. LEIDHOLDT:  No, your Honor.

4            THE COURT:  You may step down.  Thank you very much.

5       I am going to require, however, that you tender your

6  notes.  You can give them to Mr. McNally tomorrow if you will.

7       Mr. McNally, if you can make them available to Mr.

8  Arenstein and Ms. Leidholdt and Professor Baum?

9            MR. McNALLY:  Certainly.

10           THE WITNESS:  You're referring to my handwritten notes

11  I took during the interviews?

12           THE COURT:  Correct.  Thanks very much.

13           (Witness excused)

14           THE COURT:  Call your next witness.

15           MR. McNALLY:  Your Honor, we have no more unique

16  witnesses here.  What we do have, however, is an affidavit that

17  I believe was referred to earlier that was written in Malay

18  that was produced in the context of this case.

19       Since Mr. Souratgar left the stand, we were able to

20  get this translated, and now we are prepared to offer this in

21  evidence.  Traditionally speaking, what we would do is lay a

22  foundation with the witness as to whether this is, in fact, his

23  affidavit.

24           THE COURT:  Whose affidavit is it?

25           MR. McNALLY:  The petitioner's affidavit, your Honor.

CCDJSOU6

1        THE COURT:  So your application is to recall the

2   petitioner to the stand unless, of course, there is a

3   stipulation with regard to the admissibility of the affidavit.

4        Is that correct?

5        MR. McNALLY:  That's correct, your Honor.

6        THE COURT:  Mr. Arenstein, what do you have to say?

7        MR. ARENSTEIN:  I object to the translation.

8        Apparently it is translated by one of the people who

9   translated one of the other documents which I objected to, and

10  then Ms. Lee testified that she read it and it was in her

11  language.

12       I object to the document unless it is translated by an

13  official court interpreter and it is accurate.  I don't know

14  whether it is accurate or not.  I can't determine it because I

15  don't speak the language.

16       THE COURT:  Mr. McNally, is the affidavit in Malay?

17       MR. McNALLY:  Yes, the affidavit is in Malay.

18       THE COURT:  It is the petitioner's affidavit?

19       MR. McNALLY:  That is correct.

20       THE COURT:  Mr. Arenstein, is the petitioner fluent in

21  Malay?

22       MR. ARENSTEIN:  I don't believe he is, your Honor.

23       THE COURT:  Well, I would allow you to call a

24  translator to the stand afterwards, but on the foundational

25  question, if there is an objection on the foundational point,

CCDJSOU6

1   then you may recall Mr. Souratgar to the stand to lay the

2   foundation.

3           MR. McNALLY:  Is there a foundational objection?

4           MR. ARENSTEIN:  Yes.

5           THE COURT:  Then you're calling Mr. Souratgar?

6           MR. McNALLY:  Yes.

7           THE COURT:  Mr. Souratgar, please come on up here.

8           Mr. Souratgar, the court reminds you that you're still

9   under oath.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  You may be seated.

12          MR. McNALLY:  Your Honor, there are actually two

13  affidavits.

14          THE COURT:  Of Mr. Souratgar?

15          MR. McNALLY:  That's correct.

16          THE COURT:  Okay.

17          (Off-the-record discussion)

18   ABDOLLAH NAGHASH SOURATGAR,

19       recalled as a witness by the Respondent,

20       having been previously duly sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MR. McNALLY:

23  Q.  Mr. Souratgar, I have handed you what has been marked for

24  identification as Respondent's 37.

25          THE COURT:  We are going to make 37-1 the purported

CCDJSOU6                        Souratgar - direct

1    English translation and 37-2 a document that appears to have

2    the No. 3 in the lower-right-hand corner, and the word, the

3    first word at the top of the page is spelled as P E R N Y A T A

4    A N.  Any objection to that?

5              MR. McNALLY:  None whatsoever, your Honor.

6              THE COURT:  Go ahead.  You an ask him about 37-2.

7              (Respondent's Exhibit 37-2 received in evidence)

8    BY MR. McNALLY:

9    Q.  With regards to what has been identified as 37-2, beginning

10   with the page that has the No. 3 in the

11   lower-right-hand-corner, do you recognize this document?

