UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In the Matter of one infant child
ABDOLLAH NAGHASH SOURATGAR,

Petitioner,

v. 12 Civ. 7797 PKC

LEE JEN FAIR,

Respondent.

------------------------------x

December 14, 2012
10:30 a.m.

Before:

HON. P. KEVIN CASTEL,

District Judge

APPEARANCES

ROBERT D. ARENSTEIN,
SANDRA NUNEZ,
Attorneys for plaintiff

PATTON BOGGS LLP
Attorneys for defendant
BY: ANDREW J. McNALLY, Esq.
DORCHEN A. LEIDHOLDT, Esq.
Of counsel

Also Present:
JENNIFER BAUM,
JENNA DiCOSTANZO,
Gardians ad Litem
- and -
JANE KIM, Esq.

(Trial resumes)

(In open court)

THE COURT: Please be seated. Good morning.

Respondent may call her next witness.

MS. LEIDHOLDT: Your Honor, we have no more witnesses to call. Our understanding is that Mr. Arenstein will stipulate to the qualifications of the -- he has waived his objection, pardon me -- to the qualifications of the translator of the documents that were submitted by Mr. Souratgar's attorney in the Malaysia Shairiah court, so we have finished our case.

THE COURT: Let me get this straight now. I didn't understand that the objection was to the qualifications. I thought it was an objection to the absence of a translation coming in in any way permitted by the rules.

Now, if there is a stipulation between the parties that the translation which has been previously submitted as R-37-1 and R-38-1 is a fair and accurate translation, then that disposes of the issue. Is the respondent prepared to stipulate to that?

MR. McNALLY: Yes, your Honor.

THE COURT: Is the petitioner prepared to stipulate?

MR. ARENSTEIN: Yes, your Honor.

THE COURT: So R-37 and R-38 may come in without objection. Is that correct?

MR. ARENSTEIN: Yes, your Honor.

THE COURT: They are received as a translation.

(Respondent's Exhibits R-37 and R-38 received in evidence)

THE COURT: All right. Is there anything further in the respondent's case?

MR. McNALLY: Yes, your Honor, two minor items.

Yesterday we were working with a document that I asked your Honor take judicial notice of. You suggested that I mark it appropriately. I have marked it as R-39. I can submit another copy to the court that has said marking on it.

THE COURT: That is fine. Why don't you do that. That is just for identification?

MR. McNALLY: Correct.

THE COURT: Thank you.

MR. McNALLY: Finally, your Honor, yesterday you had received a parcel from Singapore with the mediation notes. You entrusted it to me and asked I circulate copies of the same to Ms. Baum and Mr. Arenstein.

THE COURT: Yes.

MR. McNALLY: I am happy to report I did that last night, and I have the originals for your Honor.

MR. ARENSTEIN: I would like to thank Mr. McNally for his fast and speedy copying it and getting it to us last night.

THE COURT: Thank you very much.

MS. LEIDHOLDT: Yesterday, your Honor, you directed us to obtain Dr. Cling's notes --

THE COURT: Yes.

MS. LEIDHOLDT: -- and make copy copies of them.

Ms. Kim was able to pick them up early this morning and Ms. Kim is currently making copies of them, and we will shortly have them to Mr. Arenstein.

THE COURT: Do you have any idea on the timing of that?

MS. LEIDHOLDT: There is a terribly long line outside and she is probably in that line, but I believe she has completed the task and is on her way back up.

THE COURT: That is wonderful.

Is there anything further, Mr. McNally?

MR. McNALLY: We rest, your Honor.

THE COURT: Okay. Any rebuttal case?

MR. ARENSTEIN: Your Honor, I have submitted to the court Petitioner's Exhibit GG, which is a case in Singapore talking about the civil contempt and contempt of court regarding the penal code that was submitted by Mr. McNally, and I ask the court to take judicial notice of Petitioner's Exhibit GG which I have handed to both parties and handed to the court.

THE COURT: All right. I will take that under advisement. Throughout the course of this proceeding there have been various materials referenced by the parties or by the

court as to which the parties have been placed on notice, and the court will take under advisement whether to take judicial notice of those materials, noting that there has not been objection to the taking of judicial notice.

MR. ARENSTEIN: This is a case in Singapore, an actual judicial case that was decided by the court.

Anyway, your Honor, the other thing is I would like to move at this point to strike the testimony, the irrelevant testimony of both Ms. Lee Jen Fair and of the psychologist Dr. Cling, pursuant to your Honor's direction to make the motion at this time.

THE COURT: All right. I will take that under advisement. Is there a rebuttal case by petitioner?

MR. ARENSTEIN: We ask that the court take the Judicial Harmony report that was submitted, and based on that report, if the court takes judicial notice of it, since it was submitted to the court and requested by the court, we will dispense with any rebuttal witness.

THE COURT: Well, do you want to have the materials marked as an exhibit in this case?

MR. ARENSTEIN: I would. I would like to make it Court's Exhibit 1 or 2, whatever number.

THE COURT: No. You can make it a petitioner's exhibit.

MR. ARENSTEIN: Then I make it Petitioner's Exhibit

HH.

THE COURT: All right. You are offering it?