12   A.  Sorry.  Again the question?

13   Q.  Do you recognize this document?

14   A.  This one, no.

15   Q.  With the section that purports to be --

16   A.  Which page is it?

17             THE COURT:  Let me show you, sir. (Pause)

18             Do you recognize the document that follows excluding

19   the last page which is not part of 37-2?  We'll make that 37-3,

20   the affidavit of translation.

21             THE WITNESS:  This page, your Honor?

22             THE COURT:  Yes, from the page that I showed you to

23   that page?

24             THE WITNESS:  Yes.

25             THE COURT:  Do you recognize that document?

CCDJSOU6                          Souratgar – direct

1          THE WITNESS:  Because this is in Malay language and I

2     don't understand at all Malay language.

3          THE COURT:  Yes.

4          THE WITNESS:  I can see my name is there.  I can see

5     my passport number is there, I can see the address, I can see

6     239 Tivoli Condominium.  I know where it is, but I really

7     cannot understand Malay language.  What I did in Malaysia, my

8     lawyer translated for me everything, and I know what is that

9     after he translate I signed.

10          THE COURT:  Take a look at Page 9.

11          THE WITNESS:  Yes, sir, this page?

12          THE COURT:  Yes.  Is that your signature?

13          THE WITNESS:  No, sir.

14          THE COURT:  Okay.

15     BY MR. McNALLY:

16     Q.  Do you know whose signature that is, sir?

17     A.  This is not my signature, sir.

18     Q.  Is that the signature of your attorney?

19     A.  I don't know.

20     Q.  Do you recall, just having looked at this document, do you

21     recall the purpose of this document, why it was prepared?

22     A.  I don't understand Malay language.

23     Q.  Do you recall if it was prepared in connection with

24     Malaysia custody suit?

25     A.  I have a lawyer in Malaysia which represented me for when I

CCDJSOU6                          Souratgar – direct

1    got Ms. Jen Lee Fair in Malaysia, I find my child over there.

2    I put the application for the custody and I was granted joint

3    custody which never happened.

4    Q.  Can you tell if this document was prepared in connection

5    with the suit you just described?

6    A.  Sir, I don't understand Malay language.  You are asking me

7    to say something which I don't understand.  I can see my name

8    is there, my passport number is there, the address 239

9    Tivoli -- actually Tivoli which I don't know, is Tivoli, Tivoli

10   condominium.

11            THE COURT:  Subject to connection, meaning subject to

12   the testimony of the translator, you may ask the witness

13   whether looking at 37-1 helps him in understanding 37-2 and to

14   assume for the sake of the question subject to connection that

15   it is an accurate English translation.

16   BY MR. McNALLY:

17   Q.  Can you turn your attention to the first page of the

18   document that I have handed you which has been identified as

19   37-1?  Yes.

20            For the purposes of the record, that is written in

21   English, correct?

22   A.  Yes.

23   Q.  Can you take a look at this document?

24   A.  Yes.

25   Q.  Your name is identified in Paragraph 1 of this document,

CCDJSOU6                          Souratgar - direct

1    correct?

2    A.  Yes.

3    Q.  Can you take a moment to take a look at the English portion

4    of this document --

5    A.  Yes.

6    Q.  -- marked as respondent's 37-1 and tell me if you recognize

7    this?

8              THE COURT:  The question in essence is, looking at

9    37-1 and accepting for the moment, accepting for the moment it

10   is an accurate translation of 37-2, does looking at 37-1, and

11   just accepting it as the truth, as a true translation, does

12   that help you identify 37-2?

13             So take a moment and look at 37-1 and it may help.

14             THE WITNESS:  This is --

15             THE COURT:  Yes, it is.

16             THE WITNESS:  -- this is 37-2?

17             THE COURT:  I will mark it for you because it wasn't

18   marked.  I am going to mark it, okay?