MR. ARENSTEIN: Yes, I am, your Honor.

THE COURT: Any objection?

You're offering it into evidence. Is that correct?

MR. ARENSTEIN: Yes, that is correct.

THE COURT: Any objection?

MR. McNALLY: No, your Honor, except I do have a photocopy here if that would be easier.

THE COURT: I will take the photocopy, that will be great. I am marking the original as Petitioner's HH, but the court would appreciate a photocopy if you have an extra. That is received in evidence.

(Petitioner's Exhibit HH received in evidence)

MR. ARENSTEIN: I think he will put a sticker on it.

THE COURT: Okay. So perhaps I misunderstood you, Mr. Arenstein. You're resting and you are not putting in the undertaking, nor are you offering any evidence with regard to the Turkish Airline circumstance. Is that correct?

MR. ARENSTEIN: I believe the undertaking was already submitted, your Honor.

THE COURT: I believe you're mistaken. I don't ask for the undertaking. I don't want the undertaking. I am not an inquiring magistrate here. I am a judge in an adversary system. You are free to offer what you wish to offer or not

offer evidence. That is your prerogative, not mine.

You referred to some sort of a ruling from the court. You're not offering that, either?

MR. ARENSTEIN: That was GG, your Honor. I handed it to you.

THE COURT: GG is the ruling of the Singapore court in this case with regard to the undertaking?

MR. ARENSTEIN: No, no, no. I have that here.

THE COURT: I am not asking for this, Mr. Arenstein, but you've referred to it many times, and I gather your intention was to rest this case without putting it in?

MR. ARENSTEIN: No. I intend to put it in right now as Petitioner's Exhibit HH.

THE CLERK: You have HH already.

MR. ARENSTEIN: Then II.

THE COURT: I have HH, yes, right.

MR. ARENSTEIN: Petitioner's Exhibit II. Everybody has a copy.

(Pause)

THE COURT: I am returning some phones that have been given to my Deputy that have not been received into evidence. I don't know what they are doing here on my Deputy's desk, but I ask that they be taken away.

(Pause)

THE COURT: Again I think at one point I recall in the

course of this hearing I was offered an opportunity to inspect the phones. That is not what I do for a living. I am not an inquiring magistrate here.

If somebody wants to offer evidence to me, they can offer evidence. If somebody wants a physical object received in evidence, we consider the physical object, but I don't just inspect things that are not in evidence.

THE CLERK: Is that offered and received?

MS. NUNEZ: II.

THE COURT: Are you offering now --

MR. ARENSTEIN: That was not accepted into evidence.

THE COURT: What have you offered now? I don't understand. Something marked as II, and what is it, sir?

MR. ARENSTEIN: II is the undertaking and filing and acceptance of the court of the undertaking, your Honor, in Singapore.

THE COURT: You're offering it into evidence?

MR. ARENSTEIN: Yes, I am.

THE COURT: Any objection?

MR. McNALLY: No objection to it coming in, your Honor only insofar as it being characterization of being.

Accepted. It appears to have been filed, according to my reading of the first two pages of the document. I don't know if that constitutes an acceptance or endorsement of the same.

THE COURT: Mr. Arenstein has repeatedly represented to me that this has been accepted, that he has received information that this has been accepted by the court in Singapore, the undertaking has been accepted.

Surely this document will reflect judicial approval of the undertaking and not merely a filing. I have heard Mr. Arenstein make this representation to me on a number of occasions. Mr. Arenstein, this is a judicial approval. I haven't read the exhibit. You are giving me a judicial approval of the undertaking?

MR. ARENSTEIN: I don't know that a judge has signed it, but it says, "Filed and accepted by the Court."

THE COURT: As you can apply for $20 million in attorney's fees in this case, I don't think there is any restriction and the Clerk of Court will accept that for filing, too, correct, in this Court?

MR. ARENSTEIN: I assume so, yes.

THE COURT: But you didn't make that representation that it has been filed with the court in Singapore. You've made the representation to this Court repeatedly in the course of this proceeding that the undertaking was filed and accepted by the court in Singapore.

Did the court in Singapore take any action with regard to your client's undertaking?

MR. ARENSTEIN: My client's counsel informed me that

this document was filed and accepted by the court and is now part of the court's case, and his undertaking is something, from what my counsel tells me in Singapore, which can be enforced by the court.

THE COURT: You made a representation to this Court repeatedly that your client -- in fact, you told me your client had filed it. I think you told me your client had filed it, and then you came back into court and you said, "Your Honor, I have news," in words or substance, thank Goodness we have a record here, but my recollection of it is that, "I wanted to bring you up to date, the court in Singapore has accepted my client's undertaking."

Are you now telling me that the court, the judge in Singapore has taken no action with regard to your client's undertaking?

MR. ARENSTEIN: I was informed by Ms. Gomez, who is counsel for Mr. Souratgar, because I am not a lawyer in Singapore, this is accepted and filed with the court and now can be enforced by the judge.

I don't know whether the judge put a judicial signature on it, but it is part of the court file and it is part of a document which is enforceable, and Mr. Souratgar is responsible to take action pursuant to that order.