19             So 37-1 begins there and ends on the page marked with

20   an 8 in the lower-right-hand-corner and the words "lawyer

21   Syarie plaintiff," okay, and R 37-2 begins on something that

22   has 3 at the lower corner and ends at a Page 9, and R 37-3 is

23   this last page which is an affidavit of translation.

24             THE WITNESS:  Thank you, sir.

25             THE COURT:  Look at R 37-1, and the question is

1  whether that -- assuming that is an accurate translation, which

2  is what I am asking you to do, to assume it for the moment,

3  does that help you identify 37-2?

4          THE WITNESS:  This is looks like which my lawyer put

5  the application for the custody in Malaysia because the content

6  has the same meaning I did.

7          THE COURT:  Thank you.

8  BY MR. McNALLY:

9  Q.  If you can turn to Page 8 of this document, 37-1, there is

10  a paragraph at the very bottom that says this statement of

11  claim is filed by Tetuan Azaine Fakhrul, Advocates &

12  Solicitors?

13  A.  Mr. --

14  Q.  Who is Mr. Fakhrul?

15  A.  My lawyer.

16  Q.  Did your lawyer, based on your examination of this, prepare

17  this document?

18          THE COURT:  Prepare 37-2?

19          MR. ARENSTEIN:  May I just ask, because I have in

20  front of me and I have only been given the 37, Exhibit R 37,

21  and then I was given a form that is not marked, and on the top

22  it says Form MS 26 Shairiah Court, Civil Procedure Act,

23  Affidavit of Answers.

24          THE COURT:  I don't have anything, I don't have that

25  in front of me.  I don't have anything about it.

CCDJSOU6                          Souratgar - direct

1           MR. McNALLY:  That will come in next.

2           MR. ARENSTEIN:  Is this the only document we are

3      talking about now.

4           THE COURT:  I don't know what "this" is.

5           MR. McNALLY:  R 37 is the only document we are

6      currently talking about.

7           MR. ARENSTEIN:  What is 37-1 as opposed to 37-R?

8           (Off-the-record discussion)

9           MR. ARENSTEIN:  I was given a different document.

10          THE COURT:  I don't think you were given a different

11     document.  I think the court, in the course of the examination,

12     broke the exhibit into three parts, and counsel for the

13     respondent is now going to assist you by conforming it to what

14     the court said.  Am I correct, Ms. Kim?

15          MS. KIM:  Yes.  Thank you.

16          THE COURT:  Thank you.

17          MR. McNALLY:  May I proceed, your Honor?

18          MR. ARENSTEIN:  I have no objection.

19          THE COURT:  Give Mr. Arenstein --

20          MR. ARENSTEIN:  No objection.

21          THE COURT:  You have it now?

22          MR. ARENSTEIN:  I do.  Go ahead.

23          THE COURT:  Fine.

24     BY MR. McNALLY:

25     Q.  You mentioned Mr. Fakhrul?

CCDJSOU6                        Souratgar - direct

1    A.   Who is he, Mr. Kakhrul?

2    Q.   Based on your examination of 37-1 which is in English, can

3    you tell, was this -- was 37-2, which is in Malay, prepared on

4    your behalf in connection with the Malaysia custody suit?

5    A.   Again assume this is a translator of this one when I had

6    because I don't understand this one.

7                THE COURT:  You're to assume that for the moment.

8                THE WITNESS:  I did put the application for the

9    custody in Malaysia, and Mr. Fakhrul was my lawyer and did it.

10               THE COURT:  Looking at 37-1, is that what you

11   understood to be the content of the application that was put in

12   to the Malaysia court?

13               THE WITNESS:  Yes, as far as I read it right now, yes,

14   this is sure I am applying for the custody, yes.

15               MR. McNALLY:  I would like to submit R 37-1 through R

16   37-3 into evidence.

17               MR. ARENSTEIN:  Without objection, exception for the

18   translation being proper.