THE COURT: Mr. Arenstein, this is a question that goes to candor, your candor with the court. Do you have any

indication that any judge of any court in Singapore has acted upon your client's undertaking --

MR. ARENSTEIN: The only indication --

THE COURT: -- in the record in this proceeding?

MR. ARENSTEIN: In this proceeding, the only indication I got was from Ms. Gomez, your Honor.

THE COURT: That is not part of the record in this proceeding, is it?

MR. ARENSTEIN: No.

THE COURT: In the evidence in this proceeding?

MR. ARENSTEIN: No, other than the document I have and the document that is on top of it because the first document was the document that was taken to the consulate in Singapore here.

THE COURT: And this reflects simply that there was a filing. That's all it reflects?

MR. ARENSTEIN: I was told by Ms. Gomez that it was accepted by the court as an enforceable document. Whether or not the judge signed it or not, I don't see a signature.

THE COURT: There is no evidence before me of that, correct?

MR. ARENSTEIN: That's correct.

THE COURT: I should go on the evidence before me, correct?

MR. ARENSTEIN: That's correct, your Honor. That is

all I have to give you. I have nothing more.

THE COURT: But I get back to what you have represented to this Court, and you have waffled even now and vacillated between the court accepted it for filing, meaning that it is now part of the record in Singapore, and a representation that there has been some form of judicial action taken. You don't disclaim a representation that there's been judicial action on it, right?

You still adhere to that?

MR. ARENSTEIN: I can get a clarification from Ms. Gomez, but what I was told by Ms. Gomez and I mentioned to this Court is that the court has filed and accepted this document as a document which they can enforce. I don't know whether a judge has put his signature on it or not.

THE COURT: We are not talking about signature.

Is it fair to say you have represented to me in this courtroom that a judge in Singapore has acted on your client's undertaking? Is that a Fair characterization of what you told me?

MR. ARENSTEIN: I don't -- if I said that, then I misspoke -- I don't know whether a judge, I don't know whether a judge has acted on it because I'm not in Singapore. All I know is that this is a document that is part of the court record which I assumed the judge is aware of in Singapore.

THE COURT: What is the basis for your assumption?

MR. ARENSTEIN: There is a filing and acceptance by the court of this undertaking.

THE COURT: So you would assume I am aware of anything that is docketed on ECF in this Court, is that a fair equivalent?

MR. ARENSTEIN: It is not the same as ECF in Singapore. I can't tell you how Singapore works, but I believe what is filed in the Singapore court becomes part of the record in Singapore and is acted on. If Mr. Souratgar were to not follow that undertaking, I believe that a judge could find him in contempt of that undertaking.

THE COURT: You don't understand. I am still back on the candor issue. I am back on your candor with me. That is what I am back on, Mr. Arenstein.

What I am trying to find out is could the court have acted on it before it was filed?

MR. ARENSTEIN: The court act?

THE COURT: Could the court do anything or see it before it was filed?

MR. ARENSTEIN: I don't see how a court can act until it is filed, but she said the court accepted.

THE COURT: Now, do you have any evidence of anything happening other than it being filed?

MR. ARENSTEIN: I have evidence that it was accepted by the court. They can reject it. Clerks have rejected --

THE COURT: Where?

MR. ARENSTEIN: I have had things filed on ECF that have been rejected by ECF.

THE COURT: No. Mr. Arenstein, think with me for a minute. I think what you're accepting is a judge can't function on something until it is filed, right?

MR. ARENSTEIN: That's correct.

THE COURT: So if we were talking about this system, the judge couldn't know about your motion until you filed it on the ECF, correct?

MR. ARENSTEIN: That's correct.

THE COURT: We start from the assumption the judge in Singapore could not act on this until it was filed, right?

MR. ARENSTEIN: I agree.

THE COURT: You agree with it. You have evidence it was filed?

MR. ARENSTEIN: I have evidence it was filed and accepted by the clerk.

THE COURT: That is the starting point where a judge could either do something with it or not do something with it the moment it is filed. You have evidence it is filed, right?

MR. ARENSTEIN: That is correct.

THE COURT: Now, where is your evidence that upon filing, the first moment that the court could act on it, that the court has acted on it, because that is what I understand

you told me in the course of this hearing.

MR. ARENSTEIN: I can get you a clarification on the word of "acceptance" in Singapore from Ms. Gomez because Ms. Gomez is the one who represented to me it is accepted by that court is the court acting upon it. I don't know how the Singapore court works because I don't practice in that court.

THE COURT: You adhere to the representation that the Singapore court, upon the filing, then acted upon it? Is that what you continue to represent to this Court?

MR. ARENSTEIN: I am not representing that. I don't know exactly. I am not a Singapore lawyer. I only can take what I am told by a Singapore lawyer, who tells me that the court accepted it and it is part of the court record now and is enforceable by the court. I can get a clarification from a Singapore lawyer, but I don't practice in the Singapore court.

THE COURT: This is the hearing. You're welcome to offer into evidence whatever you want to offer into evidence.

MR. ARENSTEIN: Then I offer into evidence the document marked GG which has -- II, I believe, which is the acceptance and filing by the court and the actual undertaking.

THE COURT: Mr. Arenstein, it is already in evidence.