19               THE COURT:  So 37-1 and 2 are -- well, 37-2 is in

20   evidence, and with regard to the translation, you are going to

21   have to prove that out.  Any cross-examination of

22   Mr. Souratgar, Mr. Arenstein?

23               MR. ARENSTEIN:  Yes, quite a bit.  He is not done yet.

24               THE COURT:  Think he is.

25               MR. McNALLY:  I just have to get in a second

CCDJSOU6                        Souratgar – direct

1    affidavit.

2              THE COURT:  There is another document?

3              MR. McNALLY:  Yes.

4              (Off-the-record discussion)

5              THE COURT:  Mr. Souratgar, anything you say to me must

6    be on the record.  If you want to say it, you have to say so

7    everyone in the courtroom can hear it.  Is there a question you

8    wanted to ask me?

9              THE WITNESS:  What to do with this one?

10             THE COURT:  Just leave it there, okay?

11             (Off-the-record discussion)

12             THE COURT:  Okay.

13   BY MR. McNALLY:

14   Q.  Mr. Souratgar, I have handed you what has been marked for

15   identification as Respondent's 38-1, 38-2 and 38-3.  Now,

16   Respondent's 38-1 begins on the first page.  Respondent's 38-2

17   begins on --

18             THE COURT:  It has in the upper-right-hand copy,

19   "client's copy" and the word B O R A N G M S 26 at the top.  Do

20   you see that, sir?  Do you see this page here?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  That is Respondent's 2.  And the last page

23   is Respondent's 3.  Go ahead with your question, Mr. McNally.

24             MR. McNALLY:  Sure.

25   BY MR. McNALLY:

CCDJSOU6                       Souratgar - direct

1    Q.  Mr. Souratgar, can you take a look at what begins on -- has

2    been marked as R 38-2.

3    A.  Yes.

4    Q.  Do you recognize -- I understand that this document is in

5    Malay, but do you recognize the document?

6    A.  Again I can see my name is there, my passport number is

7    there, Ms. Lee Jen Fair named there, yes.

8    Q.  Do you know what this document was, why this document was

9    prepared?

10   A.  I don't understand the meaning, but I can understand they

11   put "Affidavit" on top.

12   Q.  Why don't you turn to what has been marked as R 38-1 which

13   purports to be the English translation of this document.  Let's

14   assume for the moment the English translation of this document

15   is accurate.

16           THE COURT:  You're going to be asked to assume that.

17   That will be proven up later on, but for the moment assume it

18   is an accurate translation.  Go ahead, next question.

19   BY MR. McNALLY:

20   Q.  Can you take a look at the English version of this

21   document?

22   A.  Yes.

23   Q.  Taking a look at the English version of this document, can

24   you tell what what this document is?

25   A.  They put "affidavit."

CCDJSOU6                          Souratgar - direct

1    Q.  Was it prepared on your behalf in connection with the

2    Malaysia custody suit, assuming the translation is accurate?

3    A.  It must be.  I believe so because there is a Malay language

4    there and I can see on Page 50 my signature is there.  I

5    signed, it should be mine.

6              THE COURT:  All right.  Thank you.

7              MR. McNALLY:  Your Honor, I would like to move R 38-2

8    into evidence.

9              THE COURT:  Any objection?

10             MR. ARENSTEIN:  The same objection, but no objection

11   to it going in with once the translation.

12             THE COURT:  Received subject to the translation.

13             (Respondent's Exhibit 38-2 received in evidence)

14             THE COURT:  Go ahead.  Anything further?

15             (Off-the-record discussion)

16             MR. McNALLY:  Just a couple of questions, your Honor,

17   that relate to this document here.

18   BY MR. McNALLY:

19   Q.  Mr. Souratgar, do you remember putting in issue with the

20   Malaysia custody suit the religious practices of your wife?

21             MR. ARENSTEIN:  Objection.

22             THE COURT:  Overruled.

23   A.  Sorry.  Can you -- your question?

24   Q.  Do you recall putting in issue in the Malaysia custody suit

25   the religious practices of your wife?