MR. ARENSTEIN: Then I have nothing further, your Honor.

THE COURT: So I take it then you are not offering -- are you offering any rebuttal witnesses?

MR. ARENSTEIN: No, your Honor.

THE COURT: So you are not offering any evidence to rebut the testimony of the mother with regard to the Turkish Airlines incident, correct?

MR. ARENSTEIN: We haven't received the letter from the Turkish Airlines.

THE COURT: I didn't ask you whether you received the letter.

MR. ARENSTEIN: I can put my client on the stand.

THE COURT: I don't care what you do. I am trying to have a clarification.

MR. ARENSTEIN: Then I will put my client on the stand.

THE COURT: I don't know what you mean by "but then I will." I am asking you a question. I am not telling you what to do, Mr. Arenstein. I want a clear record here.

MR. ARENSTEIN: Your Honor, I am going to put the petitioner on the stand in rebuttal of the mother's testimony on the Turkish Airlines, the limited purpose.

THE COURT: All right. You may take the stand.

Please be seated, sir. Mr. Souratgar, the court reminds you you're still under oath.

THE WITNESS: Yes.

THE COURT: Please be seated.

ABDOLLAH NAGHASH SOURATGAR,

recalled as a witness by the Petitioner,
having been previously duly sworn, testified as follows:

DIRECT EXAMINATION

DIRECT EXAMINATION

BY MR. ARENSTEIN:

Q. Mr. Souratgar, would you tell the court where you were on November 12th, 2012.
A. In the United States, in Kingston.
Q. Who were you with?
A. With my son.
Q. Where were you the entire day?
A. If I can recall, we went for shopping to buy some groceries, something like that, and then we went to the supermarket, and then if I remember, it was a hangover for the mother to visit the son on the 12th, if I am not mistaken, and we stay, we stay together because as far as I remember, I was here. I can't recall exactly what we did on the 12th of November, but I was in the United States, in Kingston.
Q. Did you go to sleep with your son?
A. Yes, of course.
Q. Where were you at 11:00 o'clock on November 12th, 2012, 11:00 pm at night?
A. At home.
Q. What did you do the next morning?
A. Again I remember, as far as I remember, I think I have

to -- at 9:00 o'clock again, if I am not mistaken, is bring my son for 14 Sharon Drive, the place, as far as I remember, that was supposed to be in this way, I can't remember.
Q. You were in Kingston for the entire day and night and morning. Is that correct?
A. Yes. I am living in Kingston. They call it North Front Street.
Q. Were you ever at Kennedy Airport at 11:00 pm on November 12th, 2012?
A. No, no, I never been on that day in the airport.
Q. Did you have any boarding pass or anything to go on a plane? Did you board a plane on that day?
A. No, I never have -- I have my ticket from the Emirates Airlines, which is in my bag right now. I came from the Emirate Airlines. I never have any flight booking more than 23 hours.
MR. ARENSTEIN: No further questions.
THE COURT: Mr. Souratgar, you testified in this courtroom on November 1st. Do you recall it was during the electrical power outage? Do you remember that?
THE WITNESS: Sorry?
THE COURT: Do you remember appearing in a courtroom in this courthouse? Now that I think about it, it was not this courtroom, but there was a courtroom in this courthouse on November the 1st, 2012. Do you recall appearing and testifying

before me in this courthouse during the blackout resulting from the hurricane?

THE WITNESS: Yes, sir.

THE COURT: That was November 1st. Do you remember that date?

THE WITNESS: I think it should be November -- I can't really remember.

THE COURT: From the time of that appearance to today, have you at any time been to Kennedy Airport?

THE WITNESS: One time.

THE COURT: When was that?

THE WITNESS: When Ms. Gomez come, I go and pick them up.

THE COURT: What date was that, approximately?

THE WITNESS: Ms. Gomez came on --

THE COURT: I can offer you a calendar of the month of November.

THE WITNESS: Thank you very much.

I believe it was the 31st November or the 1st of December -- sorry, sorry -- 29 November. I have a booking hotel when they book in the hotel on 39th Street, No. 149, which I went to the airport with Ms. Tammy, picked them up, send them to a hotel.

THE COURT: Do you recall what airlines they came in on?

THE WITNESS: Emirate Airlines.

THE COURT: At any time have you been to Kennedy Airport since that time?

THE WITNESS: No.

THE COURT: Have you traveled, since your first arrival in the United States which was shortly before the hearing that I referenced on November 1, have you at any time traveled outside the United States?

THE WITNESS: No, sir; no, sir.

THE COURT: Have you at any time traveled out of the State of New York?

THE WITNESS: Only to go Kingston and here. There is no other places.

THE COURT: Thank you. You may inquire.

MR. McNALLY: My counsel asked me if we can have a brief recess. We have a calendar that suggests --

THE COURT: You can have a brief recess. We'll take a five-minute recess.

MR. McNALLY: I think we might need a little bit longer than that because she has to retrieve the calendar from her office downtown that reflects when visitation occurred. We don't believe there was a visitation session on November 12th.

THE COURT: If somebody wants to have something faxed to my Chambers, they're welcome to have it faxed to my Chambers and I'll have it brought down here.