CCDJSOU6                              Souratgar - direct

1    A.   Yes.

2    Q.   What did you say?

3    A.   My wife told in her affidavit which I asked him to give up

4    her religion as Islam, which I explained I never forced her to

5    become Muslim, I never forced her to practice Islam, and I give

6    the evidence she is going to the church, she is practicing the

7    Christianity without any of my objection.

8    Q.   But you advised the court that your wife was practicing

9    Christianity and attending church?

10            MR. ARENSTEIN:  Objection.

11            THE COURT:  Doesn't the document speak for itself, Mr.

12   McNally?

13            THE WITNESS:  I just said --

14            THE COURT:  If the document speaks for itself, then it

15   will speak for itself.

16            THE COURT:  Any cross-examination?

17   CROSS EXAMINATION

18   BY MR. ARENSTEIN:

19   Q.   Why did you file this application for joint custody,

20   Mr. Souratgar?

21   A.   I found my wife with my son, actually, in Malaysia on 29

22   June 2011, and I quickly went to the house and then they don't

23   let me to see my son.  I made the police report and I filed,

24   because I advised my lawyer because I am in Malaysia, I have to

25   follow Malaysia, and I put the application for the custody.

CCDJSOU6                          Souratgar - cross

1   Q.  Did your wife leave without your consent?

2   A.  Yes, sir.

3   Q.  And she came to Malaysia with your child?

4   A.  She went to Malaysia with my child in June 2011.

5   Q.  What is the status of this action now?

6   A.  Right now nothing is moving because she came back to, she

7   moved again to Singapore and jurisdiction, their jurisdiction

8   become Singapore and then I got care and control in Singapore.

9   Q.  Did you get an apartment in Malaysia after you found your

10  son with Ms. Lee at her mother's house?

11  A.  I had an apartment in Malaysia.  I had an apartment because

12  we decided to stay in Malaysia.

13  Q.  Did you plan to stay there until the custody suit was

14  decided?

15  A.  Not back in Singapore.

16  Q.  Did you plan to stay in Malaysia until the custody suit was

17  going to be decided in Malaysia?

18  A.  No.

19  Q.  I ask you to look at this document, at Paragraph 52.

20         THE COURT:  I don't know what you're talking about

21  when you say, "this document."

22  BY MR. ARENSTEIN:

23  Q.  I ask you to look at Respondent's 38-1 in evidence, R 38-1

24  that is translated.  It is not in evidence?

25         THE COURT:  Go ahead.

CCDJSOU6                         Souratgar - cross

1   BY MR. ARENSTEIN:

2   Q.  I direct you to Paragraph 52 which states, "My lawyer also

3   advised me that the issue of my residency status in Malaysia

4   should not be in dispute.  This is because according to Islamic

5   law, an Islamic judge should decide on cases for permanent

6   residence and people who visit that place.  This is because the

7   people who visit this place are the same as permanent

8   residents."

9           Is that the statement you made in this affidavit?

10  A.  Yes, as advised by my lawyer.

11          MR. ARENSTEIN:  No further questions.

12          THE COURT:  Any redirect?  No, we are not shifting

13  lawyers.

14          (Off-the-record discussion)

15  REDIRECT EXAMINATION

16  BY MR. McNALLY:

17  Q.  One last question.

18          Mr. Souratgar, in addition, in addition to advising

19  the court in Malaysia that your wife was practicing

20  Christianity, did you ever advise the court in Singapore that

21  your wife --

22          MR. ARENSTEIN:  Objection, your Honor.

23          THE COURT:  Overruled.  Overruled.

24  BY MR. McNALLY:

25  Q.  I'll rephrase it.

CCDJSOU6                          Souratgar – redirect

1              In addition to advising the court in Malaysia that

2     your wife was practicing Christianity, isn't it true you also

3     advised the court in Singapore that your wife was practicing

4     Christianity?

5              MR. ARENSTEIN:  Objection.

6     A.  I don't understand the question.

7              THE COURT:  Overruled.

8     BY MR. McNALLY:

9     Q.  Did you ever advise --

10             MR. ARENSTEIN:  Which court are we talking about, your

11    Honor?

12             MS. LEIDHOLDT:  In Singapore.

13    BY MR. McNALLY:

14    Q.  Did you ever advise any court in Singapore that your wife

15    was practicing Christianity?