MR. McNALLY: We'll make that arrangement, your Honor.

THE COURT: We're in recess.

(Recess)

THE COURT: Please be seated.

THE WITNESS: Thank you.

THE COURT: Any cross-examination?

MR. McNALLY: No, your Honor.

THE COURT: You may step down.

(Witness excused)

THE COURT: Anything further in the rebuttal case of petitioner?

MR. ARENSTEIN: No, your Honor.

THE COURT: Petitioner rests?

MR. ARENSTEIN: Yes, we do.

THE COURT: That concludes the evidentiary phase of this case. I will permit but not require anybody who wishes to say anything further in this case may do so at this time.

What I will require is that counsel remain in the courtroom, and I'm having my Deputy hand to you the Deputy's notes of the exhibits that have been received into evidence. What I am going to direct you to do is to meet and confer and go through the exhibits and have a pile that begins with the exhibits in exhibit order, whether it is 1 through 36 or A through Z that you agree have been received into evidence, and a separate pile of anything that has been marked for

identification or otherwise marked in this case but not received into evidence.

I will require you to meet and confer on that, and I will take the Bench if there is any dispute, we will get the transcript if need be and resolve it. I want to have the exhibits that have been received in evidence assembled by the parties.

Let me ask a question of the guardian ad litem, is there any evidence that the guardian ad litem wishes to offer of any sort?

MS. BAUM: No, your Honor. I've submitted a number of reports and letters, and I would just ask that the court take those into consideration.

THE COURT: Okay. Any objection to my taking the submissions of the guardian ad litem into consideration, Mr. Arenstein?

MR. ARENSTEIN: The only objection I would have is I don't think she can determine whether there is a grave risk of danger. In one of her letters she made a statement that if the evidence shows, she might make a recommendation as to grave risk. I think that is in your Honor's purview to determine grave risk.

The only other thing that I would address the court on is if your Honor is going --

THE COURT: Do you understand what I am asking?

I am asking whether I can take her positions into account, not whether I should agree with her positions. Do you understand the difference? I am asking you, can I take account of the positions of the guardian ad litem, not am I bound by anything the guardian ad litem has said?

Do you understand?

MR. ARENSTEIN: I understand that. The only problem I have with that, this is not a custody case, and usually a guardian ad litem is used in a custody case to advocate a position.

THE COURT: They are usually are. This is not a custody case.

MR. ARENSTEIN: Right. I understand that.

I have a little trouble understanding, your Honor, why the guardian ad litem would take a position in this case on the legal evidence that has been permitted to your Honor.

THE COURT: We are only talking about that which has already been submitted by the guardian ad litem. Do you have an objection to the court considering the submissions that the guardian ad litem has made to this Court?

(Off-the-record discussion)

MR. ARENSTEIN: We have no objection to the report except if it is contained in the report that there could be a XIII (b) or some sort of a violation, that the guardian's opinion would not necessarily be correct in this case because

you are the arbitrator, you are the decider of the fact.

THE COURT: In other words, if I understand you correctly, you have no objection to the court considering what the guardian ad litem has said, but you don't agree with everything the guardian ad litem has said, correct?

MR. ARENSTEIN: That's correct.

THE COURT: All right.

MR. ARENSTEIN: If she takes a conclusion, if she comes to a legal conclusion there is a grave risk of danger, I don't think that that would be proper.

THE COURT: Okay. Thank you.

Does the respondent have any objection to my taking into account the views of the guardian ad litem?

MS. LEIDHOLDT: No, your Honor.

THE COURT: All right. Is there anything the petitioner wishes to say by way of a closing statement or do you want to rely on what you've said and submitted heretofore?

MR. ARENSTEIN: I just say two things.

On the Article XX, I think the evidence -- Article XIII and XIII (b), as your Honor is aware, it has to be under clear and convincing evidence and it has to, on XX, shock the conscience of the court. I don't believe the testimony here has shocked the conscience of the court on Singapore, and on XIII (b) I don't think the grave risk of danger met the standard of clear and convincing evidence.

I think we have made our prima facie case under all 3, 5, 11 and 12 of the Hague Convention where we have shown the habitual residence of the child was Singapore, there was wrongful retention and wrongful removal of the child pursuant to the court orders of Singapore which did not allow Ms. Lee to take the child out of Singapore, and under Abbott and Kroll, the two cases that are seminal in the Supreme Court on the nescient orders, they were violated.

Mr. Souratgar has a right of custody under the Hague Convention, and the fact is that I think we have met our prima facie burden by the preponderance of the evidence on the petition for the return. So I believe we have made our prima facie case and I believe Article XIII (b) and Article XX have not been proven on the standards of this Court, and I ask your Honor to grant our petition to return the child back to Singapore.

THE COURT: All right. Anything the respondents wish to say?

MS. LEIDHOLDT: Your Honor, so I understand, your Honor will not be setting a schedule for a post-trial brief, which we would welcome the opportunity to submit to this Court.

THE COURT: No. I understand that the parties legitimately desire expedition in this case, and the treaty so requires, and you've all been gracious enough to provide me with trial memoranda, so I am giving you the opportunity now if

there is anything you wish to say by way of closing argument or post evidentiary submission, this is your time to do it.