16    A.  The court in Singapore we are in is Family Court, nothing

17    to do with Christianity or Muslim.

18    Q.  During any custody proceeding in Singapore court, did you

19    ever advise them that Ms. Lee was practicing Christianity?

20    A.  No.  We are in Family Court.  Family Court is the Muslim

21    and Christian can go, everybody can go.

22             MR. McNALLY:  No further questions.

23             THE COURT:  You may step down, sir.

24             (Witness excused)

25             THE COURT:  Is there anything?  You have a translation

CCDJSOU6

1    witness who will testify?

2              MS. LEIDHOLDT:  Yes.  Not present now, your Honor.

3              THE COURT:  You will have him tomorrow morning?

4              MS. LEIDHOLDT:  Yes, I believe we can.

5              THE COURT:  Who else do you have besides the

6    translation witness?

7              MR. McNALLY:  That is all that we have, your Honor,

8    except I want to make one application for judicial notice.

9              THE COURT:  All right.  Go ahead.

10             MR. McNALLY:  This was something that I had advised

11   the other side about back on Monday, and we recently heard some

12   testimony about alleged abduction of Ms. Lee of the subject

13   child.

14             An issue that we believe goes to grave risk is the

15   potential for criminal consequences that could result to

16   Ms. Lee upon her return from Singapore.  I would like to submit

17   to the court for judicial notice a chapter of the People Code

18   in Singapore that punishes kidnapping.

19             THE COURT:  All right.  So if you want to just

20   identify it to the record or do you want to mark it for

21   identification, or some such thing?  You can hand that up

22   tomorrow morning, okay?

23             MR. McNALLY:  That sounds good, your Honor.

24             THE COURT:  Is there anything else in Respondent's

25   case?

CCDJSOU6

1          MR. McNALLY:  Other than the translator, I don't

2     believe there is.  Nothing else, your Honor.

3          THE COURT:  Thank you.

4          Now, does the petitioner have a rebuttal case?

5          MR. ARENSTEIN:  We do, your Honor.  I have one

6     witness, Roy Lubic.  I have given respondent notice.

7          THE COURT:  Who is this witness?

8          MR. ARENSTEIN:  A psychologist and he was in the

9     courtroom.  He is not here now.

10          THE COURT:  Okay.  We'll pick up tomorrow morning at

11     10:00 o'clock.  I wish you all a very pleasant evening and I

12     hope everybody remains healthy.

13          (Court adjourned until Friday, December 14, 2012, at

14     10:00 o'clock am)

15

16

17

18

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2   Examination of:                                Page

3   YASMEEN HASSAN

4   Direct By Ms. Leidholdt . . . . . . . . . . 879

5   Cross By Mr. Arenstein . . . . . . . . . . . 927

6   Redirect By Ms. Leidholdt . . . . . . . . . 945

7   B.J. CLING

8   Direct By Ms. Leidholdt . . . . . . . . . . 951

9   Cross By Mr. Arenstein . . . . . . . . . . .1040

10  ABDOLLAH NAGHASH SOURATGAR

11  Direct By Mr. McNally . . . . . . . . . . .1059

12  Cross By Mr. Arenstein . . . . . . . . . . .1070

13  Redirect By Mr. McNally . . . . . . . . . .1072

14                     DEFENDANT EXHIBITS

15  Exhibit No.                                Received

16   31, 32, and 33  . . . . . . . . . . . . . 950

17   34   . . . . . . . . . . . . . . . . . . . 957

18   37-2   . . . . . . . . . . . . . . . . . .1060

19   38-2   . . . . . . . . . . . . . . . . . .1069

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300