MS. LEIDHOLDT: Your Honor has been very generous in giving us the opportunity to elaborate on our theory of the case throughout the pendency of this case. So I would respectfully submit that respondent has met the burden of proving by clear and convincing evidence that the subject child faces a grave risk of harm should he repatriated to Singapore.

Your Honor, that grave risk is that the petitioner really from the registration of the parties' marriage in January of 2008 until the time that the petitioner fled Singapore, had exerted a pattern of increasing coercive control, domination and abuse that included repeated acts of physical abuse against the respondent, some of which are documented through police reports and medical reports, others are not.

During these incidents of physical abuse, the subject child was exposed to his father's violence against the mother, physical violence against the mother, that the petitioner subjected our client to repeated acts of sexual abuse, that some of which rose to the level of rape, that were degrading and humiliating and extraordinarily debilitating to the respondent, and many of these acts took place in front of the subject child who shared a bedroom with the parties and slept next, immediately next to his mother.

The petitioner subjected our client to psychological battery and directed vial and humiliating epithets to her on a regular basis, to her on a regular basis, frequently shouting at her and constantly criticizing her, criticizing her as a wife and criticizing her parenting of the subject child, and that this psychological battering took place in the presence of the subject child.

I would also submit, your Honor, that the petitioner exerted a scheme, carried out a scheme where he reduced the respondent mother to a condition of dependence on him economically, that this was deliberate and that he carried out his scheme by securing the immigration documentation of the mother and the subject child, keeping this documentation, identity cards, birth certificates, passports in his office safe, which was a powerful tool of control and domination over the petitioner and the subject child.

Your Honor, part of petitioner's scheme was to surreptitiously render our client a citizen of Iran by obtaining without her knowledge a passport in her name and obtaining a passport for the subject child which she did not approve of.

Respondent observed the passport petitioner had secured for the subject child. She knows that it exists. She never saw the passport, the Iranian passport that the petitioner obtained for her until the pendency of this case.

She knows this passport exists now. It has her photograph on it. Never did she consent to this passport being made, never has she consented to being a citizen of Iran, never has she subjected the subject child in this case to being a citizen of Iran.

Your Honor, we respectfully submit as part of petitioner's course of conduct, his scheme, he exerted control over the respondent using the legal system, a legal system that sadly in Singapore failed to protect her from the petitioner's violence, that our client went to the police precinct in Singapore reporting violence on six separate occasions. On three of those occasions there were medical reports. At no time did the police in Singapore take any action to protect the respondent mother from petitioner's violence.

Your Honor, I respectfully submit that respondent is remarkable in that she took diligently and took so many steps to protect herself and the child from petitioner's violence once she was able to leave petitioner's residence and actually even before then she initiated a custody case prior to leaving, shortly before leaving.

After she initiated that case, petitioner cross-filed for custody, and when it appears that petitioner was not happy with what was going on at that point in time in the Singapore courts, he initiated his own separate custody case in the courts of Malaysia, in the Shairiah court of Malaysia.

Your Honor, we have, we have submitted documentation that shows in the Shairiah court of Malaysia petitioner submitted documentation in which he stated that our client is a practicing Christian and was taking the subject child to church.

Our expert witness, Ms. Hassan, has testified for a Muslim to practice Christianity in Malaysia is a very severe crime. It is the crime of apostasy. In this respect, your Honor, Mr. Souratgar placed Ms. Lee in grave danger in Malaysia in his effort to secure custody of the child.

All of this, your Honor, places the subject child at grave risk of harm. There is evidence before this Court that Mr. Souratgar told, informed two individuals of his scheme to take the respondent to Iran with the subject child where he would have control over her and he would continue his punishing behavior of her.

He informed Ms. Lee of this scheme, and most importantly, he informed her sister, Jen Pink Lee, of this scheme. When he first informed Ms. Jen Pink Lee of his scheme to take the child to Iran, telling her that Ms. Lee, the respondent, is a bad mother and the child should not have a mother like her and she was going to take the child to Iran, Ms. Pink Lee immediately informed her sister, and that's when our client left the petitioner.

Subsequently, the petitioner went to Ms. Pink Lee's

office, I believe the day after the respondent left him and detailed his scheme, that he was going to, that he had reported it to the authorities of Malaysia, which prohibits their citizens from holding dual citizenship, that our client had Iranian citizenship, that this would result in her citizenship being rescinded, that she would then no longer be a Malaysian citizen, that it would put her permanent residence status in Singapore into jeopardy, and she would have no other opportunity to go to any other country other than Iran, they would take the child to Iran, and once she was in Iran, he would have her put in jail in Iran. He detailed this to Jen Pink Lee, your Honor. Just one second, please.

(Pause)

Your Honor, we would submit that our witnesses, our fact witnesses, Jen Fair Lee and Jen Pink Lee and Ms. Chew were credible. Our client Ms. Lee's testimony I think you see was detailed and responsive and factually specific and entirely credible, and the testimony of her sister was similarly credible.

In striking contrast, your Honor, we would respectfully submit that Mr. Souratgar's testimony lacked any measure of credibility. It was contradictory, internally contradictory. While he claimed that our client has chased him around with knives and choppers and repeatedly attempted suicide and described her as a histrionic, crazed, homicidal

lunatic, that that evidence is contradicted internally in his testimony and it is contradicted by our client's testimony on the stand. It is contradicted by Dr. Cling's psychological evaluation of our client which is uncontroverted, your Honor.

Your Honor, our expert witness, Dr. Cling, provides the framework for understanding Mr. Souratgar's course of conduct. She has characterized him as someone who was hell-bent on the domination and control and ultimately when she left him, the destruction of our client.

Your Honor, it is very clear in this case that the interests of the mother and the subject child cannot be separated, that our client was the primary caretaker of the subject child, she was an excellent and responsive mother under conditions that would make it very difficult to be a good mother.

Part of Mr. Souratgar's scheme is to deprive Shayan of his mother, to remove her from his life, from the child's life. That would be extraordinarily injurious to this child. Should Shayan be repatriated to Singapore in the custody, care and control of his father, he will be in the custody, care and control of someone who attempted to destroy the child's mother. That is a grave risk of harm.

The idea the Singapore courts are going to protect our client, it is very clear that that is not the case. Ms. Hassan testified that the Shairiah court is not bound by any rulings

of the Family Court in Singapore, so assuming the Family Court takes protective steps, the Shairiah court will not be bound by that, and that the Shairiah court will have jurisdiction over the custody case any time either party initiates a divorce. It can be Mr. Souratgar or it can be Ms. Lee.

Obviously, it would be appropriate for there to be a divorce in this particular case. If your Honor reads the supervised visitation report, your Honor will note that Mr. Souratgar represents he is living in Malaysia, that he is becoming a citizen of Malaysia, he is residing in Malaysia.

At any time Mr. Souratgar can bring a custody action in Malaysia, and that custody action will be in the Shairiah court in Malaysia, and Mr. Souratgar has already told the court in Malaysia our client is a practicing Christian who is taking the child to church. Ms. Hassan made it clear what the consequences of that will be of a Shairiah court in Malaysia and that it is very clear that Mr. Souratgar has secured an Iranian passport for our client and for the subject child. We have seen a copy of that passport.

How easy would it be to take the child to Iran where he runs a business? How easy it would be to let his brother in Singapore run the Singapore end of the business? He made representations repeatedly to both Ms. Lee and her sister that he wants to take the child to Iran, the child will have a better life in Iran, he is intent on taking the child to Iran.

Your Honor, if the child goes to Iran, the child no longer has a mother. What a grave risk of harm to that child!

Your Honor, we submit that Article XX also applies in this particular case, that Singapore has grievously failed to protect the human rights of this mother and child whose interests are interconnected and inseparable. She sought police action and police protection and protection from the criminal justice system over and over again in Singapore but was denied it.

She went to Family Court to get an order of protection and did not succeed in doing that not because there wasn't a very well documented history of domestic violence, and ultimately in Singapore she finds herself in the Shairiah court, the only place that she could obtain a divorce because she is Muslim.

As Ms. Hassan made very clear, that court where the substantive law comes from the Koran fails to protect the due process rights, the rights to equal protection and the human rights of women in that court system.

So, your Honor, we would submit that we have met our burden of establishing by clear and convincing evidence that if the subject child is repatriated to Singapore, there is a grave risk of harm to that child and that Singapore has failed to provide protection, fundamental fairness and protection of the human rights of both the mother and the child.

Thank you.

THE COURT: Thank you, Ms. Leidholdt.

Anything further from anyone? I will take up the visitation issue in a moment. Anything further on the merits of the hearing?

MS. BAUM: May I be heard?

I do urge the court to deny the petition. No matter what position the court takes ultimately, the child is going to be deprived of one of his parents.

I think the evidence showed that the petitioner engaged in a remarkably sophisticated plan to defraud the governments of Singapore, Malaysia and Iran into coercing a change of citizenship for the child and his mother, and I think that if the child is returned, the evidence shows that the child will be separated from his mother.

For the reasons already stated by the respondent, that would definitely present a grave risk to the child, and I think the party responsible for the separation of the child from either parent is the petitioner, by engaging in a scheme to defraud the child of his citizenship. For that reason, I urge the court to deny the petition.

THE COURT: Thank you. Anything further from the petitioner?

MR. ARENSTEIN: One second.

(Off-the-record discussion)

MR. ARENSTEIN: Your Honor, first of all, I would object to the guardian making a conclusion of grave risk of danger, which I did earlier.

Secondly, if all the things were true, even if they were true, I don't think that this has gone to the level of clear and convincing evidence.

In addition, Mr. Souratgar, who has been through this whole trial here, he has not gone to Iran, not done anything to violate a court order. We have had a violation of court orders by Ms. Lee Jen Fair, who apparently decides she can take the law into her own hands, the laws of Singapore which is a signatory to this. I assume, I haven't seen, but I did see a letter the U.S. Attorney or the State Department was going to weigh in on that on this date, December the 14th at least. That was the letter or copy I got.

This is not a custody case. What I just heard from the guardian is custody. Under the Hague Convention, under Article XVI, there isn't supposed to be any custody. Article XIX, you are not supposed to rule on the merits of custody. What the guardian has done has basically ruled on custody, and the fact is I think that is not proper under the Hague Convention.

This is not a custody case. This is where the child lived all his life in Singapore. He has never lived in the United States until Ms. Lee Jen Fair, against the law, against

an order of the court, took the child to different places, violated four different orders, four times she has violated the orders, and now we come here and the guardian says very grave risk of danger.

Well, I am concerned about Mrs. Lee Jen Fair's taking of the child and what she has done with this child, four times abducting the child from one place to another where my client has to expend resources to be able to find that child and hide the child out.

I don't believe there is any grave risk of danger. I think the Article XIII (b) and Article XX should be denied. By that expedition, you will be rewarding the respondent for her blatant conduct in disregard of the law your Honor.

Thank you.

THE COURT: Thank you all very much. The hearing is concluded. I'll get an order up on the visitation issue on ECF momentarily.

MR. ARENSTEIN: May I address the visitation issue.

We have had four abductions that were testified to in this Court, even admitted to by Ms. Lee Jen Fair. We have had to have security to watch the respondent so that she doesn't remove the child. The grandmother who is the person who basically engineered the removal of the child from one place to another is still here with the mother.

We have no objection to the mother visiting with the

child, but I had asked the guardian to take some responsibility when the mother was seeing the child. The guardian refused to take any responsibility whatsoever to safeguard that the child would not be abducted.

My client has gone nowhere with the child but here and he has had the child here pursuant to your Honor's order. We have had four abductions by Mrs. Lee Jen Fair. We have had no guarantee, no way to prevent her from re-abducting the child to someplace else.

If she is able to re-abduct this child outside of the jurisdiction of this Court, under the case of Chavin v. Chavin just argued in the U.S. Supreme Court, we might have a moot case here before your Honor. So I would suggest or respectfully ask the court that if you are going to have visitation, that there be somebody responsible that that child not be re-abducted to someplace else or not be removed in some way so that we at least know. We have spent a fortune, my client has no more money now to spend for security to make sure that Mrs. Lee Jen Fair doesn't further abduct this child.

The guardian has not cooperated with me. I asked her to help us devise a way so that it would be secure. She says your client can pay for it, your client can take care of this, your client can take care of that.

Well, my client doesn't have all the money to do that. I think if there is going to be something with security, maybe

Mrs. Lee Jen Fair should chip in or should be paying some of the costs. We're in this Court to date because Mrs. Lee Jen Fair abducted the child to the United States. It is uncanny that the abductor should have unrestricted powers to take the child anywhere she wants or not be restricted to have the child here without any safeguards at all.

So I ask your Honor if you issue or create an order of visitation, there be some safeguards that the child is not taken out of the jurisdiction of the court.

Thank you, your Honor.

THE COURT: All right. Anyone else wish to be heard?

MR. McNALLY: Yes, your Honor, very briefly.

Obviously, I think that with regards to the temporary arrangement that has been set in place for the care of the child, it is not something that is ideal for our client.

That being said, the threat of flight I think exists. Mr. Arenstein points to our client as bringing up is also very apparent on the other side. We have heard a lot of testimony in this case about the potential for Mr. Souratgar to take the child to Iran. That was his intention, and that still exists.

We have not attempted to impose by circumstance any sort of restrictions on your Honor's order, and we respectfully request that the visitation rights that are set forth in your order are adhered to or if not expanded upon so that our client can enjoy time with her child.

THE COURT: All right. Thank you very much.

We are adjourned, and let me just say in conclusion, it is apparent to me there are a lot of areas where the parties are in sharp disagreement, but the court will observe that it is my belief that both parents, separately and individually, love Shayan. I take that from the evidence and I take that from their actions. It is, indeed, sad that the adults have created a situation where this winds up in the hands of a judge adjudicating a petition under a treaty between the United States and Singapore.

I also wish to express my gratitude to all, including court staff, court reporters, guardian ad litem, counsel team for petitioner and counsel team for the respondent, including associate counsel, legal assistants, attorneys not yet admitted to the Bar, and others who have helped in proceeding with this case and proceeding, as it needs to be, on an expedited basis.

I cannot help that from time to time I express a view on what I see, and I have done so, but that doesn't take away from the fact that I realize that behind the presentations has been a lot of hard work by a lot of people, in some instances by attorneys who are not being compensated for their work, as is the case with Professor Baum and Mr. McNally and perhaps with others, and I thank all of you for your attention to this matter.

I wish you the best for the holidays and I hope for

the wisdom to decide this case correctly, and it will be my endeavor to try and decide this case with the utmost dispatch.

Thank you.

MR. ARENSTEIN: Thank you.

MR. McNALLY: Thank your Honor.

(Court adjourned)

INDEX OF EXAMINATION

Examination of: Page

ABDOLLAH NAGHASH SOURATGAR

Direct . . . . . . . . . . . . . . . . . . . . .17

PLAINTIFF EXHIBITS

Exhibit No. Received

HH . . . . . . . . . . . . . . . . . . . . . . 6

DEFENDANT EXHIBITS

Exhibit No. Received

R-37 and R-38 . . . . . . . . . . . . . . . . . 3